**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**

**CASE NO: 21-CR-175-TJK**

**v.**

**ENRIQUE TARRIO,**

                    **Defendant.**

_____/


### *ENRIQUE TARRIO'S MOTION TO TRANSFER VENUE*
### *AND MEMORANDUM OF LAW*


   **COMES NOW** the Defendant, Enrique Tarrio, by and through his attorneys, pursuant to Rule 21 of the Federal Rules of Criminal Procedure, and the Fifth and Sixth Amendments to the United States Constitution, and respectfully moves for a change of venue to ensure a fair trial by an impartial jury without the significant prejudice that exists in the current jury pool.[1]  Defendant, Enrique Tarrio (hereinafter referred to as "Tarrio" or "Defendant") asks the Court to move his trial outside the District of D.C. to the appropriate alternative venue of Southern District of Florida where he resides, where he was arrested, and where witnesses for the Defense reside.


### PROCEDURAL HISTORY


   On March 7, 2022, a grand jury in the District of Columbia issued an eight count *Second* S*uperseding Indictment*, charging Defendant Enrique Tarrio with Conspiracy to Obstruct an Official Proceeding, in violation of 18 U.S.C §1512(k); Obstruction of an

---

[1] Tarrio brings this motion at this time and before the substantial investment of time and effort in jury selection has been expended. Tarrio requests leave to supplement or amend his motion for change of venue as the trial date approaches and potential jury questionnaires are received.

Official Proceeding and Aiding and Abetting, in violation of 18 USC §1512(c)(2); Obstruction of Law Enforcement During a Civil Disorder and Aiding and Abetting, in violation of 18 USC §231(a)(3); Destruction of Government Property and Aiding and Abetting, in violation of 18 USC §1361; and Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 USC §111(a)(1). All allegations levied against Tarrio hinge on a few transcripts of conversations with other Proud Boys members via electronic means which seemingly form the backbone of the government's case against him. Tarrio was not present during the events of January 6, 2021 Capitol Incident (hereinafter referred to as "J6"). Tarrio was the Chairman and public face of the Proud Boys. On March 7, 2022, Tarrio was taken into custody at his house in Miami, Florida.  On March 8, 2022, Tarrio appeared in the United States District Court for the Southern District of Florida. On March 15, 2022, a detention hearing/removal hearing took place and Tarrio was ordered detained by United States Magistrate Judge Lauren Louis.  Tarrio has been removed to Virginia and awaits trial.

## **MEMORANDUM OF LAW**

The Sixth Amendment to the United States Constitution grants criminal defendants the right to a fair trial by an impartial jury.  *Duncan v. Louisiana*, 391 U.S. 145 (1968).  "The great value of a trial by jury certainly consists in its fairness and impartiality."*United States v. Burr,* 25 F. Cas. 49, 51 (CC Va. 1807). An impartial jury is required under the Constitution and has been required since the times of common law. *Id.; see also Patton v. Yount, 467 U.S. 1025 (1984).*

A criminal trial ordinarily should take place in the district where the offense was committed.  *U.S. Const. amend. VI; Fed. R. Crim. P. 18.*  If "extraordinary local prejudice" will prevent the defendant from obtaining a fair trial in the district of the

2

offense, then due process requires transferring the trial to another appropriate alternative venue.  *Skilling v. United States*, 130 S. Ct. 2896 (2010).   For these situations, the Federal Rules of Criminal Procedure have long provided a mechanism to enable a defendant to seek a change of venue.   Enter the Federal Rule of Criminal Procedure Rule 21, which allows a defendant to initiate a motion, dependent upon the court's discretion, for transfer of a criminal case for trial in another district, if (a) the atmosphere is so prejudicial the defendant cannot obtain a fair and impartial trial within the district in which the action is brought or (b) for the convenience of the parties and witnesses, if in the interest of justice.  The purpose of the rule is to secure a fair trial to the defendant when circumstances in the district where the action is brought would place an undue risk of unfairness upon the defendant if tried within that district. *Sheppard v. Maxwell*, 384 U.S. 333 (1965).

I.    FRCP RULE 21 (A) PROVIDES THAT THE COURT **MUST** TRANSFER THE PROCEEDING AGAINST TARRIO TO ANOTHER DISTRICT BECAUSE THE PREJUDICE AGAINST TARRIO IS SO GREAT IN THE TRANSFERRING DISTRICT THAT THE TARRIO CANNOT OBTAIN A FAIR AND IMPARTIAL TRIAL THERE.

Federal Rule of Criminal Procedure 21 (a) states, in pertinent part, that upon a defendant's motion, the court ***must*** transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there. The defendant carries a substantial burden in establishing that pretrial prejudice is "so great" that continuances, gag orders, voir dire, and other safeguards are insufficient to preserve the right to a fair trial. See *United States v. Ayala*, 64 F. Supp. 3d 446, 450 (E.D.N.Y. 2014). Although cases granting motions to transfer under Rule 21(a)

are extremely rare, the circumstances mandating the transfer in this case are unprecedented and require such a result.  The courts have recognized two types of prejudice that support a motion to transfer venue: *presumed prejudice* and *actual prejudice*.  *Hayes v. Ayers*, 632 F.3d 500, 508 (9th Cir. 2011) (quoting *United States v. Sherwood*, 98 F.3d 402, 410 (9th Cir. 1996)).  Presumed prejudice refers to the conditions that exist before trial in the district in question; the court will typically consider in this regard whether there was a barrage of inflammatory publicity, whether news accounts were factual or opinionated, whether those accounts included material that would not be admissible, the size of the overall jury pool, and the availability of judicial tools to mitigate the prejudicial effect of pretrial publicity. Prejudice may be presumed "when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime."  *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir. 1988).  Prejudice should be presumed in only extreme cases.  *Harris*, 885 F.2d at 1361 (presumed prejudice is "rarely applicable" and "reserved for an extreme situation").

Actual prejudice focuses on whether the opinions expressed by particular potential jurors in the course of jury selection demonstrate impermissible bias.  Actual prejudice also occurs when the voir dire did not adequately detect and defuse juror bias.

In Washington, D.C., the presumed prejudice against Tarrio is so great that a fair and impartial trial is impossible.  The D.C. potential jury pool has been tainted without cure in a singular way that is unparalleled in legal history.  In D.C., the media coverage of the J6 events and the effects thereof saturate the public with prejudicial and inflammatory publicity.   This detrimental pretrial publicity has created widespread community prejudice against Tarrio and the Proud Boys.  Specifically,  Tarrio, as the

very public face of the Proud Boys, is situated in a unique position where the prejudice to him is much greater than any other "J6" Defendant.

The inflammatory nature is evident in that Tarrio has been labeled a "white supremacist," a belief largely held throughout D.C., due to the media bias, when in reality Tarrio is a brown skinned Cuban-American.  The potential jury members come from the most politically uniform community in the entire country.   In the 2016 Presidential Election, unlike the rest of the country, where the election results were more competitive,[2] a whopping 94.6% of District of Columbia voters voted against Donald Trump.[3]   Similarly, in the 2016 Presidential Election, 95.9% of District of Columbia voters voted against Donald Trump.[4]  In both of these elections, the Democratic candidate received more than 90% of the vote.[5]  About 33% of D.C. residents work for the government.[6]  There is an absolute lack of political diversity in D.C. that is sui generis in our political system.  While in most criminal cases this unique political landscape would be irrelevant, in this case it cuts to the heart of the characteristics of this community.   This case has a political aspect that cannot be denied.  Politics today are polarized to say the least and therefore this aspect of the transferring districts community is dispositive to the analysis for change of venue.

The Supreme Court has overturned convictions where the district court failed to transfer for venue after prejudicial pretrial publicity. *See e.g. Rideau v. Louisiana,* 373 U.S. 723 (1963); *Estes v. State of Texas,* 381 U.S. 532 (1965); *Sheppard v. Maxwell,*

---

[2] Hall, Madison. "How the 2020 Election Results Compare to 2016, in 9 Maps and Charts." Business Insider, Business Insider, 18 Nov. 2020, https://www.businessinsider.com/2016-2020-electoral-maps-exit-polls-compared-2020-11#the-electoral-vote-count-from-2016-to-2020-basically-flipped-1.

[3] 2020 Election Results, DCBOE, https://electionresults.dcboe.org/election_results/2020-General-Election (last visited April 26, 2022).

[4] 2016 Election Results, DCBOE, https://electionresults.dcboe.org/election_results/2016-General-Election (last visited April 26, 2022).

[5] *See Id.*

[6] *District of Columbia,* Urban Institute (2021), https://www.urban.org/policy-centers/cross-center-initiavies/state-37and- local-finance-initiative/projects/state-fiscal-briefs/washington-dc

384 U.S. 333 (1966). The Supreme Court has also reversed convictions where there was a "huge…wave of public passion" and where the venire possessed "a belief in [defendant's] guilt." *Irvin v. Dowd,* 366 U.S. 717, 728 (1961)(vacating a conviction and death sentence for the trial court's failure to transfer venue for community publicity); see also *Patton v. Yount*, 467 U.S. 1025 (1984).

## II.   THE SKILLING FACTORS

In the prosecution of Jeffrey Skilling, former chief financial officer of Enron, the defense filed a motion for change of venue based on the localized hostility towards him in Houston and the extensive pretrial publicity that poisoned the potential jury pool.  The Southern District Court of Texas denied Skilling's motion to transfer venue and he was ultimately convicted.  On appeal, the Fifth Circuit held that the volume and negative tone generated by Enron's collapse had indeed created a presumption of juror prejudice, but found the presumption had been rebutted based on the fact that the district court had conducted a thorough jury selection process. The case went up to the Supreme Court.

In *Skilling v. United States,* 561 U.S. 358 (2010), the Supreme Court rejected the Skilling's claims on both presumed and actual prejudice. With regard to presumed prejudice, the court held that even pervasive adverse pretrial publicity does not *inevitably* lead to an unfair trial. There, the court noted that the news stories about Enron and Skilling did not contain any confessions or present the kind of vivid and unforgettable information likely to produce prejudice. The court also noted that four years had elapsed between Enron's bankruptcy and Skilling's trial as well as the size and diversity of the potential jury pool in Houston would not render it impossible to find 12 impartial individuals.

The *Skilling* court laid out a combination of factors to be considered in determining the appropriateness of change of venue. *See Skilling v, United States,* 561 U.S. 358 (2010). The factors in *Skilling* relevant to an analysis of presumed prejudice due to pretrial publicity are: (1) The size and characteristics of the community in which the crime occured; (2) The nature and extent of pretrial publicity; (3) The proximity of time between the publicity and the trial; and (4) Evidence of juror partiality such as when the jury acquits the defendant of some of the alleged crimes.[7]  In *Skilling,* the Supreme Court explained that cases reversed on appeal for failure to change venue had trials that were tainted by an atmosphere "utterly corrupted by press coverage." 561 U.S. at 380.

## III.   ANALYSIS OF SKILLING FACTORS

### A.  SIZE AND CHARACTERISTICS OF THE COMMUNITY

According to the United States Census Bureau, as of July 2021, Washington D.C. is a relatively small community, with a population of about 670,000.[8]  Of these people, there is an estimated potential jury pool of less than 500,000.[9]  Approximately 93% of voters in D.C. voted against Donald Trump in the 2020 election, rendering it the least diverse political population in the country.[10] In both the 2020 and 2016 elections, the Democratic candidate received more than 90% of the vote. This incredible lack of

---

[7] The fourth factor is not discussed herein as it is only relevant to a finding of Actual Prejudice.  Here, Tarrio has filed this motion before trial and therefore can only rely on an analysis of presumed prejudice..
[8] See https://www.census.gov/quickfacts/DC.
[9] See District of Columbia, The Urban Institute (September 2021), https://www.urban.org/policycenters/cross-center-initiatives/state-and-local-finance-initiative/projects/state-fiscalbriefs/Washington-dc,
[10] See Election Results: The 2020 presidential race, Politico.com (2021); https://www.politico.com/2020-election/results/president (last visited April 26, 2022).

diversity is unique to the jury pool for the District of Columbia. In addition to the national news stories, this jury pool has been bombarded with propaganda and negative publicity on a daily basis by the local media, local politicians, and national politicians that live in the local community.  The negative publicity has programmed the potential D.C. jury pool to believe that an attack was committed by white supremacists intent on insurrection and their violent fanatical actions caused a curfew, a lockdown to be placed, and a military occupation and hold for their protection over a period of months.

Washington D.C. provides a small, uniform pool of people when compared to the size and characteristics of Skilling's "large, diverse pool" of 4.5 million eligible jurors in Houston, the fourth largest city in America. *Skilling,* 561 U.S. at 382.  Venue survey data obtained during the month of January 2022 demonstrated that 73% of D.C. voters who participated in an online survey believe that any individual who was inside the US Capitol on January 6 should be convicted of insurrection - a charge not even the Government has levied.[11]

## B.  NATURE AND EXTENT OF PRETRIAL PUBLICITY

The nature of the media coverage over J6 has been negative, vivid, and unforgettable.  The extent of the negative pretrial publicity is pervasive and perhaps more than any other event in American history.  Every local D.C. and national politician has made negative statements referring to the individuals involved in the January 6 incident as "white supremacists" and "insurrectionists".  D.C. residents have been bombarded with 24 hour coverage of the January 6 incident with constant updates of arrests, criminal charges, and prosecutorial outcomes.

---

[11] Results from John Zogby online survey in the case of United States v. Gabriel Garcia, 1:21-CR-129

Tarrio, as the face and symbol of the Proud Boys, has received the Democratic party's seething hatred, which cannot be contained, mitigated, or controlled.  Tarrio stands for the antithesis of leftist liberal ideology and must be crushed, destroyed, and canceled by the left leaning members of the jury pool of Washington D.C. There cannot be any other verdict in their minds but guilty.  Regardless if the prosecution has met their burden beyond a reasonable doubt, the jury will return a politically favorable verdict of guilty, or the jurors themselves will be shunned and canceled by their Washington D.C. tribe at work, at home, in their social circles, at church and throughout their community.  In this atmosphere of extreme community prejudice and D.C.'s tribal political landscape, a fair trial for Tarrio is impossible.

President Biden referred to Trump supporters involved in the January 6 incident as "a group of thugs, insurrectionists, political extremists, and white supremacists."[12] The D.C. jury pool, already adverse to Trump supporters, has been programmed to believe by their party's political leaders that the January 6 incident was a white supremacist insurrection and a domestic terror attack. This message programming was further magnified by Attorney General Merrick Garland. He stated, "there was a line that connected the January insurrection to the Oklahoma City Bombing and back to the battles of the original Justice Department against the Ku Klux Klan."[13]

The Ku Klux Klan reference is more than mere rhetoric and contributes to the prejudice so great in Tarrio's case as evidenced by the current lawsuit he is defending against where he is sued under the modern version of an 1871 law known as the Ku Klux Klan Act by the D.C. Attorney General Karl A. Racine (D), who has gone as far as conducting a press conference and accusing Tarrio of being part of vigilantes,

---

[12] Remarks by President Biden at Signing of an Executive Order on Racial Equity, The White House (2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/01/26/remarks-by-president-biden-at-signing-of-an-executive-order-on-racial-equity/ (last visited April 26, 2022).
[13] Merrick Garland ties Oklahoma City bombing to Capital riot (yahoo.com)(June 15, 2021).

insurrectionists, masters of a lawless mob who terrorized D.C. residents. It is these terrorized residents represented by Attorney General Racine that make up the jury pool members in this case.  Tarrio is also defending a lawsuit brought by the Metropolitan African Methodist Episcopal Church for trespassing and burning its Black Lives banner. This incident was investigated as a hate crime by the D.C. police. The United States Census Bureau population estimates that 46% of D.C.is African American.[14]

As if the negative publicity was not enough, consider the effect that the National Guard's deployment to Washington D.C. for more than 4 months after the incident. At least 26,000 National Guard troops took over D.C.  There was also a curfew in place as well as road and bridge closures for months. D.C. residents were told over and over again that their punishment was the fault of the January 6 defendants. Every potential juror in the District was negatively impacted by the events of January 6.  Vice President Harris compared it to Pearl Harbor and September 11 when she said, "Certain dates echo throughout history, including dates that instantly remind all who have lived through them – where they were and what they were doing when our democracy came under assault. Dates that occupy not only a place on our calendars, but a place in our collective memory: December 7, 1941, September 11, 2001, and January 6, 2021." [15]

President Biden has also made statements referencing Trump supporters involved in the January 6 incident as "a group of thugs, insurrectionists, political extremists, and white supremacists."[16] While on the House Floor in Washington D.C., Representative Cori Bush called the January 6 incident "a white supremacist

---

[14] https://www.census.gov/quickfacts/DC
[15] Vice President Kamala Harris ' remarks on January 6 anniversary Updated 11:13AM ET, Thu January 6, 2022, https://www.cnn.com/2022/01/06/politics/transcript-kamala-harris-january-6-anniversary-speech/index.html
[16] Remarks by President Biden at Signing of an Executive Order on Racial Equity, The White House (2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/01/26/remarks-by-president-biden-at-signing-of-an-executive-order-on-racial-equity/ (last visited April 26, 2022).

insurrection" and a "domestic terror attack".[17] Within the first week of the incident, Democrats received their marching orders, and 73% of Democrat leaders in Washington referred to the January 6th event as an "insurrection".[18] Adding to the programming, Attorney General Merrick Garland, during his Senate Judiciary Committee on February 22, 2021, described the January 6th incident as "a heinous attack that sought to disrupt a cornerstone of our democracy"  and further elaborated that the individuals involved as "white supremacists … who stormed the Capitol."[19] The Department of Homeland Security declared that government offices were potential targets of violent domestic extremists, who were emboldened by the "recent mob assault on the Capital on January 6th."

*Skilling* emphasized "the kind of vivid, unforgettable information the Court has recognized as particularly likely to produce prejudice," when considering the factor of jury partiality. 561 U.S. at 383. The Capitol incident was, in itself, vivid and unforgettable, placed in the same category as the date that will live in infamy and the deadliest terrorist attack on American soil in U.S. history by Vice President Harris and the imagery replayed countless for the D.C. community.   The media's constant replay of has guaranteed that no one can forget those vivid images and the accompanying rhetoric. Those that control the political narrative are sending a message to all prospective jurors that anything but a guilty verdict will be unacceptable. Nancy Pelosi has made it clear that voting in favor of conviction of "insurrection" is "courage", while

[17] Rep. Cori Bush Calls Trump "White Supremacists-in-Chief", NBC4 Washington, https://www.nbcwashington.com/news/national-international/rep-cori-bush-calls-trump-white-supremacist-inchief/2540892 (last visited April 26, 2022).
[18] Lawmakers of each party used distinct language on social media in days following Jan. 6 rioting at U.S. Capital, Pew Research Center (2021), https://www.pewresearch.org/fact-tank/2021/01/15/how-lawmakers-social-media-activity-changed-in-the-days-after-the-u-s-capital-riot/ft_2021-01-15_socialmediacongress_01/ (last visited April 26, 2022).
[19] Hearing before the U.S. Senate Committee on the Judiciary, Merrick Brian Garland (Nominee for Attorney General), February 22, 2021 (2021), https://judiciary.senate.gov/imo/media/doc/SJC%20Testimony.final.pdf  (last visited April 26, 2022).

voting against conviction is "pathetic".[20] The insular politics of D.C. are a significant risk to a fair trial by an impartial jury in a case that is entirely political, with a defendant in the titular role of the leader of the Proud Boys who has been marred without mercy by the media as a polarizing political figure.

The nature and extent of pretrial publicity has created a bias that cannot be cured by the Court through any other means but a transfer of venue.  Political bias is especially engrained because it has developed over such a long period of time that the negative publicity solidifies the prejudice.  "Bias can infect the cognitive process from beginning to end and anywhere between," and "political commitments are very likely to give rise to bias," according to a Florida State University study on the issue of liberal bias.[21] A 2018 study of 51 experimental studies involving over 18,000 participants examined the prevalence of political bias when it challenged political beliefs of allegiances.[22] The researchers found that people exhibited a bias in favor of their own politics, that they saw information as "more valid and compelling when it confirmed rather than challenged their political affinities."[23]  This is an important consideration in a political case before a jury that has completely adverse views to the defendant, debating political issues, ideologies, and beliefs hostile to the core beliefs of the jurors. Due to heightened political awareness in D.C., as the political capital of our country, D.C. jurors would be statistically more likely to skew their verdict in favor of the more politically correct verdict – a guilty verdict. Jurors would feel shame to even raise the possibility of a not guilty verdict within their D.C. community, regardless of the evidence presented.

---

[20] *See Pelosi Statement on Impeachment Trial of Donald Trump*, Speaker Nancy Pelosi (2021), https://www.speaker.gov/newsroom/21321 (last visited April 26, 2022).
[21] Winegard, Bo and Clark, Cory and Hasty, Connor R. and Baumeister, Rory, Equalitarianism: A Source of Liberal Bias (May 8l, 2018), available at SSRN:https://ssrn.com/abstract=3175680.
[22] Peter H. Ditto et al., At Least Bias is Bipartisan: A Meta-Analytic Comparison of Partisan Bias in Liberals and Conservatives, 14 Perspectives on Psychological Science 273-291 (2018).
[23] *Id.*

For the D.C. community, the conclusion cannot be avoided that this media spectacle, in a very real sense, is Tarrio's trial – where he has been found guilty of insurrection as a white supremacist.  Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.  The combined elements of D.C.'s prejudiced and polarizing politics, the endless negative pretrial publicity, and the proximity of the publicity and the trial, render the District of Columbia a hostile jurisdiction for the trial of Tarrio and the venire so greatly prejudiced that a change of venue is necessary to cure the prejudice.

## C.  THE PROXIMITY OF PUBLICITY TO TRIAL

In *Skilling*, the case went to trial four years after the highly publicized origination of the case.  The instant case is scheduled to go to trial on August 8, 2022, just months after Tarrio's arrest. Tensions remain high and the media's attention on these Capitol incident cases has not relented, as seen by the slew of news stories covering the pretrial proceedings of Tarrio to this day.[24]  Undersigned counsel has been barraged with requests from media outlets and reporters requesting information about the case.

Local media outlets continue to report daily on J6 cases. Recent  sentencing of high-profile J6 defendants, the ongoing civil lawsuits, and the National Guard stories have maintained the J6 rhetoric alive and current in the local discourse at the beauty parlor, barbershop, church, and family gatherings. Indeed, there are almost daily stories about the Congressional investigation into the events of January 6th, revealing new details and the failure of many people who have been subpoenaed by the

---

[24] https://www.wusa9.com/article/news/national/capitol-riots/enrique-tarrio-says-family-will-put-up-their-houses-to-back-1m-bond-proud-boys-ethan-nordean-joe-biggs-dominic-pezzola-donald-trump-capitol-riot/65-668f6fc1-757c-4415-9234-8abbc617de02 (last visited April 26, 2022).

Congressional committee to cooperate. In fact, the closer we get to the mid-term elections in November 2022, the more intense the nature and extent of the publicity will be in this case.  Between the media's concentration on Tarrio, the political response to the Capitol incident and the relentless media coverage of politician's statements made about the J6 defendants leading up to the midterms, this case is the type of exceptional circumstance that warrants a transfer of venue, as the presumption of prejudice in this community is unavoidable and incurable by other means.

IV.   *VOIR DIRE* IS INEFFECTIVE IN WEEDING OUT BIASED JURORS, ESPECIALLY IN CASES OF EMOTIONAL PRETRIAL PUBLICITY

The jury is a cornerstone of the American legal system.[25]  Jurors must remain impartial, valuing their life experiences on one hand and acting as "blank slates" on which litigants paint the case's facts and law on the other.[26]  Pretrial publicity  is an issue that has increased in frequency and effect as technology advances.  Potential jurors have been known to Google the parties, their attorneys and the media coverage in any case.  The courts have historically preferred *voir dire* of potential jurors as a means of curing the prejudice that comes with pretrial publicity, instead of deciding to transfer venue under FRCP Rule 21 as raised "at or before arraignment." *See United States v. Haldeman*, 559 F.2d 31, 60, 63-64 (D.C. Cir. 1976). However, in cases where the extreme nature and extent of negative pretrial publicity that prejudices the potential

---

[25] See JUD. CONF. OF THE U.S., HANDBOOK FOR TRIAL JURORS SERVING IN THE UNITED STATES COURTS 15 (2019) http://www.vaed.uscourts.gov/jury/ jurortrialhandbook.pdf [https://perma.cc/D3JT-UGQX] ("The effectiveness of the democratic system itself is largely measured by the integrity, the intelligence, and the general quality of citizenship of the jurors who serve in our courts.").

[26] Richard Lorren Jolly, The New Impartial Jury Mandate, 117 MICH. L. REV. 713, 715 (2019); see also JUD. CONF. OF THE U.S., supra note 32, at 12 ("The words of Supreme Court Justice Oliver Wendell Holmes from over a century ago apply with equal force to jurors serving in this advanced technological age: 'The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.'" (quoting Patterson v. Colorado, 205 U.S. 454, 462 (1907))).

jury eliminates the possibility of a fair trial, voir dire is incapable of securing an impartial jury.

While there are cases where gag orders, continuances, time, sequestration, thorough *voir dire,* and other safeguards may be sufficient to detect and eliminate juror bias, this is not one of those cases. This case is utterly corrupted by negative press coverage and reinforced on a local level.  In *Skilling*, The 5th Circuit Court of Appeals, which heard the defendant's appeal, partially agreed with the defendant and found a presumption of juror prejudice based on: (a) the negative media coverage; (b) co-defendant's guilty plea; and (c) large number of victims in the greater Houston area. The 5th Circuit, however, did not overrule the trial court because it found that the presumption of jury prejudice had been rebutted by the jury selection process. Specifically, the 5th Circuit held that "the volume and negative tone of media coverage generated by Enron's collapse created a presumption of juror prejudice....however, that presumption is rebuttable, the court examined the *voir dire*, found it 'proper and thorough,' and [that] the District Court had empanelled an impartial jury."  Can proper and thorough voir dire rebut the presumption of jury prejudice in this case?  No. The presumption of jury prejudice in this case is fueled by the worst and most invasive type of negative publicity - emotional.

Studies have shown that voir dire does not weed out biased jurors in cases of emotional pretrial publicity.  *Emotional publicity* is the kind of sensational publicity likely to arouse an emotional response.  Of particular importance is the finding from *On the Effectiveness of Voir Dire in Criminal Cases With Prejudicial Pretrial Publicity: An Empirical Study*, which found that voir dire challenges are insufficient and ineffective at

weeding out biased jurors in cases with prejudicial pretrial publicity.[27]  "The net effect of careful *voir dire* concerning pretrial publicity, therefore, was nil, and the bias created by the publicity survived *voir dire* unscathed."[28]  Furthermore, "emotional publicity" can not be cured, not even through time and continuances.[29] *See Yount*, 467 U.S. at 1031 ("[A]dverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed").

The community prejudice in D.C. is fed daily by the unprecedented amount of political and media commentary on the criminal case and the staggering amount of emotion that charged the 2020 Presidential election.  Nothing about the pretrial publicity and community prejudice in this case are similar in scope or magnitude to any local case in the past. To expect that a careful voir dire, sequestration, of other principles of protection as used in prior D.C. publicity cases would be constitutionally sufficient to preserve the Tarrio's Fifth and Sixth Amendment rights to an impartial jury would be fantasy.

As the *American University Law Review study On the Effectiveness of Voir Dire in Criminal Cases With Prejudicial Pretrial Publicity: An Empirical Study* noted, "jurors awareness and willingness to report bias is imperfect." Moreover liberals are less aware of their personal biases.[30] This matters in jury selection, where counsel and the Court rely, to a large extent, on juror self-reporting. Under these circumstances, a fair trial for Tarrio is simply improbable in light of the community prejudice and highly polarized

---

[27] Kerr, N L, et al. "*On the Effectiveness of Voir Dire in Criminal Cases With Prejudicial Pretrial Publicity: An 64 Empirical Study*", Am. University Law Review, vol. 40, no. 2, 1991, pp. 665–701, https:// www.ojp.gov/library/abstracts/effectiveness-voir-dire-criminal-cases-prejudicial-pretrial-publicity-empirical.
[28] *Id*. at 697.

[29] *Id*. at 675.
[30] *Are Liberals Really More Egalitarian,* Psychology Today (2021), https://www.psychologytoday.com/us/blog/the63anitsocial-psychologist/202102/are-liberals-really-more-egalitarian; Winegard, Bo, et al, *Equalitarianism: A Source of Liberal Bias, supra.*

environment of the Washington D.C. community.  This improbability can be computed. In assessing human behavior, the United States Court of Appeals for the District of Columbia created a mist fitting test: ``We are concerned not simply with probabilities, but with conditional probabilities: if one event occurs, how likely is it another event will occur?" *United States v. Prandy-Binett,* 995 F. 2d 1069, 1070 (D.C. Cir. 1993); *United States v. (Monte) Brown,* 374 F. 3d 1326, 1328 (D.C. Cir. 2004); *see also Skilling,* 130 S. Ct. at 2948 ("[A]s the tide of public enmity rises, so too does the danger that prejudices of the community will infiltrate the jury"). The value of this analysis is to consider the effect of circumstances in the cumulative. *United States v. Prandy-Binett II,* 5 F.3d 558, 559 (D.C. Cir. 1993). This conditional analysis is aptly pertinent to reviewing prospective jurors.  In considering voir dire as a safeguard in combating the community prejudice that exists in this case, we can ask:

- Out of the eligible jury pool, if 95% of D.C. voted against Donald Trump, what portion of these prospective jurors will be able to remain impartial in a case involving a fact pattern of both Donald Trump and Tarrio claiming that Biden lost the election and Trump won the election?

- Of these *remaining* prospective jurors in D.C., how many can remain impartial after seeing nonstop media coverage about the Capitol incident that involved the Proud Boys whose chairman and leader is Tarrio?

- Of these *remaining* prospective jurors in D.C., how many can remain impartial after living through the D.C. lockdown and continuing militant patrol in response to the Capitol incident involving the Proud Boys, without attributing blame to Tarrio?

- Of these *remaining* prospective jurors in D.C., how many can remain impartial after being advised by the federal government that there is a fear of domestic terrorism and that people like Tarrio, or motivated by Tarrio, "could continue to mobilize to incite or commit violence" near their home in D.C.?

- Of these *remaining* prospective jurors in D.C., how many can remain impartial after hearing President Biden accuse Capitol arrestees like Tarrio of being "insurrectionists, political extremists, and white supremacists," and other politicians parroting nearly the same?

- Of these *remaining* prospective jurors in D.C., how many can remain impartial after hearing calls to conviction from the politicians and pundits who control the political ethics narrative of D.C.?

- Of these *remaining* prospective jurors in D.C., how many can remain impartial after seeing numerous stories about Tarrio's support of a "racist president"?

- Of these *remaining* prospective jurors in D.C., how many can remain impartial after seeing numerous stories about Tarrio being an "insurrectionist"?

- Of these *remaining* prospective jurors in D.C., how many can refrain from trying to punish Tarrio for his politics, or for something he is not charged with, such as "insurrection"?

- Of these *remaining* prospective jurors in D.C., how many will disobey "cancel culture" and the social pressure to punish Tarrio for being politically incorrect?

- Of these *remaining* prospective jurors in D.C., how many will have the confidence to raise the conversation of a not guilty verdict in deliberations with juror members who might call them "racist" for even bringing up the discussion?

- Of these *remaining* prospective jurors in D.C., how many can render a not guilty verdict even if it will mean being scrutinized by the public after such a verdict, potentially being called a "racist" or a "traitor" by their community after doing so?

- Of these *remaining* prospective jurors in D.C., how many can render a not guilty verdict in the face of a community seeking retribution for the militarization and unforgettable disruption of their city?

- Of these *remaining* prospective jurors in D.C., how many can render a not guilty verdict if that means letting Tarrio walk free on these charges?

These inquiries can go on and on until we reach a point near absolute zero, but we don't have to go to this extreme absolute. Rule 21(a) only requires a showing of a "great" prejudice against the defendant. This case easily satisfies the showing of great prejudice. "This analysis assumes interdependence." *Prandy-Binett II*, 5 F.3d at 560. Indeed, the D.C. potential jury pool lived through the extraordinary militarization of D.C. in response to the Capitol incident, combined with the obsessive media coverage of the incident, combined with particularized media attention on Tarrio, combined with the devastating political linguistics aimed at characterizing all participants in the Capitol incident as terrorists, combined with malicious inaccuracies about "white supremacy" being attributed to Tarrio, combined with news coverage on the civil lawsuits that Tarrio is defending in D.C., combined with the district's incomparable political opposition to the politics that define the underlying case, and the residents' large federal government

employment statistics —all yield a great prejudice in D.C. against Tarrio that cannot be cured by voir dire, sequestration, or any other method that might otherwise safeguard the defendant's constitutional rights in another case.

Therefore, the totality of the circumstances render the D.C. Circuit's usual practice of deferring a motion for transfer until after *voir dire* insufficient to protect Tarrio's constitutional rights.  Instead, it may  result in a false sense of security with a jury panel that is inherently incapable of unbiased adjudication.    Further, the presumptive cost, inconvenience and delay in securing a fair jury in this case is a strong factor weighing in favor of a change of venue. Finally, the appearance of propriety also weighs heavily in favor of transferring the venue for this case.   The only remedy sufficient to cure the prejudicial pretrial publicity and community prejudice against the defendant is to transfer this matter to an appropriate alternative venue.

## V.    APPROPRIATE ALTERNATIVE VENUE

The appropriate alternative venue must provide for a fair trial by an impartial jury. In *United States v. McVeigh,* 918 F. Supp. 1467, 1470 (W.D. Okla. 1996), the prosecution (led by Merrick Garland) did not object to the Defendant's Motion for change of venue, and instead suggested the case be moved to the Northern District of Oklahoma in Tulsa.   The Oklahoma District Court was left to decide whether the appropriate alternative venue should be another district within the state of Oklahoma, as suggested by the prosecution, or if another district would be an appropriate alternative venue.   The Court noted that the media coverage in Oklahoma compared with the national news coverage was staggering in terms of volume and focus.   The Court also noted that with the passage of time, Oklahoma's news coverage remained focused

throughout the state on the aftermath with individual stories of grief, recovery, and community spirit.  This was contrasted to national news coverage that waned over time. The Court ruled that the "emotional burden of the explosion and its consequences" and the community prejudice against the defendants accused of the bombing in Oklahoma City was so great that they could not obtain a fair and impartial trial *in the state* of Oklahoma. *United States v. McVeigh,* 918 F. Supp. 1467, 1470 (W.D. Okla. 1996) ("There is no disagreement among the parties with Judge Alley's concern about a trial in Oklahoma City. The effects of the explosion on that community are so profound and pervasive that no detailed discussion is necessary."). [31]  Unlike the geography of Oklahoma, D.C. and the neighboring jurisdictions are huddled together to form one community. Where while one may work in D.C., they lay their head to rest in Maryland. In fact, D.C. is one of a three-part area that makes up the DMV.  One will often hear local radio hosts refer to events in the DMV, and what they mean is the **D**istrict, **M**aryland and **V**irginia. The DMV encompasses the city of Washington, D.C. plus all of the surrounding suburbs, as many people commute in from Virginia and Maryland to work every day.  Thus, the immediate neighboring jurisdictions cannot provide an appropriate alternative venue.

### A.   SOUTHERN DISTRICT OF FLORIDA

While the Court can consider many alternative venues for this case in a vacuum, the appropriate alternative venue for this case that also takes into account the considerations listed in FRCP Rule 21 (b) is the U.S. Southern District of Florida.  This community is much larger than Washington D.C., has a community of varied political

---

[31] McVeigh's case was transferred to the District of Colorado, where he was ultimately convicted and sentenced to death.

viewpoints and is also a convenient forum since Tarrio resides there, witnesses for the Tarrio's defense also reside in the Southern District of Florida as well as the defense attorneys.

While pretrial publicity was as prevalent in Florida as it was nationwide, it did not compare to the level of political publicity experienced in Washington D.C., nor was the community prejudiced through a curfew, the closure of their streets, or through continuous National Guard presence all blamed on the J6 defendants. Florida residents have not been warned that domestic terrorists are threatening their hometown. Florida is not an insulated and nearly totally homogenous political community. Florida residents are not employed by the federal government in statistically significant rates. The parties are significantly more likely to find an unbiased jury panel in a community where media exposure to the case is more limited and the jury pool more diverse.


**VI.**   FRCP RULE 21 (B) PROVIDES THAT UPON THE DEFENDANT'S MOTION, THE COURT **MAY** TRANSFER THE PROCEEDING, OR ONE OR MORE COUNTS, AGAINST THAT DEFENDANT TO ANOTHER DISTRICT FOR THE CONVENIENCE OF THE PARTIES, ANY VICTIM, AND THE WITNESSES, AND IN THE INTEREST OF JUSTICE.


Federal Rules of Criminal Procedure Rule 21 (B) provides that the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice.

In weighing the convenience of the defendant and the witnesses, transferring venue to the Southern District of Florida is appropriate. In determining whether the Court should grant the Defendant's motion to transfer venue in the interest of justice, the Court should consider not just *Skilling's* presumed prejudice, but also the

appearance of prejudice and the cost and logistical difficulties involved in dealing with prejudice amongst a D.C. jury pool.

While no authority prescribes an exclusive list of factors beyond which a court may not inquire when deciding a Rule 2l(b) transfer motion, the courts have weighed different factors in practice.  Even if the Court finds that the pretrial prejudice doesn't pass the Rule 21(a) threshold, the Court should consider the pretrial prejudice is relevant in the interest of justice.  The presumptive cost, inconvenience and delay in securing a fair jury in this case is a strong factor weighing in favor of a change of venue.

## CONCLUSION

This case is nothing less than historic.  Let no one in history say that this trial was unfair, fixed, or a mere hollow formality. Tarrio has demonstrated that he faces insurmountable prejudice in the District of Columbia, prohibitive of an impartial jury.  He has rightfully invoked his constitutional guarantee to a fair trial by an impartial jury under the Sixth Amendment, and aptly requests a transfer of venue to the Southern District of Florida pursuant to Rule 21(a) and/or (b) of the Federal Rules of Criminal Procedure. Under the *Skilling* analysis, Tarrio has demonstrated presumed prejudice considering the unique size and characteristics of the D.C. community from which the jury pool originates, the nature and extent of the pretrial negative publicity, and the proximity of that publicity to the trial.  Prejudice, or the appearance of prejudice, or the logistical difficulties involved in dealing with prejudice are legitimate factors favoring transfer under Rule 21 (B) in the interest of justice.  The Court should not wait for voir dire to commence before considering a transfer of venue. A case of this magnitude, where the community prejudice is so high, should be transferred now. If the Court waits until voir

dire commences, any postponement of voir dire could potentially reset the case for months.

**WHEREFORE**, Tarrio respectfully moves this District Court grant motion, as detailed above.

Respectfully submitted,

**BY: /s/ Sabino Jauregui, Esq.**
Florida Bar Number 503134
Jauregui Law, P.A.
1014 West 49 Street
Hialeah, Florida 33012
Phone 305-822-2901
FAX 305-822-2902

*/s/ Nayib Hassan*
Florida Bar No. 20949
Attorney for Defendant
LAW OFC.OF NAYIB HASSAN
6175 NW 153 St., Suite 209
Miami Lakes, Florida 33014
Tel. No.: 305.403.7323
Fax No.: 305.403.1522

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was electronically noticed through the CM/ECF system to the US Attorney's Office on this 2nd day of May, 2022 to the following:

Jason McCollough
Luke Jones
Erik Kenerson

**BY: /s/ Sabino Jauregui, Esq.**
Florida Bar Number 503134
Jauregui Law, P.A.
1014 West 49 Street

Hialeah, Florida 33012
Phone 305-822-2901
FAX 305-822-2902