## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Case No.  21-CR-0175-3 (TJK) |
| | * | |
| ZACHARY REHL | * | |

### MOTION TO DISMISS FOR A VIOLATION OF THE
### PRESENTMENT CLAUSE OF THE FIFTH AMENDMENT

Zachary Rehl, by his undersigned counsel, hereby respectfully moves this Honorable Court to dismiss the Indictment.  As more fully set forth below, the basis for this motion is that the Government did not properly instruct the Grand Jury on the elements of the offense.  And that the quotes attributed to Mr. Rehl in the Indictment mischaracterize his words because they are taken out of context and truncated.  Where a prosecutor's legal instructions to the grand jury misstate the applicable law and where the prosecutor introduces inaccurate testimony, the indictment is subject to dismissal if the effect of the errors "substantially influenced the grand jury's decision to indict," or if "there is *grave doubt* that the decision to indict was free from the substantial influence" of such errors. *Bank of Nova Scotia*, 487 U.S. 250, 256 (1988).

Were the Court to determine that it has insufficient information to grant Mr. Rehl's Motion to Dismiss, he respectfully requests that the Court, pursuant to Rule 6(e), Order the Government to produce the Grand Jury minutes so that the Court and Mr. Rehl may review them in support of his motion.

## I.    Factual Background

### A.    The Indictment

The Court is well aware of the charges brought against Mr. Rehl so only a summary is necessary.  The case arises out of the political rally organized by former President Trump and his

supporters on January 6, 2020.  The first act in furtherance of the conspiracy allegedly takes place on December 19, 2020, the date the "Stop the Steal" rally was announced.[1]

In connection with the events at the Capitol on January 6, Mr. Rehl is charged with eight separate offenses, namely: seditious conspiracy; conspiracy to obstruct an official proceeding; obstruction of an official proceeding; conspiracy to prevent an officer from discharging his duties; civil disorder; two counts of destruction of government property; and two counts of assaulting an officer.

Every count is based on the conduct of others.  In particular, every one of the substantive counts is based on allegations that others destroyed property, interfered with officers, or threw bottles at law enforcement.  Mr. Rehl did not do any such thing.  The entirety of the charges against Mr. Rehl is based on a handful of statements commenting on political events that he is alleged to have made.  Under binding Supreme Court and Circuit precedent, Mr. Rehl's statements implicate his rights under the First Amendment.

Mr. Rehl is not alleged to have injured or assaulted anyone or battled law enforcement.  He is not alleged to have destroyed any property or removed any police barricades.  He is not alleged to have interfered with any officer in the discharge of his duties. He is not alleged to have used force in

---

[1]  In pertinent part, the Indictment alleges:

13.  On December 19, 2020, plans were announced for a Stop the Steal protest event in Washington, D.C., on January 6, 2021, to coincide with Congress's Certification of the Electoral College vote.

. . .

29.  On December 19, 2020, shortly after plans for the rally on January 6 were publicly announced, BIGGS sent a private message to TARRIO in which he stated that the Proud Boys "recruit losers who wanna drink." BIGGS suggested, "Let's get radical and get real men."

any fashion.  He did not toss water bottles at anyone.  He did not wrest any police shields from officers.  He did not use a weapon or deploy irritants.  When he allegedly entered the Capitol at 2:53 p.m., the proceedings had been suspended for nearly 40 minutes.  He did not force his way into the building.  He entered at the same time as hundreds or thousands of other Americans, none of whom have been charged with multiple felonies, including seditious conspiracy.

As quoted in the discovery produced by the government, Mr. Rehl and three other members of the Philadelphia Proud Boys made the decision to enter the Capitol Building "as a group."  They wanted to "go in and take a peek."  They were "curious as to what was  going on inside the Capitol Building."  They did not enter the Capitol until after they had learned that the Vice President had left the Capitol.  They did not force their way into the building.  They did not take any action against any law enforcement officer or member of Congress; did not intimidate any one; did not obstruct any proceedings.  No allegation in the Indictment supports any contrary inference.

With respect to the seditious conspiracy count, there is no allegation that Mr.  Rehl or any of the other named defendants brought any weapons or firearms to DC.  In contrast, the seditious conspiracy charges brought against the Oath Keepers included only those persons who are alleged to have brought firearms, including in some instances AR-15s, to a hotel in Northern Virginia allegedly for use as a "quick reaction force,"  *See, e.g., United States v. Rhodes,* No.  22-cr-15 (APM).

### B.    Mr.  Rehl's Statements Did Not Present a Clear and Imminent Danger and Were Presented to the Grand Jury Out of Context

The statements attributed to Mr. Rehl in the Indictment involve the type of speech which is at the heart of the protections afforded by the First Amendment.  None of the statements presented

a clear and present danger as required by *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (state may not forbid speech advocating the use of force or unlawful conduct unless this advocacy is directed to inciting or producing **imminent** lawless action and is likely to incite or produce such action).  More importantly, there is no allegation in the Indictment that Mr. Rehl's statements met the clear and present danger standard.

Of the seven statements quoted, some are purely innocuous as when Mr.  Rehl sent a message that he had arrived in the DC shortly after 9 pm on January 5.[2]  At least one of the alleged statements was posted in November, preceding the alleged conspiracy.  All of the statements are quoted out of context and truncated.  Thus, the statements mischaracterize the meaning of the words attributed to Mr. Rehl.

## II.    The Law

### A.    The First Amendment Requires the Strictest Examination of Evidence

The First Amendment *strictissimi juris* standard was established in *Noto v. United States*, 367 U.S. 290, 299-300 (1961), and elaborated in *NAACP v. Claiborne Hardware*, 458 U.S. 886, 918-19 (1982).[3]  Those cases hold that the First Amendment requires the strictest examination of evidentiary

---

[2]  Third Superseding Indictment at ¶¶ 14 (11/27), 37 (12/29), 42 (12/30), 49 (1/3), 51 (1/4), 58 (1/5), and 61(1/5).

[3]  "[T]here must be "clear proof that a defendant 'specifically intends to accomplish [the aims of the organization] by resort to violence. . . [T]his intent must be judged 'according to the strictest law,' for otherwise there is a danger that one in sympathy with the legitimate aims of such an organization, but not specifically intending to accomplish them by resort to violence, might be punished for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share." *N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. at 919 (cleaned up).

sufficiency to ensure that no defendant is convicted of conspiracy for "agreeing" with co-conspirators on anything but the objective of committing crimes.

As the Seventh Circuit explained in a leading case:

> When the group activity out of which the alleged offense develops can be described as a bifarious undertaking, involving both legal and illegal purposes and conduct, and is within the shadow of the First Amendment, the factual issue as to the alleged criminal intent must be judged *strictissimi juris*. This is necessary to avoid punishing one who participates in such an undertaking and is in sympathy with its legitimate aims, but does not intend to accomplish them by unlawful means. Specially meticulous inquiry into the sufficiency of proof is justified and required because of the real possibility in considering group activity, characteristic of political or social movements, of an unfair imputation of the intent or acts of some participants to all others.

*United States v. Dellinger*, 472 F.2d 340, 392 (7th Cir. 1972) (emphasis added). In *Dellinger*, the "Chicago 7" Anti-Riot Act appeal, the court observed that the doctrine of *strictissimi juris* would preclude finding that any defendant had an unlawful intent if the finding were based solely on the fact that he participated in planning and organizing the activity out of which "riots" arose, or on the mere imputation to him of the plan of any associate that illegal activity occur. *Id*. In such cases the typical approach to criminal liability, particularly where conspiracy is charged, is simply inapplicable. As observed in *United States v. Spock*, 416 F.2d 165, 173 (1st Cir. 1969), "The metastatic rules of ordinary conspiracy are at direct variance with the principle of *strictissmi juris*." Such evidence is, of course, a large part of the case against Mr. Rehl.

> When the alleged agreement is both bifarious and political within the shadow of the First Amendment, we hold that an individual's specific intent to adhere to the illegal portions may be shown in one of three ways: by the individual defendant's prior or subsequent unambiguous statements; by the individual defendant's subsequent commission of the very illegal act contemplated by the agreement; or by the

> individual defendant's subsequent legal act if that act is 'clearly
> undertaken for the specific purpose of rendering effective the
> later illegal activity which is advocated.' *Scales v. United States*, 367 U.S.
> 203, 234 (1961).

*United States v. Spock*, 416 F.2d 165, 173 (1st Cir. 1969)

Because of the pervasive intertwining of constitutionally protected activity with a small dose

of legally prohibited conduct, a much more precise, demanding and particularized analysis of the

evidence as to each defendant is required under the *strictissimi juris* doctrine.   Under that approach,

the statements and conduct of others cannot be proof of a defendant's illegal intent.   *Spock*, 416 F.2d

at 173-74.   A defendant's support or sympathy for those who embrace illegal action is not illegal

advocacy.   Neither is a defendant's knowledge of any illegal aspects of the conspiracy illegal.   As

here, any claim that Mr.  Rehl was aware of the conspiracies charged against the Proud Boys or the

activities of the other defendants does not make him a party to the charged conspiracies. See *id.* 178-

79.  Much more is required to pass muster under the First Amendment.

     **B.**     **The First Amendment Prohibits Punishment of Advocacy Unless Directed to Inciting *Imminent* Lawless Action and Is Likely to Incite Such Action**

> [I]t is of prime importance that no constitutional freedom, least of all
> the guarantees of the Bill of Rights, be defeated by insubstantial
> findings of fact screening reality. . . . And so the right of free speech
> cannot be denied by drawing from a trivial rough incident or a
> moment of animal exuberance the conclusion that otherwise peaceful
> picketing has the taint of force.
> . . .
>
> It is clear that "fighting words" – those that provoke *immediate
> violence* – are not protected by the First Amendment.   Similarly,
> words that create an *immediate* panic are not entitled to constitutional
> protection.   This Court has made clear, however, that mere advocacy
> of the use of force or violence does not remove speech from the
> protection of the First Amendment.   In *Brandenburg v. Ohio*, 395

> U.S. 444, we reversed the conviction of a Ku Klux Klan leader for
> threatening "revengeance" if the "suppression" of the white race
> continued; we relied on "the principle that the constitutional
> guarantees of free speech and free press do not permit a State to
> forbid or proscribe advocacy of the use of force or of law violation
> except where such advocacy is directed to inciting or producing
> imminent lawless action and is likely to incite or produce such action."
> *See Noto v. United States*, 367 U.S. at 297- 298 ("the mere abstract
> teaching ... of the moral propriety or even moral necessity for a resort
> to force and violence, is not the same as preparing a group for violent
> action and steeling it to such action").

*N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982) (emphasis added).

In other filings before this Court, the government has denied that Mr. Rehl's words are protected by the First Amendment. ECF 421 at 15-17. In its argument, the government relied on *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) for the proposition that the the "First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." However, *Mitchell,* which involved application of hate-crime enhancement is consistent with Mr. Rehl's argument. *Mitchell* upheld the rule that speech loses its First Amendment protection when it incites imminent violence and also upheld the application of the strictest standard of evidence, even in the context of imminent harm.

First, in *Mitchell,* the speech incited an imminent, violent crime. Mitchell's words were followed within three seconds by a serious, violent assault. It thus was not protected by the First Amendment because it was *immediately* followed by violent action.[4] Second, *Mitchell* recognized the

---

[4]  *Wisconsin v. Mitchell*, 508 U.S. at 480 (emphasis added):

As the boy walked by, Mitchell said: " 'You all want to fuck somebody up? There goes a white boy; go get him.' " Mitchell *counted to three and pointed in the boy's direction*. The group ran toward the boy, beat him severely, and stole his tennis shoes. The boy was rendered unconscious and remained in a coma for four days.

requirement for strict evidentiary review.

> While "[s]uch testimony is to be *scrutinized with care* to be certain the statements are not expressions of mere lawful and permissible difference of opinion with our own government or quite proper appreciation of the land of birth," we held that "these statements ... clearly were admissible on the question of intent and adherence to the enemy."

*Mitchell*, 508 U.S. at 489-90 (emphasis added).

### C.   The Fifth Amendment Right to Grand Jury

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . .

U.S. Const. amend. V.

The dual roles of the Grand Jury are deeply rooted in our system of justice:

> the Founders thought the grand jury so essential to basic liberties that they provided in the Fifth Amendment that federal prosecution for serious crimes can only be instituted by 'a presentment or indictment of a Grand Jury.' The grand jury's historic functions survive to this day. Its responsibilities continue to include both the determination whether there is probable cause to believe a crime has been committed and the protection of citizens against unfounded criminal prosecutions.

*United States v. Calandra,* 414 U.S. 338, 343 (1974). The grand jury clause of the Fifth Amendment confers the substantial right on defendants that they shall not be tried except on presentment of an indictment. The defendant may be tried only on the charges named in the indictment that the grand jury has approved. *Stirone v. United States*, 361 U.S. 212, 215-16 (1960) (Deprivation of "the right to be tried only on charges presented in an indictment and returned by a grand jury ... is far too serious to be treated ... as harmless error."). The defendant is deprived of his right to have all charges screened by the grand jury "if the deviation in proof ... from the specifics of the indictment affects an

essential element of the offense charged." *United States v. Lemire*, 720 F.2d 1327, 1345 (D.C. Cir.1983).

### D.      Standard for Dismissal

Dismissal of an indictment is appropriate where the court finds that an error before the Grand Jury "substantially influenced the grand jury's decision to indict, or [that] there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S.250, 256 (1988) (quoting *United States v. Mechanik*, 475 U.S. 66, 78 (1986) (cleaned up). "The prejudicial inquiry must focus on whether any violations had an effect on the grand jury's decision to indict." *Bank of Nova Scotia*, 487 U.S. at 263; *United States v. Naegele*, 474 F. Supp.2d 9, 12-13 (D. D.C. 2007) (holding that defendant made factually based showing of particularized need for production and inspection of grand jury materials).   Here, the government committed two instructional errors.   First, it failed to instruct the jury that only speech that poses an imminent danger can be punished.   *See Brandenburg, supra*. Second, it failed to instruct the jury that speech that where speech falls within the shadow of the First Amendment, the alleged criminal intent must be judged *strictissimi juris*.   *See Noto; Dellinger*, *supra*.

### E.      Dismissal is Warranted Where the Grand Jury is Not Properly Charged

Where a "prosecutor's legal instruction to the grand jury seriously misstates the applicable law, the indictment is subject to dismissal if the misstatement casts "grave doubt that the decision to indict was free from the substantial influence" of the erroneous instruction." *United States v. Stevens*, 771 F. Supp. 2d 556, 567 (D. Md. 2011) (dismissing indictment based on instructional error); *see also United States v. Peralta*, 763 F. Supp. 14, 21 (S.D. N.Y. 1991) (dismissing indictment upon

9

finding "that defendants were seriously prejudiced by the cumulative effect of the government's misleading statements of law and its use of inaccurate hearsay testimony").

In dismissing the indictment, the district court in *United States v. Breslin,* 916 F.Supp. 438 (E.D. Penn. 1996) explained the importance of properly instructing the grand jury:

> Perhaps the most disturbing thing occurred when the prosecutor stated that the grand jury did not have to agree with everything in the indictment; only the "critical" parts.
>
> The prosecutor stated:
>
>> In the same way if you return the indictment if it's in the same basic form, it doesn't mean you agree with each and every sentence or each and every line or that you feel there's enough evidence to justify each and every line in the manner and means, it simply means you agree that there was a conspiracy, it was essentially the conspiracy that is laid out in here even if it wasn't every single line. This is more for the benefit of our office in setting forth what our view of the conspiracy is. In terms of what you have to decide as to whether there is probable cause, you don't have to agree with every single line in here. We can talk about that if any of you have any questions. If there is a critical aspect of the conspiracy you disagree with, well, then certainly that's a big difference. But if you simply think, well, I don't remember, I don't think there's evidence here that Credit Swisse was involved, that is not an important point and that's not a point that makes the conspiracy or is a problem with the conspiracy charge.
>
> It is true that a petit jury need only find one act in furtherance of a conspiracy, although they must be in agreement as to the one act. A grand jury, on the other hand, must return an indictment only if they have probable cause to believe that the persons named in the indictment did the things described in the indictment. They may charge that the means are unclear, or that the acts were committed by one or more specified means, but to suggest to a grand jury that the indictment is a vehicle for the U.S. Attorney's Office to organize its

10

thoughts and theory of the case, that the grand jury should only concern itself with important points – not adequately defined by the prosecutor – and not be concerned if there is not evidence to support presumably unimportant points is a perversion of the grand jury process. It is the grand jury that presents the indictment, not the United States Attorney.

Rule 7 of the Federal Rules of Criminal Procedure states that the indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." The offense is charged by the grand jury, not the prosecutor, based on probable cause grounded in evidence, not the thoughts and theories of the U.S. Attorney's Office. Clearly, an indictment cluttered with means and methods that the grand jury had no evidence to support is unacceptable under the rule.

*Breslin*, 916 F. Supp. 438, 445–46 (E.D. Pa. 1996)

The instructional errors in this case thwarted the dual responsibilities of the Grand Jury "to include both the determination whether there is probable cause to believe a crime has been committed and the protection of citizens against unfounded criminal prosecutions." *Calandra,* 414 U.S. at 343.

**F.     Dismissal is Warranted Where Inaccurate Information is Presented to the Grand Jury**

The Indictment attributes only a few statements to Mr.  Rehl.  As shown below, the statements were taken out of context or truncated, making the information conveyed inaccurate.

**Paragraph 14 - Statement posted to social media on November 27, 2020.**

The statement was posted before the conspiracy is alleged to have even begun.[5]  Its timing clearly precludes any finding of imminent danger.  Moreover, the statement was posted in reference to a news article about the reinstatement of the death penalty, clearly a subject of First Amendment

---

[5]  "REHL posted on social media, 'Hopefully the firing squads are for the traitors that are trying to steal the election from the American people.'"  Indictment, Background at ¶ 14.d.

protection.

**Paragraph 37 - Statement About Not Wearing Colors on January 6**.

This is an innocuous statement about not wearing Proud Boys colors that is taken out of context without reference to the conversation of the MOSD members, who were concerned that wearing Proud Boys colors would once again attract the same type of knife attacks that had sent four of their members to the hospital in December, when they had last attended a political rally in DC.[6] *See* MOSD Tr.  96-97.[7]

It is noteworthy, that the Secret Service assessment of the Proud Boys decision not to wear "colors" on January 6 was not viewed as a problem of any kind.  The assessment also reflects that the Proud Boys have participated in "numerous" demonstrations "without arrests."

---

[6] ". . . At different times, NORDEAN, BIGGS, REHL, and Donohoe reiterated that Proud Boys members should avoid wearing Proud Boys colors on January 6, 2021."

[7] After discussions about avoiding another stabbing incident in DC, Mr. Rehl stated:

I'm hearing so much this about what's going on in DC or that's going possibly be going on in DC. Guys, look, you got to understand, we're going without colors. So a lot, a lot of the fears and dynamics that people are thinking about are just complete bullshit and just ramble.

MOSD, 12/30/20 zoom conference, Tr. at 96-97.  MOSD Transcript attached as Ex.  1.

12

12. On 01/06/21, at an unknown time, **Proud Boys (RID)** will host an unnamed demonstration in Washington DC. The purpose of this demonstration is to join the pro-Trump demonstrations. There was no indication of civil disobedience. The group advised they will not wear their traditional black and yellow attire and will dress "incognito." The group self-reported plans to demonstrate in smaller groups throughout DC. Current numbers of planned participants was not indicated, but the group stated they will "turn out in record numbers." **Proud Boys** is of record for numerous demonstrations at the White House and temporarily protected sites. Their demonstrations have concluded without arrests.

FOIA documents obtained by CREW at 4393-94.[8]

**Paragraph 42. - January 6 is going to be a different operation.**[9]

This statement once again is a response to the December 12 incident in the evening after thre rally was over, when four Proud Boys were stabbed. taken out of context. Nearly at the end of the 1 hour and 38 minute MOSD meeting on December 30, 2020, when the group has primarily discussed their desire to avoid a repeat of the December 12 incident when in the evening after the political rally, four Proud Boys were stabbed and sent to the hospital, Mr. Rehl tells the group that they hope to have a different operation. The fuller quote reflects that Mr. Rehl states:

> We're not, we're not going to be doing like a Proud Boy fuckin', you know, *8:00 o'clock at night march and flexing*, flexing our guns and shit. So you guys got to understand that. We're not doing that this time. You know, we're doing a completely different operation."

MOSD Tr. at 96-97. See full transcript at Ex. 1. The reference to the "8:00 o'clock at night march"

---

[8] Citizens for Responsibility and Ethics in Washington ("CREW"), *The Secret Service knew about Jan 6 threat. They dismissed it,* 8/17/22 at https://tinyurl.com/4b5amb2s

[9] "REHL warned prospective members that January 6 was going to be a 'completely different operation' and that the Proud Boys would not be conducting a 'night march and flexing our [arms] and shit.'" Indictment at ¶ 42.

is significant because the stabbing on December 12 took place at approximately 9 p.m.  The statement is not evidence of a plan to do anything illegal on January 6.

**Paragraph 49 - Rally at the Capitol**

This paragraph again leaves an inaccurate impression by truncating Mr.  Rehl's words:

> On January 3, as efforts to plan for January 6 intensified in the MOSD leadership chat, TARRIO stated in the MOSD Leaders Group that he wanted to wait until January 4 to make final plans.  In response, at 7:10 p.m., PERSON-3 posted a voice note to the MOSD Leaders Group in which he stated:
>> I mean the main operating theater should be out in front of the house of representatives. It should be out in front of the Capitol building.  That's where the vote is taking place and all of the objections.  So, we can ignore the rest of these stages and all that shit and plan the operations based around the front entrance to the Capitol building. I strongly recommend you use the national mall and not Pennsylvania avenue though. It's wide-open space, you can see everything coming from all angles.
>
> REHL responded that the Capitol was a "good start."

Indictment at ¶ 49.

After the post by Person-3, Mr. Rehl responds by asking whether Tarrio is still planning to do a speech, the type of activity that takes place at a political rally, not at a seditious conspiracy event as the government argued to the grand jury.



From: 454128414 Captain Trump
Is @NobleLead still doing a speech? Where is that? These are things that are holding up my thought process for the moment. Other than that the captial is a good start
1/3/2021 4:14:21 PM(UTC-8)

Source Info:
e577462c3128fd6117148d47ebb1077cdcd3691e_files_full.zip/private/var/mobile/Containers/Shared/AppGroup/237A30D0-FE61-47D7-84D1-511A2D9881FB/telegram-data/account-8136281 88310846801 3/postbox/db/db_sqlite : 0x30042617 (Size: 873086976 bytes)

Bates #21CR175_00006411.

Moreover, while the government surely tries to paint a rally at the Capitol as an "act in furtherance of the conspiracy", Indictment at 10, it is in fact a "public forum" for First Amendment purposes.

> [C]ourts have long recognized that the Capitol Grounds as a whole meet the definition of a traditional public forum: They have traditionally been open to the public, and their intended use is consistent with public expression. In *Jeannette Rankin Brigade v. Chief of Capitol Police*, a three-judge panel of the United States District Court for the District of Columbia, striking down a statute that forbade " 'parad[ing], stand [ing], or mov[ing] in processions or assemblages' " around the Capitol, concluded that the Grounds are "an area to which access cannot be denied broadly or absolutely." 342 F.Supp. 575, 583–84 (D. D.C.1972) (three-judge panel) (quoting 40 U.S.C. § 193g). The Supreme Court summarily affirmed, making Jeannette Rankin Brigade binding precedent. 409 U.S. 972 (1972). Later, in *Community for Creative Non-Violence v. Kerrigan* ("CCNV"), we observed that "[t]here is no doubt that the Capitol Grounds are a public forum." 865 F.2d 382, 383, 387 (1989) (upholding as "a reasonable time, place or manner restriction" a regulation limiting the length of time during which demonstration "[p]rops and [e]quipment" may remain on the \*42 \*\*392 Grounds). Clearly, therefore, the "Grounds (excluding such places as the Senate and House floors, committee rooms, etc.) have traditionally been open to the public," and "the primary purpose for which the Capitol was designed – legislating" – is entirely consistent "with the existence of all parades, assemblages, or processions which may take place on the grounds." *Jeannette Rankin Brigade*, 342 F.Supp. at 584. Indeed, in *Jeannette Rankin Brigade*, the district court observed that "the fundamental function of a legislature in a democratic society assumes accessibility to [public] opinion."

*Lederman v. United States*, 291 F.3d 36, 41-42 (D.C. Cir. 2002) (sidewalk abutting East steps of Capitol was a public forum for First Amendment purposes).

Thus, with respect to ¶ 49, not only did the government truncate Mr. Rehl's statement, mischaracterizing its meaning.  It alleged to the Grand Jury that talk of protesting at the Capitol is

an act in furtherance of a conspiracy.  It also obviously failed to instruct the Grand Jury that DC

Circuit and Supreme Court precedent recognized that the Capitol grounds up to and including the

sidewalk abutting the steps to the Capitol is a "public forum" for First Amendment purposes.

**Paragraph 51 - Mischaracterizes Mr.  Rehl's comments.**

This paragraph again truncates Mr.  Rehl's post to make it appear as if he is directing others

to delete posts when in fact, he is only explaining how deletions work on telegram.

**Paragraph 58 and 61.  References to Radios Mischaracterize their Purpose**

Again, the government by taking Mr. Rehl's statements out of context, mischaracterize their

meaning turning an innocent statement into an "act in furtherance of the conspiracy."[10]

For example, on December 27, 2020, Mr.  Rehl sent the following message to other Proud

Boys about the value of radios at rallies as a life-saving tool:

> From: 454128414 Captain Trump
> For real, best thing is to invest in is some radios and set up channels
> for your chapters and designate guys to watch over a smaller crowd
> so everyone can stay in touch, they are a lifesaver.  One of our guys
> literally had a heart attack in DC and was saved because we were able
> to contact each other on these, dude wanted to go back to his room
> and we all told his ass he was going to the hospital and he was told by
> the Ors he woulda died if he did that.
> 12/27/2020 1049:35 PM(UTC-8)

---

[10]  The Indictment alleges:

58.     In response to a question from a participant in the New MOSD Leaders
Group, REHL, who traveled to Washington, D.C., on January 5, 2021, stated that he
was bringing multiple radios with him, and that there was a person who was planning
to program the radios later that evening.

61.     At 9:03 p.m., REHL notified NORDEAN, BIGGS, Donohoe and others that
he had arrived in Washington, D.C. Donohoe responded by requesting one of the
radios that REHL had brought.

16

Bates #21CR175_00002092.

### G.   Mr. Rehl Suffered Prejudice

Coupled with the fact that Mr. Rehl did not destroy any property, commit any violence, battle law enforcement, force himself into the Capitol, possess weapons and did not enter the Capitol until more than 40 minutes after the proceedings had been suspended, it is clear that the government's errors in instructing the Grand Jury and its mischaracterization of facts prejudiced Mr. Rehl. There is more than enough evidence for this Honorable Court to find that Mr. Rehl was "seriously prejudiced by the cumulative effect of the government's misleading statements of law and its use of inaccurate hearsay testimony." *Peralta*, 763 F. Supp. at 21.

There should be no doubt that the government's errors either "substantially influenced the grand jury's decision to indict." Or, that "there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S.250, 256 (1988). Accordingly, the Court should dismiss the Indictment against Mr. Rehl.

### H.   Grand Jury Minutes

Were the Court to believe that it lacks sufficient evidence from which to make a finding that the Grand Jury was not properly instructed and that multiple factual errors and mischaracterizations were presented to the Grand Jury, Mr. Rehl respectfully requests that the Court Order the government to produce the Grand Jury minutes for review pursuant to Rule 6(e)(3)(E)(i) and (ii), FED. R. CRIM. P (Court may authorize disclosure of grand jury minutes in "connection with a judicial proceeding" or to a defendant "who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury").

## CONCLUSION

Wherefore, Mr. Rehl respectfully requests that this Honorable Court dismiss the Indictment because the errors that occurred before the Grand Jury "substantially influenced the grand jury's decision to indict" or indicate that "there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." The errors therefore prejudiced Mr. Rehl's Fifth Amendment right to have the Grand Jury determine whether there is probable cause to believe he committed a crime and to be protected against unfounded criminal prosecutions.

Were the Court to find that the underlying facts warranting dismissal have not be adequately developed, Mr. Rehl respectfully requests that this Honorable Court Order the government to disclose the minutes of the Grand Jury proceedings pursuant to Rule 6(e)(3)(E)(i) and (ii), FED. R. CRIM. P.

Respectfully submitted,

/s/ *Carmen D. Hernandez*

**Carmen D. Hernandez**
Bar No. MD03366
7166 Mink Hollow Road
Highland, MD 20777
(240) 472-3391; (301) 854-0076 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this Motion was served on all counsel of record via ECF this 24th day of August, 2022.

/s/ *Carmen D. Hernandez*

**Carmen D. Hernandez**