# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-CR-175 (TJK)** |
| | : | |
| **ETHAN NORDEAN, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## GOVERNMENT'S OPPOSITION TO NORDEAN'S AND TARRIO'S OMNIBUS MOTIONS IN LIMINE TO EXCLUDE PROPOSED GOVERNMENT EXHIBITS

## CONTENTS

BACKGROUND .................................................................................................................... 2

ARGUMENT ......................................................................................................................... 5

  I.    Legal Principles ......................................................................................................... 5

  II.   Evidence of the Defendants' Affiliation with the Proud Boys is Admissible ................. 7

    A.  Rule 404 Does Not Preclude Evidence About the Proud Boys. ..................................... 7

    B.  The First Amendment Does Not Preclude Evidence About the Proud Boys. ................. 11

    C.  Rule 403 Does Not Preclude Evidence About the Proud Boys. .................................... 13

  III.  The Other Evidence Listed in the Government's 404(b) Notice is Admissible............ 13

    A.  December 12 Rally ................................................................................................ 14

    B.  Black Lives Matter ............................................................................................... 16

    C.  Oregon Capitol .................................................................................................... 17

  IV.  The Statements and Documents are Admissible .......................................................... 18

    A.  Telegram Communications ...................................................................................... 18

    B.  Social Media ........................................................................................................ 22

    C.  "1776 Returns " ................................................................................................... 26

  V.   The Government's Video Exhibits are Relevant and Admissible............................... 28

    A.  Videos of Persons Other Than Defendants ............................................................. 28

    B.  Videos Edited by News Media ............................................................................... 30

    C.  Video Montage of United States Capitol Police Footage ........................................... 31

    D.  Congressional Record Montage .............................................................................. 31

    E.  Nordean's "Selfie" Videos ..................................................................................... 32

    F.  Composite Exhibits ............................................................................................... 34

CONCLUSION ..................................................................................................................... 37

## GOVERNMENT'S OPPOSITION TO NORDEAN'S AND TARRIO'S OMNIBUS MOTIONS IN LIMINE TO EXCLUDE PROPOSED GOVERNMENT EXHIBITS

On October 14, 2022, Nordean and Tarrio each filed a motion *in limine* to exclude proposed government exhibits. *See* ECF Nos. 489, 491. As explained in further detail below, those motions should be denied in their entirety.

## BACKGROUND

On July 6, 2022, the Court entered a scheduling order to govern the exchange of information and court filings in the lead-up to the December 12, 2022, trial. ECF 426 ("Scheduling Order"). That order contemplated the government providing a preliminary exhibit and witness list, along with exemplar summary exhibits, on August 19, 2022—nearly four full months prior to trial. *Id.* at 1. The government provided the materials in accordance with the Scheduling Order, leaving ample time for the parties to resolve any concerns about the manner in which the government proposed introducing the evidence at trial. *See* Exhibit 1 (email to defense counsel); Exhibit 2 (partially redacted version of August preliminary exhibit list). Among the materials provided in August 2022 was a preliminary version of many exhibits Nordean now complains about. *See* ECF 489 at 4-5 (bullets 9 and 10); Ex. 2 at 3, 15, 18. The August preliminary exhibit list included several items of physical evidence, along with a number of open-source videos. *Id.* at 1-2, 12-15. As part of the August 19 production, the government provided a draft PowerPoint exhibit summarizing financial transactions tied to Nordean. *Id.* at 17.

Between August 19 and October 1, 2022—the day after the government provided its second preliminary exhibit and witness lists—the government received no substantive engagement from counsel for any defendant regarding the materials it provided in August.[1]

On September 30, 2022, the government provided updated draft witness and exhibit lists. The government also provided, as the Scheduling Order directed, copies of the listed exhibits via an electronic data transfer site. Among the items the government provided were copies of closed-circuit security footage ("CCTV") and body-worn camera ("BWC") videos. Nordean complains that the "U.S. Capitol Police CCTV and Body Worn Camera Video" series of the Exhibit List, ECF 489-1 at 5, 8, lists only one time stamp, but he ignores that many of the BWC and CCTV exhibits that the government provided are in fact the actual clips that the government intends to introduce. For example, item "MPD BWC From MPD Officer Cynthia Rios, 2:52pm" on the September Exhibit List, *id*. at 8, corresponds to a 4-second video clip showing Biggs and other members of the Proud Boys walking through the Capitol around 2:52 p.m., carrying a stolen American flag.[2] The CCTV series contains *only* videos that are clipped to the portion the government intends to introduce. For example, the exhibit list contains an entry for "Camera 686 (3:11 p.m.))" *Id.* at 6. The corresponding video provided on September 30 bearing that file name

---

[1]     Nordean states that on October 9, 2022, he "asked the government to clarify which portions of certain exhibits it intends to introduce at trial." ECF 489 at 3. This was the first substantive communication we received from Nordean's counsel on these issues, and he requested a response by October 10, 2022, when motions were due on October 14.

[2]     Of the eight BWC videos provided by the government as part of the September 30 exchange, six were either already clipped to the final exhibit length or contained both the full-length version and a clipped version intended for introduction.

is 1:46 in length and shows Nordean walking through the Capitol with another member of the Proud Boys.

As part of its production of exhibits pursuant to the Scheduling Order, the government also provided Telegram and other message threads that it intends to use at trial. For those threads that make up the bulk of the evidence underlying the indictment, and which the government has relied upon throughout litigation in this case, the government produced excerpts (or "sub-exhibits") showing the messages it currently intends to introduce at trial.[3] Along with the sub-exhibits, the government also provided full message threads (which are sometimes quite lengthy) to facilitate any discussion or litigation that may arise pursuant to Fed. R. Evid. 106 ("Remainder of or Related Writings or Recorded Statements").

The government also provided, on September 30, 2022, several "composite" video exhibits that contain videos from January 6, 2021. (The Court will recall that, during a status conference in advance of the previous trial date, defense counsel expressed concern about the form such composite exhibits might take.) In addition to the montage videos about which Nordean complains, ECF 489 at 4, bullet 3, the government provided many additional draft composite exhibits that focus on specific time periods from January 6, 2021. *See* ECF 489-1 at 23 (exhibit list category of "Assembled Videos and Photographs"). Those draft composite exhibits include excerpts that the

---

[3]     The government, in creating sub-exhibits, prioritized those chats that have provided the most evidence relied upon by the government so far, providing sub-exhibits for all of the permutations of the Ministry of Self-Defense chats and the Boots on Ground chat. It has not yet provided sub-exhibits for all chats. The September 30 Exhibit list is, of course, still a "preliminary" one pursuant to the scheduling order. The government will therefore continue to refine these sub-exhibits, as well as its exhibit list as a whole and those exhibits provided so far.  Still, those excerpts already provided gave the defense enough information to meet and confer with the government and/or file specific motions *in limine* regarding the chats the government views as most important to its case. The defense chose to do neither.

government intends to use at trial from, among other sources, the open-source videos about which Nordean complains. ECF 489 at 4, bullet 3.  The government also provided the specific videos that it intends to introduce from phones seized from Paul Rae, Nicholas Ochs, Christopher Worrell, Anthony Mariotto, and others. *See id.* at 4, bullet 2. Nordean has raised no arguments about those specific composite exhibits.

On October 14, 2022, Nordean filed his instant motion, arguing, among other things, that the government's productions were too vague to allow him to file motions *in limine*. For the reasons stated below, his motion should be denied.

## ARGUMENT

### I.     Legal Principles

Relevant evidence is admissible, Fed. R. Evid. 402, and evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

Relevant evidence may only be excluded if its "probative value is *substantially* outweighed" by countervailing factors such as "unfair prejudice, confusing the issues or misleading the jury." Fed. R. Evid. 403 (emphasis added). This rule "establishes a high barrier to justify the exclusion of relevant evidence, by requiring that its probative value must be 'substantially' outweighed by considerations such as 'unfair' prejudice." *United States v. Lieu*, 963 F.3d 122, 128 (D.C. Cir. 2020).  "Rule 403 does not bar powerful, or even prejudicial evidence. Instead, the Rule focuses on the danger of *unfair* prejudice, and gives the court discretion to exclude evidence only if that danger *substantially* outweigh[s] the evidence's probative value." *United States v. Pettiford*, 517 F.3d 584, 590 (D.C. Cir. 2008) (emphasis in original) (cleaned up). In this analysis, "it is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the event charged." *United States v. Moore*,

732 F.2d 983, 989 (D.C. Cir. 1984) (quoting *United States v. Da*y, 591 F.2d 861, 878 (D.C. Cir. 1978)) (emphasis in original) (cleaned up); *see also Roberson*, 581 F. Supp. 3d at 76 ("Rule 403 does not countenance exclusion of evidence because it too effectively suggests that the defendant committed the charged crime.").

Federal Rule of Evidence 404(b) provides that evidence of "other crimes, wrongs, or acts" is not admissible to prove a defendant's character, but is admissible for any non-propensity purpose, including motive, intent, plan, knowledge, and absence of mistake. *See United States v. Bowie*, 232 F.3d 923, 926, 930 (D.C. Cir. 2000) (citing Fed. R. Evid. 404(b)). Rule 404(b)(2)(A) requires that the government must, before trial, provide "reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial." Rule 404(b) is a rule of "inclusion rather than exclusion." *Bowie*, 232 F.3d at 929. Specifically, "[a]lthough the first sentence of Rule 404(b) is 'framed restrictively,' the rule itself 'is quite permissive,' prohibiting the admission of 'other crimes' evidence 'in but one circumstance' — for the purpose of proving that a person's actions conformed to his character." *Id.* at 929-30 (quoting *United States v. Crowder,* 141 F.3d 1202, 1206 (D.C. Cir. 1998) (*en banc*)); *accord United States v. Cassell*, 292 F.3d 788, 792 (D.C. Cir. 2002) ("[A]ny purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered *solely* to prove character") (quoting *United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990)) (emphasis in original)).

There is a two-pronged test for determining whether evidence of prior crimes is admissible under Rule 404(b). First, the evidence must be "probative of a material issue other than character." *Miller*, 895 F.2d at 1435 (citation omitted). Second, the evidence is subject to the balancing test of Federal Rule of Evidence 403, which, as discussed, renders it inadmissible only if the prejudicial effect of admitting the evidence "substantially outweighs" its probative value. *Id.*

## II.   <u>Evidence of the Defendants' Affiliation with the Proud Boys is Admissible</u>

Nordean and Tarrio argue that Rules 401, 403, 404, and the First Amendment prohibit the government from introducing evidence of their affiliation with the Proud Boys. *See* ECF 489 at 6-12; ECF 491 at 5. This argument fails: The defendants' affiliation with the Proud Boys is highly relevant to issues including the formation of the conspiracy, the defendants' knowledge and intent, the structure of the conspiracy, and the reason hundreds of men followed the defendants' lead onto Capitol grounds on January 6, 2021. The probative value of the associational evidence vastly outweighs whatever prejudice may attach to the defendants' membership in the group.

The defendants' affiliation with the Proud Boys is not the type of evidence subject to Fed. R. Evid. 404(b). That Rule does not apply to evidence unless the evidence "lack[s] any purpose but proving character." *Bowie*, 232 F.3d at 930. Here, the defendants' relationships with one another by virtue of their membership in the Proud Boys provide critical context for the size, scale, manner, and means of the conspiracy.

### A.   <u>Rule 404 Does Not Preclude Evidence About the Proud Boys.</u>

The Third Superseding Indictment ("TSI") alleges that the charged conspiracy offenses involved manner and means including "[e]ncouraging members of the Proud Boys and others to attend the Stop the Steal protest in Washington, D.C." and "[d]ressing 'incognito' on January 6, rather than wearing Proud Boys colors." TSI, ECF 380 ¶¶ 28.a, 28.d. The charged overt acts in furtherance of the conspiracy likewise show that the Proud Boys' organizational structure, including the special "Ministry of Self-Defense" (MOSD) sub-group, was central to the operation of the conspiracy. Tarrio formed MOSD immediately after the announcement of the "wild" rally on January 6; he and the other leader defendants drew exclusively upon Proud Boys members for its recruits; they used their status as senior Proud Boys leaders to establish a command structure,

and then they used that command structure to assemble their subordinates in Washington, D.C. and bring them to the Capitol.

Throughout the day's events, the defendants showed that they viewed their actions as integrally connected with their status as Proud Boys. Nordean, addressing the crowd, made exhortations like "back the yellow." Biggs, shouting through a megaphone, told them to be "loud and motherfucking Proud Boy proud." The conspirators also frequently flashed the Proud Boys' hand sign, including after critical moments like Pezzola's robbery of the shield and the successful attack on outnumbered officers guarding the steps to the building:

 

Accordingly, under any interpretation of the rules, the defendants' membership in the Proud Boys is non-propensity evidence of the conspiracies charged, and thus not subject to analysis under Rule 404(b). *See McGill*, 801 F.3d at 879; *see also United States v. Mahdi*, 598 F.3d 883, 891 (D.C. Cir. 2010). The Court has already found as much, explaining that Nordean's and Biggs's membership and stature within the group was "relevant to the nature and circumstances of the offense insofar as they show that the defendants were leaders and shared a pre-existing common bond which provides context to explain how these individuals, from disparate parts of the country, are at least alleged to have wound up together in Washington, D.C." on January 6th. ECF 71

(transcript of 4/19/21 ruling on Nordean and Biggs detention, hereinafter "Detention Ruling") at 16.

The defendants' attendance and leadership at past rallies is also relevant to their intent in forming the charged conspiracy and their knowledge of its unlawful aims. Each of the defendants had either been present at or discussed prior rallies where the Proud Boys used violent force in pursuit of an objective. For example, with the exception of Pezzola, they were all participants in the MOSD Leaders Telegram chat, where they ruminated over having abstained from using force against the police in Washington, D.C. in December 2020. The discussion, which immediately followed reports of clashes between police and Proud Boys at a rally in Oregon, took place on January 1, 2021, and is excerpted below:

| Person-2 | Our disposition towards the police needs to be reevaluated |
|---|---|
| Person-3 | Not sure what to do about it thought because it would be an escalation that we would never be able to back away from |
| Person-2 | I see it as an inevitability. |
| Person-3 | Very true. I'm ready for the escalation but i worry about some of our guys. |
| Person-2 | We can/should start adopting black bloc style tactics. Not necessarily all black like Antifa, but we should make an effort to hide our identities when in public |
| Person-3 | We could have ran them the fuck over in DC and they wouldn't have been able to do shit |
| Person-2 | We absolutely could have. |
| … | … |
| **Tarrio** | **I had a plan for it... But someone talked me out of it** |
| Person-2 | Masks, standardized attire, etc. Same thing black bloc does to make individual identification as difficult as possible. |
| Person-3 | Wasn't me. I had 150 pissed off PB that just got maced. It took all i had with [name redacted]'s help to calm them |
| **Biggs** | **Yeah. We could have** |
| Bertino | [Name Redacted] kept telling me to give the order to push through them. Lol |
| Bertino | He was wild. Lol |
| **Biggs** | **I wanna fuck shit up** |
| Bertino | I should go to BLM plaza and stab 4 people and see what happens to me |
| Bertino | Think I would be out on $550 bail in 26 hours? |

| Person-3 | It's coming to it. I mean how much longer are we going to let this shit continue. |
| Bertino | #fucktheblue |
| Person-3 | Agree, they chose their fucking side so let's get this done. |
| **Tarrio** | **Lol I was the one that told him to** |
| **Biggs** | **I'm ready to just be the Zamboni** |
| **Biggs** | **And roll over mother fuckers** |
| Bertino | And I was trying to get him to chill cause I figured you wouldn't want us to do that lo. |

The discussion above shows that that the conspirators refrained from using sufficient force on a prior occasion and regretted that decision. A jury may rightfully draw the inference that the MOSD leadership understood that Tarrio—the undisputed leader of the group—approved of violence in future confrontations with police in Washington, D.C. These facts are not "other crime[s], wrong[s], or act[s]," but are instead directly probative of whether there was an agreement to use force on January 6, a key issue in the case. "[D]irect evidence of a fact in issue will, by definition, always satisfy Rule 404(b)." *Mahdi*, 598 F.3d at 891 (cleaned up, quoting *United States v. Alexander*, 331 F.3d 116, 125-26 & n.13 (D.C. Cir. 2003))).

Indeed, it is precisely because affiliation evidence is so relevant in conspiracy cases that the federal circuits are nearly uniform in allowing the government wide latitude to present it. Nordean cites to some cases in the gang context, but the overwhelming majority of cases regarding gang affiliation do not help him because "[e]vidence of gang affiliation is admissible in cases in which it is relevant to demonstrate the existence of a joint venture or conspiracy and a relationship among its members' and each defendant's knowledge of and participation in the [charged] conspiracy." *United States v. Castillo-Aguirre*, 983 F.3d 927, 936 (7th Cir. 2020); *see also*, *e.g.*, *United States v. Shelledy*, 961 F.3d 1014, 1020-21 (8th Cir. 2020) ("The government may elicit testimony about the defendant's social or gang membership if it is relevant to a disputed issue in the case"); *United States v. Ford*, 761 F.3d 641, 649 (6th Cir. 2014) ("Evidence of gang affiliation

is relevant where it demonstrates the relationship between people and that relationship is an issue in the case, such as in a conspiracy case").[4]

**B.  The First Amendment Does Not Preclude Evidence About the Proud Boys.**

Nor is there a valid First Amendment basis for excluding evidence about the Proud Boys. Nordean's reliance on two sentencing cases in support of his argument here, ECF 489 at 10-11, is unpersuasive. In *Dawson v. Delaware*, 503 U.S. 159 (1992), the Supreme Court concluded that "the Constitution does not erect a per se barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Id.* at 165. In *Dawson*, the state introduced—at the penalty phase of a death-penalty case in Delaware—the defendant's membership in the Aryan Brotherhood prison gang, along with a stipulation stating that the Aryan Brotherhood "refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities." The stipulation was silent on the Delaware chapter. *Id.* at 162. The Court held that the stipulation was inadmissible because, as a factual matter, it was so narrow that it did not relate to any issue at sentencing beyond the defendant's abstract beliefs and did not even illuminate what the Aryan

_____

[4]      The cases cited by Nordean, ECF 489 at 8-9, are not analogous to the facts here. In *United States v. Irvin*, 87 F.3d 860, 864 (7th Cir. 1996), the probative value of gang membership in a non-conspiracy drug case was greatly reduced by the lack of evidence that the gang was engaged in selling drugs. *United States v. Elkins* concerned whether the government had laid the proper foundation to impeach a defense witness for bias a result of the witness' alleged membership in the same gang as the defendant. 70 F.3d 81, 84 (10th Cir. 1995). *United States v. Roark* involved the government presenting two DEA agents who acted as experts on the illegal activities of the Hell's Angels motorcycle gang, the trial court striking that testimony mid-trial after a *Jencks* issue arose, and then instructing the jury to ignore the testimony. 924 F.2d 1426, 1430-34 (8th Cir. 1991). The Court there opined that the government's trial strategy amounted to "guilt[] by association." *Id.* at 1434. By contrast, in this case, the defendants' membership in the Proud Boys is directly relevant to the conspiracy for the reasons stated above.

Brotherhood gang in Delaware believed in any event. *Id.* at 166-67.[5] That is a far cry from this case, where defendants, who were all members of the Proud Boys, associated with other members of that group and conspired with each other, and with other hand-picked member, to prevent the lawful transfer of Presidential power by force. Their associations with one another are relevant to a conspiracy charge for the reasons outlined above.

Nor is *United States v. Lemon*, 723 F.2d 922 (D.C. Cir. 1983), on point. *Lemon* concerned whether a defendant could face a higher sentence as a result of mere membership in a group, not whether affiliation evidence may be relevant in a conspiracy case. *See id.* at 937 ("[W]e discuss finally the first amendment principles that govern the consideration of membership or affiliation with such a group for the purpose of sentencing."). Lemon was not charged with conspiracy, let alone with a conspiracy that involved other members of the Black Hebrews, the group at issue in that case. *See id.* at 924. Putting aside that these defendants are in fact charged in a conspiracy and that the relevant question is whether their pre-existing affiliation with one another is relevant to those charges — not whether that affiliation as such is an aggravating sentencing factor — the government' s evidence meets the test set out in *Lemon*: "there must be sufficiently reliable evidence of the defendant's connection to illegal activity within the [organization]." *Id.* at 941. Here, the indictment alleges the fact that Nordean was involved in a conspiracy within the Proud Boys up to and on January 6. Nordean may dispute that fact, and he is free to argue to the jury that the government's evidence does not prove a conspiracy, but nothing in the First Amendment prevents the government from presenting that evidence to the jury.

---

[5] The Supreme Court went so far as to say that *Dawson* would have been a much different case, had the government presented evidence in accord with its pretrial proffer—that the Aryan Brotherhood "is a white racist prison gang that is associated with drugs and violent escape attempts at prisons, and that advocates the murder of fellow inmates." *Id.* at 165.

### C.  Rule 403 Does Not Preclude Evidence About the Proud Boys.

Nordean makes no attempt to explain how the probative value of the defendants' affiliation in and position within the Proud Boys is "grossly outweighed by the dangers of unfair prejudice, confusing the issues, and misleading the jury." ECF 489 at 12. He instead relies on several news articles that he claims show that the Proud Boys are "one of the most reviled" groups in the country. *Id.* at 9-10, 12. But screening out jurors who may harbor unduly prejudicial biases against the Proud Boys is one of the functions of *voir dire*, and the amount of negative press the Proud Boys may or may not have received should not influence the Court's relevance decision.[6] Whatever infamy the Proud Boys may have, it pales in comparison to the types of gang-affiliation evidence Courts have upheld, especially in conspiracy cases. *See United States v. Machado-Erazo*, 47 F.4th 721, 729-30 (D.C. Cir. 2022) (MS-13); *United States v. Castillo-Aguirre*, 983 F.3d 927, 936 (7th Cir. 2020) (Sinaloa Cartel); *United States v. Ford*, 761 F.3d 641, 648-50 & n.5 (6th Cir. 2014) ("Vice Lords" gang involving former members of the "Bloods").

### III.    The Other Evidence Listed in the Government's 404(b) Notice is Admissible

Nordean moves to preclude categories of evidence identified in the government's 404(b) notice: (a) violent confrontations involving Proud Boys at a rally on December 12, 2020; (b) Tarrio's destruction of a #BLACKLIVESMATTER banner at that same rally; and (c) an incident at the Oregon State Capitol. None of these objections has merit.

---

[6]      Moreover, it must also be noted that *these* defendants proudly promoted their street fighting and lawless conduct in the lead-up to January 6. It is the brand that *these* defendants established and nurtured. This highlights the absurdity of defendants' argument. We are not talking about a Proud Boys member from Anytown, U.S.A. being associated with Nordean's comments of lawlessness, but rather Nordean's own association with his own comments.

A. **December 12 Rally**

The violence that occurred at the December 12 rally involving the Proud Boys is directly relevant to the defendants' intent in forming the charged conspiracy. That episode led directly to the creation of MOSD, and it is undeniable evidence of the intent of those who joined MOSD. For the reasons stated above, it is direct evidence of the conspiracy. The government's evidence will show that, following that rally, the defendants' and other Proud Boys' attitude towards the police soured considerably on multiple fronts, but especially with respect to whether they believed the police were on the side of "Antifa" and whether the Proud Boys believed that the police had adequately investigated the violence that left members of the Proud Boys with knife wounds. *See*, *e.g.*, Statement of Offense, *United States v. Jeremy Bertino*, 22-cr-329 (TJK) at ¶ 9.

This combative attitude towards police as January 6 approached was reflected in many areas, but the exchange referred to above about the group's "disposition towards the police" needing to be re-evaluated is typical. Without evidence of the events of December 12, the jury could not properly place that conversation—which took place during and in furtherance of the conspiracy—and others like it into context. It must also be noted that Nordean's personal disposition towards the police was also affected by the events of December 12. Shortly after that event, he made the following statement on his podcast while speaking to another MOSD leader:

> When I was in D.C. [on December 12], this "line," [of officers] right, that they were putting up was like mostly females, right? About like 120-pound women. And I'm 260 pounds, okay? And I'm a pretty big guy, and I've got J.B., I've got a lot of the guys – just monsters front line, right? And behind them is like 800 Proud Boys. And so they're like "sorry sir, you're not allowed to pass." And I'm furious because I've got people over there – like there's like two Proud Boys' wives on the other side, just like 50 yards away from us. And we can see Antifa messing with them. And I'm like "I'm gonna storm this line if you don't let me through there and get those people through." So the Commander hears me and he's like "Uh, yeah, I'll walk you around. You can get them out." And I'm like "yeah that was a good decision, man. Because, because I don't wanna have to do that, but you're putting me in a position as a leader with almost 1,000 people that I'm responsible for behind me…

This exchange demonstrates how the events of December 12 shaped Nordean's attitude toward police as he prepared to return to Washington, D.C. on January 6. (It also is relevant to establish Nordean's leadership within the Proud Boys and his willingness to use his "1,000 people" to overpower those who stood between him and his objective.)

On January 6, Nordean again used the December rally and its aftermath as a call to arms:

We got some guys last time we were here get stabbed. And the guy who was the stabber got let out. What was it? $500 bail or something like that? Enrique shows up and gets detained before he gets to D.C. and he's charged with two felonies – multiple felonies. For what? We put ourselves on the line every goddamn time we come here. We put our lives and our safety and everything on the line and these people put us in jail. We'll I'm tired of it. It's time to just say no. Back the yellow. Back the yellow, gentlemen!

The events of December 12 are thus direct evidence underlying the formation of the conspiracy and highly relevant to the defendants' state of mind as they entered the conspiracy. But even if the strictures of Rule 404(b) apply, the December 12 rally is admissible because it is offered for reasons other than character—intent and state of mind.

The D.C. Circuit has a well-developed body of case law permitting the introduction of 404(b) evidence at trial. Indeed, "[a]lthough the first sentence of Rule 404(b) is 'framed restrictively,' the rule itself 'is quite permissive,' prohibiting the admission of 'other crimes' evidence 'in but one circumstance' — for the purpose of proving that a person's actions conformed to his character." *Bowie*, 232 F.3d at 929, quoting *Crowder,* 141 F.3d at 1206. "In conspiracy prosecutions, the prosecution is usually allowed considerable leeway in offering evidence of other offenses 'to inform the jury of the background of the conspiracy charged . . . and to help explain to the jury how the illegal relationship between the participants in the crime developed." *Machado-Erazo*, 47 F.4th at 728 (cleaned up, citing *United States Mathis*, 216 F.3d 18, 26 (D.C. Cir. 2000)). To paraphrase the D.C. Circuit in the drug context, Nordean's prior experience of violence cannot

alone prove that he was part of a violent conspiracy on January 6, but it is still a brick in the wall of evidence needed to prove his intent and/or state of mind in joining the conspiracy. *See Crowder*, 141 F.3d at 1209 n.5.

## B.  Black Lives Matter

Nordean and Tarrio both object to the government's introduction of Tarrio's destruction of a "Black Lives Matter" banner during the December rally. ECF No 489 at 22-23; ECF 491 at 4-6, bullets 3, 4, 8, and 9. The crime—committed by Tarrio while surrounded by other members of the Proud Boys at the rally discussed in the previous section, is relevant to the formation of the conspiracy for all the reasons discussed just above. In addition, it is relevant because of how Tarrio, as the leader of both the Proud Boys and MOSD, reacted to news coverage of the burning. He took to his influential Parler account and posted the following message:

> Against the wishes of my attorney I am here today to admit that I am the person responsible for the burning of this sign. And I am not ashamed of what I did because I didn't do it out of hate…I did it out of love. Love for a country that has given my family SO MUCH. The burning of this banner wasn't about race religion or political ideology it was about a racist movement that has terrorized the citizens of this country. I will not sandby and watch them burn another city.
>
> So let me make this simple. I did it.
>
> Come get me if you feel like what I did was wrong. We'll let the public decide.
>
> Forever PROUD
>
> -Enrique

In both taking credit for and celebrating his criminal activity, Tarrio sent the message to his followers—who included Nordean, Biggs, Rehl, and Pezzola—that the unlawful use of force was not only tolerated, but encouraged, if it was committed in furtherance of the Proud Boys' aims.

Concealing the fact of Tarrio's arrest from the jury would also make it impossible to understand much of the surrounding events, such as (1) a co-conspirator predicting that "We could

have a fucking riot" if Proud Boys were caught off guard by the news; (2) Bertino stating that the arrest could be "the shot heard round the world and the normies will fuck up the cops"; (3) Tarrio, in anticipation of his absence on January 6, instructing Biggs: "Whatever happens… Make it a spectacle"; and (4) Biggs and Nordean using the arrest as a rallying cry for the Proud Boys marching group on January 6 ("After what they did to our boy Enrique, we're gonna let D.C. fucking know we're goddamn here.").

Tarrio's actions on December 12, and his subsequent arrest for them, are thus admissible because they have a relevant non-character purpose, *see*, *e.g.*, *Bowie*, 232 F.3d at 929-30, for showing the formation and workings of the conspiracy, along with the motive, intent, and knowledge of the conspirators. Any prejudice to Tarrio would be small given the disparity in seriousness between the prior and charged offense. *See United States v. Mahdi*, 598 F.3d 883, 890-91 (D.C. Cir. 2010) (finding that evidence of defendant threatening two victims with a knife was not unfairly prejudicial in trial involving charges he shot nine people and stabbed and cudgeled two others). Any prejudice that might result could be cured with a limiting instruction.

### C.  Oregon Capitol

Nordean objects to the admission of evidence relating to the unlawful breach of the Oregon State Capitol, which occurred on or about December 21, 2020. ECF 489 at 23. The government's evidence with respect to that event will be limited to after-the-fact discussions about it among members of the Proud Boys. For example, in the Official Presidents' Chat, a large group of which Nordean, Tarrio, and Rehl were members, one member asked if anyone was watching what was going on in Oregon, and another responded, "I am, its awesome. The boomerwaffen has mobilized!" Shortly thereafter, another member stated, "patriots stormed the statehouse . . . in oregon . . . Its all boomers, larpers & pp," and another user responded, "They still fucking did it . . . We can't talk shit when they backed they talk this time."

The government does not intend to show video or photographic depictions of the events at the Oregon Statehouse, nor will it attempt to connect those responsible for that attack to these defendants or any other Proud Boys, and it is willing to work with the Court and defense to craft an appropriately sanitized way to present the information. In that sense, the evidence about the Oregon Capitol is not even truly 404(b) evidence, and the government would agree to a limiting instruction if requested by the defense to minimize any prejudice to the defendants. The evidence is thus appropriately limited to that which goes to knowledge and its effect on the listener—knowledge among the conspirators that "normies" stormed the statehouse in Oregon on December 21, both showing that it was possible to do so and that members of the Official Presidents Chat celebrated it. What narrow prejudice may exist based on the government's limited presentation can be appropriately cured through a limiting instruction. The evidence should thus be admitted.[7]

## IV.    The Statements and Documents are Admissible

### A. Telegram Communications

Nordean claims that the government has failed to provide "sufficient clarity" concerning the Telegram messages and text that it intends to introduce at trial. ECF 489 at *15. This is nonsense. The particular messages already identified as trial exhibits include the ones central to the conspiracy, including:

---

[7]    Nordean claims that the evidence should be excluded because the government's notice is deficient. ECF 489 at 7-8. The policy behind the Rule 404(b) notice requirement is "to reduce surprise and promote early resolution on the issue of admissibility." Fed. R. Evid. 404(b) advisory committee's note to 1991 amendments; *see also United States v. Carrasco*, 381 F.3d 1237, 1241 (11th Cir. 2004). As noted above and in the letter the government sent, it does not regard Proud Boys structure evidence as 404(b) evidence, but given that the policy is to promote early resolution and reduce surprise, the government's notice allowed the defendant to file the instant motion, and he has had the information since February 2021. The evidence should not be excluded due to the form of the notice.

1. MOSD Leaders (December 20, 2020), recovered from Tarrio phone
2. MOSD Prospect Chat (December 27, 2020), recovered from Tarrio, Nordean, and Rae phones
3. MOSD-OP (January 1, 2021), recovered from Tarrio phone
4. MOSD Members Main (January 2, 2021), recovered from Tarrio phone
5. MOSD Leaders (January 4, 2021), recovered from Nordean and Rehl phones
6. Boots on Ground (January 5, 2021), recovered from Nordean phone

Instead of engaging in meaningful review and motions practice on any of these proposed exhibits, the defendants seek to kick the can down the road by claiming that they are unable to identify the portions of the voluminous messages that the government seeks to introduce.

Nordean also argues that the government plans to "introduce hundreds" of Telegram messages that "long predate the alleged conspiracy." ECF 489 at 15. The relevance and admissibility of these messages is explained in the government's Statements Motion, ECF 475, and in its Reply in support of that motion, ECF 512. The government adopts those arguments rather than retreading them here.

In support of his argument about inflammatory rhetoric, Nordean cites a January 6 case, *United States v. Hale-Cusanelli*.  *See* ECF 489 at 16-17 (citing D.D.C. no 1:21-cr-37 (TNM)). Contrary to Defendant Nordean's retelling, *Hale-Cusanelli* does not stand for the proposition that "derogatory remarks" and "inflammatory political views" are inadmissible. Indeed, the court in *Hale-Cusanelli* said just the opposite when it found that the defendant's reprehensible calls for civil war and revolution were "highly probative" of the defendant's motive to act on January 6. *See Hale-Cusanelli*, 1:21-cr-37 (TNM), ECF 82 (transcript of status conference) at 12. The court explained that any prejudice created by the defendant's views was not "unfair" prejudice even though a jury might "react negatively"—the court explained that the "probative force of the[] statements creates any prejudice resulting from them" and thus there was no "unfair" prejudice. *Id.* at 12-13 (citing *United States vs. Wilkins*, 538 F.Supp.3d 49, 73 (D.D.C. 2021)).

The *Hale-Cusanelli* court did draw the line at the government's attempt to introduce the defendant's antisemitic views as a means to explain *why* the defendant was interested in civil war; *i.e.*, the defendant sought to overturn the government because he believed it to be controlled by Jews. *Id.* at 13:14 – 13:23. For that court, such an argument was simply a step too far because it was "tangential" to the defendant's desire to stop the election count. *Id.* As a result, Hale-Cusanelli's statements to others that he "would kill all the Jews and eat them for breakfast, lunch and dinner, and he wouldn't need to season them because the salt from their tears would make it flavorful enough" failed the balancing test of Rule 403. *Cusanelli*, 21-cr-37, ECF 68 at 4.

In this case, as the Court well knows, the defendants' statements of intent are littered with vulgarity and offensive language. *See* Detention Ruling, ECF 71 at 17. Any attempt to excise the profanity from their statements would require mass redactions (including technologically complicated redaction of audio and video files) and in many cases render their statements practically unintelligible. Take for example the government's evidence of video messages exchanged among MOSD Leaders during the initial moments of the riot. The video is direct evidence of the MOSD leadership's command and control of the men they led to the Capitol and includes real-time reactions from co-conspirator Charles Donohoe and directives from co-conspirator Jeremy Bertino. The government can do little about the fact that the screen name assigned to Charles Donohoe in the message string was "Cracker Ni**er Fa**ot":



So too with Biggs' response to a celebrity's calls for unity following the election, to which Biggs responded publicly on social media, "No b*tch. This is war." So too with Tarrio's exchange with a Proud Boys "elder" on January 6 at 2:38 p.m. in which the "elder" said, "I told you we should have rushed the police line on the 12th...This could have been us but you're a ni**er" to which Tarrio responded, "This is so much better" and then "Make no mistake . . ." and then "we did this." The defendants' relentless use of vulgarity in their conspiratorial conversations does not make those discussions "unfairly prejudicial" — this is simply how these Proud Boys choose to speak to one another.  Profanity and epithets were such a common part of the conspirators' vernacular that removing all instances would leave the conversations so heavily redacted as to cause more confusion, distraction, and harm than the language itself.[8]

---

[8]      The same analysis applies to incidental references to drug use throughout the conversations, which Nordean wrongly conceives of as Rule 404(b) evidence. *See* ECF No. 489 at 23. According to their statements, the defendants and other Proud Boys occasionally consumed illegal substances together and occasionally made references to being high or drunk. These statements, at a minimum, demonstrate bonds and trust among the conspirators, and the statements would lose their context without them. The government should not be forced to neuter otherwise-relevant evidence because the defendants regret having made reference to drugs during their

B. **Social Media**

Nordean takes issue with what he characterizes as the government's efforts to introduce "political posts," and he suggests that the government's introduction of *any and all* intent, motive, and state of mind evidence are "exclusively designed to arouse the jury's anger, emotion, and partisan prejudice." ECF 489 at 20. Not so.

The government has a case to prove to a jury—a jury that will be qualified by this Court and will swear to faithfully follow this Court's instructions and apply the law as explained by this Court. That case involves Nordean's involvement in a conspiracy to use force to stop the lawful transfer of power from former President Trump to current President Biden. The nature and strength of the defendants' conviction that they needed to stop Biden from becoming President is a central question to be resolved by this impartial jury. Having committed crimes aimed at overturning an election, Nordean cannot cry foul at the prospect that the government will present evidence of that motive and intent.

"[M]otive is a well-established non-propensity purpose for introducing evidence under Rule 404(b)." *See United States vs. McGill*, 815 F.3d 846, 883 (D.C. Cir. 2016). Nordean's social media posts establish that motive. Nordean claims that his social media posts do not include communications with his co-conspirators. Even if that were true, Nordean's motive and intent as he prepared to travel to Washington, D.C. on January 6 are central issues to be decided by the jury as they assess, *inter alia*, whether Nordean entered into an agreement with the other defendants to use force to oppose the peaceful transfer or power (18 U.S.C. § 2384) or corruptly obstructed the

---

conversations. Any prejudice to the defendants from such references would be infinitesimal — it is unlikely that a jury would decide that, because Ethan Nordean liked to use cocaine, he entered into a seditious conspiracy. Whatever *de minimis* prejudice there is can be cured with a limiting instruction.

electoral college certification (18 U.S.C. § 1512(c)(2)). Nordean's public posts include calls to "revolt" against the government and engage in "civil disobedience." Such posts reveal important context about Nordean's intentions.[9] Moreover, Nordean's public postings reflect an increasing hostility toward the government and law enforcement. For example, on December 31, 2020—the same day that Tarrio posted his "Lords of War" picture of Pezzola (TSI at ¶ 44)—Nordean posted an image of himself and included text that read, "Back the YELLOW" and "Let them remember the day they decided to make war with us." On January 5, 2021, just hours after Tarrio's arrest, Nordean posted "It is apparent now more than ever, that if you are a patriot, you will be targeted and they will come after you, funny thing is that they don't realize is, is we are coming for them. You've chosen your side, black and yellow teamed with red, white and blue against everyone else." Because these statements are clearly relevant to the charged conspiracy, the Court was right to cite posts like these in support of its detention rulings in this case. *See, e.g.*, Detention Ruling, ECF 71 at 17-23 (quoting posts as early as 11/4/2020 by Nordean, Biggs, Rehl, and Tarrio, and explaining that posts "shed light on the nature and circumstances of the offense.").

In addition, and contrary to Nordean's proffer to this Court that public social media was not a means of communication among the co-conspirators, all four of Nordean's co-conspirators charged in this case were followers of Nordean's social media account. And Nordean reciprocally

---

[9]     The defendants have made clear that they will attempt to argue that the Proud Boys' objective for January 6 was simply peaceful protest. It is therefore important for the government to be able to include Nordean's November postings that called for "civil disobedience" in order to demonstrate how Nordean's postings tilted to the more ominous in the days before January 6. Moreover, if the government is prohibited from using Nordean's more benign postings concerning unfair COVID regulations and the like, the defendants are likely to introduce such evidence themselves and claim that the government attempted to hide such evidence from the jury. "[T]he prosecution is entitled to prove its case by evidence of its own choice[.]" *Old Chief v. United States*, 519 U.S. 172, 186 (1997). This includes the prosecution's right to address potential defenses in its case-in-chief.

followed both Tarrio and Biggs. Accordingly, Nordean's and his co-conspirators' public postings are relevant to the existence of the conspiracy. In fact, Nordean would tag Tarrio in his postings, including pictures like the below, which was posted on December 29, 2020, that showed "me and dad @noblelead on the front line" (along with Pezzola).



As with defendants' social media posts, the defendants' statements during video podcasts in the lead-up to January 6, 2021, are highly probative of the defendants' motive and intent on January 6, 2021. Indeed, just as with the social media postings, this Court found that the defendants' statements during video podcasts were probative of the detention consideration. *See* Detention Ruling, ECF 71 at 19-20, 23 (describing statements made during video podcasts by Nordean and Biggs). Among the statements that were specifically identified to counsel for Nordean on October 22, 2022, were the following from "Rebel Talk with Rufio" Episodes 1 and 2, both of which featured guests who were leaders of the Ministry of Self Defense:

- After four years of literally having our whole, our rights taken away, and our li- lives just destroyed, and demolished, and our reputations torn apart, I really don't care very much about the optics, because here's the thing, no matter how you look at it, just like you were saying with fighting, it's never going to look good or pretty. **To get things done right, like you have to – the things that we are gonna have to do to get things back on track, if we can at all, is not going to be, you know, gum drops and rainbows, and freaking unicorns. It's not gonna be handshakes and hugs, it's gonna be freaking fists to the face and potentially, you know, even worse.** REBEL TALK EPISODE 1 at 15:22 (emphasis added).

- …when **I was in D.C., this "line," right, that they were putting up was like mostly females, right? About like 120-pound women. And I'm 260 pounds, okay? And I'm a pretty big guy, and I've got J.B., I've got a lot of the guys – just monsters front line, right? And behind them is like 800 Proud Boys. And so they're like "sorry sir, you're not allowed to pass."** And I'm furious because I've got people over there – like there's like two Proud Boys' wives on the other side, just like 50 yards away from us. And we can see Antifa messing with them. **And I'm like "I'm gonna storm this line if you don't let me through there and get those people through."** So the Commander hears me and he's like "Uh, yeah, I'll walk you around. You can get them out." And I'm like "yeah that was a good decision, man." *Id.* at 23:20 (emphasis added).

- [following discussion of negotiation to resolve conflict] Well the only thing left is force.[…] You know? And we're trying, and that's the thing. **I don't want to have to use force against the government. I don't want to do that. Like I don't think anyone really wants to, because the repercussions are just unknown. And you, you, you put yourself on the biggest fucking target list known to man. Nobody wants to do that.** [GUEST: We're not anti-government.] Right, but here's the thing. **We'll replace you. We don't care about … we care about law and order that much that we will assemble an army that will literally just replace you like that. We'll just be like "I'll take your badge. Shits mine now. You're no longer sitting in office. You're no longer the governor, this guy over here that we just voted in right now is. Goodbye." And it will literally be like that.** *Id.* at 27:46 (emphasis added).

- **When police officers go after criminals, they use force. Which is aka violence. Okay? So, when police officers or government officials are breaking the law, what are we supposed to do as the people? Discourse? What are we supposed to – debate? No, you have to use force. This is the organized militia part of our freaking constitution here.** Um, this is something that we need to get back ingrained in our heads and desensitize our- ourselves from this stuff that we've been taught. That, you know, you never use violence. **We'll I'm sorry, that's literally the foundation of every prominent country is force.** REBEL TALK EPISODE 1 at 15:58 (emphasis added).

Even if the Court were to consider these statements 404(b), as opposed to non-hearsay co-conspirator statements inextricably intertwined with the charged conduct, each of the foregoing statements are highly probative of Nordean's motive as he prepared to travel to Washington, D.C. on January 6: not peaceful protest, but the use of force to stop the lawful transfer of power. There is nothing "unfair" about their use, and they should be admitted.

### C.  <u>**"1776 Returns "**</u>

Nordean and Tarrio assert that the document "1776 Returns," which was received by Tarrio on December 29, 2020, is inadmissible under Rules 401, 402, and 403. *See* ECF 489 at 20-21; ECF 491 at 4. The defendants' arguments are unavailing.

The document is highly probative of the issues to be resolved by the jury, and the only prejudice arising from the document is due to its close relationship to the facts charged. It is properly admissible as evidence as to Tarrio's intent, motive, and state of mind as he approached January 6, 2021. This is relevant because, among the questions to be resolved by the factfinders in this case, the jury will consider whether Tarrio and his selected men had entered into an agreement to use force to stop the peaceful transfer of power on January 6. Tarrio's receipt and reaction to the 1776 Returns document is highly probative of Tarrio's state of mind as January 6 approached, *e.g.*, a jury may properly conclude that Tarrio was not merely going to Washington, D.C. to see a rally, but rather was discussing and considering how his assembled men might use force to stop the peaceful transfer of power. Granted, the document differed on certain "details" — such as the particular buildings on the Capitol campus to be invaded — but its "essential nature" was the same: a plan to use force to prevent the transfer of power. *See United States v. Gatling*, 96 F.3d 1511,

1518 (D.C. Cir. 1996) (explaining that a conspiracy is defined by its "essential nature," not by "the details"). [10]

Admission of the document is also necessary to give explanatory context to a conversation between Tarrio and Bertino shortly after the riot. After Bertino posted messages in celebration that read, "Brother. You know we made this happen" and then later, "1776 motherfuckers," Tarrio responded, "The Winter Palace." *Id.* The first page of the 1776 Returns document references the "Winter Palace" in describing the storming of buildings as a plan to "Storm the Winter Palace." ECF 401-1 at 1.

Once established that the document is admissible and relevant as to Tarrio's motive, intent, and state of mind, the document is admissible against all defendants to prove the existence of the conspiracy. *United States v. Salameh*, 152 F.3d 88, 111 (2d Cir. 1998) ("Where a defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant."). In *Salameh*, the Second Circuit addressed the recovery of terrorist materials possessed by one defendant, which materials included discussion of the desirability of terrorist attacks and how to use explosives. *Id.* Finding that the terrorist materials were not hearsay, the Second Circuit held that no analysis under Rule 801(d)(2)(E) (co-conspirator statements) was necessary and the evidence was admissible against all co-conspirators. *Id.*; *accord United States v. Aref*, 285 F. App'x 784, 791 (2d Cir. 2008) (holding that missile possessed by one defendant and "never seen" by the co-conspirator was admissible against all members of the conspiracy.).

For all these reasons, the 1776 Returns document is admissible.

---

[10]     This point is also germane to Rehl's pending motion for severance, ECF 492 at 6.

**V.**     **The Government's Video Exhibits are Relevant and Admissible**

The defendants argue for the exclusion of various video exhibits that have been produced to them by the government. For the reasons below, these arguments should be rejected.

**A.  Videos of Persons Other Than Defendants**

The government intends to introduce certain videos, including United States Capitol Police CCTV, Metropolitan Police Department body worn camera, videos taken by other rioters and video taken by journalists at trial. Nordean contends that any videos that do not specifically capture the defendants' actions on January 6, 2021, are irrelevant. ECF 489 at 12. Without identifying any proposed exhibits, Tarrio similarly objects to any videos that do not show members of the conspiracy. ECF 491 at 3.

In fact, the majority of the government's proposed video exhibits depict the defendants and their actions on January 6, 2021. The few proposed exhibits that do not capture the defendants, are relevant because they show (1) the willingness of the defendants' co-conspirators and the men the defendants marched to the Capitol to engage in violence that day; (2) the results of their actions and/or (3) that a civil disorder occurred on January 6, 2021.

1.     The videos show the conspiracy in action via co-conspirators
        and "tools."

As the government explained in its Statements Motion, ECF 475 at 4–7, 10–14, 18–19, and in its Omnibus *Motions In Limine*, ECF 494 at 3–7, the actions of co-conspirators and tools of the defendants' conspiracy to disrupt the certification proceeding, including members of the MOSD chat, and those who followed the defendants to the Capitol on January 6, are relevant. The actions of these individuals are relevant because the defendants sought to gather and mobilize this group of followers who they could then unleash during the attack on the Capitol. Accordingly, videos that depict the actions of the defendants' co-conspirators and tools are relevant because these

individuals joined the defendants in their efforts to disrupt the certification proceeding, just as the defendants intended.

Nordean objects to videos that the government intends to introduce by individuals such as Paul Rae, Nicholas Ochs, Christopher Worrell and Anthony Mariotta.  He asserts that these videos do "not appear to capture the defendants' activities." ECF 489 No. at 12. Nordean is largely mistaken.

The government intends to introduce four videos taken by Rae on January 6, 2021. Either Nordean, Biggs, Pezzola, and/or Donohoe can be found in each of them. The videos by Ochs, Worrell and Mariotta likewise depict the actions of either the defendants or their co-conspirators and tools. For instance, a video filmed by Mariotta[11] depicts Donohoe, Pezzola, and other of the defendants' tools near the base of a staircase on the west plaza before it was overrun by rioters. The other video that the government intends to introduce that was filmed by Mariotta[12] depicts Nordean at this same location. Similarly, the video filmed by Ochs depicts Biggs as he and others, including members of the defendants' marching group, ascend a staircase after a line of police officers were overrun by rioters, including other members of the defendants marching group. The videos filmed by Worrell show this same location and depict Donohoe and other of the defendants' tools. These videos, which capture the actions of the defendants, their co-conspirators and tools are relevant and admissible at trial.

2.      The videos are evidence of a "Civil Disorder"

Count Five of the Third Superseding Indictment charges the defendants with violating 18 U.S.C. § 231 by obstructing, impeding, and interfering with, or attempting to obstruct, impede, or

---

[11]      This video is entitled "IMG_3966."
[12]      This video is entitled "IMG_3980."

interfere with, law enforcement officers during the breach of the United States Capitol on January 6, 2021. To establish a violation of 18 U.S.C. § 231(c)(3), the government must prove, among other things, that a "civil disorder"[13] existed on the date charged. 18 U.S.C. § 231(c)(3); *United States v. Red Feather*, 392 F. Supp. 916, 918-19 (D. S.D. 1975). The videos that the government seeks to introduce at trial, which depict the events of January 6, all help to establish that a public disturbance occurred, and that this public disturbance (a) caused an immediate danger of injury to another individual, (b) caused an immediate danger of damage to another individual's property, (c) resulted in injury to another individual, and (d) resulted in damage to another individual's property. For instance, the videos recorded by Rae depict rioters climbing scaffolding and a media tower and entering and remaining in the Capitol building, all of which helps to establish that a civil disorder occurred. Accordingly, these videos are relevant.

**B.  Videos Edited by News Media**

Nordean next objects to the use at trial of "video clips selectively edited by the news media." ECF 489 at 13.  Tarrio also objects to "open source hearsay videos without foundation of any kind on the basis of relevancy," including "media and reporter 'hit pieces.'" ECF 491 at 6. The full journalist montages were provided so that the defendants would be aware of the source documents of the clips the government intends to introduce and so they can seek to introduce other portions of the videos if they wish.  But the government does not intend to show these montages in their entirety. Instead, the government will introduce isolated and unedited video clips captured by these journalists, without narration. For instance, the government intends to introduce a portion of a *New Yorker* montage that captures Biggs traveling through the Capitol and inside of the Senate

---

[13]     "[A]ny public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1).

Gallery.  It also intends to offer a portion of a *Los Angeles Times* montage that captures Pezzola robbing a United States Capitol Police officer of his shield. None of the portions selected for use at trial contain "commentary by reporters of the events." *Id.* The discrete clips of the actions of the defendants are relevant and not unduly prejudicial. Accordingly, they are admissible.

### C.  Video Montage of United States Capitol Police Footage

The government has assembled a video montage of U.S. Capitol Police (USCP) footage providing an overview of the riot at the Capitol on January 6.  Nordean objects to this exhibit because it depicts "property destruction, confrontations with law enforcement and assault." ECF 389 at 13. The video depicts major breaches and representative scenes of the riot during critical moments during the siege. As discussed above, evidence of injuries to people and property, or the immediate danger of injuries to people are property, is required to establish that a civil disorder occurred, as charged in Count Five. Accordingly, the Video Montage of USCP Footage, which provides evidence of injury to law enforcement officers and property damage to the Capitol, and as such, evidence that a civil disorder occurred at the Capitol on January 6, is relevant and admissible. The Video Montage of USCP Footage will also provide the jurors with information about major locations in the Capitol and enable them to contextualize the testimony that they will see and hear about the defendants' own actions. Any danger of prejudice to the defendants from the jury viewing the Video Montage of USCP Footage can be cured by a limiting instruction. *See, e.g.*, *United States v. Jensen*, 21-CR-6 (TJK), ECF 89, at 3–4 (Sept. 18, 2022) (admitting relevant videos that did not depict defendant because "any risk of such unfair prejudice can be mitigated through a limiting instruction") (citing *United States v. Bell*, 795 F.3d 88, 100 (D.C. Cir. 2015)).

### D.  Congressional Record Montage

The government has similarly prepared a Congressional Record Video Montage, made up of recordings of events in the chambers of Congress on January 6, 2021. It does not, as Nordean

contends, purport to instruct the jury on the law; indeed, it does not even include the law in it. ECF No. 389 at 14. The Congressional Video Montage is a less than ten-minute video that quotes from the Congressional Record regarding the actions of both the House and the Senate, including the Joint Session on January 6, 2021, and includes video of the proceedings recorded by the House and Senate recording studios.

As it noted on its preliminary exhibit lists, the government expects to introduce Senate Concurrent Resolution 1 and certain statutes, including 3 U.S.C. §§ 15, 16, 17 and 18, as well as the Twelfth Amendment to the United States Constitution; it also anticipates having a witness read portions of these exhibits into the record during testimony about the electoral college certification process. The government does not, however, intend to ask the witnesses to opine on the laws or provide instructions about the laws to the jury. Accordingly, Nordean's objection to the Congressional Video Montage should be overruled.

### E.   Nordean's "Selfie" Videos

Nordean next contends that "videos depicting Nordean intoxicated" have no relevance to this case, and that by offering the exhibits the government seeks only to "humiliate the defendant." ECF 489 at 14. To the contrary, while Nordean does appear to be intoxicated in the videos, the government intends to introduce these videos at trial because they are evidence of Nordean's participation and reaction to the events of January 6, 2021.

On January 23, 2021, Nordean recorded a series of eight "selfie"-style videos, apparently after a night of drinking, in which he boasted about being part of the attack on the Capitol. In one of these videos, Nordean began to discuss an interaction with someone at a bar earlier in the evening. In the next video, Nordean continued this story by describing, with evident pride, his involvement in "storming the Capitol":

Yeah, this bitch was like trying to lecture me on my life, that I was, the small amount of my life that I'm willing to reveal to people at my drunkest state. I'm just out with one of my boys getting drunk. And I'm like "you know, it's so nice being able to socialize with people, fuck this Covid bullshit, you know?" And she's like "Well, I'm a nurse, so you have to understand." I'm like "Bitch! You don't get it!" She doesn't fucking get it. And she's like "I feel like if you're focus is only on socializing, then I'm, I'm worried about you." "Bitch, I just, I just, I was, I was part of fucking storming the Capitol of the most powerful country in the – the fucking world. And you're gonna lecture me on what is important right now? Shut the fuck up!"[14]

In the next video, Nordean punctuated his remarks. Staring menacingly into the camera, Nordean said, "Seventeen, seventy-fucking-six, bitch!" and then appeared to growl at the camera.[15]

Nordean's admission that he "was part of fucking storming the Capitol," is plainly relevant to a determination of whether he agreed with others to use force to prevent the certification proceeding that was taking place within the Capitol Building. In context, his statement further shows that he was proud of what he had accomplished on January 6. The mere fact that Nordean was intoxicated while he made these statements does not create a risk of prejudice, and certainly not the kind of "unfair prejudice" that would come within shouting distance of outweighing the probative value of his statements.

The government provided the additional five videos of Nordean from January 23, 2021, to provide context for the three videos described above. Given Nordean's objection to these other videos, the government does not intend to introduce them at trial, but will maintain them on its exhibit list.

---

[14] This video is entitled "cam_4fe7d602.mp4."
[15] This video is entitled "cam_a772a217.mp4."

### F. **Composite Exhibits**

Nordean also objects to the government's use of an exhibit that it has created that shows videos of the defendants marching on January 6, 2021, along with a map that shows the geographic location of each video and transcripts of the some of the marchers' statements. He argues that the probative value of the exhibit is substantially outweighed by the risk of unfair prejudice. ECF 489 at 21. Nordean is mistaken.

On January 6, 2021, Biggs, Nordean and Rehl led a large group of men on a march from the Washington Monument to the Capitol Building. Multiple videos, from multiple vantage points, captured portions of this march. To enable the jurors to understand the context of the videos, including the location of the videos being played, as well as how the videos fit together, the government has created a visual representation of these disparate pieces of evidence. As shown below, an embedded map shows the location depicted in the video, and the direction that the defendants were then marching.



Although the line on the map simply links the locations of the videos included in the montage, Nordean contends that it argues to the viewer that, "when the Proud Boys group was standing near the Washington Monument on the morning of January 6, it was their goal from the beginning to breach the Capitol Building." ECF 489 at 21.

The line about which Nordean complains does not imbue any intent on the defendants. First, the location line stops at the Peace Circle. A line that does not show that the defendants on restricted Capitol Grounds — much less inside the Capitol building — cannot possibly express the defendants' intent to "breach the Capitol Building." Moreover, as seen below, at one point, the line shows the defendants' marching group walking *away from* the Capitol.



Nordean does not claim that any of the information contained in the march exhibit is irrelevant, nor could he  make such a claim. The exhibit shows Biggs, Nordean and Rehl marching their co-conspirators and tools of their conspiracy to the Capitol while they exercised control over the group and riled them up. Under Rule 403, relevant evidence may only be excluded where its "probative value is *substantially* outweighed" by countervailing factors such as "unfair prejudice, confusing the issues or misleading the jury." Fed. R. Evid. 403 (emphasis added). A line on a map that shows the path the defendants marched on January 6 is not prejudicial and certainly does not clear the "high barrier to justify the exclusion of relevant evidence." *United States v. Lieu*, 963 F.3d 122, 128 (D.C. Cir. 2020).

## CONCLUSION

For the foregoing reasons, and any that may be presented during future argument before ethe Court, the Court should deny the Defendant's Omnibus *Motion In Limine*.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:    */s/ Jason McCullough*
JASON B.A. MCCULLOUGH
D.C. Bar No. 998006, NY Bar No. 4544953
ERIK M. KENERSON, OH Bar No. 82960
NADIA E. MOORE, NY Bar No. 4826566
  On Detail to the District of Columbia
Assistant United States Attorneys
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7233 //
jason.mccullough2@usdoj.gov

By:    */s/ Conor Mulroe*
CONOR MULROE, NY Bar No. 5289640
Trial Attorney
U.S. Department of Justice, Criminal Division
1301 New York Ave. NW, Suite 700
Washington, D.C. 20530
(202) 330-1788
Conor.Mulroe@usdoj.gov