IN THE UNITED STATES DISTRICT
COURT DISTRICT OF
COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**DOMINIC PEZZOLA,**<br><br>*Defendant.* | No. 1:21-cr-175 (TJK) |

**DEFENDANT PEZZOLA'S REPLY TO ECF 689 (GOVERNMENT OPPOSITION TO PEZZOLA'S MOTION FOR DISMISSAL OR MISTRIAL)**

    NOW COMES Defendant Dominic Pezzola, by and through undersigned counsel, with this Reply to ECF 689 (Government's opposition to Pezzola's motion to dismiss and/or mistrial).

    First, the government claims that there are no Brady violations associated with the revelations exposed on the national Tucker Carlson show do not withstand scrutiny. The televised program was in receipt of tens of thousands of hours of footage from January 6 which had been previously withheld from the public. The footage reportedly came from the U.S. House of Representatives.

    Although every defense lawyer in every January 6 case attests that they have not seen all of this evidence, the government claims all the footage was provided to Pezzola. Pezzola submits that although his counselors have viewed many hundreds of hours of discovery relating to January 6, they were unfamiliar with the Tucker Carlson footage relating to Jan. 6 defendant Jacob Chansley. "[A]ll the footage of Jacob Chansley that aired on Tucker Carlson earlier this week has been

produced to these defendants in discovery," claims the government. (And Chansley and Pezzola were at times very near each other inside the Capitol on January 6.)

Pezzola has been deprived of the footage in question. The footage in question is exculpatory, in that it refutes, rebuts and debunks the arguments of the government that January 6 demonstrators forcefully battled their way through the Capitol. An evidentiary hearing is required to determine the precise scope and scale of the government's discovery violations.

THE GOVERNMENT'S THREADBARE RESPONSE REGARDING ALLEGEDLY "CLASSIFIED" FBI MESSAGES CRIES OUT FOR INVESTIGATION

Among the trillobites of discovery provided by the government are drop-down internal communications between FBI Special Agent Miller and other agents. From the context it is clear that the message threads pertain to Proud Boys investigations.

From these snippets of conversation,[1] it is clear that the FBI agents are comfortable talking to each other about violating the most basic rights of defendants and the most fundamental rules of evidence-gathering and investigation. The agents speak of altering an official report, and of destroying hundreds of pieces of evidence.[2] But the government "disputes the nefarious conclusion that counsel for Pezzola seeks to tease out of the messages."

**"You need to go into that CHS report . . . and edit out that I was present."**

The United States claims that a message by a high-ranking FBI official directing SA Miller to "go into that CHS report you just put and edit out that I was present" was part of a harmless review

---

[1] Note that the Court's March 13 oral order for attorneys to stop reviewing these disclosures prevents a complete and proper argument. Without being able to consult the actual documents, counsel is forced to rely on memory, recollections of other lawyers, or snippets of information found on already-filed pleadings.

[2] Note that Pezzola does not concede or waive the 6th amendment violation already described and pleaded. That issue appears to be more fully briefed in codefendant Rehl's pleadings, and Pezzola joins Rehl's arguments.

for accuracy. "Like all other reports, CHS reports are reviewed for accuracy," writes the government.

According to the government:

> That message referred to an email sent by the CHS, who is an online researcher and not a member of the Proud Boys. The agent who sent it had recently transitioned to a supervisory role, and thus was no longer a handler of that source. He also had not realized he was still copied on emails from the online source. The supervisory agent made the request to edit out his name because he believed he was not copied (and thus not "present" for purposes of the email contact), and because per FBI policy, he cannot approve the write-up of a source meeting he was involved in. After Agent Miller told the supervisory agent that he was, in fact, copied on the email from the online source, he withdrew his request not to be listed, a different supervisor approved the report, and the online source was instructed not to cc the other agent in future emails. In short, the exchange concerns a routine clerical matter and does not suggest any wrongdoing on the part of the FBI generally or of Agent Miller personally.

Counsel for Pezzola submits that this tortured proffer simply does not explain the wording of the message ("You need to go into that CHS report . . . and edit out that I was present"). One can think of a hundred different ways for a superior to command an inferior FBI agent to engage in a "routine clerical matter" as described.

Note that the message used the word "present." Not "cc'ed" (courtesy copied) on the report. Not "listed." Not "copied." The government's proffered explanation doesn't name the names or provide details necessary to assess the veracity of the government's explanation.

Pezzola is entitled to see the documents in question (with any redactions deemed necessary) and to subpoena the officials involved and to question them in an evidentiary hearing.

**"My boss just ordered me to destroy 334 pieces of evidence."**

**"OMG. That's insane!"**

Next, the government desperately seeks to cover up an obvious potentially earth-shattering corruption scandal by merely proffering[3] that a text message confessing that "my boss ordered me to destroy 338 pieces of evidence!" was harmless, innocent, and legal.

But if there was anything routine, innocuous, or mundane about such a provocative message, such characteristics are belied by Agent Miller's shocked response: "OMG. That's insane!"

Even under a perspective extravagantly favoring the government, this exchange cries out for investigation by the Court.  Yet the United States responds by misframing the issue as one of "**Other agent's destruction of unrelated evidence" (page 8).**  The government continues with: "As the Court knows, disposal of evidence is a routine part of the lifecycle of every criminal case. The process through which this occurs is formalized in the policies of the Department of Justice. See Justice Manual § 9-14.000 et. Seq. ("Procedure for Disposal of Seized Evidence in Closed Criminal Cases")."[4]

"This 'destruction' of evidence," says the government, "related to the disposition of 338 items of evidence from a nearly 20-year-old multi co-defendant trial."

> Pursuant to policy, the FBI waited to dispose of the evidence until all defendants' appellate rights were extinguished. The special agent disposed of this evidence by returning it to defendants' family members or otherwise destroying it pursuant to FBI policy. The case was not related to this prosecution, and the agent was not involved in this investigation.

ECF 687 at 6-8

---

[3] One would think that the government would offer an affidavit, a declaration, or an exhibit to assuage concerns over an issue of this magnitude.  But the government offers only an unsworn proffer of two paragraphs which lacks sufficient details to asses it.  During a break in trial on March 13, when Counsel privately asked AUSA McCullough to name the "20 year old case," the prosecutor could not name the case.

[4] ECF 687 at 6-8.

As counselor Roots stated in court on Monday, March 13, the government's "proffer" doesn't pass the smell test. It is difficult to imagine an FBI agent saying "My boss just ordered me to destroy 334 pieces of evidence," if the agent meant to say "My boss just ordered me to follow the Bureau's Procedure for Disposal of Seized Evidence in Closed Criminal Cases related to the disposition of 338 items of evidence from a nearly 20-year-old multi co-defendant trial."

The government offers no hint of (1) the identity of the "boss," (2) the name of the supposed "nearly 20-year-old multi co-defendant" case, or (3) the name of the "defendants' family members" who supposedly received some of the 338 pieces of evidence.

Indeed, the proffer contradicts the original message in material ways. The original message indicated that a high-ranking FBI officer had directed a lower-ranking officer to "destroy 338 pieces of evidence." But the 'proffer' filed by the government on Sunday (ECF 687) claims that "The special agent disposed of this evidence by returning it to defendants' family members or otherwise destroying it."

And would Special Agent Miller respond "OMG that's insane!" to a statement about disposing of items from an unrelated 20-year-old case? In accordance with the Bureau's evidence retention policy? It seems unlikely.

**CONCLUSION**

Pezzola prays for an evidentiary hearing into these matters, with witnesses subpoenaed to testify under oath. Additionally, Pezzola requests a mistrial and dismissal.

Dated: March 17, 2023

Respectfully Submitted,
/s/ Roger Roots
Roger I. Roots, Esq
John Pierce Law
21550 Oxnard St,
3rd Floor, PMB #172
Woodland Hills, CA 91367
213.279.7648

**CERTIFICATE OF SERVICE**

I hereby certify that this document is being filed on this March 17, 2023, with the Clerk of the Court by using the U.S. District Court for the District of Columbia's CM/ECF system. All attorneys of record will receive an electronic copy, including:

Erik Michael Kenerson U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA 555 Fourth Street, NW, Suite 11-449 Washington, DC 20530
Telephone: (202) 252-7201 Email: erik.kenerson@usdoj.gov

/s/ Roger Roots