U.S. District Court

District of Columbia

UNITED STATES

v.                                      1:21-cr-00175-TJK

NORDEAN et al

MOTION TO COMPEL DISCLOSURE OF ALL CONFIDENTIAL HUMAN
SOURCES OF HOMELAND SECURITY

COMES NOW Defendant Dominic Pezzola, by and through undersigned

counsel, with this motion to compel the United States to reveal all informants,

undercover operatives and other Confidential Human Sources (CHSs) relating to

the events of January 6.

Pezzola recently learned that a federal agency other than FBI—the

Homeland Security Investigations (HIS) unit—was handling and running

undercover CHSs on Jan. 6.  The federal prosecutors in this case are refusing to

disclose information regarding these non-FBI informants.  The existence, and

likely conduct of these CHSs is almost certainly exculpatory for Pezzola.

BACKGROUND

The United States has torturously avoided disclosing the full scale of

undercover CHSs among the Proud Boys on Jan. 6.  Government FBI agent

witnesses first admitted there was one CHS embedded among the Proud Boys on Jan. 6.  Then there were two; then there were three.  Then the government stipulated on April 4 that there were 8 FBI CHSs among the Proud Boys.

On Friday, March 31, federal prosecutors pulled defense counsel aside and disclosed there were additional undercover officers belonging to Metro PD among defendants on Jan. 6.

**Pezzola has become aware that the largest numbers of undercover CHSs on Jan. 6 belonged to <u>agencies other than FBI</u>.**

At least two law enforcement agencies each outnumbered the FBI in terms of running undercover agents, informants, and CHSs on Jan. 6.  First, the DC Metro Police had at least 13 undercover plain-clothes agents among the Proud Boys and other patriots on Jan. 6. Next, there appear to have been some 19 CHSs on Jan. 6 belonging to an agency called HIS (Homeland Security Investigations). When added to the 8 FBI CHSs now acknowledged by the prosecutors, this means that there were at least forty (40) undercover informants or agents doing surveillance among defendants on January 6.

On Thursday, March 31, Pezzola filed a motion to serve witness Ray Epps by publication.  Defendants contend Mr. Epps is being suspiciously protected from prosecution by the government.   Pezzola's motion included a paragraph addressing revelations by J6 defendant William Pope in another J6 case that

undercover Metro officers were among the crowd on Jan. 6 instigating the crowd to storm the Capitol.

The following day, Friday, March 31, federal prosecutors in this case pulled defense lawyers aside and revealed that the United States possessed previously undisclosed information regarding MPD officers working undercover on Jan. 6. Specifically, there are previously undisclosed text messages between the undercover officers and Proud Boy supporters which evidence very close, familial and/or intimate contact and relationships.

The information involved twelve (now known to be 13) undercover or plain-clothes Metropolitan Police Officers among demonstrators on Jan. 6, 2021.

Some of these undercover Metro officers marched with the Proud Boy march. And some appear to have played roles of instigators, in that they are seen on body-worn videos chanting "Go! Go!," "Stop the Steal!," and "Whose house? Our house!" on Jan. 6.  Others generally followed demonstrators toward the Capitol.

 Pezzola submits that the entire defense in this trial, including opening, cross, and defense cases, would have been different, and much more aggressive, if defense counsel had known of the scope and scale of undercover government operations on Jan. 6.  Prosecutors made arguments contrary to information they

possessed and withheld; and defense counsel could have lodged different cross-examination and direct examination questions if they had known of these materials.

For example, this newly disclosed information supports Proud Boy assessment of antifa prior to Jan. 6.  Undercover metro officers are seen on videos and private texts remarking on the dangerousness and violence of antifa.  (Prior to these revelations, prosecutors had painted Proud Boy statements regarding antifa as exaggerated or even illusionary.  Indeed, prosecution witnesses had said antifa in DC was largely illusionary.  Prosecutors repeatedly suggested through their witnesses that defendants' chats, texts, and posts about antifa were not defensive in nature; but were secret Proud Boy code for intending violence against Congress, the Capitol, or federal officers.

**The government has withheld this exculpatory information.**

With each bombshell, the government generally begins its responses to late disclosure complaints by saying the government was provided with the information; even if buried in mountains of unnavigable discovery debris. But in this situation, prior discovery dumps did not provide all the information.  Buried in this discovery was a chart naming twelve Metro officers working for the unit on Jan. 6.  But an additional, thirteenth undercover Metro officer was revealed in the recent revelations.  (And, coincidentally, the thirteenth undercover officer appears

to have been the most vociferous in promoting the storming of the Capitol on Jan.

6.)

The material rebuts significant portions of the 404(b) motive evidence the

government was permitted to present over objection. In particular, it confirms the

reality of law enforcement concerns about antifa violence, provides percipient

evidence that antifa engaged in the exact sort of violence described by Proud Boy

members as reasons for joining the Proud Boys, and otherwise supports the claim

that antifa initiated violence against Trump supporters. If defense counsel had

possession of this material earlier the information would have informed defense

cross examinations.  Given the circumstantial nature of this case, the material is

exculpatory, material and relevant.

**The defense is entitled to know every Homeland Security Investigations CHS operating among Proud Boys and Capitol protestors on Jan. 6.**

More recently, Pezzola has become aware that another agency, the

"Homeland Security Investigations" (HSI) unit, was also handling more CHSs on

Jan. 6 than the FBI.  The startling case of J6 defendant Jeremy Brown brought the

existence of HSI informants on Jan. 6 to light.  *See* Mitch Perry, "Federal trial in

Tampa begins after Jan. 6 defendant Jeremy Brown detained for 14 months,"

*Florida Phoenix*, Dec. 12, 2022.[1]  In the days before Jan. 6, HSI handlers visited

---

[1] : https://floridaphoenix.com/2022/12/05/federal-trial-in-tampa-begins-after-jan-6-defendant-jeremy-brown-detained-for-14-

Brown's residence and attempted to recruit Brown into becoming a paid CHS for Homeland Security Investigations.

Brown recorded the would-be handlers' attempt to recruit him.  And in the video, the HSI handlers (Brett Lindsey and Paul Ura) indicated they were _making_ **nineteen** _additional_ stops that day.  From the context, it seems obvious that the HSI agents were planning on similar recruitment contacts to meet with or recruit 19 other HSI CHSs.[2]  (Note that the Justice Department appears to be retaliating against Brown for refusing the agents' offer by charging Brown with multiple crimes.)

## Prosecutors in this case say they have no duty to provide CHS from agencies other than FBI.

On April 4, Assistant U.S. Attorney Ballentine responded to undersigned counsel's email by stating

Mr. Roots,

I don't know whether [name redacted by Roots] or Oath Keeper Jeremy Brown are sources for another agency. But even if they were, I don't see how that fact would be relevant here. Homeland Security — and I'm not even sure specifically what that would be — is not the investigative agency in this case. I understand the relevance of your CHS theory to be that if there was "a plan," then the FBIs CHSs would have reported the existence of the plan to their handlers. They did not report a plan, and therefore there was no plan.  What is the relevance of [name redacted by Roots]'s purported status as a source to another agency?[3]

---

months/#:~:text=In%20a%20federal%20courtroom%20in,in%20connection%20with%20the%20Jan (accessed 4/5/2023).

[2] The December 9, 2020 audio has been filed in Brown's case in the U.S. Middle District of Florida.  The disclosure that the handlers were scheduled to meet with 19 additional CHSs is at the 58:23 minute mark).

[3] Ballantyne's email was in response to an email which read:

Of course, AUSA Ballantyne's proclamations violate the government's obligations under Brady and its progeny.

While *Brady* obligations do not extend to the entirety of the government, they do include any and all investigative agencies who worked on the case or agencies related who knew or should have known that information would be material to a prosecution arising from their direct involvement.

Here, for example, the U.S. Capitol Police are directly related and fully aware of the events of January 6, 2021.  The USCP is an agency of Congress.  The USCP and Congress are the two primary alleged victims and the USCP is the primary investigative agency in terms of the immediacy to events and geographic proximity. Most of the witnesses and investigators from the Federal Bureau of Investigation have no first-hand knowledge of the events of January 6, 2021, but are merely reviewing the reports of others, primarily USCP officers.

---

Jocelyn,

Still following up on [name redacted by Roots].  We have two witness who absolutely insist that Proud Boy [name redacted by Roots] made suspicious calls on Jan. 6.  [name redacted by Roots] called one individual (named Brett) by mistake (wrong number) and made statements consistent with being a CHS awaiting instructions to engage in activities at the Capitol.  Note that the name Brett is shared by a "Homeland Security Agent" who seemed to be running CHSs on Jan. 6.

The case of Jeremy Brown in Tampa involves a "Homeland Security" agent named Brett.  As you may know, "Homeland Security" and FBI went to Brown's house to recruit Brown into becoming a CHS after J6, and when Brown refused, Brown was arrested on numerous charges.
1.      This begs the question: even if [name redacted by Roots] was not an FBI CHS; was he a "Homeland Security" CHS?
2.      Same question regarding Ray Epps.  Was Epps a "Homeland Security" CHS?
--Thanks,
-----Roger

The City of Washington, D.C.'s Metropolitan Police Department had undercover officers on the scene at the U.S. Capitol on the early afternoon of January 6, 2021, and were on standby under memoranda of understanding to respond to assist the U.S. Capitol Police.

Plainly, under Brady, the prosecution is obligated to provide the identities of Homeland Security Investigations (HSI) informants operating on Jan. 6.

> The Supreme Court in *Brady* held that the Due Process Clause imposes on the prosecution an affirmative duty to disclose exculpatory information to the defense. Under Brady, suppression of evidence material to either guilt or punishment, whether or not there is bad faith on the part of the government, constitutes a due process violation. See 373 U.S. at 87, 83 S.Ct. 1194.
>
> **We have defined "Brady material" as "exculpatory information, material to a defendant's guilt or punishment, which the government knew about but failed to disclose to the defendant in time for trial." *Coleman v. United States*, 515 A.2d 439, 446 (D.C.1986). (quoting *Lewis v. United States*, 393 A.2d 109, 114 (D.C.1978), aff'd after rehearing, 408 A.2d 303 (D.C.1979)).**
>
> This case does not present the classic Brady situation involving information in the hands of prosecutors which they do not have an incentive to divulge. See *United States v. Brooks*, 296 U.S.App. D.C. 219, 221, 966 F.2d 1500, 1502 (1992). Here, the prosecutors never heard the tape and, therefore, could not have known whether the recording would have been exculpatory.
>
> The government asserts that the duty to disclose information under Brady does not include a duty to investigate the records of the Department of Corrections. See *Lewis v. United States*, 393 A.2d 109, 115 (D.C.1978) ("The Brady principle does not imply a prosecutor's duty to investigate— and come to know— information which the defendant would like to have but the government does not possess."); *Levin v. Katzenbach*, 124 U.S.App. D.C. 158, 162, 363 F.2d 287, 291 (1966) ("[W]e do not

suggest that the government is required to search for evidence favorable to the accused.").

**However, the Brady doctrine requiring disclosure of exculpatory information has been extended to situations where a division of the police department not involved in a case has information that could easily be found by the prosecutors if they sought it out, see *Brooks*, 296 U.S.App. D.C. at 221, 966 F.2d at 1502, and there is a duty to search branches of government "closely aligned with the prosecution," id. at 222, 966 F.2d at 1503 (citation omitted). . . .**

*Robinson v. United States of America*, 825 A.2d 318 (D.C. 2003).  *Furthermore,*

"[T]he duty of disclosure affects not only the prosecutor, ***but `the government as a whole, including its investigative agencies,'*** because the Jencks Act refers to evidence gathered by `the government,' and not simply that held by the prosecution." *Wilson v. United States*, 568 A.2d 817, 820 (D.C.1990) (quoting  *United States v. Bryant*, 142 U.S.App. D.C. 132, 140, 439 F.2d 642, 650 (1971) ("Bryant I"), on remand, 331 F.Supp. 927, aff'd, 145 U.S.App. D.C. 259, 448 F.2d 1182 (1971) ("Bryant II")).

In *Wilson* we applied *Brady* and *Jencks* requirements to the Washington Metropolitan Area Transit Authority (WMATA), where WMATA police were involved in the investigation and the case arose out of an attempt to enforce WMATA regulations. 568 A.2d at 819-21; see also *Morris v. Washington Metro. Area Transit Auth.*, 251 U.S.App. D.C. 42, 44, 781 F.2d 218, 220(1986) (when the Metro Transit Police are involved, WMATA is considered a governmental entity); *Bryant I*, 142 U.S.App. D.C. at 140, 439 F.2d at 650 (tape recordings in the possession of the Bureau of Narcotics and Dangerous Drugs are in the possession of the government). Appellant urges that the Corrections Department should similarly be considered part of the government for disclosure purposes.

The case before us does not require that we go that far. **This case presents a narrower issue: whether the government has a duty to preserve evidence obviously material which, as the trial court found, the police knew or should have known about, and could have obtained if requested**

**promptly from another government agency.** In *Brooks*, the Court of Appeals explained **courts' willingness to insist on an affirmative duty of inquiry on the part of the prosecutor, because an "inaccurate conviction based on government failure to turn over an easily turned rock is essentially as offensive as one based on government non-disclosure."** See *Brooks*, 296 U.S.App. D.C. at 222, 966 F.2d at 1503 (citing as an example *Calley v. Callaway*, 519 F.2d 184, 223 (5th Cir.1975) (*en banc*) (reflecting concern for "inherent fairness")). *Brooks* dealt with information that was already in the hands of the police department, albeit in a different unit than the one that investigated the case, and the law is clear that information in the hands of the police department is considered to be held by the "government" for *Brady* purposes. See *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555 (holding prosecutor's Brady obligation to disclose exculpatory evidence to defense applies to facts known to anyone acting on the government's behalf, including the police).

* * *

**Even when the prosecutor does not know about certain evidence, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."** *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555.

*Robinson v. United States*, 825 A.2d 318 326-329 (D.C. 2003).

## CONCLUSION

The United States is refusing to provide information which obviously has a high likelihood of being exculpatory.  Under the most foundational principles of Brady v. Maryland, defendants are entitled to this information.

ACCORDINGLY, Pezzola asks for an order compelling the United States to provide the names, identities, and reports of all HSI confidential informants operating at or near the Capitol or around the Proud Boys on January 6, 2021.

RESPECTFULLY SUBMITTED,


/s/ Roger Roots, esq.

Co-counsel for Defendant Pezzola


CERTIFICATE OF SERVICE

I hereby certify and attest that on April 5, 2023, I caused this document to be uploaded into this Court's electronic filing system, thereby serving it upon all parties of record.

/s/ Roger Roots