# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-CR-175 (TJK)** |
| | : | |
| **ETHAN NORDEAN, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTIONS
## FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL

## TABLE OF CONTENTS

I.    PROCEDURAL BACKGROUND ................................................................................... 2

II.   FACTS ADDUCED AT TRIAL .................................................................................... 4

III.  DEFENDANTS' ARGUMENTS ................................................................................ 31

  A.   Legal Standard for Judgment of Acquittal ............................................................... 32

  B.   The Conspiracy Charges ........................................................................................... 33

     1.   The Facts Adduced at Trial Prove That the Defendants Formed a Criminal Conspiracy .......... 33

     2.   The Defendants' Statements are Evidence of the Conspiracy .................................... 40

     3.   The Conspiracy Constituted Seditious Conspiracy in Violation of 18 U.S.C. § 2384 ............... 43

     4.   The Conspiracy Constituted Obstruction of an Official Proceeding in Violation of 18 U.S.C. Sections 1512(k) and 1512(c)(2) ................................................................. 48

     5.   Tarrio Is Guilty of Conspiracy and Substantive Offenses—One Need Not Be "Present" to Commit a Crime ................................................................................ 57

     6.   All Six Defendants Were Properly Found Guilty of Conspiracy to Impede Members of Congress and Law Enforcement, in Violation of 18 U.S.C. § 372 ............................... 59

  C.   The Destruction of Property Offenses ...................................................................... 60

     1.   All Six Defendants Were Properly Found Guilty of Destruction of the Black Metal Fence, in Violation of 18 U.S.C. § 1361 ........................................................... 61

     2.   Pezzola Was Properly Found Guilty of Destruction of the Capitol window, in Violation of 18 U.S.C. § 1361 ........................................................................ 66

  D.   Pezzola's Assault of Officer Ode and Robbery of a Riot Shield ................................... 70

IV.   THE DEFENSE CASE STRENGTHENED THE GOVERNMENT'S EVIDENCE ....................... 72

V.   DEFENDANTS' REQUESTS FOR A NEW TRIAL ........................................................ 78

   A.   Legal Standard for Motion for a New Trial ............................................................. 78

   B.   None of the Publicity Surrounding the Trial Had Any Effect on the Jury or Its Deliberations ...... 78

   C.   The Alleged Presence of an "Antifa" Member is Factually Dubious and Not Cause For a New Trial.................................................................................................................... 82

## GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTIONS
## FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL

The United States respectfully opposes the motions for judgment of acquittal filed by defendants Ethan Nordean (ECF 822) and Enrique Tarrio (ECF 823), and the United States respectfully opposes the motions for judgment of acquittal and motions for a new trial by defendants Dominic Pezzola (ECF 824), Joe Biggs and Zachary Rehl (ECF 828).

The defendants devote much time and energy in their motions to legal arguments previously raised during a four-month long trial. They ask this Court to reconsider its rulings of law on the use of defendants' statements, the application of the Seditious Conspiracy statute, and the meaning of "corruptly"—to name just a few. All of the issues raised in the defendants' motions were the subject of extensive pre-trial litigation and countless hours of conferences during trial. The Court considered these issues and ruled. The Court had it right before trial, and the Court had it right during trial, and nothing presented in the defendants' motions is new or persuasive. The Court should reject the defendants' invitation to rule *again* on these legal issues and deny the motions.

Beyond those arguments, the defendants spend little time discussing or otherwise challenging the evidence introduced at trial or its application to the elements of the crimes charged. Principally, they argue that the defendants' own words cannot be used to prove the existence of the conspiracies charged at Counts One, Two, and Four; that the jury had no basis to conclude that Nordean and Biggs destroyed a black metal fence (Count Six); that Pezzola's destruction of the window did not cause more than $1,000 in damage (Count Seven); and that Pezzola did not assault Officer Ode or rob him of his shield (Counts Nine and Ten).

On this score, the evidence was more than sufficient to convict, and the government's evidence at trial (detailed herein) soundly defeats the defendants' claims. The defendants' words

and actions prove the existence of a conspiracy. Countless messages show the defendants forming and carrying out the conspiracy. The testimony of coconspirators provided further support for the conspiracy, and the defendants' actions—recorded in messages, photos, and on video—proved the existence of a conspiracy beyond any reasonable doubt. Finally, the testimony of law enforcement along with hours of video provided irrefutable proof of the defendants' crimes on January 6.

The evidence produced at trial in the government's case-in-chief, viewed in the light most favorable to the government, is more than sufficient to permit a rational trier of fact to find the essential elements of the crimes charged in the Indictment with respect to each defendant beyond a reasonable doubt. Accordingly, the defendants' motions for judgment of acquittal and new trial should be denied.

## I.  PROCEDURAL BACKGROUND

The Third Superseding Indictment (the "Indictment") charged all five defendants with seditious conspiracy, in violation of 18 U.S.C. § 2384 (Count One); conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k) (Count Two); obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Three); conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties, in violation of 18 U.S.C. § 372 (Count Four); obstruction of law enforcement during a civil disorder and aiding and abetting, in violation of 18 U.S.C. §§ 231(a)(3), 2 (Count Five); destruction of government property and aiding and abetting, in violation of 18 U.S.C. § 1361, 2 (Counts Six and Seven); assaulting, resisting, or impeding federal officers, in violation of 18 U.S.C. § 111(a)(1) (Counts Eight and Nine); and robbery of personal property of the United States, in violation of 18 U.S.C. § 2112 (Count Ten). ECF 380.

With respect to the conspiracy charges, the Indictment alleged that from in and around December 2020, through in and around January 2021, the defendants entered into an unlawful

agreement "to oppose the lawful transfer of presidential power by force, by opposing the authority of the Government of the United States and by preventing, hindering, or delaying by force the execution of the laws governing the transfer of power, including the Twelfth Amendment to the Constitution and Title 3, Section 15 of the United States Code." *Id.* at ¶¶ 26 – 27. The Indictment further alleged that, between December 2020 through January 2021, the defendants agreed "to corruptly obstruct, influence, and impede an official proceeding, that is, the Certification of the Electoral College vote, in violation of Title 18, United States Code, Section 1512(c)(2)," and "to prevent by force, intimidation, and threat . . . . Members of Congress and law enforcement officers, from discharging [their] duties . . . and to induce [them] by force, intimidation, and threat . . . to leave the place where their duties as officers were required to be performed." *Id.* at ¶¶ 110, 114.

The trial of these defendants began with jury selection from December 19, 2022, through January 13, 2023. The government presented its evidence through 21 witnesses from January 13, 2023, through March 20, 2023. At the close of the government's case, all defendants moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, and the Court deferred ruling pending further briefing. Trial Transcript (hereinafter "Tr.[1]") at 14373:15-18 (Kelly, J.). Defendants presented 19 witnesses, including testimony from defendants Rehl and Pezzola. At the conclusion of the evidence, all defendants renewed their motions for judgment of acquittal, and the Court again deferred ruling. Tr. 19598:7-8 (Kelly, J.).

Closing arguments were delivered on April 24 and 25, 2023. On May 4, 2023, the jury returned its verdict. ECF 804. All defendants except for Pezzola were found guilty of seditious conspiracy, under both the "oppose by force the authority of the Government of the United States" prong and the "using force to prevent, hinder, or delay the execution of any law of the United

---

[1]  Unless otherwise noted, references to "Tr." are to the trial transcript, which is numbered sequentially from the start to the end of the trial.

States" prong (Count One); and conspiracy to obstruct an official proceeding (Count Two). *Id.* All defendants were found guilty of obstruction of an official proceeding (Count Three); conspiracy to use force, intimidation, or threats to prevent officers of the United States from discharging their duties, under both the preventing a Member of Congress or federal law enforcement officer from "discharging a duty" prong and the "inducing" a Member of Congress or federal law enforcement officer "to leave" the place where their duties are required to be performed prong (Count Four); obstructing officers during a civil disorder (Count Five); and destruction of government property, *i.e.,* a black metal fence, in an amount greater than $1,000 (Count Six). *Id.* Pezzola was additionally found guilty of destruction of government property, *i.e.,* the window near the Senate Wing Door, in an amount greater than $1,000 (Count Seven); assaulting, resisting, or impeding certain officers (Count Nine); and robbery of personal property of the United States (Count Ten). *Id.*

## II.  FACTS ADDUCED AT TRIAL

Defendants were members of a group known as the Proud Boys. In the months leading up to January 6, Tarrio was the Chairman of the organization, and Nordean, Biggs, and Rehl held positions of influence and leadership within the organization. As described in more detail herein, *infra*, these defendants emphasized and promoted the Proud Boys' involvement in street violence. Among other things, the promotion of street violence served as a recruiting tool that attracted members, such as Pezzola, who understood that the use of force and violence was celebrated within the club.

The Proud Boys organization rose to a new level of national prominence in September 2020 when, during a nationally televised Presidential debate, candidate Donald Trump told the Proud Boys to "stand back and stand by," and that someone needed to do something about "Antifa

and the left." Ex. 1101.[2] Thereafter, interest in the Proud Boys organization and membership inquiries exploded. Tr. 9876:10-16 (Bertino) (Interest in the club and recruiting "went out of control. There was nonstop emails; there was nonstop requests for membership. They just kept pouring in.").

In private communications, Proud Boys members expressed elation over the attention. Ex. 514-2, -3, and -6; Tr. 8050:4 – 25 (Dubrowski). In private communications, co-conspirator John Stewart told other Proud Boys, including Tarrio, Nordean, and Rehl, that he interpreted President Trump's statement to be a directive to "stand by" and not to "engage immediately but be ready to go." Ex. 514-7. Biggs took to social media to declare that "Trump basically said to go fuck them up!" Ex. 603-66. When other members took issue with Biggs' statement, Tarrio defended Biggs. Among other things, Tarrio told the Proud Boys "Elders" (a group that included Nordean) that Biggs was just "saying shit we've always said" and that the "[t]iming was bad." Ex. 500-8.

Approximately one week later, on October 4, 2020, as the Elders continued to discuss the Proud Boys' issues with public perception associated with Biggs and others comments, Nordean proposed to the Elders, "[w]hy don't we just fash the fuck out so we don't have to worry about these problems anymore..live free or die hard." Ex. 500-15. Nordean further explained, "Politics ain't workin for nobody, optics game doesn't work, the left os[3] destroying our culture and mind fucking our children, our rights are being stripped away […] our cities are burning down....it's time to fuckin rage, not play tea time with rhinos[.]" *Id.*

---

[2] Unless otherwise noted, references to "Ex." refer to Government Exhibits.

[3] When the defendants' and other actors' words appear in quotes, the government has attempted to reproduce the language as it appeared in the original.

In late 2020, in part as a result of President Trump and candidate Biden's comments, the Proud Boys began to view themselves as the foot soldiers of the right. Tr. 5374:5 – 14 (Greene) ("The conversations I was having, we, as the Proud Boys, viewed ourselves almost as the foot soldiers of the right where Antifa was the foot soldiers of the left."); *see also* Tr. 9859:24 – 9861:9 (Bertino).

        *Response to the Presidential Election*

This attitude fueled the defendants' response to the 2020 presidential election. The morning after the election, November 4, Biggs took to social media to espouse his view that the democrats were stealing the election and that there was probably going to be a "civil war" because they were "poking the bear." Ex. 603-1. Biggs stated that the "left" did not "realize they are radicalizing people by stealing this election." Ex. 603-2. The next day, on November 5, Biggs posted that it was "time to storm into these election areas where they are counting ballots" in order to "make sure they don't steal this shit." Ex. 603-3. Later the same day, Biggs told his followers that it was "time for fucking War if they steal this shit." Ex. 603-4. Tarrio echoed similar themes on his social media account. On November 5, Tarrio told his followers that the Proud Boys would not "standby and watch [America be] taken over by these socialist pigs." Ex. 600-2. The following day, Tarrio posted a message stating that the "media constantly accuses us of wanting to start a civil war" and then stated, "[c]areful what the fuck you ask for we don't want to start one...but we will sure as fuck finish one." Ex. 600-5. The coordinated messaging by Tarrio and the other defendants was not mere coincidence—Tarrio, Biggs, and Nordean followed one another on social media and they were each followed by Rehl and Pezzola. Ex. 600-A, -B, and -C.

By November 7, major media outlets reported that Joseph Biden had won the election. Tarrio, Biggs, Nordean, and Rehl used their social media platforms to encourage action against

the stolen election. Harkening back to President Trump's statement on the debate stage, Tarrio told his followers that the Proud Boys were "rolling out" and that the "standby order has been rescinded." Ex. 600-6. Shortly thereafter, Tarrio and other Proud Boys attended a pair of election-oriented "rallies" in Washington, D.C. marked by violence by Proud Boys against the group's perceived adversaries.

### *The November 2020 Rally*

Tarrio encouraged the Proud Boys to travel to Washington, D.C. for the Million MAGA March on November 14, 2019, to support former President Trump and demonstrate "against this stolen election. Ex. 600-9. On social media, Tarrio told his followers that a "can of whoopass" was in route to D.C. Ex. 600-15. Once on the ground in Washington, D.C. on November 14, Tarrio posted that the Proud Boys "will be on the streets of DC all night" and that "DC Antifa ends tonight." Ex. 600-16.

In fact, violence did unfold on the streets of Washington, D.C. at the hands of Proud Boys including Tarrio. Rehl, who was not present, posted videos of Proud Boys engaged in street violence, including multiple videos of a member of the Proud Boys smashing a black woman in the face with a helmet and sending her to the ground bloody and motionless. Ex. 602-9 and -10. Rehl made clear that he viewed these actions as politically righteous; he commented on one video, "POYMFB!! WE WILL NOT LAY DOWN! We WILL stand UP for America!!" Ex. 602-9. And Rehl directly framed this violence as an effort to oppose the election results—shortly after midnight on the night of the rally (November 14-15), Rehl posted a video montage of Proud Boys engaged in violence on the streets of Washington, D.C. along with an accompanying post in which he stated, "Be careful what you wish for when you ask to release the Kraken!" Ex. 602-12. In a

subsequent post, Rehl indicated that these attacks were coordinated using "the same tactics" that the men had learned in the military. Ex. 602-14; Tr. 6277:6-20 (Camiliere).

Rehl was not alone in promoting the Proud Boys' use of violence at the rally. Biggs, who was also not present, posted a celebratory video of the same event shortly after 2 a.m. and told his followers that he had just spoken with Tarrio who told him that "proud boys had one hell of a day" and that "[i]n self defensse they whipped commie ass and were victorious." Ex. 603-13. Nordean, who was also not present, posted a message within minutes of Biggs' post and reported that the Proud Boys had "killed it in DC" and that "more needs to be done" to "come together and run these scumbags out of our cities and anyone supporting them." Ex. 601-3.

Tarrio continued to promote the Proud Boys use of violence following the November rally. Tarrio told his social media followers what the stakes were, posting, "If Biden steals this election, [the Proud Boys] will be political prisoners. We won't go quietly . . . I promise." Ex. 600-17. Tarrio appeared on InfoWars shortly after the rally and celebrated the Proud Boys use of violence in D.C. *See* Ex. 620-B and -C. As a video of Proud Boys engaged in street violence played during his appearance, Tarrio explained that he personally "jumped through" Antifa's defenses and "took out their entire shield wall." Ex. 620-B. Tarrio explained that "nothing has changed for the Proud Boys" and that "thanks to Joe Biden" and his comment on the debate stage, "a lot more people know who we are." Ex. 620-C. Tarrio went on to describe that the Proud Boys "cleared out Freedom Plaza two times, we cleared out Black Lives Matter Plaza and we cleaned the streets of DC for an entire night and Sunday afternoon, we handed back the keys over to Mayor Bowser because we owned that city that night." *Id*. Tarrio also continued to promote the use of violence on his social media platform, telling his followers that "because of [the Proud Boys] there's some terrorists eating ice cream and drinking soup from a straw as I type this post." Ex. 600-18.

Pezzola was present in Washington, D.C. for the November rally, but he was not yet a Proud Boys member. *See, e.g.*, Ex. 604-1 *et seq*. Pezzola had joined the social media platform Parler on November 6, and he began to "follow" Tarrio shortly thereafter. Ex. 604-1; Tr. 6262:4-12, 6653:3-15 (Camiliere). Politics was part of the reason that Pezzola wanted to join the Proud Boys. Ex. 23 ("Im willing to fight until my last breath to make sure my children & their children don't inherit a communist country."); *see also* Tr. 19257:6-8 (Pezzola). Pezzola frequently posted "comments" to Tarrio's posts on the Parler platform. Ex. 604-10, -11, and -12. Through social media and other contact with the group, Pezzola understood what type of behavior was rewarded within the Proud Boys structure. Pezzola wrote, in an unsent letter detailing why he wanted to join the Proud Boys, that one of the things he had to offer was being a "physically fit 43 year old male" who "can be anywhere I'm needed @ any time" and who was "willing to stand first on the line to protect who I love and what we stand for." Ex. 23.

The social media content Pezzola had access to included a lengthy propaganda video posted by Tarrio on November 25, 2020. The video depicted Proud Boys engaging in repeated acts of violence in city streets across America. Ex. 600-22. Nordean and Biggs were both featured in the video: Nordean knocked out an adversary in an incident known as "the punch heard 'round the world," and Biggs riled up the crowd in support of Donald Trump as the finale of the video. *Id.* Minutes after posting the video, Tarrio posted "[a]fter our mention on the debate stage we have been swamped with new prospects," and that the Proud Boys had "slowed down vetting" because letting everyone in would have the "potential to change the culture" within the club. Ex. 600-23. These public posts advertised the group' propensity for violence. Tr. 6504:2 – 9 (Camiliere).

Around the same time, on November 27, Nordean posted menacing messages in which he announced that the "spirit of 1776" had "resurfaced," and he wished "good luck" to the "traitors

of this country." Ex. 601-10. The same day, Rehl invoked the same reference to "traitors" on his social media post and explicitly tied the concept to the election. He wrote, "[h]opefully the firing squads are for the traitors that are trying to steal the election from the American people." Ex. 602-29. Biggs posted a similar message in which he posted a mock response to a celebrity who called on Americans to come together following the election; Biggs responded, "No bitch. This is war[.]" Ex. 603-22. Tarrio echoed the same theme of war while posting a mock response to President-elect Biden, writing "No YOU need to remember the American people are at war with YOU. No Trump… No peace. No quarter." Ex. 600-24.

### *The December 2020 Rally*

President Trump announced another rally in Washington, D.C. on December 12. Thereafter, Biggs posted a flyer for the Proud Boys to return to Washington, D.C. and wrote, "Call to action. Get your fucking ass there on the 12th." Ex. 603-19. Biggs and Rehl posted messages regarding the lawsuits that had been filed to stop the election. Rehl wrote, in part, that people were "waiting until the courts play out" in order to "let the constitution do its thing and not go apeshit if we don't have to." Ex. 602-33. Shortly before the rally on December 8, Biggs posted a message that stated, "THE SUPREME COURT HAS ACCEPTED THE CASE FROM TEXAS PREPARE FOR FOUR MORE YEARS OF TRUMP!!!!" Ex. 603-26. But just a few days later, on December 11, Biggs wrote, "Death to SCOTUS" after the Supreme Court declined to take the case. Ex. 603-27.

All five of the defendants traveled to Washington, D.C. to participate in the election protest with the Proud Boys on December 12. Tr. 4480:16 - 4484:1 (Quested). Just like in November, the Proud Boys were primed for violence. On December 12, Tarrio posted to social media that "[s]ilent big dick ninjas" were roaming the streets of D.C. and that Antifa had been running from the Proud

Boys all night. Ex. 600-36. Biggs posted online that he was "ready to rumble." Ex. 603-27. On the night before the rally, Tarrio led a group of Proud Boys to the Washington Monument where he addressed his men. Tr. 4487:10 – 14 (Quested). In his speech, Tarrio disputed the results of the election and encouraged his men to resist the stolen election. *Id.* at 4487:23 – 4488:2. Tarrio announced, "If you want a war, well, you've got one." *Id.* at 4488:8-9. Pezzola stood near the front during the speech and enthusiastically celebrated Tarrio's words. *Id.* at 4485:20 – 4486:8.

The night of the rally, December 12, Tarrio led the Proud Boys in a march through Washington, D.C. Their language was confrontational, and they appeared ready to engage in street-level violence with Black Lives Matter and Antifa. *Id.* at 4493:15-18. Their stated objective was to reclaim the streets of Washington, D.C. *Id.* at 4497:16-23. A group of Proud Boys stole a banner, and Tarrio joined his men setting the banner ablaze in the intersection of 12th and I Streets NW. Ex. 273; Tr. 9970:2-6 (Bertino). As the banner burned, a large group of Proud Boys gathered around it and chanted and yelled in celebration. *Id.*

Later the same evening, the Proud Boys viciously attacked a pedestrian (who they believed was associated with Antifa) who was walking down 12th Street NW. Ex. 272. After being confronted, shoved and punched in the face by a member of the Proud Boys, the victim pulled out a knife and continued to retreat. *Id.*; Ex. 270. A large group of Proud Boys swarmed the victim and beat him until he was left motionless on the ground, only ceasing the assault when police intervened. *Id.* Pezzola was one of the men engaged in the attack. Tr. 10076:19-24 (Bertino). During the victim's retreat, he stabbed multiple people, including co-conspirator Jeremy Bertino. Ex. 272 and 603-29; Tr. 9973:8-20 (Bertino).

*Fallout From the December 2020 Rally*

Tarrio, Nordean, and Biggs claimed that the Proud Boys were the victims of an attack and criticized the response by authorities in D.C. Biggs posted on social media that "the media lies" and "made it seem" like the Proud Boys had stabbed four people when "we got stabbed." Ex. 603-32. Biggs added that the Proud Boys had "whipped their asses." *Id.* Biggs later added that "[t]he time is now" and asked people to "stand with us and fight back." *Id.* Later the same day, Nordean declared that the "government puts more priority on protecting federal property, than they do it's own people" and that he was "disgusted" with the officers. Ex. 601-22.

These two events—Tarrio's burning of the banner and the stabbing of Jeremy Bertino during the attack on the purported Antifa member—formed the backdrop for the Proud Boys return to Washington, D.C. on January 6. The defendants harnessed these twin currents into a plot to violently disrupt the transfer of power.

The group's evaluation of the December 12 rally was largely favorable, with the defendants celebrating the Proud Boys' success in inflicting violence against perceived Antifa members. Nordean declared that the Proud Boys had "owned DC." Ex. 601-24. Rehl reported in a separate, private message that the Proud Boys "were just in DC protesting [the election]… and beating the shit out if Antifa." Ex. 546-2. Biggs declared that the Proud Boys "had Antifa scum on the run all night crying like little bitches." Ex. 603-30.

At the same time, leadership viewed the stabbings as a tactical failure, and they believed that the group's effectiveness had been hampered by a general lack of discipline among the rank-and-file. *See*, *e.g.*, 514-33 (Tarrio: "Chapters wanted to do what the fuck they wanted and didn't listen."). In a conversation with Proud Boys chapter presidents following the rally, Tarrio described the problem as "dudes not listening to a simple chain of command." Ex. 514-34. On

December 15, 2020, in response to one Proud Boys member telling Tarrio that none of his guys from Indiana were going "back to DC unless the presidents asks us to come and we are going armed," Tarrio told the man that he was "trying to plan something like this out but it's Tought because we don't know when their release is going to happen." Ex. 514-35.

<u>Creation of the Ministry of Self Defense</u>

Early in the morning of December 19, President Trump announced on Twitter, "Big protest in D.C. on January 6th. Be there, will be wild!" Ex. 1102. Roughly two hours later, at approximately 4 a.m., Tarrio and Biggs discussed the status and reputation of the Proud Boys, in which Tarrio stated that "the drinking stuff helps us mask and recruit," and Biggs replied, "But we recruit losers who wanna drink. Let's get radical and get real men." Ex. 525-5. Later that day, Tarrio held a 15-minute video chat with Nordean and Biggs. Ex. 518-1. Then, shortly after midnight on December 20, Tarrio created an encrypted Telegram group chat for the leaders of the Ministry of Self Defense ("MOSD"). Ex. 501-1. Those leaders in the chat group (the "MOSD Leaders" group) included defendants Tarrio, Biggs, Nordean, and Rehl, as well as co-conspirators Charles Donohoe, Jeremy Bertino, and John Stewart. *Id.*

Tarrio presented the new "MOSD" chapter to the Proud Boys Elders (a group that included Nordean) to obtain their approval to start the new chapter. Ex. 600-69 and -72. Tarrio told them that the purpose of the MOSD was to "standardize event organizing" and to help the club to "harness ourselves in large numbers," including specifically the "rally boys" who were known for engaging in violence at political demonstrations. *Id.* However, Tarrio also signaled a broader purpose to the elders, suggesting that the MOSD mission involved political revolution: when he was advocating for the creation of the chapter, he sent the message "-whispers- Seventeen seventy six…." Ex. 500-74. As one of the Elders had previously told the group in the leadup to the

December rally, "[t]here wasn't much of a reason to rally before other than punching commies. But now there's a real reason. We are months away from gulags. It's now or never. We fight or get locked up." Ex. 500-40. Nordean agreed: "Perfectly said my brotha." *Id.*

With the approval of the Elders in place, the MOSD Leaders began to recruit individual Proud Boys for membership in the MOSD. MOSD members were chosen for two crucial traits: the discipline to follow orders from leadership and the penchant to employ street violence against the Proud Boys' perceived adversaries. To achieve the MOSD's goals, Tarrio implemented certain rules. First, the group would be made up exclusively of "hand selected" members who were specifically chosen by the MOSD leadership. Ex. 500-69. Second, the group was subject to strict secrecy requirements, with members forbidden from discussing it with outsiders or even with other Proud Boys. Ex. 613-P. Third, the members were required to observe the chain of command both by following direct orders without question (in one leader's words, "turn your brains off and follow") and by conforming at all times to the general norms and expectations set by leadership ("fit in or fuck off"). Ex. 613-E and 503-3.

Tarrio directed that MOSD members stay "on topic" during discussions in the Telegram chat groups where the members convened (the "MOSD Members" groups). Ex. 503-2 and -3. This rule was broadcast to all members when they first joined the chat, and it was enforced from time to time when members were admonished for discussing subjects that did not, in the leaders' view, advance the "mission" of the group. *E.g.*, Ex. 503-1 and 505-20. One recurring topic that did *not* draw any such rebuke — and which therefore received tacit approval from the leadership — was the celebration of violence as a means to advance the Proud Boys' political agenda. *See*, *e.g.*, 503-13 ("Represent, countrywide. Storm everyone's capitals.").

Tarrio and the other leaders provided direction to the MOSD members via the Telegram groups and via a recorded video meeting. Members were ordered not to wear Proud Boys "colors" (*i.e.*, the group's typical uniform of black and yellow) when they were in Washington D.C. for January 6, and they were encouraged to acquire specific items of tactical gear for use during the event. Ex. 501-12 and -45. During the video meeting, the leaders again stressed the need for secrecy and the importance of following the chain of command. Members were told that the group would always have a "strategic objective" and that January 6 would as well. Ex. 613-G. However, when members asked about the strategic objective for January 6, Tarrio repeatedly declined to reveal it, stating only that the members would be told later. Ex. 613-D and -M.

Tarrio, Biggs, and Nordean posted coordinated messages about the group's return to Washington, D.C. For example, Tarrio posted an announcement on social media on December 29, 2020, that the Proud Boys would "turn out in record numbers on Jan 6th" but they would be "incognito." Ex. 600-50. Within minutes, Nordean posted the message, "[g]oing to DC on the 6th . . . . but you won't recognize us, we will blend into the crowd…" Ex. 601-33. Later the same day, Biggs posted a video message and announced that "[w]e will not be attending DC in colors." Ex. 603-43.

As January 6 approached, Tarrio increased his online rhetoric concerning a coming revolution. Just minutes after midnight, on New Year's Day, Tarrio posted messages that read, "Let's ring in this year with one word in mind. Revolt." Ex. 600-52. He posted a similar message later that day in which he wrote, "New Years Revolution." Ex. 600-54. During a podcast on December 28, 2020, Nordean called for the use of force against law enforcement and government officials, explaining that "the only thing left is force." Ex. 608-C. Nordean went on to explain that he didn't "want" to use force against the government "because the repercussions are unknown"

but that he was prepared to "prepare an army" that will "literally replace" the government officials in charge. *Id.* A few days later, on December 31, 2020, during a podcast recorded with co-conspirator Jeremy Bertino. Nordean explained that "when police officers or government officials are breaking the law . . . you have to use force." Ex. 609-B. Per Nordean, "this [wa]s the organized militia part of our constitution," and force is "literally the foundation of every prominent country." *Id.* Biggs echoed the same sentiment, when on December 23, 2020, he told another user that he was not "gonna say things that'll put me in jail tonight" but that "[w]e all know what needs to be done." Ex. 603-39. Biggs was more explicit on January 2, 2021, when he posted a message that read, "Every law makers who breaks their own stupid Fucking laws should be dragged out of office and hung. The government should fear the people. Not the other way around. You work for us. You don't have ruling power over me. We only allow you to have that privilege. FAFO[.]" Ex. 603-55.

### The Winter Palace

Shortly before New Year's Eve, Tarrio received a document from a girlfriend—titled "1776 Returns"—that contained plans calling for the occupation of government buildings in Washington, D.C. to protest the election results. Ex. 528-1. The document called for groups of people to amass outside government buildings and overwhelm the defenses with a sudden surge of the crowd. Ex. 528-1A. The "logistics" as set forth in the document called for people to meet at 1 p.m. on January 6, to confirm that there were "enough people around," then to "[w]ait for signal from lead, storm building" at 1:30. *Id.* The document referred to this effort as storming the "Winter Palace," which referenced the Russian Revolution, and which obscure reference would later be invoked by Tarrio in private messages as the riot unfolded on January 6. *Id.*; *see also* Ex. 530-5. Tarrio thereafter Googled "Winter Palace," and interacted with the document on his phone.

Tr. 12966:11 – 12967:1 (Miller). On January 3, 2021, during a private text conversation with a separate woman, Tarrio again made reference to the "Winter Palace." Ex. 538-18. Specifically, the woman remarked to Tarrio that if "this kid … [is] anything like you, I'm in so much trouble … [h]e's gonna be like mom, I'm gonna go take the Capitol." *Id.* Tarrio responded immediately, "The Winter Palace." *Id.*

The defendants understood the significance of the Electoral College Certification and its role in certifying the election results on January 6. In a social media post on December 23, Rehl explained that January 6 was the "day where Congress gets to argue the legitimacy of the electoral college votes[.]" Ex. 602-40. Rehl also posted an article on December 26 that discussed actions that Vice President Pence could take to stop the certification on January 6. Ex. 602-41. Biggs also posted messages about Vice President Pence shortly before January 6, commenting that Pence would "betray" Trump and that Biggs would be in D.C. to "witness this historic Judas moment." Ex. 603-50. Biggs also posted celebratory messages in which he reported those Members of Congress who planned to object to the certification on January 6. Ex. 603-44 and -53.

*Pezzola Joined the Ministry of Self Defense*

Pezzola was added to the MOSD by co-conspirator Jeremy Bertino shortly before January 6. Around New Year's Eve, Pezzola had traveled to visit Bertino following Bertino's release from the hospital after the stabbing event in Washington, D.C. on December 12. Tr. 10075:16 – 10076:9 (Bertino). Pezzola delivered a decorative shield to Bertino, and Pezzola told Bertino that he had participated in restraining the man who stabbed Bertino. *Id.* A few days later, on January 2, Bertino added Pezzola to the MOSD. Tr. 10076:16 – 24 (Bertino); Ex. 507-7.

On December 31, around the time of Pezzola's visit to Bertino, Tarrio posted an image of Pezzola on the streets of D.C. in a menacing pose amongst a group of Proud Boys. Ex. 600-51.

Tarrio captioned the image with the message, "Lords of War. #J6 #J20", which caption associated the Proud Boys, "war," and dates of significance to the election (*i.e.*, the dates of the certification and inauguration). *Id.* Biggs posted the same image one minute before Tarrio. Ex. 603-46. Biggs captioned the image, "Epic[.]" *Id.*

### *Tarrio's Arrest on January 4*

Meanwhile, in late December of 2020, Tarrio learned that there would be a warrant for his arrest based on his burning of the banner at the December rally. Ex. 553-1.14. Tarrio shared this information with the other MOSD leaders and explained that he was "pushing for" the arrest to happen on January 6, which other leaders believed could act as the "shot heard round the world" and inspire "the normies [to] fuck up the cops." Ex. 501-39. Tarrio was arrested shortly after leaving the airport when he landed in the D.C. area on January 4. Tr. 4202:21 – 4203:12 (Koble). The upper-echelon Proud Boys Elders immediately began exchanging messages about the arrest with and one Elder asking, "is everything compromised?" In response, Nordean directed the others to "nuke all the chats" that Tarrio was in "or just try and scrub as much as you can." Ex. 500-81. Other MOSD leaders also learned of Tarrio's arrest and, immediately upon hearing the news, began taking steps to destroy evidence by "nuking" – or deleting – the various encrypted chat groups in which the planning for January 6 was taking place. *E.g.*, Ex. 500-81, 501-62, and 509-4. MOSD leaders, including Nordean and Rehl, communicated to the membership that they should all clean up their chats, and the leaders destroyed the original MOSD Leaders and MOSD Members groups. Ex. 509-6. New message groups were created for the MOSD, which initially excluded Tarrio. Ex. 509-1 and 510-1. Another group, called Boots on Ground, was created and was joined by MOSD members and non-members who were in D.C. Ex. 512.

In the reconstituted MOSD chats, the members' calls for violence intensified and became increasingly specific to the approaching certification proceeding. For example, on January 3, 2021, one of member posted an image of the White House in the MOSD Member chat and included the comment, "1776 flag flying over the White House last night." Ex. 507-10. Another member remarked, "[g]onna be war soon . . . " to which another member responded, "Yes Sir time to stack those bodies in front of Capitol Hill." *Id.* Shortly thereafter, another member posed a question to the group, "So are the normies and 'other' attendees going to push thru police lines and storm the capitol buildings? A few million vs A few hundred coptifa should be enough." Ex. 507-11. Another member posted a video message in which he remarked that the people effecting the stolen election had been "caught" and that by persisting, they were "gonna make the whole country stand up and fuckin' do bad things to bad people." Ex. 507-12. The following day, the conversation continued among the MOSD. One of the members again asked the question, "what would they do of 1 million patriots stormed and took the capital building. Shoot into the crowd? I think not." Ex. 507-16. MOSD leader and co-conspirator John Stewart remarked, "They would do nothing because they can do nothing[.]" *Id.* These conversations among the members provided assurance to the MOSD leaders that they had selected the right men for the job. By January 4, Bertino was communicating to other MOSD leaders that "this was where the rubber meets the road," by which Bertino meant that "all other options were pretty much exhausted and we felt like it was time to make whatever move we had to make to save the country." Ex. 505-22; Tr. 10131:3-10 (Bertino).

*Plans for the Attack Continued*

After the shock of Tarrio's arrest subsided, the MOSD continued with its plans. After his arrest, Tarrio—who now faced additional felony charges for unlawfully possessing ammunition magazines—was held in custody overnight and then ordered to leave D.C. Ex. 933; Tr. 4212 -

4214 (Koble). Nordean and Biggs assumed direct operational control over the MOSD, and they assured their subordinates that "the rally's continuing" and that they had formed a "plan" about which they had consulted Tarrio. Ex. 510-9 and -23. In a private, encrypted message, Nordean instructed his men to meet at the Washington Monument at 10 a.m. and that "from there" the men would be "marching to the Capitol." Ex. 551. The call to meet at 10 a.m. at the Washington Monument was also broadcast by other MOSD leaders to the MOSD members and Boots on Ground participants. Ex. 510-24 and 512-5.

On the morning of January 6, some MOSD leaders expressed what they hoped to see happen that day. One leader wrote, at 7:20 a.m., "I want to see thousands of Normies burn that city to ash today," continuing, "The state is the enemy of the people." Ex. 509-26. Bertino responded, "We are the people." Co-conspirator John Stewart responded, "I will settle with seeing them smash some pigs to dust," and acknowledged, "These normiecons have no adrenaline control." *Id.* Bertino said, "Fuck it let them loose," and Stewart remarked that the police "went too far when the arrested Henry [Tarrio] as a scare tactic." *Id.* Bertino's conversations with Proud Boys leaders revealed no disagreements with those sentiments, and his conversations with Proud Boys generally involved a mood of "[d]esperation." Tr. 10137:3 – 10138:1 (Bertino)

### *The March to the Capitol*

At approximately 10:00 a.m., a group of over 100 Proud Boys met at the Washington Monument—as instructed. Tr. 5482:11-15 (Greene). Consistent with the directives of Biggs, Tarrio, and other leadership, the assembled men were not wearing Proud Boys colors, but many wore tactical equipment such as helmets and plate carriers. *Id.* at 5481:20-22 (Greene); *see also* Ex. 1000 at 00:25-3:05. Many were also wearing t-shirts stating, "Enrique Tarrio did nothing

wrong"—a message of support for Enrique Tarrio's arrest on January 4 for his participation in the burning of the banner on December 12. *E.g.*, *id.* at 13:52.

Shortly after 10 a.m., Nordean, Biggs, and Rehl marched the Proud Boys group, including members of the MOSD like Pezzola, away from the planned speeches at the Ellipse and towards the Capitol. *Id.* at 3:05. On their march from the Washington Monument to the Capitol, observers noted that the Proud Boys were more serious and disciplined than they were during the rally in December. *See*, *e.g.*, Tr. 4623:18 – 4624:11 (Quested). On that march, Nordean and Biggs addressed the men through a megaphone—telling them that in their view the police and government had failed them. *E.g.*, Ex. 1000 at 4:10-5:33. As the group walked past the front face of the Capitol at approximately 11:20 a.m.—more than an hour prior to the initial breach—Nordean announced, "We represent the spirit of 1776. If you haven't noticed, real men are here. We know what the oath is [unintelligible] to support and defend the Constitution . . . Let us remind those who have forgotten what that means." *Id.* at 10:23-10:36. As the group marched past U.S. Capitol Police officers on at approximately 11:28 a.m., Biggs gave the group of officers the middle finger, and the group taunted them, yelling "treason," and warning the officers, "don't make us go against you." Nordean Ex. 301 at 1:52:37; Ex. 1000 at 12:00-12:20. The group continued to the east side of the Capitol. As the group stood on the east side of the Capitol, one of the Proud Boys with them yelled out, "let's take the fucking Capitol." The man was chastised and told not to "say" that. Ex. 1000 at 14:10-14:30.

On the march, Rehl played an integral organizational role, using his radio to ensure that the group of approximately 200 stayed together as it marched towards the Capitol. *Id.* at 8:15-8:30. He also communicated with co-conspirators who were not present, but who were monitoring events in Washington remotely, about how things were going on the ground, including whether

journalists were following the group and the fact that they had not seen much Antifa presence. Ex. 509-29.

Shortly before noon, Nordean, Biggs, and Rehl led the men back to the west side of the Capitol to a group of food trucks located at approximately 2nd Street and Constitution Avenue NW, arriving at approximately 12:10 p.m. There the group stopped and waited for approximately thirty minutes. At 12:45 p.m., fifteen minutes before the certification of the Electoral College vote was scheduled to start, Nordean mustered the men into a column and marched them back towards the Capitol. Ex. 1000 at 19:05-19:20, Ex. 1001 at 00:50-1:15. In doing so, Nordean, Biggs, and Rehl led the men away from President Trump's speech, which was underway.

### *The Attack on the Capitol*

Biggs, Nordean, Rehl, and their men played an integral role in the first breach of the restricted perimeter on January 6. They arrived at the Peace Circle, at the edge of the restricted portion of Capitol grounds, at approximately 12:50 p.m. Prior to their arrival, the Peace Circle was uncrowded and relatively peaceful. Ex. 1001 at 00:10-00:32. Biggs led the crowd in chants that included "USA!," "Where's Antifa", and "Whose Capitol? Our Capitol!" *Id.* at 4:17-4:40 & 6:29-6:35. The latter chant had not been used on January 6 by the defendants prior to that moment. *E.g.*, Tr. 5493:11-14 (Greene); Nordean Ex. 301. Within minutes, the crowd grew and became more agitated. At 12:53 p.m., approximately one minute after Biggs led the "Whose Capitol? Our Capitol!" chant, the crowd surged forward towards a police barricade manned by five officers. Ex. 1001 at 8:07. As the crowd surged forward, Nordean and Biggs attempted to organize the men to stay with and follow them. *Id.* at 8:18-8:37. Rehl moved to the front of the crowd while yelling, "Fuck them! Storm the Capitol!" *Id.* at 10:01-10:20; Tr. 12246:5-10 (Miller).

Multiple Proud Boys participated in the clash with police at the Peace Monument. One Proud Boy, who had been personally recruited by Ethan Nordean to come to January 6 and be "on the front lines" with him, charged forward and held up a Proud Boys' hand gesture as the barricades fell. Tr. 12261:6 – 12262:6 (Miller); Ex. 550-2 and -3. Co-conspirator Donohoe posted a selfie-style video to the MOSD Leaders chat group in which he filmed himself crossing the fallen barricades at the Peace Circle. Donohoe remarked sarcastically, "Oops! Looks like we just stormed the Capitol building!" Ex. 1137; Tr. 10143:1-4 (Bertino). Upon viewing this video in the MOSD message group, Bertino encouraged the MOSD leaders to "form a spear." Ex. 1137. He then instructed the members, "Storming the capital right now!!" Tr. 10156:21 – 10157:10 (Bertino); Ex. 510-33. He gave the same instruction to the Boots on Ground chat, which was created for all Proud Boys members in Washington, D.C. on January 6, and he told the men to "Get there." *Id.* at 10156:1-8; Ex. 512-8.

After the first barricades fell, members of the Proud Boys led the way onto Capitol grounds. Pezzola charged forward with Proud Boys from New York, and some of them removed barricades along the way. Tr. 12264:16-24 and 12317:22 – 12318:5 (Miller); Ex. 1001 at 11:51 and Ex. 447-A at 1:10-1:38. Rehl moved to the front and was surrounded by other Proud Boys. *Id.* at 12318:10 – 12319:21; Ex. 445-D. Biggs filmed a selfie-style video as he charged up the walkway, capturing Nordean celebrating with the Proud Boys' hand gesture and Biggs defiantly announcing that they "had gone through every barricade thus far . . . fuck you!" Ex. 404-D. Nordean and Biggs moved through the crowd in a "stack" formation—hands on shoulders—with other Proud Boys to reach the very front of the crowd. Tr. 12322:18 – 12323:12 (Miller); Ex. 492-Fx at 00:35. Nordean, Biggs, Rehl, Pezzola, and their men were stopped at a waist-high black metal fence with law enforcement attempting to regroup on the other side. With his men surrounding him, Nordean

yelled at the officers, calling them "pigs" and "traitors." Tr. 7088:4-24 (Cooney). Rehl also yelled at the officers. Tr. 12325:16-19 (Miller); Ex. 417x at 00:24-00:30.

Just minutes after the initial barricades fell, Biggs, Nordean, and their men would again play a key role in the initial breach. Biggs called Nordean over to him, and then Nordean and Biggs combined to rip the fixed black metal fence out of the ground, by moving it back and forth and breaking the construction anchors that affixed it to the ground. Ex. 445-Bx and 492-G; Tr. 7125:5 – 7126:2 (Cooney); Tr. 11479:13-21 (McIntyre) (describing construction of fence). Nordean and Biggs charged forward with their men, and Biggs waived the crowd forward. Ex. 445-By. It was not yet 1:00 p.m., but Nordean, Biggs, Rehl, and the dozens of Proud Boys they had led to the Capitol were unlawfully on Capitol grounds and approaching the base of the building.

In the West Plaza, U.S. Capitol Police—some in riot gear—attempted to reform a line. Nordean, Biggs, Rehl, and Pezzola again positioned themselves at the front. They and other rioters continued to ignore the Capitol Police Officers' directives. Members of the crowd began to physically engage with law enforcement. Bertino, watching from afar, believed he was witnessing the next American Revolution. Tr. 10161:10-13 (Bertino). As Nordean, Biggs, and Rehl watched the fighting, Pezzola surged forward and forcefully grabbed and ripped away a riot shield from a Capitol Police Officer. *See*, *e.g.*, Ex. 229x, 444-Ax, and 1108-30; Tr. 12356-363 (Miller). Shortly thereafter, Donohoe, threw two water bottles at a line of police officers. Ex. 444-Ax; Tr. 12383:2 – 12384:7 (Miller). Donohoe then united with Pezzola and led Pezzola to the rear of the plaza as they both carried Pezzola's stolen riot shield. Ex. 450x and 442-A; Tr. 12390:9 – 12391:25 (Miller). Pezzola responded affirmatively when asked, "you just stole a riot shield?" Ex. 450x; Tr. 12394:17-21 (Miller). Pezzola posed for a picture with the shield while making a hand gesture

associated with the Proud Boys. Ex. 475. Donohoe posted a message to the MOSD leaders, including Tarrio, Biggs, Nordean, and Rehl, that read, "Got a riot shield!" Ex. 509-33.

Around the same time, shortly before 1:30 p.m., as the police began to regain control of the West Plaza, Biggs and Nordean, along with other members of the Proud Boys, regrouped on the Capitol lawn. Tr. 12378:2 – 12379:10 (Miller). Biggs filmed a selfie-style video with Nordean and several other Proud Boys. Biggs boasted that they had just "stormed" the Capitol and Biggs unapologetically claimed that January 6th was a day in "infamy." *Id.* at 12380:3-16; Ex. 404-LL.

*Defendants Breached the Building*

At approximately 1:30, law enforcement had regained some level of control of the West Plaza. Rehl stood at the rear of the plaza, Donohoe and Pezzola stood nearby, and Nordean and Biggs stood back on the lawn. Tr. 12396:19-23 (Miller). Rehl recognized that law enforcement had pushed the crowd back, and Rehl reported in a text message to others that the crowd was at a "standstill." Ex. 547-5. At approximately 1:36 p.m., Pezzola's and Donohoe's group moved forward through the crowd to an entrance to a set of stairs that led to the Upper West Terrace. Tr. 12399:3 – 12400:21 (Miller); Ex. 160-Cx. At approximately 1:44 p.m., Biggs and Nordean's group moved forward through the crowd to the same area. Tr. 12404-407 (Miller); Ex. 160-Dx and 211x. They were among dozens of other Proud Boys who had reunited at the base of the stairs. Those stairs led to the Upper West Terrace, which abutted the Capitol building and many doors and entrances to that building. At this entrance, which was under scaffolding, a small group of outnumbered officers guarded the foot of the stairs. Daniel Lyons Scott, a Proud Boy who had marched behind Nordean, Biggs, and Rehl to the Capitol (and the same man who had earlier yelled out, "let's take the fucking Capitol"), initiated a push by shoving two officers and pushing them up the stairs. Tr. 12467:6-9 (Miller); Ex. 451x. Almost instantaneously thereafter, the crowd

overwhelmed the officers and pushed up the scaffolding. Pezzola, Donohoe, and Biggs were among the surge of rioters to move up the concrete stair behind Scott. Tr. 12467:12-12470:16 (Miller); Ex. 451x and 476x. Scott, along with multiple other Proud Boys who participated in the assault, displayed the Proud Boys hand gesture while celebrating immediately afterwards. Tr. 12471:17 – 12472:23 (Miller); Ex. 411-C. Shortly thereafter, co-conspirator Stewart instructed the MOSD members to "Accelerate!" Ex. 510-36.

Pezzola continued up the stairs with a mass of other rioters. He yelled at officers manning a barricade at the top of the stairs, "You better be fucking scared. Yeah, you better be fucking scared. ….We ain't fucking stopping . . . You better decide what side you're on motherfuckers. You think Antifa's fucking bad? Just you wait." Ex. 429-Cx. After a brief struggle with the rioters, the police line gave way. Pezzola moved up the stairs and approached the building with a small group of rioters. Once at the building, Pezzola used the stolen riot shield to break a window on the building. Ex. 425. The first rioters into the building entered through that window. Tr. 12516:4-6 (Miller). Pezzola was among the first half-dozen rioters into the building. *Id.* at 12518:6-9 (Miller). As a result of rioters' entry into the building, the certification of the Electoral College was halted. *E.g.*, Tr. 11862:7-12 (McCumber).

Biggs, who had initially gone up the stairs under the Inaugural scaffolding, exited the stairs, briefly reunited with Nordean, *e.g.*, Tr. 12493:13-21 (Miller), and then scaled a wall to go back up the stairs soon after rioters had reached the Upper West Terrace. *Id.* at 12500:13-25; Ex. 497-L. Once on the terrace, Biggs gestured back down to the ground to encourage those still on the ground to join him. Tr. 12505:9-25 (Miller); Ex. 414-Ax. Biggs entered the building with two other Proud Boys within minutes of Pezzola. Tr. 12525:6-12 (Miller); Ex. 112. Biggs stole a drink from a small shop inside the Capitol. Tr. 12535:14-21 (Miller); Ex. 409-A. A few minutes after entering, Biggs

exited the Capitol on the east side and rejoined other Proud Boys. Tr. 12532:18-24, 12543:5-25 (Miller); Ex. 163x and 409-A. Biggs filmed himself and the crowd on the east side of the Capitol and remarked, "we've taken the Capitol." *See*, *e.g.*, Ex. 405-I.

At 2:38 p.m., as Biggs stood outside the doors on the east side of the Capitol, Tarrio posted, "Don't fucking leave" on his social media account. Ex. 600-59. Two minutes later, at approximately 2:40 p.m., Biggs entered the Capitol a second time—this time through the Columbus Doors on the east side of the building. Tr. 12566:4-21 (Miller); Ex. 433-C and 172x. Several members of the Proud Boys and the men they led to the Capitol were in the location during the breach, including one man who sprayed at officers with a chemical irritant. Tr. 12562:2-21 (Miller); Ex. 431-A. Biggs took advantage of the crowd's overwhelming numbers, and Biggs made his second entry as part of a tactical line of four Proud Boys immediately after the crowd overwhelmed officers guarding the door. Ex. 433-C. Biggs' group pushed directly past those officers, with Biggs brushing up against one. Ex. 172x. Once inside, Biggs and his men went to the Senate gallery, with Biggs removing rope dividers from a hallway along the way. Tr. 12577-579 (Miller); Ex. 129x, 131x, and 455-A. One of the men with Biggs stole a flag from outside the Senate Chaplin's Office, and Biggs posed with that flag for a selfie. Tr. 12631:3-23 (Miller); Ex. 130 and 405-BB.

### The Defendants Celebrated Their Achievement

As this scene unfolded in the Capitol, Tarrio exchanged messages with Proud Boys leaders. For example, starting at around 2:39 p.m., Tarrio exchanged text messages with Bertino. Bertino stated, "Brother, you know we made this happen," and Tarrio responded, "I know." Ex. 530-5. The exchange continued:

**Bertino**: I'm in tears, bro.

**Tarrio**: This is it.

**Bertino**: 1776, motherfucker.

**Tarrio**: The Winter Palace.

*Id.*; *see* discussion, *supra*, describing the Winter Palace document.

Nordean had climbed the same set of concrete stairs and entered the Capitol's Upper West Terrace door as the doors were in a state of alarm. Tr. 12546:3-21 (Miller); Tr. 11662:5-9 (Riggleman); Ex. 153x and 473. Once inside, Nordean moved around the Rotunda with other Proud Boys, including a Proud Boys member who had twice entered the building with Biggs. While in the Rotunda, Nordean told a group of officers in the Rotunda that the "thin blue line" was "dead." *E.g.*, Tr. 12667:1 – 12668:6 (Miller); Ex. 256.

Rehl also entered the Capitol. Around the same time that Pezzola was breaking the window near the Senate Wing Door, Rehl remained in the West Plaza with a group of Proud Boys. While there, Rehl moved forward toward a line of officers and sprayed a substance from a canister at an officer before quickly retreating into the crowd. Ex. 2003, 2004, and 2008. The police line eventually gave way, and Rehl and his group of Philadelphia Proud Boys advanced toward the Capitol and up the same concrete stairs as Biggs, Nordean, and Pezzola. Tr. 12549:1-16 (Miller). Rehl's group posed for photographs flashing the Proud Boys hand gesture from the Upper West Terrace. *Id.* at 12552:8-21; Ex. 401-T. While there, at approximately 2:30 p.m., Rehl sent a text message to other Philadelphia Proud Boys that read, "Civil war started." Ex. 547-5. Rehl then asked the Proud Boys he was with whether they wanted to go inside. Rehl's group entered the Capitol through the Senate Wing Door. Tr. 12635:8-23 (Miller); Ex. 115x. His group entered a private office that included maps of Oregon on the walls, where Rehl smoked and posed for

pictures while flashing the Proud Boys hand gesture. Tr. 12639:16 – 12640:24 (Miller); Ex. 415x and 402-B.

Tarrio attempted to call both Nordean and Biggs while they were inside the Capitol. Biggs returned Tarrio's call after exiting the Capitol building, and the call connected for 42 seconds. Tr. 12646:14-23 (Miller); Ex. 653-1. Less than five minutes after that call, Tarrio posted a photo to his Parler account of a rioter in a chair on the Senate floor with the caption, "1776." Ex. 600-60. Tarrio followed that with a number of posts to his Parler account, including, "This is no longer Washington, D.C. This is the city of the people of the United States of America, come and take it." Ex. 600-61. At 3:03 p.m. on January 6, Tarrio continued his text-message conversation with Bertino, and Bertino sent him a video of Pezzola breaking the window with the shield, asking Tarrio if he recognized anyone. Ex. 530-7. Tarrio sarcastically responded, Nopeeeeeeee. *Id.*; Tr. 10168:20-25 (Bertino). Tarrio later compared what he saw in the video of Pezzola breaking the window to "George Washington, Sam Adams, and Franklin." Ex. 530-7.

Some of the men Biggs, Nordean, and Rehl had marched to the Capitol continued to effectuate the goals of the conspiracy long after they were separated from their leaders. For example, at least two Proud Boys—one a member of MOSD and the other a member of Boots on Ground—participated in a violent attempt to overwhelm officers guarding an entrance to the Capitol in an area known as the "tunnel" on the Lower West Terrace. Tr. 12674-679 (Miller); Ex. 461 and 481-B.

Shortly after Biggs exited the building and had a 42-second call with Tarrio, Biggs and Nordean reconnected and the two joined a group of six other Proud Boys and took a group photo with the Capitol in the background. They threw up their Proud Boys hand signal and one of the men displayed an American flag that the Biggs group had stolen from outside the Senate chamber.

29

Tr. 12694:12-24 (Miller); Ex. 449. Thereafter, Nordean walked away from the Capitol, then back towards it on Constitution Avenue, with two of the Proud Boys from that photo. As he walked up Constitution Avenue, he wore a POW flag he had stolen from the Rotunda like it was a cape. Tr. 12657-660 (Miller), 12699-700 (Miller); Ex. 181, 183, and 552-1.

At 4:06 p.m., close in time to when Nordean was parading up Constitution Avenue with the pilfered POW flag, Tarrio was still talking with other Proud Boys leaders in the same chat where he had previously said, "Make no mistake . . . we did this." When another leader asked, "So what do we do now?", Tarrio replied, "do it again." Ex. 500-86.

From the start of the riot, the defendants and their co-conspirators celebrated their achievement of storming the Capitol. Tarrio, who was monitoring the attack on the Capitol from afar as it unfolded, posted encouraging messages to social media including "Proud of my boys and my country," and "Don't fucking leave." Ex. 600-59. Tarrio privately claimed credit for the riot at the Capitol, telling Proud Boys senior leadership, "Make no mistake . . . we did this," and Biggs and Nordean posed with other Proud Boys on the west lawn of the Capitol for a celebratory video in which Biggs stated that "January 6 will be a day in infamy." Ex. 400-LL and 500-84. Rehl made social media posts calling January 6 a "historical day," Ex. 602-52, and he told his mother he was "so fucking proud" of the Proud Boys' "raid of the capitol." Ex. 545-3. Pezzola, once inside the building, filmed a video of himself having a "victory smoke in the Capitol," and stating, "I knew we could take this motherfucker over if we just tried hard enough… Proud of your motherfucking boy." Ex. 403-G. On the evening of January 6, Bertino recorded a podcast, in which he referred to Tarrio's recent calls to revolution and said to legislators, "You were fucking around for years. Today, you found out," a reference to the "FAFO" slogan often used by the Proud Boys. Ex. 606-Q and -T.

The defendants' celebratory statements continued in the days that followed. On January 7, Tarrio addressed the MOSD members, telling them he was "proud of y'all." Ex. 510-51. Rehl likewise told the MOSD members he was "proud as fuck what we accomplished yesterday." Ex. 510-52. Biggs recorded a podcast-style interview in which he called January 6 a "warning shot" to the government that showed them "how weak they truly are" after being "bitch-slapped . . . on their own home turf." Ex. 611-B. Biggs explained that "January 7th was warning shot to the government – look, we started this country this way and we'll fuckin' save it this way." Ex. 611-D. Nordean recorded a video of himself describing an encounter with a woman at the bar; in the video he faulted the woman for not appreciating that he "was part of fucking storming the Capitol of the strongest country in the fucking world… 1776, bitch." Ex. 470-B and -C. In a meeting in Miami about a week or two after January 6, Tarrio told Bertino that if Tarrio were there on January 6, he would have been saying "Go, go, go." Tr. 10224:2-11 (Bertino).

Then, as members of the MOSD began to be publicly identified and arrested, the defendants took steps to cover up their criminal conduct. MOSD Leaders directed others to clean-up, delete, or "nuke" the encrypted chats that had been used to plan and carry out the attack, including those used by the MOSD members. *See*, *e.g.*, Ex. 509-41, -42, and 516-1. Bertino tried— and failed—to delete the Boots on Ground chat. Tr. 10211:6-12 (Bertino). Tarrio, likely realizing how incriminating the video of Pezzola smashing the window would be, reached out to Pezzola through Bertino to instruct Pezzola to state he that he was not with the Proud Boys. Tr. 19253:1-18 (Pezzola).

## III. DEFENDANTS' ARGUMENTS

The defendants' arguments take various forms. First, the defendants argue generally that the evidence at trial was insufficient to prove their participation in any criminal conspiracy. *See* ECF 822 at 3-5 (Nordean); ECF 823 at 1-2 (Tarrio); ECF 828 at 3-10 (Biggs and Rehl). As part of

this argument, Biggs and Rehl argue that their "protected speech" was improperly used against them, *id.* at 4-10, and that the defendants' convictions for both conspiracy offenses and substantive offenses creates a "very real potential for a violation of the double jeopardy clause," *id.* at 11. Second, on certain conspiracy counts, the defendants reargue legal issues that this Court has already resolved in the government's favor, relating to the "corruptly" element of the obstruction charges, *see* ECF 822 at 2-3; ECF 828 at 11-16; and the execution clause of seditious conspiracy, *see* ECF 822 at 5-6. Third, the defendants raise factual arguments against their guilt on specific substantive counts: Nordean, Biggs, and Rehl on Count Six (fence destruction), ECF 822 at 8; ECF 828 at 21-23; Pezzola on Count Seven (window destruction), ECF 824 at 3-4; and Count Ten (robbery of the shield), ECF 824 at 4-5.

For the reasons that follow, all these arguments should be rejected and the motions denied.

**A.  Legal Standard for Judgment of Acquittal**

Federal Rule of Criminal Procedure 29(a) provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). When ruling on a motion for judgment of acquittal, the Court must "consider[ ] the evidence in the light most favorable to the government and determin[e] whether, so read, it is sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt." *United States v. Kayode*, 254 F.3d 204, 212-13 (D.C. Cir. 2001) (quoting *United States v. Harrington*, 108 F.3d 1460, 1464 (D.C. Cir. 1997)).

A defendant "seeking to overturn a jury verdict for insufficient evidence bears an exceedingly heavy burden." *United States v. Salamanca*, 990 F.2d 629, 637 (D.C. Cir. 1993). Sufficiency review "is highly deferential: [the Court] must accept the jury's verdict if any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *United States*

*v. Williams*, 836 F.3d 1, 6 (D.C. Cir. 2016) (quotation marks omitted). The Court "view[s] the evidence in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence, and giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *Id.* (quotation marks omitted). The Court must "accord[ ] the government the benefit of all legitimate inferences," *United States v. Weisz*, 718 F.2d 413, 437 (D.C. Cir. 1983), and deny the motion if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Arrington*, 309 F.3d 40, 48 (D.C. Cir. 2002) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Put another way, the Court may grant a motion for judgment of acquittal only when "a reasonable juror must necessarily have had a reasonable doubt as to the defendant[']s guilt." *Weisz*, 718 F.2d at 437 (citing *United States v. Singleton*, 702 F.2d 1159, 1162-63 (D.C. Cir. 1983)); s*ee also United States v. Reese*, 561 F.2d 894, 898 (D.C. Cir. 1977); *Curley v. United States*, 160 F.2d 229, 232-33 (D.C. Cir. 1947) ("[I]f there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt, the motion [for judgment of acquittal] must be granted."). The question before the Court is focused exclusively on the sufficiency of the evidence and whether it could establish for a rational juror the elements of each offense.

Taking the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the counts of conviction proven beyond a reasonable doubt.

## B.  The Conspiracy Charges

### 1.  The Facts Adduced at Trial Prove That the Defendants Formed a Criminal Conspiracy

To prove a conspiratorial agreement, "the government need only show that the conspirators agreed on 'the essential nature of the plan,' not that they 'agreed on the details of their criminal

scheme.'" *United States v. Gatling*, 96 F.3d 1511, 1518 (D.C. Cir. 1996) (quoting United States v. Treadwell, 760 F.2d 327, 336 (D.C. Cir. 1985) (citation and quotation marks omitted)); *see also United States v. Hitt*, 249 F.3d 1010, 1015 (D.C. Cir. 2001) (citing *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977)). As the Supreme Court in *Blumenthal v. United States* explained, "the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others." 332 U.S. 539, 557 (1947) (footnote omitted). "Otherwise," the Supreme Court observed, "the difficulties, not only of discovery, but of certainty in proof and of correlating proof with pleading would become insuperable, and conspirators would go free by their very ingenuity." *Id.* It follows, therefore, that the evidence need not establish that the defendants settled on every detail of an intricately developed plan. Nor does it matter whether the persons who formed the agreement actually carried out their plans or whether the agreement ultimately was successful; though, proof concerning the accomplishment of the object of the conspiracy may certainly be evidence of the existence of the conspiracy itself. *See generally Final Jury Instructions* (ECF 767) at 16-18 (describing what is required to establish the existence of a conspiratorial agreement).

Viewed in the light most favorable to the government, the evidence amply shows beyond any reasonable doubt that Tarrio, Biggs, Nordean, and Rehl (along with others) entered into an agreement to oppose by force the lawful transfer of power following the 2020 presidential election. The evidence showed that Tarrio, Biggs, Nordean, and Rehl formed an agreement in advance of January 6 that was characterized by an unusual degree of structure and organization. At trial, the government presented ample evidence that (1) the Ministry of Self Defense existed; (2) it was created by Tarrio; (3) its leaders included Biggs, Nordean, and Rehl; and (4) those leaders shared

a mutual desire to work together for the success of the group. *See generally* Ex. 501 and 509 series (MOSD leadership chats, discussing "chain of command," recruitment of subordinates, rules of behavior, equipment and outfitting, scheduling of meetings, etc.). It is plain, then, that *an agreement* was in place among these defendants.

It was also clear that the MOSD leaders intended to pursue specific *goals* when they deployed the group at rallies. During a video briefing on December 30, 2020, one MOSD leader explained: "Each rally needs to have a strategic objective. You know, we don't just show up somewhere just for no reason." Ex. 613-G. Likewise, when a member of the MOSD membership chat group appeared to be losing focus in the days before the event, one leader sent a voice note saying "This fucking group has a mission; either get with it or fuck off," and Bertino followed it with one saying "This chat has a mission, this chat has its objective, um, and it doesn't need to be, um, you know, distracted from the mission at hand." Ex. 505-20 and -21.

Given that Tarrio, Biggs, Nordean, Rehl, and their coconspirators indisputably formed a structured organization that existed to pursue a "mission" on January 6, the only remaining question is whether that mission involved forcibly opposing the transfer of presidential power. The trial record is replete with evidence that it did, and that each defendant agreed with that objective.

To start, the defendants' statements in the months leading up to January 6 evinced an intense desire to keep Donald Trump in power. For example:

- Tarrio, immediately after the election, labeled the result a "fraud," announcing "We're rolling out. Standby order has been rescinded." Ex. 600-6. Soon after, he made clear he viewed himself and his organization as having a direct and vital interest in the result of the election, posting to Parler on November 16: "If Biden steals this election @TheProudBoys will be political prisoners. We won't go quietly… I promise."

Ex. 600-17. He advertised the Proud Boys' November 14th rally in Washington DC with the hashtag "#StopTheSteal," Ex. 600-10,

- Biggs, the morning after the election, called the process a "disgrace" that unfairly robbed Trump of a "blowout." Ex. 603-1. He called Democrats "shameful, un-American, Commie pieces of shit" who were "radicalizing people by stealing this election. They are gonna create their own worst enemy from this." Ex. 603-2.

- Nordean, in the wake of the election, accused "Dems" of "trying to steal this election." Ex. 601-5. Ten days later, he later posted a warning to his perceived political adversaries: "We tried playing nice and by the rules, now you will deal with the monster you created. The spirit of 1776 has resurfaced and has created groups like the Proudboys and we will not be extinguished. . . . Good luck to all you traitors of this country we so deeply love...you're going to need it." The next day, he posted a video from what he described as a "stop the steal rally." 601-11.

- On November 6, Rehl posted "Calling all Trump supporters in the area tomorrow! Our country is at stake, we need all hands on deck!" Ex. 602-1. He re-posted statements by Donald Trump with captions like "#stopthesteal" and "Not so fast Biden." Ex. 602-2.

The defendants' pre-January 6 statements also shed light on the *means* they were willing to use in furtherance of their political goals. Tarrio, on his way to an earlier election-related rally, posted that a "can of whoopass" was "in route to DC," Ex. 600-15, and he later made statements on social media and in public interviews celebrating the violence that ensued, *e.g.,* Ex. 600-18 and 620-B. Biggs, on social media, advocated "storm[ing] into these election areas where they are counting ballots." Ex. 603-3. Nordean stated on a podcast that "the only thing left is force." Ex. 608-C. Rehl voiced a hope that "the firing squads are for the traitors that are trying to steal the

election from the American people," Ex. 602-29, and he posted a video of Proud Boys engaging in street violence with a caption referencing the election-related phrase "release the Kraken." Ex. 602-12.

Subordinate members of MOSD likewise expressed an eagerness to use violence as part of the group, sending messages to the chat about intentions to "log into minecraft," Ex. 503-5, "beat the motherfuck" out of Antifa, Ex. 503-17, "break some legs," *id.*, "kick ass when… it's time to kick ass," Ex. 503-23, "storm everyone's capitols," Ex. 503-13, "let the bodies hit the floor," Ex. 507-11, and "stack those bodies in front of Capitol hill," Ex. 507-10. MOSD's leaders never expressed any disapproval about such remarks. *See* Tr. 8515-8517 (Dubrowski). Given the rule about staying "on topic," and the leaders' occasional complains when they believed members were going off topic, their silence in the face of this violent chatter can and should be understood as tacit approval. *E.g.*, 503-1 and -41; *see* Tr. 8588:4-24 (Kelly, J.) (Court's oral ruling on Telegram exhibits, affirming this theory of relevance).

On the day itself, the defendants' words and actions provided further confirmation of their unlawful purpose. Biggs, Nordean, and Rehl were all present at the Capitol, and each of them personally used force there. Biggs and Nordean joined with others to forcibly destroy a black metal fence at one of the breach points, allowing the Proud Boys group and other rioters to make further progress toward the Capitol.[4] Rehl used a chemical spray to assault a police officer during an altercation on the west front of the Capitol. Throughout, these defendants made clear through their statements that they understood themselves to be levying an attack on the Capitol — not participating in a peaceful protest taken too far. For example, during the first breach at Peace

---

[4] This conduct is the basis of Count Six and is discussed in greater detail herein, *infra*, at Part III.C.1. Nordean also argues that the agreement to use force failed to satisfy the legal standard for Seditious Conspiracy, which argument is addressed herein, *infra*, at Part III.B.3.

Circle, Rehl filmed the violence against police while shouting "Fuck them! *Storm the Capitol*!" Ex. 400-D (emphasis added). Moments later, with the crowd moving toward the building in the wake of retreating officers, Biggs recorded himself proclaiming, "American citizens are *storming* the Capitol! *Taking it back* right now!" Ex. 404-F (emphasis added). In response, Nordean flashed a Proud Boys hand sign at the camera. *Id.* Later, with the west terrace fully overtaken by rioters, Rehl messaged friends "everyone *raided* the capital," and made clear that he intended further progress notwithstanding the forcible resistance from law enforcement: "We're *at a standstill*, cops are dropping concussion bombs and pepper spraying, people are pepper spraying back and fighting riot cops." Ex. 547-5 (emphasis added).

Tarrio, who remained active on social media throughout the day, was vocal in approving both the violent conduct taking place and the result of that conduct – that is, the interruption of the certification proceeding. He posted that he was "enjoying the show" and "Proud Of My Boys and my country"—explicitly endorsing what his subordinates on the ground were doing. Ex. 600-58 and -59. And more than that, by explicitly encouraging his co-conspirators to persist in their unlawful conduct —telling them, "Do what must be done" and "don't fucking leave"— Tarrio sought to contribute to the success of the endeavor by bringing his influence as Proud Boys chairman and MOSD leader to bear on it. *Id.* Tarrio posted a photo of a rioter at the Senate dais with the caption "1776" (echoing the "1776" chant the men on the ground had been using), and he posted a photo of cowering lawmakers with the caption "When the people fear the government, there is tyranny... When the government fears the people... There is liberty." Ex. 600-60 and -63.

Finally, the defendants' later retrospective statements provided still further evidence that they and their followers had, in fact, been acting in pursuit of their shared goal of stopping the transfer of power — in other words, that they were not simply caught up in the moment or under

the influence of herd mentality. By repeatedly celebrating and ratifying what had taken place, the defendants made clear that, in co-conspirator Bertino's words, the interruption of the certification proceeding constituted the "accomplish[ment]" of MOSD's "mission." Ex. 510-39. For example:

- Tarrio told the Proud Boys Elders, "Make no mistake.. We did this…" 500-84.[5] On January 7, Tarrio told his subordinates in MOSD that he was "proud of y'all." Ex. 510-51. When asked what the Proud Boys should do next, Tarrio responded: "Do it again." Ex. 500-86.

- Biggs recorded a podcast-style interview in which he called January 6 a "warning shot" to the government that showed them "how weak they truly are" after being "bitch-slapped on their own home turf." Ex. 611-B and -D. Biggs explained that "January 7th was warning shot to the government – look, we started this country this way and we'll fuckin' save it this way" and he went on to explain that people forget that the founding fathers were "considered terrorists." Ex. 611-D. Twice—once while on the grounds of the Capitol and once immediately thereafter—he referred to January 6 a day that would live "in infamy," Ex. 404-LL and 509-37, echoing President Franklin Roosevelt's speech about the surprise attack on the United States that brought the country into World War II.

- Nordean recorded a video of himself describing an encounter with a woman at the bar; in the video he faulted the woman for not appreciating that "I was part of fucking storming the Capitol of the strongest country in the fucking world… 1776, bitch." 407-B, 407-C. Chatting with fellow Proud Boys leaders about the possibility of charges

---

[5] This was the same group to whom Tarrio had advocated for the creation of MOSD by saying "-whispers- Seventeen seventy six…." Ex. 500-74.

against him, Nordean said "I might get arrested when I land, but I regret nothing." Ex. 514-60.

- Rehl told his mother he was "so fucking proud" that his "raid of the capital" appeared to have "set off a chain reaction of events throughout the country." Ex. 545-3.[6] Like Tarrio, he also told the MOSD membership that he was "proud as fuck what we accomplished" on January 6. Ex. 510-52.

In sum, the government's evidence readily proved the existence of a conspiracy that included all the charged objective. As explained below, the defendants' specific arguments to the contrary do nothing to defeat that conclusion.

### 2.  The Defendants' Statements are Evidence of the Conspiracy

Defendants Rehl and Biggs claim that the evidence was insufficient in part because the government relied on their statements as evidence. ECF 828 at 4-10. Their current arguments are no different than those the Court rejected pretrial when it ruled that the admission of defendants' statements did not violate the First Amendment. *See*, *e.g.*, Dec. 14, 2022 Hr'g Tr. at 28-29. It should do the same here. Biggs and Rehl fundamentally fail to distinguish between cases involving threats and/or incitement (where speech itself is punished) and the use of otherwise protected speech as evidence of some other crime. The Supreme Court has explicitly sanctioned the latter, holding that "the evidentiary use of speech to prove an element of the offense, or to prove motive or intent" does not violate the First Amendment. *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993).

*Mitchell* permits evidentiary use of speech, even where that speech is otherwise protected by the First Amendment. Biggs and Rehl concede as much, ECF 828 at 9, but then argue that this case should not have been sent to the jury, without citing so much as a single case to support that

---

[6] Rehl had previously boasted to his mother about Proud Boys violence. Ex. 545-1.

contention. *Id.* at 9-10. In fact, the overwhelming majority of cases applying *Mitchell* to the evidentiary use of otherwise protected speech—even speech about things like religion and politics—has held that the admission of the evidentiary use of protected speech does not violate the First Amendment. *See, e.g.*, *United States v. Smith*, 967 F.3d 1196, 1205 (11th Cir. 2020) (rap lyrics) *United States v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015) ("This challenge is meritless, however, because here the speech is not 'itself the proscribed conduct.' The speech was not the basis for the prosecution, but instead it was used to establish the existence of, and [defendant's] participation in, the alleged RICO enterprise") (internal citation omitted) (rap lyrics and tattoos); *United States v. Hassan*, 742 F.3d 104, 127 (4th Cir. 2014) (conversations about the necessity of waging violent jihad, including a religious obligation, both admissible and relevant to allow the jury to attach nefarious intent to what otherwise may have been considered to be innocent acts); *United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012) ("[A]lthough the conspiracy was closely related to, and indeed proved by, many of the defendants' conversations about political and religious matters, the conviction was based on an agreement to cooperate in the commission a crime, not simply to talk about it"); *United States v. Fullmer*, 584 F.3d 132, 158 (3d Cir. 2009) (speeches advocating civil disobedience); *United States v. Salameh*, 152 F.3d 88, 111-12 (2d Cir. 1998) (the defendants were not "prosecuted for possessing or reading terrorist materials. The materials seized . . . were used appropriately to prove the existence of the bombing conspiracy and its motive").

The Court, moreover, properly instructed the jury on the use to which it could put the defendants' statements. *See Final Jury Instructions* at 42. The Court instructed the jury that it may consider statements to "show that the speaker had a certain motive, intent, knowledge, or state of mind"—precisely the type of use sanctioned by *Mitchell*—and reminded the jury that the First

Amendment protects the right to free speech where that speech does not pose an imminent risk of violence and is not likely to produce such violence. *Id.* This instruction was explicitly agreed to by both Rehl and Biggs. *See* email attached hereto as Exhibit A. The final instruction was modeled on a limiting instruction that the Court gave earlier in the case, after the government presented evidence from the defendants' Parler accounts—another instruction to which Rehl and Biggs explicitly agreed. *See* email attached hereto as Exhibit B; Tr. 6670 (Feb. 1, 2023).[7]

Biggs and Rehl cite no law in support of their claim that the "government was required to prove more than it did to warrant getting the case to the jury" because of the First Amendment, ECF 828 at 10, and in any event they are incorrect that the government's evidence was limited to speech and mere presence. For all the reasons set forth herein, the government more than met its burden to prove the elements of the offenses charged in this case, including an agreement to use force.[8]

The jury was rightly permitted to examine the defendants' words, among the whole of the evidence in the case, to determine whether they intentionally joined a conspiracy to stop the transfer of power by any means necessary (including force). Those words shed light on their

---

[7] MR. PATTIS: Judge, I spoke to Ms. Hernandez who's capable, obviously, of speaking for herself, but I think we are all in accord on the limiting instruction.

THE COURT: All right. Ms. Hernandez?

MS. HERNANDEZ: Yes, sir.

THE COURT: Is that correct?

MS. HERNANDEZ: Yes, sir.

[8] Biggs' and Rehl's contention that the government's argument was a "concession" of a failure to meet its burden of proof is itself startlingly unfounded. ECF 828 at 4-5. The block-quoted portion of the government's argument from p.5 of ECF 828 was an argument about the legal requirements of conspiracy, rooted in the Court's instructions. It drew no objection at the time.

motives, their intent, and whether they intentionally joined a conspiracy – exactly the type of use sanctioned by *Mitchell.* The Court instructed the jury accordingly, with a joint instruction explicitly agreed to by both Biggs and Rehl.[9] There is no basis to disturb the jury's verdict.

### 3.  The Conspiracy Constituted Seditious Conspiracy in Violation of 18 U.S.C. § 2384

Nordean argues that the government's application of Seditious Conspiracy to the defendants' conduct is both legally and factually flawed. ECF 822 at 5-6. Among other things, Nordean argues that the government has engaged in a "historically" flawed application of the statute because, he asserts, "Congress does not 'execute' federal law" and opposing the authority of the United States requires more than preventing a "law's application to a set of facts in a particular instance." *Id.* Nordean further argues that, as a factual matter, there was no "seditious 'use of force'" agreed to or employed by the defendants. *Id.* at 6-7. Nordean's arguments are misplaced, and his motion on these bases should be denied.

---

[9] The defendants' citations to *Counterman v. Colorado*, 143 S. Ct. 2106 (2023), and incitement cases such as *Brandenburg v. Ohio*, 395 U.S. 444 (1969), are misplaced.  They rightly concede that *Counterman* is a threats case, which this is not.  ECF 828 at 6.  However, the defendants seem to contend that this is an incitement case, which this is also not.  *Id.* ("case involving incitement and political speech").  As the Court has recognized, the defendants are not charged with incitement, nor with any offense in which speech itself forms the *actus reus*, and thus the *Brandenburg* standard does not control.  Dec. 14, 2022 Hr'g Tr. at 28; Mem. Op. Denying Motions to Dismiss Third Superseding Indictment (ECF 586) at 35 ("Rehl blurs the distinction between statutes that criminalize speech itself and the Government's use of a defendant's statements as evidence of a separate crime. Brandenburg deals with the former, but this case involves the latter").  Although Biggs and Rehl attempt to argue that the use of speech to prove motive and intent in this case is somehow different than the uses sanctioned by the Supreme Court in *Mitchell*, they cite no case in support of that proposition.  In any event, the government's evidence was much more robust than the "speech plus mere presence" that Biggs and Rehl contend here.  *See* ECF 828 at 8.  Biggs, Rehl, and their co-conspirators and charges personally used force against the government on January 6 inside the restricted perimeter of the Capitol grounds, including but not limited to Biggs ripping down a metal fence and Rehl spraying a chemical irritant at a police officer.

### a. The Government's Application of the Seditious Conspiracy Statute to an Attempt to Stop the Lawful Transfer of Power is Sound.

As this Court has already found in resolving the motions to dismiss filed earlier in this case, to prove seditious conspiracy, the government must prove that the defendants conspired to "'oppose by force the [government's] authority' or to prevent by force the execution of a law wholesale—that is, in all its applications." *See* Dec. 11, 2022 Mem. Op. (ECF 586) at 6.[10] It is difficult to imagine a greater opposition to the government's authority than one aimed at undermining the lawful transfer of power following a presidential election. *See United States v. Rahman*, 854 F. Supp. 254, 259 (S.D.N.Y. 1994) (observing that Section 2384 "protects basic societal interests and must be read to cover a wide spectrum of activities").

A violation of Section 2384 under either of the two prongs charged in this case requires proof that a defendant agreed to use force against the "government *as a government*," and thus requires that a defendant planned to use force "to resist some positive assertion of authority by the government" or to resist "the authority of the United States while endeavoring to carry the laws into execution." *Baldwin v. Franks*, 120 U.S. 678, 693 (1887) (emphasis added). An agreement to oppose by force the lawful transfer of power constitutes such "forcible resistance of the authority of the United States while endeavoring to carry the laws into execution." *Id.* Preventing the incoming President from taking office would plainly "adversely affect the ability of the United States government to govern or perform one of its proper functions." *Final Jury Instructions* at 22.

---

[10] Nordean raises no new legal arguments in the instant motion, and the Court has previously ruled. The government hereby incorporates its Opposition to Nordean's Motion to Dismiss the Seditious Conspiracy count into this opposition. ECF 454.

Indeed, the lawful transfer of power is a critical underpinning of our democratic system of government and a central aspect of our government's obligations under the Constitution. As this Court explained:

> the charged conspiracy to stop the certification of the Electoral College vote from taking place on January 6, 2021, *is* a conspiracy to hinder execution of the Twelfth Amendment and Electoral Count Act in all their applications and on a nationwide basis. These laws, which together set out the procedures Congress must follow to facilitate the transition of executive power from one president to another, are executed after an election at only one time and in one place. *See* U.S. Const. amend. XII; 3 U.S.C. § 15. And when they are executed, these laws implement that transition throughout the United States. Thus, thwarting the proceeding designed to carry out these laws' commands prevents their execution in what is effectively their *only* application and with effect 'all over the United States.'

*See* Dec. 11, 2022 Mem. Op., ECF 586 at 8 (citing *Bryant v. United States*, 257 F. 378, 380–82 (5th Cir. 1919)). As the Court noted, the defendants' forcible resistance to "presidential-transition laws" has nationwide effect. *Id.* The lawful transfer of power requires the government to exercise its authority by carrying laws into execution. *Id.* This Court has already correctly found that "the charged conspiracy to stop the certification of the Electoral College vote from taking place on January 6, 2021, *is* a conspiracy to hinder execution of the Twelfth Amendment and Electoral Count Act in all their applications and on a nationwide basis." Dec. 11, 2022 Mem. Op. (ECF 586) at 8. And this Court has also correctly ruled that Congress does "execute" the Twelfth Amendment and the Electoral Count Act within the meaning of the statute through its actions, including the manner in which its "proceedings carry out or put into effect an outcome with independent legal significance." *Id.* at 13-14. Thus, the defendants' agreement to use force to stop the execution of those laws fits squarely within the Seditious Conspiracy statute. Nordean's arguments are without merit.

### b.   The Trial Record is Replete with Evidence of an Agreement to Use Force—and the Actual Use of Force—on January 6

For the purposes of Section 2384, force is understood in its ordinary sense to mean an act or acts that "threaten[] or result[] in violence" or "threaten[] or result[] in harming or destroying property or harming or killing people." *Final Jury Instructions* at 24. That understanding of force draws on the common-law linkage between force and violence, *see Stokeling v. United States*, 139 S. Ct. 544, 550 (2019) ("common-law authorities frequently used the terms 'violence' and 'force' interchangeably"), and reflects mid-nineteenth-century legal definitions of force that would have informed the legislators who drafted and enacted the original seditious conspiracy provision. *See Webster's American Dictionary of the English Language* (1828) (force defined as "any unlawful violence to person or property"); *see also Stokeling*, 139 S. Ct. at 550 (defining "force" as either "power, violence, or pressure directed against a person or thing," or "unlawful violence threatened or committed against persons or property") (citing dictionaries).

Contrary to Nordean's suggestion, the defendants need not, however, actually use force to violate Section 2384—even though these defendants did. *See Bryant v. United States*, 257 F. 378, 385-86 (5th Cir. 1919); *see also Dennis v. United States*, 341 U.S. 494, 573 (1951) (Jackson, J., concurring) ("The basic rationale of the law of conspiracy is that a conspiracy may be an evil in itself, independently of any other evil it seeks to accomplish."). The trial record is replete with evidence of the defendants' use of and celebration of "force, which is, aka, violence" (Ex. 609-B) to advance their objectives, and the evidence at trial showed that the defendants intentionally recruited men who would bring that street violence to the Capitol on January 6. *See*, *e.g.*, Ex. 503-5, -17, and -23.

Nordean's suggestion that he did not personally engage in acts of force at the Capitol is belied by the evidence. The evidence showed beyond any reasonable doubt that Biggs and Nordean

joined with others to forcibly destroy a black metal fence. *See* discussion, *infra*, at Part III.C.1 (Count Six). Nordean's claim that he, at one point, allegedly "stopp[ed] an assault on law enforcement" by merely putting his hand on someone's shoulder—even if true—does not cleanse Nordean of his involvement and contribution to the conspiracy or introduce such doubt as to Nordean's motives as to upset the jury's verdict. Moreover, the jury may rightly have interpreted Nordean's action as a directive to the man to take the fight elsewhere (*i.e.*, not directly in front of Nordean) such that Nordean would not be a collateral target of officers' efforts to subdue the rioter.

Finally, Nordean argues that the jury's verdicts as to Pezzola's involvement in the Seditious Conspiracy (Count One-Not Guilty) is allegedly "irreconcilable" with the jury's inability to return a verdict as to Nordean's guilt for Pezzola's destruction of the window (Count Six) or Donohoe's water-bottle assault (Count Eight), and also with its acquittal of Nordean for Pezzola's assault of Officer Ode (Count 9). Put differently, Nordean argues that if he was not found vicariously liable for Pezzola's use of force, then Nordean must not have agreed to use force to oppose the lawful transfer of power. But, the jury's verdict simply has no bearing on the adjudication of motions for acquittal under Rule 29. *See, e.g.*, *United States v. Dykes*, 406 F.3d 717, 722 (D.C. Cir. 2005) ("We do not know what went through the jurors' minds. . . . But even if the [verdicts were inconsistent], a 'criminal defendant convicted by a jury on one count [cannot] attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count.'") (quoting *Powell*, 469 U.S. at 58). Rather, the Court must "consider[ ] the evidence in the light most favorable to the government and determin[e] whether, so read, it is sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt." *Kayode*, 254 F.3d at 212-13. It was the province of the jury to determine which theories of vicarious liability the government had proven beyond a reasonable doubt, and they did so. Their

decision in no way undermines the government's quantum of proof on the other counts—for which there was ample evidence.

### 4. The Conspiracy Constituted Obstruction of an Official Proceeding in Violation of 18 U.S.C. Sections 1512(k) and 1512(c)(2)

In their motions, counsel for Nordean, Biggs, and Rehl encourage this Court to again revisit the appropriate legal standard for 18 U.S.C. § 1512(c)(2) in light of the D.C. Circuit's opinion in *United States v. Fischer*, No. 22-3038 (D.C. Cir. Apr. 7, 2023). See ECF 822 (Nordean) at 2-3, ECF 828 (Biggs and Rehl) at 11-21. Just as they did in April 2023, the defendants ask this Court to interpret corruptly according to the definitions offered by Judge Walker as an act taken "with the intent to procure an unlawful benefit [] either for himself or some other person" (ECF 828 at 13) or an act taken with "the intent to procure a benefit which [he] knows is unlawful" (ECF 822 at 2). *See*, *e.g.*, Nordean Motion to Dismiss (ECF 742), Biggs Motion to Dismiss (ECF 744). The government filed its opposition, and the government incorporates its prior filing (ECF 750) into this opposition.

The defendants still have it wrong. To prove that a defendant acted corruptly for purposes of Section 1512(c)(2), the government must establish that the defendant "use[d] independently unlawful means or act[ed] with an unlawful purpose, or both." *Final Jury Instructions* at 31. The government must also prove that the defendant acted with "consciousness of wrongdoing," meaning with "an understanding or awareness that what the person is doing is wrong." *Id.*; *see also United States v. Reffitt*, No. 21-cr-32, ECF 119 at 26 (D.D.C. Mar. 7, 2022); *Arthur Andersen LLP v. United States*, 544 U.S. 696, 706 (2005) (faulting jury instructions in Section 1512 case for "fail[ing] to convey the requisite consciousness of wrongdoing").

### a. The Fischer Opinion Did Not Change the Court's Previous Ruling

In April, this Court considered the parties' arguments and the *Fischer* Opinion and found that *Fischer* "did not change the status quo on the meaning of 'corruptly' that has existed since I first declined to dismiss the indictment." Tr. 19180:11-15 (Kelly, J.), refencing Dec. 28, 2021, Mem. Opinion Denying Defendants' Motions to Dismiss (ECF 263). Specifically, this Court held that "Judge Walker's concurrence didn't persuade me to adopt his view that 'corruptly' must include the aspect of obtaining a benefit." Tr. 19180:21-23 (Kelly, J.).[11]

The Court had it right in December 2021 and in April 2023. The definition of "corruptly" set forth in the Court's Section 1512(c)(2) Jury Instruction (ECF 767 at 31-32) is legally sufficient and appropriate in the context of congressional obstruction. To violate Section 1512(c)(2), a defendant must act "corruptly." Because that term is not statutorily defined, it is "understood . . . to have its ordinary meaning." *United States v. North*, 910 F.2d 843, 881 (D.C. 1990) (per curiam), *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990). As a matter of plain language, "corruptly" is "normally associated with wrongful, immoral, depraved, or evil." *Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005); *see North*, 910 F.2d at 881 ("corruptly" means "depraved, evil: perverted into a state of moral weakness or wickedness"). The instructions require the government to prove that each defendant either "use[d] unlawful means" or "ha[d] an unlawful purpose." *Final Jury Instructions* at 31. The inclusion of a narrative paragraph in the instruction further ensures that the jury instructions "convey the requisite consciousness of wrongdoing." *Arthur Andersen*, 544 U.S. at 706.

The definition of "corruptly" contained in the *Final Jury Instructions* is also consistent

---

[11] The defendants in *Fischer* cited this ruling as part of their argument for for panel rehearing. *See United States v. Fischer*, D.C. Cir. no. 22-3038, Doc. 1996380 at 16 and Ex. A. The Court denied the petition for rehearing in a per curiam order. *See Fischer* Doc. 2000424.

with, though more demanding than, definitions of "corruptly" applied to Section 1512(c)(2) by other courts of appeals. Since Section 1512(c)(2)'s enactment in 2002, courts have interpreted "corruptly" in Section 1512(c)(2) to require intent to obstruct and some degree of wrongfulness. *See United States v. Delgado*, 984 F.3d 435, 452 (5th Cir. 2021); *See United States v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013) (upholding jury instruction defining "corruptly" as acting with "consciousness of wrongdoing") (internal quotation marks omitted); *United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) (to act "corruptly" is to act "with an improper purpose" and "to engage in conduct knowingly and dishonestly with the specific intent to subvert, impede or obstruct") (quoting *United States v. Mintmire*, 507 F.3d 1273, 1289 (11th Cir. 2007)); *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013) (same); *United States v. Mann*, 701 F.3d 274, 307 (8th Cir. 2012) (same). Courts interpreting the neighboring provision, Section 1512(c)(1), have reached similar conclusions. *See United States v. Bedoy*, 827 F.3d 495, 510 (5th Cir. 2016) (a "proper definition" of "corruptly" for purposes of Section 1512(c)(1) is to act "knowingly and dishonestly, with the specific intent to subvert or undermine the due administration of justice") (internal quotation marks omitted); *United States v. Matthews*, 505 F.3d 698, 705 (7th Cir. 2007) (upholding instruction defining "[c]orruptly" in Section 1512(c)(1) as acting "with the purpose of wrongfully impeding the due administration of justice").

### i. *Section 1512 Does Not Require Assaultive Conduct*

Biggs and Rehl argue that the D.C. Circuit's holding in *Fischer* requires that the government prove an assault in order to meet the burden of Section 1512(c)(2)'s "corruptly" requirement. ECF 828 at 14. That is simply not the holding of the *Fischer*, which explained that a "'corrupt' intent exists at least when an obstructive action is independently unlawful — *i.e.*, an independently unlawful act is necessarily 'wrongful' and encompasses a perpetrator's use of

'independently corrupt means' or 'an unlawful method.'" *Fischer* at *18, quoting *United States v. Aguilar*, 515 U.S. 593, 616-17 (1995) and *North*, 910 F.2d at 942. Judge Pan's lead opinion simply stated that assaulting law enforcement officers during the Capitol riot "clearly meets the test of independently unlawful conduct." *Id.*

So too does defendants' conduct here. Defendants were not innocent, patriotic rubes who innocently wandered into a restricted area. These men planned for and undertook a series of unlawful actions to stop the "official proceeding" from going forward. These defendants organized a group of more than 100 "real men" (*e.g.*, men prepared to "fight until [their] last breath") to travel to Washington, D.C. and "follow the commands of leadership." On January 6, Nordean, Biggs, and Rehl led the organized group away from the organized events on the National Mall and directly to the Capitol. Tarrio monitored events from afar, including through encrypted message chats that were established specifically for group's use in the leadup to January 6. Nordean, Biggs, Rehl, and Pezzola arrived at the Capitol less than ten minutes before the "official proceeding" was to begin. They led their men across trampled barricades and were among the first wave of rioters to unlawfully storm Capitol grounds. Nordean and Biggs joined with others to violently tear down a waist-high black metal fence, and they encouraged others to advance onto Capitol grounds, which Rehl and Pezzola promptly did. After a brief time regrouping and celebrating, they reassembled their men at the base of the concrete stairs and again overwhelmed law enforcement with the force of their numbers. Their men broke through barricades and broke open windows. They stormed inside the Capitol and traveled to the Senate Gallery, private offices, and the Capitol Rotunda. Their persistent and violent actions served to stop the Electoral College Certification. They intentionally and willfully took unlawful action to stop the official proceeding. As Biggs explained after the riot, "when your government steals an election from you, when there's clear

fucking evidence . . . that is time to stand up." Ex. 611-M.

### ii.   The Defendants Did Intend to Procure an Unlawful Benefit

Nordean suggests that the government was required to prove that the defendants acted with "the intent to procure a benefit which [they knew was] unlawful." ECF 822 at 2, quoting *Fischer* at 354 (Walker, J. concurring opinion). Nordean argues that the government is required to prove that the defendants understood that the benefit—*e.g.*, Trump's re-election—"was an 'unlawful' outcome." ECF 822 at 2. In other words, if Nordean "believed the 2020 presidential election was 'stolen,'" his intent was only to bring about a purportedly "lawful" benefit to President Trump and any action to obstruct the certification was lawful. ECF 822 at 2-3.

Even if the "benefits" test were to apply, which it does not, the law does not countenance an ends-justifies-the-means approach to the obstruction of an official proceeding. If that were the case, an individual could escape prosecution for any unlawful act of obstruction under 1512(c) (including document destruction) so long as the actor believed that the ultimate outcome was lawful. For example, Nordean's approach would permit the destruction of evidence in an official proceeding if the actor believed that he should ultimately prevail in the case.

Indeed, in rendering the opinion in *Fischer*, Judge Pan noted that those defendants' "intentions of helping their preferred candidate overturn the election results would suffice to establish a 'hope or expectation of either . . . benefit to oneself or a benefit of another person.'" *Fischer* at *18, citing *Aguilar*, 515 U.S. at 616-617. In doing so, Judge Pan implicitly recognized that, in the context of January 6, the unlawful benefit was a delay of and interference with the Electoral College Certification to benefit President Trump. The laws of the United States and Congressional rules provide a lawful means to alter the outcome of the Electoral College Certification. However, the defendants' unlawful actions triggered an "emergency designation

recess" to which former President Trump and the defendants were not entitled. Thus, even if the unlawful benefits test were to be applied, the defendants' actions satisfy the standard.

### b. The Defendants Intended to, and Did, Interfere with the Official Proceeding

Nordean suggests that the evidence did not prove that Nordean (or the other defendants) understood the certification process and thus could not have targeted the "Official Proceeding" at the Capitol on January 6. ECF 822 at 3-4. Once again, Nordean has it wrong. The "official proceeding" in question — Congress's joint session to certify the electoral college vote — was the subject of explicit discussion in the MOSD leaders' chat in the days leading up to January 6. *See* Ex. 501-56 (co-conspirator Stewart, in small-group MOSD leaders' chat: "[T]he main operating theater should be . . . out in front of the Capitol building. That's where the vote is taking place, and all the objections."). Other statements by the conspiracy's leaders showed that they understood the significance of the Congressional proceeding: Rehl explained to another Parler user that January 6 was "the day where Congress gets to argue the legitimacy of the electoral college votes," and Biggs posted the names of members of Congress who were expected to "OBJECT on January 6th." Ex. 602-40 and 603-53.[12] All these statements fortify the common-sense inference compelled by the conspirators' movements on January 6: that the defendants' actions were meant to disrupt the proceeding. Unlike the thousands of other Trump supporters who gathered to watch the President's speech at the Ellipse, the Proud Boys group, under the leadership of Biggs, Nordean, and Rehl, marched directly to the Capitol. Then — after staging near the food trucks for a time — they returned to Peace Circle just as the certification proceeding was beginning.

---

[12] The jury was not obligated to credit—and likely did not credit—Nordean and others' argument that they had their head-in-the-sand and did not see any of these discussions in the encrypted message groups from which they planned the attack. Thus, Nordean's argument that the evidence did not "show him discussing the vote count" (ECF 822 at 3-4) does not require the conclusion that Nordean lacked knowledge of the certification proceeding.

Likewise, the statements of the defendants and their co-conspirators after the fact show that they viewed their success or failure as hinging on Congress's ability to conduct the proceeding. During the riot, Tarrio and Bertino exchanged messages in which Bertino asked, "Did we just influence history?" to which Tarrio responded, "Let's first see how this plays out." Ex. 530-5. Bertino then added, "They HAVE to certify today! Or it's invalid" *Id.* Tarrio's co-conspirators initially celebrated the breach of the building and the resulting cessation of proceedings before expressing bitter disappointment when Congress ultimately resumed later that night. At 8:22 PM, shortly after the Senate reconvened, Biggs posted "R.I.P. America 1776 – 2021." Ex. 603-64. That same evening, co-conspirator Bertino said in the MOSD leaders group, "We failed. The house is meeting again." Ex. 509-37. The next day, Rehl complained that "instead of all these politicians getting scared," they were all "turning on Trump and cucking." Ex. 544-4. He commented to his mother the next day that "they all came back with the biggest fuck you to everyone," since only "7 senators" were willing to "stand up against the fraudulent votes." Ex. 545-5.

All this evidence, along with the actual conduct that constituted the completed obstruction offense discussed just below, was more than sufficient for the jury to find Tarrio, Biggs, Nordean, and Rehl guilty of Count Two.

### c. The Defendants Did, in Fact, Corruptly Obstruct the Official Proceeding on January 6 in Violation of 18 U.S.C. § 1512(c)(2)

Count Three (18 U.S.C. § 1512(c)(2)) charges the substantive obstruction offense that was the object of the conspiracy charged in Count Two (18 U.S.C. § 1512(k)). All defendants were found guilty based on the overwhelming weight of the evidence shown at trial.

The conduct of Biggs, Nordean, and Rehl on the ground — including their use of force as summarized above — all contributed directly and substantially to the emergency that necessitated evacuating Congress. Likewise their unlawful presence inside the building was a substantial factor

preventing the resumption of the proceeding. As law enforcement officers testified, it was impossible for the members of Congress to safely return to the chambers until all rioters had been cleared. *See, e.g.*, Tr. 3622 (Inspector Loyd; testifying that unsafe for proceedings to continue "[b]ecause we had mobsters in the building"); *id.* at 3687 ("[E]ventually, we pushed all the protestors out so we could start the ballot process over again."). The defendants' purpose was unlawful, because they sought to prevent the transfer of power and thereby substitute their preferred Presidential candidate for the one lawfully selected through the electoral process. *See, e.g.*, Ex. 602-33 (Rehl describing "go[ing] apeshit" as a fallback option that would be required if "the constitution doing its thing" didn't result in preferred outcome). And their agreed-upon means — the use of force, as discussed above — were independently unlawful.

The evidence likewise overwhelmingly supports Pezzola's guilt on Count Three. Among the countless participants in the riot on January 6, Pezzola stands out for his direct personal impact on Congress's ability to continue carry out the certification proceeding. As dire as conditions were through Breaches 1, 2, and 3, it was not until Breach 4 that the chambers were evacuated, and it was Pezzola who accomplished that breach, using a riot shield he had robbed from Officer Ode. Once inside, Pezzola traveled through the building in a group made up of the very first rioters to enter the building, some of whom were shouting "Where they have the Congress at?," "Where they meeting at?," and "Where are they counting the fucking votes?" Ex. 453. Indeed, as he was smashing a window on the Capitol building with a stolen police riot shield, Pezzola's goal was for someone inside the building to hear him, and he believed that this was a way to get the government to listen to him. Tr. 19409:23 – 19410:25 (Pezzola).

The arguments raised in Tarrio's Motion to Adopt and Supplement Niordean's [sic] Motion for Judgment of Acquittal (ECF 823) are addressed further herein, *infra*, at Part III.B.5. In brief,

any reasonable finder of fact could have found him guilty of Count Three under the "willfully causing" or "aiding-and-abetting" theories, given (1) his purposeful role in mobilizing the other MOSD and members who would go on to act as the principles committing the offense; and (2) his affirmative encouragement of those principles via social media posts while the offense was underway. *See Final Jury Instructions* at 26-18 (defining these theories of liability). Of course, Tarrio is equally guilty of Count Three under the theory of co-conspirator liability, because (as discussed above) he was part of a conspiracy to commit precisely this offense, and the offense was committed during the conspiracy, by one or more of its members, in furtherance of the conspiracy, and as a reasonably foreseeable consequence thereof. *See id.* at 28-29 (defining co-conspirator liability).

Because the evidence overwhelming supports all defendants' convictions on Count Three, their motions regarding this count should be denied.

### d. The Defendants Were Guilty of Both Conspiracy to Obstruct the Official Proceeding and Obstructing the Official Proceeding

Defendants Biggs and Rehl argue that the substantive charge in Count Three is indistinguishable from the conspiracy charge in Count Two because when the "agreement to act occurs concurrently . . . [with] the decision to act [] there is no principled distinction between the conspiracy and the substantive charge." ECF 828 at 11. First, as a factual matter, the government disputes the contention that the conspiracy among the defendants formed in an instant. Among other things, the government's evidence includes numerous indicia of a premeditated plan to use force to stop the transfer of power. Among just a few highlights, the government's evidence included: (1) Tarrio's written plan to "storm" government buildings, (2) Biggs private message to Tarrio to "get radical" and "get real men," (3) Nordean's private message to the troops that they would be meeting at the Monument and then "marching to the Capitol," (4) discussion among

leaders and members in the MOSD concerning "storming" the Capitol, (5) Nordean, Biggs, and

Rehl's leadership of the amassed force to the gates of the Capitol at 12:50 p.m., (6) Donohoe's and

others reactions upon storming the first barricades (*e.g.*, "oops, looks like we stormed the Capitol

building"), and (7) Tarrio's celebration of the achievement in messages with Bertino and the Proud

Boys Elders. Second, as a matter of law, there is a legal distinction between conspiracy and

substantive offenses. Conspiracy (Count Two) requires the formation of an agreement between

two or more people. The substantive offense (Count Three) can be carried out by a single person

and requires that the defendant attempted to or did obstruct or impede an official proceeding. *Final

Jury Instruction* at 30; *see United States v. Mack*, 466 F.2d 333, n.4 (D.C. Cir. 1972) ("There is no

legal obstacle to either indicting, convicting, or imposing concurrent sentences upon appellants for

the crimes of both felony-murder and premeditated murder, where those crimes arose from a single

act."); *see also United States v. Lee*, 489 F.2d 1242, 1243–44 (D.C. Cir. 1973) (upholding

convictions on charges that included conspiracy to murder and first degree felony murder).

### 5. Tarrio Is Guilty of Conspiracy and Substantive Offenses—One Need Not Be "Present" to Commit a Crime

In his Motion to Adopt and Supplement Niordean's [*sic*] Motion for Judgment of Acquittal,

ECF 823, Tarrio raises one additional argument: that he "was not present" at the Capitol on January

6 and "had no communication with any of the Defendants" from the time of his arrest on January

4 until after the "initial breach." *Id.* at 1. This assertion is both factually wrong and legally

irrelevant.

Starting with the facts, the evidence proved that Tarrio was in contact with his co-

conspirators beginning almost immediately upon his release in custody. For example, Nicholas

Quested's videos showed Tarrio speaking to co-conspirator Bertino on a video call as soon as he

had access to a friend's telephone. *See* Tr. 4518:8-25 (Quested). On multiple occasions, he

discussed having telephone contact with Nordean. *See id.* at 4518:8-25; 4521:10-13 (Quested). On the evening of January 5, he spoke separately to Stewart, Bertino, and Biggs, with the latter conversation relating to the "plan" for January 6. Ex. 509-19, -21, and -23. And once he regained access to his Telegram account, Tarrio resumed participating in the MOSD group chats, including a conversation on the morning of January 6 about "live feeds" of the day's events. *E.g.*, Ex. 509-25 and -28.[13]

Regardless, even without such evidence of Tarrio's continued contact with his co-conspirators, he would still be guilty of conspiracy. The government's evidence, summarized above, established that the conspiracy began at least as early as December 20, 2020 (the date of the creation of the first MOSD leaders chat) and that Tarrio was its principal organizer. There was never a shred of evidence that Tarrio ever withdrew from the conspiracy, and in fact — as he appears to concede — he sent numerous messages "subsequent to the breach of the United States Capitol" celebrating the conspiracy's success in bringing about that result. ECF 823 at 1. As the Court's jury instructions correctly indicated, a person need not be active at every stage of the conspiracy to be guilty. *Final Jury Instructions* at 19 ("The duration and extent of the defendant's joining of the agreement has no bearing on the issue of the defendant's guilt."). Indeed, a defendant need not be "active" at all, so long as the evidence establishes their agreement to the conspiracy's objects. *Id.* ("Each member of a conspiracy may perform separate and distinct acts, or no acts at all."). Because Tarrio occupied a leadership role in the conspiracy from its outset and through its culmination, his argument must be rejected.

---

[13] Based on these facts, it would be accurate to conclude, as one juror purportedly stated, that Tarrio "was still calling the shots behind the scenes with those who he wanted to talk to." ECF 823 at 1 (Tarrio's motion, quoting juror's statement to the media). Regardless, the Court must ignore Tarrio's argument on this point, because it is prohibited from "receiv[ing] . . . evidence of a juror's statement" regarding "any juror's mental processes concerning the verdict." Fed. R. Evid. 606(b).

**6. All Six Defendants Were Properly Found Guilty of Conspiracy to Impede Members of Congress and Law Enforcement, in Violation of 18 U.S.C. § 372**

Count Four charges the defendants with conspiracy to prevent Members of Congress by force, intimidation, or threat from discharging the duties of an office, trust, or place of confidence under the United States, and with conspiracy to induce Members of Congress by force, intimidation, and threat to leave the place where their duties as officers were required to be performed, in violation of 18 U.S.C. § 372.[14] In his motion, Nordean again resurrects arguments that he made—and the Court rejected—at the motion to dismiss stage. As this Court found, for purposes of Section 372, "members of Congress and Capitol Police officers occupy an 'office, trust, or place of confidence under the United States' and so too are 'officers of the United States.'" Dec. 11, 2022 Mem. Op. (ECF 586) at 21-23.

The jury rightly found all defendants guilty of both objects of the conspiracy charged in Count Four. Once again, the overarching conspiracy proven by the government — to forcibly oppose the transfer of Presidential power — necessarily included preventing the discharge of duties by Members of Congress (*i.e.*, the duty of conducting the certification proceeding) and by law enforcement officers (*i.e.*, the duty of protecting the Capitol), and also included inducing those same persons to leave the places where their duties were to be performed (*i.e.*, the legislative chambers and the officers' guard posts, respectively). While the offense was underway, all defendants (including Tarrio, watching from afar) could see how their collective conduct was

---

[14] To prove a violation of Section 372, the government must prove that (1) the defendant agreed with at least one other person to, by force, intimidation, or threat to prevent a Member of Congress or federal law enforcement officer from discharging his or her duties or to leave the place where that person's duties are required to be performed (2) the conspiracy was formed in the United States, and (3) the defendant joined or entered into that agreement with awareness of and the intent to further one or both of its unlawful goals. *Final Jury Instructions* at 25-26.

forcing the Congresspersons to evacuate and the officers to retreat; nonetheless, they persisted in their conduct, because this result was one that they jointly desired.

On this conspiracy count, Pezzola was found guilty along with his co-defendants. Ample evidence supports that verdict. Although Pezzola was not an MOSD leader, he was an enthusiastic MOSD member, having been brought into the organization on an apparent fast-track in the leadup to January 6. He participated in the planning chats, speaking directly to Tarrio about lodging logistics, and offering his assistance in getting radios programmed. Ex. 505-11, -12, -16 and -17. Whatever his advance knowledge of the leadership's strategic goals, Pezzola recruited "fighters" to come on January 6 and knew he could find himself in "full-blown… war." Ex. 1104 and 1107. And no later than 1:00 PM on January 6 — after he had been part of Breach 1 at Peace Circle and watched police officers fleeing for safety to escape from the mob that he was a part of — Pezzola knew and understood that he was part of a group effort, using force, intimidation, and threat, to prevent officers from discharging their duties. Moreover, after he had forced the Members of Congress to "leave the place" where their duties were to be performed, Pezzola recorded a statement making clear he viewed himself as part of a collective endeavor among the Proud Boys present to bring about that result: "I knew *we* could take this motherfucker over if *we just tried hard enough*. Proud of your motherfucking boy." Ex. 403-G (emphasis added).

### C. The Destruction of Property Offenses

Counts Six and Seven charged destruction of government property—the black metal fence (Count Six) and the Capitol window (Count Seven)— in violation of 18 U.S.C. § 1361. A violation of Section 1361 requires proof that (i) the defendant injured, damaged, or destroyed property or attempted to do so, (ii) that the defendant did so willfully, (iii) that the property involved was property of the United States, and (iv) that the damage or attempted damage to the property in question exceeded the sum of $1,000. *Final Jury Instructions* at 35.

1.  **All Six Defendants Were Properly Found Guilty of Destruction of the Black Metal Fence, in Violation of 18 U.S.C. § 1361**

The defendants argue that their conviction for the destruction of a black metal fence should be set aside for lack of evidence. ECF 824 at 1-2; ECF 822 at 8; ECF 828 at 21-23. Defendants' arguments fall into two buckets. First, Biggs and Nordean argue that, although the evidence shows them to have had contact with the fence, they are not criminal responsible for its destruction, and they are joined by the other defendants in arguing that they should not be held liable for the acts of others. Second, the defendants argue that they were not responsible for damage to the fence of more than $1,000.

a.  *Nordean and Biggs joined together to tear down two sections of the black metal fence.*

The defendants' destruction of the fence was recorded on video from multiple angles and observed by responding officers on the scene. The evidence presented to the jury at trial included multiple videos of the destruction, including videos that showed Biggs and Nordean with their hands on the fence as it was torn from the ground. The evidence was further supported by testimony by a percipient witness, Officer Shae Cooney. Each independent piece of evidence presented at trial, standing alone, more than establishes the defendants' guilt. Taken together, there can be no serious question that the jury based its conviction on the evidence at trial and found the defendants guilty beyond a reasonable doubt.

The evidence at trial showed that within minutes of trampling the fence at the First Street gate, the four defendants present on Capitol grounds on January 6 moved purposefully to the front of the crowd. Biggs recorded himself as he approached the Capitol, and Biggs (as recorded on video) told the jury that he had "gone through every barricade" to that point. Ex. 404-D. The jury then saw Biggs, Nordean, Rehl, and Pezzola move to the front of the crowd and stand opposite a

line of officers. They were separated by a waist-high, black metal fence. The fence posts were screwed into the concrete and Officer Cooney testified that it "it takes a pretty good amount of force" to get it detached. Tr. 7149:2-11 (Cooney).

Immediately before they joined forces to destroy the fence, Biggs and Nordean were standing a few feet away from one another at the front of the crowd. Ex. 445-Bx. Biggs called out to "Rufio" and nodded for Nordean to join him. *Id.* at 0:30. Nordean moved next to Biggs and then let out a yell to encourage the crowd. *Id.* Nordean and Biggs then looked down at the fence in front of them at Biggs tested its strength. *Id.* at 0:56. Biggs then pulled his mask over his face. *Id.* at 1:03. Officer Cooney testified that the crowd was "starting to move [the fence] back and forward to unscrew it from the ground and rip it apart." Tr. 7011:14-19 (Cooney). Around the time this was unfolding, Nordean shouted "pigs" and "traitors" at Officer Cooney while looking right at her. *Id.* at 7088:4-22.

Within seconds of Biggs' linking up with Nordean and pulling his mask over his face, Biggs and Nordean violently pulled the fence toward themselves and ripped it from the adjoining post. Ex. 445-Bx at 1:29. Notably, Biggs and Nordean *simultaneously* tore apart two adjoining sections of the fence—Nordean tore down the section to the left of the post, and Biggs tore down the section to the right of the post. *Id.* This fact alone serves to prove beyond a reasonable doubt that the two men standing closest to the fence and immediately next to one another are responsible for the simultaneous destruction of those two sections. It is preposterous to conclude that some phantom puppeteer, who was oft referred to by Nordean's counsel, acted simultaneously with Biggs from three rows deep in the crowd.

Video evidence further proved Nordean and Biggs' role in the destruction. Nordean's right hand was shown gripping the fence in an underhand grip, which grip is consistent with Nordean's

effort to pull the fence out of the ground (as opposed to resting his hand on top of the fence in an effort to steady himself). Ex. 492-G at 4:00. For his part, Biggs was relentless in his effort to tear down the fence. Video showed that even after the fence had broken loose from the post, Biggs continued his effort to tear the fence to the ground. *Id.* at 4:26 – 4:40. Once the fence section in front of Biggs had been taken to the ground, Biggs put both hands on the post that had linked Biggs' section and Nordean's section and attempted to tear the *post* to the ground. *Id.* at 4:52 – 4:58.

Moreover, consistent with the video evidence, Officer Cooney testified that she saw Nordean "pulling at the fence, back and force, and ripping it out of the concrete." Tr. 7149:21-22 (Cooney). Officer Cooney explained that although her view of Nordean was obscured at points in time, she was able to "see in between" the various obstructions to see Nordean destroying the fence. *Id.* at 7469:8-16. The jury would have been rightly able determine that Biggs and Nordean were criminally responsible for destroying the fence based on Officer Cooney's testimony alone. The jury did not just have testimony, however. That testimony is supported by video evidence and the fact that Officer Cooney purposefully responded to the exact location where Nordean and Biggs were tearing down the fence just as they completed their criminal act. Ex. 417x at 0:45. And the video showed that Officer Cooney was looking at Nordean when she arrived at the location. *Id.*

Finally, as further proof of their involvement in the destruction, after tearing down the fence, Biggs and Nordean immediately moved forward. Video showed the trampled fence at Nordean's feet just before he moved intentionally forward toward a line of outnumbered officers. Ex. 417x at 0:52; Ex. 445-Bx at 1:35. Nordean and Biggs then surged forward with Biggs waving the crowd forward. Ex. 417x at 0:52 – 1:05; Ex. 445-By. Just to their right, Rehl rushed past the

trampled fence and joined Nordean and Biggs at the front of the advancing crowd. Ex. 445-By. This evidence underscored that the destruction had a purpose—Nordean and Biggs tore down the fence so that they and the men in their charge could continue their advance on the Capitol.

### b. The jury properly convicted all of the defendants for the acts of their co-conspirators, Biggs and Nordean.

As the Court correctly instructed the jury, a defendant is guilty of an offense committed by his co-conspirators if the offense was committed during the defendant's involvement in the conspiracy, in furtherance of the conspiracy, and it was a reasonably foreseeable consequence of the conspiracy. ECF 767 at 28-29. All those requirements were satisfied on Count Six for Tarrio, Rehl, and Pezzola. As explained above, and as reflected in the jury's verdicts on Counts One, Two, and Four, each of the defendants was part of a conspiracy with multiple criminal objects, including (to take just one example) forcibly preventing members of Congress from discharging their duty. Destroying physical barriers as part of an effort to reach the Capitol building, as Biggs and Nordean did, clearly advanced the goals of the conspiracy, satisfying the "in furtherance" requirement. Likewise, given that the agreement specifically included the use of *force* among its means, it was eminently foreseeable to all conspirators that force against property would be used in this fashion.

Moreover, beyond mere foreseeability, Rehl and Pezzola had actual knowledge of the destruction of the fence, given their presence at the scene as part of the mob. *See* Ex. 417 (Rehl in crowd shouting at officers); Ex. 492-G at 2:46, 4:55 (Pezzola at fence, looking in direction of Nordean and Biggs). When Biggs and Nordean succeeded in tearing down the fence, Rehl and Pezzola ratified that conduct by charging forward over the downed fence along with other members of the crowd. Their ability to progress toward the Capitol resulted directly from their co-conspirators' destruction of property.

### c.  The damage to the fence was in an amount greater than $1,000.

The jury heard evidence that the damage to the fence was in an amount greater than $1,000. A representative of the Architect of the Capitol, Jason McIntyre, testified that the fence was a "temporary fence that we, the Architect of the Capitol, install in the days leading up to the presidential inaugural on the west front." Tr. 11478:7-9 (McIntyre). The fencing is stored in an off-site location and is brought out and installed approximately "two to three weeks prior to each inaugural." *Id.* at 11479:6-14. Every four years, the fence is brought out of storage and staff use "construction anchors" to bolt the posts into the concrete ground and then "each of the fence panels are, then, secured to the posts." *Id.* at 11479:17-19. Due to its limited use, the fence that was in place on January 6 was in "like new" condition; however, when McIntyre arrived on January 7, the fence was "completely dismantled" and a "total loss." *Id.* at 11480:1-9 and 11486:10. Due to the damage, none of the fence was reusable and had to be scrapped. *Id.* at 11480:18-21.

The fence was originally purchased in 2008 at a total cost of $32,000. Ex. 932-B; *see also* Tr. 11483:1-3 (McIntyre). Since 2008, the cost of building materials has gone up such that the replacement cost of the fence would be more expensive today than in 2008. Tr. 11487:9-10 (McIntyre). The fence was a total of 328 linear feet, which calculates to a cost of $97.56 per linear foot. *Id.* at 11484:2-13. The majority of the panels were six feet in length, which was reflected in both the video evidence and McIntyre's testimony. *Id.* at 11485:6-7. The cost of replacement for each panel of fence was thus $585.36.

Focusing solely on the two panels that Nordean and Biggs destroyed at approximately 12:57 p.m. on January 6 (*see* discussion, *supra*, at Part III.C.1.a), the damage was at least $1,170.72. Moreover, taken altogether, the jury heard and saw evidence to further conclude that the actions of Nordean and Biggs initiated the destruction of adjoining sections of the fencing. The

video evidence showed that immediately after Nordean and Biggs initiated the destruction of the fence, members of the mob tore down the adjacent panels using their hands and feet. *See*, *e.g.*, Ex. 492-G at 4:26 *et seq*. In addition to those sections destroyed at 12:57 p.m., the jury saw evidence that Biggs continued to contribute to the destruction of fencing throughout his time at the Capitol, including handing dismantled sections of fencing back to other rioters for further destruction. Tr. 12480:3 – 12484:25 (Miller); Ex. 253 and 410-E.

### 2. Pezzola Was Properly Found Guilty of Destruction of the Capitol window, in Violation of 18 U.S.C. § 1361

At trial, the jury convicted Pezzola of destruction of the Capitol window. In his motion, Pezzola argues that the government failed to prove that the damage or attempted damage to the Capitol window exceeded the sum of $1,000. ECF 824 at 3-4. Specifically, Pezzola argues that he was responsible for the destruction of only one pane of glass and not two panes of glass, which reduced the damage to less than $1,000. *Id.*

Video evidence showed Pezzola using a stolen police riot shield to destroy both panes of glass in the window adjacent to the Senate Wing Door. Ex. 425; Tr. 11446:4-6 (McIntyre). The hallway where that window is located connects the Senate wing to the Capitol. *Id.* at 11446:24-25. The jury heard testimony that each of the panes of glass destroyed by Pezzola were estimated to cost $774 to replace. The total cost of the damage attributable to Pezzola's actions was thus $1,548. As to the cost to repair each pane of glass, the jury heard testimony concerning the cost of the repair, including the safety and security considerations that factored into the selection of the winning bidder and influenced the total cost of the repair. *See*, *e.g.*, Tr. 11461:1-13 (McIntyre) (Materials and vehicles entering the Capitol complex need to be "screened" and employees need to have background checks and all of the "inherent time and effort it takes by the contractor in order to do business at our facility . . . raises the price."). The cost to replace the two panes of glass

was part of a project to replace multiple panes of glass that had been broken on January 6. Tr. 11447-59 (McIntyre). The total price of the replacement glass payable to the contractor for all twenty-eight (28) windows in the project was $16,095. Tr. 11468-71 (McIntyre); Ex. 931-B. The thickness of the glass varied—twenty-five of the panes (25 panes) were one-quarter inch thick and three of the panes were one and three-quarters inches thick. The Architect of the Capitol applied a four-times multiplier (4x) to calculate the difference in cost between the 25 thinner panes and the 3 thicker panes. Tr. 11468 – 11472 (McIntyre). The two panes destroyed by Pezzola were of the thinner, one-quarter inch thick variety. *Id.* Based on the calculations, each of the panes destroyed by Pezzola were estimated to cost $431 per pane for the contractor to purchase and install. *Id.*; Ex. 931-A. In addition to the contractor's costs, the Architect of the Capitol incurred some additional direct costs, including costs associated with painting the wood around the windows and the costs associated with hazardous material abatement. Tr. 11472 – 11477 (McIntyre); Ex. 931-A. After adding the contractor's costs and the direct costs incurred by the Architect of the Capitol together, the total cost to replace each thinner, one-quarter inch pane of glass was estimated to be $774 per pane.

Pezzola used the shield to strike both panes of glass six times in the following pattern: left-left-right-left-left-left. Ex. 425 at 0:41-0:47. Pezzola's action cleared the entire left pane of glass from its frame, and Pezzola's action nearly did the same with the right pane of glass. Specifically, the right panes of glass were cracked prior to Pezzola's destructive blow, but the glass remained largely attached to the frame on all four sides except for the lower left corner. *Id.* Pezzola's destructive blow served to detach the window from its frame at the bottom and along both the right and left sides. *Id.* Two additional blows by another rioter then completely dislodged the window from its frame. *Id.* at 0:47 – 0:52.

The video evidence plainly shows that Pezzola did "injure" and "commit[] any depredation" to the window. 18 U.S.C. § 1361. The damage to each window caused by Pezzola was estimated at $774 per pane. In his motion, Pezzola suggests that because the right pane appeared to have been cracked (Ex. 425 at 0:16) and another rioter had thrown a two-by-four through the lower left-hand corner (*id.* at 0:20-0:25), Pezzola cannot be responsible for any damage caused by his subsequent blow to the right-hand pane (*id.* at 0:44).

As an initial matter, Pezzola's theory of defense would run counter to the plain language of the statute. Section 1361 makes it a crime for anyone to "willfully injure or commit[] any depredation" against any property of the United States or attempts to commit such depredation. 18 U.S.C. § 1361. The statute makes the crime a felony "if the damage or *attempted* damage" exceeds $1,000. *Id.* (emphasis added). The statute thus criminalizes the "willful" act or attempt to injury or commit depredation to federal property. The criminality of the act does not turn on "actual loss" amount, but rather the damage attributable to the willful act of injury or depredation. *See United States v. Bowe*, 360 F.2d 1, 8 (2d Cir. 1966) (A plan to "blow off the head and arm of the Statue of Liberty" did "contemplate[] damage" in excess of the felony amount.").

Here, the evidence plainly showed the Pezzola willfully injured and committed depredation to both panes of glass. *See*, *e.g.*, Ex. 425. In other words, Pezzola engaged in a willful act of destruction of federal property that encompassed destroying *all the glass in front of him* (*i.e.*, both panes) so that he and other rioters "could take this motherfucker over." Ex. 403-G. Pezzola himself acknowledged that while he was busting open the window, the goal was for someone inside to hear him. Tr. 19409:20-22 (Pezzola). Pezzola's willful act of destruction was extensive, and that willful destruction is the *actus reus* of the crime. The jury could have rightly taken into account both panes of glass in considering the "value of the damage or attempted damage to the property" based on

the "reasonable cost repairing or [] replacing the property." *Final Jury Instructions* at 36. That someone else may have caused some damage to the window prior to Pezzola's destructive blow does not negate Pezzola's willful act to remove both panes of glass. The total cost of repair for both panes of glass are properly attributable to Pezzola, and the total cost of damage was properly calculated at $1,548.

In the alternative, the government notes that Pezzola's violent blow to the right pane of the window caused additional damage to the frame that held the glass in place. Indeed, the evidence at trial showed that the window frame suffered additional damage as Pezzola's blow separated the window from the frame on the right-hand pane. Ex. 425 at 0:44. Testimony from Jason McIntyre of the Architect of the Capitol demonstrated that direct costs associated with repainting and insulating the surrounding frame for each window amounted to $283. Tr. 11473:23 – 11476:7 (McIntyre); Ex. 931-A. Accordingly, were one to consider the full cost of repair of the left pane ($774) and only the direct labor costs of the right pane ($283), the resulting damage attributable to Pezzola's actions would still have been above $1,000 ($774 + $283 = $1,057). *See* Ex. 931-A.

Finally, and in further alternative, Pezzola was charged with direct destruction of the window and under an aiding and abetting theory. Third Superseding Indictment (ECF 380). The evidence provided "beyond a reasonable doubt that [Pezzola] in some way participated in the offense committed by others as something the defendant wished to bring about and to make succeed." *Final Jury Instructions* at 27. Indeed, the evidence met every element of the aiding and abetting instruction. First, the evidence at trial showed that, with respect to the right pane of glass, Pezzola knew that the offense "was going to be committed or was being committed by others." *Id.* During his direct testimony, Pezzola acknowledged that he saw "another kid break the window" and was "kind of like, oh, I guess this is what *we're* doing." Tr. 19075:4-6 (Pezzola) (emphasis

added). The evidence showed that Pezzola "performed an act or acts in furtherance of the offense." *Final Jury Instructions* at 27. Again, during his direct testimony, Pezzola said the next thing he did was to begin breaking the window. Tr. 19075:8 – 25 (Pezzola) (explaining that someone else broke the right hand pane, and "[t]hat's kind of how I got the idea, and I broke the left one."). The evidence showed that Pezzola "knowingly performed that act or those acts for the purpose of aiding, assisting, soliciting, facilitating, or encouraging others in committing the offense." *Final Jury Instructions* at 27. Finally, the evidence showed that Pezzola acted "with the intent that others commit the offense." *Id.*

### D. Pezzola's Assault of Officer Ode and Robbery of a Riot Shield

At trial, the jury convicted Pezzola of robbery of the police shield. In his motion, Pezzola does not dispute that he took the police riot shield and carried it around at the Capitol. Rather, Pezzola first argues that his taking was not done by force[15]—*i.e.*, Pezzola argues that he simply "picked the shield off of the floor after another demonstrator had possession of the shield." ECF 824 at 4. Pezzola next argues that he returned the shield and thus did not intend to permanently deprive the United States of the shield. *Id.*. Pezzola's arguments are belied by the evidence introduced at trial.

Testimonial and video and photographic evidence proved beyond any doubt that Pezzola used force to take the shield from Officer Ode. The jury received video and photographic evidence from multiple angles that showed Pezzola in the violent act of tearing the shield out of the hands

---

[15] A violation of Section 2112 requires proof that (i) the defendant took property from a person, (ii) that the defendant did so against that person's will, (iii) that the defendant did so by force or violence, (iv) that the defendant carried the property away, (v) that the defendant took the property without a right to it and intending to steal it, in other words, that he intended to permanently deprive the United States of it; and (vi) that the property was the personal property of the United States. *Jury Instructions* at 40-41.

of Officer Ode. *See, e.g.*, Ex. 1113 (Pezzola's right hand on shield), Ex. 1116 (Ode's left hand on shield as Pezzola continues to pull on shield); Ex. 1117 (same), Ex. 1127 (Pezzola falling backward with possession of shield), Ex. 203 (wide angle of Pezzola taking shield), Ex. 229x (same), Ex. 444Ax (ground level view showing Pezzola taking shield). With respect to Exhibit 1113, Officer Ode identified himself and Pezzola (described as a man wearing a gray or blue jacket, blue jeans, and a dark hat with an American flag) and testified that the picture showed "two individuals grabbing my shield or my arm and forcefully attempting to take it away from me." Tr. 7491:8-23 (Ode). Officer Ode further testified regarding video exhibits and described the same moment, as caught on video, in which individuals in the crowd "violently and forcefully grabbed [his] shield and pulled [him] down to the ground." *Id.* at 7487:10 – 7488:22. Moreover, Pezzola himself admitted that he grabbed Officer Ode's shield while it was still in Officer Ode's hand and tried to "take it from his possession." Tr. 19375:8-19 (Pezzola); *see also id.* at 19376:3-19377:7 (describing grabbing and pulling the shield with intent "to take possession of it.").

Pezzola next argues that he did not intend to permanently deprive the United States of the property. ECF 824 at 4. Rather, Pezzola argues that he only possessed the riot shield "for around one hour" and then "voluntarily handed the shield to police officers prior to leaving the Capitol." *Id.* However, video evidence showed that Pezzola maintained possession of the shield for approximately ninety minutes. Pezzola carried the shield outside the Capitol, then used the shield to break windows in the Capitol, and then carried the shield around the interior of the Capitol. Pezzola's continued possession of the shield alone provides strong circumstantial evidence that Pezzola intended to permanently deprive the United States of the shield—Pezzola continued to possess the shield even after its utility in self-defense from rubber bullets had passed. Moreover, the video evidence showed that Pezzola did not voluntarily return the shield, but rather had the

shield taken from him by a line of officers. Ex. 114x. In his testimony, Pezzola acknowledged that he was "making [his] way out" of the building" at approximately 2:36 p.m. when an officer "reached out towards" him. Tr. 19412:15 – 19413:10 (Pezzola). As Pezzola himself explained, it was only after the officer reached out and "grabbed onto" the shield that Pezzola decided, "here you go, you can have it back" and said something like that to the officer. *Id.* In other words, Pezzola took possession of the shield using force, maintained possession of the shield for approximately 90 minutes, and only returned the shield when a line of officers took it back from him. Based on all of the evidence in the case when viewed in a light most favorable to the government, a jury was correct in concluding that Pezzola intended to permanently deprive the United States of the shield.[16]

## IV. THE DEFENSE CASE AND WITNESSES STRENGTHENED THE GOVERNMENT'S EVIDENCE

The defendants all moved for judgment of acquittal pursuant to Rule 29(a) at the close of the government's case and renewed them at the end of all the evidence. Nordean, in an argument specifically adopted by Tarrio, Biggs, and Rehl, moved for judgment of acquittal under Rule 29(c), which allows a defendant to move for judgment of acquittal after a guilty verdict. ECF 822 at 1,

---

[16] Pezzola sets forth no argument as to his motion for acquittal on Count Nine, *i.e.*, the assault on Officer Ode. Indeed, Pezzola's motion acknowledges that he was "triggered" by the officers attempts to disperse the crowd, which led to the Pezzola's assault on the officers. ECF 824 at 6. Pezzola's conviction as to the assault is firmly supported by the video and photographic evidence that shows Pezzola's assault on Officer Ode (Ex. 203, 229x, 444-Ax, and 1108 – 1130), the testimony of Officer Ode (*See*, *e.g.*, Tr. 7484-7500), and the admissions of Pezzola during his testimony (*See*, *e.g.*, Tr. 19025-19032 (Pezzola explained that he is "conditioned to run towards the danger, to neutralize the danger, so the first thing he did when he came "under fire" was to "get low" and "make [him]self a smaller target" and then Pezzola "grabbed the first thing available" to protect himself with, which was Officer Ode's shield.)). Bottom line—the evidence showed that Pezzola assaulted Officer Ode, and Pezzola admitted to assaulting Officer Ode. The jury did not credit Pezzola's claim of self-defense and rightly convicted Pezzola based on the overwhelming weight of the evidence at trial.

ECF 823 at 1, ECF 828 at 29.[17] The Court must decide the defendants' motions made pursuant to Rule 29(a) at the close of the government's evidence as that existed at that point. It must decide the renewed motions and the motions pursuant to Rule 29(c) based on all evidence adduced at trial, including the defense case. *See* Rule 29(b) ("If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved").

For the reasons stated above, the evidence produced in the government's case was sufficient to sustain the jury's verdicts. The defense case did little to undermine the government's case, and in many ways, it strengthened it. Witnesses for the defense took the stand and denied knowledge of a "plan" to storm the Capitol. However, cross examination of those witnesses revealed that they many were not in a position to know the existence of a plan. Other witnesses, including the two defendants who took the stand, were evasive and combative during their testimony, which undermined the credibility of their accounts. One defense witness, Fernando Alonzo, wore a yellow Fred Perry polo shirt with black laurels on it during his testimony, but then claimed that the shirt had no connection to the Proud Boys because it was not a black shirt with yellow laurels. *Id.* at 15504:15 – 15505:3 (Alonzo).

Rehl took the stand of his own volition. During his direct examination, he stated that he thought that the rioters committing the Peace Circle breach were just looking for stages–a statement so absurd that he was compelled to explain it to his own lawyer, "And, like, look, sorry – you're giving me this look like – but it's the honest God truth." Tr. 17976:4-16 (Rehl). Rehl was not particularly interest in answer questions on cross-examination—on one occasion, he refused to answer a question six times. *Id.* at 18533:22 – 18537:25. On another, it took four tries. *Id.* at 18718:19 – 18721:6. On direct, he readily answered at least 14 separate questions about whether

---

[17] Pezzola made references to Rule 29 generally, without citing a specific subsection of that rule. *See generally* ECF 824.

he assaulted anyone on January 6. He lied all 14 times. After being confronted with video evidence of his assault during the first day of cross examination, he flatly and unequivocally denied it. On the second day of cross-examination, when faced with yet another video of his assault, his answer changed to a conspicuous "not that I recall." *Id.* at 18740:4-7. His lies evolved from first being unable to confirm whether a hat was camouflage on the first day of cross-examination to glibly remarking "not saying that's not me" on the second. *Id.* at 18741:1-2. When confronted with undeniable evidence that he had a spray canister in his hand with a substance coming out, Rehl's answer was "if that was me, it would have been an Osmo," referring to a handheld recording device that had not been mentioned in the 4-month trial before that moment. *Id.* at 18744:18-21. Rehl's testimony about his assaults on January 6 was not the only thing contradicted by other irrefutable evidence. For example, Rehl testified that he ran his chapter to "make better men," *Id.* at 17785:8-10, when in fact he was shown to be fast-tracking people he thought would crack skulls. *Id.* at 18483:12-17; 18679:17-23.

Pezzola also took the stand of his own volition. During his testimony, he called the trial "corrupt" and the charges "fake." Tr. 19331:2-3 (Pezzola). He inserted nonresponsive answers for which he had no evidentiary basis, other than wild rumors. *Id.* at 18997:14-15, 19357:12 – 19358:1 (calling Ray Epps a government informant based on what was "wildly rumored"). Pezzola's testimony was, at times, evasive and combative. However, Pezzola readily admitted to the elements of assault, robbery, and obstruction during direct and cross examination. For example, he admitted to grabbing Officer Ode's shield with the intent to take possession of it and to wanting to influence the government when he broke the Capitol window with a shield. *Id.* at 19376:10 – 19377:7 and 19410:15-17.

Even those witnesses whose direct examination was designed to attack some portion of the government's case did not persuasively undermine those portions. An investigator, David Jones, testified on direct that he could recognize Rehl's voice and that Rehl wasn't the person yelling "Fuck them, storm the Capitol," but on cross examination, it was shown that he was not familiar enough with Rehl's voice to recognize it, even when Rehl was clearly the speaker. Tr. 17720:15-25 (Jones). Anthony Guiffre, who was added to the MOSD chat by Rehl, testified that he did not participate or even know that it was a rally-planning chapter. Tr. 16353:8-14 (Guiffre). Guiffre testified that he saw that rioters had breached the building while watching at a bar on CNN. He did not go to the Capitol because he did not think it was a good idea, in contrast with all of the defendants. *Id.* at 16359:1-7.

Many defense witnesses made sweeping claims on direct examination about knowing what they and the defendants intended and expected on January 6. Then on direct, their sweeping claims were contradicted by contemporaneous messages. For example, Travis Nugent testified that he had no reason to expect violence on January 6, but on cross-examination he admitted that, to him, being a "rally boy" meant "protest," which meant "violence." Tr. 14559:12-15 (Nugent). He confirmed that videos of Proud Boys committing violence helped his chapter with recruitment. *Id.* at 14575:21-22. The jury saw that in November 2020, Nugent was himself encouraging Proud Boys to show up to an event "ready to fight." *Id.* at 14610:11 – 14611:3. George Meza, a witness called by Enrique Tarrio testified on direct that the purpose of the rally on January 6 was to go there and peacefully protest. *Id.* at 15178:12-4 (Meza). On cross examination, he was shown to have sent a video message in the wake of January 6, in which he called January 6 "our battle, and our victory." Ex. 1523. And, in live testimony before the jury, he proudly called January 6 a "glorious event" *Id.*; Tr. 15429:5-6 (Meza). Although Fernando Alonzo testified on direct that it

was "ludicrous" that it was ever implied that the Proud boys would storm the Capitol, on cross-examination, he admitted that in December 2020, around the time of the formation of MOSD, he believed that he was "at war today, right now." *Id.* at 15537:10-17 (Alonzo). Alonzo also participated in a Telegram chat that included Tarrio and multiple other members of MOSD, and on cross examination, Alonzo was shown to have advocated for stacking bodies on the White House lawn on January 7. Ex. 1601-F. Alonzo also confirmed that another MOSD member discussed storming the Capitol in a Telegram chat. Ex. 1604-A. These witnesses reinforced the testimony of government witnesses like Jeremy Bertino and Matthew Greene, who acknowledged their understanding of the agreement that had formed.

Whether intentionally or not, many defense witnesses corroborated the government's theory of the case. Nugent sent messages in the leadup to January 6 that were consistent with the Proud Boys' turn against the police during that time frame, including that it was "time to turn our backs on the cops," and that they could not "allow cops to become social justice warriors." *Id.* at 14605:9-18 (Nugent). Alonzo testified that he believed that Antifa was backed by the "Democrats, the police, and the FBI." *Id.* at 15540:1-5 (Alonzo). This corroborated Bertino's testimony, who spoke to his belief at the time that law enforcement and politicians had turned on them. *E.g.*, Tr. 10105:8 – 10106:9 (Bertino). Dominic Pezzola's common-law wife confirmed that he joined he Proud Boys after he became consumed by politics, supporting the government's contention that he did not join the group to join a social drinking club. *Id*. at 17193:12 – 17194:12 (Magee).

Likewise, defense witnesses who were present in the marching group on January 6 corroborated the government's theory of the case. Nugent confirmed that Proud Boys members were willing to follow Nordean, and that what made Nordean famous was his fighting ability. *Id*

at 14627:19 – 14628:14 (Nugent). Nugent confirmed that Biggs and Nordean were viewed at leaders at a meeting at an AirBnB in Washington on January 5, where they discussed tactics for the following day and that the members were supposed to follow the commands of leadership, even if those members did not fully understand what leadership had in mind. *Id.* at 14636:3 – 14637:4 (Nugent). Eddie Block confirmed that Nordean organized the men at the food trucks and took charge like a leader. *Id.* at 14991:14-19 (Block). Block confirmed in the weeks leading up to January 6, the idea of "storming the Capitol" was "All over social media." *Id*. at 14995:20 – 14996:3 (Block). Block explained that Biggs arrived at the Capitol and led the chants of "Whose Capitol? Our Capitol!" Block explained that Biggs was "a very big deal" who was looked up to not just by Proud Boys, but by conservatives across the board. *Id.* at 14997:1-8 (Block). Shortly after Biggs chanted this, the crowd moved forward and over the barricades. *Id.* at 14997:9-12 (Block). Once those barricades came down, Nugent turned to Nordean and asked him whether they were doing this. Nordean just looked at Nugent, and then he turned and walked towards the Capitol. Nugent testified that he fell back on the chain of command and followed his leader. *Id.* at 14643:24-14645:4 (Nugent).

The defense witnesses corroborated the government's evidence that the defendants and many of their associates rushed to delete evidence after Tarrio's arrest or after January 6 and found the videos that emerged featuring them to be incriminating. Nugent suggested "nuking" the MOSD group after Tarrio was arrested, because he did not want the chat to come into law-enforcement hands. *Id.* at 14622:12-25 (Nugent). Alonzo made a comment about Eddie Block that "snitches get stitches" when Alonzo learned that Block had released his video of January 6th to a media outlet. Tr. 15600:5-7 (Alonzo). Jeffrey Finley deleted photos from his phone and advised others to do the same thing. Tr. 16275:8-13 (Finley). He also advised Eddie Block to delete his video. *Id.* at

16285:11-19. Finley also deliberately lied to a social media audience about the fact that he went in the Capitol with other Proud Boys. *Id.* at 16288:10 – 16290:8.

In short, nothing about the defense case undermined the sufficiency of the government's case, and in many ways it added to the quantum of evidence supporting the defendants' guilt. The Court should deny the motions, not only based on the evidence in the government's case, but based on all the evidence admitted at trial.

## V.   DEFENDANTS' REQUESTS FOR A NEW TRIAL

Biggs and Rehl have also requested a new trial, pursuant to Fed. R. Crim. P. 33, arguing that publicity during the trial required a new trial. ECF 828 at 23-28. Pezzola has requested a new trial, because an individual with no ties to the defendants has given an interview in which he claimed to be Antifa member who was a supporter of President Trump. Neither request has merit, and both should be denied.

### A.   Legal Standard for Motion for a New Trial

Rule 33(a) states, in relevant part, that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. While "[t]rial courts enjoy broad discretion in ruling on a motion for a new trial," the D.C. Circuit has "held that granting a new trial motion is warranted only in those limited circumstances where 'a serious miscarriage of justice may have occurred.'" *United States v. Wheeler*, 753 F.3d 200, 208 (quoting *United States v. Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990)).

### B.   None of the Publicity Surrounding the Trial Had Any Effect on the Jury or Its Deliberations

Biggs and Rehl make no allegation, let alone offer any proof, that any of the 16 jurors seated in this case, much less the 12 who actually deliberated, were exposed to any of the coverage they complain of during the trial. Indeed, they seem to concede as much, as rather than point to

any prejudice they may have suffered because of publicity, they instead contend that they are entitled to a new trial, "even in the absence of any particular showing of prejudice." ECF 828 at 24. It is a wise concession, as they cannot establish prejudice, and in any event they are not entitled to a new trial.

As Mr. Pattis, then acting only as counsel for Biggs, conceded when the House Select Committee (HSC) report was first issued, "the main event [of press coverage of the report] was Mr. Trump," not the Proud Boys or the Committee's conclusions about them. *See* Tr. 332:21-333:2 (Dec. 20, 2022). As the Court noted at the time, Mr. Pattis's references to the Report's findings could have easily generated more press coverage regarding those findings than the report itself did. *See id.* at 335:20-25 (The Court: "Well, here's my issue with you saying that, is that whatever you say is going to be picked up in the media and then regurgitated out there to the jury pool. So I mean, right now, we have a situation where the – I wasn't looking, but the very little headlines that I caught, as you suggested, had all to do with the former president"). The Court reiterated, later in *voir dire*, that it had not seen *any* prospective jurors say they had seen coverage of the Proud Boys after they filled out their questionnaire. Tr. 2089:10-18 (Kelly, J.) (Denial of Pezzola's Motion for Additional Peremptory Strikes). Biggs and Rehl have provided no citations to the contrary in this motion, for which they carry the burden to demonstrate that a serious miscarriage of justice may have occurred. *See United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014); *United States v. Mangieri*, 694 F.2d 1270, 1285 (D.C. Cir. 1982).[18]

---

[18] It follows that if jurors did not see news about the HSC committee report, they did not see its mentions of Charles Donohoe's statements contained therein. Although the government appreciates Biggs' and Rehl's attempts to divine the reasoning behind its strategic choices as to which witnesses to call, it disagrees with their conclusion and notes that it agreed to make Donohoe available to them to call as a witness. Additionally, although Biggs and Rehl claim that the jury was "forbidden to hear" that Ryan Samsel claimed that Biggs threatened him with a gun, ECF 828 at 25, Pezzola told the jury exactly that. *E.g.*, Tr. 19244:20-24, 19245:12-18 (Pezzola). The Court also gave the jury an instruction that "no party contends that there was, in fact, a gun." Tr.

As the parties covered during litigation during *voir dire*, the Court's *voir dire* process in this case was thorough and searching. It incorporated the concerns expressed by Mr. Pattis regarding the release of the HSC report: the Court asked the vast majority of prospective jurors whether they had heard any news related to January 6 in the time between when they initially filled out their survey and when the Court examined them. Very few jurors had heard any news at all, and those who had largely had their exposure limited to knowledge of the Committee's referral of President Trump to the Department of Justice.[19] There were very few, if any, follow-up questions on exposure to media after December 5, 2022, the date the prospective jurors filled out their survey, and even fewer, if any, motions to strike jurors for cause based on post-December 5 exposure to media coverage. The Court's *voir dire* also established that the seated jurors took the Court's instructions to avoid media coverage seriously. One juror, for example, stated that she had scrolled past headlines, did not delve into them, and did not really learn anything from them. Tr. 1877:24-1878:12 (Juror 1177). Another, who did hear about the House Select Committee's referral of President Trump, noted that she instructed her husband to change the channel if things came up. Tr. 1448:19-1449:14 (Juror 1324). Yet another stated that she "got a Politico breaking news alert, but I did not read it," and confirmed that she did not recall learning anything. Tr. 1940:22-1941:1 (Juror 0935). Biggs and Rehl demand that the Court order a new trial, arguing without citation to authority that the timing of the Committee report "rebut[s] any presumption that a properly instructed jury follow[s] the law." ECF 828 at 26. But they have offered no

---

19226:19-20 (Kelly, J.).  So the jurors were, in essence, instructed that the Samsel statement was false.

[19] Given the way the defendants argued the case—in part blaming the former President—any knowledge that the former President had been criminally referred could only have served to aid, rather than hinder, the defendants' defense. *E.g.*, Tr. 20122:10-12 (Biggs Closing Argument) ("Be there, it's going to be wild, the commander in chief said. And so they came to your town").

allegations, let alone any proof, that any of the jurors were aware of the Committee's report, which issued after the jurors were instructed to avoid media coverage, but also when the vast majority could still be asked questions about any exposure during *voir dire*.

The defendants have similarly made no allegation, let alone offered any proof, that any jurors were aware of President Biden's campaign announcement—which, in any event, mentioned neither the Proud Boys nor this trial, and used images from January 6 only briefly—or the *60 Minutes* program as of deliberations. *See* ECF 828 at 25-26. They have cited no authority nor made any substantive argument to distinguish mid-trial publicity, where the jurors have already been instructed to avoid media coverage (and had shown an ability and willingness to do so) from pre-trial publicity of the type discussed in *Skilling v. United States*, 561 U.S. 358 (2010), *Rideaeu v. Louisiana*, 373 U.S. 723 (1963), *Irvin v. Dowd*, 366 U.S. 717 (1961) or *Murphy v. Florida*, 421 U.S. 794 (1975), all of which the defendants cite, and all of which the parties discussed in extensive pre-trial litigation regarding venue. Pre-trial publicity (unlike mid-trial publicity) of course necessarily occurs when the prospective jurors are under no obligation to avoid the news.[20]

Biggs and Rehl also do not address the jury's verdict, which completely undermines their assertion that this was the "closest this nation has ever come to a show trial." ECF 828 at 26. The jury deliberated for over a calendar week, during which it asked multiple substantive questions. The jury acquitted one defendant of seditious conspiracy and conspiracy to obstruct an official proceeding. It could not reach a verdict as to all defendants on one count, and on four of the five as to another. It acquitted four defendants of another substantive count. ECF 804. If the allegations Biggs and Rehl make about the effect of publicity on this trial were based in fact, the Court would

---

[20] Biggs and Rehl concede that this case did not have the "carnival-like" atmosphere of *Sheppard v. Maxwell*, 384 U.S. 333 (1966), which did involve mid-trial publicity.  ECF 828 at 23.

certainly have expected the jury to at least have convicted all the defendants of the lead charge, and likely to have convicted on all counts. That it did not seriously undermines the defendants' arguments. *See Skilling*, 561 U.S. at 395 ("The jury's not-guilty verdict on nine insider-trading counts after nearly five days of deliberation, meanwhile, suggests the court's assessments [that the jurors selected could be fair and impartial] were accurate"). Biggs and Rehl have not carried their burden to show a manifest injustice, and their request for a new trial should be denied.[21]

### C. The Alleged Presence of an "Antifa" Member is Factually Dubious and Not Cause For a New Trial

Pezzola's request for a new trial based on a post-trial interview given by a convicted January 6th defendant, Landon Copeland, should be summarily denied. Pezzola alleges, without evidence, that the government knew of Copeland's claims that he was a member of Antifa prior to his post-trial interview, published in *The Gateway Pundit* on June 2, 2023.[22] Assuming *arguendo* that the government knew of Copeland's claims as he told them to *The Gateway Pundit*—a fact the government does not concede—the defendant has not and cannot substantiate his bald claim that the information in Copeland's interview "would have likely changed the outcome of the trial."[23] ECF 824 at 5. For one, this was not Copeland's first interview. Soon after his arrest, he

---

[21] The Court should not consider substantively the Rehl's and Biggs' complaints about alleged secrecy during the trial, CHS disclosures, and whether Rehl's communications were unlawfully reviewed. *See* ECF 828 at 23. He makes no argument as to why those alleged deficiencies satisfy the manifest injustice standard, and thus the government cannot adequately respond to their arguments. To the extent the Court considers them substantively, the government notes that all of these issues litigated before and/or during the trial, and it asks that the Court deny the motion for a new trial for the same reason it denied the various motions for mistrials and new trials and sanctions for in the leadup to and during trial.

[22] *The Gateway Pundit* ran a disclaimer with the interview, noting that it could "neither confirm nor deny the allegations by Mr. Copeland at this time."

[23] Pezzola claims that Copeland's identity "remained a mystery" to his counsel. ECF 824 at 6. Copeland was charged publicly in April 2021.

interviewed with a Fox affiliate from his native Utah, where he admitted to telling a probation officer, "I would eat your flesh for its nutrient. I don't think you know what I am," but apparently did not mention his alleged Antifa membership or the alleged 250-person meeting from January 5. Fox 13 Investigates: Utah Man charged in Capitol riot says he'd 'willingly do it again,' available at:  https://www.fox13now.com/news/fox-13-investigates/utah-man-charged-in-capitol-riot-says-hed-willingly-do-it-again (last visited July 18, 2023).

Even taking Copeland's post-trial interview at face value, it would not affect the outcome of the trial. He refused to name any of the 250 people he allegedly met with on January 5, or to name the location of the meeting. He stated that they hoped to actually assist Trump supporters. In a letter allegedly written by Copeland and reprinted by *The Gateway Pundit*, he claimed that Antifa "have attended all modern protests *in support of the people protesting*" (emphasis added) and noted that many of the members are Trump supporters. https://www.thegatewaypundit.com/2023/06/jan-6-antifa-whistleblower-writes-letter-prison-admits/ (last visited July 18, 2023).

Finally, even assuming *arguendo* that a jury would believe that 100 members of Antifa attended the riot, Pezzola does not articulate how that would change the outcome of his case. He was acquitted of seditious conspiracy and conspiracy to obstruct an official proceeding. There is no allegation, even within Copeland's interview, that the 100 alleged Antifa members were acting at the behest of the government. Pezzola admitted to robbing a police shield by force (although he claimed self-defense, the jury rejected that theory, which would not be affected by the presence of alleged Antifa members in any event). Tr. 19376:10-19377:7 (Pezzola, agreeing that he pulled on Officer Ode's shield in an attempt to take possession of it). He admitted that as he smashed open the window to the Capitol, he did so because he thought that was a way to get the government to

listen to him. Tr. 19410:15-17 (Pezzola, admitting to his corrupt intent while carrying out an independently unlawful act). There is no remotely reasonable likelihood that the information provided by Landon Copeland, even if withheld and credited, would change the outcome of the trial. The Court should deny Pezzola's motion for a new trial, as he has not remotely carried his burden of showing a manifest injustice.

## **CONCLUSION**

The government proved the essential elements of the crimes of conviction with respect to each defendant beyond a reasonable doubt. For the foregoing reasons, the defendants' motions should be denied and the jury's verdict should not be disturbed.

Respectfully Submitted,
MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Jason B.A. McCullough*
JASON B.A. MCCULLOUGH
    NY Bar No. 4544953
ERIK M. KENERSON, OH Bar No. 82960
NADIA E. MOORE, NY Bar No. 4826566
    On Detail to the District of Columbia
Assistant United States Attorneys
601 D Street NW
Washington, D.C. 20530

*/s/ Conor Mulroe*
CONOR MULROE, NY Bar No. 5289640
Trial Attorney
U.S. Department of Justice, Criminal Division
1301 New York Ave. NW, Suite 700
Washington, D.C. 20530
(202) 330-1788
Conor.Mulroe@usdoj.gov