In the United States District Court
District of Columbia

UNITED STATES OF AMERICA,

-*v*-

ETHAN NORDEAN, et.al.,

        *Defendants*.

Docket No.: 21-CR-00175 (TJK)

## SENTENCING MEMORANDUM FOR DEFENDANT DOMINIC PEZZOLA

STEVEN A. METCALF II, ESQ.
**Metcalf & Metcalf, P.C.**
99 Park Avenue, 6th Floor
New York, NY 10016
*Office* 646.253.0514
*Fax* 646.219.2012
metcalflawnyc@gmail.com

ROGER ROOTS, ESQ.
*Partner*
**John Pierce Law**
21550 Oxnard Street
3rd Floor PMB #172
Woodland Hills, CA 91367

*Attorneys for Dominic Pezzola*

# I.  **PRELIMINARY STATEMENT**

The most important task in determining one's prison sentence, and what is just, necessary, not greater than sufficient: is to determine someone's true heart, and what that person has stood for, and who he truly is, not only to himself but to others.

A person's true heart is where that person truly resides and where we discover what Justice represents in this case. During sentencing, judges perform a quintessential task constantly and effectively utilizing their own humanity and experience, and that of the person standing before them – ready to be sentenced to potentially years in prison. Depending on that person's age, family circumstances, where there are in life on that day – a few years came make all the difference.

Three years, for example, can make the difference if that person and others truly caring for him are able to do their prison time, and make the most of it, as to the other way around, where "the time does you".[1]

This quintessential task is paramount to full Justice in our legal system. Regardless, of whether such factors are denominated as History, Background, and Characteristics, or any other 18 U.S.C. §3553(a) factor, or if derived from federal sentencing case law, or whether it is regarded as revealed intention or motive:  a person's true heart is not going to be found in any law book.

---

[1] Dom Pezzola has spent almost 3 years in jail awaiting this sentencing, and it's the three years that we seek to depart from that will make all the difference in this man's life, and the lives of those who care and depend on him.

It doesn't matter where you come from in the world. It doesn't matter what cards one was dealt at birth, or how that individual chooses to play his cards.

Dominic Pezzola will be standing before this Court, on September 1, 2023, after, (1) living over 40 years of his life without any criminal convcitions, (2) having a wife and two daughter which he truly cares for, and each of whom depend on him for financial and emotional support, (3) having honorably served this country in the military for six years, and (4) having taken responsibility for *his actions* while on the stand before this Court.[2]

Mr. Pezzola's world is different from all the others who undoubtedly will be present in the courtroom that day. Pezzola was a businessman, one who learned a *niche* trade from working for years with his father, that of commercial flooring, and obtaining such contacts.

If the proposed guidelines on Pezzola are deviated from, slightly, and he is ultimately sentenced in the 60-month range, as such is just, necessary, not greater than sufficient – then we are back to what I stated above: 3 years will make all the

---

[2] With regards to putting the government to its proofs – it must be highlighted that the government *would only agree to a plea* to the top count of seditious conspiracy. Mr. Pezzola knew he was not guilty of such charge and would not agree to a crime that he did not commit. Additionally, the collateral consequences of a conviction to the top charge would have been even more financial devesting to Pezzola's family (in that, upon information and belief, his daughters would certainly not be able to use his GI Bill for any portion of their college – regardless of such GI Bill being on a freeze during the pendency of this case). Nonetheless, after nineteen weeks of trial, and two weeks of jury deliberations – the jury found Pezzola not guilty of the top count of seditious conspiracy, the only count Pezzola could have plead to prior to trial. Therefore, it is respectfully submitted that Pezzola still get credit for his acceptance of responsibility.

difference in this families life, and allow for Pezzola to make the most of prison time to benefit his family, in particular his mother and children.

A deviation from the mandatory minimum of proposed PSR guidelines of three years will certainly benefit others. We hereby, respectfully request this honorable Court consider Mr. Pezzola be sentenced in the 60 month range, and that such be applied as a downward departure from the proposed PSR guidelines[3] because such time, will make all the difference in the world for others, when they will need it the most.

## II.   <u>FACTUAL BACKGROUND</u>

In sum, Defendant Pezzola physically, financially and emotionally has not only cared for his two biological children, but also cares for his wife and her work, which supports their family.

At trial, Mr. Pezzola immediately accepted responsibility for *his* actions while testifying.

---

[3] Such sentence would allow Mr. Pezzola to rehabilitate himself in the federal prison system, and to come out at an age where he still can be a contributory member of society again, and provide for all those who currently depend on him. We ask your Honor to consider our requests, first, because Mr. Pezzola accepted responsibility for his actions;  Second, because Mr. Pezzola – from what I have learned – does have a good heart, a strong mind, and a young family that depend on him for everything. Third, because at the time of his release, his children will be in their late twenties at such time will be need for their father figure.  And lastly, because Mr. Pezzola is without question worthy of a second chance, a chance to restart his life before he is too old to be given such an opportunity.

Specifically, he testified as follows:

> Q.   Why did you take the stand today?
>
> A.   So I'm taking the stand today to take responsibility for my actions on January 6, and I'm also taking the stand to explain how these men over here that I'm indicted with should not be roped into my actions, and to also explain how there was no conspiracy. One never existed, and the craziest damn thing is I never even knew these guys until I met them here at the courthouse.
>
> MR. KENERSON: Objection to whether anyone else joined the conspiracy.
>
> THE COURT: That's sustained.
>
> BY MR. METCALF:
>
> Q.   So then you said you want to take responsibility. What did you do on January 6?
>
> A.   So, I got caught up in all the craziness. I trespassed at the first breach. I trespassed at the second breach. I think there may have been a third one. I'm not quite sure. But I basically trespassed all the breaches.
>
>      During the scuffle with the whole shield incident, I did grab onto the police officer's shield, and I pulled on it out of fear for my own life, because deadly force was being used against us by the police. And then I made my way up to the scaffolding, not really thinking straight.
>
> Q.   Real quick, Dom. When you grabbed at the shield, did you take possession of it at that time?
>
> A.   No, I didn't. I grabbed onto it, and I pulled onto it. Everything happened in a split second. One minute,

I was there, and I was seeing the blood on the ground and everything, and I went up, and I was trying to explain to the cops it's not legal to shoot people in the face. And then the bullets started coming in at me, inches from my face. So yeah, I grabbed onto it and I pulled on it just out of a reaction. But I fell backwards and actually fell back on my back, and I let go of it. And someone else actually grabbed it from the police officer, and I grabbed it from them. We're going to have proof to show this.

Q.    After that, did you yell and scream at the police?

A.    I did. I was angry. I was not thinking clearly. I was upset. I had seen a lot of -- I had seen mothers grabbing their children and getting them out of the way to avoid flash bangs going off. I had seen elderly protestors, their heads split open, faces full of pepper spray. And I was upset. So yeah, I did scream some profanities at the police.

Q.    Did you then use that shield to break or damage any property of the building?

A.    I did. When I made my way up to the base of the west side terrace, I believe it is, I did break one pane of glass, one.

(*See* Tr. at p. 18868, ¶ 2 – 69, ¶ 25).

In addition, to Pezzola's taking responsibility for his action on J6, we ask this Court to also consider the impact Pezzola's actions have had on those closest to him. First, Mr. Pezzola's wife, who had to painfully take the stand in this matter, has wrote to your Honor about her deepest pains since J6. She began in stating that the "past two and a half years of my life have been, to say the least something one would

never envision their life to become." (*See* Lisa Magee Letter attached as **Exhibit D**). She explained that "[s]ince that day I have received heinous material sent to my home in the mail, to which I had to tell my daughters they were no longer allowed to get the mail. I have been hospitalized because of the stress . . .". (*See* Lisa Magee Letter attached as **Exhibit D**).

Lisa continued to explain how "Dominic was the wage earner in our home. Our children and I relied on him for our daily needs. I worked as a social worker, at a non-profit, making barely minimum wage, not nearly enough to support a family" let alone in the state of New York. (*See* Lisa Magee Letter attached as **Exhibit D**).

Dom's youngest daughter, Angelina, wrote that "since I was little, my father has always been a source of comfort, compassion, and a pillar that has kept the darkness of the world from reaching me. My father has spent his life working himself like a dog, destroying his body just to give me and my sister a better chance at life, and it's worked as I'm now attending college and have never had to deal with financial struggle, food scarcity, or homelessness in my life. (*See* Angelica Pezzola Letter attached as **Exhibit A**).

On January 6, 2021, Lisa "was in graduate school and had left my non-profit position. Since graduating I have been unable to secure employment, I can only imagine why, when my name is googled, Dominic appears, that is my new reality." (*See* Lisa Magee Letter attached as **Exhibit D**).

In speaking about what has been lost since such time, Lisa explains that she "lost my partner of 22 years, my confidant, my best friend. Trying to figure out how to navigate life as a single parent and sole provider for two college students has been an extreme struggle. I have had to watch my children struggle through the past few years, scared, depressed, bullied, and ashamed to name a few. I had to watch my child go to school in fear each day of her senior year as she was a minority in her school and the news had perpetuated that her father was part of a white supremacy group which we know is untrue." (*See* Lisa Magee Letter attached as **Exhibit D**).

Dom's daughter spoke about her lost in these words:

> [s]ince my father has been incarcerated, my life has been uprooted and twisted in such a way that I couldn't even imagine when he was still a free man. Every new person I meet I fear will recognize my last name and treat me with disdain, everytime I see my father in the news or on social media I feel despair deep in my soul as I see anonymous faces scowl and curse my family for existing. Everytime I look in the mirror and see what resemblance I have to my father I can't help but feel shame well up inside me. Everytime I enjoy life with my friends and family I can't help but think "is my dad okay? Is he enjoying his day today? Is he in pain?" And it hurts to not be able to ask him these questions every day like I used to.

(*See* Angelica Pezzola  Letter attached as **Exhibit A**).

# III.   LAW AND ARGUMENT

It is well settled that a sentencing court must follow the three-step process the *Gall* Court set forth. *Gall v. United States*, 552 U.S. 38 (2007) (highlighting the court should begin all sentencing proceedings by correctly calculating the applicable guideline range, and that "to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark").

First, the court must properly determine the guideline range. Second, the court must determine whether to apply any of the guidelines' departure policy statements to adjust the guideline range.[4] Third, the court must consider all the factors set forth in 18 U.S.C. § 3553(a) as a whole, including whether a variance[5] is warranted and appropriate. *United States v. Stone*, 432 8 F.3d 651, 655 (6th Cir. 2005); *United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005).

---

[4] *See* 18 U.S.C. § 3553(a)(5); *See also United States v. McBride*, 434 F.3d 470 (6th Cir. 2006) (guideline 7 departures are still a relevant consideration for determining the appropriate guideline sentence); *United States v. Jordi*, 418 F.3d 1212 (11th Cir. 2005) (highlighting that "the application of the guidelines is not complete until the departures, if any, that are warranted are appropriately considered"); *see also United States v. Lofink*, 564 F.3d 232 (3d Cir. 2009) (holding that district court's failure to rule on the defendant's departure arguments constitutes procedural error).

[5] Hereafter in stating a "variance", such shall be construed to mean "a sentence outside the advisory guideline system".

I.   **APPLICATION FOR A 18 U.S.C. § 3553(A) DOWNWARD DEPARTURE, VARIANCE, OR A NON-GUIDELINES SENTENCE BECAUSE MR. PEZZOLA'S EXTRAORDINARY FAMILY CIRCUMSTANCES.**

This is the first time we are able to stand before this Court, and respectfully request that taken into consideration is Mr. Pezzola's extraordinary family circumstances.

It is respectfully submitted that Mr. Pezzola be sentenced to a term of 60 months imprisonment lower than the lower end of the guideline in the PSR.

**A. THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT AND THE NATURE OF THE OFFENSE (§ 3553(A)(1)).**

Sentencing Guidelines are no longer mandatory and are not even presumed to be reasonable; instead, it is respectfully submitted that the guidelines should be considered as just one of many factors to be weighed when selecting a disposition that is sufficient but not greater than necessary to satisfy the purposes and goals set forth in § 3553(a).[6] *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *United States v. Fernandez*, 443 F.3d 19 (2d Cir. 2006). As delineated in case law, a court must

---

[6] *United States v. Mohammed*, 459 F.3d 979 (9th Cir. 2006) (highlighting in light of *Booker*, Courts should "treat such so-called departures as an exercise of *post-Booker* discretion to sentence a defendant outside of the applicable guidelines range" and subject it to a "unitary review for reasonableness, no matter how the district court styles its sentencing decision"); *see also United States v. Brown*, 578 F.3d 221 (3d Cir. 2006) (vacating and remanding where district court failed to distinguish whether above guideline sentence was product of a departure or a variance); *United States v. Miller*, 479 F.3d 984 (8th Cir. 2007) (conflating departure considerations and the variance analysis can be harmless error where the ultimate sentence is not unreasonable).

conduct its own evaluation of the § 3553(a) factors and may "reject [after due consideration] the advice of the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

Downward departure may be warranted "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." U.S.S.G. § 4A1.3(b)(1). While the "policy statements" highlight that the "in the case of a downward departure, the specific reasons why the applicable criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes";[7] nonetheless, the Second Circuit has held that "we have made it clear on other occasions that, as long as the reasons for such a departure are fully explained, 'a mechanistic, step-by-step procedure is not required.' " *See United States v. Simmons*, 343 F.3d 72 (2d Cir. 2003)(*quoting United States v. Kassar,* 47 F.3d 562, 566 (2d Cir.1995), *abrogated on other grounds by Spencer v. Kemna,* 523 U.S. 1, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998); *see also United States v. Franklyn,* 157 F.3d 90, 100 (2d Cir.1998)).

---

[7] *See* §4A1.3(c)(2).

Here, this submission proceeds with two respectful requests under 18 U.S.C. § 3553(a), whereby Defendant Pezzola is asking this court to (1) grant a downward departure in the guidelines range to a sentence of five years, which is lower than the minimum range of the guidelines set forth in the PSR, or to (2) grant a variance sentencing him outside of the applicable guideline range.

There are various separate, discrete, distinct, and compelling reason to deviate or depart from the calculated advisory guidelines in sentencing Pezzola in this case, such as the following: (1) he is financially responsible for two 2 biological children, his wife, and the family home; (2) Since being incarcerated the Defendant's has not violated any rules or crimes, and has been an ideal pre-trial individual; (3) his ability to take the witness stand and take responsibility for his own actions; (4) the good in the Pezzola's life must be weighed with and can mitigate the bad, and (5) mercy warrants a below guideline sentence.

### i.   *Mr. Pezzola's Family, and Family's Reliance Upon Him for Their Economic Well-Being.*

Mr. Pezzola is a huge part of his children's lives, and not only does he care for his children, but also the wellbeing of his wife as well. When Lisa took the stand, she told the story of a young twenty-year-old boy – becoming a young man – who fought hard to get custody of his oldest girl. Pezzola ultimately was successful, and since such time, he and Lisa have raise this girl, and cared for her every needs, where

she now is in college, and has been cared for by her father since her birth, a father who would never give up fighting for her.

It is well settled that Courts have found it appropriate under certain circumstances to a downward departure from the guidelines, pursuant to U.S.S.G. § 5H1.6. One such instance is when the Defendant was the sole or primary providers for their families. *United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992); *United States v. Mateo*, 299 F. Supp 2d 201 (EDNY 2004).

The *Feldman* Court, in an unpublished decision, found extraordinary family circumstances existed when Defendant was the sole proprietor of his business, which the court noted might not survive his absence if he was incarcerated, and the fact of his sole-provider position in the family, combined with the needs of his two sons, one of whom suffered from attention deficit disorder and was under psychiatric care. *U.S. v. Feldman*, 1994 WL 525958 (S.D.N.Y. 1994).

In *Rose*, the Court made a downward departure from the applicable Guideline based on extraordinary family circumstances for a 27-year-old defendant, who had assumed the role of a surrogate father to four young second cousins being raised by his maternal grandmother, where his incarceration would have had grave and irreversible consequences for the extended family of which he was a part, although the children were neither his biological nor his legal offspring. *U.S. v. Rose*, 885 F. Supp. 62 (E.D.N.Y. 1995); *Compare to U.S. v. Canoy*,38 F.3d 893 (7th Cir. 1994)

(vacating a defendant's sentence after the district court refused a downward departure based on extraordinary family circumstances, where the district court reasoned it lacked the authority to grant such a departure despite its finding that the defendant was "a good father, that he ha[d] three exemplary children, and that his family would suffer 'substantially' and perhaps 'irreparably' were he incarcerated for a full 27 months.").

In *Alba*, the government challenged a defendant's sentence of 6 months in a halfway house, followed by 2 years of supervised release. *U.S. v. Alba*, 933 F.2d 1117 (2d Cir. 1991). The *Alba* Court departure from the Guidelines range of 41-51 months of incarceration was based in part on the defendant's family's reliance upon him for their economic well-being, where the appellate court held that the sentencing judge's determination to depart pursuant to § 5H1.6 of the Guidelines, was not an abuse of discretion. *Id.* (remanding for other grounds regarding downward departure).  The appellate reasoning was the record amply supported the judge's conclusion that the defendant's family circumstances were extraordinary, noting that the defendant, his wife and their two daughters lived with his disabled father and his paternal grandmother, and that he had long-standing employment, working two jobs to maintain his family's economic well-being. *Id.* The appellate court highlighted without a departure, the Guidelines would result in the destruction of an otherwise

strong family unit, and his conclusion that these circumstances were sufficiently extraordinary to support a downward departure under § 5H1.6. *Id.*

Similarly, in *Galante*, the appellate court upheld the downward departure of the sentencing court on extraordinary family circumstances. *U.S. v. Galante*, 111 F.3d 1029 (2d Cir. 1997), *reh'g in banc denied*, 128 F.3d 788 (2d Cir. 1997). In *Galante*, Defendant's wife spoke "little English" and thus had a limited earning capacity, the defendant was the primary source of financial support for the family. The trial court found that if the defendant were imprisoned, the family unit would be destroyed and relegated to public assistance, and the extent of the departure was from an adjusted offense level of 23 to an offense level of 10. *Id.*

In this matter Mr. Pezzola is a family man, who provides financial, emotional, psychological support to his two children, and his best friend – his wife Lisa.

Pezzola has a family that is in dire need of his support not just financially, but also mentally and emotionally. (*See* Family and Close Friend Letters attached as **Exhibits A-E**).

### ii.   *An Individualized Assessment of Mr. Pezzola's Personal Characteristics Warrants a Mitigated <u>Sentence</u>.*

In determining the particular sentence to be imposed, 18 U.S.C. § 3553(a)(1) directs the Court to consider the "history and characteristics of the defendant." This ensures "that the punishment will suit not merely the offense but the individual defendant." *Pepper v. United States*, 562 U.S. 476, 488 (2011) (citation omitted). Just as it is necessary for the Court to understand "what set a defendant upon [an] illegal course". *Id.* at 332. Moreover, its "a court's duty is always to sentence the defendant as [s]he stands before the court on the day of sentencing." *Pepper v. United States*, 562 U.S. 476, 492 (2011) (*citing United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000) (*per curiam*)).

Section 3553(a) requires a sentencing court to consider additional factors when determining its sentence.  These additional factors include the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the range established by the Sentencing Guidelines, any pertinent policy statement from the Sentencing Commission, the need to avoid unwarranted sentencing disparities and the need to provide restitution to any victims. Consideration of these additional factors supports a non-Guidelines sentence of term of seven years imprisonment.

However, we respectfully request that this Honorable Court take this into serious consideration.

In *Booker*, the Supreme Court held that mandatory application of the Sentencing Guidelines violated a defendant's Sixth Amendment rights. *United States v. Booker*, 543 U.S. 220 (2005); *See Kimbrough v. United States*, 552 U.S. 85, 100-01 (2007); *United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008). Essentially, the rigid framework of the Guidelines was replaced with a process that makes the Guidelines merely advisory, and that requires judges to consider the factors specified in 18 U.S.C. § 3553(a) to determine a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing. *Kimbrough*, 552 U.S. at 101.

The post *Booker* goals include the need for the sentence imposed to:

(1)     reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense;

(2)     afford adequate deterrence to criminal conduct;

(3)     protect the public from further crimes of the defendant; and

(4)     provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

With this framework in mind, § 3553(a) provides for variances from the advisory Guidelines range based on, *inter alia*, "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1); *Kimbrough*, 552 U.S. at 108-10.

Additionally, *post-Booker* decisions have specified the procedure a district court must follow in sentencing, where the Guidelines serve as only a "starting point" in determining a sentence, and a sentencing court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007). All of the sentencing factors enumerated under 18 U.S.C. § 3553(a) must be considered for the District Court to "make an individualized assessment based on the facts presented." *Gall*, 522 U.S. at 50; *see also United States v. Rigas*, 583 F.3d 108, 116 (2d Cir. 2009).

Put differently, courts should utilize the "most up-to-date picture" of a defendant's "history and characteristics", and one much more detailed than the PSR, which seems to not even confirm who Titus was living with at the time of his PSR interview.  *Pepper*, 562 U.S. at 492.

For example, in *Pepper*, a defendant was convicted of narcotics trafficking, sentenced, and later resentenced as a result of other proceedings. By the time of his resentencing, the defendant "had been drug free for nearly five years, had attended college and achieved high grades, was a top employee at his job slated for a

promotion, had reestablished a relationship with his father, and was married and supporting his wife's daughter." *Pepper*, 562 U.S. at 492. The Supreme Court emphasized that the District Court should have applied the § 3553(a) factors to the man standing before it on resentencing, rather than ending the analysis of his "history and characteristics" at the time of the first sentencing. *Id.; United States v. Gonzales*, 163 F. Supp. 3d 1078, 1126 (D.N.M.), *aff'd*, 844 F.3d 929 (10th Cir. 2016) ("a court may consider 'post offense rehabilitative efforts' in deciding whether to grant" a variance); *United States v. Rutherford*, 323 F. Supp. 2d 911, 914 (E.D. Wis. 2004) (same).

Consistent with this principle, "this circuit has recognized repeatedly that in deciding whether to depart downward a sentencing court may consider any presentence rehabilitation that a defendant has demonstrated as well as the likelihood that probation rather than prison will facilitate a defendant's future rehabilitation." *United States v. K*, 160 F. Supp. 2d 421, 442 (E.D.N.Y. 2001); *see also United States v. Maier*, 975 F.2d 944, 948 (2d Cir. 1992).

Courts may vary from the guidelines to avoid the strict requirements of §4A1.3 and impose an outside-the-guidelines sentence based on the inadequacy of the defendant's criminal history category. *See e.g. United States v. Mejia-Huerta*, 480 F.3d 713 (5th Cir. 2007) ("We reiterate for emphasis that §4A1.3 49 applies only to departures—based on unrepresentative criminal history—not to variances.")

Here, as described above, Mr. Pezzola's love and devotion for his family rehabilitative efforts since his arrest have been nothing short of extraordinary. Family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted. Such factors are only a basis for departure in extraordinary cases. Pezzola's family circumstances and those who rely on him are extraordinary. *See e.g. United States v. Spero*, 382 F.3d 803 (8th Cir. 2004) (highlighting a situation in which one parent is critical to a 129 child's well-being qualifies as an exceptional circumstance justifying a downward departure); *United States v. Leon*, 341 F.3d 928 (9th Cir. 2003) (affirming the district court's departure based on defendant's indispensable role in caring for his wife, who recently had her kidney removed due to renal cancer and who had been diagnosed as being at risk of committing suicide if she were to lose her husband to death or incarceration); *United States v. Sprei*, 145 F.3d 528 (2d Cir. 1998) (reversing the district court's grant of a downward departure based on the devastating impact a long period of incarceration would have on the defendant's children, for whom the defendant).

Here, if Mr. Pezzola is sentenced to an offense level of 30, then in serving such sentence, the impact to two young children will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support. Further, the loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. The sentencing expose here, and

the harm to the family is sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.

Moreover, the loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family. Lastly, the departure effectively will address the loss of caretaking or financial support because if sentenced to or below 60 months, then Pezzola will not get out until in his "early or late fifties" and if such is the case then Pezzola in his fifties will effective be unemployable at such time.

We respectfully submit that each of these facts—Mr. Pezzola's commitment to family, education, and therapy—supports the imposition of a mitigated sentence. *See, e.g., United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008) (affirming a 91-month variance down from the guideline range based in part on "the support that the defendant stood to receive from his family [and] personal qualities indicating his potential for rehabilitation"); *United States v. Schroeder*, 536 F.3d 746 (7th Cir. 2008) (remanding for resentencing where the sentencing court did not address defendant's claim of extraordinary family circumstances); *United States v. Martin*, 520 F.3d 87 (1st Cir. 2008) (affirming a 91-month variance down from the guideline range based in part on "the support that the defendant stood to receive from his family [and] personal qualities indicating his potential for rehabilitation;" *post-*

*Booker*, "policy statements normally are not decisive as to what may constitute a permissible ground for a variant sentence in a given case"). *United States v. Husein*, 478 F.3d 318, 324 (6th Cir. 2007) (affirming sentence of one-day credited for time served and three years supervised release, including 270 days of home confinement, despite an advisory Guidelines range of 37 to 46 months, where the court noted that defendant's "family is going to benefit more by your presence than society is going to benefit from your incarceration"); *See also United States v. Chapman*, 356 F.3d 843, 847 (8th Cir. 2004) (reversing district court's denial of downward departure for post-offense rehabilitation, holding that "truly exceptional rehabilitation alone can, in rare cases, support a downward departure even when the defendant does not accept responsibility"); *United States v. Lehmann*, 513 F.3d 805 (8th Cir. 2008) (affirming a downward variance to probation where the district court found that a prison sentence would negatively affect the defendant's disabled young son).

Lastly, it should be noted that we understand that there are factors that are prohibited grounds for downward departures or variances, such as: (a) Mr. Pezzola has always been a hardworking, family man, who has worked endless hours to ensure that he always provided for family, including caring for his children; (b) Mr. Pezzola is cared about in his community, a respected family-man, where others will be doing this time with him; (c) lack of a formal college education, as life dictated

that he had to work with his hands early in live to provide; and (d) his lack of guidance as a youth.

Each of these grounds are present here, and its respectfully submitted that identified in the guidelines as a permissible ground for departure, even if such offender characteristic or other circumstance is not ordinarily relevant to a determination of whether a departure is warranted. *Cf. United States v. Decora*, 177 F.3d 676 (8th Cir. 1999) (explaining that although the court relied for downward departure on factors not ordinarily relevant—education, employment record, family and community responsibility—these factors were present in an unusual degree not adequately taken into consideration by the Sentencing Commission).

We ask this Court to take a look at each of these factors, as a whole, in making its determination.

## IV. THE SERIOUSNESS OF THE OFFENSE, RESPECT FOR THE LAW, AND JUST PUNISHMENT FOR THE OFFENSE.

A non-guidelines sentence at or below time-served is appropriate and sufficient to reflect the seriousness of the offense of which Mr. O'Brien was convicted and to promote respect for the law and to provide just punishment. In fact, a sentence of an overly lengthy incarceration may undercut respect for the law. *Gall v United States*, 552 U.S. 38, 54 (2007) (highlighting "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as

merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing").

## A.   ADEQUATE DETERRENCE TO FUTURE CRIMINAL CONDUCT.

Imposing the mandatory minimum in this case, will have little to no bearing on deterrence.  Mr. Pezzola merely seeks a sentence that is just and just under the mandatory minimum, that of five years. After five years, Mr. Pezzola will be in his late forties, where he will no longer even be able to resort to a life a crime. Empirical research shows no relationship between sentence length and deterrence.  In a pre-Guideline study of specific deterrence, no difference in deterrence was found as a result of sentence severity, including between probation and imprisonment.  *See* ANDREW VON HIRSCH, *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects.").

"There is generally no significant association between perceptions of punishment levels and actual levels . . . implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms." GARY KLECK, *et al.*, *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005).

In addition to the ineffectiveness of imprisonment on deterrence, an over-emphasis on general deterrence poses the ethical problem of punishing one person to promote deterrence of others. "Judicial punishment can never be administered merely as a means for promoting another good either with regard to the criminal himself or to civil society, but must in all cases be imposed only because the individual on whom it is inflicted has committed a crime.  For one man ought never to be dealt with merely as a means subservient to the purpose of another." IMMANUEL KANT, *The Science of Right*, 195 (W. Hastie trans., 1790).

General deterrence simply is not a good reason for a lengthy prison term.

With the love, support, and nurturing that he receives from his wife, children, and family, Dominic Pezzola is sure to turn his life around in the right direction.

## V. THE ENHANCEMENTS IN THIS CASE RESULT IN SIGNIFICANT INCREASE IN THE GUIDELINE RANGE AND THUS A <u>DEPARTURE SHOULD APPLY</u>.

The enhancements in this case are substantial, to the point where this Court should consider a departure based on its cumulative effect on the guidelines.

In *Lauersen* the Second Circuit held:

> We recognize that the Guidelines permit the use of a subsection 2F1.1(b)(8)(B) enhancement in addition to a subsection 2F1.1(b)(1)(N) enhancement. Nevertheless, we think that the cumulation of such substantially overlapping enhancements, when imposed upon a defendant whose adjusted offense level translates to a high sentencing range, presents a circumstance that is present "to a degree" not adequately considered by the Commission, *see* 18

U.S.C. § 3553(b)(1), and therefore permits a sentencing judge to make a downward departure. *Cf. United States v. Gigante,* 94 F.3d 53, 56 (2d Cir.1996) (downward departure authorized where substantially enhanced sentence range results from a series of enhancements proven only by preponderance of the evidence), *amending* 39 F.3d 42, 48 (2d Cir.1994).

Upon remand, therefore, the District Judge must impose the subsection 2F1.1(b)(8)(B) enhancement, but may exercise discretion to mitigate the effect of the enhancement by making a downward departure.

*U.S. v. Lauersen*, 348 F.3d 329 (2d Cir. 2003).

Similarly, here, as the Second Circuit recognized, when the enhancements are "substantially overlapping enhancements" and result in a significant increase in the sentencing range minimums, then a departure should be considered and applied. *Id.*

Here, the Pezzola enhancements are substantial. For example, in paraghagh 127 of the Pezzola PSR we objected as follows:

**Specific Offense Characteristics**: The offense involved causing or threatening physical injury to a person in order to obstruct **the administration of justice** (to wit: the conspirators were among the first wave of rioters to breach the Capitol grounds and building and were part of a mob of rioters that caused injuries to Capitol Police officers guarding the outer perimeter at First Street. Conspirators tore apart a black metal fence on Capitol grounds, which allowed the first wave of rioters to continue advancing onto Capitol grounds and towards the Capitol building. They also led their men forward toward an outnumbered line of retreating law enforcement officers. The conspirators engaged in hand-to-hand combat with law enforcement officers who were guarding the US Capitol, and some used force to rob law enforcement officers of

property. The conspirators overwhelmed a line of officers at the base of the scaffolding that led to the US Capitol building and threw objects at police officers. They broke windows to access the Capitol building and achieve the objective of stopping the certification and used force to push past law enforcement officers who were guarding the doors of the US Capitol in order to gain entry to the US Capitol and stop the certification), therefore, eight levels are added. USSG 2J1.2(b)(1)(B)."

(*See* PSR at ¶ 127).

As highlighted above, the circumstances in this matter warrant a completely different outcome. One where this Court deviate and sentence Mr. Pezzola to three years below the minimum guidelines set forth in the PSR.

Respectfully, we request that Pezzola be sentenced to five years, when under the circumstances, this case screams for a departure of the guidelines, or for some departure to be done. Because that is what is just under these circumstances. Here, applying the guidelines and the mandatory minimum, such guidelines are grossly inappropriate to the charges imposed and are substantially outweigh by the facts in this case. We respectfully request that this Court take this into consideration.

## VI.   THE GOVERNMENT'S PREPOSED "TERRORISM ENHANCEMENT" IS BASELESS AND WITHOUT SUPPORT IN THE EVIDENCE.

The terrorism enhancement, codified in section 3A 1.4 of the federal sentencing guidelines, traces its roots back to the 1995 Oklahoma City bombing, after which

Congress enacted tougher penalties to deter acts of "intimidation or coercion" aimed at the government or civilian population.

In the intervening years, terrorism sentences have most frequently been applied to defendants with ties to ISIS or *al-Qaida*, or to violent domestic extremists like *Cesar Sayoc*, who pleaded guilty in 2018 to mailing pipe bombs to members of Congress.

As the editors of the Harvard Law Review write in a recent article, the "Terrorism Enhancement" is "A Blunt Tool for a Nuanced Problem." The enhancement is difficult to apply for a number of reasons:

> A final problem with a more aggressive use of the terrorism enhancement is that it is a particularly blunt tool. Mechanically, the enhancement increases a defendant's offense level to not less than thirty-two and increases the defendant's criminal history to Category VI — the highest criminal history category. . . . For instance, Judge O'Toole refused to apply the enhancement over conncerns about fairness, later stating that "the automatic assignment of the defendant to a Criminal History Category VI . . . is not only too blunt an instrument to have ge        nuine        analytical value, it is fundamentally at odds with the design of the Guidelines.

*Note, Responding to Domestic Terrorism: A Crisis of Legitimacy*, 136 Harv. L. Rev. 1914, 1932 (2023), citing Melissa Powers, *Comment, Drifting Away from Terrorism: Downward Departure from the Terrorism Enhancement in Cases of Mental Illness*, 62 ST. LOUIS U. L.J. 939, 953 (2018) and Joanna Baltes et al., *Convicted Terrorists: Sentencing Considerations and Their Policy Implications*, 8 J. NAT'L SEC. L. & POL'Y 347, 356 (2016).

The terrorism enhancement's requirement of automatic enhancement ignores the individual 'history and characteristics' of the Defendant, and "instead places too much weight on a questionable interpretation of what constitutes terrorism under the Guidelines." *United States v. Garey*, 383 F. Supp. 2d 1374, 1379 (M.D. Ga. 2005) (declining to apply the enhancement because it was too "excessive." *Id*. at 1380.

Pezzola's conduct on January 6 hardly qualify as "terrorism."  Pezzola did make contact with a Metropolitan Police Department officer and ended up in a scrum after which he came up with a police shield.  Pezzola did break a single pane of glass and enter the Capitol through a window.  Pezzola did wander various halls of the Capitol before having a "victory smoke" and then exiting.

Under no standard ever pronounced by any court could such conduct qualify as "terrorism."  Rather, Pezzola joined hundreds of others seeking to have their voices heard at the Capitol on January 6, 2021.

In light of this, the governments claims are baseless, and literally should not warrant much more of a response.

## VII.   <u>CONCLUSION AND SENTENCING RECOMMENDATION</u>

For the reasons set forth above, it is respectfully prayed that this Court impose upon Pezzola a term of imprisonment substantially below the advisory guidelines,

or through a non-guidelines sentence commensurate with this sentencing application.

Steven A. Metcalf, Esq.      /s/
_____
STEVEN A. METCALF II, ESQ.
**Metcalf & Metcalf, P.C.**
99 Park Avenue, 6th Floor
New York, NY 10016
Office 646.253.0514
Fax 646.219.2012
metcalflawnyc@gmail.com

ROGER ROOTS, ESQ.
Partner
**John Pierce Law**
21550 Oxnard Street
3rd Floor PMB #172
Woodland Hills, CA 91367

**Attorneys for Dominic Pezzola**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the instant Motion was served via ECF this 17th day of August, 2023 on all counsel of record.

/s/ Steven A. Metcalf II
_____

**STEVEN A. METCALF II, ESQ.**