```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3      United States of America,      )
                                       )
 4                      Plaintiff,     ) Criminal Action
                                       ) No. 21-cr-175
 5      vs.                            )
                                       ) JURY TRIAL
 6      Ethan Nordean,                 ) Day 60
        Joseph R. Biggs,               ) PUBLIC
 7      Zachary Rehl,                  )
        Enrique Tarrio,                ) Washington, DC
 8      Dominic J. Pezzola,            ) April 5, 2023
                                       ) Time:  1:45 p.m.
 9                      Defendants.    )
        _____
10
                        TRANSCRIPT OF JURY TRIAL
11                          HELD BEFORE
               THE HONORABLE JUDGE TIMOTHY J. KELLY
12                  UNITED STATES DISTRICT JUDGE
        _____
13
                        A P P E A R A N C E S
14
        For Plaintiff:     Jason McCullough
15                         Erik Kenerson
                           601 D Street NW
16                         Washington, DC  20530
                           Email:  Jason.mccullough2@usdoj.gov
17                         Email:  Erik.kenerson@usdoj.gov
                           Conor Mulroe
18                         DOJ-CRM
                           1301 New York Avenue NW, Suite 700
19                         Washington, DC  20005
                           Email:  Conor.mulroe@usdoj.gov
20                         Nadia Moore
                           U.S. Attorney's Office
21                         271 Cadman Plaza East
                           Brooklyn, NY  11201
22                         Email:  Nadia.moore@usdoj.gov
        For Defendants:
23        Nordean           Nicholas D. Smith
                           David B. Smith, PLLC
24                         1123 Broadway
                           Townsend Building, Suite 909
25                         New York, NY  10010
                           Email:  Nds@davidbsmithpllc.com
```

| | | |
|---|---|---|
| 1 | Biggs: | **John Daniel Hull, IV** |
| | | Hull McGuire, PC |
| 2 | | 1420 N Street, NW |
| | | Washington, DC  20005 |
| 3 | | Email:  Jdhull@hullmcguire.com |
| | | **Norman A. Pattis** |
| 4 | | Pattis & Smith, LLC |
| | | 383 Orange Street, First Floor |
| 5 | | New Haven, CT  06511 |
| | | Email:  Npattis@pattisandsmith.com |
| 6 | | |
| | Rehl: | **Carmen Hernandez** |
| 7 | | Law Office of Carmen Hernandez |
| | | 7166 Mink Hollow Road |
| 8 | | Highland, MD  20777 |
| | | Email:  Chernan7&aol.com |
| 9 | | |
| | Tarrio: | **Nayib Hassan** |
| 10 | | Law Offices of Nayib Hassan, P.A. |
| | | 6175 NW 153 Street, Suite 209 |
| 11 | | Miami Lakes, FL  33014 |
| | | Email:  Hassan@nhassanlaw.com |
| 12 | | **Sabino Jauregui** |
| | | Jauregui Law, P.A. |
| 13 | | 1014 West 49 Street |
| | | Hialeah, FL  33012 |
| 14 | | Email:  Sabino@jaureguilaw.com |
| 15 | Pezzola: | **Steven Alan Metcalf, II** |
| | | Metcalf & Metcalf, P.C. |
| 16 | | 99 Park Avenue, Sixth Floor |
| | | New York, NY  10016 |
| 17 | | Email:  Fedcases@metcalflawnyc.com |
| | | **Roger Roots** |
| 18 | | Roger Roots, Attorney at Law |
| | | 113 Lake Drive East |
| 19 | | Livingston, MT  59047 |
| | | Email:  Rogerisaacroots@outlook.com |
| 20 | | |
| 21 | Court Reporter: | Janice E. Dickman, RMR, CRR, CRC |
| | | U.S. District & Bankruptcy Courts |
| 22 | | Email:  Janicedickmandcd@gmail.com |
| 23 | | |
| 24 | | |
| 25 | | |

17115

1        *   *   *   *   *   *   *P R O C E E D I N G S*   *   *   *   *   *   *



17116



17117



17118



17119



17120



17121



17122



17123



17124



17125



17126



17127



17128



17129



17130



17131



17132



17133



17134



17135



17136



17137



17138



17139



17140



17141



17142



17143



17144



17145



17146



17147



17148



17149



17150



17151



17152



17153



17154



17155



17156



17157



17158



17159



17160



17161



17162



17163



17164



17165



17166



17167



17168



17169



17170



17171



17172



17173



17174



17175



17176



17177



17178





1
2
3
4
5
6
7
8
9
10
11
12
13          (Whereupon the jurors enter the courtroom.)
14          THE COURT:  Everyone may be seated.
15          Ladies and gentlemen, we're now going to hear from a
16   witness called by Mr. Pezzola.
17          MR. METCALF:  Thank you, Your Honor.
18          Mr. Pezzola calls Lisa Magee to the stand.
19          THE COURTROOM DEPUTY:  Ma'am, please --
20          THE COURT:  Ma'am, if you would just stand.
21          THE COURTROOM DEPUTY:  Raise your right hand.
22                    LISA MAGEE,
23   was called as a witness and, having been first duly sworn, was
24   examined and testified as follows:
25          THE COURT:  All right.  Mr. Metcalf, you may proceed,

1    sir.

2                    MR. METCALF:  Thank you.

3                    DIRECT EXAMINATION

4    BY MR. METCALF:

5    Q.  Can you spell -- or, state and spell your name for the

6    record, please.

7    A.  Lisa Magee.  L-I-S-A.  M-A-G-E-E.

8    Q.  Now, before the judge has to tell me this, because he does

9    basically every time, he's always going to say try to speak

10   into the microphone and try to be projected in that -- in that

11   sense and for us not to talk over each other.

12          So, if you get frustrated at me, just let me finish what

13   I have to say first.  Is that okay?

14   A.  Okay.

15   Q.  All right.  Sorry I had you waiting all day, but you're

16   here now.

17          So, how old are you, Lisa?

18   A.  I'm 40 years old.

19   Q.  And we've obviously met before, right?

20   A.  Yes, we have.

21   Q.  And throughout the time of us meeting, I come to learn that

22   you've raised a family with Mr. Pezzola; is that correct?

23   A.  Yes, I have.  We have two daughters together.

24   Q.  And how old are your daughters?

25   A.  They are 18 and 22.

1    Q.   What's your oldest daughter's name?

2    A.   Maria.

3    Q.   Your youngest?

4    A.   Angelina.

5    Q.   They both go to school?

6    A.   They -- yes.  They both go to school.  Maria is currently

7    attending a trade school to become an aesthetician and Angelina

8    just started her second semester of community college.

9    Q.   Now, how long have you been with Mr. Pezzola for?

10   A.   A little over 22 years.

11   Q.   How did you meet him?

12   A.   We met in 2001.  I was working at a -- as a waitress at the

13   time.  A friend of mine from work was having a birthday party,

14   Dominic happened to be at the birthday party because her

15   boyfriend at the time was a childhood friend of Dominic's.

16   They had grown up together.  She introduced us at the party and

17   we hit it off.  He asked me out on a date and I agreed to go.

18   Q.   So did you meet him from friends and the restaurant, or

19   were those two, kind of, events commingled into one?

20   A.   I had seen him come into the restaurant a couple times, in

21   passing, said hi here and there.  But I kind of had this thing

22   that I wouldn't date customers, type thing.  But since I was

23   introduced to him outside of that environment, I decided to --

24   and got to have a more intimate conversation, get to know him a

25   little better.  So I gave him a shot.

1    Q.  Okay.  So then, in learning about Dominic -- I mean, he

2    must -- both of you must have been young at that point.

3         How old were you at that point?

4    A.  I had -- I was 18, just about to turn 19 years old.  And he

5    was 23 at the time.

6    Q.  Oh, wow.

7         And what did you learn about him?

8    A.  I learned that he was a single father in the midst of

9    trying to obtain custody of his -- our oldest daughter, Maria.

10   Q.  Who is now 22, right?

11   A.  Who is now 22 years old.

12         So he was a single father.  He was in the Marine Corp

13   and he worked in a family business.

14   Q.  And you also had -- he had some hobbies, right?  At least

15   in high school that I've learned of.

16   A.  Yes.  Dominic was an avid boxer throughout high school.

17   I've seen lots of photographs of that in looking at yearbooks.

18   In high school he won the Mission Bouts for Aquinas Institute,

19   which is a college preparatory school in Rochester, New York.

20         After high school, he proceeded to box at a local

21   boxing --

22   Q.  Wait just one second.  I want to show you -- you mentioned

23   photographs.

24         MR. METCALF:  Can I have this screen shared with the

25   witness, please?

```
 1    BY MR. METCALF:
 2    Q.  Lisa, I'm showing you what I have marked for identification
 3    as Pezzola Exhibit 256.
 4         Do you recognize this photo?
 5    A.  I do recognize that photo.
 6    Q.  What is that photo of?
 7    A.  That is a photograph of Dominic in training at Montgomery
 8    Boxing Club in Rochester, New York.
 9    Q.  Okay.  And where is he?
10    A.  He is the second person.  With a backwards baseball cap on.
11    Q.  And then I'm going to show you also -- excuse me, which
12    one -- I'm going to show you the second page to what has been
13    marked as Pezzola Exhibit 256.
14         Do you see that photograph?
15    A.  I do.
16    Q.  And what is that photograph of?
17    A.  That is a photograph of him sparring.  I believe that's
18    actually after he had sparred, helping out his boxing coach,
19    Ms. Peek.
20         MR. METCALF:  Your Honor, at this time I move for
21    these two pages to be marked in as evidence and produced as
22    Pezzola 256.
23         MR. McCULLOUGH:  No objection.
24         THE COURT:  They will be admitted and permission to
25    publish them.
```

1    BY MR. METCALF:

2    Q.  All right.  So we're going to work backwards.  Let's just

3    stay with this photograph.

4         Where is Mr. Pezzola on this one?

5         And you can actually write on the screen.  Look

6    (indicating).  See how you can do that?

7    A.  This is Dominic here (indicating).

8    Q.  Now, the female in this, I've heard her name come up from

9    time to time.

10        Are you familiar with her?

11   A.  I am familiar with Ms. Peek.  Her name is Gloria Peek.  She

12   is the first African-American, lesbian boxing coach who

13   actually went on to coach individuals in the Olympics in boxing.

14   Q.  And she was Dominic's coach, as well?

15   A.  She was Dominic's coach.  They all called her mama.  And he

16   highly respected her and her wisdom and coaching and training,

17   and guidance in life in general.

18   Q.  She just recently passed, right?

19   A.  I've heard a rumor that she passed.  She had been

20   struggling with a brain tumor.  I'm not sure if she had passed,

21   but I had heard that she was, um, struggling very hard for her

22   life.

23   Q.  Did you hear from Dominic that something happened to her or

24   didn't -- or did he find out later on or eventually if she did

25   pass?

1   A.  I'm not sure if he found out or not if she passed.  I know

2   that he had gotten information kind of through the grapevine

3   that she was battling a very bad brain tumor and was likely

4   going to pass.

5   Q.  And this is the first photograph that we just spoke about.

6       Can you circle Dominic for us, please?

7   A.  (Indicating.)

8   Q.  So now this is during his high school, these two

9   photographs; is that fair to say?

10  A.  I would say that these are right after he graduated high

11  school.

12  Q.  Okay.  So he still continued boxing after high school?

13  A.  Yes.

14  Q.  And that's when he went on for the golden gloves; is that

15  right?

16  A.  Yes.

17  Q.  Now, at this time was he still -- was he working in the

18  family business at that time?

19  A.  At that time he was actually an apprentice electrician for

20  Tambe Electric.  However, Dominic has very large hands, so it's

21  very hard for him to fit his fingers into tiny spaces with

22  electrical.  So it was quite dangerous for him.  So he

23  transitioned to working in -- with his father in the flooring

24  business, the family business.

25  Q.  Okay.  How long did he do that for?

1    A.  I believe he was an apprentice with them for a little over

2    a year and a half.

3    Q.  Okay.  And then how long did he work with his father for?

4    A.  He worked with his father for approximately 15 years.

5    Q.  Oh, wow.  And then after that, did he open up his own

6    business?  Or what did he do from there?

7    A.  He did.  After leaving -- working for his father, he opened

8    up his own flooring -- commercial flooring company and ran a

9    crew himself.

10   Q.  Now, just in addition to the two children, you guys have

11   three dogs; is that right?

12   A.  Yes.  We have Bella, Mason, and Meila.  Pictured there is

13   Mason.

14   Q.  I'm sorry.  I didn't get a chance to say that I was showing

15   this to you.  I asked -- Lisa, I'm going to show you what has

16   now been marked for identification as Pezzola 257.  This is,

17   again, going to be two pages.  Do you recognize this photo?

18   A.  I do.  I took that photo.

19          MR. McCULLOUGH:  No objection to the admission and

20   publication.

21          MR. METCALF:  I ask they be produced then, Your

22   Honor.

23          THE COURT:  It will be admitted and permission to

24   publish it, sir.

25          MR. METCALF:  Thank you.

1    BY MR. METCALF:

2    Q.  So this is Mason?

3    A.  This is Mason, yes.

4    Q.  Now, above -- is that Dominic's favorite dog, or is that

5    your favorite dog?

6    A.  That is Dominic's boy.  That is the only other male in our

7    household, besides Dominic.

8    Q.  Now, above Dominic on his head, hanging on the wall, what's

9    in there?

10   A.  That --

11   Q.  Is that -- sorry?

12   A.  That was our first family dog, Cyrus.

13   Q.  Cyrus?

14   A.  (Nods.)  And he died of cancer about seven years ago.

15   Q.  I'm sorry, Lisa.  I didn't mean to bring that back.

16   There's tissues, if you need.  And if you need anything else to

17   drink -- or, any water, just let me know.

18          Is this also Mason in this photograph?

19   A.  Yes, that is Mason.  He's a little snuggle baby.

20   Q.  Now, you mentioned -- I just want to go back a little bit.

21   You mentioned that at the time you met Mr. Pezzola, he was --

22   he was fighting for custody of Maria.

23   A.  Yes.

24   Q.  So from the time you met Mr. Pezzola -- and then you

25   eventually moved in with him together; right?

```
1    A.  Yes.  Our --
2    Q.  How long of a timeframe would you say that would be, that
3    was?
4    A.  Within -- from us starting dating to me moving in was about
5    four months.  Our relationship progressed very quickly and --
6    Q.  Did he have custody at the time you moved in?
7    A.  At the time I moved in, he did not have custody of his
8    daughter.
9    Q.  How long did it take then, eventually -- after you moved in
10   with Mr. Pezzola, how long did it take before he got custody of
11   Maria and you guys started raising her together?
12   A.  Approximately six weeks after I moved in, Dominic was
13   granted residential custody of Maria.
14   Q.  So by the time he got custody of Maria, she must have been
15   less than a year, if I'm doing my math right.
16   A.  Yes.  She was approximately nine -- nine or ten months old.
17   Q.  And then you've been helping -- you've been raising her
18   with Dominic since then?
19   A.  Yes.  She is --
20   Q.  And she's 22 now?
21   A.  She's 22 now.  She is my daughter, our daughter.
22              THE COURT:  Ma'am, there's some water there, if you
23   want it.
24              THE WITNESS:  Thank you.
25   BY MR. METCALF:
```

1    Q.  With Dom's business, did he work late hours?  How would

2    he -- how would you describe his work habits?

3    A.  Dominic would work day and night to provide for myself and

4    our daughters, sometimes 70, 80 hours a week.  There were times

5    that he didn't get home until 3, 4 o'clock in the morning to

6    finish -- so that he could finish a job, sleep for four hours

7    and then start a new job the next day.

8    Q.  So when COVID hit, this must have been a difficult time?

9    A.  It was extraordinarily difficult.

10   Q.  Did Dom stop working?

11   A.  Yes.  The majority of his contracts were pulled.  He did a

12   lot of work in hospitals and schools, and, so, because of the

13   lockdowns, he was not able to go to work.  They weren't putting

14   contracts out, and his business greatly suffered.

15   Q.  And at the time -- I would like to actually direct your

16   attention to March -- or, May 30th of 2020.  What was going on

17   in the City of Rochester around that time?

18   A.  May 30th of 2020, there was a Black Lives Matter protest

19   which turned very violent in our -- the city we live in.  I

20   worked downtown at the time, in the courthouse, and we were

21   actually sent home early that day because of safety concerns.

22   Q.  So did you work -- did you work at the Hall of Justice or

23   did you work at the City Court?

24   A.  I worked at the City Court.

25   Q.  You worked at the City Court.  And is the City Court

1    located in the Public Safety Building in Rochester?

2    A.  It is not.  So the way the buildings are set up, it's --

3    one is -- this is Public Safety, here is City Court, and then

4    here is the County and Supreme Court (indicating).  And they're

5    all connected by an outdoor -- like, big patio.

6    Q.  Okay.  And let's not just focus on that day.  Let's focus

7    on around that timeframe.  What else was going on around

8    Rochester, as far as riots are concerned or anything that

9    stuck -- that sticks out?

10   A.  There were lots of things going on around that time.

11   Diners -- at the Ox and Stone, it's a restaurant.  It's called

12   the east end of the city that we live in, it's where --

13   basically all the restaurants and bars and stuff.  Diners were

14   actually attacked by protesters.  They came by and smashed all

15   their plates, destroyed the restaurants.

16   Q.  While people were sitting and actually eating their dinner?

17   A.  While -- yes, yes.

18   Q.  So this was going on around -- basically around the whole

19   city, from what I could tell, at the time?

20   A.  Yes.

21   Q.  And eventually restaurants, bars, everything eventually

22   started to close, right?

23   A.  Yes.

24   Q.  All right.  So going back to May 30th, then.  You're in the

25   City Court, and that protest that you speak of, did it happen

1    close to where you were working?

2    A.   Yes.  I would say it's within 1,000 feet of the building I

3    was working in.

4    Q.   And what happened at your job then at that point in time?

5    A.   We received a phone call to leave work early, that there

6    was protests going on and that they were turning violent.

7    There were police cars being burned, people's personal vehicles

8    were being set on fire, as well as a construction trailer that

9    was right outside of the courthouse I was working at was set on

10   fire.

11   Q.   What ended up becoming the significance of that

12   construction truck?

13   A.   It was for the Foy Construction, which is a company that

14   Dominic had contracted work from and ultimately -- he was

15   actually supposed to be working that job in the courthouse, but

16   because of the riots, that job was shut down for quite some

17   time.

18   Q.   All right.  So what is it that you did at the courthouse?

19   What was your job and responsibilities?

20   A.   I was the supervisor of the pretrial release of the Monroe

21   County Bar Association.  So I would go into the jail at 6 a.m.,

22   interview inmates, collect all of their pertinent information,

23   go back to my office, run their background checks, confirm the

24   information they gave to me was true and accurate, and then I

25   would return to the court and give release recommendations to

1    the judge that was doing arraignments that day.

2    Q.  And so why would Dom be -- was Dom contracting to do

3    flooring for the courthouse as well?  Is that what you're

4    saying?

5    A.  Yes.

6    Q.  Okay.  So I looked up May 30, 2020, and I think that was a

7    Saturday?

8    A.  Yes.

9    Q.  That's why you were working on Saturday?

10   A.  Yes.  We do Saturday morning arrangements for individuals

11   who are arrested on Fridays and overnights.

12   Q.  Now, the trailer that you speak of -- I'm going to ask now

13   that the witness is shown what I have marked for identification

14   as Pezzola 258.

15       Let me know when you see the article.

16   A.  I see the article.

17   Q.  Is this article having to do with what you just described,

18   that incident with the truck?

19   A.  Yes.

20   Q.  And how -- how far would you say this is from your house?

21   A.  Approximately six to seven miles.  I actually live on the

22   same road this occurred on.  It stretches from one end of the

23   city to the other.  It begins as Lake Avenue, turns into State

24   Street and then proceeds into Exchange Boulevard.

25   Q.  So it's six to seven miles basically on the same road?

1    A.  Yes.

2    Q.  So you --

3    A.  It may not even be that far of a distance.

4    Q.  So you could take the same road -- at the time you could

5    have taken the same road from your house to work?

6    A.  Yes.

7    Q.  It was one straight path?

8    A.  Yes.

9    Q.  And Dominic is -- was Dominic aware of this incident and

10   what was going on at the time, to your knowledge?

11   A.  He was aware of the incident.  He actually sent me a text

12   message asking me if I was okay.  I said to him that, yes, I am

13   okay.  They're sending us home early.  I will be heading home

14   shortly.

15   Q.  So now at this point in time, in your lives, did you see

16   changes in Dominic?

17   A.  Yes.  Dominic was somebody who always went to the gym, went

18   to work, was a very active person.  Due to the lockdowns, you

19   know, he was stuck at home.  He started drinking very heavily

20   and would inundate himself with Fox News day and night.

21   Q.  And before -- before COVID was Dominic into politics?

22   A.  Barely.

23   Q.  And then during this time, he became involved -- or,

24   interested in politics?

25   A.  He became consumed by politics.

1    Q.  So what did you tell him to do then?

2    A.  I told him to find some friends and get a hobby.

3    Q.  Oh, man.

4    A.  Yeah.

5    Q.  If you could only go back to that moment in time.

6         Did Dominic then go get friends and a new hobby?

7    A.  He did.

8    Q.  Is that why we're sitting here today?

9    A.  It is.

10   Q.  So, you became aware that he started applying for the Proud

11   Boys or to be a member of the Proud Boys; is that fair to say?

12   A.  Yes, it is.

13   Q.  Approximately what timeframe did you learn this or did you

14   find out that he was applying for the Proud Boys?

15   A.  It was at the end of November.

16   Q.  Of 2020?

17   A.  Of 2020, yes.

18   Q.  So about two months before January 6?

19   A.  Not even two months.

20   Q.  So 11-14-2020 -- I never forget that date because 11-14 is

21   actually my birthday.  On that day did Mr. -- did Dom come to

22   D.C.?

23   A.  He did.  He actually talked to me about wanting to come

24   down and attend the rally that was going on down here in D.C.

25   I thought --

1   Q.  At that time, at that time was he part of the Proud Boys?

2   A.  He was not.

3   Q.  So he comes to D.C.  You didn't have any reason to think

4   anything of it, right?

5   A.  No, I did not.

6   Q.  And what did you find out that he did in D.C., in November?

7   A.  In November, he ended up running into, I believe, a Proud

8   Boy named Dick Sweats.  He got his contact information.  They

9   spoke a little bit.

10  Q.  So you know Dick Sweats.  I thought it was Dick Sweats or

11  Dick Sweats?

12  A.  Dick Sweats, I believe.

13  Q.  So Dominic met a guy who calls himself Dick Sweats.  Is

14  that -- did he go by any other name?

15  A.  Not that I know of.  And I thought that his name was quite

16  ridiculous.

17  Q.  Okay.  So you're not on any chats or anything, like any

18  Telegram chats or anything like that?

19  A.  No.

20  Q.  So you don't know about people's handling names or anything

21  like that?

22  A.  No clue.

23  Q.  But that's the name that you knew that Dom met in November

24  when he came to D.C. --

25  A.  Correct.

1    Q.  -- of 2020?

2         So then what happened after that?

3    A.  After that Dominic showed interest in joining the Proud

4    Boys.  He explained a little bit to me about how they would

5    attend rallies and protect people, just normal citizens from

6    being harmed and attacked and bullied by other people and other

7    groups.

8    Q.  And would he start going to meetings, going out drinking

9    with some of these guys?  Like what was going on then in

10   November, to your recollection?

11   A.  To my recollection, he had gotten in contact with them

12   about how to go about joining and becoming a Proud Boy.  He

13   ultimately did get in touch with somebody, I don't know who,

14   and ultimately ended up joining and becoming a Proud Boy.

15   Q.  Now, he goes back to D.C. on December 12th, 2020, right?

16   A.  Yes.

17   Q.  What happens there?

18   A.  At that time he had become a Proud Boy.  And while he was

19   there, he ended up being photographed by *The Washington Post*

20   and being put on the front page of their newspaper.

21   Q.  How did you find out about that?

22   A.  He showed me a photograph.

23   Q.  Do you remember what you said to him?

24   A.  "You're a fucking idiot."

25   Q.  Did you ever see or hear of information about how he got

1    initiated into the Proud Boys, the whole punching while you say

2    five cereals?

3    A.  Yes.  I actually saw a video of his initiation into the

4    Proud Boys and him being punched and having to name five

5    cereals.

6    Q.  Did you say the same thing to him then that you said to him

7    when you heard about *The Washington Post*?

8    A.  I told him they looked like a bunch of 17-year-old boys in

9    a fraternity acting like children.

10   Q.  So, now anything else about the December 12th, 2020 trip at

11   all that you remember?

12   A.  I am the person -- Dominic is not very savvy with

13   technology, so I actually booked his hotel room and booked his

14   rental car for the trip.

15   Q.  So then he took -- he takes another trip at the end of

16   December, right by New Year's, right?

17   A.  Yes.

18   Q.  What do you know about that trip?

19   A.  He decided to go on that trip because another Proud Boy had

20   contracted COVID.  And during that trip --

21   Q.  Well, first, why did he go on that trip?  Was it really to

22   give a shield?  Was it to get out?  Was it --

23   A.  No, it was to get out of New York.  Everything was locked

24   down.  You couldn't do anything in New York.  Anything.  And he

25   wanted to just get out of New York and go down south where

17198

1    everything was still open.  You could go to a restaurant, you

2    could go to a bar, you could go to the gym and workout.  And we

3    weren't afforded those things in New York at the time.

4    Q.  Then you come out to find out and learn of an individual by

5    the name of Bertino, right?

6    A.  Yes.

7    Q.  And you found out that Dom went to -- he stopped at

8    Bertino's house during this trip, right?

9    A.  Yes.

10   Q.  Do you know how long he was even there for?

11   A.  Less than an hour, from my understanding.

12   Q.  And he came back at least a couple of days later, right?

13   A.  Yes.

14   Q.  Do you remember when he came back?

15   A.  It was after the new year.

16   Q.  So then after the new year, before January 6th, do you

17   remember when he left to go to D.C. for January 6?

18        Did he leave on the 5th?

19   A.  Yes, he left on the 5th.

20   Q.  So between him coming home and leaving for D.C., do you

21   remember your father coming by the house?

22   A.  Yes.  My father came over in the morning on -- I believe it

23   was the 4th, it could have been the 3rd, to drop off Christmas

24   presents because we weren't able to attend Christmas at his

25   home that year.  My stepmother wasn't feeling well, so we

1    didn't go.

2    Q.  So at that time, did you or your factor voice any concern

3    to Dominic about trips to D.C.?

4    A.  Yes.  Dominic was talking about -- to my dad about the

5    Proud Boys and possibly coming down here to D.C. on the 6th.

6    To which my father said to him, You have a wife and two girls,

7    you need to keep your ass at home.  There's going to be however

8    many people there, I don't think it's a good idea for you to

9    go, you have a responsibilities here at home.

10                 To which Dom --

11   Q.  Did Dom respond to that?

12   A.  He did.  He said, You're right.  I understand where you're

13   coming from and you're right, I'm not going to go.

14   Q.  So then at this point in time, you're not -- are you still

15   working at the courthouse at this point in time?

16   A.  I was not.  I had left my job at the courthouse because I

17   was attending graduate school and it was just becoming too much

18   to try and juggle both.

19   Q.  So at this point in time, January 2021, you're back in

20   school?

21   A.  Yes.

22   Q.  And is this around final time?  Or what time of the year

23   was this?

24   A.  For me this was right after finals and we were on our

25   intersession break, but I still had a ton of schoolwork.  I try

1    to get ahead on things, and I took intersession classes, so I

2    had about a week break.

3    Q.   My real question is this:   January 6th comes, are you at

4    home?

5    A.   No.

6    Q.   Where did you go?

7    A.   I went out with my friends.

8    Q.   And so you had a girls' night out?

9    A.   We had a girls' night out.   We went to the casino and we --

10    Q.   And that's when Dom left to go to D.C.?

11    A.   Yes.   Up until I decided to have a girls' night out, he was

12    planning on staying home.   Once he found out that I was going

13    to be leaving for the evening, he was, like, well, I'm just

14    going to go then.

15    Q.   Let me ask you:   Do you still love Dominic?

16    A.   Very much.

17    Q.   Would you lie for him?

18    A.   No.

19    Q.   Why wouldn't you lie for him?

20    A.   I don't see a reason to lie for him.   I would never put

21    myself in a position to perjure myself and not be home to care

22    for my children.

23              MR. METCALF:   Thank you, Lisa.   I appreciate it.

24              THE COURT:   All right.   Mr. McCullough.

25              Mr. McCullough, do you think there's a need to visit

1    on the phone?

2                MR. McCULLOUGH:  Your Honor, I don't believe so, no.

3    No.

4                THE COURT:  Okay.

5                          CROSS-EXAMINATION

6    BY MR. McCULLOUGH:

7    Q.  Ms. Magee, thank you very much.  Good afternoon.

8    A.  Good afternoon.

9    Q.  I don't know how much you've heard about the trial, but

10   it's 4 o'clock and we'll get you out of here today.

11         So just -- hopefully, that's a relief, as you can

12   appreciate.

13   A.  Yes.

14   Q.  You've been with Mr. Pezzola for a long time?

15   A.  Yes.

16   Q.  And part of being with Mr. Pezzola is that you have grown

17   to see the character of the man that you're with, correct?

18   A.  Yes.

19                THE COURT:  Mr. McCullough, could you just keep your

20   voice up.  I'm sorry.  I know --

21                MR. McCULLOUGH:  Of course.  Of course.

22   BY MR. McCULLOUGH:

23   Q.  And you've seen Dom as someone that is in the Marine Corps?

24   A.  Yes.

25   Q.  And I think you've said that during Dom's time in the

17202

1     Marine Corp, you were only apart for about two weeks of that
2     whole time; is that right?
3     A.  Yes.
4     Q.  And then Dom left the Marine Corp and started his own
5     business, worked for his own business?
6     A.  Yes.
7     Q.  Through all of these experiences, you've seen Dom's work
8     ethic?
9     A.  Yes.
10    Q.  Is that yes?
11          And, I'm sorry.
12    A.  Yes.  Sorry.
13    Q.  I apologize.
14    A.  Yes.
15    Q.  And you've seen Dom's, you know, loyalty to the causes that
16    he believes in?
17    A.  Yes.
18    Q.  And, so, when he is -- whether that's being a Marine or
19    whether that's dedicating himself to his business, he's a guy
20    that commits himself to it, correct?
21    A.  I would say depending.
22    Q.  Sure.  And so you described --
23          MR. METCALF:  Your Honor, can she finish the answer?
24          THE COURT:  I didn't think -- did you have more to
25    your answer, ma'am?

```
 1                    THE WITNESS:  I did.

 2                    THE COURT:  Okay.  You may.

 3                    THE WITNESS:  I would say it would -- it's dependent

 4       upon the situation at that time, in terms if he would stay

 5       loyal to something through and through.

 6       BY MR. McCULLOUGH:

 7       Q.  So, Mr. Pezzola, he would work 70, 80 hours to make his

 8       business go.  He would commit himself to it, correct?

 9       A.  Yes.

10       Q.  You mentioned, kind of, the fight for custody for his

11       daughter?

12       A.  Yes.

13       Q.  He committed himself to that, correct?

14       A.  Yeah.  It was his child, yes.

15       Q.  And, I mean, these are the things -- these are the things

16       that make Mr. Pezzola who he is to you, correct?

17       A.  Correct.

18       Q.  His commitment to the things that he believes in, correct?

19       A.  The commitment to his children and myself, yes.

20       Q.  The commitment to his job?

21       A.  Yes.

22       Q.  The commitment to his family?

23       A.  Yes.

24       Q.  And the commitment to the oath that he took as a Marine?

25       A.  Yes.
```

1    Q.  So, Mr. Pezzola took an oath to defend the Constitution,

2    correct?

3    A.  Correct.

4    Q.  And that was part of his being a Marine?

5    A.  Yes.

6    Q.  Mr. Pezzola's -- Mr. Pezzola's -- Mr. Pezzola shared with

7    you that his oath didn't end when he left the Marines, correct?

8    A.  Yes.  I believe that's true, actually, for all service

9    members that take that oath.

10   Q.  And as you said, after Mr. Pezzola -- when Mr. Pezzola got

11   into 2020, he was paying more attention to politics, correct?

12   A.  Yes.

13   Q.  And you saw Mr. Pezzola become increasingly focused on the

14   battle between good and evil, correct?

15            MR. METCALF:  Objection as to form.  It's a little

16   vague.  In fact, very vague.

17            THE COURT:  Overruled.

18            But, Mr. McCullough, can you keep your voice up

19   again, please.

20   BY MR. McCULLOUGH:

21   Q.  And I'll rephrase.  I'll rephrase.

22            If it's -- as Mr. Pezzola became increasingly focused on

23   politics, you understood him to be increasingly focused on kind

24   of the split that was becoming apparent in the country,

25   correct?

1    A.   Yes.

2    Q.   And he viewed the country as kind of falling into two

3    sides, correct?

4    A.   I don't know in terms of whether he saw it falling into, as

5    you put it, good and evil, just that there was a divide going

6    on.

7    Q.   And Mr. Pezzola believed that the country was on the brink

8    of civil war.  Did he share that with you?

9    A.   I don't recall.

10   Q.   And you saw as Mr. Pezzola got further along in 2020, he

11   traveled to Washington, D.C. for a rally in November, correct?

12   A.   Correct.

13   Q.   And he traveled to D.C. for a rally in December again,

14   correct?

15   A.   Correct.

16   Q.   And then he mentioned that he had become a Proud Boy,

17   correct?

18   A.   Yes.

19   Q.   And Mr. Pezzola began traveling with the Proud Boys,

20   correct?

21   A.   Yes.  To the rallies that you mentioned in D.C. and then I

22   know he had approximately six or seven, like, meet-ups with the

23   Proud Boys, but I'm not sure where those exactly took place.

24   Q.   And, in fact, Mr. Pezzola was becoming more committed to

25   the Proud Boys, correct?

1    A.  To an extent, yes.

2    Q.  And you mentioned Mr. Pezzola's trip down to the Carolinas?

3    A.  Um-hum.

4    Q.  And you're aware of a purpose -- one of the purposes of

5    that trip, correct?

6    A.  Yes.

7    Q.  And one of the purposes of that trip was to deliver the

8    shield to Mr. Bertino, correct?

9    A.  Yes.

10   Q.  Just -- we'll have Special Agent Needler hold up for the

11   witness Exhibit 72, already in evidence.

12        And, Ms. Magee, have you ever seen this shield before?

13   A.  That particular shield, no.

14   Q.  Okay.  And, Ms. Magee, you would agree that that is kind of

15   a black and yellow shield, correct?

16   A.  Yes.

17   Q.  Made of wood?

18   A.  Yes.

19   Q.  It's kind of an art project, if you will, correct?

20   A.  Yes.

21   Q.  And Mr. Pezzola drove approximately 600 miles, correct, to

22   deliver that shield to Mr. Bertino?

23   A.  I have no idea what the distance is.

24   Q.  Drove all the way down to North Carolina?

25   A.  Correct.

1    Q.  From Rochester, New York, correct?

2    A.  Correct.  But the purpose of that trip was not just to

3    deliver the shield to Mr. Bertino.  The purpose of that trip

4    was to actually just get out of New York and have a little mini

5    vacation.  So happened that the individual that was actually,

6    from my understanding, supposed to deliver the shield to

7    Mr. Bertino fell ill with COVID and was unable to go.  So

8    Dominic said, Hey, yeah, I want to get the hell out of New York

9    anyway for a while, so...

10   Q.  Mr. Pezzola stepped up, correct?

11   A.  Yes.

12   Q.  And, I mean, that's what Mr. Pezzola does, correct?

13   A.  Depending on the situation, yes.

14   Q.  When the situation -- when help is needed, Mr. Pezzola is

15   going to step up, and he's going to deliver, correct?

16   A.  If he's able to, yes.

17   Q.  And so, when Mr. Pezzola wanted to get out of the -- of the

18   area, he didn't go to, kind of, neighboring Pennsylvania to get

19   out, correct?

20            MR. METCALF:  Objection as to speculation.

21            THE COURT:  Overruled.

22            MR. METCALF:  And relevance.

23            THE COURT:  Overruled.

24   BY MR. McCULLOUGH:

25   Q.  Ms. Magee, you kind of mentioned COVID policies.

1    A.  Um-hum.

2    Q.  My understanding is that COVID policies were fairly

3    restrictive in New York, correct?

4    A.  Not fairly; very.

5    Q.  Neighboring Pennsylvania, the policies were much less

6    restrictive, correct?

7    A.  I have no idea what Pennsylvania's policies were at the

8    time.

9    Q.  Policies -- pardon me.

10   A.  Sorry.

11   Q.  That was entirely my fault.  My apologies.  The policies in

12   Maryland were less restrictive, correct?

13   A.  I don't know.

14   Q.  Or New Jersey were less restrictive?

15   A.  I was -- my personal knowledge really was only on -- to the

16   restrictions that were in where I was living.

17   Q.  So, Mr. Pezzola then decided to deliver that shield all the

18   way down to Mr. Bertino, correct?

19   A.  Yes.

20   Q.  You mentioned this incident that -- you mentioned the

21   incident that had taken place in May of 2020?

22   A.  Yes.

23   Q.  That sounds like it hit fairly close to home for you?

24   A.  It did.

25   Q.  And I can imagine that it was fairly scary?

1    A.  It was -- it was very frightening.  Very frightening.

2    Q.  And you said that Mr. Pezzola called to check on you,

3    correct?

4    A.  Yes.

5    Q.  You also mentioned this other incident where diners were

6    attacked, correct?

7    A.  Yes.

8    Q.  Those were people that were eating somewhere that were

9    attacked, correct?

10   A.  Yes.  At the time, where we lived, you couldn't sit inside

11   the restaurants, so they actually lined tables up along outside

12   of the restaurants, kind of along the sidewalk area.  And

13   that's, like, really the only way you could go out to dinner at

14   the time.

15   Q.  Those events were happening, and you and Mr. Pezzola were

16   experiencing them, correct?

17   A.  Yes.

18   Q.  And they were -- they angered you?

19   A.  They did anger me.  They angered me, they petrified me,

20   they made me fearful.

21   Q.  And Mr. Pezzola was committed to defending against that,

22   correct?

23          MR. METCALF:  Objection as to knowing Mr. Pezzola's

24   mindset at a specific point in time.

25          THE COURT:  Overruled.

1    A.  Can you repeat the question?

2    BY MR. McCULLOUGH:

3    Q.  The question is that Mr. Pezzola was there to protect you,

4    correct?

5    A.  I would assume so.

6    Q.  And so, when you're scared or angry, Mr. Pezzola is going

7    to make sure that he is there to protect you, correct?

8    A.  Not necessarily.  If he's able to, but that's not always

9    the case.

10   Q.  Now, Ms. Magee, you -- there's a notebook that was

11   recovered in your home.

12   A.  Okay.

13   Q.  Do you -- holding it up for you.  Do you recognize -- I'm

14   showing -- this is Exhibit 23, already in evidence.  Just going

15   to hand this up to you.  You do not need to put on gloves.

16          MR. METCALF:  This is Exhibit 23, Government 23?

17          MR. McCULLOUGH:  Government Exhibit 23, correct.

18          MR. METCALF:  Thank you.

19   BY MR. McCULLOUGH:

20   Q.  Ms. Magee, I'll just ask you if you recognize that

21   notebook.

22   A.  This is the notebook that Dominic used when he was taking a

23   college math course.  My daughter could really use these notes

24   right now.  She's struggling.

25   Q.  I'm familiar with this -- this exercise.

```
 1              THE COURT:  I'm sorry -- I didn't hear.
 2              MR. PATTIS:  Objection to counsel testifying about
 3      what he could or couldn't use.
 4              THE COURT:  Sustained.  But you may -- you may
 5      proceed, Mr. -- Mr. McCullough.
 6              MR. McCULLOUGH:  I'll strike my comment.  My
 7      apologies to Mr. Pattis.
 8      BY MR. McCULLOUGH:
 9      Q.  And if you'll turn to the yellow tab there.  Do you
10      recognize that handwriting?
11      A.  Yes.  That is Dominic's handwriting.
12      Q.  That's Dominic's handwriting?
13      A.  Yes.
14      Q.  And I'll ask you to just turn one page back before that.
15      Do you recognize that handwriting?
16      A.  That is my handwriting.
17      Q.  I'm sorry.  That is your handwriting?
18      A.  Yes.
19      Q.  I'll ask you to turn one page after the handwritten notes
20      by Mr. Pezzola.
21              I'll ask you if you recognize that handwriting?
22      A.  That is my handwriting.
23      Q.  Okay.  So let's look at the pages between.
24      A.  I saw this, but I never read it.
25      Q.  So, just directing your attention to some of the statements
```

1    within that notebook, on the first page of that notebook,

2    Mr. Pezzola describes why he wants to become a Proud Boy; is

3    that right?

4    A.  I'm a slow reader.  Give me a second.

5    Q.  Absolutely.

6        (Pause.)

7    A.  Yes.

8    Q.  Mr. Pezzola described being willing to fight until his last

9    breath to make sure his children and their children don't

10   inherit a communist country, correct?

11           MS. HERNANDEZ:  Objection, Your Honor.  Hearsay.

12           THE COURT:  Overruled.

13   A.  That's what it states here.

14   BY MR. McCULLOUGH:

15   Q.  And at the bottom of the second page, Mr. Pezzola described

16   his view.  He said -- he wrote:  Ultimately if we are not in a

17   civil war, I would like to open a dog sanctuary.

18       Do you see where it says that?

19   A.  I do see where it states that.

20   Q.  He goes on to write:  I truly believe this is a battle

21   between good and evil, freedom versus tyranny, capitalism

22   versus communism.

23           MR. METCALF:  Your Honor, I don't see the relevance

24   if she didn't read this document.  She already indicated that

25   she has no knowledge of this document.  Lack of foundation as

```
 1    well.
 2              THE COURT:  Let me hear you, Mr. McCullough.
 3              (Bench conference:)
 4              THE COURT:  Mr. McCullough, I understand what she
 5    testified to on direct, but she also said she's never read this
 6    in her life.
 7              MR. McCULLOUGH:  So, Your Honor, this is my last
 8    question on this; if I could just get an answer on it.  I think
 9    the point is that her -- I've established that her handwriting
10    is on the page before this and the page after, Your Honor.  So
11    I think the jury can evaluate whether or not it's credible.
12              THE COURT:  What is your question?
13              MR. McCULLOUGH:  Whether -- I'll ask her to read that
14    and tell me whether he's ever shared those views with her
15    before.
16              THE COURT:  Well, I think have you a good faith basis
17    to just ask the question:  Has he shared those views with you?
18    So I'll overrule the objection, if that's all we're doing here.
19              MR. McCULLOUGH:  Um-hum.
20              (Open court.)
21    BY MR. McCULLOUGH:
22    Q.  Sorry, Ms. Magee.  Pardon me.  Dom -- strike that.  I fell
23    into some of Mr. Metcalf's phraseology.
24         Had Mr. Pezzola ever shared with you his views that the
25    country was on the brink of civil war?
```

1    A.  I don't recall him saying that to me, no.

2    Q.  Did he ever describe this concept of the country falling

3    into a battle of good versus evil?

4    A.  Not to me, no.

5    Q.  Or freedom versus tyranny?

6    A.  Not to me, no.

7    Q.  And so, when Mr. Pezzola left for Washington, D.C., to go

8    to -- on January 5th --

9    A.  Um-hum.

10   Q.  -- you didn't know what was in his head, correct?

11   A.  I had no idea.  I don't possess the power of telepathy, so,

12   no.

13   Q.  You just knew that he was going to Washington, D.C. with

14   the Proud Boys, correct?

15   A.  I knew that he was going to Washington, D.C.  I assumed it

16   was with the Proud Boys.

17   Q.  And his relationship with the Proud Boys -- I think you

18   alluded to it, but you were frustrated with that relationship

19   with the Proud Boys, correct?

20   A.  I was frustrated with the amount of drinking Dominic was

21   doing, yes.

22   Q.  Mr. Pezzola was not somebody who had done much drinking

23   before, correct?

24   A.  He drank.  But he went from drinking a couple of beers to

25   drinking entire bottles of bourbon.

1    Q.  Mr. Pezzola had changed in that way?

2    A.  He had.

3    Q.  When Mr. Pezzola returned from Washington, D.C., were you

4    frustrated with him?

5              MR. METCALF:  Your Honor, out of scope.  We're going

6    way past the timeline that was established on our direct.

7              THE COURT:  Over -- overruled as to scope.

8    A.  Can you repeat the question?

9    BY MR. McCULLOUGH:

10   Q.  I'll even withdraw the question.

11        When Mr. Pezzola returned from Washington, D.C., he

12   didn't stay for long, did he?

13   A.  No.

14   Q.  Mr. Pezzola was there on -- at the house that you share on

15   Friday, January 8th, correct?

16   A.  Yes.

17   Q.  But he left the following day, on Saturday, January 9th,

18   correct?

19   A.  Yes.

20   Q.  And you were unable to get in touch with Mr. Pezzola using

21   his regular cell phone, correct?

22             MR. METCALF:  Your Honor, objection.  Same scenario,

23   out of scope.

24             THE COURT:  Sustained.

25   BY MR. McCULLOUGH:

1    Q.  Mr. Pezzola had gotten rid of his cellular phone following

2    the events in Washington, D.C.?

3                MR. METCALF:  Same objection, Your Honor.

4                THE COURT:  Sustained as to scope.

5                MR. McCULLOUGH:  I have no further questions.

6                THE COURT:  All right.  Mr. Metcalf, any redirect?

7                MR. METCALF:  Just very short.

8                THE COURT:  Sure.

9                        REDIRECT EXAMINATION

10   BY MR. METCALF:

11   Q.  Lisa, sorry.  I have to ask, before I get you out of here:

12   When Dom went to North Carolina, did he drive?

13   A.  I believe so, yes.

14   Q.  You sure it wasn't the other individual he went with who

15   did the driving?

16   A.  I don't know.

17   Q.  Do you remember his truck being gone?

18   A.  No.  His truck was home.

19   Q.  Did he have any other vehicle then?

20   A.  No.

21   Q.  So then someone would have had to have picked him up for

22   that trip?

23   A.  Yes.

24   Q.  And did you then later learn about the different stops

25   that -- who was the other individual that was with him?  Was it

1    Rhoney?

2    A.  No.  No.  I don't believe his name is -- went by the name

3    Rhoney.  I believe he went by the name of Casper.

4    Q.  Yeah, Casper.  That's correct.

5         Okay.  Did you come to find out that Casper had a bunch

6    of different people, friends and family, throughout the course

7    of that trip that they made stops at?

8    A.  Yes.

9    Q.  How many of those stops did you learn about?

10   A.  I don't recall.  I believe there was several.

11          MR. METCALF:  Thank you, Lisa.  I really appreciate

12   it.

13          THE WITNESS:  Thank you.

14          THE COURT:  All right.  Ma'am, you may step down.

15   Thank you for your testimony.

16          THE WITNESS:  Thank you.

17          THE COURT:  And, Mr. McCullough, we have an exhibit

18   here.  Thank you.

19          Can I have counsel at sidebar briefly?

20          (Bench conference:)

21          THE COURT:  All right.  Consistent with what we

22   talked about before, I'm going to release them for the day.

23   Madam Clerk will do as we talked about -- oh, then we'll get

24   to -- I'm sorry.  That's right, the stipulations.

25          We'll do that, then we'll dismiss them.  Then we'll

17218

1    talk about your expert.

2            MR. METCALF:  Same scenario -- set up as yesterday,

3    where it was placed on the --

4            THE COURT:  Absolutely.  The exact same situation as

5    Mr. Pattis.  I will simply tell them that -- I'm not going to

6    repeat what a stipulation is, I'm just going to tell them there

7    are some stipulations that have been reached between

8    Mr. Pezzola and the government and Mr. Metcalf will present

9    them to you.  All right.

10           MR. METCALF:  Thank you.

11           (Open court:)

12           THE COURT:  All right.  Ladies and gentlemen, we have

13   a few move stipulations in this case that have been reached

14   between Mr. Pezzola and the government, and so Mr. Metcalf will

15   present those to you now.

16           Just like yesterday, you're going to have copies of

17   these going forward, but he will present them and read them to

18   you.

19           MR. METCALF:  Thank you, Your Honor.

20           THE COURT:  And, Madam Clerk, if we can get the Elmo

21   on the screen -- the screen for the jury and the public.

22           Perfect.  Well, almost perfect.  Now it's perfect.

23   Okay.  Thank you.

24           MR. METCALF:  This is defendant Pezzola's Joint

25   Exhibit 1.  Contains a stipulation regarding Pezzola's

1    witnesses, Aaron Sauer and Arthur Lashomb.

2         The government and defendant Dominic Pezzola hereby

3    agree and stipulate that, Number 1, Mr. Pezzola traveled from

4    New York to Washington, D.C. with Aaron Sauer, Arthur Lashomb

5    and Matthew Greene on January 5th, 2021.

6         Number 2, on the night of January 5th, 2021,

7    Mr. Pezzola stayed in the same hotel room as Aaron Sauer,

8    Arthur Lashomb, and Matthew Greene.

9         Number 3, on the morning of January 6, 2021, Pezzola

10   Sauer, Greene, Lashomb left the hotel at the same time and

11   walked to the Washington Monument where they arrived at

12   approximately 10 a.m.

13        Number 4, between 11:15 a.m. and 11:20 a.m., Pezzola,

14   Sauer, Greene, and Lashomb left the march and walked around

15   different blocks in Washington, D.C.

16        Number 5, at approximately 12:50 p.m., Pezzola,

17   Sauer, Greene, Lashomb walked back into the crowd involved in

18   the march headed towards the Peace Circle.

19        Number 6, shortly thereafter and prior to the breach

20   of the police barricades at the Peace Circle, Pezzola, Sauer,

21   Greene, and Lashomb joined the demonstrators at the Peace

22   Circle.

23        Number 7, Sauer and Lashomb did not have any contact

24   with any other defendants in this case.

25        Thank you.

1          THE COURT:  All right.  Very well.

2          Thank you, Mr. Metcalf.

3          All right.  Ladies and gentlemen, it's 4:35.  And as

4   far as testimony goes, we're going to end the day.  I'll be

5   discussing a few other matters outside the -- outside your

6   presence with the lawyers.  So we'll see you tomorrow morning.

7          As always, please do not -- my handy reminder for you

8   all:  Please avoid all media coverage regarding January 6th and

9   this case in particular.  Do not contact -- do not conduct any

10  independent investigation and do not discuss the evidence in

11  the case with anyone, including amongst yourselves.

12         Thank you very much.  We'll see you tomorrow morning.

13         (Whereupon the jurors leave the courtroom.)

14         THE COURT:  Everyone may be seated, please.

15         (Pause.)

16         THE COURT:  Okay.  All right.  So I will hear from

17  you, Mr. Metcalf, on the expert issue.  And I'll just stick --

18  before we do that, I'll just -- I think the question after that

19  would be -- and part of the answer to what I'm about to say

20  will be how I resolve the expert question.

21         But putting that aside for the moment, the question

22  before that to the parties would be how to chop up tomorrow, in

23  what order and how the parties want to proceed with all the

24  different tasks at hand, so...

25         But, Mr. Metcalf, let me hear -- hear from you on

1    this point first.  And you heard -- you heard -- I mean, I

2    expressed where I was earlier.

3              MR. METCALF:  Absolutely.  I heard you loud and

4    clear, Your Honor.

5              The moment that demonstrators got to the west side

6    terrace, that -- that's a very unique point in time in this

7    entire case.  It's a unique perspective because there's so many

8    different angles that are captured of that specific ten minutes

9    that is actually extremely vital to Mr. Pezzola, and I'll get

10   into that.

11             This is not about self-defense.  As many times as we

12   want to keep making it and bringing it back to self-defense, we

13   acknowledge we have not prevailed on that argument.  This is

14   something bigger, deeper, and it all goes to questioning the

15   validity of a lot of these elements.

16             We can just think about intent.  Counts 10, Counts 8,

17   Counts 9, intent in getting into the conspiracy.  All of this

18   links up.  This one chain of events that is set off when

19   demonstrators first really meet with the police is vital

20   information that the jury should hear.  They should hear this

21   information because there's a huge hole right there.

22             In that ten-minute scenario, there's a huge, huge

23   hole that needs to be completely filled up.  This chain of

24   events that I'm talking about and this particular individual,

25   again, limited timeframe, just around that time, west side

1    terrace, same area where Mr. Pezzola is alleged to have robbed

2    a Capitol shield.

3              Now, during the course of this trial we got different

4    pictures -- this is during the course of the trial, Your Honor.

5    January 15th, it's been on the record a couple different times,

6    we got about 15 photographs of Mr. Pezzola becoming in

7    possession with this shield.  And there's a different story to

8    be told.

9              I should be able to tell that story to negate or have

10   the jury be able to question intent of -- this is just the

11   robbery count.

12             THE COURT:  Right.

13             MR. METCALF:  Just robbery.  So without me even going

14   into how the assault ties into this angle, how then Pezzola's

15   actions afterwards go towards him being part of a conspiracy,

16   him having to ultimately try to obstruct officials.  All of

17   this stems from this point in time.  This is the point in time

18   crucial for Mr. Pezzola.

19             The jury is going to be asked to make a bunch -- as

20   we're going through these jury instructions, the jury is going

21   to have to make some inferences here, Judge, and there's

22   inferences that have -- reasonable inferences that the jury is

23   going to have to make.  They're going to have to infer

24   circumstantially whether or not -- what Mr. Pezzola's intent

25   was with regards to that one count.

```
1              THE COURT:  Um-hum.

2              MR. METCALF:  So I should be able to present an

3    entire defense and I should be able to elicit certain

4    information from this individual that talks about the police

5    formation at that time.

6              It talks about the leadership.  It talks about the

7    leadership tactics and orders that are given from leadership

8    down to these officers.

9              I'll give you a prime example.  Officer Lloyd we've

10   heard about, but we haven't heard about his pointing --

11   circular motions pointing back and then shots directly

12   thereafter.  I should be able to present this evidence to allow

13   this jury to infer --

14             THE COURT:  Infer that your client acted in

15   self-defense?

16             MR. METCALF:  No.

17             THE COURT:  The defense of others?

18             MR. METCALF:  No.

19             THE COURT:  Okay.  Then what?

20             MR. METCALF:  He did not have the intent to steal or

21   rob anybody.

22             THE COURT:  Because he was intending self-defense or

23   defense of others?

24             MR. METCALF:  No.  Listen.  No, Your Honor.  It

25   doesn't have to be self-defense.  It's circum -- the totality
```

1    of these circumstances and what was going on at that time

2    became chaos like that (snaps fingers), and then all of a

3    sudden it happened in a different area.  It has to be explained.

4         Because it goes from where Pezzola is, and then if

5    you're looking at it from above, there's another incident that

6    happens about 20 feet over this way (indicating).  So there are

7    certain different times where things erupt, people erupt.  Ryan

8    Samsel is getting aggressive --

9         THE COURT:  Ryan Samsel --

10        MR. METCALF:  -- the guy in the blue sweatshirt is

11   getting involved.

12        THE COURT:  But Ryan Samsel -- can I just -- just to

13   pause for a moment.

14        The Ryan Samsel episode is outside the very tightly

15   constrained boundaries of time and place that you're talking

16   about, right?

17        MR. METCALF:  Nope.  Not until you actually see what

18   these videos show.  They show John Blackbeard (sic) getting

19   shot in the face.  Ryan Samsel is actually on the ground

20   wrapping his face up.

21        THE COURT:  Sure.  But --

22        MR. METCALF:  And then he gets -- it's a different

23   scene than the first breach.  It all leads to the second scene,

24   same scenario that I'm speaking about.

25        Ryan Samsel gets a little bit aggressive.  Guy in the

1    blue sweatshirt, still don't know who he is, he gets

2    aggressive.  Guy in tan jacket gets aggressive.  Then Quaglin

3    comes in with his jacket that has the American flag on it, that

4    whole scenario, you see these guys in different videos up close

5    as to what's going on.  You see the lineup.  You see the

6    formation.  You see the guys from different angles.

7            THE COURT:  Mr. Metcalf, just tell me, what's the

8    difference between what you're describing and suggesting that,

9    in fact, what was happening was self-defense or defense of

10   others?

11           MR. METCALF:  Okay.  So self-defense --

12           THE COURT:  What is the difference -- in other words,

13   how does this -- whatever evidence you are -- want to have this

14   witness talk about, how -- first of all, the evidence itself,

15   facts are in evidence and available to you either way.  So this

16   is expert testimony.  And so I guess my question is:  What

17   would this witness testify to that would negate one of the

18   elements of the offense in a way that would not be self-defense

19   or defense of others?  Because I think it's very natural.  I

20   understand the theory that, well, Mr. Pezzola grabbed the

21   shield because -- and I understand how that could negate -- how

22   that could provide a theory of self-defense, that could be a

23   self-defense theory.  He -- you know, he grabbed the shield

24   because he didn't want to be hit or someone else didn't want to

25   be hit.

```
 1              The problem is, again -- and I know you've
 2    acknowledged this, but I just want it noted.  We litigated this
 3    and I ruled on it -- what seems like quite a long time ago.  In
 4    fact, it seems like quite a long time ago because it was a long
 5    time ago.  So, I guess my point is, what is different?  What
 6    are you telling me -- how could this be a defense or negate one
 7    of the elements of the crime if it's not that?  Because at a
 8    minimum, even if you can articulate to me some very dancing-on-
 9    the-head-of-a-pin answer, it certainly feels like the effect of
10    a juror just hearing this evidence would be an invitation to a
11    defense that I've excluded.
12              MR. METCALF:  Your Honor, confusion mitigates intent.
13    Chaos mitigates intent.  There is a whole bunch of different
14    things that are going on around these circumstances that when
15    freeze-framed and explained, when actually shown, demonstrate a
16    different picture.
17              When Mr. Pezzola falls back, people fall on top of
18    him.  When you actually can see what's going on, he doesn't
19    have possession of it.  There are different scenarios that can
20    be inferred here as far as whether or not the officer dropped
21    that shield, whether or not someone grabbed it before he did,
22    when he grabbed it.  This goes to the force element.  This goes
23    to intent to rob and use force.  It's a totality of the
24    circumstance kind of scenario where you have to bring all these
25    things into place in order to be able to come to that
```

17227

1    conclusion.  I'm not saying -- I get what --

2              THE COURT:  Isn't that -- isn't that -- I mean, to

3    the extent you're arguing to me, there are facts here that we

4    want to argue from that mitigate -- that suggest, no, in fact,

5    he didn't -- you know, the government hasn't proved this

6    element, because, look, it kind of -- similar to the way

7    Mr. Smith has sort of gone -- you know, frankly, both sides

8    have.  In terms of looking at the -- looking at these scenes

9    from all points of view, from all -- and sort of, I referenced

10   the Zapruder film the other day to someone who was young enough

11   to not have any idea what I was talking about.

12             But the point is to very closely, frame by frame,

13   look at the different angles and say, look, the government

14   hasn't proven it because, look, that shows, for example, he

15   didn't even mean to grab the shield or whatever.  I guess my

16   point is that's all -- those are all facts.  And you had and

17   may be have the ability to put witnesses on and -- or, through

18   the cross-examination of the government's witnesses, as many of

19   you did, to say, look, look what happened here, he actually

20   fell back and didn't even intend to grab the -- the shield.

21             MR. METCALF:  It's all the circumstances that lead up

22   to that point, Your Honor.

23             THE COURT:  Right.  I guess, again, my point is what

24   does an expert have to do with any of that?

25             MR. METCALF:  So he explains the formation.  Okay?

1    Going right off the introduction, demonstrators and police

2    lines -- it's not just one police line.  There's two police

3    lines.  Okay?  There's a word, a specific terminology for the

4    front line of the officers and the back line.  I didn't even

5    know that the back line was linebackers until I started dealing

6    with him.  Then there's a different formation from up above

7    that we have shown.

8            No one is going to be able to explain that formation

9    and then the -- where the leadership is placed, where the

10   leadership then gives orders to them as to what to do and how

11   it's a deviation from policy.  These officers are --

12           THE COURT:  Okay.  So tell me.  Okay.  I grant you

13   that we haven't had a witness who -- well, in theory we haven't

14   had a witness who could do that, but you have to tell me why

15   that's relevant.

16           MR. METCALF:  Because --

17           THE COURT:  I'm sorry to do this to you, but --

18           MR. METCALF:  Judge --

19           THE COURT:  Yeah.

20           MR. METCALF:  -- it's relevant because it goes to

21   various different elements of crimes that Mr. Pezzola is

22   charged with.

23           THE COURT:  Tell me what the various elements are.

24   That's why we're here.

25           MR. METCALF:  So Number 10, we'll talk about Count

```
 1    10, specifically the use of force, the force component, then
 2    intent with robbery, so that's Number 10.  Number 8 and 9,
 3    assault also has to go with this, so we can talk about the
 4    intent of assault for Counts 8 and 9.  Then if we go even
 5    further into the indictment, we can talk about how this
 6    ultimately is going to link Dom to him leaving this area using
 7    this shield and how this was all part of a master plan to
 8    ultimately get in the building, work his way upstairs and try
 9    to obstruct Congress and be a part of every single conspiracy
10    count.
11            So, asking me what it's relevant to, I had to chuckle
12    because I could place this to five different scenarios based on
13    this one chain of events.  So if they are -- if officers are
14    trained to specifically not do something, which is not rile up
15    the crowd even more, they're specifically trained to find the
16    agitators, take them out of the equation, physically, they can
17    do that, or you have a man from a vantage point shoot down, but
18    shoot down --
19            THE COURT:  Okay.  You don't have to scream.  We're
20    all right here.
21            MR. METCALF:  Okay.  Shoot down, but shoot not above
22    the face, not above -- don't do a head shot.  So now you have
23    someone who could explain the formation, the actual indications
24    as to how they signal each other, as to how it's supposed to go
25    when you have a formation such as that, meaning where the
```

1    vantage points are going to go, who it's going to go towards.

2    Meaning if you're going to shoot, which is the circular

3    movement (indicating), you're going to shoot over there, they

4    have in their mind who they're shooting at, the agitators.

5           Now, if non-agitators are being shot and then

6    agitators are being shot, and then a non-agitator is being shot

7    and then of the first five shots, four of them are head shots,

8    somebody has to be able to explain, this is how it's supposed

9    to go.  Every single shot --

10          THE COURT:  Okay.  We're right here.  Again, this

11   isn't -- you have a judge here, not a jury, just argue --

12          MR. METCALF:  Understood, Your Honor, but this is

13   essentially an important point for the scenario for what I'm

14   ultimately going to be framing up with Mr. Pezzola because

15   after this it's Mr. Pezzola, or I get another investigator -- I

16   mean, we have an Officer Hanak who sat here the whole trial,

17   and I tried to move that way.

18          So I'm trying to make this as simple and as condensed

19   as possible.  He can break down the entire formation and

20   explain the very specific indications that I'm indicating to

21   Your Honor, how there has to be a leader, how that leader has

22   to ultimately give an order to a specific individual and what

23   they are supposed to do and what they're not supposed to do.

24   Then the leader is going in the crowd and seeing what's going

25   on with people and not changing anything, not helping -- there

1    are a couple of people who try to get help, but when Black gets

2    shot in his face, Johnny (sic) Black gets shot in his face and

3    he's got a hole in his face and people trying to wrap his face,

4    and Inspector Lloyd comes over, there becomes a point in time

5    where they try to take him away and it looks like they're

6    trying to arrest him.  That then agitated the crowd immensely,

7    it sparked it --

8              THE COURT:  How does agitating the crowd -- how does

9    that negate whether he committed robbery?

10             MR. METCALF:  It shows that the police deviated from

11   policy --

12             THE COURT:  No, no, no, no, no.

13             MR. METCALF:  -- at that instance and that instance

14   created a storm of chaos where other people were actually

15   banging into him, on top of him.  People are laying on top of

16   you and there's a shield on top of you and officers are

17   pushing -- or, getting pulled and then there's an actual team

18   that's -- or, there's a movement that's -- that officers are

19   supposed to take him out and they're using different force,

20   going in conflicting ways, and all of this is going on and

21   three people end up on top of you and by you and then a shield

22   is there, it goes to negate intent.

23             THE COURT:  But -- okay.  So I guess my question is

24   this:  If it -- if it's a question of, as you have just teed it

25   up, that people fell on him and kind of the physics of what

1    happened, why is it relevant why the people fell -- I grant you

2    that just like, again, we were talking about the fence and the

3    like, that the circumstances -- the physical circumstances of

4    what was going on there is relevant.  If you can imagine all

5    sorts of scenarios where someone, because of the physical way

6    they interact with you, negates your intent to do a particular

7    thing, but, again, why does it matter why that happened?  The

8    fact is if it did happen -- it did happen, and you can -- you

9    can do that.  But I guess I'm having trouble understanding how

10   it negates his intent regarding the riot shield.

11         MR. METCALF:  Judge, one thing the jury is not going

12   to able to consider unless they have someone like this on the

13   stand is what's called a rescue circle.  A rescue circle is

14   where officers in the front line, the scrimmage line are

15   actually --

16         THE COURT REPORTER:  Please slow down.

17         MR. METCALF:  When they -- when officers see an

18   officer go down, past the certain point, right -- so they

19   create the line for a reason.  When officers go down and they

20   see an officer going down, they then create what's called a

21   rescue circle.  This rescue circle is that force that was

22   contradicting the force where Pezzola was at that specific

23   time.  That has to be considered -- as allowing this jury to

24   actually infer or come to a conclusion when they're considering

25   the counts of robbery.  Right then and there, that one example

1    shows why this witness is necessary.  And then that -- in

2    conjunction with everything else I've explained to you and the

3    whole scenario that's going on around them, allows for a jury

4    to make the inferences that it needs to make in order to come

5    to a reasonable conclusion as to all these counts, especially

6    with regard to Mr. Pezzola.

7            There is going to come a time where this shield -- so

8    this chain of events happens here and it happens quickly, but

9    that shield stays with Pezzola and that becomes a big scenario

10   that ultimately is going to be considered as to whether or not

11   he was part of a conspiracy in three different ways.

12           THE COURT:  Right.  I get --

13           MR. METCALF:  And whether or not he was ordered and

14   he agreed and that's how they were going to do the force.  Was

15   it foreseeable?  Like, you got to grant me something here with

16   regards to relevance, like this is relevant to every layer of

17   this case.

18           THE COURT:  I get how factually, whether he committed

19   robbery and whether he then had the shield and how -- just as a

20   matter of fact, the things that flow from that are important to

21   your defense in explaining how he came on to the shield.  I get

22   it.  But, again, what I don't understand is how the

23   circumstances in which he got the shield -- how expert

24   testimony that is not about -- look, he got the shield because

25   he wanted to defend himself, which, you know -- well, that's

1      not that.  How -- how this expert testimony explains either a

2      defense that's not self-defense or negates one of the -- in

3      other words, you mentioned the rescue circle, you said?

4              MR. METCALF:  Yes.

5              THE COURT:  Okay.  So let's say -- I don't know what

6      that is.  But explain to me -- in other words, if that explains

7      or if that provides background context as to why there were a

8      set of officers where they were or something like that and

9      physically made it so that -- you know, I think you started to

10     say people were on top of him or whatever it was.  Okay.  But,

11     again, what I don't understand is why does it matter that it

12     was a rescue circle?  What is -- why can't -- why can't you

13     just point out there were these officers there.  They --

14     whatever they were doing, they fell on top of him, and that was

15     the reason he grabbed the shield.  Assuming that's not

16     self-defense or some other, you know, involuntary reason.

17             I guess I just don't understand why an expert and all

18     these elaborate explanations for all the things that were going

19     on.  I do understand why it could in theory be a part of a

20     self-defense defense, but I -- I'm just struggling to

21     understand the relevance.

22             Not the relevance -- I understand -- to be clear, I

23     understand why it's an important -- that negating the robbery

24     is downstream too important to negating the other charges

25     against your client.  That linkage is very clear.  But how does

1    this expert testimony negate the -- in the first place, negate

2    the robbery?  In other words, even if it were -- I mean, even

3    if it were -- yeah, I guess that's --

4              MR. METCALF:  I'll try to make it easy.

5              THE COURT:  Please.

6              MR. METCALF:  Let's talk about the inferences with

7    regard to police deviating from policy.  That inference should

8    be allowed to be considered with regards to these circumstances.

9              THE COURT:  But I --

10             MR. METCALF:  I don't get how I'm being confusing

11   here.  They -- the police actually created a more dangerous

12   environment than what was there before they started acting in

13   the manner that they did.  I should be able to explain that

14   with an expert, as to exactly what was going on.  And the

15   government should have a fair crack at that expert to be able

16   to say, No, it wasn't.

17             This -- the circumstances -- if we're just talking

18   about the robbery, the circumstances surrounding the robbery

19   happen so quick that every fact matters.  I can't explain a

20   formation with a nonexpert.  I can't explain the leadership

21   roles and what they're supposed to do without a nonexpert.  I

22   can't explain what a rescue circle is and how this particular

23   rescue circle is involved with Mark Ode.  That cop who took the

24   stand said, I was pulled.  The jury should be able to infer

25   from that information that behind him was a botched rescue

1    circle, or an attempted rescue circle that ultimately somehow

2    diverged with the people standing next to Mr. Pezzola, where he

3    couldn't go forward anymore and ended up going back.

4         They should be able to hear that information to make

5    a decision as to force, the use of force, the threat of force

6    that Mr. Pezzola is alleged to have done and his intention at

7    that time.  It's all -- it's one event, one causal link leading

8    to another causal link and they should have the whole picture

9    for this very short period of time.

10        I'm not saying, hey, let's take this expert and go

11   through a walk throughout -- three, four hours.  I'm talking

12   ten minutes to explain a scenario that went from what the heck

13   is going on to complete chaos, and then ultimately led to the

14   next breaches.

15        So it's important for this jury to understand the

16   full context of it from somebody who can explain what was going

17   on with regards to whether or not there was deviation from

18   policy --

19        THE COURT:  But again, that -- you know, actually, of

20   all the things you've said, at times you've said -- they need

21   to explain, for example, that it was a whatever circle.

22        Okay.  Even if I were to buy that, would I -- what

23   really is outside -- it seems to me there's a circle of

24   different things you've thrown out that this expert could talk

25   about.

1          What to me seems the most clear that's outside the

2     bounds is deviation from policy.  In other words, what -- that

3     truly -- now, that is -- or, at least deviation from law would

4     be a self-defense -- a possible self-defense theory because

5     the -- they would need to be defending themselves from unlawful

6     force.  But it doesn't have anything to do -- in other words --

7          MR. METCALF:  Your Honor, I'm not actually saying

8     that.  If there's a deviation from policy --

9          THE COURT:  It doesn't matter --

10          MR. METCALF:  -- it starts something over here, the

11     chain of fact -- the chain links to where I am that created a

12     ridiculously dangerous circumstance.  That's relevant.

13          THE COURT:  But what does it matter if it's a

14     deviation from policy?

15          If the -- if the police caused this in some way, they

16     caused it.  Who -- why does it matter that it's a deviation

17     from policy or it's unlawful or it violated this part of the

18     manual?

19          MR. METCALF:  Because it stirred up and created that

20     entire circumstance.

21          THE COURT:  It would have done that regardless --

22          MR. METCALF:  Nope.  That -- that is assumption that

23     I would not make.

24          People are standing there.  People -- Johnny (sic)

25     Black gets shot in his face.  You got a bunch of agitated

1      people there.  They already made it this far, right?  They've

2      already got up the stairs.  They're there.  They're pissed off.

3              Police are trained to control the situation under

4      those circumstances and instead of controlling the situation

5      and doing what they should do, which is nonlethal head shots,

6      they end up doing lethal head shots to the point where someone

7      gets shot right in the face, they're trying to bandage him up,

8      they then start getting riled up and saying various different

9      things to police, leads -- words lead to pushes to shoves,

10     leads to complete mayhem.

11             If Pezzola was standing in a different area, it would

12     not have worked out that way.  And you can't just say he would

13     have just ended up with a shield if he was actually 100 feet

14     back.

15             THE COURT:  Right.  And again, I guess --

16             MR. METCALF:  So the circumstance created a scenario.

17     Now, I'm not saying self-defense because I'm saying it goes

18     towards formulating the intent to use force against an officer,

19     to actually rob an officer of their property.  That's what I'm

20     talking about.

21             THE COURT:  And so it was chaos and as a result he

22     wasn't trying to rob.  So just -- I mean, explain -- it was

23     chaos -- I just -- I'm sorry.  I don't understand your

24     argument, Mr. Metcalf.  I'm going to confess.

25             Can I hear briefly -- look, I think -- let's do this:

1    Let me hear briefly from the government.  I'll hear from you

2    again -- Mr. Pattis, it's Mr. Metcalf's expert.

3            MR. PATTIS:  He's a friend and he's a co-defendant.

4    Can I briefly -- two, three sentences?

5            MR. METCALF:  Yeah.  I must not be articulating

6    myself, so I would ask if he can.

7            THE COURT:  Here's what I'm going to say:  I'm going

8    to hear briefly from the government.  If you want to -- if you

9    want to submit something overnight, I'll take a look at it and

10   I'll give you final ruling tomorrow morning.  But I just -- I'm

11   struggling.

12           I don't rule out -- first of all, given that

13   self-defense is off the table, that's an obvious potential

14   basis here.  But it's not there.  Hold on.  Just let me

15   explain.

16           And then, I'm not -- I want to make sure I'm seeing

17   every single way in which this expert could possibly give

18   relevant testimony.  So, I am hesitant to just say no.  But, I

19   don't -- I haven't heard an articulable reason for expert

20   testimony.  All the things you're saying -- I mean, I think the

21   government has -- you haven't been prohibited from eliciting

22   that there were circumstances there that -- factually, right,

23   that might have led your client to react in some way or

24   whatever.

25           I'm just having a hard -- you know, as you described,

1    the projectile is coming down and all the rest.  You've

2    elicited that, that's all in evidence.  What I'm trying to

3    figure out is what's the extra -- if it's not --

4         MR. METCALF:  I'll give you five.  This is what this

5    witness does and then I'll stop.

6         Number one, police formation.  Number two, the

7    leadership setup.  Number three, the leadership tactics which

8    is -- involves demands being given to these officers.  That

9    ultimately goes into number four; that's deviating from trained

10   procedures and protocol.  Number five, it then shows the

11   crowd's reaction to certain events that are happening around

12   them.

13        Those five scenarios cannot be articulated in the way

14   that they have to be by a nonexpert.

15        THE COURT:  Okay.  My -- I guess as you just laid it

16   out there, my reaction is the crowd's reaction, they're

17   reacting to factual things that are happening in front of them.

18   It doesn't -- and it doesn't -- whether the -- whatever tactics

19   were going on, whatever the -- all the rest of it, they're not

20   really reacting to that.  They don't even know that, right?

21   They're reacting to what is in evidence.

22        So, anyway.  Let me hear from the government.

23        MR. METCALF:  The expert can explain as part of the

24   protocol how certain people are supposed to be removed, if they

25   get to a certain level, as part of their procedure.

```
 1                So, for example, before shots start going off, if
 2      there's a main agitator who is really pushing the limits, like
 3      maybe how Chris Quaglin was at one point.  But before
 4      everything started going around as far as the shots, like if
 5      there's one person out there and he's an agitator who is
 6      causing a lot of different problems, they're trained as to how
 7      to remove him quickly or how to make him be the target of the
 8      next projectile, if that's the choice that they're going to do.
 9                But this has to be explained --
10                THE COURT:  So, hold on.  So this is the -- now
11      you're -- now we're -- this is the difficulty, is now you're
12      articulating something just as a factual point.  That's totally
13      different.
14                You're saying, well, if the police had done their job
15      and actually taken out the particular person, they should have
16      in some way -- I don't really know what "take out" means in
17      this context, but if they had done something more and --
18                MR. METCALF:  Remove from the crowd.
19                THE COURT:  -- removed person A, B, or C, then your
20      client wouldn't have -- wouldn't have committed robbery, or
21      that somehow negates --
22                MR. METCALF:  Your Honor, the robbery component here
23      has to mean -- we at least have to consider that the intent
24      component of robbery was formulated in a very split second
25      or -- that's going to be our position.
```

1           It wasn't like he walked up the stairs and said, I am

2    going to steal a riot shield because that's the next thing I'm

3    going to be able to do.  Right?  Not part of any plan.

4    Circumstantially happened in the moment.  So that means intent

5    had to be formulated almost immediately upon a certain

6    situation happening.

7           So now I've tried to dissect and figure out where

8    that situation could be.  And in dissecting it, there are

9    various different components and all these components and these

10   deviations from this policy created a snowstorm right around

11   Mr. Pezzola at that specific time.  And but for him being at

12   that exact spot, this set of events would not have happened the

13   way that it did and he probably wouldn't have ended up with a

14   riot shield.

15          So it has to be all of the surrounding circumstances

16   surrounding that fall and him actually getting possession of

17   the shield I believe should be examined, should be explained,

18   and should be presented in a way where the jury can make

19   reasonable inferences going forward.

20          THE COURT:  All right.  Let me hear from the

21   government.

22          And as you all know, it's been a long day.  And,

23   Mr. Metcalf, if you want to submit something overnight that I

24   look at, I'm happy to receive it.

25          Mr. Kenerson, if you are taking the laboring war for

 1    the government here.

 2              MR. KENERSON:  Yes.  Thank you, Your Honor.  I'll --

 3    I'll -- mic was off, I apologize.  I will try to be brief in

 4    response.

 5              So, Mr. Metcalf just laid out five -- I think what he

 6    said were the five most important things, or something like

 7    that, to come from this expert's -- purported expert's

 8    testimony, and then there was also this idea of a rescue circle

 9    that came up quite often.

10              Outside of deviation from policy, nothing in those

11    five points he laid out, nor rescue circle, was in the notice.

12    So, I understand that the Court did not rule with us on

13    lateness of notice, but I think that the way this has evolved

14    today, we are talking about a sufficiency of notice issue as

15    well, at least with the testimony as proffered by Mr. Metcalf.

16    So, that's number one.

17              The notice said that there would be testimony about

18    deviation from policy.  It said there would be testimony --

19              THE COURT:  I just need everyone to cease

20    conversations while I'm hearing from an attorney.

21              MR. KENERSON:  -- about deviation from standards.

22    But a lot of the specifics that Mr. Metcalf just went into were

23    not in the notice.  The Court has it, they can -- they can look

24    at it tonight.  But I do want to flag that as an issue.

25              With respect to this idea that there's somehow --

1    even if we assume for the sake of argument that the police

2    instigated this chaos and that chaos instigated by police is

3    what led to Mr. Pezzola being in a position to take the shield,

4    I share the Court's skepticism with the notion that police

5    instigating it, even if we assume that is true, somehow negates

6    what happened later.

7              THE COURT:  Well, when he says -- you're saying

8    later, but I think it sounds like the proffered -- it's all

9    about a very small band of time.

10             MR. KENERSON:  Correct.  By later I did mean a matter

11   of seconds.

12             But, yes, they instigated and then sometime after

13   it's instigated, according -- again, assuming, arguendo, they

14   instigated it sometime thereafter, a matter of seconds, is when

15   this happens.  And as I understand the argument, it seems to be

16   that if he were 100 feet back, he would not have wound up with

17   the shield, and that -- that may well be true.

18             But, you know, if -- if -- put it out of the officer

19   realm.  If Mr. Pezzola is over at the Washington Monument and

20   the police instigate something which causes someone to run away

21   from the Capitol towards the Washington Monument, Mr. Pezzola

22   runs into that person and robs him of his wallet, that doesn't

23   absolve him of that robbery in any way, shape or form, or any

24   more than this.  Even if you assume that he took an

25   opportunity, essentially, that doesn't negate the intent to

1    steal aspect of it, even if that formed quickly.

2            One thing I do want to note on -- just on the

3    self-defense issue, because I think the Court has raised that

4    it -- it could see how this may fit into a self-defense

5    situation.  And if we are correct, the Court did preclude it

6    with no opposition having been filed by Mr. Metcalf.

7            One of the things that the Court said -- if you

8    recall, we did bring this up again.  I think that Mr. Metcalf

9    and Roots wanted to open on self-defense, and we discussed it

10   at the time.  The Court said it was going to preclude it.  The

11   Court did say --

12            THE COURT:  Well, Mr. Kenerson, in fairness to them,

13   they're conceding that this isn't -- they're not trying to

14   fight that battle.

15            MR. KENERSON:  I understand, I understand.  I'm just

16   noting the Court did say it would hear from them again and

17   would need a good reason.  It sounds like they are not pursuing

18   that for some reason at this point.

19            (Off-the-record discussion between government

20   counsel.)

21            MR. KENERSON:  So, it sounds like they're not

22   pursuing it.  I just want to -- that's my understanding, that

23   they are not pursuing it.  If they're -- so, that's that.

24            THE COURT:  All right.  Here's what I -- here's what

25   I would say:  Look, I'll -- I mean, Mr. Metcalf, Mr. Kenerson

1    is right to a degree, at least, that while I am -- I think --

2    because I think this is what the law is, that if the timing is

3    not the problem for you in terms of when you provided notice --

4    but, I mean, it is -- I'm not -- it is a legitimate point that

5    they got a notice, the notice -- and the notice is -- says some

6    things, and I feel like we're kind of snaking around today in

7    terms of what exactly the basis is and what the point and the

8    basis of the expert testimony would be.  So, look, I will -- I

9    will consider whatever anyone files on this point by midnight

10   tonight and will take it up first thing tomorrow morning and

11   I'll do some thinking about it.

12          Look, I do think it's -- I'm trying, before I

13   preclude the expert, to make sure I really think there's no

14   avenue here and -- but I -- but I don't see it, or at least I

15   don't see it in the sense that it's -- to the extent that it's

16   something that's proper for an expert to testify about.  But

17   we -- we will see.

18          MR. PATTIS:  Your Honor --

19          THE COURT:  Mr. Pattis, I'm not going to open up --

20   really, we -- I've tried to keep this -- if you -- let me put

21   it this way:  If you talk to Mr. Metcalf and he puts your

22   thoughts into filing tonight, I'll look at it.

23          MR. PATTIS:  Let me say by way of objection, not

24   being able to speak, State-Created Danger doctrine, take a look

25   at that.  That's the answer to the whole thing.

1          THE COURT:  So I'll look at that.  Let's talk about

2     tomorrow.

3          This is what I think, at least how I start -- how we,

4     I think, should start, is, look, I'll -- we should -- we'll

5     quickly take up this expert issue and see where that goes.

6          Then we would have at least until later in the

7     morning, a block of time we could do some more jury instruction

8     and get as far as we can on that.  Whether I -- putting the

9     expert aside, what -- what else -- and putting the expert aside

10    and then assuming we might want to reserve some more time for

11    the under-seal matter, but then also are there any other things

12    the parties think we should plan on trying to knock out

13    tomorrow and in what order?

14         MS. HERNANDEZ:  How late is the Court going tomorrow,

15    Your Honor?  Tomorrow, the first day of --

16         THE COURT:  Say again?

17         MS. HERNANDEZ:  I believe tomorrow is the first day

18    of Passover, or today, actually --

19         THE COURT:  Actually, I think it was yesterday.  It

20    was technically yesterday, but today is the day when Seders are

21    celebrated.

22         MS. HERNANDEZ:  Yeah.

23         THE COURT:  So, I -- I can go -- I mean, tomorrow,

24    you know -- well, it depends -- I'm not going to keep the

25    jury -- I'm not going to keep the jury past five o'clock.  If

1    there's -- depending on our ability -- I mean, we could stay a

2    little bit later after that if we need to knock out other --

3                MR. METCALF:  Your Honor, I'll cut right to the

4    point.  I don't think we have anything to fill up until 5

5    o'clock tomorrow because if I don't go with this expert, my

6    next witness is Dominic Pezzola.  Dominic Pezzola is not going

7    to testify right away.  There's going to be other evidence that

8    comes in before he testifies.

9                THE COURT:  What other evidence?

10               MR. METCALF:  There's also defendants who could also

11   testify.  There's also a couple of other, I think, pieces of

12   evidence that have to get put on.  I don't want to speak on

13   their behalf, but ultimately I've been last this entire trial.

14   So, Mr. Pezzola would like to execute being last at testifying.

15               THE COURT:  Okay.  But we all agreed that we would

16   wait until all the other evidence was in and then -- and then

17   you all would decide on that question.  So my point is -- fine.

18   Let's just assume the expert -- whether it's -- in or out, what

19   are we doing after the expert?

20               MR. PATTIS:  We've asked the government to make

21   available two of the officers we interviewed the other day from

22   the Metropolitan Police Department.  We also are waiting to

23   interview with a third who has counsel, represent -- choice of

24   counsel issues that apparently a conflict arose yesterday, and

25   I don't know if that's been resolved.  And then I believe -- I

1     don't want to speak for anyone else.  I believe there are

2     other --

3              MR. JAUREGUI:  Your Honor, Jauregui for Tarrio.  We

4     have a stipulation with the government that we're going to

5     present to the jury.  We've created some exhibits that we've

6     already provided to the government.  We have a few issues that

7     we need to argue about.  If Your Honor would like, I can email

8     you the exhibits tonight and then we can have a brief argument

9     tomorrow and then we'll be ready to go, after Mr. Metcalf.

10             THE COURT:  All right.  So is it fair to say, putting

11    aside for a moment the expert, and -- well, the expert and then

12    we have these late -- the witnesses, Mr. Pattis, you indicated.

13    Are there any -- and then putting stipulations.  Are there any

14    other live witnesses that are in play that we're talking about?

15             MS. HERNANDEZ:  I hope -- I'm trying to get my

16    investigator to come in to testify.  He's been busy on another

17    case.  I think he would be available tomorrow afternoon.  There

18    are some disputes with the government as to the scope of his

19    testimony.

20             THE COURT:  All right.  And Mr. -- all right.  Okay.

21    And Mr. Roots?

22             MR. ROOTS:  Several issues.  We have another expert,

23    and that is the window expert.  This is the world's foremost

24    authority on windows.  He has installed over 20,000 panes of

25    glass.  He is in Ohio, and he's ready to fly here and testify

1    as an expert on that.

2              THE COURT:  Okay.

3              MR. ROOTS:  Also we have not given up on Ray Epps.

4              THE COURT:  All right.  Understood.  So, what does --

5    all right.  So I had -- I had thought we might be in a position

6    to at least rest, not in terms of your clients testifying or

7    not, but rest in terms of all the other evidence tomorrow.  You

8    understand what I mean.  But it sounds like that's not in the

9    cards.

10             Mr. Kenerson, you wanted to say something.

11             MR. KENERSON:  I would like to note on this window

12   expert, we have repeatedly informed counsel for Mr. Pezzola

13   that we have received no notice, still.  So we're objecting.

14             THE COURT:  Well...

15             MR. ROOTS:  Could I say, that's simply not true.

16             THE COURT:  Well, I'm not going to referee that.

17   It's -- the truth or falsity of that is like the -- like

18   whatever the case law says on proving different methods of

19   liability.  The answer is out there, and you all will let me

20   know about it.

21             So, all right.  Look, tomorrow we're going to -- it

22   sounds like -- is it possible, from the government's

23   perspective, that a couple of these, call them Mr. Pattis --

24   the witnesses that Mr. Biggs wants to call could be available

25   tomorrow?

```
 1              MR. McCULLOUGH:  Yes.  So, Your Honor, just to --
 2     maybe just to summarize what the government's understanding of
 3     where we are is -- it's sounding grammatically incorrect, but
 4     I'll go with it.  My understanding is that we've got the
 5     stipulation from team Tarrio, that we've got the expert from
 6     team Pezzola, which will be resolved, two live witnesses.  Then
 7     with respect to the two officer witnesses, they are available
 8     tomorrow to testify, and so if they are to be called, they'll
 9     be here at 9 o'clock tomorrow.  And they're available to be
10     called.
11              THE COURT:  I mean, does it make sense, if the
12     stipulation -- Mr. Jauregui, if the stipulation is not verbate
13     at present, does it make sense -- and the experts for
14     Mr. Pezzola, at least one of them, I'll rule on tomorrow, and
15     the other one is -- you all advise me where the situation is
16     regarding the notice and whatnot.  Does it make sense to just
17     skip over that and go right to these other two witnesses that
18     we know are going to be called that we can knock out?
19              MR. PATTIS:  We may or may not call them.  I mean, we
20     interviewed them the other day.  We were hoping to talk to the
21     third.  There's a disagreement among the defense about the
22     course to take.  We would like them available.  If we don't
23     call them, we do need to have a fallback plan.
24              THE COURT:  You need to have a?
25              MR. PATTIS:  Fallback plan.
```

1          THE COURT:  Right.

2          MR. METCALF:  And, Your Honor, if Your Honor denies

3    our Steven Hill expert application, then I would seek to put

4    Agent Hanak on the stand for me to be able to create this

5    record factually.  So that would require -- it would be the

6    same exact videos that I've already noticed them on, and I

7    would just then need to wait for the 36 hours and everything

8    along those lines.  But I would ask that he be made available.

9          Your Honor, at some point the jury needs a full

10   picture.

11         THE COURT:  Sure.

12         MR. METCALF:  And this will be explained as to

13   circumstances on the ground at that specific time.  We've only

14   showed portions.

15         THE COURT:  I guess I would say this:  It is not

16   like -- you know, I could say, well, goodness gracious, some of

17   that came in, I thought, in the government's case, and you

18   could cross, but you have the right to put it on yourself and

19   do what you want to do with it factually.

20         So I would say this:  Talk to the -- obviously,

21   obviously, evidence in the case is going to bleed over past

22   tomorrow.  So I would say engage the government on that

23   question.  It doesn't strike me -- I think it was a similar

24   situation where the government made someone available for the

25   defense to -- I think, maybe I'm wrong -- to go through some

1    particular videos that the defense wanted.  Am I misremembering

2    that?

3         MR. McCULLOUGH:  I think in this case, Your Honor, if

4    that's what you're referring to --

5         THE COURT:  Yes.

6         MR. McCULLOUGH: -- I think we made the U.S. Capitol

7    Police --

8         MS. HERNANDEZ:  That didn't work out too well.

9         MR. McCULLOUGH:  We made the U.S. Capitol Police

10   Officer available to introduce the permits.  I do understand

11   that in the Oath Keepers case that a circumstance like that was

12   kind of worked out.  I think we would just seek a -- kind of a

13   proffer of what it is that we're seeking to put in through

14   Special Agent Hanak, so that Special Agent Hanak can, to the

15   extent he needs to, focus on the videos so he knows what it is

16   he's about to be asked about.

17        THE COURT:  So, look, engage with that.  I think

18   it's -- you know, if Mr. -- if part of my pushback on this

19   expert has been, look, I don't know that it's an expert --

20   look, I understand the importance of that moment to Defendant

21   Pezzola.  There's no question about it.  And if he wants to put

22   on a witness to say, Look, look, what's happening here, you

23   know A, B, and C is happening, the way other defendants have

24   done that, it strikes me that's a reasonable thing.  So you all

25   engage on that.  Send me whatever you want on the expert

1    tonight.

2            It sounds like you should have the -- those other

3    witnesses available as the other -- the witnesses Mr. Pattis

4    mentioned in case we need to chew up time.

5            MR. McCULLOUGH:  Yes.  And the last one, Your Honor,

6    is -- I think it's been raised, but Ms. Hernandez has a

7    investigator that I understand is going to be available

8    tomorrow afternoon, and so I think we would -- I think there

9    are kind of two exhibit issues that are teed up with respect to

10   that individual, but otherwise I -- I have --

11           THE COURT:  I have to resolve.

12           MR. McCULLOUGH:  -- the evidentiary issues we would

13   ask you to rule on, which we would tee up overnight, consult

14   further with Ms. Hernandez and tee them up for you.  But I

15   think those are fairly discrete issues.  And then it would seem

16   like we could proceed with that.

17           Look, I do think that we are -- from our perspective,

18   we are -- we are close.  I mean, I think there's -- no one

19   likes to be done, you know, kind of.  It's just kind of

20   difficult to kind of hold hands and jump off the cliff, but I

21   think we seem to be there, Your Honor.  I mean, based on what

22   we can tell.  And I think that we should try to drive hard

23   tomorrow to the extent we can and see if we can get to a

24   position where we are at least resting some of the defendants'

25   cases so we can move into next week with a game plan to get to

1   closings.

2           THE COURT:  I'm sorry, counsel.  What's -- what's

3   going on?  What's going on here?

4           MS. HERNANDEZ:  I'm sorry, Your Honor.  We're trying

5   to figure out some --

6           THE COURT:  We're going to -- we're going to break --

7   look, we're going to break in a moment, so you can all do that

8   because that is what -- what is most productive right now, is

9   for you all to be talking, but it's not appropriate to be

10  getting up.  We're all trying to have a conversation about how

11  to move forward.  I understand you all need to do that.  I

12  understand we're tired, it's the end of the day.  But goodness

13  gracious.  All right.  All right.  Just, please.

14          MS. HERNANDEZ:  Question.  The Court said you were

15  going to do some time for sealed matter.  What is the Court

16  contemplating --

17          THE COURT:  Well, again, I think the question is --

18  let's -- part of my answer to your question was going to be

19  driven by how much we have lined up.  I think it does make

20  sense, again, maybe with regard to -- let me put it this way:

21  If there's some new aspect of the under-seal matter that we

22  need to discuss tomorrow, obviously I will let you all know and

23  we will do that.  If -- but otherwise, now that I'm hearing

24  what I'm hearing here, I think it makes sense to just press

25  ahead, get as many witnesses done as we can, and we can -- and

1   then for reasons I had discussed, I -- there may be additional

2   information that could inform the ultimate resolution of that.

3   So, I think the best thing is to just press ahead tomorrow

4   and -- now that I'm hearing where we are on witnesses, let's

5   press ahead and get as much done as we can.

6         MS. HERNANDEZ:  It's just that a lot of our defense

7   issues are up in the air, depending on this ruling or that

8   ruling, depending on interviews with officers and that type --

9         THE COURT:  I get it.

10        MS. HERNANDEZ:  That's why it's kind of difficult to

11  say where we are.

12        THE COURT:  I understand.

13        Mr. Pattis?

14        MR. PATTIS:  From Team Biggs, we would like to know

15  what the charge is going to be prior to the weekend so we can

16  use that to prepare our arguments.

17        THE COURT:  Well, that's another -- that's another

18  piece of this, too.  That's why we'll start -- I'm going to --

19  we're going to go -- look, Mr. Pattis, here's -- here's where I

20  think that will fall.  We are going to -- we will -- we've gone

21  through a third, just by pages, anyway, a crude measure, but a

22  measure, of the 45 pages.  A third each day.  We'll go through

23  the -- so we'll start tomorrow and do the remaining third.

24  Doesn't mean we'll have everything resolved, but it means I'll

25  have heard from you on all of it.

1           And then we'll talk about -- I mean, what I thought I

2     can do, it's something I can do even though we do not -- you

3     know, actually as I was thinking this over lunch, I thought,

4     oh, maybe we could have something on video or audio either on

5     Friday or Monday.  But we can't, as I thought it through,

6     because the whole point of that is that the court staff is off.

7           So even though we don't have -- so, we can't do that.

8           But that doesn't mean I can't at least receive --

9     we'll be at the end of it tomorrow and I can have as a goal to

10    try to circulate to all of you something as early as possible,

11    whether that's -- I can spend Friday doing that, if it bleeds

12    into Saturday.  But Friday or Saturday getting you that so you

13    have that in advance.

14          That -- you know, there are -- maybe the parts of it

15    that you are interested in aren't affected by this, but we --

16    as we know, there are other parts of it that require the

17    parties to -- you know, I'm thinking 404(b) and some other

18    things that I think will require the parties to -- sort of punt

19    it back to the parties on the details.  So some of that is

20    still going to be in limbo.  I don't think that's what you

21    really care about, but fair enough.

22          So I -- from my perspective, I think of using Friday

23    to try to get as far as I can on that and, hopefully, you

24    know -- again, we're going to have -- we're not going to be

25    complete, but it will probably be complete probably for the

1   purposes of you crafting a closing.

2           All right.  So that's where we'll begin.  Tomorrow,

3   9 o'clock.  So we won't -- unless there's some -- just for

4   planning purposes, unless there's something I don't know about

5   that we need to discuss, we'll -- we won't do anything sealed

6   tomorrow and try to make as much ground as we can on witnesses.

7           MS. HERNANDEZ:  I think --

8           THE COURT:  And stipulations and all the rest.

9           MS. HERNANDEZ:  I think, from the defense side, we

10  definitely would like to resolve the charge as far as -- as

11  much as we can tomorrow because -- take up as much time with

12  that as anything else because that's probably the most

13  important aspect at this point.

14          THE COURT:  We will get as far as we can, but we're

15  going to do -- we're going to do the last third of it and

16  then -- and then if the parties don't have, for example, the

17  things we've kind of hit and said, well, the parties should

18  discuss that.  If there's nothing for us to consider, then

19  there's no -- we won't be able to make progress.

20          So we'll spend as much time as we think is productive

21  going through the rest of the document.  And I don't -- I don't

22  know that we're going to be any more productive any further on

23  that.

24          Mr. McCullough, you look confused.

25          MR. McCULLOUGH:  No.  That's my I'm-about-to-ask-a-

1    question face.  And, my apologies, just -- next Friday, are we

2    sitting?

3              THE COURT:  Sorry.  Next Friday?

4              MR. McCULLOUGH:  My -- I'm calculating whether next

5    week is a three-day week or a four-day week.

6              THE COURT:  The 14th?

7              MR. McCULLOUGH:  Correct.

8              THE COURT:  Oh, it's a three-day?

9              MR. McCULLOUGH:  Well, that's -- if we are not

10   sitting Friday, it's a three-day week.  I'm just trying to do

11   the kind of estimation in terms of when we land this.

12             THE COURT:  It's a good question.  So by then I

13   had -- I have right now a full -- I have right now a full day

14   planned on other matters.  However, given where we are, I

15   will -- we will move things around on that.

16             So, my guess is we will have -- and this means --

17   yeah, part of it is a pretrial conference in another matter

18   that I'm going to -- I've been waiting and hoping I wouldn't

19   have to pull the plug on, but I'm going to do that.

20             So, I think the parties should try to plan on at

21   least a half a day, and I'll do my best to clear up as much

22   time as I can.

23             MS. BALLANTINE:  Just very briefly, Your Honor.  I

24   have a trial attorney at this table who begins another trial in

25   District Court on Monday, the 17th.  And she is committed to

1    this case through the duration of it.  But to the extent that

2    you have any ability to give us a full day on Friday, I would

3    be very grateful because we have had to negotiate this nonstop.

4              THE COURT:  Look, I -- again, that's the first Friday

5    where I was pretty confident we wouldn't need to be in, but --

6    and I've just been trying to adapt as we go.

7              So I hear what you are saying, Ms. Ballantine, and I

8    think, given the situation, I'm going to do everything I can to

9    clean up and create as much time as I can.

10             MS. BALLANTINE:  Thank you, Your Honor.

11             THE COURT:  Yes.

12             MS. HERNANDEZ:  Just so the Court understands, as far

13   as defendants testifying, Mr. Rehl has not yet decided what

14   he's going to do.  But that would probably be -- that decision

15   would have to be made, I guess, by Tuesday.  I mean, if he

16   testifies, I'm saying I think that would be -- he would be

17   testifying Tuesday.

18             THE COURT:  What we decided was that -- I mean, what

19   we decided before was that I would receive all the evidence

20   from all the defendants non -- that is not their testimony and

21   then they would decide.

22             So the question is whether we're going to -- when

23   we're going to hit that point.  I guess I had hoped we would

24   hit that point tomorrow, but that may be -- may not be

25   possible, given what I'm hearing here.

```
1              But I agree with you.  It seems to me we can shoot to

2     hit that point on Tuesday and then -- and then, you know,

3     obviously your clients will either decide to do so or I'll have

4     the appropriate colloquy with them and we'll go forward.

5              MS. HERNANDEZ:  I'm just telling that to the Court in

6     case this Friday issue -- because I think we probably need more

7     than a day for closing arguments.

8              THE COURT:  You know, Mr. Pattis has said, too.

9     We'll see.  We'll see.

10             But, we'll -- you know, we'll take that up when we're

11    close.

12             But, look, bottom line is, given what I'm hearing

13    now, I can -- I'll adjust things -- I'll adjust my schedule for

14    the 14th as appropriate.

15             MS. HERNANDEZ:  Is the government putting on a

16    rebuttal case?

17             THE COURT:  How can they decide that until they see

18    your case?

19             I mean, what is the government -- can the government

20    make any representations one way or the other about that?

21             MR. McCULLOUGH:  We have no representation to make at

22    this time.

23             THE COURT:  All right.  All right.  See you all

24    tomorrow at 9 o'clock.

25                                   *   *   *
```

17262

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3        I, JANICE DICKMAN, do hereby certify that the above and

4    foregoing constitutes a true and accurate transcript of my

5    stenographic notes and is a full, true and complete transcript

6    of the proceedings to the best of my ability.

7                    Dated this 6th day of April, 2023

8

9

10                    _____

11                    Janice E. Dickman, CRR, CMR, CCR
                      Official Court Reporter
12                    Room 6523
                      333 Constitution Avenue, N.W.
13                    Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25

## 0

**06511** [1] - 17114:5

## 1

**1** [2] - 17218:25, 17219:3
**1,000** [1] - 17191:2
**10** [5] - 17219:12, 17221:16, 17228:25, 17229:1, 17229:2
**100** [2] - 17238:13, 17244:16
**10010** [1] - 17113:25
**10016** [1] - 17114:16
**1014** [1] - 17114:13
**11-14** [1] - 17194:20
**11-14-2020** [1] - 17194:20
**11201** [1] - 17113:21
**1123** [1] - 17113:24
**113** [1] - 17114:18
**11:15** [1] - 17219:13
**11:20** [1] - 17219:13
**12:50** [1] - 17219:16
**12th** [2] - 17196:15, 17197:10
**1301** [1] - 17113:18
**1420** [1] - 17114:2
**14th** [2] - 17259:6, 17261:14
**15** [2] - 17186:4, 17222:6
**153** [1] - 17114:10
**15th** [1] - 17222:5
**17-year-old** [1] - 17197:8
**17th** [1] - 17259:25
**18** [2] - 17180:25, 17182:4
**19** [1] - 17182:4
**1:45** [1] - 17113:8

## 2

**2** [1] - 17219:6
**20** [1] - 17224:6
**20,000** [1] - 17249:24
**20001** [1] - 17262:13
**20005** [2] - 17113:19, 17114:2
**2001** [1] - 17181:12
**2020** [11] - 17189:16, 17189:18, 17192:6, 17194:16, 17194:17, 17196:1, 17196:15, 17197:10, 17204:11, 17205:10, 17208:21
**2021** [4] - 17199:19,
17219:5, 17219:6, 17219:9
**2023** [2] - 17113:8, 17262:7
**20530** [1] - 17113:16
**20777** [1] - 17114:8
**209** [1] - 17114:10
**21-cr-175** [1] - 17113:4
**22** [6] - 17180:25, 17181:10, 17182:10, 17182:11, 17188:20, 17188:21
**23** [5] - 17182:5, 17210:14, 17210:16, 17210:17
**256** [1] - 17183:3, 17183:13, 17183:22
**257** [1] - 17186:16
**258** [1] - 17192:14
**271** [1] - 17113:21

## 3

**3** [2] - 17189:5, 17219:9
**30** [1] - 17192:6
**30th** [3] - 17189:16, 17189:18, 17190:24
**33012** [1] - 17114:13
**33014** [1] - 17114:11
**333** [1] - 17262:12
**36** [1] - 17252:7
**383** [1] - 17114:4
**3rd** [1] - 17198:23

## 4

**4** [3] - 17189:5, 17201:10, 17219:13
**40** [1] - 17180:18
**404(b** [1] - 17257:17
**45** [1] - 17256:22
**49** [1] - 17114:13
**4:35** [1] - 17220:3
**4th** [1] - 17198:23

## 5

**5** [3] - 17113:8, 17219:16, 17248:4
**59047** [1] - 17114:19
**5th** [5] - 17198:18, 17198:19, 17214:8, 17219:5, 17219:6

## 6

**6** [5] - 17191:21, 17194:18, 17198:17, 17219:9, 17219:19

**60** [1] - 17113:6
**600** [1] - 17206:21
**601** [1] - 17113:15
**6175** [1] - 17114:10
**6523** [1] - 17262:12
**6th** [5] - 17198:16, 17199:5, 17200:3, 17220:8, 17262:7

## 7

**7** [1] - 17219:23
**70** [2] - 17189:4, 17203:7
**700** [1] - 17113:18
**7166** [1] - 17114:7
**72** [1] - 17206:11

## 8

**8** [3] - 17221:16, 17229:2, 17229:4
**80** [2] - 17189:4, 17203:7
**8th** [1] - 17215:15

## 9

**9** [6] - 17221:17, 17229:2, 17229:4, 17251:9, 17258:3, 17261:24
**909** [1] - 17113:24
**99** [1] - 17114:16
**9th** [1] - 17215:17

## A

**a.m** [4] - 17191:21, 17219:12, 17219:13
**Aaron** [3] - 17219:1, 17219:4, 17219:7
**ability** [4] - 17227:17, 17248:1, 17260:2, 17262:6
**able** [21] - 17189:13, 17198:24, 17207:16, 17210:8, 17222:9, 17222:10, 17223:2, 17223:3, 17223:12, 17226:25, 17228:8, 17230:8, 17232:12, 17235:13, 17235:15, 17235:24, 17236:4, 17242:3, 17246:24, 17252:4, 17258:19
**absolutely** [3] - 17212:5, 17218:4, 17221:3
**absolve** [1] - 17244:23

**according** [1] - 17244:13
**accurate** [2] - 17191:24, 17262:4
**acknowledge** [1] - 17221:13
**acknowledged** [1] - 17226:2
**acted** [1] - 17223:14
**acting** [2] - 17197:9, 17235:12
**Action** [1] - 17113:4
**actions** [1] - 17222:15
**active** [1] - 17193:18
**actual** [2] - 17229:23, 17231:17
**adapt** [1] - 17260:6
**addition** [1] - 17186:10
**additional** [1] - 17256:1
**adjust** [2] - 17261:13
**admission** [1] - 17186:19
**admitted** [2] - 17183:24, 17186:23
**advance** [1] - 17257:13
**advise** [1] - 17251:15
**aesthetician** [1] - 17181:7
**affected** [1] - 17257:15
**afforded** [1] - 17198:3
**African** [1] - 17184:12
**African-American** [1] - 17184:12
**afternoon** [4] - 17201:7, 17201:8, 17249:17, 17254:8
**afterwards** [1] - 17222:15
**Agent** [4] - 17206:10, 17252:4, 17253:14
**aggressive** [4] - 17224:8, 17224:25, 17225:2
**agitated** [2] - 17231:6, 17237:25
**agitating** [1] - 17231:8
**agitator** [3] - 17230:6, 17241:2, 17241:5
**agitators** [4] - 17229:16, 17230:4, 17230:5, 17230:6
**ago** [4] - 17187:14, 17226:3, 17226:4, 17226:5
**agree** [3] - 17206:14, 17219:3, 17261:1
**agreed** [3] - 17181:17,

17233:14, 17248:15
**ahead** [4] - 17200:1,
17255:25, 17256:3,
17256:5
**air** [1] - 17256:7
**Alan** [1] - 17114:15
**alleged** [2] - 17222:1,
17236:6
**allow** [1] - 17223:12
**allowed** [1] - 17235:8
**allowing** [1] -
17232:23
**allows** [1] - 17233:3
**alluded** [1] - 17214:18
**almost** [2] - 17218:22,
17242:5
**America** [1] - 17113:3
**American** [2] -
17184:12, 17225:3
**amount** [1] - 17214:20
**Angelina** [2] -
17181:4, 17181:7
**anger** [1] - 17209:19
**angered** [2] -
17209:18, 17209:19
**angle** [1] - 17222:14
**angles** [3] - 17221:8,
17225:6, 17227:13
**angry** [1] - 17210:6
**answer** [8] - 17202:23,
17202:25, 17213:8,
17220:19, 17226:9,
17246:25, 17250:19,
17255:18
**anyway** [3] - 17207:9,
17240:22, 17256:21
**apart** [1] - 17202:1
**apologies** [3] -
17208:11, 17211:7,
17259:1
**apologize** [2] -
17202:13, 17243:3
**apparent** [1] -
17204:24
**application** [1] -
17252:3
**applying** [2] -
17194:10, 17194:14
**appreciate** [3] -
17200:23, 17201:12,
17217:11
**apprentice** [2] -
17185:19, 17186:1
**appropriate** [3] -
17255:9, 17261:4,
17261:14
**April** [2] - 17113:8,
17262:7
**Aquinas** [1] -
17182:18

**area** [6] - 17207:18,
17209:12, 17222:1,
17224:3, 17229:6,
17238:11
**argue** [3] - 17227:4,
17230:11, 17249:7
**arguendo** [1] -
17244:13
**arguing** [1] - 17227:3
**argument** [5] -
17221:13, 17238:24,
17244:1, 17244:15,
17249:8
**arguments** [2] -
17256:16, 17261:7
**arose** [1] - 17248:24
**arraignments** [1] -
17192:1
**arrangements** [1] -
17192:10
**arrest** [1] - 17231:6
**arrested** [1] -
17192:11
**arrived** [1] - 17219:11
**art** [1] - 17206:19
**Arthur** [3] - 17219:1,
17219:4, 17219:8
**article** [3] - 17192:15,
17192:16, 17192:17
**articulable** [1] -
17239:19
**articulate** [1] -
17226:8
**articulated** [1] -
17240:13
**articulating** [2] -
17239:5, 17241:12
**aside** [4] - 17220:21,
17247:9, 17249:11
**aspect** [3] - 17245:1,
17255:21, 17258:13
**ass** [1] - 17199:7
**assault** [3] - 17222:14,
17229:3, 17229:4
**Association** [1] -
17191:21
**assume** [5] - 17210:5,
17244:1, 17244:5,
17244:24, 17248:18
**assumed** [1] -
17214:15
**assuming** [3] -
17234:15, 17244:13,
17247:10
**assumption** [1] -
17237:22
**attacked** [4] -
17190:14, 17196:6,
17209:6, 17209:9
**attempted** [1] -

17236:1
**attend** [3] - 17194:24,
17196:5, 17198:24
**attending** [2] -
17181:7, 17199:17
**attention** [3] -
17189:16, 17204:11,
17211:25
**Attorney** [1] -
17114:18
**attorney** [2] -
17243:20, 17259:24
**Attorney's** [1] -
17113:20
**audio** [1] - 17257:4
**authority** [1] -
17249:24
**available** [12] -
17225:15, 17248:21,
17249:17, 17250:24,
17251:7, 17251:9,
17251:22, 17252:8,
17252:24, 17253:10,
17254:3, 17254:7
**Avenue** [4] -
17113:18, 17114:16,
17192:23, 17262:12
**avenue** [1] - 17246:14
**avid** [1] - 17182:16
**avoid** [1] - 17220:8
**aware** [4] - 17193:9,
17193:11, 17194:10,
17206:4

# B

**baby** [1] - 17187:19
**background** [2] -
17191:23, 17234:7
**backwards** [2] -
17183:10, 17184:2
**bad** [1] - 17185:3
**ballantine** [1] -
17260:7
**BALLANTINE** [2] -
17259:23, 17260:10
**band** [1] - 17244:9
**bandage** [1] - 17238:7
**banging** [1] -
17231:15
**Bankruptcy** [1] -
17114:21
**bar** [1] - 17198:2
**Bar** [1] - 17191:21
**barely** [1] - 17193:22
**barricades** [1] -
17219:20
**bars** [2] - 17190:13,
17190:21
**baseball** [1] -

17183:10
**based** [2] - 17229:12,
17254:21
**basis** [4] - 17213:16,
17239:14, 17246:7,
17246:8
**battle** [4] - 17204:14,
17212:20, 17214:3,
17245:14
**battling** [1] - 17185:3
**became** [5] -
17193:23, 17193:25,
17194:10, 17204:22,
17224:2
**become** [5] - 17181:7,
17196:18, 17204:13,
17205:16, 17212:2
**becomes** [2] -
17231:4, 17233:9
**becoming** [7] -
17191:11, 17196:12,
17196:14, 17199:17,
17204:24, 17205:24,
17222:6
**beers** [1] - 17214:24
**BEFORE** [1] -
17113:11
**began** [1] - 17205:19
**begin** [1] - 17258:2
**begins** [2] - 17192:23,
17259:24
**behalf** [1] - 17248:13
**behind** [1] - 17235:25
**believes** [2] -
17202:16, 17203:18
**Bella** [1] - 17186:12
**Bench** [2] - 17213:3,
17217:20
**Bertino** [6] - 17198:5,
17206:8, 17206:22,
17207:3, 17207:7,
17208:18
**Bertino's** [1] - 17198:8
**best** [3] - 17256:3,
17259:21, 17262:6
**better** [1] - 17181:25
**between** [9] -
17198:20, 17204:14,
17211:23, 17212:21,
17218:7, 17218:14,
17219:13, 17225:8,
17245:19
**big** [2] - 17190:5,
17233:9
**bigger** [1] - 17221:14
**Biggs** [4] - 17113:6,
17114:1, 17250:24,
17256:14
**birthday** [3] -
17181:13, 17181:14,

17194:21
**bit** [5] - 17187:20, 17195:9, 17196:4, 17224:25, 17248:2
**Black** [4] - 17189:18, 17231:1, 17231:2, 17237:25
**black** [1] - 17206:15
**Blackbeard** [1] - 17224:18
**bleed** [1] - 17252:21
**bleeds** [1] - 17257:11
**block** [1] - 17247:7
**blocks** [1] - 17219:15
**blue** [2] - 17224:10, 17225:1
**booked** [2] - 17197:13
**botched** [1] - 17235:25
**bottles** [1] - 17214:25
**bottom** [2] - 17212:15, 17261:12
**Boulevard** [1] - 17192:24
**boundaries** [1] - 17224:15
**bounds** [1] - 17237:2
**bourbon** [1] - 17214:25
**Bouts** [1] - 17182:18
**box** [1] - 17182:20
**boxer** [1] - 17182:16
**boxing** [5] - 17182:21, 17183:18, 17184:12, 17184:13, 17185:12
**Boxing** [1] - 17183:8
**boy** [1] - 17187:6
**Boy** [7] - 17195:8, 17196:12, 17196:14, 17196:18, 17197:19, 17205:16, 17212:2
**boyfriend** [1] - 17181:15
**Boys** [15] - 17194:11, 17194:14, 17195:1, 17196:4, 17197:1, 17197:4, 17199:5, 17205:19, 17205:23, 17205:25, 17214:14, 17214:16, 17214:17, 17214:19
**boys** [1] - 17197:8
**brain** [2] - 17184:20, 17185:3
**breach** [2] - 17219:19, 17224:23
**breaches** [1] - 17236:14
**break** [5] - 17199:25, 17200:2, 17230:19,

17255:6, 17255:7
**breath** [1] - 17212:9
**brief** [2] - 17243:3, 17249:8
**briefly** [6] - 17217:19, 17238:25, 17239:1, 17239:4, 17239:8, 17259:23
**bring** [3] - 17187:15, 17226:24, 17245:8
**bringing** [1] - 17221:12
**brink** [2] - 17205:7, 17213:25
**Broadway** [1] - 17113:24
**Brooklyn** [1] - 17113:21
**building** [2] - 17191:2, 17229:8
**Building** [2] - 17113:24, 17190:1
**buildings** [1] - 17190:2
**bullied** [1] - 17196:6
**bunch** [5] - 17197:8, 17217:5, 17222:19, 17226:13, 17237:25
**burned** [1] - 17191:7
**business** [11] - 17182:13, 17185:18, 17185:24, 17186:6, 17189:1, 17189:14, 17202:5, 17202:19, 17203:8
**busy** [1] - 17249:16
**buy** [1] - 17236:22
**BY** [18] - 17180:4, 17183:1, 17184:1, 17187:1, 17188:25, 17201:6, 17201:22, 17203:6, 17204:20, 17207:24, 17210:2, 17210:19, 17211:8, 17212:14, 17213:21, 17215:9, 17215:25, 17216:10

## C

**Cadman** [1] - 17113:21
**calculating** [1] - 17259:4
**cancer** [1] - 17187:14
**cannot** [1] - 17240:13
**cap** [1] - 17183:10
**capitalism** [1] - 17212:21
**Capitol** [4] - 17222:2,

17244:21, 17253:6, 17253:9
**captured** [1] - 17221:8
**car** [1] - 17197:14
**cards** [1] - 17250:9
**care** [2] - 17200:21, 17257:21
**Carmen** [2] - 17114:6, 17114:7
**Carolina** [2] - 17206:24, 17216:12
**Carolinas** [1] - 17206:2
**cars** [1] - 17191:7
**case** [18] - 17210:9, 17218:13, 17219:24, 17220:9, 17220:11, 17221:7, 17233:17, 17249:17, 17250:18, 17252:17, 17252:21, 17253:3, 17253:11, 17254:4, 17260:1, 17261:6, 17261:16, 17261:18
**cases** [1] - 17254:25
**casino** [1] - 17200:9
**Casper** [3] - 17217:3, 17217:4, 17217:5
**causal** [2] - 17236:7, 17236:8
**caused** [2] - 17237:15, 17237:16
**causes** [2] - 17202:15, 17244:20
**causing** [1] - 17241:6
**CCR** [1] - 17262:11
**cease** [1] - 17243:19
**celebrated** [1] - 17247:21
**cell** [1] - 17215:21
**cellular** [1] - 17216:1
**cereals** [2] - 17197:2, 17197:5
**certain** [7] - 17223:3, 17224:7, 17232:18, 17240:11, 17240:24, 17240:25, 17242:5
**certainly** [1] - 17226:9
**CERTIFICATE** [1] - 17262:1
**certify** [1] - 17262:3
**chain** [6] - 17221:18, 17221:23, 17229:13, 17233:8, 17237:11
**chance** [1] - 17186:14
**changed** [1] - 17215:1
**changes** [1] - 17193:16
**changing** [1] - 17230:25

**chaos** [8] - 17224:2, 17226:13, 17231:14, 17236:13, 17238:21, 17238:23, 17244:2
**character** [1] - 17201:17
**charge** [2] - 17256:15, 17258:10
**charged** [1] - 17228:22
**charges** [1] - 17234:24
**chats** [2] - 17195:17, 17195:18
**check** [1] - 17209:2
**checks** [1] - 17191:23
**chernan7&aol.com** [1] - 17114:8
**chew** [1] - 17254:4
**child** [1] - 17203:14
**childhood** [1] - 17181:15
**children** [6] - 17186:10, 17197:9, 17200:22, 17203:19, 17212:9
**choice** [2] - 17241:8, 17248:23
**chop** [1] - 17220:22
**Chris** [1] - 17241:3
**Christmas** [2] - 17198:23, 17198:24
**chuckle** [1] - 17229:11
**Circle** [3] - 17219:18, 17219:20, 17219:22
**circle** [15] - 17185:6, 17232:13, 17232:21, 17234:3, 17234:12, 17235:22, 17235:23, 17236:1, 17236:21, 17236:23, 17243:8, 17243:11
**circular** [2] - 17223:11, 17230:2
**circulate** [1] - 17257:10
**circum** [1] - 17223:25
**circumstance** [5] - 17226:24, 17237:12, 17237:20, 17238:16, 17253:11
**circumstances** [13] - 17224:1, 17226:14, 17227:21, 17232:3, 17233:23, 17235:8, 17235:17, 17235:18, 17238:4, 17239:22, 17242:15, 17252:13
**circumstantially** [2] - 17222:24, 17242:4
**citizens** [1] - 17196:5

**City** [7] - 17189:17, 17189:23, 17189:24, 17189:25, 17190:3, 17190:25
**city** [4] - 17189:19, 17190:12, 17190:19, 17192:23
**civil** [3] - 17205:8, 17212:17, 17213:25
**classes** [1] - 17200:1
**clean** [1] - 17260:9
**clear** [5] - 17221:4, 17234:22, 17234:25, 17237:1, 17259:21
**Clerk** [2] - 17217:23, 17218:20
**client** [4] - 17223:14, 17234:25, 17239:23, 17241:20
**clients** [2] - 17250:6, 17261:3
**cliff** [1] - 17254:20
**close** [6] - 17190:22, 17191:1, 17208:23, 17225:4, 17254:18, 17261:11
**closely** [1] - 17227:12
**closing** [2] - 17258:1, 17261:7
**closings** [1] - 17255:1
**Club** [1] - 17183:8
**clue** [1] - 17195:22
**CMR** [1] - 17262:11
**co** [1] - 17239:3
**co-defendant** [1] - 17239:3
**coach** [5] - 17183:18, 17184:12, 17184:13, 17184:14, 17184:15
**coaching** [1] - 17184:16
**collect** [1] - 17191:22
**college** [3] - 17181:8, 17182:19, 17210:23
**colloquy** [1] - 17261:4
**COLUMBIA** [1] - 17113:1
**coming** [5] - 17198:20, 17198:21, 17199:5, 17199:13, 17240:1
**comment** [1] - 17211:6
**commercial** [1] - 17186:8
**commingled** [1] - 17181:19
**commit** [1] - 17203:8
**commitment** [5] - 17203:18, 17203:19,

17203:20, 17203:22, 17203:24
**commits** [1] - 17202:20
**committed** [7] - 17203:13, 17205:24, 17209:21, 17231:9, 17233:18, 17241:20, 17259:25
**communism** [1] - 17212:22
**communist** [1] - 17212:10
**community** [1] - 17181:8
**company** [2] - 17186:8, 17191:13
**complete** [5] - 17236:13, 17238:10, 17257:25, 17262:5
**completely** [1] - 17221:23
**component** [1] - 17229:1, 17241:22, 17241:24
**components** [2] - 17242:9
**conceding** [1] - 17245:13
**concept** [1] - 17214:2
**concern** [1] - 17199:2
**concerned** [1] - 17190:8
**concerns** [1] - 17189:21
**conclusion** [3] - 17227:1, 17232:24, 17233:5
**condensed** [1] - 17230:18
**conduct** [1] - 17220:9
**conference** [3] - 17213:3, 17217:20, 17259:17
**confess** [1] - 17238:24
**confident** [1] - 17260:5
**confirm** [1] - 17191:23
**conflict** [1] - 17248:24
**conflicting** [1] - 17231:20
**confused** [1] - 17258:24
**confusing** [1] - 17235:10
**confusion** [1] - 17226:12
**Congress** [1] - 17229:9
**conjunction** [1] -

17233:2
**connected** [1] - 17190:5
**Conor** [1] - 17113:17
**Conor.mulroe@ usdoj.gov** [1] - 17113:19
**consider** [4] - 17232:12, 17241:23, 17246:9, 17258:18
**considered** [3] - 17232:23, 17233:10, 17235:8
**considering** [1] - 17232:24
**consistent** [1] - 17217:21
**conspiracy** [4] - 17221:17, 17222:15, 17229:9, 17233:11
**constitutes** [1] - 17262:4
**Constitution** [2] - 17204:1, 17262:12
**constrained** [1] - 17224:15
**construction** [2] - 17191:8, 17191:12
**Construction** [1] - 17191:13
**consult** [1] - 17254:13
**consumed** [1] - 17193:25
**contact** [4] - 17195:8, 17196:11, 17219:23, 17220:9
**contains** [1] - 17218:25
**contemplating** [1] - 17255:16
**context** [3] - 17234:7, 17236:16, 17241:17
**continued** [1] - 17185:12
**contracted** [2] - 17191:14, 17197:20
**contracting** [1] - 17192:2
**contracts** [2] - 17189:11, 17189:14
**contradicting** [1] - 17232:22
**control** [1] - 17238:3
**controlling** [1] - 17238:4
**conversation** [2] - 17181:24, 17255:10
**conversations** [1] - 17243:20
**cop** [1] - 17235:23

**copies** [1] - 17218:16
**Corp** [3] - 17182:12, 17202:1, 17202:4
**Corps** [1] - 17201:23
**correct** [59] - 17180:22, 17195:25, 17201:17, 17202:20, 17203:8, 17203:13, 17203:16, 17203:17, 17203:18, 17204:2, 17204:3, 17204:7, 17204:11, 17204:14, 17204:25, 17205:3, 17205:11, 17205:12, 17205:14, 17205:15, 17205:17, 17205:20, 17205:25, 17206:5, 17206:8, 17206:15, 17206:19, 17206:21, 17206:25, 17207:1, 17207:2, 17207:10, 17207:12, 17207:15, 17207:19, 17208:3, 17208:6, 17208:12, 17208:18, 17209:3, 17209:6, 17209:9, 17209:16, 17209:22, 17210:4, 17210:7, 17210:17, 17212:10, 17214:10, 17214:14, 17214:19, 17214:23, 17215:15, 17215:18, 17215:21, 17217:4, 17244:10, 17245:5, 17259:7
**counsel** [7] - 17211:2, 17217:19, 17245:20, 17248:23, 17248:24, 17250:12, 17255:2
**count** [3] - 17222:11, 17222:25, 17229:10
**Count** [1] - 17228:25
**country** [6] - 17204:24, 17205:2, 17205:7, 17212:10, 17213:25, 17214:2
**counts** [3] - 17221:16, 17232:25, 17233:5
**Counts** [3] - 17221:16, 17221:17, 17229:4
**County** [2] - 17190:4, 17191:21
**couple** [7] - 17181:20, 17198:12, 17214:24, 17222:5, 17231:1, 17248:11, 17250:23
**course** [7] - 17201:21, 17210:23, 17217:6, 17222:3, 17222:4, 17251:22

**court** [4] - 17191:25, 17213:20, 17218:11, 17257:6

**Court** [23] - 17114:21, 17189:23, 17189:24, 17189:25, 17190:3, 17190:4, 17190:25, 17243:12, 17243:23, 17245:3, 17245:5, 17245:7, 17245:10, 17245:11, 17245:16, 17247:14, 17255:14, 17255:15, 17259:25, 17260:12, 17261:5, 17262:11

**COURT** [120] - 17113:1, 17179:14, 17179:20, 17179:25, 17183:24, 17186:23, 17188:22, 17200:24, 17201:4, 17201:19, 17202:24, 17203:2, 17204:17, 17207:21, 17207:23, 17209:25, 17211:1, 17211:4, 17212:12, 17213:2, 17213:4, 17213:12, 17213:16, 17215:7, 17215:24, 17216:4, 17216:6, 17216:8, 17217:14, 17217:17, 17217:21, 17218:4, 17218:12, 17218:20, 17220:1, 17220:14, 17220:16, 17222:12, 17223:1, 17223:14, 17223:17, 17223:19, 17223:22, 17224:9, 17224:12, 17224:21, 17225:7, 17225:12, 17227:2, 17227:23, 17228:12, 17228:17, 17228:19, 17228:23, 17229:19, 17230:10, 17231:8, 17231:12, 17231:23, 17232:16, 17233:12, 17233:18, 17234:5, 17235:5, 17235:9, 17236:19, 17237:9, 17237:13, 17237:21, 17238:15, 17238:21, 17239:7, 17240:15, 17241:10, 17241:19, 17242:20, 17243:19, 17244:7, 17245:12, 17245:24, 17246:19, 17247:1, 17247:16, 17247:19, 17247:23, 17248:9, 17248:15, 17249:10, 17249:20, 17250:2,

17250:4, 17250:14, 17250:16, 17251:11, 17251:24, 17252:1, 17252:11, 17252:15, 17253:5, 17253:17, 17254:11, 17255:2, 17255:6, 17255:17, 17256:9, 17256:12, 17256:17, 17258:8, 17258:14, 17259:3, 17259:6, 17259:8, 17259:12, 17260:4, 17260:11, 17260:18, 17261:8, 17261:17, 17261:23, 17262:1

**Court's** [1] - 17244:4

**courthouse** [7] - 17189:20, 17191:9, 17191:15, 17191:18, 17192:3, 17199:15, 17199:16

**courtroom** [2] - 17179:13, 17220:13

**COURTROOM** [2] - 17179:19, 17179:21

**Courts** [1] - 17114:21

**coverage** [1] - 17220:8

**COVID** [6] - 17189:8, 17193:21, 17197:20, 17207:7, 17207:25, 17208:2

**crack** [1] - 17235:15

**crafting** [1] - 17258:1

**CRC** [1] - 17114:21

**create** [4] - 17232:19, 17232:20, 17252:4, 17260:9

**Created** [1] - 17246:24

**created** [7] - 17231:14, 17235:11, 17237:11, 17237:19, 17238:16, 17242:10, 17249:5

**credible** [1] - 17213:11

**crew** [1] - 17186:9

**crime** [1] - 17226:7

**crimes** [1] - 17228:21

**Criminal** [1] - 17113:4

**CRM** [1] - 17113:18

**CROSS** [1] - 17201:5

**cross** [2] - 17227:18, 17252:18

**CROSS-EXAMINATION** [1] - 17201:5

**cross-examination** [1] - 17227:18

**crowd** [6] - 17219:17, 17229:15, 17230:24, 17231:6, 17231:8,

17241:18

**crowd's** [2] - 17240:11, 17240:16

**CRR** [2] - 17114:21, 17262:11

**crucial** [1] - 17222:18

**crude** [1] - 17256:21

**CT** [1] - 17114:5

**custody** [8] - 17182:9, 17187:22, 17188:6, 17188:7, 17188:10, 17188:13, 17188:14, 17203:10

**customers** [1] - 17181:22

**cut** [1] - 17248:3

**Cyrus** [2] - 17187:12, 17187:13

---

# D

**D.C** [23] - 17194:22, 17194:24, 17195:3, 17195:6, 17195:24, 17196:15, 17198:17, 17198:20, 17199:3, 17199:5, 17200:10, 17205:11, 17205:13, 17205:21, 17214:7, 17214:13, 17214:15, 17215:3, 17215:11, 17216:2, 17219:4, 17219:15, 17262:13

**dad** [1] - 17199:4

**dancing** [1] - 17226:8

**dancing-on** [1] - 17226:8

**Danger** [1] - 17246:24

**dangerous** [3] - 17185:22, 17235:11, 17237:12

**Daniel** [1] - 17114:1

**date** [3] - 17181:17, 17181:22, 17194:20

**Dated** [1] - 17262:7

**dating** [1] - 17188:4

**daughter** [6] - 17182:9, 17188:8, 17188:21, 17203:11, 17210:23

**daughter's** [1] - 17181:1

**daughters** [3] - 17180:23, 17180:24, 17189:4

**David** [1] - 17113:23

**days** [1] - 17198:12

**DC** [4] - 17113:7, 17113:16, 17113:19, 17114:2

**dealing** [1] - 17228:5

**December** [4] - 17196:15, 17197:10, 17197:16, 17205:13

**decide** [4] - 17248:17, 17260:21, 17261:3, 17261:17

**decided** [7] - 17181:23, 17197:19, 17200:11, 17208:17, 17260:13, 17260:18, 17260:19

**decision** [2] - 17236:5, 17260:14

**dedicating** [1] - 17202:19

**deeper** [1] - 17221:14

**defend** [2] - 17204:1, 17233:25

**Defendant** [1] - 17253:20

**defendant** [3] - 17218:24, 17219:2, 17239:3

**Defendants** [2] - 17113:9, 17113:22

**defendants** [5] - 17219:24, 17248:10, 17253:23, 17260:13, 17260:20

**defendants'** [1] - 17254:24

**defending** [2] - 17209:21, 17237:5

**defense** [35] - 17221:11, 17221:12, 17223:3, 17223:15, 17223:17, 17223:22, 17223:23, 17223:25, 17225:9, 17225:11, 17225:18, 17225:19, 17225:22, 17225:23, 17226:6, 17226:11, 17233:21, 17234:2, 17234:16, 17234:20, 17237:4, 17238:17, 17239:13, 17245:3, 17245:4, 17245:9, 17251:21, 17252:25, 17253:1, 17256:6, 17258:9

**definitely** [1] - 17258:10

**degree** [1] - 17246:1

**deliver** [6] - 17206:7, 17206:22, 17207:3, 17207:6, 17207:15, 17208:17

**demands** [1] - 17240:8

**demonstrate** [1] - 17226:15
**demonstrators** [4] - 17219:21, 17221:5, 17221:19, 17228:1
**denies** [1] - 17252:2
**Department** [1] - 17248:22
**dependent** [1] - 17203:3
**DEPUTY** [2] - 17179:19, 17179:21
**describe** [2] - 17189:2, 17214:2
**described** [5] - 17192:17, 17202:22, 17212:8, 17212:15, 17239:25
**describes** [1] - 17212:2
**describing** [1] - 17225:8
**destroyed** [1] - 17190:15
**details** [1] - 17257:19
**deviated** [1] - 17231:10
**deviating** [2] - 17235:7, 17240:9
**deviation** [10] - 17228:11, 17236:17, 17237:2, 17237:3, 17237:8, 17237:14, 17237:16, 17243:10, 17243:18, 17243:21
**deviations** [1] - 17242:10
**Dick** [6] - 17195:8, 17195:10, 17195:11, 17195:12, 17195:13
**Dickman** [2] - 17114:21, 17262:11
**DICKMAN** [1] - 17262:3
**died** [1] - 17187:14
**difference** [2] - 17225:8, 17225:12
**different** [30] - 17216:24, 17217:6, 17219:15, 17220:24, 17221:8, 17222:3, 17222:5, 17222:7, 17224:3, 17224:7, 17224:22, 17225:4, 17225:6, 17226:5, 17226:13, 17226:16, 17226:19, 17227:13, 17228:6, 17228:21, 17229:12, 17231:19, 17233:11, 17236:24,

17238:8, 17238:11, 17241:6, 17241:13, 17242:9, 17250:18
**difficult** [4] - 17189:8, 17189:9, 17254:20, 17256:10
**difficulty** [1] - 17241:11
**diners** [3] - 17190:11, 17190:13, 17209:5
**dinner** [2] - 17190:16, 17209:13
**direct** [3] - 17189:15, 17213:5, 17215:6
**DIRECT** [1] - 17180:3
**directing** [1] - 17211:25
**directly** [1] - 17223:11
**disagreement** [1] - 17251:21
**discrete** [1] - 17254:15
**discuss** [4] - 17220:10, 17255:22, 17258:5, 17258:18
**discussed** [2] - 17245:9, 17256:1
**discussing** [1] - 17220:5
**discussion** [1] - 17245:19
**dismiss** [1] - 17217:25
**disputes** [1] - 17249:18
**dissect** [1] - 17242:7
**dissecting** [1] - 17242:8
**distance** [2] - 17193:3, 17206:23
**District** [2] - 17114:21, 17259:25
**DISTRICT** [3] - 17113:1, 17113:1, 17113:12
**diverged** [1] - 17236:2
**divide** [1] - 17205:5
**doctrine** [1] - 17246:24
**document** [3] - 17212:24, 17212:25, 17258:21
**dog** [4] - 17187:4, 17187:5, 17187:12, 17212:17
**dogs** [1] - 17186:11
**DOJ** [1] - 17113:18
**DOJ-CRM** [1] - 17113:18
**Dom** [14] - 17189:10, 17192:2, 17194:21, 17195:23, 17198:7,

17199:10, 17199:11, 17200:10, 17201:23, 17202:4, 17213:22, 17216:12, 17229:6
**Dom's** [4] - 17189:1, 17201:25, 17202:7, 17202:15
**Dominic** [33] - 17113:8, 17181:14, 17182:1, 17182:16, 17183:7, 17184:7, 17184:23, 17185:6, 17185:20, 17187:7, 17187:8, 17188:12, 17188:18, 17189:3, 17191:14, 17193:9, 17193:16, 17193:17, 17193:21, 17194:6, 17195:13, 17196:3, 17197:12, 17199:3, 17199:4, 17200:15, 17207:8, 17210:22, 17214:20, 17219:2, 17248:6
**Dominic's** [7] - 17181:15, 17184:14, 17184:15, 17187:4, 17187:6, 17211:11, 17211:12
**done** [9] - 17214:22, 17236:6, 17237:21, 17241:14, 17241:17, 17253:24, 17254:19, 17255:25, 17256:5
**down** [20] - 17191:16, 17194:24, 17197:24, 17197:25, 17199:5, 17206:2, 17206:24, 17208:18, 17217:14, 17223:8, 17229:17, 17229:18, 17229:21, 17230:19, 17232:16, 17232:18, 17232:19, 17232:20, 17240:1
**downstream** [1] - 17234:24
**downtown** [1] - 17189:20
**drank** [1] - 17214:24
**drink** [1] - 17187:17
**drinking** [6] - 17193:19, 17196:8, 17214:20, 17214:22, 17214:24, 17214:25
**Drive** [1] - 17114:18
**drive** [2] - 17216:12, 17254:22
**driven** [1] - 17255:19
**driving** [1] - 17216:15
**drop** [1] - 17198:23

**dropped** [1] - 17226:20
**drove** [2] - 17206:21, 17206:24
**due** [1] - 17193:18
**duly** [1] - 17179:23
**duration** [1] - 17260:1
**during** [7] - 17185:8, 17193:23, 17197:20, 17198:8, 17201:25, 17222:3, 17222:4

## E

**early** [4] - 17189:21, 17191:5, 17193:13, 17257:10
**East** [2] - 17113:21, 17114:18
**east** [1] - 17190:12
**easy** [1] - 17235:4
**eating** [2] - 17190:16, 17209:8
**effect** [1] - 17226:9
**either** [4] - 17225:15, 17234:1, 17257:4, 17261:3
**elaborate** [1] - 17234:18
**Electric** [1] - 17185:20
**electrical** [1] - 17185:22
**electrician** [1] - 17185:19
**element** [2] - 17226:22, 17227:6
**elements** [5] - 17221:15, 17225:18, 17226:7, 17228:21, 17228:23
**elicit** [1] - 17223:3
**elicited** [1] - 17240:2
**eliciting** [1] - 17239:21
**Elmo** [1] - 17218:20
**Email** [13] - 17113:16, 17113:17, 17113:19, 17113:22, 17113:25, 17114:3, 17114:5, 17114:8, 17114:11, 17114:14, 17114:17, 17114:19, 17114:22
**email** [1] - 17249:7
**end** [10] - 17190:12, 17192:22, 17194:15, 17197:15, 17204:7, 17220:4, 17231:21, 17238:6, 17255:12, 17257:9
**ended** [7] - 17191:11, 17195:7, 17196:14,

17196:19, 17236:3, 17238:13, 17242:13
**engage** [3] - 17252:22, 17253:17, 17253:25
**Enrique** [1] - 17113:7
**enter** [1] - 17179:13
**entire** [6] - 17214:25, 17221:7, 17223:3, 17230:19, 17237:20, 17248:13
**entirely** [1] - 17208:11
**environment** [2] - 17181:23, 17235:12
**episode** [1] - 17224:14
**Epps** [1] - 17250:3
**equation** [1] - 17229:16
**Erik** [1] - 17113:15
**erik.kenerson@ usdoj.gov** [1] - 17113:17
**erupt** [2] - 17224:7
**especially** [1] - 17233:5
**essentially** [2] - 17230:13, 17244:25
**established** [2] - 17213:9, 17215:6
**estimation** [1] - 17259:11
**Ethan** [1] - 17113:6
**ethic** [1] - 17202:8
**evaluate** [1] - 17213:11
**evening** [1] - 17200:13
**event** [1] - 17236:7
**events** [9] - 17181:19, 17209:15, 17216:2, 17221:18, 17221:24, 17229:13, 17233:8, 17240:11, 17242:12
**eventually** [5] - 17184:24, 17187:25, 17188:9, 17190:21
**evidence** [18] - 17183:21, 17206:11, 17210:14, 17220:10, 17223:12, 17225:13, 17225:14, 17225:15, 17226:10, 17240:2, 17240:21, 17248:7, 17248:9, 17248:12, 17248:16, 17250:7, 17252:21, 17260:19
**evidentiary** [1] - 17254:12
**evil** [4] - 17204:14, 17205:5, 17212:21, 17214:3
**evolved** [1] - 17243:13

**exact** [3] - 17218:4, 17242:12, 17252:6
**exactly** [3] - 17205:23, 17235:14, 17246:7
**examination** [1] - 17227:18
**EXAMINATION** [3] - 17180:3, 17201:5, 17216:9
**examined** [2] - 17179:24, 17242:17
**example** [6] - 17223:9, 17227:14, 17232:25, 17236:21, 17241:1, 17258:16
**Exchange** [1] - 17192:24
**excluded** [1] - 17226:11
**excuse** [1] - 17183:11
**execute** [1] - 17248:14
**exercise** [1] - 17210:25
**exhibit** [2] - 17217:17, 17254:9
**Exhibit** [7] - 17183:3, 17183:13, 17206:11, 17210:14, 17210:16, 17210:17, 17218:25
**exhibits** [2] - 17249:5, 17249:8
**experiences** [1] - 17202:7
**experiencing** [1] - 17209:16
**expert** [37] - 17218:1, 17220:17, 17220:20, 17225:16, 17227:24, 17233:23, 17234:1, 17234:17, 17235:1, 17235:14, 17235:15, 17236:10, 17236:24, 17239:2, 17239:17, 17239:19, 17240:23, 17246:8, 17246:13, 17246:16, 17247:5, 17247:9, 17248:5, 17248:18, 17248:19, 17249:11, 17249:22, 17249:23, 17250:1, 17250:12, 17251:5, 17252:3, 17253:19, 17253:25
**expert's** [2] - 17243:7
**experts** [1] - 17251:13
**explain** [15] - 17228:8, 17229:23, 17230:8, 17230:20, 17234:6, 17235:13, 17235:19, 17235:20, 17235:22,

17236:12, 17236:16, 17236:21, 17238:22, 17239:15, 17240:23
**explained** [7] - 17196:4, 17224:3, 17226:15, 17233:2, 17241:9, 17242:17, 17252:12
**explaining** [1] - 17233:21
**explains** [3] - 17227:25, 17234:1, 17234:6
**explanations** [1] - 17234:18
**expressed** [1] - 17221:2
**extent** [6] - 17206:1, 17227:3, 17246:15, 17253:15, 17254:23, 17260:1
**extra** [1] - 17240:3
**extraordinarily** [1] - 17189:9
**extremely** [1] - 17221:9

**F**

**face** [10] - 17224:19, 17224:20, 17229:22, 17231:2, 17231:3, 17237:25, 17238:7, 17259:1
**fact** [9] - 17204:16, 17205:24, 17225:9, 17226:4, 17227:4, 17232:8, 17233:20, 17235:19, 17237:11
**factor** [1] - 17199:2
**facts** [3] - 17225:15, 17227:3, 17227:16
**factual** [2] - 17240:17, 17241:12
**factually** [4] - 17233:18, 17239:22, 17252:5, 17252:19
**fair** [5] - 17185:9, 17194:11, 17235:15, 17249:10, 17257:21
**fairly** [5] - 17208:2, 17208:4, 17208:23, 17208:25, 17254:15
**fairness** [1] - 17245:12
**faith** [1] - 17213:16
**fall** [3] - 17226:17, 17242:16, 17256:20
**fallback** [2] - 17251:23, 17251:25
**falling** [3] - 17205:2,

17205:4, 17214:2
**falls** [1] - 17226:17
**falsity** [1] - 17250:17
**familiar** [3] - 17184:10, 17184:11, 17210:25
**family** [7] - 17180:22, 17182:13, 17185:18, 17185:24, 17187:12, 17203:22, 17217:6
**far** [12] - 17190:8, 17192:20, 17193:3, 17220:4, 17226:20, 17238:1, 17241:4, 17247:8, 17257:23, 17258:10, 17258:14, 17260:12
**father** [9] - 17182:8, 17182:12, 17185:23, 17186:3, 17186:4, 17186:7, 17198:21, 17198:22, 17199:6
**fault** [1] - 17208:11
**favorite** [2] - 17187:4, 17187:5
**fearful** [1] - 17209:20
**fedcases@ metcalflawnyc.com** [1] - 17114:17
**feet** [4] - 17191:2, 17224:6, 17238:13, 17244:16
**fell** [6] - 17207:7, 17213:22, 17227:20, 17231:25, 17232:1, 17234:14
**female** [1] - 17184:8
**fence** [1] - 17232:2
**few** [3] - 17218:13, 17220:5, 17249:6
**fight** [3] - 17203:10, 17212:8, 17245:14
**fighting** [1] - 17187:22
**figure** [3] - 17240:3, 17242:7, 17255:5
**filed** [1] - 17245:6
**files** [1] - 17246:9
**filing** [1] - 17246:22
**fill** [1] - 17248:4
**filled** [1] - 17221:23
**film** [1] - 17227:10
**final** [2] - 17199:22, 17239:10
**finals** [1] - 17199:24
**fine** [1] - 17248:17
**fingers** [2] - 17185:21, 17224:2
**finish** [4] - 17180:12, 17189:6, 17202:23
**fire** [2] - 17191:8,

17191:10
**first** [18] - 17179:23, 17180:13, 17184:12, 17185:5, 17187:12, 17197:21, 17212:1, 17221:1, 17221:19, 17224:23, 17225:14, 17230:7, 17235:1, 17239:12, 17246:10, 17247:15, 17247:17, 17260:4
**First** [1] - 17114:4
**fit** [2] - 17185:21, 17245:4
**five** [11] - 17197:2, 17197:4, 17229:12, 17230:7, 17240:4, 17240:10, 17240:13, 17243:5, 17243:6, 17243:11, 17247:25
**FL** [2] - 17114:11, 17114:13
**flag** [2] - 17225:3, 17243:24
**Floor** [2] - 17114:4, 17114:16
**flooring** [4] - 17185:23, 17186:8, 17192:3
**flow** [1] - 17233:20
**fly** [1] - 17249:25
**focus** [3] - 17190:6, 17253:15
**focused** [3] - 17204:13, 17204:22, 17204:23
**following** [2] - 17215:17, 17216:1
**follows** [1] - 17179:24
**FOR** [1] - 17113:1
**force** [13] - 17226:22, 17226:23, 17229:1, 17231:19, 17232:21, 17232:22, 17233:14, 17236:5, 17237:6, 17238:18
**foregoing** [1] - 17262:4
**foremost** [1] - 17249:23
**foreseeable** [1] - 17233:15
**forget** [1] - 17194:20
**form** [2] - 17204:15, 17244:23
**formation** [10] - 17223:5, 17225:6, 17227:25, 17228:6, 17228:8, 17229:23, 17229:25, 17230:19,

17235:20, 17240:6
**formed** [1] - 17245:1
**formulated** [2] - 17241:24, 17242:5
**formulating** [1] - 17238:18
**forward** [5] - 17218:17, 17236:3, 17242:19, 17255:11, 17261:4
**foundation** [1] - 17212:25
**four** [6] - 17188:5, 17189:6, 17230:7, 17236:11, 17240:9, 17259:5
**four-day** [1] - 17259:5
**Fox** [1] - 17193:20
**Foy** [1] - 17191:13
**frame** [2] - 17227:12
**framed** [1] - 17226:15
**framing** [1] - 17230:14
**frankly** [1] - 17227:7
**fraternity** [1] - 17197:9
**freedom** [2] - 17212:21, 17214:5
**freeze** [1] - 17226:15
**freeze-framed** [1] - 17226:15
**Friday** [11] - 17215:15, 17257:5, 17257:11, 17257:12, 17257:22, 17259:1, 17259:3, 17259:10, 17260:2, 17260:4, 17261:6
**Fridays** [1] - 17192:11
**friend** [3] - 17181:13, 17181:15, 17239:3
**friends** [5] - 17181:18, 17194:2, 17194:6, 17200:7, 17217:6
**frightening** [1] - 17209:1
**front** [4] - 17196:20, 17228:4, 17232:14, 17240:17
**frustrated** [4] - 17180:12, 17214:18, 17214:20, 17215:4
**fucking** [1] - 17196:24
**full** [6] - 17236:16, 17252:9, 17259:13, 17260:2, 17262:5

## G

**game** [1] - 17254:25
**general** [1] - 17184:17
**gentlemen** [3] - 17179:15, 17218:12,

17220:3
**girls** [1] - 17199:6
**girls'** [3] - 17200:8, 17200:9, 17200:11
**given** [8] - 17223:7, 17239:12, 17240:8, 17250:3, 17259:14, 17260:8, 17260:25, 17261:12
**glass** [1] - 17249:25
**Gloria** [1] - 17184:11
**gloves** [2] - 17185:14, 17210:15
**goal** [1] - 17257:9
**golden** [1] - 17185:14
**goodness** [2] - 17252:16, 17255:12
**government** [22] - 17218:8, 17218:14, 17219:2, 17227:5, 17227:13, 17235:15, 17239:1, 17239:8, 17239:21, 17240:22, 17242:21, 17243:1, 17245:19, 17248:20, 17249:4, 17249:6, 17249:18, 17252:22, 17252:24, 17261:15, 17261:19
**Government** [2] - 17210:16, 17210:17
**government's** [4] - 17227:18, 17250:22, 17251:2, 17252:17
**grab** [2] - 17227:15, 17227:20
**grabbed** [5] - 17225:20, 17225:23, 17226:21, 17226:22, 17234:15
**gracious** [2] - 17252:16, 17255:13
**graduate** [1] - 17199:17
**graduated** [1] - 17185:10
**grammatically** [1] - 17251:3
**grant** [3] - 17228:12, 17232:1, 17233:15
**granted** [1] - 17188:13
**grapevine** [1] - 17185:2
**grateful** [1] - 17260:3
**greatly** [1] - 17189:14
**Greene** [6] - 17219:5, 17219:8, 17219:10, 17219:14, 17219:17, 17219:21
**ground** [3] - 17224:19,

17252:13, 17258:6
**groups** [1] - 17196:7
**grown** [2] - 17181:16, 17201:16
**guess** [14] - 17225:16, 17226:5, 17227:15, 17227:23, 17231:23, 17232:9, 17234:17, 17235:3, 17238:15, 17240:15, 17252:15, 17259:16, 17260:15, 17260:23
**guidance** [1] - 17184:17
**guy** [5] - 17195:13, 17202:19, 17224:10, 17224:25, 17225:2
**guys** [5] - 17186:10, 17188:11, 17196:9, 17225:4, 17225:6
**gym** [2] - 17193:17, 17198:2

## H

**habits** [1] - 17189:2
**half** [2] - 17186:2, 17259:21
**Hall** [1] - 17189:22
**Hanak** [4] - 17230:16, 17252:4, 17253:14
**hand** [3] - 17179:21, 17210:15, 17220:24
**handling** [1] - 17195:20
**hands** [2] - 17185:20, 17254:20
**handwriting** [9] - 17211:10, 17211:11, 17211:12, 17211:15, 17211:16, 17211:17, 17211:21, 17211:22, 17213:9
**handwritten** [1] - 17211:19
**handy** [1] - 17220:7
**hanging** [1] - 17187:8
**happy** [1] - 17242:24
**hard** [4] - 17184:21, 17185:21, 17239:25, 17254:22
**harmed** [1] - 17196:6
**Hassan** [2] - 17114:9, 17114:10
**hassan@ nhassanlaw.com** [1] - 17114:11
**Haven** [1] - 17114:5
**head** [7] - 17187:8, 17214:10, 17226:9,

17229:22, 17230:7, 17238:5, 17238:6
**headed** [1] - 17219:18
**heading** [1] - 17193:13
**hear** [19] - 17179:15, 17184:23, 17196:25, 17211:1, 17213:2, 17220:16, 17220:25, 17221:20, 17236:4, 17238:25, 17239:1, 17239:8, 17240:22, 17242:20, 17245:16, 17260:7
**heard** [12] - 17184:8, 17184:19, 17184:21, 17197:7, 17201:9, 17221:1, 17221:3, 17223:10, 17239:19, 17256:25
**hearing** [7] - 17226:10, 17243:20, 17255:23, 17255:24, 17256:4, 17260:25, 17261:12
**hearsay** [1] - 17212:11
**heavily** [1] - 17193:19
**heck** [1] - 17236:12
**HELD** [1] - 17113:11
**hell** [1] - 17207:8
**help** [2] - 17207:14, 17231:1
**helping** [3] - 17183:18, 17188:17, 17230:25
**hereby** [2] - 17219:2, 17262:3
**Hernandez** [4] - 17114:6, 17114:7, 17254:6, 17254:14
**HERNANDEZ** [15] - 17212:11, 17247:14, 17247:17, 17247:22, 17249:15, 17253:8, 17255:4, 17255:14, 17256:6, 17256:10, 17258:7, 17258:9, 17260:12, 17261:5, 17261:15
**hesitant** [1] - 17239:18
**hi** [1] - 17181:21
**Hialeah** [1] - 17114:13
**high** [7] - 17182:15, 17182:16, 17182:18, 17182:20, 17185:8, 17185:10, 17185:12
**Highland** [1] - 17114:8
**highly** [1] - 17184:16
**Hill** [1] - 17252:3

**himself** [8] - 17186:9, 17193:20, 17195:13, 17202:19, 17202:20, 17203:8, 17203:13, 17233:25
**hit** [9] - 17181:17, 17189:8, 17208:23, 17225:24, 17225:25, 17258:17, 17260:23, 17260:24, 17261:2
**hobbies** [1] - 17182:14
**hobby** [2] - 17194:2, 17194:6
**hold** [4] - 17206:10, 17239:14, 17241:10, 17254:20
**holding** [1] - 17210:13
**hole** [3] - 17221:21, 17221:23, 17231:3
**Hollow** [1] - 17114:7
**home** [15] - 17189:5, 17189:21, 17193:13, 17193:19, 17198:20, 17198:25, 17199:7, 17199:9, 17200:4, 17200:12, 17200:21, 17208:23, 17210:11, 17216:18
**Honor** [38] - 17179:17, 17183:20, 17186:22, 17201:2, 17202:23, 17212:11, 17212:23, 17213:7, 17213:10, 17215:5, 17215:22, 17216:3, 17218:19, 17221:4, 17222:4, 17223:24, 17226:12, 17227:22, 17230:12, 17230:21, 17237:7, 17241:22, 17243:2, 17246:18, 17247:15, 17248:3, 17249:3, 17249:7, 17251:1, 17252:2, 17252:9, 17253:3, 17254:5, 17254:21, 17255:4, 17259:23, 17260:10
**HONORABLE** [1] - 17113:11
**hope** [1] - 17249:15
**hoped** [1] - 17260:23
**hopefully** [2] - 17201:11, 17257:23
**hoping** [2] - 17251:20, 17259:18
**hospitals** [1] - 17189:12
**hotel** [3] - 17197:13, 17219:7, 17219:10

**hour** [1] - 17198:11
**hours** [6] - 17189:1, 17189:4, 17189:6, 17203:7, 17236:11, 17252:7
**house** [5] - 17192:20, 17193:5, 17198:8, 17198:21, 17215:14
**household** [1] - 17187:7
**huge** [3] - 17221:21, 17221:22
**Hull** [2] - 17114:1, 17114:1
**hum** [5] - 17206:3, 17208:1, 17213:19, 17214:9, 17223:1

# I

**I'm-about-to-ask-a** [1] - 17258:25
**idea** [7] - 17199:8, 17206:23, 17208:7, 17214:11, 17227:11, 17243:8, 17243:25
**identification** [3] - 17183:2, 17186:16, 17192:13
**idiot** [1] - 17196:24
**II** [1] - 17114:15
**ill** [1] - 17207:7
**imagine** [2] - 17208:25, 17232:4
**immediately** [1] - 17242:5
**immensely** [1] - 17231:6
**importance** [1] - 17253:20
**important** [7] - 17230:13, 17233:20, 17234:23, 17234:24, 17236:15, 17243:6, 17258:13
**IN** [1] - 17113:1
**incident** [7] - 17192:18, 17193:9, 17193:11, 17208:20, 17208:21, 17209:5, 17224:5
**including** [1] - 17220:11
**incorrect** [1] - 17251:3
**increasingly** [3] - 17204:13, 17204:22, 17204:23
**independent** [1] - 17220:10
**indicated** [2] -

17212:24, 17249:12
**indicating** [3] - 17185:7, 17230:3, 17230:20
**indicating** [4] - 17184:6, 17184:7, 17190:4, 17224:6
**indications** [2] - 17229:23, 17230:20
**indictment** [1] - 17229:5
**individual** [8] - 17198:4, 17207:5, 17216:14, 17216:25, 17221:24, 17223:4, 17230:22, 17254:10
**individuals** [2] - 17184:13, 17192:10
**infer** [5] - 17222:23, 17223:13, 17223:14, 17232:24, 17235:24
**inference** [1] - 17235:7
**inferences** [6] - 17222:21, 17222:22, 17233:4, 17235:6, 17242:19
**inferred** [1] - 17226:20
**inform** [1] - 17256:2
**information** [11] - 17185:2, 17191:22, 17191:24, 17195:8, 17196:25, 17221:20, 17221:21, 17223:4, 17235:25, 17236:4, 17256:2
**informed** [1] - 17250:12
**inherit** [1] - 17212:10
**initiated** [1] - 17197:1
**initiation** [1] - 17197:3
**inmates** [1] - 17191:22
**inside** [1] - 17209:10
**Inspector** [1] - 17231:4
**installed** [1] - 17249:24
**instance** [2] - 17231:13
**instead** [1] - 17238:4
**instigate** [1] - 17244:20
**instigated** [5] - 17244:2, 17244:12, 17244:13, 17244:14
**instigating** [1] - 17244:5
**Institute** [1] - 17182:18
**instruction** [1] -

17247:7
**instructions** [1] - 17222:20
**intend** [1] - 17227:20
**intending** [1] - 17223:22
**intent** [17] - 17221:16, 17221:17, 17222:10, 17222:24, 17223:20, 17226:12, 17226:13, 17226:23, 17229:2, 17229:4, 17231:22, 17232:6, 17232:10, 17238:18, 17241:23, 17242:4, 17244:25
**intention** [1] - 17236:6
**interact** [1] - 17232:6
**interest** [1] - 17196:3
**interested** [2] - 17193:24, 17257:15
**intersession** [2] - 17199:25, 17200:1
**interview** [2] - 17191:22, 17248:23
**interviewed** [2] - 17248:21, 17251:20
**interviews** [1] - 17256:8
**intimate** [1] - 17181:24
**introduce** [1] - 17253:10
**introduced** [2] - 17181:16, 17181:23
**introduction** [1] - 17228:1
**inundate** [1] - 17193:20
**investigation** [1] - 17220:10
**investigator** [3] - 17230:15, 17249:16, 17254:7
**invitation** [1] - 17226:10
**involuntary** [1] - 17234:16
**involved** [4] - 17193:23, 17219:17, 17224:11, 17235:23
**involves** [1] - 17240:8
**issue** [6] - 17220:17, 17243:14, 17243:24, 17245:3, 17247:5, 17261:6
**issues** [7] - 17248:24, 17249:6, 17249:22, 17254:9, 17254:12, 17254:15, 17256:7
**itself** [1] - 17225:14
**IV** [1] - 17114:1

## J

**jacket** [2] - 17225:2, 17225:3
**jail** [1] - 17191:21
**JANICE** [1] - 17262:3
**Janice** [2] - 17114:21, 17262:11
**Janicedickmandcd@gmail.com** [1] - 17114:22
**January** [13] - 17194:18, 17198:16, 17198:17, 17199:19, 17200:3, 17214:8, 17215:15, 17215:17, 17219:5, 17219:6, 17219:9, 17220:8, 17222:5
**Jason** [1] - 17113:14
**jason.mccullough2@usdoj.gov** [1] - 17113:16
**JAUREGUI** [1] - 17249:3
**Jauregui** [4] - 17114:12, 17114:12, 17249:3, 17251:12
**jdhull@hullmcguire.com** [1] - 17114:3
**Jersey** [1] - 17208:14
**job** [9] - 17189:6, 17189:7, 17191:4, 17191:15, 17191:16, 17191:19, 17199:16, 17203:20, 17241:14
**John** [2] - 17114:1, 17224:18
**Johnny** [2] - 17231:2, 17237:24
**joined** [1] - 17219:21
**joining** [3] - 17196:3, 17196:12, 17196:14
**Joint** [1] - 17218:24
**Joseph** [1] - 17113:6
**judge** [5] - 17180:8, 17192:1, 17228:18, 17230:11, 17232:11
**JUDGE** [2] - 17113:11, 17113:12
**Judge** [1] - 17222:21
**juggle** [1] - 17199:18
**jump** [1] - 17254:20
**juror** [1] - 17226:10
**jurors** [2] - 17179:13, 17220:13
**jury** [21] - 17213:11, 17218:21, 17221:20, 17222:10, 17222:19, 17222:20, 17222:22, 17223:13, 17230:11, 17232:11, 17232:23, 17233:3, 17235:24, 17236:15, 17242:18, 17247:7, 17247:25, 17249:5, 17252:9
**JURY** [2] - 17113:5, 17113:10
**Justice** [1] - 17189:22

## K

**keep** [7] - 17199:7, 17201:19, 17204:18, 17221:12, 17246:20, 17247:24, 17247:25
**Keepers** [1] - 17253:11
**KELLY** [1] - 17113:11
**KENERSON** [6] - 17243:2, 17243:21, 17244:10, 17245:15, 17245:21, 17250:11
**Kenerson** [5] - 17113:15, 17242:25, 17245:12, 17245:25, 17250:10
**kind** [24] - 17181:19, 17181:21, 17185:2, 17203:10, 17204:23, 17205:2, 17206:14, 17206:19, 17207:18, 17207:25, 17209:12, 17226:24, 17227:6, 17231:25, 17246:6, 17253:12, 17254:9, 17254:19, 17254:20, 17256:10, 17258:17, 17259:11
**knock** [3] - 17247:12, 17248:2, 17251:18
**knowing** [1] - 17209:23
**knowledge** [3] - 17193:10, 17208:15, 17212:25
**knows** [1] - 17253:15

## L

**L-I-S-A** [1] - 17180:7
**laboring** [1] - 17242:25
**lack** [1] - 17212:25
**ladies** [3] - 17179:15, 17218:12, 17220:3
**laid** [3] - 17240:15, 17243:5, 17243:11
**Lake** [2] - 17114:18, 17192:23
**Lakes** [1] - 17114:11
**land** [1] - 17259:11
**large** [1] - 17185:20
**Lashomb** [8] - 17219:1, 17219:4, 17219:8, 17219:10, 17219:14, 17219:17, 17219:21, 17219:23
**last** [6] - 17212:8, 17213:7, 17248:13, 17248:14, 17254:5, 17258:15
**late** [3] - 17189:1, 17247:14, 17249:12
**lateness** [1] - 17243:13
**Law** [4] - 17114:7, 17114:10, 17114:12, 17114:18
**law** [3] - 17237:3, 17246:2, 17250:18
**lawyers** [1] - 17220:6
**layer** [1] - 17233:16
**laying** [1] - 17231:15
**lead** [2] - 17227:21, 17238:9
**leader** [3] - 17230:21, 17230:24
**leadership** [8] - 17223:6, 17223:7, 17228:9, 17228:10, 17235:20, 17240:7
**leading** [1] - 17236:7
**leads** [3] - 17224:23, 17238:9, 17238:10
**learn** [6] - 17180:21, 17182:7, 17194:13, 17198:4, 17216:24, 17217:9
**learned** [2] - 17182:8, 17182:15
**learning** [1] - 17182:1
**least** [14] - 17182:14, 17198:12, 17237:3, 17241:23, 17243:15, 17246:1, 17246:14, 17247:3, 17247:6, 17250:6, 17251:14, 17254:24, 17257:8, 17259:21
**leave** [3] - 17191:5, 17198:18, 17220:13
**leaving** [4] - 17186:7, 17198:20, 17200:13, 17229:6
**led** [3] - 17236:13, 17239:23, 17244:3
**left** [10] - 17198:17,

17198:19, 17199:16, 17200:10, 17202:4, 17204:7, 17214:7, 17215:17, 17219:10, 17219:14
**legitimate** [1] - 17246:4
**lesbian** [1] - 17184:12
**less** [5] - 17188:15, 17198:11, 17208:5, 17208:12, 17208:14
**lethal** [1] - 17238:6
**level** [1] - 17240:25
**liability** [1] - 17250:19
**lie** [3] - 17200:17, 17200:19, 17200:20
**life** [3] - 17184:17, 17184:22, 17213:6
**likely** [1] - 17185:3
**limbo** [1] - 17257:20
**limited** [1] - 17221:25
**limits** [1] - 17241:2
**line** [8] - 17228:2, 17228:4, 17228:5, 17232:14, 17232:19, 17261:12
**linebackers** [1] - 17228:5
**lined** [2] - 17209:11, 17255:19
**lines** [3] - 17228:2, 17228:3, 17252:8
**lineup** [1] - 17225:5
**link** [3] - 17229:6, 17236:7, 17236:8
**linkage** [1] - 17234:25
**links** [2] - 17221:18, 17237:11
**Lisa** [9] - 17179:18, 17180:7, 17180:17, 17183:2, 17186:15, 17187:15, 17200:23, 17216:11, 17217:11
**LISA** [1] - 17179:22
**listen** [1] - 17223:24
**litigated** [1] - 17226:2
**live** [5] - 17189:19, 17190:12, 17192:21, 17249:14, 17251:6
**lived** [1] - 17209:10
**Lives** [1] - 17189:18
**lives** [1] - 17193:15
**living** [1] - 17208:16
**Livingston** [1] - 17114:19
**LLC** [1] - 17114:4
**Lloyd** [2] - 17223:9, 17231:4
**local** [1] - 17182:20
**located** [1] - 17190:1

**lockdowns** [2] - 17189:13, 17193:18
**locked** [1] - 17197:23
**Look** [1] - 17253:22
**look** [31] - 17184:5, 17211:23, 17227:6, 17227:13, 17227:14, 17227:19, 17233:24, 17238:25, 17239:9, 17242:24, 17243:23, 17245:25, 17246:8, 17246:12, 17246:22, 17246:24, 17247:1, 17247:4, 17250:21, 17253:17, 17253:19, 17253:20, 17253:22, 17254:17, 17255:7, 17256:19, 17258:24, 17260:4, 17261:12
**looked** [2] - 17192:6, 17197:8
**looking** [4] - 17182:17, 17224:5, 17227:8
**looks** [1] - 17231:5
**loud** [1] - 17221:3
**love** [1] - 17200:15
**loyal** [1] - 17203:5
**loyalty** [1] - 17202:15
**lunch** [1] - 17257:3

## M

**M-A-G-E-E** [1] - 17180:7
**ma'am** [5] - 17179:19, 17179:20, 17188:22, 17202:25, 17217:14
**Madam** [2] - 17217:23, 17218:20
**Magee** [9] - 17179:18, 17180:7, 17201:7, 17206:12, 17206:14, 17207:25, 17210:10, 17210:20, 17213:22
**MAGEE** [1] - 17179:22
**main** [1] - 17241:2
**majority** [1] - 17189:11
**male** [1] - 17187:6
**mama** [1] - 17184:15
**man** [3] - 17194:3, 17201:17, 17229:17
**manner** [1] - 17235:13
**manual** [1] - 17237:18
**March** [1] - 17189:16
**march** [2] - 17219:14, 17219:18
**Maria** [7] - 17181:2, 17181:6, 17182:9,

17187:22, 17188:11, 17188:13, 17188:14
**Marine** [7] - 17182:12, 17201:23, 17202:1, 17202:4, 17202:18, 17203:24, 17204:4
**Marines** [1] - 17204:7
**Mark** [1] - 17235:23
**marked** [5] - 17183:2, 17183:13, 17183:21, 17186:16, 17192:13
**Maryland** [1] - 17208:12
**Mason** [6] - 17186:12, 17186:13, 17187:2, 17187:3, 17187:18, 17187:19
**master** [1] - 17229:7
**math** [2] - 17188:15, 17210:23
**matter** [12] - 17232:7, 17233:20, 17234:11, 17237:9, 17237:13, 17237:16, 17244:10, 17244:14, 17247:11, 17255:15, 17255:21, 17259:17
**Matter** [1] - 17189:18
**matters** [3] - 17220:5, 17235:19, 17259:14
**Matthew** [2] - 17219:5, 17219:8
**mayhem** [1] - 17238:10
**mcCullough** [1] - 17211:5
**McCullough** [42] - 17113:14, 17183:23, 17186:19, 17200:24, 17200:25, 17201:2, 17201:6, 17201:19, 17201:21, 17201:22, 17203:6, 17204:18, 17204:20, 17207:24, 17210:2, 17210:17, 17210:19, 17211:6, 17211:8, 17212:14, 17213:2, 17213:4, 17213:7, 17213:13, 17213:19, 17213:21, 17215:9, 17215:25, 17216:5, 17217:17, 17251:1, 17253:3, 17253:6, 17253:9, 17254:5, 17254:12, 17258:24, 17258:25, 17259:4, 17259:7, 17259:9, 17261:21
**McGuire** [1] - 17114:1
**MD** [1] - 17114:8

**mean** [28] - 17182:1, 17187:15, 17203:15, 17207:12, 17221:1, 17227:2, 17227:15, 17230:16, 17235:2, 17238:22, 17239:20, 17241:23, 17244:10, 17245:25, 17246:4, 17247:23, 17248:1, 17250:8, 17251:11, 17251:19, 17254:18, 17254:21, 17256:24, 17257:1, 17257:8, 17260:15, 17260:18, 17261:19
**meaning** [2] - 17229:25, 17230:2
**means** [4] - 17241:16, 17242:4, 17256:24, 17259:16
**measure** [2] - 17256:21, 17256:22
**media** [1] - 17220:8
**meet** [4] - 17181:11, 17181:18, 17205:22, 17221:19
**meet-ups** [1] - 17205:22
**meeting** [1] - 17180:21
**meetings** [1] - 17196:8
**Meila** [1] - 17186:12
**member** [1] - 17194:11
**members** [1] - 17204:9
**mentioned** [13] - 17182:22, 17187:20, 17187:21, 17203:10, 17205:16, 17205:21, 17206:2, 17207:25, 17208:20, 17209:5, 17234:3, 17254:4
**message** [1] - 17193:12
**met** [6] - 17180:19, 17181:12, 17187:21, 17187:24, 17195:13, 17195:23
**metcalf** [1] - 17218:8
**Metcalf** [20] - 17114:15, 17114:15, 17179:25, 17216:6, 17218:14, 17220:2, 17220:17, 17220:25, 17225:7, 17238:24, 17242:23, 17243:5, 17243:15, 17243:22, 17245:6, 17245:8,

17245:25, 17246:21, 17249:9

**METCALF** [73] - 17179:17, 17180:2, 17180:4, 17182:24, 17183:1, 17183:20, 17184:1, 17186:21, 17186:25, 17187:1, 17188:25, 17200:23, 17202:23, 17204:15, 17207:20, 17207:22, 17209:23, 17210:16, 17210:18, 17212:23, 17215:5, 17215:22, 17216:3, 17216:7, 17216:10, 17217:11, 17218:2, 17218:10, 17218:19, 17218:24, 17221:3, 17222:13, 17223:2, 17223:16, 17223:18, 17223:20, 17223:24, 17224:10, 17224:17, 17224:22, 17225:11, 17226:12, 17227:21, 17227:25, 17228:16, 17228:18, 17228:20, 17228:25, 17229:21, 17230:12, 17231:10, 17231:13, 17232:11, 17232:17, 17233:13, 17234:4, 17235:4, 17235:6, 17235:10, 17237:7, 17237:10, 17237:19, 17237:22, 17238:16, 17239:5, 17240:4, 17240:23, 17241:18, 17241:22, 17248:3, 17248:10, 17252:2, 17252:12

**Metcalf's** [2] - 17213:23, 17239:2

**methods** [1] - 17250:18

**Metropolitan** [1] - 17248:22

**Miami** [1] - 17114:11

**mic** [1] - 17243:3

**microphone** [1] - 17180:10

**midnight** [1] - 17246:9

**midst** [1] - 17182:8

**might** [3] - 17239:23, 17247:10, 17250:5

**miles** [3] - 17192:21, 17192:25, 17206:21

**mind** [1] - 17230:4

**mindset** [1] - 17209:24

**mine** [1] - 17181:13

**mini** [1] - 17207:4

**minimum** [1] - 17226:8

**Mink** [1] - 17114:7

**minute** [1] - 17221:22

**minutes** [2] - 17221:8, 17236:12

**misremembering** [1] - 17253:1

**Mission** [1] - 17182:18

**mitigate** [1] - 17227:4

**mitigates** [2] - 17226:12, 17226:13

**moment** [8] - 17194:5, 17220:21, 17221:5, 17224:13, 17242:4, 17249:11, 17253:20, 17255:7

**Monday** [2] - 17257:5, 17259:25

**Monroe** [1] - 17191:20

**Montgomery** [1] - 17183:7

**months** [4] - 17188:5, 17188:16, 17194:18, 17194:19

**Monument** [3] - 17219:11, 17244:19, 17244:21

**Moore** [1] - 17113:20

**morning** [9] - 17189:5, 17192:10, 17198:22, 17219:9, 17220:6, 17220:12, 17239:10, 17246:10, 17247:7

**most** [4] - 17237:1, 17243:6, 17255:8, 17258:12

**motions** [1] - 17223:11

**move** [6] - 17183:20, 17218:13, 17230:17, 17254:25, 17255:11, 17259:15

**moved** [5] - 17187:25, 17188:6, 17188:7, 17188:9, 17188:12

**movement** [2] - 17230:3, 17231:18

**moving** [1] - 17188:4

**MR** [124] - 17179:17, 17180:2, 17180:4, 17182:24, 17183:1, 17183:20, 17183:23, 17184:1, 17186:19, 17186:21, 17186:25, 17187:1, 17188:25, 17200:23, 17201:2, 17201:6, 17201:21, 17201:22, 17202:23,

17203:6, 17204:15, 17204:20, 17207:20, 17207:22, 17207:24, 17209:23, 17210:2, 17210:16, 17210:17, 17210:18, 17210:19, 17211:2, 17211:6, 17211:8, 17212:14, 17212:23, 17213:7, 17213:13, 17213:19, 17213:21, 17215:5, 17215:9, 17215:22, 17215:25, 17216:3, 17216:5, 17216:7, 17216:10, 17217:11, 17218:2, 17218:10, 17218:19, 17218:24, 17221:3, 17222:13, 17223:2, 17223:16, 17223:18, 17223:20, 17223:24, 17224:10, 17224:17, 17224:22, 17225:11, 17226:12, 17227:21, 17227:25, 17228:16, 17228:18, 17228:20, 17228:25, 17229:21, 17230:12, 17231:10, 17231:13, 17232:11, 17232:17, 17233:13, 17234:4, 17235:4, 17235:6, 17235:10, 17237:7, 17237:10, 17237:19, 17237:22, 17238:16, 17239:3, 17239:5, 17240:4, 17240:23, 17241:18, 17241:22, 17243:2, 17243:21, 17244:10, 17245:15, 17245:21, 17246:18, 17246:23, 17248:3, 17248:10, 17248:20, 17249:3, 17249:22, 17250:3, 17250:11, 17250:15, 17251:1, 17251:19, 17251:25, 17252:2, 17252:12, 17253:3, 17253:6, 17253:9, 17254:5, 17254:12, 17256:14, 17258:25, 17259:4, 17259:7, 17259:9, 17261:21

**MS** [17] - 17212:11, 17247:14, 17247:17, 17247:22, 17249:15, 17253:8, 17255:4, 17255:14, 17256:6, 17256:10, 17258:7, 17258:9, 17259:23, 17260:10, 17260:12,

17261:5, 17261:15

**MT** [1] - 17114:19

**Mulroe** [5] - 17113:17

**must** [5] - 17182:2, 17188:14, 17189:8, 17239:5

## N

**N.W** [1] - 17262:12

**Nadia** [1] - 17113:20

**nadia.moore@usdoj. gov** [1] - 17113:22

**name** [12] - 17180:5, 17181:1, 17184:8, 17184:11, 17195:14, 17195:15, 17195:23, 17197:4, 17198:5, 17217:2, 17217:3

**named** [1] - 17195:8

**names** [1] - 17195:20

**natural** [1] - 17225:19

**Nayib** [2] - 17114:9, 17114:10

**nds@ davidbsmithpllc.com** [1] - 17113:25

**necessarily** [1] - 17210:8

**necessary** [1] - 17233:1

**need** [20] - 17187:16, 17199:7, 17200:25, 17210:15, 17236:20, 17237:5, 17243:19, 17245:17, 17248:2, 17249:7, 17251:23, 17251:24, 17252:7, 17254:4, 17255:11, 17255:22, 17258:5, 17260:5, 17261:6

**needed** [1] - 17207:14

**Needler** [1] - 17206:10

**needs** [4] - 17221:23, 17233:4, 17252:9, 17253:15

**negate** [9] - 17222:9, 17225:17, 17225:21, 17226:6, 17231:9, 17231:22, 17235:1, 17244:25

**negates** [5] - 17232:6, 17232:10, 17234:2, 17241:21, 17244:5

**negating** [2] - 17234:23, 17234:24

**negotiate** [1] - 17260:3

**neighboring** [2] - 17207:18, 17208:5

**never** [4] - 17194:20, 17200:20, 17211:24, 17213:5
**new** [5] - 17189:7, 17194:6, 17198:15, 17198:16, 17255:21
**New** [17] - 17113:18, 17113:25, 17114:5, 17114:16, 17182:19, 17183:8, 17197:16, 17197:23, 17197:24, 17197:25, 17198:3, 17207:1, 17207:4, 17207:8, 17208:3, 17208:14, 17219:4
**News** [1] - 17193:20
**newspaper** [1] - 17196:20
**next** [10] - 17189:7, 17236:2, 17236:14, 17241:8, 17242:2, 17248:6, 17254:25, 17259:1, 17259:3, 17259:4
**Nicholas** [1] - 17113:23
**night** [6] - 17189:3, 17193:20, 17200:8, 17200:9, 17200:11, 17219:6
**nine** [2] - 17188:16
**non** [3] - 17230:5, 17230:6, 17260:20
**non-agitator** [1] - 17230:6
**non-agitators** [1] - 17230:5
**nonexpert** [3] - 17235:20, 17235:21, 17240:14
**nonlethal** [1] - 17238:5
**nonstop** [1] - 17260:3
**Nordean** [2] - 17113:6, 17113:23
**normal** [1] - 17196:5
**Norman** [1] - 17114:3
**North** [2] - 17206:24, 17216:12
**note** [2] - 17245:2, 17250:11
**notebook** [5] - 17210:10, 17210:21, 17210:22, 17212:1
**noted** [1] - 17226:2
**notes** [3] - 17210:23, 17211:19, 17262:5
**nothing** [2] - 17243:10, 17258:18
**notice** [11] - 17243:11,

17243:13, 17243:14, 17243:17, 17243:23, 17246:3, 17246:5, 17250:13, 17251:16
**noticed** [1] - 17252:6
**noting** [1] - 17245:16
**notion** [1] - 17244:4
**November** [6] - 17194:15, 17195:6, 17195:7, 17195:23, 17196:10, 17205:11
**npattis@ pattisandsmith.com** [1] - 17114:5
**Number** [3] - 17219:3, 17228:25, 17229:2
**number** [13] - 17219:6, 17219:9, 17219:13, 17219:16, 17219:19, 17219:23, 17229:2, 17240:6, 17240:7, 17240:9, 17240:10, 17243:16
**NW** [4] - 17113:15, 17113:18, 17114:2, 17114:10
**NY** [3] - 17113:21, 17113:25, 17114:16

## O

**o'clock** [7] - 17189:5, 17201:10, 17247:25, 17248:5, 17251:9, 17258:3, 17261:24
**Oath** [1] - 17253:11
**oath** [4] - 17203:24, 17204:1, 17204:7, 17204:9
**objecting** [1] - 17250:13
**objection** [11] - 17183:23, 17186:19, 17204:15, 17207:20, 17209:23, 17211:2, 17212:11, 17213:18, 17215:22, 17216:3, 17246:23
**obstruct** [2] - 17222:16, 17229:9
**obtain** [1] - 17182:9
**obvious** [1] - 17239:13
**obviously** [5] - 17180:19, 17252:20, 17252:21, 17255:22, 17261:3
**occurred** [1] - 17192:22
**Ode** [1] - 17235:23

**OF** [3] - 17113:1, 17113:10, 17262:1
**Off-the-record** [1] - 17245:19
**offense** [1] - 17225:18
**office** [1] - 17191:23
**Office** [2] - 17113:20, 17114:7
**Officer** [2] - 17230:16, 17253:10
**officer** [8] - 17223:9, 17226:20, 17232:18, 17232:20, 17238:18, 17238:19, 17244:18, 17251:7
**officers** [14] - 17223:8, 17228:4, 17228:11, 17229:13, 17231:16, 17231:18, 17232:14, 17232:17, 17232:19, 17234:8, 17234:13, 17240:8, 17248:21, 17256:8
**Offices** [1] - 17114:10
**OFFICIAL** [1] - 17262:1
**Official** [1] - 17262:11
**officials** [1] - 17222:16
**often** [1] - 17243:9
**Ohio** [1] - 17249:25
**old** [7] - 17180:17, 17180:18, 17180:24, 17182:3, 17182:4, 17182:11, 17188:16
**oldest** [1] - 17181:1, 17182:9
**Olympics** [1] - 17184:13
**once** [1] - 17200:12
**one** [34] - 17181:19, 17182:22, 17183:12, 17184:4, 17190:3, 17192:22, 17193:7, 17206:4, 17206:7, 17211:14, 17211:19, 17221:18, 17222:25, 17225:17, 17226:6, 17228:2, 17228:8, 17229:13, 17232:11, 17232:25, 17234:2, 17236:7, 17240:6, 17241:3, 17241:5, 17243:16, 17245:2, 17245:7, 17251:14, 17251:15, 17254:5, 17254:18, 17261:20
**open** [6] - 17186:5, 17198:1, 17212:17, 17213:20, 17245:9, 17246:19

**Open** [1] - 17218:11
**opened** [1] - 17186:7
**opportunity** [1] - 17244:25
**opposition** [1] - 17245:6
**Orange** [1] - 17114:4
**order** [5] - 17220:23, 17226:25, 17230:22, 17233:4, 17247:13
**ordered** [1] - 17233:13
**orders** [2] - 17223:7, 17228:10
**otherwise** [2] - 17254:10, 17255:23
**outdoor** [1] - 17190:5
**outside** [9] - 17181:23, 17191:9, 17209:11, 17220:5, 17224:14, 17236:23, 17237:1, 17243:10
**overnight** [3] - 17239:9, 17242:23, 17254:13
**overnights** [1] - 17192:11
**overrule** [1] - 17213:18
**overruled** [6] - 17204:17, 17207:21, 17207:23, 17209:25, 17212:12, 17215:7
**own** [4] - 17186:5, 17186:8, 17202:4, 17202:5
**Ox** [1] - 17190:11

## P

**P.A** [2] - 17114:10, 17114:12
**P.C** [1] - 17114:15
**p.m** [2] - 17113:8, 17219:16
**page** [8] - 17183:12, 17196:20, 17211:14, 17211:19, 17212:1, 17212:15, 17213:10
**pages** [5] - 17183:21, 17186:17, 17211:23, 17256:21, 17256:22
**panes** [1] - 17249:24
**pardon** [2] - 17208:9, 17213:22
**Park** [1] - 17114:16
**part** [16] - 17195:1, 17201:16, 17204:4, 17220:19, 17222:15, 17229:7, 17229:9, 17233:11, 17234:19,

17237:17, 17240:23,
17240:25, 17242:3,
17253:18, 17255:18,
17259:17
  **particular** [7] -
17206:13, 17220:9,
17221:24, 17232:6,
17235:22, 17241:15,
17253:1
  **parties** [9] - 17220:22,
17220:23, 17247:12,
17257:17, 17257:18,
17257:19, 17258:16,
17258:17, 17259:20
  **parts** [2] - 17257:14,
17257:16
  **party** [3] - 17181:13,
17181:14, 17181:16
  **pass** [2] - 17184:25,
17185:4
  **passed** [4] - 17184:18,
17184:19, 17184:20,
17185:1
  **passing** [1] - 17181:21
  **Passover** [1] -
17247:18
  **past** [4] - 17215:6,
17232:18, 17247:25,
17252:21
  **path** [1] - 17193:7
  **patio** [1] - 17190:5
  **PATTIS** [8] - 17211:2,
17239:3, 17246:18,
17246:23, 17248:20,
17251:19, 17251:25,
17256:14
  **Pattis** [12] - 17114:3,
17114:4, 17211:7,
17218:5, 17239:2,
17246:19, 17249:12,
17250:23, 17254:3,
17256:13, 17256:19,
17261:8
  **pause** [3] - 17212:6,
17220:15, 17224:13
  **paying** [1] - 17204:11
  **PC** [1] - 17114:1
  **Peace** [3] - 17219:18,
17219:20, 17219:21
  **Peek** [3] - 17183:19,
17184:11
  **Pennsylvania** [2] -
17207:18, 17208:5
  **Pennsylvania's** [1] -
17208:7
  **people** [22] -
17190:16, 17196:5,
17196:6, 17199:8,
17209:8, 17217:6,
17224:7, 17226:17,

17230:25, 17231:1,
17231:3, 17231:14,
17231:15, 17231:21,
17231:25, 17232:1,
17234:10, 17236:2,
17237:24, 17238:1,
17240:24
  **people's** [2] - 17191:7,
17195:20
  **perfect** [3] - 17218:22
  **period** [1] - 17236:9
  **perjure** [1] - 17200:21
  **permission** [2] -
17183:24, 17186:23
  **permits** [1] - 17253:10
  **person** [7] - 17183:10,
17193:18, 17197:12,
17241:5, 17241:15,
17241:19, 17244:22
  **personal** [2] -
17191:7, 17208:15
  **perspective** [4] -
17221:7, 17250:23,
17254:17, 17257:22
  **pertinent** [1] -
17191:22
  **petrified** [1] -
17209:19
  **Pezzola** [89] - 17113:8,
17114:15, 17179:16,
17179:18, 17180:22,
17181:9, 17183:3,
17183:13, 17183:22,
17184:4, 17186:16,
17187:21, 17187:24,
17188:10, 17192:14,
17201:14, 17201:16,
17203:7, 17203:16,
17204:1, 17204:6,
17204:10, 17204:13,
17204:22, 17205:7,
17205:10, 17205:19,
17205:24, 17206:21,
17207:10, 17207:12,
17207:14, 17207:17,
17208:17, 17209:2,
17209:15, 17209:21,
17210:3, 17210:6,
17211:20, 17212:2,
17212:8, 17212:15,
17213:24, 17214:7,
17214:22, 17215:1,
17215:3, 17215:11,
17215:14, 17215:20,
17216:1, 17218:8,
17218:14, 17219:2,
17219:3, 17219:7,
17219:9, 17219:13,
17219:16, 17219:20,
17221:9, 17222:1,

17222:6, 17222:18,
17224:4, 17225:20,
17226:17, 17228:21,
17230:14, 17230:15,
17232:22, 17233:6,
17233:9, 17236:2,
17236:6, 17238:11,
17242:11, 17244:3,
17244:19, 17244:21,
17248:6, 17248:14,
17250:12, 17251:6,
17251:14, 17253:21
  **Pezzola's** [8] -
17204:6, 17206:2,
17209:23, 17218:24,
17218:25, 17222:14,
17222:24
  **phone** [4] - 17191:5,
17201:1, 17215:21,
17216:1
  **photo** [5] - 17183:4,
17183:5, 17183:6,
17186:17, 17186:18
  **photograph** [8] -
17183:7, 17183:14,
17183:16, 17183:17,
17184:3, 17185:5,
17187:18, 17196:22
  **photographed** [1] -
17196:19
  **photographs** [4] -
17182:17, 17182:23,
17185:9, 17222:6
  **phraseology** [1] -
17213:23
  **physical** [2] - 17232:3,
17232:5
  **physically** [2] -
17229:16, 17234:9
  **physics** [1] - 17231:25
  **picked** [1] - 17216:21
  **picture** [3] - 17226:16,
17236:8, 17252:10
  **pictured** [1] -
17186:12
  **pictures** [1] - 17222:4
  **piece** [1] - 17256:18
  **pieces** [1] - 17248:11
  **pin** [1] - 17226:9
  **pissed** [1] - 17238:2
  **place** [6] - 17205:23,
17208:21, 17224:15,
17226:25, 17229:12,
17235:1
  **placed** [2] - 17218:3,
17228:9
  **Plaintiff** [2] - 17113:4,
17113:14
  **plan** [7] - 17229:7,
17242:3, 17247:12,

17251:23, 17251:25,
17254:25, 17259:20
  **planned** [1] -
17259:14
  **planning** [2] -
17200:12, 17258:4
  **plates** [1] - 17190:15
  **play** [1] - 17249:14
  **Plaza** [1] - 17113:21
  **PLLC** [1] - 17113:23
  **plug** [1] - 17259:19
  **point** [38] - 17182:2,
17182:3, 17191:4,
17193:15, 17199:14,
17199:15, 17199:19,
17209:24, 17213:9,
17221:1, 17221:6,
17222:17, 17226:5,
17227:12, 17227:16,
17227:22, 17227:23,
17229:17, 17230:13,
17231:4, 17232:18,
17234:13, 17238:6,
17241:3, 17241:12,
17245:18, 17246:4,
17246:7, 17246:9,
17248:4, 17248:17,
17252:9, 17257:6,
17258:13, 17260:23,
17260:24, 17261:2
  **pointing** [2] -
17223:10, 17223:11
  **points** [3] - 17227:9,
17230:1, 17243:11
  **police** [19] - 17191:7,
17219:20, 17221:19,
17223:4, 17228:1,
17228:2, 17231:10,
17235:7, 17235:11,
17237:15, 17238:3,
17238:9, 17240:6,
17241:14, 17244:1,
17244:2, 17244:4,
17244:20
  **Police** [3] - 17248:22,
17253:7, 17253:9
  **policies** [6] -
17207:25, 17208:2,
17208:5, 17208:7,
17208:9, 17208:11
  **policy** [11] - 17228:11,
17231:11, 17235:7,
17236:18, 17237:2,
17237:8, 17237:14,
17237:17, 17242:10,
17243:10, 17243:18
  **politics** [5] - 17193:21,
17193:24, 17193:25,
17204:11, 17204:23
  **portions** [1] -

17252:14
**position** [5] -
17200:21, 17241:25,
17244:3, 17250:5,
17254:24
**possess** [1] -
17214:11
**possession** [3] -
17222:7, 17226:19,
17242:16
**possible** [5] -
17230:19, 17237:4,
17250:22, 17257:10,
17260:25
**possibly** [2] - 17199:5,
17239:17
**Post** [2] - 17196:19,
17197:7
**potential** [1] -
17239:13
**power** [1] - 17214:11
**preclude** [3] -
17245:5, 17245:10,
17246:13
**preparatory** [1] -
17182:19
**prepare** [1] - 17256:16
**presence** [1] - 17252:6
**present** [7] - 17218:8,
17218:15, 17218:17,
17223:2, 17223:12,
17249:5, 17251:13
**presented** [1] -
17242:18
**presents** [1] -
17198:24
**press** [3] - 17255:24,
17256:3, 17256:5
**pretrial** [2] - 17191:20,
17259:17
**pretty** [1] - 17260:5
**prevailed** [1] -
17221:13
**prime** [1] - 17223:9
**problem** [2] - 17226:1,
17246:3
**problems** [1] -
17241:6
**procedure** [1] -
17240:25
**procedures** [1] -
17240:10
**proceed** [4] -
17179:25, 17211:5,
17220:23, 17254:16
**proceeded** [1] -
17182:20
**proceedings** [1] -
17262:6
**proceeds** [1] -

17192:24
**produced** [2] -
17183:21, 17186:21
**productive** [3] -
17255:8, 17258:20,
17258:22
**proffer** [1] - 17253:13
**proffered** [1] -
17243:15, 17244:8
**progress** [1] -
17258:19
**progressed** [1] -
17188:5
**prohibited** [1] -
17239:21
**project** [1] - 17206:19
**projected** [1] -
17180:10
**projectile** [2] -
17240:1, 17241:8
**proper** [1] - 17246:16
**property** [1] -
17238:19
**protect** [3] - 17196:5,
17210:3, 17210:7
**protest** [2] - 17189:18,
17190:25
**protesters** [1] -
17190:14
**protests** [1] - 17191:6
**protocol** [2] -
17240:10, 17240:24
**Proud** [22] - 17194:10,
17194:11, 17194:14,
17195:1, 17195:7,
17196:3, 17196:12,
17196:14, 17196:18,
17197:1, 17197:4,
17197:19, 17199:5,
17205:16, 17205:19,
17205:23, 17205:25,
17212:2, 17214:14,
17214:16, 17214:17,
17214:19
**proved** [1] - 17227:5
**proven** [1] - 17227:14
**provide** [2] - 17189:3,
17225:22
**provided** [2] -
17246:3, 17249:6
**provides** [1] - 17234:7
**proving** [1] - 17250:18
**public** [1] - 17218:21
**Public** [2] - 17190:1,
17190:3
**publication** [1] -
17186:20
**publish** [2] -
17183:25, 17186:24
**pull** [1] - 17259:19

**pulled** [3] - 17189:11,
17231:17, 17235:24
**punched** [1] - 17197:4
**punching** [1] -
17197:1
**punt** [1] - 17257:18
**purported** [1] -
17243:7
**purpose** [3] - 17206:4,
17207:2, 17207:3
**purposes** [4] -
17206:4, 17206:7,
17258:1, 17258:4
**pursuing** [3] -
17245:17, 17245:22,
17245:23
**pushback** [1] -
17253:18
**pushes** [1] - 17238:9
**pushing** [2] -
17231:17, 17241:2
**put** [13] - 17196:20,
17200:20, 17205:5,
17210:15, 17227:17,
17244:18, 17246:20,
17248:12, 17252:3,
17252:18, 17253:13,
17253:21, 17255:20
**puts** [1] - 17246:21
**putting** [7] - 17189:13,
17220:21, 17247:8,
17247:9, 17249:10,
17249:13, 17261:15

## Q

**Quaglin** [2] - 17225:2,
17241:3
**questioning** [1] -
17221:14
**questions** [1] -
17216:5
**quick** [1] - 17235:19
**quickly** [5] - 17188:5,
17233:8, 17241:7,
17245:1, 17247:5
**quite** [6] - 17185:22,
17191:16, 17195:15,
17226:3, 17226:4,
17243:9

## R

**raise** [1] - 17179:21
**raised** [3] - 17180:22,
17245:3, 17254:6
**raising** [2] - 17188:11,
17188:17
**rallies** [2] - 17196:5,
17205:21

**rally** [3] - 17194:24,
17205:11, 17205:13
**ran** [1] - 17186:8
**Ray** [1] - 17250:3
**reached** [2] - 17218:7,
17218:13
**react** [1] - 17239:23
**reacting** [3] -
17240:17, 17240:20,
17240:21
**reaction** [3] -
17240:11, 17240:16
**read** [5] - 17211:24,
17212:24, 17213:5,
17213:13, 17218:17
**reader** [1] - 17212:4
**ready** [2] - 17249:9,
17249:25
**real** [1] - 17200:3
**really** [13] - 17197:21,
17208:15, 17209:13,
17210:23, 17217:11,
17221:19, 17236:23,
17240:20, 17241:2,
17241:16, 17246:13,
17246:20, 17257:21
**realm** [1] - 17244:19
**reason** [8] - 17195:3,
17200:20, 17232:19,
17234:15, 17234:16,
17239:19, 17245:17,
17245:18
**reasonable** [4] -
17222:22, 17233:5,
17242:19, 17253:24
**reasons** [1] - 17256:1
**rebuttal** [1] - 17261:16
**receive** [3] - 17242:24,
17257:8, 17260:19
**received** [2] - 17191:5,
17250:13
**recently** [1] - 17184:18
**recognize** [8] -
17183:4, 17183:5,
17186:17, 17210:13,
17210:20, 17211:10,
17211:15, 17211:21
**recollection** [2] -
17196:10, 17196:11
**recommendations** [1]
- 17191:25
**record** [4] - 17180:6,
17222:5, 17245:19,
17252:5
**recovered** [1] -
17210:11
**redirect** [1] - 17216:6
**REDIRECT** [1] -
17216:9
**referee** [1] - 17250:16

referenced [1] - 17227:9
referring [1] - 17253:4
regard [3] - 17233:6, 17235:7, 17255:20
regarding [4] - 17218:25, 17220:8, 17232:10, 17251:16
regardless [1] - 17237:21
regards [4] - 17222:25, 17233:16, 17235:8, 17236:17
regular [1] - 17215:21
Rehl [3] - 17113:7, 17114:6, 17260:13
relationship [3] - 17188:5, 17214:17, 17214:18
release [3] - 17191:20, 17191:25, 17217:22
relevance [5] - 17207:22, 17212:23, 17233:16, 17234:21, 17234:22
relevant [8] - 17228:15, 17228:20, 17229:11, 17232:1, 17232:4, 17233:16, 17237:12, 17239:18
relief [1] - 17201:11
remaining [1] - 17256:23
remember [6] - 17196:23, 17197:11, 17198:14, 17198:17, 17198:21, 17216:17
reminder [1] - 17220:7
remove [2] - 17241:7, 17241:18
removed [2] - 17240:24, 17241:19
rental [1] - 17197:14
repeat [3] - 17210:1, 17215:8, 17218:6
repeatedly [1] - 17250:12
rephrase [2] - 17204:21
Reporter [2] - 17114:21, 17262:11
REPORTER [2] - 17232:16, 17262:1
represent [1] - 17248:23
representation [1] - 17261:21
representations [1] - 17261:20
require [3] - 17252:5,

17257:16, 17257:18
rescue [12] - 17232:13, 17232:21, 17234:3, 17234:12, 17235:22, 17235:23, 17235:25, 17236:1, 17243:8, 17243:11
reserve [1] - 17247:10
residential [1] - 17188:13
resolution [1] - 17256:2
resolve [3] - 17220:20, 17254:11, 17258:10
resolved [3] - 17248:25, 17251:6, 17256:24
respect [3] - 17243:25, 17251:7, 17254:9
respected [1] - 17184:16
respond [1] - 17199:11
response [1] - 17243:4
responsibilities [2] - 17191:19, 17199:9
rest [6] - 17240:1, 17240:19, 17250:6, 17250:7, 17258:8, 17258:21
restaurant [4] - 17181:18, 17181:20, 17190:11, 17198:1
restaurants [5] - 17190:13, 17190:15, 17190:21, 17209:11, 17209:12
resting [1] - 17254:24
restrictions [1] - 17208:16
restrictive [4] - 17208:3, 17208:6, 17208:12, 17208:14
result [1] - 17238:21
return [1] - 17191:25
returned [2] - 17215:3, 17215:11
Rhoney [2] - 17217:1, 17217:3
rid [1] - 17216:1
ridiculous [1] - 17195:16
ridiculously [1] - 17237:12
rile [1] - 17229:14
riled [1] - 17238:8
riot [3] - 17232:10, 17242:2, 17242:14
riots [2] - 17190:8,

17191:16
RMR [1] - 17114:21
road [4] - 17192:22, 17192:25, 17193:4, 17193:5
Road [1] - 17114:7
rob [4] - 17223:21, 17226:23, 17238:19, 17238:22
robbed [1] - 17222:1
robbery [14] - 17222:11, 17222:13, 17229:2, 17231:9, 17232:25, 17233:19, 17234:23, 17235:2, 17235:18, 17241:20, 17241:22, 17241:24, 17244:23
robs [1] - 17244:22
Rochester [6] - 17182:19, 17183:8, 17189:17, 17190:1, 17190:8, 17207:1
Roger [2] - 17114:17, 17114:18
rogerisaacroots@ outlook.com [1] - 17114:19
roles [1] - 17235:21
room [2] - 17197:13, 17219:7
Room [1] - 17262:12
ROOTS [3] - 17249:22, 17250:3, 17250:15
Roots [4] - 17114:17, 17114:18, 17245:9, 17249:21
rule [4] - 17239:12, 17243:12, 17251:14, 17254:13
ruled [1] - 17226:3
ruling [3] - 17239:10, 17256:7, 17256:8
rumor [1] - 17184:19
run [2] - 17191:23, 17244:20
running [1] - 17195:7
runs [1] - 17244:22
Ryan [6] - 17224:7, 17224:9, 17224:12, 17224:14, 17224:19, 17224:25

## S

Sabino [1] - 17114:12
sabino@jaureguilaw .com [1] - 17114:14
safety [1] - 17189:21

Safety [2] - 17190:1, 17190:3
sake [1] - 17244:1
Samsel [6] - 17224:8, 17224:9, 17224:12, 17224:14, 17224:19, 17224:25
sanctuary [1] - 17212:17
sat [1] - 17230:16
Saturday [6] - 17192:7, 17192:9, 17192:10, 17215:17, 17257:12
Sauer [8] - 17219:1, 17219:4, 17219:7, 17219:10, 17219:14, 17219:17, 17219:20, 17219:23
savvy [1] - 17197:12
saw [5] - 17197:3, 17204:13, 17205:4, 17205:10, 17211:24
scared [1] - 17210:6
scary [1] - 17208:25
scenario [11] - 17215:22, 17218:2, 17221:22, 17224:24, 17225:4, 17226:24, 17230:13, 17233:3, 17233:9, 17236:12, 17238:16
scenarios [4] - 17226:19, 17229:12, 17232:5, 17240:13
scene [2] - 17224:23
scenes [1] - 17227:8
schedule [1] - 17261:13
school [13] - 17181:5, 17181:6, 17181:7, 17182:15, 17182:16, 17182:18, 17182:19, 17182:20, 17185:8, 17185:11, 17185:12, 17199:17, 17199:20
schools [1] - 17189:12
schoolwork [1] - 17199:25
scope [5] - 17215:5, 17215:7, 17215:23, 17216:4, 17249:18
scream [1] - 17229:19
screen [4] - 17182:24, 17184:5, 17218:21
scrimmage [1] - 17232:14
seal [2] - 17247:11, 17255:21
sealed [2] - 17255:15,

17258:5
  **SEALED** [1] - 17113:6
  **seated** [2] - 17179:14,
17220:14
  **second** [8] - 17181:8,
17182:22, 17183:10,
17183:12, 17212:4,
17212:15, 17224:23,
17241:24
  **seconds** [2] -
17244:11, 17244:14
  **Seders** [1] - 17247:20
  **see** [31] - 17183:14,
17184:6, 17192:15,
17192:16, 17193:15,
17196:25, 17200:20,
17201:17, 17212:18,
17212:19, 17212:23,
17220:6, 17220:12,
17224:17, 17225:4,
17225:5, 17225:6,
17226:18, 17232:17,
17232:20, 17245:4,
17246:14, 17246:15,
17246:17, 17247:5,
17254:23, 17261:9,
17261:17, 17261:23
  **seeing** [2] - 17230:24,
17239:16
  **seek** [2] - 17252:3,
17253:12
  **seeking** [1] - 17253:13
  **seem** [2] - 17254:15,
17254:21
  **self** [20] - 17221:11,
17221:12, 17223:15,
17223:22, 17223:25,
17225:9, 17225:11,
17225:18, 17225:22,
17225:23, 17234:2,
17234:16, 17234:20,
17237:4, 17238:17,
17239:13, 17245:3,
17245:4, 17245:9
  **self-defense** [20] -
17221:11, 17221:12,
17223:15, 17223:22,
17223:25, 17225:9,
17225:11, 17225:18,
17225:22, 17225:23,
17234:2, 17234:16,
17234:20, 17237:4,
17238:17, 17239:13,
17245:3, 17245:4,
17245:9
  **semester** [1] - 17181:8
  **send** [1] - 17253:25
  **sending** [1] -
17193:13
  **sense** [7] - 17180:11,

17246:15, 17251:11,
17251:13, 17251:16,
17255:20, 17255:24
  **sent** [2] - 17189:21,
17193:11
  **sentences** [1] -
17239:4
  **service** [1] - 17204:8
  **set** [7] - 17190:2,
17191:8, 17191:9,
17218:2, 17221:18,
17234:8, 17242:12
  **setup** [1] - 17240:7
  **seven** [4] - 17187:14,
17192:21, 17192:25,
17205:22
  **several** [2] - 17217:10,
17249:22
  **shape** [1] - 17244:23
  **share** [3] - 17205:8,
17215:14, 17244:4
  **shared** [5] - 17182:24,
17204:6, 17213:14,
17213:17, 17213:24
  **shield** [33] - 17197:22,
17206:8, 17206:12,
17206:13, 17206:15,
17206:22, 17207:3,
17207:6, 17208:17,
17222:2, 17222:7,
17225:21, 17225:23,
17226:21, 17227:15,
17227:20, 17229:7,
17231:16, 17231:21,
17232:10, 17233:7,
17233:9, 17233:19,
17233:21, 17233:23,
17233:24, 17234:15,
17238:13, 17242:2,
17242:14, 17242:17,
17244:3, 17244:17
  **shoot** [7] - 17229:17,
17229:18, 17229:21,
17230:2, 17230:3,
17261:1
  **shooting** [1] - 17230:4
  **short** [2] - 17216:7,
17236:9
  **shortly** [2] - 17193:14,
17219:19
  **shot** [11] - 17181:25,
17224:19, 17229:22,
17230:5, 17230:6,
17230:9, 17231:2,
17237:25, 17238:7
  **shots** [7] - 17223:11,
17230:7, 17238:5,
17238:6, 17241:1,
17241:4
  **shoves** [1] - 17238:9

  **show** [6] - 17182:22,
17183:11, 17183:12,
17186:15, 17224:18
  **showed** [3] - 17196:3,
17196:22, 17252:14
  **showing** [3] - 17183:2,
17186:14, 17210:14
  **shown** [3] - 17192:13,
17226:15, 17228:7
  **shows** [4] - 17227:14,
17231:10, 17233:1,
17240:10
  **shut** [1] - 17191:16
  **sic** [3] - 17224:18,
17231:2, 17237:24
  **side** [3] - 17221:5,
17221:25, 17258:9
  **sidebar** [1] - 17217:19
  **sides** [2] - 17205:3,
17227:7
  **sidewalk** [1] -
17209:12
  **signal** [1] - 17229:24
  **significance** [1] -
17191:11
  **similar** [2] - 17227:6,
17252:23
  **simple** [1] - 17230:18
  **simply** [2] - 17218:5,
17250:15
  **single** [5] - 17182:8,
17182:12, 17229:9,
17230:9, 17239:17
  **sit** [1] - 17209:10
  **sitting** [4] - 17190:16,
17194:8, 17259:2,
17259:10
  **situation** [12] -
17203:4, 17207:13,
17207:14, 17218:4,
17238:3, 17238:4,
17242:6, 17242:8,
17245:5, 17251:15,
17252:24, 17260:8
  **six** [4] - 17188:12,
17192:21, 17192:25,
17205:22
  **Sixth** [1] - 17114:16
  **skepticism** [1] -
17244:4
  **skip** [1] - 17251:17
  **sleep** [1] - 17189:6
  **slow** [2] - 17212:4,
17232:16
  **small** [1] - 17244:9
  **smashed** [1] -
17190:14
  **Smith** [4] - 17113:23,
17113:23, 17114:4,
17227:7

  **snaking** [1] - 17246:6
  **snaps** [1] - 17224:2
  **snowstorm** [1] -
17242:10
  **snuggle** [1] -
17187:19
  **so..** [2] - 17207:9,
17220:24
  **someone** [11] -
17201:23, 17216:21,
17225:24, 17226:21,
17227:10, 17229:23,
17232:5, 17232:12,
17238:6, 17244:20,
17252:24
  **sometime** [2] -
17244:12, 17244:14
  **sometimes** [1] -
17189:4
  **somewhere** [1] -
17209:8
  **sorry** [18] - 17180:15,
17186:14, 17187:11,
17187:15, 17201:20,
17202:11, 17202:12,
17208:10, 17211:1,
17211:17, 17213:22,
17216:11, 17217:24,
17228:17, 17238:23,
17255:2, 17255:4,
17259:3
  **sort** [3] - 17227:7,
17227:9, 17257:18
  **sorts** [1] - 17232:5
  **sounding** [1] -
17251:3
  **sounds** [7] -
17208:23, 17244:8,
17245:17, 17245:21,
17250:8, 17250:22,
17254:2
  **south** [1] - 17197:25
  **spaces** [1] - 17185:21
  **sparked** [1] - 17231:7
  **sparred** [1] - 17183:18
  **sparring** [1] -
17183:17
  **speaking** [1] -
17224:24
  **Special** [3] - 17206:10,
17253:14
  **specific** [8] -
17209:24, 17221:8,
17228:3, 17230:20,
17230:22, 17232:22,
17242:11, 17252:13
  **specifically** [3] -
17229:1, 17229:14,
17229:15
  **specifics** [1] -

17243:22
**speculation** [1] - 17207:20
**spell** [2] - 17180:5
**spend** [2] - 17257:11, 17258:20
**split** [2] - 17204:24, 17241:24
**spot** [1] - 17242:12
**staff** [1] - 17257:6
**stairs** [1] - 17238:2, 17242:1
**stand** [5] - 17179:18, 17179:20, 17232:13, 17235:24, 17252:4
**standards** [1] - 17243:21
**standing** [3] - 17236:2, 17237:24, 17238:11
**start** [8] - 17189:7, 17196:8, 17238:8, 17241:1, 17247:3, 17247:4, 17256:18, 17256:23
**started** [10] - 17181:8, 17188:11, 17190:22, 17193:19, 17194:10, 17202:4, 17228:5, 17234:9, 17235:12, 17241:4
**starting** [1] - 17188:4
**starts** [1] - 17237:10
**State** [2] - 17192:23, 17246:24
**state** [1] - 17180:5
**State-Created** [1] - 17246:24
**statements** [1] - 17211:25
**STATES** [2] - 17113:1, 17113:12
**states** [2] - 17212:13, 17212:19
**States** [1] - 17113:3
**stay** [4] - 17184:3, 17203:4, 17215:12, 17248:1
**stayed** [1] - 17219:7
**staying** [1] - 17200:12
**stays** [1] - 17233:9
**steal** [3] - 17223:20, 17242:2, 17245:1
**stems** [1] - 17222:17
**stenographic** [1] - 17262:5
**step** [2] - 17207:15, 17217:14
**stepmother** [1] - 17198:25

**stepped** [1] - 17207:10
**Steven** [2] - 17114:15, 17252:3
**stick** [1] - 17220:17
**sticks** [1] - 17190:9
**still** [9] - 17185:12, 17185:17, 17198:1, 17199:14, 17199:25, 17200:15, 17225:1, 17250:13, 17257:20
**stipulate** [1] - 17219:3
**stipulation** [6] - 17218:6, 17218:25, 17249:4, 17251:5, 17251:12
**stipulations** [5] - 17217:24, 17218:7, 17218:13, 17249:13, 17258:8
**stirred** [1] - 17237:19
**Stone** [1] - 17190:11
**stop** [2] - 17189:10, 17240:5
**stopped** [1] - 17198:7
**stops** [3] - 17216:24, 17217:7, 17217:9
**storm** [1] - 17231:14
**story** [2] - 17222:7, 17222:9
**straight** [1] - 17193:7
**Street** [6] - 17113:15, 17114:2, 17114:4, 17114:10, 17114:13, 17192:24
**stretches** [1] - 17192:22
**strike** [3] - 17211:6, 17213:22, 17252:23
**strikes** [1] - 17253:24
**struggling** [5] - 17184:20, 17184:21, 17210:24, 17234:20, 17239:11
**stuck** [2] - 17190:9, 17193:19
**stuff** [1] - 17190:13
**submit** [2] - 17239:9, 17242:23
**sudden** [1] - 17224:3
**suffered** [1] - 17189:14
**sufficiency** [1] - 17243:14
**suggest** [1] - 17227:4
**suggesting** [1] - 17225:8
**Suite** [3] - 17113:18, 17113:24, 17114:10
**summarize** [1] -

17251:2
**supervisor** [1] - 17191:20
**supposed** [9] - 17191:15, 17207:6, 17229:24, 17230:8, 17230:23, 17231:19, 17235:21, 17240:24
**Supreme** [1] - 17190:4
**surrounding** [3] - 17235:18, 17242:15, 17242:16
**sustained** [3] - 17211:4, 17215:24, 17216:4
**Sweats** [6] - 17195:8, 17195:10, 17195:11, 17195:12, 17195:13
**sweatshirt** [2] - 17224:10, 17225:1
**sworn** [1] - 17179:23

# T

**tab** [1] - 17211:9
**table** [2] - 17239:13, 17259:24
**tables** [1] - 17209:11
**tactics** [3] - 17223:7, 17240:7, 17240:18
**talks** [3] - 17223:4, 17223:6
**Tambe** [1] - 17185:20
**tan** [1] - 17225:2
**target** [1] - 17241:7
**Tarrio** [4] - 17113:7, 17114:9, 17249:3, 17251:5
**tasks** [1] - 17220:24
**Team** [1] - 17256:14
**team** [3] - 17231:17, 17251:5, 17251:6
**technically** [1] - 17247:20
**technology** [1] - 17197:13
**tee** [2] - 17254:13, 17254:14
**teed** [2] - 17231:24, 17254:9
**Telegram** [1] - 17195:18
**telepathy** [1] - 17214:11
**ten** [4] - 17188:16, 17221:8, 17221:22, 17236:12
**ten-minute** [1] - 17221:22
**terminology** [1] -

17228:3
**terms** [8] - 17203:4, 17205:4, 17227:8, 17246:3, 17246:7, 17250:6, 17250:7, 17259:11
**terrace** [2] - 17221:6, 17222:1
**testified** [2] - 17179:24, 17213:5
**testifies** [2] - 17248:8, 17260:16
**testify** [7] - 17225:17, 17246:16, 17248:7, 17248:11, 17249:16, 17249:25, 17251:8
**testifying** [5] - 17211:2, 17248:14, 17250:6, 17260:13, 17260:17
**testimony** [15] - 17217:15, 17220:4, 17225:16, 17233:24, 17234:1, 17235:1, 17239:18, 17239:20, 17243:8, 17243:15, 17243:17, 17243:18, 17246:8, 17249:19, 17260:20
**text** [1] - 17193:11
**THE** [128] - 17113:1, 17113:1, 17113:11, 17179:14, 17179:19, 17179:20, 17179:21, 17179:25, 17183:24, 17186:23, 17188:22, 17188:24, 17200:24, 17201:4, 17201:19, 17202:24, 17203:1, 17203:2, 17203:3, 17204:17, 17207:21, 17207:23, 17209:25, 17211:1, 17211:4, 17212:12, 17213:2, 17213:4, 17213:12, 17213:16, 17215:7, 17215:24, 17216:4, 17216:6, 17216:8, 17217:13, 17217:14, 17217:16, 17217:17, 17217:21, 17218:4, 17218:12, 17218:20, 17220:1, 17220:14, 17220:16, 17222:12, 17223:1, 17223:14, 17223:17, 17223:19, 17223:22, 17224:9, 17224:12, 17224:21, 17225:7, 17225:12, 17227:2, 17227:23,

17228:12, 17228:17,
17228:19, 17228:23,
17229:19, 17230:10,
17231:8, 17231:12,
17231:23, 17232:16,
17233:12, 17233:18,
17234:5, 17235:5,
17235:9, 17236:19,
17237:9, 17237:13,
17237:21, 17238:15,
17238:21, 17239:7,
17240:15, 17241:10,
17241:19, 17242:20,
17243:19, 17244:7,
17245:12, 17245:24,
17246:19, 17247:1,
17247:16, 17247:19,
17247:23, 17248:9,
17248:15, 17249:10,
17249:20, 17250:2,
17250:4, 17250:14,
17250:16, 17251:11,
17251:24, 17252:1,
17252:11, 17252:15,
17253:5, 17253:17,
17254:11, 17255:2,
17255:6, 17255:17,
17256:9, 17256:12,
17256:17, 17258:8,
17258:14, 17259:3,
17259:6, 17259:8,
17259:12, 17260:4,
17260:11, 17260:18,
17261:8, 17261:17,
17261:23
   **the-head-of-a-pin** [1] -
17226:9
   **themselves** [1] -
17237:5
   **theory** [6] - 17225:20,
17225:22, 17225:23,
17228:13, 17234:19,
17237:4
   **thereafter** [3] -
17219:19, 17223:12,
17244:14
   **they've** [1] - 17238:1
   **thinking** [3] -
17246:11, 17257:3,
17257:17
   **third** [6] - 17248:23,
17251:21, 17256:21,
17256:22, 17256:23,
17258:15
   **thoughts** [1] -
17246:22
   **threat** [1] - 17236:5
   **three** [9] - 17186:11,
17231:21, 17233:11,
17236:11, 17239:4,

17240:7, 17259:5,
17259:8, 17259:10
   **three-day** [3] -
17259:5, 17259:8,
17259:10
   **throughout** [4] -
17180:21, 17182:16,
17217:6, 17236:11
   **thrown** [1] - 17236:24
   **ties** [1] - 17222:14
   **tightly** [1] - 17224:14
   **timeframe** [4] -
17188:2, 17190:7,
17194:13, 17221:25
   **timeline** [1] - 17215:6
   **timeline** [1] - 17246:2
   **TIMOTHY** [1] -
17113:11
   **tiny** [1] - 17185:21
   **tired** [1] - 17255:12
   **tissues** [1] - 17187:16
   **today** [6] - 17194:8,
17201:10, 17243:14,
17246:6, 17247:18,
17247:20
   **together** [4] -
17180:23, 17181:16,
17187:25, 17188:11
   **tomorrow** [32] -
17220:6, 17220:12,
17220:22, 17239:10,
17246:10, 17247:2,
17247:13, 17247:14,
17247:15, 17247:17,
17247:23, 17248:5,
17249:9, 17249:17,
17250:7, 17250:21,
17250:25, 17251:8,
17251:9, 17251:14,
17252:22, 17254:8,
17254:23, 17255:22,
17256:3, 17256:23,
17257:9, 17258:2,
17258:6, 17258:11,
17260:24, 17261:24
   **ton** [1] - 17199:25
   **tonight** [5] - 17243:24,
17246:10, 17246:22,
17249:8, 17254:1
   **took** [8] - 17186:18,
17197:15, 17200:1,
17203:24, 17204:1,
17205:23, 17235:23,
17244:24
   **top** [7] - 17226:17,
17231:15, 17231:16,
17231:21, 17234:10,
17234:14
   **totality** [2] - 17223:25,
17226:23

   **totally** [1] - 17241:12
   **touch** [2] - 17196:13,
17215:20
   **towards** [5] -
17219:18, 17222:15,
17230:1, 17238:18,
17244:21
   **Townsend** [1] -
17113:24
   **trade** [1] - 17181:7
   **trailer** [2] - 17191:8,
17192:12
   **trained** [5] - 17229:14,
17229:15, 17238:3,
17240:9, 17241:6
   **training** [2] - 17183:7,
17184:16
   **TRANSCRIPT** [1] -
17113:10
   **transcript** [2] -
17262:4, 17262:5
   **transitioned** [1] -
17185:23
   **traveled** [3] -
17205:11, 17205:13,
17219:3
   **traveling** [1] -
17205:19
   **trial** [7] - 17201:9,
17222:3, 17222:4,
17230:16, 17248:13,
17259:24
   **TRIAL** [2] - 17113:5,
17113:10
   **tried** [3] - 17230:17,
17242:7, 17246:20
   **trip** [15] - 17197:10,
17197:14, 17197:15,
17197:18, 17197:19,
17197:20, 17197:21,
17198:8, 17206:2,
17206:5, 17206:7,
17207:2, 17207:3,
17216:22, 17217:7
   **trips** [1] - 17199:3
   **trouble** [1] - 17232:9
   **truck** [4] - 17191:12,
17192:18, 17216:17,
17216:18
   **true** [7] - 17191:24,
17204:8, 17244:5,
17244:17, 17250:15,
17262:4, 17262:5
   **truly** [2] - 17212:20,
17237:3
   **truth** [1] - 17250:17
   **try** [15] - 17180:9,
17180:10, 17199:18,
17199:25, 17222:16,
17229:8, 17231:1,

17231:5, 17235:4,
17243:3, 17254:22,
17257:10, 17257:23,
17258:6, 17259:20
   **trying** [15] - 17182:9,
17230:18, 17231:3,
17231:6, 17238:7,
17238:22, 17240:2,
17245:13, 17246:12,
17247:12, 17249:15,
17255:4, 17255:10,
17259:10, 17260:6
   **Tuesday** [3] -
17260:15, 17260:17,
17261:2
   **tumor** [2] - 17184:20,
17185:3
   **turn** [4] - 17182:4,
17211:9, 17211:14,
17211:19
   **turned** [1] - 17189:19
   **turning** [1] - 17191:6
   **turns** [1] - 17192:23
   **two** [19] - 17180:23,
17181:19, 17183:21,
17185:8, 17186:10,
17186:17, 17194:18,
17194:19, 17199:6,
17202:1, 17205:2,
17228:2, 17239:4,
17240:6, 17248:21,
17251:6, 17251:7,
17251:17, 17254:9
   **type** [2] - 17181:22,
17256:8
   **tyranny** [2] -
17212:21, 17214:5

---

## U

   **U.S** [4] - 17113:20,
17114:21, 17253:6,
17253:9
   **ultimate** [1] - 17256:2
   **ultimately** [13] -
17191:14, 17196:13,
17196:14, 17222:16,
17229:6, 17229:8,
17230:14, 17230:22,
17233:10, 17236:1,
17236:13, 17240:9,
17248:13
   **Ultimately** [1] -
17212:16
   **um-hum** [5] - 17206:3,
17208:1, 17213:19,
17214:9, 17223:1
   **unable** [2] - 17207:7,
17215:20
   **under** [3] - 17238:3,

17247:11, 17255:21
**under-seal** [2] - 17247:11, 17255:21
**understood** [3] - 17204:23, 17230:12, 17250:4
**unique** [2] - 17221:6, 17221:7
**UNITED** [2] - 17113:1, 17113:12
**United** [1] - 17113:3
**unlawful** [2] - 17237:5, 17237:17
**unless** [3] - 17232:12, 17258:3, 17258:4
**up** [60] - 17181:16, 17184:8, 17186:5, 17186:8, 17190:2, 17191:11, 17192:6, 17195:7, 17196:14, 17196:19, 17200:11, 17201:20, 17204:18, 17206:10, 17207:10, 17207:15, 17209:11, 17210:13, 17210:15, 17216:21, 17218:2, 17220:22, 17221:18, 17221:23, 17224:20, 17225:4, 17227:21, 17228:6, 17229:14, 17230:14, 17231:21, 17231:25, 17236:3, 17237:19, 17238:2, 17238:6, 17238:7, 17238:8, 17238:13, 17242:1, 17242:13, 17243:9, 17244:16, 17245:8, 17246:10, 17246:19, 17247:5, 17248:4, 17250:3, 17254:4, 17254:9, 17254:13, 17254:14, 17255:10, 17255:19, 17256:7, 17258:11, 17259:21, 17260:9, 17261:10
**ups** [1] - 17205:22
**upstairs** [1] - 17229:8

**V**

**vacation** [1] - 17207:5
**vague** [2] - 17204:16
**validity** [1] - 17221:15
**vantage** [2] - 17229:17, 17230:1
**various** [4] - 17228:21, 17228:23, 17238:8, 17242:9
**vehicle** [1] - 17216:19

**vehicles** [1] - 17191:7
**verbate** [1] - 17251:12
**versus** [4] - 17212:21, 17212:22, 17214:3, 17214:5
**video** [2] - 17197:3, 17257:4
**videos** [5] - 17224:18, 17225:4, 17252:6, 17253:1, 17253:15
**view** [2] - 17212:16, 17227:9
**viewed** [1] - 17205:2
**views** [3] - 17213:14, 17213:17, 17213:24
**violated** [1] - 17237:17
**violent** [2] - 17189:19, 17191:6
**visit** [1] - 17200:25
**vital** [2] - 17221:9, 17221:19
**voice** [3] - 17199:2, 17201:20, 17204:18
**vs** [1] - 17113:5

**W**

**wait** [3] - 17182:22, 17248:16, 17252:7
**waiting** [3] - 17180:15, 17248:22, 17259:18
**waitress** [1] - 17181:12
**walk** [1] - 17236:11
**walked** [4] - 17219:11, 17219:14, 17219:17, 17242:1
**wall** [1] - 17187:8
**wallet** [1] - 17244:22
**wants** [3] - 17212:2, 17250:24, 17253:21
**war** [4] - 17205:8, 17212:17, 17213:25, 17242:25
**Washington** [19] - 17113:7, 17113:16, 17113:19, 17114:2, 17196:19, 17197:7, 17205:11, 17214:7, 17214:13, 17214:15, 17215:3, 17215:11, 17216:2, 17219:4, 17219:11, 17219:15, 17244:19, 17244:21, 17262:13
**water** [2] - 17187:17, 17188:22
**ways** [2] - 17231:20, 17233:11
**week** [7] - 17189:4,

17200:2, 17254:25, 17259:5, 17259:10
**weekend** [1] - 17256:15
**weeks** [2] - 17188:12, 17202:1
**well..** [1] - 17250:14
**West** [1] - 17114:13
**west** [2] - 17221:5, 17221:25
**whatnot** [1] - 17251:16
**whole** [10] - 17190:18, 17197:1, 17202:2, 17225:4, 17226:13, 17230:16, 17233:3, 17236:8, 17246:25, 17257:6
**wife** [1] - 17199:6
**willing** [1] - 17212:8
**window** [2] - 17249:23, 17250:11
**windows** [1] - 17249:24
**wisdom** [1] - 17184:16
**withdraw** [1] - 17215:10
**witness** [13] - 17179:16, 17179:23, 17182:25, 17192:13, 17206:11, 17225:14, 17225:17, 17228:13, 17228:14, 17233:1, 17240:5, 17248:6, 17253:22
**WITNESS** [5] - 17188:24, 17203:1, 17203:3, 17217:13, 17217:16
**witnesses** [14] - 17219:1, 17227:17, 17227:18, 17249:12, 17249:14, 17250:24, 17251:6, 17251:7, 17251:17, 17254:3, 17255:25, 17256:4, 17258:6
**won** [1] - 17182:18
**wood** [1] - 17206:17
**word** [1] - 17228:3
**words** [7] - 17225:12, 17234:3, 17234:6, 17235:2, 17237:2, 17237:6, 17238:9
**workout** [1] - 17198:2
**world's** [1] - 17249:23
**wound** [1] - 17244:16
**wow** [2] - 17182:6, 17186:5
**wrap** [1] - 17231:3

**wrapping** [1] - 17224:20
**write** [2] - 17184:5, 17212:20
**wrote** [1] - 17212:16

**Y**

**year** [6] - 17186:2, 17188:15, 17198:15, 17198:16, 17198:25, 17199:22
**Year's** [1] - 17197:16
**yearbooks** [1] - 17182:17
**years** [6] - 17180:18, 17181:10, 17182:4, 17182:11, 17186:4, 17187:14
**yellow** [2] - 17206:15, 17211:9
**yesterday** [5] - 17218:2, 17218:16, 17247:19, 17247:20, 17248:24
**York** [14] - 17113:18, 17113:25, 17114:16, 17182:19, 17183:8, 17197:23, 17197:24, 17197:25, 17198:3, 17207:1, 17207:4, 17207:8, 17208:3, 17219:4
**young** [2] - 17182:2, 17227:10
**youngest** [1] - 17181:3
**yourself** [1] - 17252:18
**yourselves** [1] - 17220:11

**Z**

**Zachary** [1] - 17113:7
**Zapruder** [1] - 17227:10