IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          CR Nos. 1:21-cr-00175-TJK-1
                                          1:21-cr-00175-TJK-2
v.                                        1:21-cr-00175-TJK-3
                                          1:21-cr-00175-TJK-5
1-ETHAN NORDEAN                           1:21-cr-00175-TJK-6
2-JOSEPH R. BIGGS
3-ZACHARY REHL                    Washington, D.C.
5-ENRIQUE TARRIO                  Monday, March 13, 2023
6-DOMINIC J. PEZZOLA,             10:00 a.m.
                  Defendants.
- - - - - - - - - - - - - - - - x
_____

TRANSCRIPT OF JURY TRIAL - DAY 46
*** MORNING SESSION ***
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the United States:    Jason B.A. McCullough, Esq.
                          Erik M. Kenerson, Esq.
                          Conor Mulroe, Esq.
                          U.S. ATTORNEY'S OFFICE
                          555 4th Street, NW
                          Washington, DC 20530
                          (202) 252-7233

For the Defendants:       Nicholas D. Smith, Esq.
                          DAVID B. SMITH, PLLC
                          7 East 20th Street
                          Suite 4r
                          New York, NY 10003
                          (917) 902-3869

                          Norman A. Pattis, Esq.
                          PATTIS & SMITH, LLC
                          383 Orange Street
                          1st Floor
                          New Haven, CT 06511
                          (203) 393-3017

                          John D. Hull, IV, Esq.
                          HULL MCGUIRE PC
                          1420 N Street, NW
                          Washington, DC 20005
                          (202) 429-6520

APPEARANCES CONTINUED:

For the Defendants:        Carmen D. Hernandez, Esq.
                           7166 Mink Hollow Road
                           Highland, MD 20777
                           (240) 472-3391

                           Nayib Hassan, Esq.
                           LAW OFFICES OF NAYIB HASSAN, P.A.
                           6175 NW 153 Street
                           Suite 209
                           Miami Lakes, FL 33014
                           (305) 403-7323

                           Sabino Jauregui, Esq.
                           JAUREGUI LAW, P.A.
                           1014 West 49 Street
                           Hialeah, FL 33012
                           (305) 822-2901

                           Steven A. Metcalf, II, Esq.
                           METCALF & METCALF, P.C.
                           99 Park Avenue
                           6th Floor
                           New York, NY 10016
                           (646) 253-0514

                           Roger I. Roots, Esq.
                           ROGER ROOTS, ATTORNEY AT LAW
                           113 Lake Drive East
                           Livingston, MT 59047
                           (775) 764-9347

Court Reporter:            Timothy R. Miller, RPR, CRR, NJ-CCR
                           Official Court Reporter
                           U.S. Courthouse, Room 6722
                           333 Constitution Avenue, NW
                           Washington, DC 20001
                           (202) 354-3111

Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

# C O N T E N T S

**<u>WITNESS:</u>**                                                    **<u>PAGE:</u>**

<u>NICOLE MILLER</u>
Cross-Examination by Mr. Smith...................12942

1                    **P R O C E E D I N G S**

2          THE DEPUTY CLERK:  This is Criminal Matter 21-175,

3     United States of America v. Defendant 1, Ethan Nordean;

4     Defendant 2, Joseph R. Biggs; Defendant 3, Zachary Rehl;

5     Defendant 5, Enrique Tarrio; and Defendant 6, Dominic J.

6     Pezzola.

7          Present for the Government are Jason McCullough,

8     Erik Kenerson, and Conor Mulroe; present for Defendant 1 is

9     Nicholas Smith.  Present for Defendant 2 are John Hull and

10    Norman Pattis; present for Defendant 3 is Carmen Hernandez;

11    present for Defendant 5 are Nayib Hassan and Sabino

12    Jauregui; present for Defendant 6 are Steven Metcalf and

13    Roger Roots.  Also present are Defendant 1, Mr. Nordean;

14    Defendant 2, Mr. Biggs; Defendant 3, Mr. Rehl; Defendant 5,

15    Mr. Tarrio; and Defendant 6, Mr. Pezzola.

16          THE COURT:  All right.  Well, good morning to

17    everyone.

18          A couple of housekeeping matters and then, based

19    on everything the parties submitted over the weekend, I'm

20    prepared to at least rule on the scope of the

21    cross-examination issue so we can hopefully get testimony

22    underway shortly.  But just some other related -- somewhat

23    related housekeeping matters.

24          First, Mr. Smith, I don't know if you know, but

25    just to inform you, Mr. Block's attorney informed me that he

1    is withdrawing his motion to quash the subpoena.  So that

2    motion will be resolved -- is resolved that way.  I'll

3    dismiss it as moot, but he is withdrawing it.  He informed

4    me he's withdrawing it.  Number one.

5         Number two, Ms. Hernandez, you filed the Sixth

6    Amendment motion.

7         When can the Government respond to that motion?

8    And I -- obviously, one of the issues Ms. Hernandez raises

9    is whether there will be a need for an evidentiary hearing.

10   So I'm -- I would expect the Government to include in its

11   response its view one way or the other of whether an

12   evidentiary hearing is required.

13        MR. KENERSON:  And I think, Your Honor, we --

14   obviously, we got her filing last night.  We read it this

15   morning briefly.  I think a couple of questions that affect

16   how long it will take to answer is how much fact-finding the

17   Government has to do and what type of things we need to put

18   together, and I think -- I would just ask if the Court would

19   let us respond to when we think we can respond tomorrow

20   morning.  I just don't want to promise something and then

21   have to move for an extension.

22        THE COURT:  Okay.  That's fair.  I mean, I know it

23   came in late.  And, obviously, it's, sort of, related to

24   some of the things we're discussing here today, but

25   obviously it's -- and, obviously, you've made certain

1    proffers in connection with it, but it is something that I'm

2    going to have to address sooner rather than later.  And so

3    we can talk about that tomorrow morning.  That seems like a

4    fair request.

5            MS. HERNANDEZ:  Your Honor, on Page 2, I made a

6    mistake.  I'm -- I told the Government already that I had

7    made a mistake.  So I'll correct that.  I just want the

8    Court to know.  I left out a line.  So --

9            THE COURT:  Okay.  You'll file something amended?

10            MS. HERNANDEZ:  Yes, just a correction.

11            THE COURT:  All right.  So look, I'll -- when

12    the -- Ms. Hernandez, when the Government represents when

13    they can respond tomorrow, we can talk about when it makes

14    sense for you to reply.  And if I have to have an

15    evidentiary hearing, I will, but, obviously, I'll -- I'll

16    read the briefing before we figure that out.

17            MS. HERNANDEZ:  Thank you, Your Honor.

18            THE COURT:  All right.  That's with regard to that

19    one.

20            Mr. Roots also filed a motion last -- I think it

21    was yesterday.  I thought a lot of -- well, when can the

22    Government represent it will respond to that motion?  I'll

23    just say, Mr. Roots, I'm skeptical that any of the relief

24    you're seeking is appropriate, but I want to give the

25    Government an opportunity to respond first.

1          MR. KENERSON:  I think -- similar response.  If

2     the Court will allow us to respond to how long we need

3     tomorrow morning.

4          THE COURT:  All right.  Very well.

5          All right.  So then we have the scope of the cross

6     issue.  And as I said, I received what the parties filed --

7          MR. SMITH:  Your --

8          THE COURT:  -- which were -- which -- yes,

9     Mr. Smith?

10         MR. SMITH:  Your Honor, I just wanted to indicate

11    that we -- Nordean filed a motion about scheduling defense

12    witnesses next week.  And if Your Honor would like to take

13    that up at lunch, that's okay, but we just wanted to put on

14    our position that we would try to get some sort of ruling so

15    that we can purchase tickets or let the witness know what he

16    needs to be doing.

17         THE COURT:  I'd like to take it up later today.  I

18    did -- I know it came in really late.  And, look, my

19    knee-jerk reaction to it is he's under subpoena.  I mean,

20    the Government has, you know -- all the parties have

21    witnesses under subpoena.  And we've all done our best to

22    try to estimate when Case A will begin and Case B will

23    begin.  And so I'm -- I mean, I think the idea that I can

24    tell you in advance, "Well, yes, definitely, we'll reserve

25    that day for the witness," I don't know that I really can.

1    I -- but go ahead.

2              MR. SMITH:  Your -- so Your Honor, I think the

3    Court has inherent case management authority power.  And

4    last week, Judge Friedman fielded a similar request from the

5    defense to allow a defense witness to testify because of a

6    scheduling conflict before the close of the Government's

7    case.  It was only one witness.  The case is Gossjankowski.

8    And it's our understanding that this does -- the Court does

9    have the authority and it does happen.  But this witness,

10   just to be clear, was about -- we think about 30 to 45

11   minutes of testimony.  And, Your Honor, we understand that a

12   trip is not an excuse for avoiding a valid subpoena, but we

13   have received statements from the witness indicating that

14   they could avoid the subpoena.  So Your Honor, unlike the

15   Government, we can't arrest this -- we can't threaten them

16   with charges or, you know, seize the -- do whatever we need

17   to do.  So if Your Honor's inclined to not give us an

18   opportunity to present a witness on Monday, we would ask

19   probably for a Court order that the witness appear -- comply

20   with the subpoena.

21             THE COURT:  All right.

22             MR. SMITH:  Yeah.

23             THE COURT:  Let -- we'll take it up, but I -- I

24   mean, I'll, you know -- look, we -- I want you to be able to

25   present the witness and, maybe, that's the way to go, but

1    we'll take it up.  I mean, I -- that came in very, very late

2    last night.

3              All right.  Very well.  With regard to Special

4    Agent Miller, last Thursday, it -- look, this is a

5    complicated and important ruling.  So you'll all forgive me

6    if I read from something we wrote down.

7              On -- last Thursday, at the start of Special Agent

8    Miller's cross-examination, Defendant Nordean revealed that

9    he had discovered a volume of messages sent to Agent Miller

10   by other FBI agents hidden within her Jencks production

11   within the -- a spreadsheet.  I released the jury early, and

12   on Friday [sic] morning, we heard argument about this from

13   the parties and brief foundational testimony from Agent

14   Miller.

15             Some confusion and speculation followed Nordean's

16   revelation of these missed messages.  But as I understand

17   things following the numerous supplemental filings and Agent

18   Miller's testimony, here is what happened:

19             Agent Miller received a large spreadsheet from FBI

20   headquarters containing her communications, both sent and

21   received, from a chat platform called Lync.

22             Then, to comply with her Jencks obligations, Agent

23   Miller filtered that document to display only her messages.

24   From there, she deleted messages that were not responsive

25   for Jencks purposes at least in her view.  And in so doing,

1    neither Agent Miller nor anyone at the FBI revealed [sic]

2    the other agents' messages for classified information and

3    relevance and perhaps other equities.

4         As far as the record reveals, the prosecutors in

5    this case were not aware that the spreadsheet containing

6    Agent Miller's Lync messages contained these other agents'

7    messages, although hidden.

8         At some point between the Jencks production and

9    Agent Miller's testimony, counsel for Defendant Nordean

10   discovered the hidden rows in the spreadsheet.  Because of

11   Agent Miller's filtering of her own messages, the newly

12   revealed rows appeared to show gaps in the conversations.

13        And since I -- we adjourned on Friday [sic], the

14   Government has reviewed the spreadsheet for classified

15   information and has produced the following to the

16   defendants:

17        One, a reproduction of the Government's original

18   production, less approximately 80 rows of messages that they

19   claim are either classified or sensitive.

20        Two, messages from Special Agent Miller that

21   provide context to the areas identified by Defendant

22   Nordean, even though the Government still contends none of

23   these messages are properly considered Jencks material.

24        And, three, a revised production of Special Agent

25   Miller's messages which also contains messages sent by other

1      agents to provide context.

2              Since then, I haven't received any additional

3      motion for -- or any motion for additional Jencks

4      productions.

5              The issue I have to decide now is whether

6      defendants may cross-examine Agent Miller on some of these

7      messages.  Specifically, Mr. Nordean's most recent of his

8      three filings on this subject reveal three areas he wishes

9      to explore with the witness -- three topics: whether Agent

10     Miller created a CHS report related to this investigation

11     that at least arguably improperly omitted an agent who was

12     present from a meeting, which he says goes to credibility --

13     Agent Miller's credibility; two, whether Agent Miller

14     accessed Defendant Rehl's attorney-client communications

15     which he says goes to her credibility, as well; and, three,

16     whether Agent Miller withheld communications about Aaron

17     Wolkind's role in the MOSD leadership chat groups.  Further,

18     Defendant Pezzola's filings have suggested an intent to

19     cross-examine Agent Miller on a message she received from

20     another agent about a supervisor's request to destroy

21     certain evidence in an unrelated matter.

22              So let's take these up one by one.

23              First, the CHS report.

24              The first subject into which Nordean wants to

25     inquire is a message Agent Miller received from another

 1    agent asking her to edit out his name from a CHS report.

 2    Agent Miller responded asking which report, showing at least

 3    that she read the message and was making some effort to

 4    respond.

 5         Nordean argues this matter is appropriate for

 6    cross-examination because it goes to Agent Miller's

 7    credibility.  He doesn't argue it's within the scope of her

 8    direct testimony, and I don't think it is.  But -- so I'll

 9    only consider whether this line of questioning is relevant

10    to help the jury evaluate Agent Miller's credibility.

11         I agree with Nordean that limited examination on

12    this subject -- cross-examination -- is appropriate, wholly

13    apart from whether Agent Miller produced any related

14    messages or not.  From the face of the messages alone, it's

15    plausible to infer that Agent Miller was asked to create a

16    CHS report related to this case that was intentionally

17    incorrect or incomplete or misleading.  If true, and if she

18    did, a reasonable juror could construe that conduct as

19    bearing on her credibility.

20         Now, in its filing yesterday, the Government

21    proffered an innocuous explanation for this conduct.  It

22    explained that the CHS's handler had been promoted to a

23    supervisory role and that that person -- that agent didn't

24    realize he was still being copied on emails from this

25    source.  So he mistakenly believed he wasn't present for

1    purposes of the report.  The Government further proffered

2    that Agent Miller explained the mistake and the supervisor

3    retracted his request.  If true, this exchange is much

4    ado -- if -- about, if not nothing, then very little.

5           However, the Government -- as Nordean points out,

6    the Government's representations themselves are not

7    evidence.  And on the face of the agents' messages alone,

8    Nordean's reading of the message is plausible.  And so I

9    think it's proper under the Rules of Evidence for Nordean to

10   be able to ask questions about that on cross if he so

11   chooses, even knowing where the line of questioning may end

12   up.

13          But a few more comments on the procedure here.  I

14   don't think -- Nordean may not explore this issue by simply

15   showing the witness and the jury the messages.  Rather, he

16   can ask the witness whether a supervisor ever asked her to

17   remove his name from a CHS report in this case and then go

18   from there.  Of course, if the witness contradicts the

19   messages, Nordean may use them for impeachment purposes.

20   But he must begin by asking Agent Miller about the facts of

21   the exchange itself, not by introducing extrinsic evidence.

22          And to put a finer point on the process issue, I

23   don't think the witness has yet opened herself up to

24   impeachment through the messages based on the questions

25   Mr. Nordean asked on Thursday.

1          He asked, "Did you withhold Lync messages about

2     whether inaccurate CHS-related information should be

3     disclosed to the defense?"  She answered, "No."

4          Even taking the messages at face value, I don't

5     think they contradict her answer to that question.

6          From there, the relevance of Agent Miller's

7     alleged failure to disclose any messages on this subject or

8     what happened during this back-and-forth with a supervisory

9     agent -- the relevance depends on her explanation for the

10    request to make the change that the supervisory agent

11    requested.

12         The second topic is Rehl's communications with his

13    former attorney.

14         The next set of messages on which Nordean and

15    other defendants, including Rehl and Pezzola, seek to

16    cross-examination [sic] Agent Miller about are messages

17    indicating another agent reviewed communications between

18    Defendant Rehl and his prior attorney.  I'm not going to

19    allow any cross-examination -- by any defendant -- on this

20    issue.  And I think, honestly, that's black-letter law.

21         Supreme Court and Circuit precedent make clear

22    that the Sixth Amendment protects the attorney-client

23    relationship, and under certain circumstances, the

24    Government's intrusion into privileged communications may

25    amount to a Sixth Amendment violation.  But whether or not

1    Rehl's rights were violated here is the subject of a

2    separate motion he filed last night that we just discussed

3    just a moment ago.  And for whatever it's worth, Nordean and

4    Pezzola obviously lack standing to challenge any alleged

5    violation of Defendant Rehl's Sixth Amendment rights.

6         Recognizing this -- and let me just pause and say,

7    the Sixth Amendment's very important and we're going to set

8    out a schedule to resolve that motion.  Ms. Hernandez is

9    going to be able to have an opportunity to challenge the

10   motion -- or to make her motion.  The Government's going to

11   be able to respond.  Maybe we'll have a -- maybe, there will

12   be a need for an evidentiary hearing and, maybe, there will

13   not, but it will get resolved one way or the other outside

14   the presence of the jury.

15        MR. SMITH:  (Indicating.)

16        THE COURT:  Mr. Smith?

17        MR. SMITH:  Your Honor, we just want to note for

18   the record that we are making an argument that's different

19   from a constitutional argument.  The D.C. Circuit, in

20   Copeland, has called it, quote, a serious breach of ethics

21   for a Government investigator to simply review

22   attorney-client communications.

23        THE COURT:  I understand.

24        MR. SMITH:  So Your Honor, we --

25        THE COURT:  I --

```
 1              MR. SMITH:  Okay.

 2              THE COURT:  -- understand.

 3              MR. SMITH:  Okay.  Thank you.

 4              THE COURT:  Recognizing this, the defendants argue

 5    that Agent Miller's discussion with another agent about that

 6    agent reading messages between Rehl and his prior counsel

 7    somehow impeaches Agent Miller's credibility.  He argues

 8    that the merits of the Sixth Amendment challenge and the

 9    questions of waiver and privilege are relevant to the

10    credibility question either in connection with her Jencks

11    production or just as a standalone issue with regard to her

12    credibility.  And under the circumstances here, I disagree.

13              So let's take those in turn.

14              First, there would have been no reason for Agent

15    Miller to have produced these communications as Jencks

16    because they're plainly not within the scope of her direct

17    testimony.  So any failure on her part to produce them does

18    not impeach her credibility for that reason.

19              Second, the general topic of Agent Miller's

20    colleague reviewing communications between Rehl and his

21    prior counsel is itself only potentially relevant to Agent

22    Miller's credibility if she engaged in sometimes -- in some

23    kind of misconduct.

24              To start, the record doesn't support any inference

25    that Agent Miller herself reviewed any of these
```

1    communications directly.

2        Moreover, I have not resolved the issue of whether

3    there was any Sixth Amendment violation here by Agent

4    Miller's colleague.  The Government has proffered evidence

5    that, in fact, no Sixth Amendment violation occurred because

6    Mr. Rehl was communicating with his attorney on a system

7    that informed him that it was monitored, read, and retained

8    by the Bureau of Prisons.  And they, in fact, attach a -- to

9    their motion a banner that seems to clearly indicate that.

10   But regardless of whether there was a Sixth Amendment

11   violation, cross-examination is not the proper vehicle to

12   litigate a Sixth Amendment challenge.  Again, I don't think

13   there's a plausible basis to ask these questions based on

14   some sort of misconduct from Agent Miller's -- based on an

15   allegation that Agent Miller committed misconduct.

16       So without any factual basis in the record

17   supporting that, I -- I'm going to preclude

18   cross-examination of Agent Miller on this topic under

19   Rule 403, because -- I'm sorry, Mr. Smith, I've -- you --

20   I've given you all extensive opportunities to be heard on

21   this; I'm not going to be heard on it anymore -- because

22   whatever probative value -- I'm going to preclude

23   cross-examination of Agent Miller on this topic under

24   Rule 403, because whatever probative value it might have is

25   substantially outweighed by the danger of unfair prejudice,

1    confusion of the issues, and misleading the jury.

2         Finally, Nordean argues in his filings that he can

3    impeach Agent Miller by contradiction on this subject.  He

4    asked the agent last week whether another agent told her he

5    had gained access to attorney-client communications about a

6    defendant in this case.  She said, "Not that I can think of,

7    no."  Even if Nordean might be able to impeach this

8    statement with the messages, again, the probative value in

9    setting out that contradiction is minimal compared with the

10   risk of unfair prejudice, confusion, and misleading the

11   jury, for all the reasons I've already discussed.

12        The third topic is the Wolkind message.

13        Nordean wishes to cross-examine Agent Miller on a

14   conversation between her and other agents about Aaron

15   Wolkind, or Aaron of the Bloody East on Telegram.

16   Specifically, in October 2021, one agent commented to Agent

17   Miller that Wolkind "wasn't" -- quote, "wasn't too involved

18   with the planning chat, nor do we know he was down at the

19   Capitol," closed quote.

20        Nordean argues this exchange is within the scope

21   of Special Agent Miller's direct examination because she

22   discussed a few Telegram messages, including some from

23   Wolkind.  I do think it's a stretch on this record.  Even if

24   Agent Miller introduced some messages by Wolkind, she

25   certainly didn't opine on his role on the -- in the

 1   conspiracy writ large.  So I think Nordean's tether to Agent

 2   Miller's direct testimony is tenuous at best.  But even

 3   accept that -- accepting that contradiction [sic] on its

 4   face, I still don't see an appropriate way to use these

 5   messages on cross-examination.

 6        To start, Nordean attempted to set up an

 7   impeachment by contradiction on this subject as follows:

 8        He first asked as a general matter, "Did you

 9   withhold any statements that relate to the subject matter of

10   your testimony in the Lync messaging system?"  Agent Miller

11   responded, "No."  Nordean then asked, "So you provided every

12   statement that you made in Lync that is related to the

13   subject matter of your testimony?"  She responded, "Yes.  I

14   believe so."

15        Nordean then asked more specific questions about

16   individual subjects.  Among them, he asked, "Didn't you

17   withhold Lync messages about whether Aaron of the Bloody

18   East was not involved in the planning chats?"  She said,

19   "Not that I'm aware of."

20        In that context, I don't think the witness has

21   impeached herself.  Agent Miller did not send messages

22   sent -- suggesting that Aaron Wolkind was not involved in

23   the MOSD leadership chats.

24        Beyond that, it's not exactly clear how Nordean

25   intends to use these messages.  He only argues that he

1    should be permitted to, quote, "cross-examine Miller about

2    how she deleted her Lync messages in conversations

3    concerning whether Aaron of the Bloody East," quote --

4    closed quote, was involved in the planning chats.

5            But as with the emails concerning Rehl's

6    communications with Moseley, there would have been no reason

7    for Agent Miller to have produced these communications as

8    Jencks because they are plainly not within the scope of her

9    direct testimony.  So any failure on her part to produce

10   them does not impeach her credibility for that reason.

11           Again, as I read the messages, Agent Miller didn't

12   say anything about Wolkind's role in the Telegram messages.

13   And the surrounding messages have nothing to do with

14   Telegram.  Nordean doesn't proffer the relevance of any

15   comment by Agent Miller he asserts she deleted.

16           Moreover, even if there were some basis to impeach

17   Agent Miller with respect to these messages, I find the

18   probative value of that impeachment would be substantially

19   outweighed by the risk the jury will take this evidence for

20   an improper purpose.  Specifically, it's the province of the

21   jury to weigh the evidence.  And for that, I'll cite to,

22   generally, United States v. Moore, 651 F.3d 30 at 59, a D.C.

23   Circuit case from 2011.  A non-testifying FBI agent's

24   characterization of Wolkind's role relatively early in the

25   investigation risks invading that province.  Thus, I will

1    also exclude any further cross-examination on this subject

2    under Rule 403.  Even if there is some minimal probative

3    value to any impeachment on this subject, it would be

4    substantially outweighed by the danger of unfair prejudice,

5    confusion of the issues, and misleading the jury.

6            Next, as I read Nordean's motions, it doesn't look

7    like he still plans to question Agent Miller about another

8    agent's comment about destroying evidence.  But it seems as

9    though Defendant Pezzola may seek to do so, so I'll address

10   that issue now.

11           On this point, another agent messaged Agent Miller

12   that her supervisor had assigned her to, quote, "destroy"

13   "338 items of evidence."  There's nothing in the record to

14   suggest that the agent who sent this message was involved in

15   this case or that this destruction related to evidence in

16   this case.

17           The Government, again, here, proffered an

18   explanation for this statement.  The comment related to

19   evidence in FBI custody from a nearly 20-year-old

20   multi-defendant trial.  According to the Government,

21   disposing of evidence in this way is standard and consistent

22   with DOJ policy once the case is completed and all the

23   defendants' appeals have been exhausted.

24           So again, this was not Special Agent Miller's

25   statement or Jencks, so whether she produced it or not has

1    no material bearing on her credibility.  And unlike the

2    messages related to the CHS report, there's no basis in the

3    record to suggest misconduct by the witness or, for that

4    matter, by the Government at all.  Agent Miller did not send

5    the message, and there's no evidence on the face of these

6    messages or in the Government's proffer, again, that this

7    message had anything to do with this case.

8            On the other hand, it's easy to imagine how a

9    defendant might use this message to insinuate serious

10    misconduct, as Mr. Pezzola did in his filing over the

11    weekend and on the record last week when he asserted Agent

12    Miller had confessed to a crime and needed to be Mirandized.

13    This is the kind of unfounded speculation that has no place

14    in a courtroom.

15            So under Rule 403, I'm not going to allow any

16    inquiry into this subject where there's no good-faith basis

17    to believe that the message has anything to do with this

18    case and Agent Miller was not the author.

19            And finally, throughout the parties' many

20    arguments on this material, defendants have pointed to

21    statements by agents regarding their views on the evidence

22    and whether they thought it supported conspiracy charges.

23    It's not clear from Mr. Nordean's filing yesterday that he

24    intends to ask Agent Miller about those statements, but he

25    did ask on Thursday whether she, quote, "withheld Lync

1    messages about whether a conspiracy exists in this case."

2          For the reasons I've excluded cross-examination on

3    most other topics, I'm going to preclude cross-examination

4    on this topic, as well.  Such statements -- particularly

5    those by other agents -- don't relate to Agent Miller's

6    direct examination, so they're not Jencks material;

7    therefore, Agent Miller's decision not to include them in

8    her Jencks production is not materially relevant to evaluate

9    her credibility on [sic] any other issue.

10          And as I've said just now with respect to the

11    Aaron Wolkind issue and earlier in this case, agents' -- and

12    I've said on the record earlier in this case -- agents'

13    views on the weight or sufficiency of the evidence or on the

14    merits of the Government's legal theory are not admissible

15    as substantive evidence of the crimes charged.  So I'm going

16    to preclude cross-examination of Agent Miller on this topic

17    under Rule 403, again, because whatever probative value

18    these messages might have -- and I don't see any -- it's

19    substantially outweighed by the danger of unfair prejudice,

20    confusion of the issues, and misleading the jury.

21          MR. SMITH:  (Indicating.)

22          THE COURT:  Mr. Smith?

23          MR. SMITH:  Your Honor, just so there are no

24    surprises, we intend to elicit from the witness her colloquy

25    under oath on March 9th as follows, and we believe all of

1    the messages we just discussed come in through this route.

2    The question, without objection, Your Honor, was "You didn't

3    remove any other -- you didn't remove any messages of yours

4    from the spreadsheet that was given to you by FBI

5    headquarters?"  The answer -- this is on transcript Page

6    12856.  The answer is "What do you mean by -- I didn't,

7    like, remove anything, but I took some statements that,

8    like -- so if anything was related to this investigation and

9    to what I was testifying to, those were provided.  Some of

10   the internal conversations regarding, like, administrative

11   things as far as case files and adding things to case files,

12   that wasn't provided because it didn't relate to my

13   testimony or to what we were doing," end quote.

14          All of the deletions that we've -- the Lync

15   deletions that we've raised with respect to Agent Miller

16   concern matters that are not administrative.  It is not

17   administrative on its face for agents to be discussing

18   whether -- the content of attorney-client communications.

19   One point we'll add here is that the record does show that

20   Agent Miller received the content of attorney-client

21   communications because an agent named T. Wang conveyed to

22   her that after reviewing Defendant Rehl's attorney-client

23   communications, the defendant and lawyer indicated they

24   definitely want to go to trial.  That is content, Your

25   Honor.

1           So to say that she withheld, she did.  It's a

2    matter of fact.  It's undisputed between the parties that

3    the agent withheld her text communications in the exchange

4    about the attorney-client communications.  It is a fact that

5    that is not an administrative matter that pertains to the

6    investigation.  That means her testimony that she withheld

7    "Internal investigations [sic] regarding, like,

8    administrative things" is not accurate.  We will impeach her

9    test- -- there was no objection to scope in that exchange,

10   it was her sworn testimony, and we're entitled to impeach

11   her on that point.

12          So Your Honor, for each message in those

13   categories regarding the nature of the conspiracy, regarding

14   review of attorney-client communications, regarding the

15   potential altering of the CHS report, those were all matters

16   that are not administrative.

17          Your Honor, on the destruction of evidence point,

18   the issue here is credibility -- the credibility issue is as

19   follows.  Even if the destruction of evidence does not

20   involve evidence in this case, it goes to credibility

21   because the witness's response to the suggestion that the

22   agent was ordered to destroy 338 pieces of evidence, Your

23   Honor -- and I hope that this is -- we're able to show this

24   to the Court -- was "Oh, my God, insane."  So the

25   Government's suggestion is that the destruction of evidence

1    pertained to a mere administrative matter; this is just the

2    boss that's being referred to ordering the agent to destroy

3    evidence because the case is over.  The witness's response

4    is entirely inconsistent with that suggestion.  If this was

5    merely cleaning out the drawers, the witness's response, in

6    all caps, "Oh, my God, insane," which we're seeking to make

7    an offer of proof of to the Court, does not follow.  It does

8    not make sense to say "Oh, my God, insane" if we're merely

9    destroying old tapes, Your Honor.  Then --

10             THE COURT:  Mr. Smith, just so it's clear,

11    everything you've described to me so far I -- either -- is

12    either covered by my ruling as excluded under 403 or I would

13    do that.

14             MR. SMITH:  Okay.  So Your Honor, let -- we're

15    just proffering that later in the conversation, the witness

16    [sic], again, refers to the destruction of evidence and the

17    witness and Miller joke about how crazy that is.  So just so

18    the Court knows that.  There is no suggestion in the actual

19    evidence that this is an administrative destruction.

20             Then, Your Honor, the question becomes, well, if

21    this evidence doesn't relate to this case and the agent who

22    made that comment is not on this case, how would it impeach

23    the credibility of the witness on the stand?  So Your Honor,

24    if one of the duties --

25             THE COURT:  I'm sorry.  Mr. Smith -- I'm sorry.  I

1    said I wasn't going to hear argument on this, and I'm not

2    going to.  So it's -- I'm excluding that based on 403.  You

3    don't need to address it --

4           MR. SMITH:  Okay.

5           THE COURT:  -- any more.

6           MR. SMITH:  Okay.  So -- Your Honor, so I

7    think we -- just so there are no surprises, we will impeach

8    the witness on the administrative --

9           THE COURT:  No.  And so there are no surprises,

10    I've ruled that out on 403 grounds.

11           MR. SMITH:  Well, Your Honor, that wasn't in the

12    briefing.  That's why we were just -- the -- oh, sorry, not

13    the destruction of evidence point, Your Honor.  Back --

14           THE COURT:  Okay.

15           MR. SMITH:  -- to the original point.

16           THE COURT:  Okay.

17           MR. SMITH:  She testifies on the 9th that -- when

18    asked about what messages were deleted, she said "Some of

19    the internal conversations regarding, like, administrative

20    things."  So Your Honor, it is not an administrative

21    thing -- oh, and she defines "administrative things."  So --

22    as far as case files and adding things to case files.  So

23    Your Honor, a review of a defendant's messages about -- a

24    review of a defendant's attorney-client communications,

25    that's not an administrative matter.  Conversations about

```
1    evidence that will be discussed in the witness's testimony,

2    that's not administrative; that's --

3              THE COURT:  And you would seek to get all those

4    other -- the substance of all those other points in as

5    contradicting her testimony?

6              MR. SMITH:  Not for their truth, Your Honor, but

7    to contradict the point that the internal conversations she

8    withheld or deleted were administrative things.

9              THE COURT:  Okay.  I'm excluding it under Rule 403

10   for all -- substantially all the same reasons I've already

11   described.

12             MR. SMITH:  So we're -- are we allowed to impeach

13   the witness about that statement?

14             THE COURT:  No.

15             MR. SMITH:  Okay.

16             THE COURT:  Mr. Roots?

17             MR. ROOTS:  I very much would like Mr. Smith to be

18   able to make this record and complete his record, if

19   possible.

20             THE COURT:  He -- if he wants to -- look, I gave

21   you all time over the weekend to file things.  If you want

22   to file something on the record to further bolster your

23   record, that's fine, but we're in the middle of trial.  You

24   all have taken a lot of time to file things.  And I'm

25   attempting to rule on those things.  So I'm not going to --
```

 1     there's just no reason for it.

 2              MR. SMITH:  Your Honor, we are going to go through

 3     with the witness why -- so we're -- I think we're allowed to

 4     show the jury why trial was canceled for a couple of days.

 5     So we are going to show that --

 6              THE COURT:  No, no.  Are you -- have -- the -- I'm

 7     sorry.  That's -- no, you're not allowed to do that.

 8              MR. SMITH:  Can I put --

 9              THE COURT:  Mr. -- no.

10              MR. SMITH:  -- the explanation in the record?

11              THE COURT:  Mr. Smith, I'm done hearing you.

12              Mr. Pattis?  You had your hand up.

13              MR. PATTIS:  One point not covered by the ruling,

14     and we did not brief it and I'd -- and that is as to the

15     witness's motive for exaggerating potentially.  Our

16     contention is that some of her identifications are

17     implausible on their face and she may or may not have had a

18     motive for doing that.  The business about her colloquy --

19     internal colloquy with others about perceived weaknesses in

20     the conspiracy case would go to explain exaggeration here.

21     And so it would be Mr. Biggs's contention that there --

22     limited inquiry about whether there were internal

23     discussions among the agents as -- agents about weaknesses

24     in the conspiracy case would be fair grounds for

25     impeachment.  I understand that it wasn't covered in the

1    briefing, and I heard your ruling loud and clear.  I'd ask

2    you to reconsider a limited line of questions along

3    that line.  And it would go something like this:  "You have

4    given nearly miraculous identifications of people based on

5    what you saw, the back of their head from 2, 3, 400 yards.

6    You are an agent who's been involved in this case from its

7    inception.  One could argue that you have an interest in the

8    outcome of the case.  Is the interest in the outcome of the

9    case affected by any perceived weaknesses you have about

10   whether there was a conspiracy?  In fact, did you not

11   entertain that with discussions with other agents?"  That's

12   a little inartful, but those five questions cover the

13   universe that I think -- that I would do with your

14   permission.  I understand your ruling is that that is

15   currently prohibited.  I'm asking you to reconsider that

16   line.

17            THE COURT:  All right.  Why don't I hear from the

18   Government -- let -- we have to get through Mr. -- I mean, I

19   guess it's efficient to do this now.  Let me hear from the

20   Government on --

21            MR. PATTIS:  I don't know how long Mr. Smith's

22   going to be and I might --

23            THE COURT:  No --

24            MR. PATTIS:  -- be it before you know it.

25            THE COURT:  I appreciate you fronting it and

 1    flagging it.

 2            MR. KENERSON:  So I think two things in response.

 3            One, the Court did set a deadline for briefing on

 4    this issue.  And, in fact, Mr. Pattis agreed to the

 5    rescheduled deadline of March -- or of Sunday, excuse me.

 6    So the fact that he's raising it now orally -- I understand

 7    the Court is considering it -- asking for our response, but

 8    our first response is he should have briefed it.

 9            But that aside, the -- I think that to the extent

10    there is any probative value there, which I think there is

11    not for the reasons the Court cited because this gets to,

12    kind of, agents' opinions -- again, not relevant under

13    Moore, just full stop, not relevant under Moore -- the fact

14    that there may have been some internal discussion amongst

15    FBI agents at the line level as to the strength of the

16    evidence I don't think comes even close to providing any

17    sort of a motive for this witness to exaggerate.  Even if it

18    did provide some limited amount of motive, that is

19    substantially outweighed by the 403 considerations that the

20    Court has articulated in response to Mr. Smith.

21            THE COURT:  Let me just --

22            MR. PATTIS:  As to the briefing issue, that -- I

23    thought -- I viewed it as optional and thought it was.  I

24    didn't know that it was required.

25            As to the limited value in the Government's view,

1    that's not no value at all.  And this is an agent who was

2    one of, I think, the five or six leads.  It's so

3    complicated.  She's been involved from the -- its inception.

4    And motive I don't think is ever collateral, including

5    motive to exaggerate.

6            THE COURT:  Well, let me just say this,

7    Mr. Pattis.  Why don't you -- I think I'd have to see the

8    context of the statement you're talking about.  I mean, my

9    impression so far is that most of what you all have tried to

10   make hay out of has not even been this agent's own

11   statements.  So let's just -- so I think that -- again, in

12   weighing, for example, relevance and 403, that seems to me,

13   kind of, important.  So maybe, we can --

14           MR. PATTIS:  I'll attempt to lay the foundation

15   and I won't ask the money question without your permission.

16           THE COURT:  Or you can just -- I mean, I think

17   the -- no, I think the easier thing would be just let me

18   know what statement you think opens the door to this --

19           MR. PATTIS:  All right.

20           THE COURT:  -- ahead of time.  Just -- I don't --

21   however you get it to me, I'd like to see that.

22           MR. PATTIS:  Will do.

23           THE COURT:  All right.  Mr. Roots, I know you've

24   had your hand up.

25           MR. ROOTS:  Well, I would just like to address,

1    again, briefly this statement:  Quote, "My boss just ordered

2    me to destroy 338 pieces of evidence."  I cannot imagine

3    someone --

4              THE COURT:  Mr. Roots --

5              MR. ROOTS:  -- sending an email or a text saying

6    that if what they meant to say was, "My boss asked me to

7    comply with the Bureau's retention policy and get rid of

8    some old stuff that belongs to a 20-year-old case and

9    deliver it back to the family."  They haven't stated the

10   case.  They haven't stated the family.  Can we ask, for the

11   record, that they state right now what the case was and the

12   family?  It doesn't pass the smell test.

13             THE COURT:  Mr. Roots, they -- there's no evidence

14   that that had anything to do with this case or anything to

15   do with this agent.  We're talking about Jencks right now.

16   So I -- it's -- I've ruled on it and I'm not going to

17   revisit the ruling.

18             Ms. Hernandez?

19             MS. HERNANDEZ:  Your Honor, I also want to -- on

20   the issue of the destruction of evidence, the Court is

21   accepting the Government's representation as to what it is,

22   and I don't think in a trial we are -- we can be precluded

23   under the Sixth Amendment and under Kyles v. Whitley, Davis

24   v. Alaska, to -- precluded from questioning the agent about

25   that.  If the agent answers, we may be stuck with her answer

1    because we can't bring in extrinsic evidence, but the

2    question, I think, is very relevant and, as I say, under

3    Kyles v. Whitley, the manner in which an investigation goes

4    forward is -- and that's a Supreme Court case -- can be

5    inquired upon.  And if, in fact, there's some wrongdoing by

6    the agents either in discussing it or in not bringing out --

7    in not reporting that the agent's about to destroy or that

8    the supervisor's ordering destruction of property, then that

9    goes to the bias of the witness --

10             THE COURT:  All right.  Ms. Hernandez --

11             MS. HERNANDEZ:  -- to --

12             THE COURT:  -- I --

13             MS. HERNANDEZ:  -- to assist --

14             THE COURT:  -- I understand --

15             MS. HERNANDEZ:  -- the Government.

16             THE COURT:  I understand --

17             MS. HERNANDEZ:  I just --

18             THE COURT:  -- your argument.

19             MS. HERNANDEZ:  I just want to cite Sixth

20    Amendment, Davis v. Alaska, Kyles v. Whitley, all Supreme

21    Court cases.

22             THE COURT:  I understand your argument.  I think

23    in the context here in which the Government has made certain

24    representations, but even beyond that, it's not this agent's

25    statement and it -- there's no indication it has anything to

```
 1        do with this case.  So --
 2              MS. HERNANDEZ:  Again, Your Honor, we're not --
 3        this isn't a Jencks issue.  This is a cross- -- this is a
 4        Sixth Amendment confrontation/cross-examination issue.
 5        Whether -- and I guess it goes -- if -- it's Jencks only
 6        because it got released inadvertently, but once it's
 7        released you cannot put the toothpaste back in the --
 8              THE COURT:  Right.
 9              MS. HERNANDEZ:  -- tube.
10              THE COURT:  And that's why -- and it's exactly for
11        that reason why I ruled the other way on the issue of the
12        CHS document, to be clear.  If they want to ask questions
13        about that, I think that's fair game.  There's no question
14        that it has to do with this case.  More than that, it has to
15        do with this agent's conduct.  There may well be, as the
16        Government says, an innocent explanation.  Okay.  They --
17        but you get to ask.  When there's no connection to the case
18        and no connection to the agent, that's a different matter.
19        So that's why I ruled the way I have under Rule 403.
20              MS. HERNANDEZ:  Again, I don't think --
21              THE COURT:  I --
22              MS. HERNANDEZ:  -- the Court can make that ruling
23        without allowing us to cross-examine or without some sworn
24        declaration from the Government.
25              THE COURT:  All right.  Very well.
```

```
 1              I don't see a --
 2              MR. METCALF:  (Indicating.)
 3              THE COURT:  Yes, Mr. Metcalf?
 4              MR. METCALF:  Your Honor, I'm a little confused
 5      here on a couple of different things.  First, I want to
 6      address the briefing scenario.  We got a ruling by Your
 7      Honor on Thursday that said that we can no longer further
 8      review this document.  So I took that at heart and I waited
 9      for the Government's production and their filing which came
10      and -- started at 12:00 p.m. yesterday, at the filing
11      deadline.  So at that time, there was a little bit of a
12      crossroads that some of us could have been in as far as
13      addressing new issues that have come up.  Now, there's 80
14      different rows that are taken out.  I have a completely
15      different application with regards to the classification
16      mentioned of that document, but I'll go back to that later
17      on.  But for purposes of what we're talking about right now,
18      and Sixth Amendment violations, or the potential for Sixth
19      Amendment violation, or witness credibility, her
20      credibility's at issue in her oath, in how --
21              THE COURT:  Mr. Metcalf, I've ruled on this.  I
22      gave you all an opportunity to file something.  Some did;
23      some did not.  I've even -- but there's no -- I'm not going
24      to hear from you now on this question.
25              MR. METCALF:  But that goes to my point.  How
```

1    could Your Honor make this ruling pending Ms. Hernandez's

2    application right now?

3            THE COURT:  Because if there is -- because the

4    remedy -- we'll have to see what the remedy might be if

5    there's a Sixth Amendment -- well, there's two issues.  If

6    there's a Sixth Amendment violation, the remedy will have

7    nothing to do with the jury's task.  Right?  Okay.

8            MR. METCALF:  Your Honor -- maybe it can make Your

9    Honor reconsider your 403 decision.  If there's an

10   evidentiary hearing and we find out more information and we

11   go through various different aspects of the core issue here,

12   which is, did she know?  Did she actually utilize that

13   information?  Does that open up her credibility?  Just -- I

14   hold the DOJ to a much higher standard than I do to any

15   other scenarios that I've dealt with in New York -- and I've

16   dealt with this issue numerous, numerous times.  And just

17   because they got it doesn't mean that they should just be

18   able to walk in the door and utilize it anytime --

19           THE COURT:  Mr. Metcalf, I'm going to take that up

20   outside the presence of the jury.  Depending -- maybe,

21   you're right.  Maybe we -- maybe, number one, well, I'll

22   learn something that means I have to dismiss the case; or --

23   against Mr. Rehl; or, maybe, I'll learn something that you

24   all say, "Jeez, we should have been able to ask her about

25   it," and you could seek relief along that -- along those

```
 1    lines at that time, but on the record I have before me right
 2    now, this is, in the first instance, especially given the
 3    tenuous nature between this -- the witness on the stand and
 4    what happened here that she heard -- Mr. Smith is right --
 5    she heard from someone else that this had happened, I'm
 6    ruling it out of bounds on Rule 403.
 7               Let's bring in the --
 8               MR. METCALF:  Wait, Your Honor.
 9               THE COURT:  -- witness and proceed.
10               Mr. Metcalf --
11               MR. METCALF:  I'm -- I still have a little bit
12    more, Your Honor.
13               THE COURT:  I'm sorry.
14               MR. METCALF:  Because I don't know how to proceed
15    in preparing my cross-examination if there's 80 different
16    lines that have been taken out and I don't know the
17    classification to them.
18               THE COURT:  So that -- the one -- one of the
19    hanging issues here is that issue of the removed lines.
20    I -- is the Government planning -- Mr. Pattis raised this
21    last time.  And is the Government going to make -- and he
22    suggested the Government produce to me -- or, maybe, to the
23    parties and to me, but at least as to me -- a privilege log,
24    a -- something that describes the documents, or the
25    documents themselves so I can review them.
```

1          MR. PATTIS:  So I don't know what the

2    classification status of all this stuff is.  I heard it in

3    open court and accept at face value the representations that

4    they might be classified, and if so, I guess I ought not to

5    be able to review them.  At a minimum, we thought the

6    Government should be required to produce a privilege log or

7    its functional equivalent that identified the item excluded

8    and the basis for the exclusion in a short and plain

9    statement.  I won't take a position for purposes of

10   advancing the ball about whether I should see it

11   contemporaneously with the Court, but I'm -- did make a

12   special master suggestion last week along the line to get it

13   reviewed by someone, and I'm -- I am still requesting that

14   review.

15          THE COURT:  Yeah.  Let me just -- that's the one,

16   I think, issue here that is, sort of, left hanging.  How

17   does the Government want to address -- how would the

18   Government suggest that get addressed?  It doesn't -- well,

19   how does the Government think I should proceed as to those

20   documents?

21          MR. KENERSON:  So Your Honor, I -- the Government,

22   in hearing Mr. Pattis's request last week, I think, said at

23   the time -- and this is still how we plan to proceed -- the

24   lines that have been removed have been compiled by

25   Ms. Ballantine.  Those do include classified information, so

1    we cannot provide them to the defense.  We will --

2    Ms. Ballantine is out of the jurisdiction today, but

3    tomorrow when she's back she will provide that information

4    to the court information security officers who will deliver

5    it to the Court.

6              THE COURT:  All right.  And it's how many lines?

7              MR. KENERSON:  Approximately 80.

8              THE COURT:  All right.  And that means it's 80 --

9    does that mean it's 80 messages?

10             MR. KENERSON:  Yes, approximately --

11             THE COURT:  All right.

12             MR. KENERSON:  It's -- but --

13             THE COURT:  So --

14             MR. KENERSON:  Not the exact number, but -- and I

15   would note that everything removed was either classified or

16   pertained to sources and methods or internal FBI file paths

17   that likely couldn't be accessed from a browser anyhow.

18   None of them were sent by Agent Miller, none were within the

19   scope of her direct testimony, and we don't believe any were

20   required to be produced to these defendants regardless

21   of classification --

22             THE COURT:  All right.  Well --

23             MR. KENERSON:  -- sensitivity.

24             THE COURT:  -- the point is -- to be clear,

25   Mr. Pattis, it seems to me -- when I get them, I will review

1    them not for class- -- not -- in the first instance, not as

2    classified -- whether -- their classification status is,

3    sort of, secondary.  The first question is, are they things

4    that -- are they Jencks material?  And so do you get access

5    to them now -- I mean, then -- we would cross the bridge of,

6    if they're classified and Jencks, what we do about it, but

7    the point is I can review them at least for that threshold

8    determination and then we'll go from there.  I mean, if, you

9    know -- depending on --

10           MR. PATTIS:  The situation that I'm in is an

11   uncomfortable one.  I recognize my claw-back

12   responsibilities but also take the position in this case

13   that the Sixth Amendment confrontation issues are

14   significant, and if the constable blundered while, you know,

15   the agent is on the stand, that, I think, gives us an

16   entitlement to documents we might not otherwise have which

17   is why I resisted returning them absent a Court order which

18   is my position still.  I've heard the order not to review

19   them, and I have not.  So we will await your --

20           THE COURT:  At a minimum --

21           MR. PATTIS:  We will await your review.

22           THE COURT:  At a minimum, I have to -- I mean, you

23   haven't reviewed them, and so I need to -- you need to know

24   before she's done on cross whether they're things that

25   you -- I think you are entitled to have on cross.  So as

1    soon as I get them, I will review that and let you all know.

2             MS. HERNANDEZ:  (Indicating.)

3             THE COURT:  All right.  Ms. Hernandez?

4             MS. HERNANDEZ:  Your Honor, on this point, I'd

5    like to let the Court know that on Friday, I asked the

6    Government to give us -- provide a statutory definition of

7    "classified" and "sensitive" that they were using in terms

8    of the -- these 80 emails, and they never responded, and I

9    asked that they respond in time for the motions deadline or

10    for the filings deadline, and I just bring to the Court's

11    attention that the term "sensitive" is used in the

12    protective order and that doesn't preclude us from getting

13    those materials.

14             THE COURT:  Right.

15             MS. HERNANDEZ:  So I don't know what this

16    definition of -- it's -- I don't know what definition --

17    what "sensitive" means.  Does it mean that they were talking

18    about personal information or does it mean -- again,

19    sensitive as -- the only term "sensitive" that's been used

20    in this case is in the protective order and all that --

21    that's a lower designation than highly -- whatever -- highly

22    sensitive or whatever, and we -- it was not -- we were not

23    precluded from reviewing it.

24             THE COURT:  It's not -- it doesn't mean they are

25    classified, but the point is, when I get these 80 lines, I

1    can review them to make sure they're not -- I guess it would

2    be Jencks or, in theory, Brady.

3              MS. HERNANDEZ:  Or Rule 16.

4              THE COURT:  Or Rule 16.

5              MS. HERNANDEZ:  Right.

6              THE COURT:  Right.

7              MS. HERNANDEZ:  I mean, I understand that the

8    Court is reviewing all these things.  The concern from the

9    defense side is that we -- in an adversarial process, we

10   should have an ability to inform the Court's

11   decision-making, particularly because we know what our

12   defenses are, what the Government's case is in a

13   different -- we look at it in a different way than the

14   Court.

15             THE COURT:  Okay.  But I -- and I think the -- to

16   your point -- let me just make sure the Government -- when

17   they do this -- I think this is important, and I guess they

18   would do it anyway.  When I get produced those 80 messages,

19   Mr. Kenerson, it should be clear what is -- what the

20   Government contends is classified and what the Government

21   contends is something short of classified but sensitive,

22   because the reality is if the -- if I determine something is

23   discoverable for whatever reason, the issues that we have to

24   address if something is non-classified but sensitive are

25   entirely different from the problems that would be created

 1    by a classified document in that category.  So I need to

 2    know the classification status of every one of those 80

 3    messages so if I do run into this, as Ms. Hernandez says, if

 4    it's something short of classified, that, you know -- we

 5    have protective orders in this case, blah, blah, blah, blah,

 6    blah.  I understand the Government would be reluctant to

 7    that, but if I find the defense needs the document, they're

 8    going to end up getting the document pretty quickly.

 9    Classified information is, as you know, a different animal.

10              MR. KENERSON:  Very well.

11              THE COURT:  All right.  Mr. Smith, are we clear on

12    the scope of where you're headed?

13              MR. SMITH:  Yes, Your Honor.  I'm -- I -- we

14    understand that the defense is allowed to use the CHS report

15    issue, and we intend to use that evidence.

16              THE COURT:  All right.

17              MR. SMITH:  Okay.

18              THE COURT:  All right, then.  If there's nothing

19    further, Ms. Harris, let's bring in the jury and we can

20    bring in the witness.

21              (Brief pause.)

22              For everyone's planning purposes, I have to make

23    today a 5:00 o'clock stop time, just so you all know.

24              MR. KENERSON:  And has the Court confirmed that

25    Friday is a no-go?

```
 1              THE COURT:  And Friday's a no-go.  Correct.
 2              MR. KENERSON:  Thank you.
 3              THE COURT:  Thank you for reminding me of that.
 4              (Nicole Miller resumed the witness stand.)
 5              (Brief pause.)
 6              THE DEPUTY CLERK:  Jury panel.
 7              (Jury returned to jury box.)
 8              THE COURT:  All right.  Everyone may be seated.
 9              Welcome back, ladies and gentlemen.  We will pick
10    up with Mr. Smith's cross-examination.
11                        CROSS-EXAMINATION
12    BY MR. SMITH:
13    Q.  Good morning, Agent.
14    A.  Good morning.
15    Q.  So we just broke for a couple of days at trial.  And my
16    first question is -- is whether, in the meantime -- I think
17    we broke on Thursday of last week.
18    A.  Yes.
19    Q.  Okay.  Between then and now, have you had any
20    conversations with prosecutors or agents in connection with
21    this case?
22    A.  No.
23    Q.  Have any agents or prosecutors in this case shared any
24    information with you?
25    A.  No.
```

1   Q.  So in the course of this -- you mentioned that you were

2   a case agent, correct, on this investigation?

3   A.  With six others, yes.  Six of us total.

4   Q.  So in the course of your work in this investigation,

5   have you reviewed and/or crafted any CHS reports?

6   A.  Yes.

7   Q.  And which one was it, reviewed or crafted?

8   A.  Review and crafted, but it wasn't pertaining to

9   necessarily this case.  But I have done CHS work, yes.

10  Q.  Okay.  And -- but you've also reviewed CHS reports in

11  connection with this investigation?

12  A.  Yes.

13  Q.  Okay.  And just remind us -- the jury.  What -- is a

14  CHS an informant, in layman's terms?

15  A.  Yeah, that's correct.

16  Q.  Okay.  Agent, did another agent in this investigation

17  ask you to edit out from a CHS report that he was present in

18  the report?

19  A.  He did.

20  Q.  Okay.

21  A.  But there's more to that.

22  Q.  Okay.

23  A.  Do you want me to explain or --

24  Q.  Well, let me ask you a second question and then, I

25  think, that will give you an opportunity to explain.

```
 1              So when the agent asked you to edit him out --
 2   edit his name out from the report, did you respond in a way
 3   suggesting you were considering how to comply with the
 4   request?
 5   A.  I would need to see my response.
 6   Q.  Okay.  You don't -- sitting here today, do you recall
 7   whether you responded?
 8   A.  I don't know if I did or didn't.
 9              MR. SMITH:  Okay.  So Your Honor, at this point,
10   I'm just going to bring up -- an exhibit up for the witness.
11   And just so the Court knows, I've redacted the name of the
12   other agent in the conversation.
13   BY MR. SMITH:
14   Q.  Let me try to make this bigger for you, Agent.  Hold on
15   a second here.  I'm going to zoom in on this.  There you go.
16   Can you read that, Agent?
17   A.  I can.
18   Q.  Okay.  So I'd ask you to begin with the comment we
19   just -- I believe we just referenced:  "You just put an" --
20   or "a CHS report out.  Edit out that I was present."
21              MR. KENERSON:  Objection.
22              THE COURT:  Sustained.  Is this refreshing
23   recollection, Counsel?
24              MR. SMITH:  Yeah, I'm trying to --
25              THE COURT:  All right.
```

```
 1              MR. SMITH:  -- point to -- the witness to what I'm
 2     referring --
 3              THE COURT:  Just -- if you'd just ask her --
 4              MR. SMITH:  Okay.  So --
 5              THE COURT:  -- the appropriate question.
 6              MR. SMITH:  -- do you see that statement?
 7              THE WITNESS:  I do.
 8     BY MR. SMITH:
 9     Q.  Okay.  And do you see your response?
10     A.  I do.
11     Q.  Does that refresh your recollection?
12     A.  It does.
13     Q.  Okay.  So I think the question was whether you responded
14     to the request by the agent with a question about how to
15     comply.
16     A.  My response to the agent was "For which one?"  Because I
17     did multiple reports.  It was an email sent to me from a
18     source.  And the individual who had messaged me was no
19     longer a case -- like, a case handler for the source, and
20     they were an acting supervisor at the time.  This individual
21     was not removed from the report and it was signed by
22     somebody else.
23     Q.  It -- okay.  So you have testified that you did not
24     communicate with the Government this week -- between last
25     week and today; correct?
```

```
 1    A.  Correct.
 2    Q.  Okay.  So when the agent says to you -- said to you "You
 3    need to edit out that I was" --
 4              MR. KENERSON:  Objection.
 5              THE COURT:  Sustained.
 6              MR. SMITH:  This was her testimony --
 7              MR. KENERSON:  Objection.
 8              THE COURT:  Hold -- Counsel --
 9              MR. SMITH:  Your Honor, decorum -- this is a
10    true -- the --
11              THE COURT:  Sir --
12              MR. SMITH:  -- prosecutor's shouting at me.
13              THE COURT:  Okay.  Sir, you can ask the witness.
14    You can ask the witness questions about her conduct.
15    BY MR. SMITH:
16    Q.  So I believe you testified -- correct me if I'm wrong --
17    that you recalled, now having reviewed this document, a
18    conversation with an agent who asked you to edit out that he
19    was present.
20    A.  Yes.
21    Q.  Okay.  And does this document you're looking at appear
22    to be the same conversation that we were just referring to?
23    A.  Yes.
24    Q.  Okay.  So -- and then I think you testified that you
25    responded with a question about which report the agent was
```

1    referring to; correct?

2    A.  Right, because he was the boss at the time.  So a boss

3    cannot approve.  If I'm -- so if I'm to write a report in

4    our system, the boss cannot be on that reporting and then

5    approve it.  This individual that we're referring to here in

6    these messages with me was the boss at the time.

7    Q.  Okay.  So when you say -- can I ask you --

8    A.  Oh, go ahead.

9    Q.  -- a follow-up --

10   A.  Yep.

11   Q.  -- question.

12   A.  Yep.

13   Q.  So you just said that a boss cannot be on the report and

14   approve it; right?

15   A.  Correct.

16   Q.  Okay.  What does -- what do you mean by "on the report"?

17   A.  So if you're present -- so how our system works is

18   because this individual was acting as a supervisor -- so

19   they had approving powers, basically -- if I'm to submit a

20   report to them and their name is on the report with mine,

21   they're unable to approve it.  It's got to be somebody whose

22   name -- like, who wasn't present for -- there or whose name

23   is not on the report, if that makes sense.

24   Q.  No, that does make sense.

25            But I guess I -- my question for you is, when the

1    agent's indicating they're -- to edit out that he was

2    present, present is a fact that's true or false, whether

3    someone is present; correct?

4    A.  Sure, but this is also, I believe, in reference to an

5    email.  So the source had sent me information through an

6    email, and this individual was copied on that email.  So

7    when we do our reporting in our systems, I put the names of

8    the people in the email chain who the source would have sent

9    the information to.  But this individual was technically at

10   this time, from what I remember -- because this would have

11   been -- this looks like --

12   Q.  So I don't mean to --

13   A.  -- July --

14   Q.  -- cut you off.  When you say "individual," you're

15   referring to the agent who's --

16   A.  To the agent on the --

17   Q.  Okay.

18   A.  -- other end of this --

19   Q.  Okay.

20   A.  -- yes -- would have no longer been the handler for the

21   source.  So because that individual had now moved into a

22   boss role, they were no longer responsible for what we call

23   handling the source at that time.  I was responsible for

24   handling the source.  But since their name was still in the

25   email, that is why I had copied them initially when I wrote

1    the report that they were present, because they were a

2    recipient of the email.

3    Q.   Okay.  So the agent was technically present on that --

4    A.   The agent was a recipient of the email as well as

5    myself.

6    Q.   And that's what you understood "present" to mean;

7    correct?

8    A.   Yes.  Correct.

9    Q.   Okay.  So when you're having a conversation here about

10   whether one is present on the communication, that means

11   whether one is copied?

12   A.   In this reference, yes.

13   Q.   Okay.  So this agent who is asking you to edit out that

14   he was present was technically present?

15   A.   Copied in the email.

16   Q.   And that's what you agreed "present" means; right?

17   A.   Yes --

18   Q.   Okay.

19   A.   -- in this reference.

20   Q.   So you understood the agent to be asking you to enter a

21   false entry; correct?

22   A.   No.  So I actually -- I had a conversation with this

23   agent after in person because they were the acting

24   supervisor.  Again, there was more to it because the

25   individual had been -- was no longer a handler of the case.

 1    It was my understanding -- and you'd have to speak to the

 2    agent on the other end of this -- that they hadn't read the

 3    email because, in fact, they're no longer handling the

 4    source; only I was.  So after our conversation, it was

 5    decided, from what I remember, that the agent was going to

 6    stay on the reporting and a different boss would, then,

 7    super- -- or would, then, sign it.  And, again, you'll have

 8    to ask the other individual the questions, because I don't

 9    know --

10    Q.  I understand you to be saying that the agent who made

11    the request of you here to edit out that he was present was

12    no longer handling this CHS; correct?

13    A.  Correct.

14    Q.  That is a separate question from whether he was present

15    on a communication; correct?

16    A.  Correct.

17    Q.  Okay.  So in the conversation you're having with the

18    agent, he doesn't ask you to reflect that he's no longer

19    handling a CHS; correct?

20    A.  So not -- well, again, there's more to this

21    conversation, because we had a conversation afterwards --

22    Q.  I understand --

23    A.  -- like, in person.

24    Q.  -- the conversation after -- but I'm just asking -- so

25    I'm asking some more targeted questions, not about what

1    happened later.

2              So you testified that this agent was no longer

3    handling a CHS involved in this communication you're having

4    with him; correct?

5    A.   Correct.

6    Q.   Okay.  But no longer handling the agent [sic] is a

7    separate question from whether this agent was copied on

8    communications about that CHS; correct?

9    A.   Okay.

10   Q.   Is that right?

11   A.   You're asking me -- can you rephrase your question?

12   Q.   The question whether the agent communicating with you is

13   no longer handling a CHS is a separate question from whether

14   that agent is copied on communications about that CHS.

15   A.   Okay.  Yes.

16   Q.   Okay.  So your conversation, as I understand it -- and

17   you've refreshed your recollection on here -- is not about

18   whether that supervisory agent talking to you is handling a

19   CHS.  The question is whether you should edit out that he

20   was present on a communication; correct?

21   A.   Kind of.  So again, there's more to it.  It's not a

22   "yes" or "no" question.  There's more to it.

23   Q.   Well, we just said there's two separate questions here;

24   right?  There's the question about whether this supervisor

25   is still handling an agent [sic] and then there's a question

1    about whether he was, as a matter of fact, copied on the

2    communication about that CHS; right?

3    A.  Kind of.  Again, it -- so there's more to it because

4    there was a conversation that was had after it.  That -- my

5    understanding of this, again, is --

6    Q.  I'm not -- so I know you want to give your explanation.

7    I'm going to give you that opportunity --

8    A.  Okay.

9    Q.  -- but I just want to focus on some facts first before

10   we get to the next part.  Is that okay?

11   A.  Yeah.  Yeah.

12   Q.  Okay.  So it is a "yes" or "no" question whether someone

13   was copied on the communication; correct?

14   A.  Yes, and I believe this agent was copied on the

15   communication.

16   Q.  Okay.  Thank you.

17        Then the agent asked you to remove the fact from a

18   report that he was copied on the communication; correct?

19   A.  But the reason he -- he did.

20   Q.  Okay.  So --

21   A.  Okay.

22   Q.  Okay.  Agent --

23   A.  Okay.  He did.  He did.

24   Q.  -- I'm going --

25   A.  Yes.

1              MR. KENERSON:  I'd ask that the witness be

2     permitted to answer the question.

3              THE COURT:  All right.  The witness should be able

4     to answer the question, but, Mr. Smith, you may ask your

5     next question.

6     BY MR. SMITH:

7     Q.  Okay.  So that -- the request that was being made of you

8     was to make a false entry; correct?

9     A.  No.

10    Q.  Okay.

11    A.  Okay.

12    Q.  So -- okay.  So I think we just said two things, and

13    then we'll leave the subject.  I think you said you're

14    having a conversation with an agent about whether he was

15    copied on a communication about a CHS; correct?

16    A.  He was copied on the communication, yes --

17    Q.  Yes.

18    A.  -- for the CHS.

19    Q.  And then you said it was a "yes" or "no" factual

20    question whether someone is copied on a communication;

21    correct?

22    A.  And he was copied on that communication.

23    Q.  Yes.

24    A.  Yes.

25    Q.  Then you said that when the agent asks you to edit out

```
 1    he was present, he's referring to whether he was copied on a
 2    communication; correct?
 3    A.  Yes.
 4    Q.  But -- so we'll get -- yes.  Okay.  So the request he
 5    was making of you was to make a false entry in a document;
 6    correct?
 7    A.  So again, we had a conversation after this because I
 8    don't --
 9    Q.  I know --
10    A.  -- believe --
11    Q.  I know --
12    A.  -- that that --
13    Q.  I know you had a --
14    A.  -- agent was --
15    Q.  I'm going to let you get to the conversation after.  I'm
16    sorry.  I'm not --
17    A.  That's okay.
18    Q.  -- trying to be rude, but we have to do it with -- step
19    by step --
20    A.  Sure.
21    Q.  -- to get to the facts.
22            So at this point, before you have the other
23    conversation, the agent is asking you to make a false
24    statement of fact in a document?  The CHS report.
25    A.  I don't see it that same way you do.
```

1    Q.  But -- so I'm not asking -- so it's not about opinion;

2    right?  Because we said all these things are true or false;

3    right?  Whether someone's copied on a communication is true

4    or false.  What the agent is asking you to do, you said,

5    concerns whether the agent was copied on a communication;

6    then the agent asks you to edit out that he was present;

7    meaning, edit out that he was copied on the communication.

8    That is not a true fact; right?

9    A.  He was present on the communication.  That's correct.

10   Q.  So it is not a true fact to say that he was not present

11   on the communication; right?

12   A.  I'm sorry.  Repeat your last question.

13   Q.  So it is not a -- if it's a true fact that he was

14   present on the communication, it's not a true fact that he

15   was not present on the communication?

16   A.  I mean, that's a -- I mean, yes.

17   Q.  Okay.  And that -- and I think you testified earlier

18   that he was asking you to edit the report to say that he was

19   not present on the communication; right?

20   A.  I -- again, I -- it was for different reasons than that,

21   but yes, that is what the text reads.

22   Q.  Okay.  Thank you.  That's all I was asking.

23            And now, you could -- I said I'd give you an

24   opportunity to explain, so you can -- please do.

25   A.  Sure.  So my response was "For which one?  The most

1    recent one he copied you in."  I had a conversation with

2    that agent.  He said he was unaware that he had been copied

3    in the emails because he hadn't been following along since

4    the source was no longer his priority anymore; it was mine.

5    Additionally, the conversation, because he was the boss at

6    the time, was why he had wanted his name removed, because he

7    can't approve it if he's on the report and is the boss at

8    the time, but what ended up ultimately happening, I

9    believe -- and I'd need to see the final source reporting to

10   confirm -- but from what I remember is I think he stayed on

11   and somebody else had approved the report.

12   Q.  Thank you, Witness -- Agent, excuse me.

13           Would you agree that those are reasons for making

14   a request rather than the facts of the request itself?

15           MR. KENERSON:  Objection.  Relevance to her

16   opinion on that point.

17           THE COURT:  Overruled.

18           THE WITNESS:  Repeat your question.

19   BY MR. SMITH:

20   Q.  Would you agree that the explanation you just gave are

21   reasons that the supervisory agent did what he did, the

22   reasons he made the request, or are they facts about the

23   request itself?

24   A.  I would say they're reasons.

25   Q.  Okay.  Thank you.  So I'm going to move on to a

1    different subject here.

2              Agent, as the case agent, you've interviewed a

3    number of witnesses in this investigation; correct?

4    A.  Correct.

5    Q.  You've interviewed Charles Donohoe?

6              MR. KENERSON:  Objection.  Scope.  Relevance.

7              THE COURT:  All right.  Let's go to the -- let's

8    have a sidebar briefly, please.

9              (Bench conference:)

10             MR. SMITH:  Your Honor, I'm just laying a

11   foundation for questions, because I have to be able to

12   establish that she's aware of certain things.  She testified

13   about Mr. Donohoe's communications.  She testified about

14   Mr. Bertino's communications.  I'm just laying the

15   foundation that she's interviewed them and -- I'm not going

16   to ask questions about what those witnesses said to her.

17             THE COURT:  Well, if that's all this is, I suppose

18   Mr. Kenerson has no objection; correct?

19             MR. KENERSON:  Correct, if that's all this is.

20             THE COURT:  All right.  You may proceed.

21             (Return from bench conference.)

22   BY MR. SMITH:

23   Q.  Apologies, Agent.  So you -- just so you know what I'm

24   doing, I'm just -- I'm getting a sense of what you've done

25   on the investigation overall.

1          So you testified that you've interviewed Charles

2    Donohoe?

3    A.  I have.

4    Q.  Okay.  You've interviewed Jeremy Bertino?

5    A.  I have.

6    Q.  Okay.  You've interviewed someone named Kenny Lizardo?

7    A.  I have.

8    Q.  Okay.  So you -- when you were interviewing Mr. Bertino,

9    isn't it the case that you gave him false information about

10   the nature of the Government's evidence?

11          MR. KENERSON:  Objection.  Scope.

12          MR. SMITH:  Your Honor, this is a credibility

13   issue.

14          THE COURT:  Again, we could have discussed this at

15   the first bench conference.

16          (Bench conference:)

17          MR. SMITH:  Your Honor, so the Government --

18   the -- multiple defense lawyers have advised the Government

19   for -- in emails over days that this subject was going to

20   come up.  This testimony -- this is already in evidence.

21   This is a conversation where the agent --

22          THE COURT:  I know -- okay.  I understand where

23   you are.

24          Mr. Kenerson, are you objecting to this as beyond

25   the scope?

1          MR. KENERSON:  I mean, I --

2          THE COURT:  I -- go ahead.

3          MR. KENERSON:  Yes.  I mean, the objection is

4     "beyond the scope."

5          THE COURT:  I mean, I think for reasons we've --

6     for reasons that actually played into the kinds of things I

7     already looked at -- I mean, I think there is a credibility

8     issue here that's tied to the investigation.  And so on this

9     particular -- I'm not -- this doesn't blow open, you know,

10    everything she's done on the investigation, but I think

11    Mr. Smith gets to poke at this for credibility purposes.

12          MR. KENERSON:  Understood.

13          (Return from bench conference.)

14    BY MR. SMITH:

15    Q.  Agent, I'm sorry for that.  The last question I asked

16    you was whether you had, in interviewing a Government

17    witness -- had given them false information about the nature

18    of the Government's evidence.

19    A.  Specifically pertaining to?

20    Q.  Well, let me just start with the general question.  Have

21    you, in interviewing a Government witness, given them false

22    information about the nature of the Government's evidence?

23    A.  Not that I'm aware of.

24          MR. SMITH:  Okay.  So Your Honor, I'm going to

25    bring up what's been marked as Government Exhibit-506.  It's

1    an audio recording from March 18th, interview conducted by

2    Ms. Miller.  The timestamp is 1 hour, 15 minutes, and 49

3    seconds, and it goes to 1 hour and 16 minutes and 46

4    seconds.  It's in evidence.  And I'll start playing it.

5                (Audio played.)

6                MR. SMITH:  Oops, apologies.

7                THE COURT:  Mr. Smith, if you would just pause for

8    one moment.  I want Ms. Harris to just confirm that it is in

9    evidence, although I have no reason to doubt --

10               THE DEPUTY CLERK:  506?

11               MR. SMITH:  Correct.  It was introduced through

12   Witness Bertino.

13               MR. KENERSON:  And those particular timestamps.

14               MR. SMITH:  And those particular timestamps.

15               THE DEPUTY CLERK:  I don't see it --

16               MR. SMITH:  Excuse me?

17               THE DEPUTY CLERK:  I don't see it listed.  It was

18   not in the initial list, and I don't see it on the

19   additional pages that I have with numbers that weren't on

20   the original list.  Hold on.

21               MR. SMITH:  Okay.

22               THE DEPUTY CLERK:  506?

23               MR. SMITH:  Correct.

24               THE DEPUTY CLERK:  I'm not showing it.

25               THE COURT:  Does --

```
 1                    MR. SMITH:  Your Honor --

 2                    THE COURT:  Let me just hear you at sidebar.

 3                    (Bench conference:)

 4                    THE COURT:  Mr. Kenerson, does the Government have

 5       this in evidence?

 6                    MR. KENERSON:  Certain portions.  I just --

 7                    THE COURT:  Okay.

 8                    MR. KENERSON:  I don't have the timestamps in

 9       front of me.

10                    MR. SMITH:  This --

11                    THE COURT:  Okay.

12                    MR. SMITH:  -- exact -- Your Honor, I can

13       represent -- I don't have the -- the transcript is about

14       15,000 pages.

15                    THE COURT:  It --

16                    MR. SMITH:  It is in evid- -- this --

17                    THE COURT:  Okay.

18                    MR. SMITH:  This exact exchange is in evidence.

19                    THE COURT:  All right.  And I don't think it

20       really --

21                    THE DEPUTY CLERK:  Could it be in evidence through

22       someone else?

23                    THE COURT:  No, I don't think so.

24                    Ms. Harris is asking whether -- but it doesn't

25       really matter whether it is or is not.  The point is the --
```

1    Mr. -- this exchange, as long as it's cabined to what we're

2    talking about, is admissible -- is at least admissible for

3    him to play, with this witness, now.

4            Mr. Kenerson?

5            MR. KENERSON:  I think that's right.  And just one

6    point of clarification in case Ms. Harris is looking in

7    Government exhibits.  He -- Mr. Smith may have said

8    Government-506.  It was actually Nordean-506.

9            THE DEPUTY CLERK:  That's probably the problem.

10           THE COURT:  All right.

11           MR. SMITH:  That's right.  That's exactly right.

12   Okay.

13           THE COURT:  All right.

14           MR. SMITH:  Okay.  Thank you.

15           THE COURT:  All right.

16           (Return from bench conference.)

17           (Audio played.)

18   BY MR. SMITH:

19   Q.  So do you recall interviewing Jeremy Bertino in March of

20   2022?

21   A.  I do.

22   Q.  Okay.  And do you recall that in your interview, you

23   showed him a document called 1776 Returns?

24   A.  I did.

25   Q.  Okay.  And that audio recording we just heard, that

1    reflected your questions -- or statements made to Jeremy

2    Bertino; correct?

3    A.  It did.

4    Q.  Okay.  So when -- I think we heard Bertino ask you --

5    he's looking at the 1776 Returns document during this

6    exchange we heard; right?

7    A.  He is.

8    Q.  Okay.  And when you informed Mr. Bertino that he -- that

9    Enrique Tarrio created the 1776 Returns document, did you

10   have any factual basis for believing that?

11   A.  I did.

12   Q.  What was that?

13   A.  So the information -- the document was recovered from

14   Enrique Tarrio's phone which the FBI had just recently

15   gotten into prior to that interview with Jeremy Bertino.

16   Mr. Tarrio was sent that document from Eryka Flores -- I

17   don't -- a female friend of his.  Additionally, he, then,

18   Googles "Winter Palace."  And you wouldn't have known

19   "Winter Palace" unless you opened the document.  So he gets

20   it on -- I want to say it was December 30th, roughly.  He

21   Googles, I think, "Winter Palace" -- it may have been

22   January 4th or January 2nd.  I'd have to double-check that

23   for those dates.  And then there's a text message sent to

24   Bertino on January 6th that says "Winter Palace," which

25   indicated to me that, maybe, Jeremy Bertino knew about the

12964

1    document.

2    Q.  So let -- are you finished or --

3    A.  I was going to say, so I believed Mr. Tarrio had created

4    the document or had some role in it, and I still believe

5    that.

6    Q.  Okay.  So I think you heard in that exchange Mr. Bertino

7    says "I thought you just told me he was sent it from someone

8    else," and then he seeks -- did you hear that question?

9    A.  I would need to hear the recording again, but yes,

10   something to that extent.  I think I said -- "created," were

11   my words.

12   Q.  Yeah.  And then Mr. Bertino follows up and said "I

13   thought you just told me someone sent to it to him"; right?

14   Do you remember that part?

15   A.  I'd -- again, I'd need to hear that again.

16   Q.  Okay.  Let's listen --

17   A.  But I know my words, I think, were "created."

18   Q.  Okay.  So your basis for telling him that it -- that

19   Tarrio created the document was that he received it and then

20   Googled the word "Winter Palace"?

21   A.  And once you open that document, the title of it is:

22   Storming the Winter Palace.

23   Q.  No, no, no, I understand that.  All of those facts are

24   consistent with receiving a document; correct?

25   A.  Correct.

12965

1    Q.  So when Jeremy Bertino clarifies "Do you mean he

2    received it or did he create it," and then you said "He

3    created it with assistance"; right?

4    A.  I did.

5    Q.  Okay.  So what is your basis for telling him that Tarrio

6    created it as opposed to receiving it?

7    A.  I think he had involvement in the creation of the

8    document.  Whether it was initially off the bat when it was

9    sent to him by Eryka or -- there were also different

10   variations of the document.  So we saw from our evidence

11   recovery, like, an Edition 1, 2, 3, 4, each with different

12   edits.  So I think Mr. Tarrio had some involvement in that,

13   and I still think that way.

14   Q.  You think that.  Can you tell us what the facts are that

15   you base your thinking on.

16   A.  Sure.  So there's text messages between Mr. Tarrio and

17   Eryka prior to him receiving the document where she talks

18   about she's creating something.  Again, I don't have those

19   in front of me.  I can't tell you what they are verbatim.

20   Q.  Okay.

21   A.  But it indicates that she is planning on working on

22   something and wants his assistance with it.  The document

23   is, then, sent to him on December -- again, I think it's

24   the 30th.  I would need to verify that date, but I'm pretty

25   sure it's the 30th around noon.  He ends up Googling "the

1    Winter Palace" shortly thereafter.  Again, I -- I'm not

2    certain on the date.  It's somewhere between, I want to say,

3    the 1st and the 4th, but he ends up Googling "Winter

4    Palace."  I would -- I can get you all of this if I need to,

5    but -- anyway, ends up Googling the --

6    Q.  I take your word for it.

7    A.  I'm sorry?

8    Q.  I said I take your word for it --

9    A.  Oh, okay.

10   Q.  Yeah.

11   A.  After Googling it, he -- at some point, there's a

12   message sent to Jeremy Bertino on the 6th about -- where he

13   uses the term "Winter Palace."  Additionally, in his phone,

14   on January 2nd -- I don't remember the time -- but it's

15   either created, modified, or accessed that document.  It's

16   in his phone -- yeah, it's the 1776 document, and it's in

17   his phone, created, modified, or accessed.

18   Q.  Okay.

19   A.  Okay.  After created, modifying, or accessing that

20   document, within a minute, there's a phone call to Ethan

21   Nordean.  What that's about, I don't know.  Is it related?

22   I don't know.  But, again -- and then days later is the text

23   message to Jeremy Bertino saying "Winter Palace."  All of

24   those facts in play is what leads me to believe, and still

25   believe, that Enrique Tarrio had some involvement in

1    creation of that document.

2    Q.  Okay.  Those are all the facts; right?

3    A.  The facts that I know right now, yes.

4    Q.  Okay.  So you assisted in the compilation of evidence

5    for the exhibits that are used in this case; right?

6    A.  I provided evidence, but I did not ultimately choose

7    what went into the presentation and what went into what we

8    saw.

9    Q.  Okay.  And you viewed footage of the defendant group in

10   this case walking all of the way from the Washington

11   Monument to the Capitol building; correct?

12   A.  I did.

13   Q.  Okay.  And -- from different video streams?

14   A.  Correct.

15   Q.  Okay.  So -- I want to get into those modules -- these

16   video montages that you testified about on direct.  I think

17   there were two main ones.  One was Government Exhibit-1000

18   and the next one was Government's Exhibit-1001; right?

19   A.  I don't know what the numbers are, but there's the march

20   monument [sic] and then there's the Peace Circle monument.

21   Q.  Okay.  And the way that these montages are put together

22   is to take -- you testified about different video streams

23   that you had reviewed of the march; right?

24   A.  Correct.

25   Q.  And the way the montages are made that you testified

12968

1    about is to take various clips from those streams and put

2    them together into a montage; right?

3    A.  Correct.

4    Q.  Okay.  And those montages don't reflect real-time

5    reality; right?

6    A.  What do you mean?

7    Q.  So you didn't simply take all of the live stream video

8    footage and put it into the montages.  There were edits

9    done; right?

10   A.  So different parts of different videos, yes, and that's

11   because, if we would have taken the entire video of the

12   march around, the jury would be here for months.

13   Q.  Right.  And -- but it's more than that; right?  Because

14   I think the prosecutor asked you whether certain comments

15   that Ethan Nordean made during those clips were edited out;

16   correct?  Do you remember --

17   A.  I don't recall.

18   Q.  So this was last Wednesday, probably.  So that is fair.

19   But you don't -- I'm going to just ask it another way,

20   maybe.

21           Do you remember that when you began watching one

22   of the montages -- the march montage, the prosecutor asked

23   you, "Does this include every comment Mr. Nordean made on

24   the march?"

25   A.  Okay.  Yes.  That's correct.

1    Q.  And your answer was?

2    A.  "No."

3    Q.  Okay.  And did the prosecutor ask you to explain which

4    comments of Mr. Nordean's were not included in the montage?

5    A.  I don't remember.

6    Q.  Okay.  So -- do you know why certain comments of

7    Mr. Nordean's were excluded from the montage we watched?

8    A.  I didn't pick what went into that montage.

9    Q.  Okay.  So some of the footage from the montage was taken

10    from a filmmaker named Eddie Block; right?

11    A.  It was.

12    Q.  And Eddie Block is -- I think you went through him in

13    your testimony -- but he's a paraplegic in a wheelchair;

14    correct?

15    A.  He is.

16    Q.  And is it your understanding that he was essentially

17    filming in an unbroken stream from -- the march from the

18    Washington Monument to the Capitol building?

19    A.  Yes.

20    Q.  And is it your understanding that Block was streaming

21    his footage online as he filmed?

22    A.  Yes.

23    Q.  It was -- was it streamed on YouTube?

24    A.  I don't know what site it was streamed on, but I know,

25    based on his comments on the video, a lot of the time it

 1    went in and out.

 2    Q.  So sometimes the footage went in and out.  But it's your

 3    understanding that Block was attempting to film the march

 4    from the beginning to the end --

 5    A.  Yes.

 6    Q.  -- at the Capitol -- okay.  And it's your understanding

 7    that the defendants in this case knew about Eddie Block

 8    filming them; right?

 9    A.  Yes.

10    Q.  Eddie Block had their permission to film; correct?

11    A.  I don't know if -- what Eddie -- what conversations

12    Eddie had with the defendants here, but I know he had his

13    camera, like, pretty -- visually, you could see it, and he

14    was following them around.

15    Q.  Okay.  And -- so you haven't seen any footage where the

16    defendants tell Eddie Block, Hey, you should not be filming

17    us -- filming our march from the Washington Monument to the

18    Capitol; right?

19    A.  Not that I recall.

20    Q.  Okay.  So is there -- have you seen any indication in

21    the evidence that the defendants did not know that that

22    footage was being streamed online live?

23    A.  Not that I can think of, but only because Eddie was --

24    as he was filming, he would continuously say, "Oh, you know,

25    server's down," or, "I can't get on to the connection."  I

1    don't know if your defendants -- if the defendants were

2    within earshot of that or not because Eddie was, kind of,

3    all over the place.

4    Q.  Okay.  So some of the footage from the montage, it was

5    also taken from a camera person called Pamela Hemphill;

6    right?

7    A.  Yes.

8    Q.  And is she -- was she, kind of, like an older lady who

9    was protesting that day?

10   A.  I don't know much about Pamela Hemphill.  I just watched

11   her videos.

12   Q.  Okay.  And you recall testifying about some of those in

13   the montage we watched?

14   A.  Yes.

15   Q.  Okay.  And similarly to Eddie Block, she was filming the

16   defendants with her phone up as she interviewed them; right?

17   A.  She was filming the defendants, yes.

18   Q.  Right.  In a way that was very visible to people

19   standing around; correct?

20   A.  Sure.

21   Q.  Okay.  Now, there were others filming that day, as well;

22   right?

23   A.  There were.

24   Q.  There was a British filmmaker named Nick Quested who was

25   also filming the group on the march from the Washington

1     Monument to the Capitol; right?

2     A.   There was.

3     Q.   Okay.  And some of his footage is in the montage, as we

4     watched?

5     A.   Yes.

6     Q.   And similarly, the -- it was your understanding that the

7     group gave him permission to film them that day?

8     A.   I don't know if what the -- what conversations Quested

9     had with the group.

10    Q.   Did you see any evidence in your investigation of this

11    case that the group did not want Mr. Quested to be filming

12    their march from the Washington Monument to the Capitol?

13    A.   Again, I wasn't privy to any of the conversations, but

14    it -- I didn't -- from what I remember watching, I don't

15    recall anyone telling him to stop.

16    Q.   Okay.  So just to sum up that point, we have three

17    streams of videos being made of the defendants; correct?

18    A.   Mm-hmm.

19    Q.   And no evidence indicating they did not want themselves

20    to be filmed; right?

21    A.   Not that I'm aware of, no.

22    Q.   Okay.  So you testified at various points that Nordean

23    gave orders to the group of marchers; right?

24    A.   Yes.

25    Q.   Like stop and go?

1    A.   Yes.

2    Q.   And it's your understanding that he gave orders because

3    he wanted them to be followed rather than disobeyed; right?

4    A.   I don't know why he was giving orders.  I don't know

5    what was going through Mr. Nordean's head.

6    Q.   Okay.  Do you have any -- have you seen any evidence

7    suggesting that the orders were not -- were given so that

8    they wouldn't be obeyed?

9    A.   No.

10   Q.   Okay.  So I'm going to bring up what's been marked as

11   Nordean Exhibit-301.  And what I'm going to do, Agent, is

12   we're going to go through some of the clip -- we're going to

13   go through chronologically the montage that you went through

14   on direct but with clips that weren't included in the

15   montage.  Okay?

16   A.   Okay.

17   Q.   So we're going to start with Nordean Exhibit-301, and

18   we're going to go to 1 hour, 17 minutes, and 56 seconds.

19   That is in evidence.  It came in through Witness Quested.

20             MR. SMITH:  And permission to publish?

21             THE COURT:  All right.  Permission to publish is

22   granted.

23             MR. SMITH:  Thank you.

24             (Video played.)

25   BY MR. SMITH:

1    Q.  So Agent, before we go on a little bit further, let me

2    just back up one second here.

3            MR. SMITH:  This is really tricky stuff.  Let me

4    show this scene again one more time.

5            (Video played.)

6    BY MR. SMITH:

7    Q.  So Agent, can you see the Washington Monument in the

8    background there that I've drawn the yellow line next to?

9    A.  I can.

10   Q.  Okay.  So would you say that the arrow -- I'm drawing an

11   arrow towards the Washington Monument.  That is the

12   direction of -- that's west; correct?

13   A.  Yes.

14   Q.  Okay.  And then I'm going to draw an arrow in another

15   direction.  And that's east; correct?  (Indicating.)

16   A.  Yes.

17   Q.  Okay.  East is towards -- from this perspective that

18   we're looking at right now, east is towards the Capitol

19   building; correct?

20   A.  Correct.

21   Q.  And this crowd of people right here, the Proud Boys

22   crowd, is standing on the National Mall; correct?

23   A.  Correct.

24   Q.  Okay.  Now, this day -- on this day, on the morning of

25   January 6th, there was a rally being held called the Stop

1    the Steal rally; correct?

2    A.  At the Ellipse, yes.

3    Q.  At the Ellipse.

4            And is the Ellipse -- from this perspective, is

5    the Ellipse west?

6    A.  It's more this direction (indicating.)

7    Q.  It -- okay.  Right.  So would you say it's north and

8    west?

9    A.  Yes.

10   Q.  Okay.  It's the opposite direction of the Capitol;

11   correct?

12   A.  Correct.

13   Q.  Okay.

14            (Video played.)

15   BY MR. SMITH:

16   Q.  So did you hear what the -- what Ethan Nordean said

17   there?

18   A.  "We're going to go to the Capitol, make a presence, and

19   then go back to the main rally."  Something to that extent.

20   Q.  Do you see him pointing?

21   A.  I did.

22   Q.  Okay.  Which direction is he pointing?

23   A.  I'd have to re-see the video, but I think he's pointing

24   in the direction of the Monument.

25   Q.  Okay.  Or -- I think you also said that around here --

1    maybe, right here (indicating), was the Ellipse?

2    A.  Yes, but I think his pointing was this way, (indicating)

3    but yes.

4    Q.  Okay.  Fair enough.  Okay.  Let's just watch that.

5          (Video played.)

6          MR. SMITH:  I apologize.  I just want to make sure

7    we get the pointing right here.

8          (Video played.)

9    BY MR. SMITH:

10   Q.  Now, before Mr. Nordean makes that comment, again, I

11   want to just circle someone right here with the yellow

12   circle around their head.  Can you see that figure?

13   A.  I can.

14   Q.  Who is that?

15   A.  That's Travis Nugent.

16   Q.  Okay.  And was Travis Nugent in the close proximity of

17   Ethan Nordean throughout this march?

18   A.  Yes.

19   Q.  Okay.  And would you say that Mr. Nugent was consulting

20   with Mr. Nordean and Mr. Biggs and Mr. Rehl throughout the

21   march?

22   A.  He has conversations with them, but what's said is -- I

23   don't know.

24   Q.  Do you recall moments -- and we'll get to those -- where

25   Mr. Nugent is pointing directions where the figures should

1   go?

2   A.  He's -- I do see his hands pointing.  I would need to

3   see the specific clip to, kind of, gather what you're

4   speaking about.

5   Q.  What would you -- what was your understanding of what

6   Mr. Nugent was doing when he's pointing directions?

7              MR. KENERSON:  Objection.  Foundation.

8              THE COURT:  The witness can answer if she knows.

9   And, Mr. Smith, if you'd just keep your voice up a little

10  bit.

11             MR. SMITH:  I apologize, Your Honor.

12             THE COURT:  It's all right.

13             THE WITNESS:  Repeat your question.

14  BY MR. SMITH:

15  Q.  So what -- I think you testified that at various points

16  on the march, you see this figure (indicating), who is

17  wearing a black neck gaiter, pointing out directions to the

18  group that he's standing with here of defendants; right?

19  A.  He's having conversations with them, and what's said is

20  unknown, but his fingers do go -- like, point at things.

21  But, again, I don't know what the conversation is, so I

22  don't know what that's in context to.

23  Q.  It doesn't -- it didn't appear to you that he's pointing

24  out landmarks or a destination?

25  A.  So again, certain parts throughout the video -- and as,

12978

1   I'm sure, this proceeds and we get to that, we can, kind of,

2   highlight that further.  But --

3   Q.  Okay.

4   A.  -- at this specific video --

5   Q.  Right.

6   A.  -- you're showing me now, no.

7   Q.  Okay.  Now, it looks like, throughout this march, this

8   guy -- this figure, Nugent, is wearing a neck gaiter;

9   correct?

10  A.  Yes.

11  Q.  And it appears to be covering almost his entire face,

12  except for his eyes?

13  A.  On this view, yes.

14  Q.  It's somewhat hard to identify him; right?

15  A.  On this view, but, again, it's -- there's tons of video

16  throughout the day.  So from the Washington Monument to the

17  march to, you know, Capitol grounds.

18  Q.  Okay.  And you don't recall Mr. Nugent ever lift- -- on

19  the march video that you've looked at, you don't recall him

20  ever moving down his face mask?

21  A.  He might have at some point, but I don't recall a

22  specific instance because -- I mean, I've watched this video

23  several times.

24  Q.  Yeah.  So -- do you see that map behind you?

25  A.  I do.

1    Q.  You've been pointing out through your testimony where

2    various defendants end up at the Capitol with -- with

3    colored markers; right?

4    A.  I have.

5    Q.  Now, Travis Nugent was with this group of people after

6    the first barrier was breached, right?

7    A.  I'd need to double-check.  I'm not 100 percent certain,

8    but he does go onto Capitol grounds.

9    Q.  So that -- well, that would imply that he goes past the

10   first breach at the Peace Circle?

11   A.  Yes.

12   Q.  Okay.  So you know that as a fact?

13   A.  Yes, because he -- well, I know he -- he -- at some --

14   he gets onto Capitol grounds.

15   Q.  Okay.

16   A.  I don't know if it's through the First Street barricade

17   or if he goes a different direction, but he is on Capitol

18   grounds at some point.

19   Q.  So he's -- let me just understand this.  So he's walking

20   with the -- with what's being characterized as the

21   leadership group right here (indicating); right?

22   A.  Yes.

23   Q.  He's walking with them all of the way from the

24   Washington Monument to the Capitol; right?

25   A.  Yes.

1    Q.  You see him pointing in various directions; right?

2    A.  Well -- while having conversations with people.

3    Q.  Right.  Okay.  And you see him cross the first breached

4    barrier; right?

5    A.  Again, I would need to see a clip of that video.

6    Q.  He's a Proud Boy; right?

7    A.  I believe so, yes.

8    Q.  Okay.  So he goes on to the Capitol grounds with the

9    group, right, where some of those colored markers are?

10   A.  Yes.

11   Q.  Was he charged?

12            MR. KENERSON:  Objection.  Scope.

13            THE COURT:  Sustained.

14            MR. KENERSON:  Relevance.

15            THE COURT:  Sustained as to relevance.

16            MR. SMITH:  Let me get back to that.

17            (Video played.)

18   BY MR. SMITH:

19   Q.  What was that last comment?

20   A.  I was looking at the pointing.  So the pointing was

21   behind him and then in front of him.  You'll also notice a

22   pause when he says "We're going to march back to" --

23            MR. PATTIS:  Objection.  Non-responsive, Judge.

24            MR. SMITH:  That's -- Your Honor, she can narrate.

25   She can narrate.

```
 1              THE COURT:  All right.  If there's no --

 2              MR. SMITH:  There's no objection.

 3              THE COURT:  All right.

 4              MR. SMITH:  Yeah.

 5              THE COURT:  You may proceed.

 6              MR. SMITH:  Yeah.

 7              THE WITNESS:  Yeah.  He says "We'll go to the

 8    Capitol," points behind him.  There's a pause.  It looks

 9    like he looks at Eddie Block or in the direction of Eddie

10    Block -- maybe, not specifically at him --

11              MR. SMITH:  Right.

12              THE WITNESS:  -- and then continues with "We'll

13    march" -- or "go back to the rally" and points the direction

14    of the Monument.

15    BY MR. SMITH:

16    Q.  Okay.  And then there's -- I was asking you about a

17    comment right after that where he said "make yourselves look

18    good."

19    A.  Can you play that again?  I'm sorry.

20    Q.  Okay.

21    A.  I was focused on pointing.

22              (Video played.)

23    BY MR. SMITH:

24    Q.  Did he say "Wave around, eat and drink, and make

25    yourself look good"?
```

1    A.  I heard "every chance you get," something to that

2    extent, and then "make yourself look good."  Yes.

3    Q.  Okay.  So let's just proceed on with the march here.

4    I'm going to bring up a section that you testified about,

5    again, on one of the montage clips from Eddie Block, but it

6    just -- this segment was not included in the --

7    A.  Okay.

8    Q.  -- clip.  So I'm going to go to Nordean-301 at 2 hours

9    and 44 minutes and 32 seconds.  And first, I'll let you,

10   kind of, get situated here.

11              (Brief pause.)

12              Okay.  So I'm going to put this back up on the

13   screen.

14              So Agent, can you see this, like, row of trucks

15   right here?

16   A.  I do.

17   Q.  Those are food trucks; right?

18   A.  Yes.

19   Q.  Okay.  And do you remember testifying about a moment

20   when the group of marchers reaches the food trucks and stops

21   and eats food?

22   A.  I do.

23   Q.  Okay.  And I think some of the footage that was shown in

24   this scene involved what some of the defendants here called

25   the beast.  There was a scene where something -- they said

1    "Oh, there's the beast."  And there was a motorcade that

2    drove by; right?

3    A.  Right.

4    Q.  Okay.  So that's approximately where we are in time;

5    right?

6    A.  I'd need you to play this a little more, but --

7    Q.  I'm going to.  But after the food scene with the

8    defendants, they, then, proceed in the montage video to the

9    Peace Circle; correct?

10   A.  Yes.

11   Q.  So this would probably be about 10 minutes before they

12   proceed to the Peace Circle?

13   A.  Again, I don't know what point we are in the video, but

14   they were at the food trucks for, maybe, 30, 40 minutes.

15   Q.  Okay.  And then they proceed to the Peace Circle?

16   A.  Yes.

17   Q.  Okay.

18          (Video played.)

19   BY MR. SMITH:

20   Q.  So you said this was one of the last stops before the

21   Capitol; right?

22   A.  Yes.

23   Q.  So it looks like -- did you see this figure on the left

24   side of the screen?

25   A.  Yes.

1    Q.  Okay.  He's a journalist?

2    A.  He is.

3    Q.  And he's talking with someone who's filming?

4    A.  He's talking with Eddie Block.

5    Q.  Okay.  And he asks Eddie Block where the group is going?

6    A.  He does.

7    Q.  And Eddie Block says "We're going back to the rally"?

8    A.  He does.

9    Q.  Okay.  And then the journalist asks "Is anything going

10  on at the Capitol"; right?

11    A.  He does.

12    Q.  Okay.  And Eddie Block says "No, not really"; right?

13    A.  He does.

14    Q.  So we'll -- I know you would like to show other

15  additional clips.  We'll get to those in just a second here.

16         So we were talking about that individual, Travis

17  Nugent, who was wearing a black neck gaiter.  It makes it

18  very difficult to see who he is.  I'm going to bring up

19  what's been marked as Nordean Exhibit-305.  And it's been

20  admitted.  Let's see here.

21         (Brief pause.)

22         And I'm going to -- thank you.

23         I'm drawing a circle around someone again.  Is

24  that -- the person I've drawn a yellow circle around, is

25  that Travis Nugent?

1    A.   That is.

2    Q.   Okay.   I'm going to ask you to -- and where do you --

3    where is the group at this point?

4    A.   They are passing the Peace Monument.

5    Q.   Okay.   And do you understand them to be heading towards

6    the food trucks?

7    A.   They're going to -- can I show you --

8    Q.   Yeah.   Please.

9    A.   It's easier.

10   Q.   Please.

11   A.   So they're proceeding this direction, (indicating.)   So

12   north.   Yeah.   And then they're going to end up circling the

13   Capitol, ending up on the east side.

14   Q.   Right.   And then where do they go from -- while you're

15   still up there, where do they go from the east side?

16   A.   So from the east side, they end up taking, kind of, the

17   same route back --

18   Q.   Mm-hmm.

19   A.   -- and they end up at the food trucks.

20   Q.   And then from the food trucks, it's --

21   A.   They end up going to the Peace Circle --

22   Q.   Right.

23   A.   -- and then that's when the breach happens.

24   Q.   Okay.   Okay.   Thank you.   So thank you for letting us

25   know where this is.   I'll let this play.

```
 1                    (Video played.)
 2    BY MR. SMITH:
 3    Q.  Now, I've paused it here because we were discussing
 4    earlier how during the march of the group, this person,
 5    Nugent, with the black mask would often point directions to
 6    the group; right?
 7    A.  Correct.
 8    Q.  Does he appear to be doing that here?
 9    A.  Yes, he appears to be pointing.  Yes.
10    Q.  Okay.  And you indicated that the conversations that --
11    among the group when he was pointing were not audible;
12    right?
13    A.  I -- again, if you want to play a certain clip, if you
14    want me to try to listen, I can.
15    Q.  Okay.  Okay.
16                    (Video played.)
17    BY MR. SMITH:
18    Q.  Now, did you see where he was just pointing?
19    A.  He's pointing in the direction that they end up
20    ultimately going.
21    Q.  Thank you for that.
22              So he looks to be pointing to the other side of
23    the building -- the Capitol building; correct?
24    A.  The way I see it is he's pointing to the road in front
25    of him and then, kind of, down Constitution, but --
```

```
 1    Q.  And you testified that after this point, the group walks

 2    around to the back side of the Capitol or the east side;

 3    correct?

 4    A.  Yes.  There's stops along the way, but yes.

 5    Q.  Okay.  And it's your testimony that he appears to be,

 6    sort of, pointing that route out right there?

 7    A.  And having a conversation, yes.

 8    Q.  Okay.  So we'll play the conversation.  Hold on.

 9              (Video played.)

10    BY MR. SMITH:

11    Q.  Do you see where he's pointing now?

12    A.  I would believe this to be either in the direction of

13    the Washington Monument or the food trucks.

14    Q.  Or?

15    A.  The food trucks.

16    Q.  Or -- is there another one?

17    A.  No, just those two.

18    Q.  So do you remember how -- when we were looking at the

19    Nordean Exhibit-301 at about an hour and 17 minutes at the

20    National Mall and we pointed out how there's two objects

21    that are in the back- -- there were two objects in the

22    background, the Washington Monument and the Ellipse --

23    A.  Mm-hmm.

24    Q.  -- and how they were both west and north?

25              Okay.  So is it -- so do you see this -- Nugent
```

1    pointing back in that direction?

2    A.  He's pointing that direction, yes, but what specifically

3    he's pointing at, I don't know, but it could be.

4    Q.  Oh.  So did you hear him say "We're heading back to the

5    rally"?

6    A.  I didn't.  If you want to back it up, I'll pay more

7    attention.

8    Q.  Okay.

9              (Video played.)

10   BY MR. SMITH:

11   Q.  Oh.  I guess it's "Start heading back"; right?

12   A.  I still can't hear.  Sorry.

13   Q.  Okay.  It's difficult without headphones, but the

14   headphones in here are not very good.  So --

15             (Video played.)

16             THE WITNESS:  Okay.  I hear "Start heading back."

17   BY MR. SMITH:

18   Q.  Oh, thank you.  Thank you.

19             So earlier, when we were -- we watched a video

20   clip where Mr. Nordean was addressing a group of people in

21   the National Mall; right?

22   A.  He was.

23   Q.  And Mr. Nordean said that "We're going to head down to

24   the Capitol, make a presence, and then head back to the

25   rally"; right?

1    A.  He does, but that's not what they do.

2    Q.  I -- okay.  Thank you.

3    A.  But yes, he does.

4    Q.  Okay.  So you understand this case is about planning;

5    right?

6            MR. KENERSON:  Objection to her understanding of

7    what the case is about.

8            THE COURT:  Sustained.

9    BY MR. SMITH:

10   Q.  Okay.  So I just want to -- here's the last point on

11   this.  Mr. Nordean, in the earlier clip we watched, used the

12   phrase "head back"; right?

13   A.  He did.

14   Q.  Head back to the rally; right?  And this figure here is

15   using the phrase "head back"; right?

16   A.  He is.

17   Q.  And he's pointing in the direction that the rally is;

18   right?

19   A.  Or the food trucks or the Monument, but yes, pointing in

20   that vicinity.

21   Q.  Well, actually -- well, so -- so I think you just

22   pointed out on the map where this is; right?  This is First

23   Street, you know, almost right in front of the Capitol?

24   A.  (Indicating.)

25   Q.  Right.  And so the food trucks are actually north;

1    right?

2    A.  Yeah, on Constitution.  Yes.

3    Q.  Constitution is -- it runs -- it runs perpendicular to

4    the Capitol building?

5    A.  Yes.

6    Q.  Okay.  And Constitution on that map, can you point

7    out --

8    A.  It would be over here (indicating.)

9    Q.  Okay.  Now, if we look at where this figure's

10   pointing -- okay.  So that would be -- Constitution is this

11   way (indicating.)  And then he's pointing this way

12   (indicating.)  Right?

13   A.  Yes.

14   Q.  Okay.  So he's not pointing towards the food trucks.

15   He's pointing either towards the Washington Monument, some

16   point north on the National Mall, or the Ellipse; right?

17   A.  I don't know what he's pointing at, but in that

18   direction.  Sure.

19   Q.  But not the food trucks?

20   A.  I -- again, I can't see from -- I'd need a different

21   angle to determine that --

22   Q.  Okay.

23   A.  -- for sure.

24   Q.  So I think we -- you testified about Pamela Hemphill and

25   how she took some video footage of the group walking towards

1    the Capitol and that some of that footage ended up in the

2    montages; right?

3    A.  Yes.

4    Q.  So I'm going to bring up a part of that that was not --

5    I believe was not included.  You can let me know if it was.

6    I'm going to Nordean Exhibit-316 at 3 minutes and 30

7    seconds.

8            MR. SMITH:  And this has -- this exhibit has been

9    admitted.

10           THE DEPUTY CLERK:  You said Nordean-316?  316?

11           MR. SMITH:  316.  This is --

12           THE DEPUTY CLERK:  It's not admitted.  It hasn't

13   even been --

14           MR. SMITH:  Okay.  So Your Honor, this is the

15   footage of Pamela Hemphill which was included in the

16   Government's exhibits.  This is a scene, I guess, a few

17   seconds before one of the Government's clips.  It might

18   actually be in one of them, but I'm not positive.

19           THE COURT:  All right.  Is there going to be an

20   objection, Mr. Kenerson?

21           MR. KENERSON:  I don't think so, but if we could

22   just briefly go to the phones to confirm.

23           THE COURT:  All right.

24           (Bench conference:)

25           MR. KENERSON:  I under- -- I assume he's about to

```
 1   play the portion.
 2           MR. SMITH:  Yes, Your Honor.  I'm about to play a
 3   portion where Ms. Hemphill asks whether the plan is to go
 4   inside.  And I think this might actually be in the
 5   Government's montage.  They might be using it themselves,
 6   but I'm not positive.
 7           MR. KENERSON:  I don't think it's in the montage;
 8   however, we don't have objection to that portion of it
 9   coming in.  I just wanted to confirm it was that portion.
10           MR. SMITH:  Okay.
11           THE COURT:  Okay.
12           MR. SMITH:  Okay.  Thank you.
13           THE COURT:  You may proceed.
14           (Return from bench conference.)
15   BY MR. SMITH:
16   Q.  So I'm going to --
17           MR. SMITH:  Permission to publish?
18           THE COURT:  And if you can just, Mr. Smith, for
19   the record, do the time.
20           MR. SMITH:  Yes.  It's Nordean Exhibit-316 at 3
21   minutes and 30 seconds.
22   BY MR. SMITH:
23   Q.  Agent, I'm going to play a clip to you and then we'll
24   get to questions after.
25           (Video played.)
```

1    BY MR. SMITH:

2    Q.  All right.  So the voice we heard right there was --

3    that was -- you understand that to be Pam Bu- --

4    A.  I do.

5    Q.  Not Bundy.  Hemphill.

6    A.  Mm-hmm.

7    Q.  Okay.

8         MR. KENERSON:  I apologize, Your Honor.  Just for

9    the record, that ended at 3:58.

10        THE COURT:  Thank you.  I was going to point it

11   out.  Thank you.

12        Mr. Smith, you may proceed.  Okay.  And just so

13   the witness understands, we're not stopping here to exclude

14   anything.

15   BY MR. SMITH:

16   Q.  We're happy to keep playing.  We're just asking you some

17   questions.  That's all.  So Ms. Hemphill is -- films other

18   scenes involving Ethan Nordean; correct?

19   A.  Yes.

20   Q.  In this one, she asks them whether they want to -- "Are

21   we going inside the Capitol"; right?

22   A.  And he says "No."

23   Q.  And he says "No."  But this isn't the only time that Pam

24   Hemphill asks this group about going inside; right?

25   A.  Correct.

1    Q.  She's pestering them with that question; right?

2    A.  I don't know what she's doing.

3    Q.  Well, I won't use the word "pestering."  She asks that

4    question multiple times; right?

5    A.  She asks it more than once, yes.

6    Q.  And she seems to be following them around asking them

7    that question; right?

8    A.  She's following them, taking video.

9    Q.  Okay.  And there was -- I'm bringing this down.  I'm

10   going to bring up a Government exhibit -- or a section from

11   a Government exhibit where there's the time, Agent, when

12   that person, Pam Hemphill, says -- again, says "We want to

13   go" -- "We're getting" -- "We want to go inside the

14   Capitol"; right?  So there was Government Exhibit -- do you

15   recall what I'm talking about?

16   A.  I believe so.  I'm just waiting for the clip.

17   Q.  Okay.  So it's Government Exhibit-1000, and it's at 13

18   minutes and 55 seconds.  I'll bring that up.  I'll bring it

19   up at 13 minutes and 40 seconds just so we can see where

20   we're at here.  Okay.  Let me just play it here.

21              (Video played.)

22   BY MR. SMITH:

23   Q.  Now, before we play this, this is Ethan Nordean I've

24   circled in yellow; correct?

25   A.  Correct.

1    Q.  And this is footage taken by Pam Hemphill; correct?

2    A.  Yes.

3    Q.  Okay.

4              (Video played.)

5    BY MR. SMITH:

6    Q.  Now, at this point, there's a, kind of -- a, sort of,

7    mini transcript up here on the right side of the montage;

8    right?

9    A.  There is.

10    Q.  And at -- there's a male voice saying "Let's do it";

11    right?

12    A.  Yes.

13    Q.  And Ethan says "What?"

14    A.  Yes.

15    Q.  And that male voice says "Let's go check out the

16    Capitol"; right?

17    A.  Correct.

18    Q.  And I want you to look at -- then there's another voice

19    that comes in; right?  Let's see here.

20              (Video played.)

21    BY MR. SMITH:

22    Q.  Then there's another voice, a woman's voice, that says

23    "Take the Capitol"; right?

24    A.  There's another voice.  Yes.

25    Q.  And that's Pam Hemphill?

```
 1    A.  It -- I mean, it sounds similar to hers.

 2    Q.  Okay.  And then we see Ethan, sort of, shaking his head

 3    here after this; right?

 4    A.  We do.

 5    Q.  Okay.  And I don't think you were actually asked this

 6    question.  But the suggestion is that he's shaking his head

 7    at Pam Hemphill; right?  Let's watch that again.

 8              (Video played.)

 9    BY MR. SMITH:

10    Q.  Is Ethan shaking his head there?

11    A.  He is shaking his head there.

12    Q.  Doesn't he start shaking his head before Pam Hemphill,

13    in the background, says "Take the Capitol"?

14              Let's watch that again.

15              (Video played.)

16    BY MR. SMITH:

17    Q.  Maybe he's shaking his head before or immediately as the

18    woman in the background is saying "Take the Capitol"; right?

19    A.  Up and down, yes.

20    Q.  He's shaking his head before she makes that comment?

21    A.  Or as she is stating it, yes.  Yes --

22    Q.  Okay.

23    A.  -- I would agree with you.

24    Q.  It's before?

25    A.  Well, no, you said, "Or as she's starting to say it."
```

1    Q.  Well, let's see if it's before.  It's important.

2              (Video played.)

3    BY MR. SMITH:

4    Q.  It was a very quick reaction; right?

5    A.  Very quick, yes.

6    Q.  Yeah.  So do you think he's responding to Pam Hemphill?

7              (Video played.)

8              MR. SMITH:  Oh, and then I'll let this play.

9              (Video played.)

10   BY MR. SMITH:

11   Q.  So right there, this -- who is this figure wearing a

12   hoodie?

13   A.  Fonticoba.

14   Q.  Okay.  And he's telling -- and that -- in this scene

15   right here, he appears to be telling Pam Hemphill to leave;

16   right?

17   A.  He does.

18   Q.  Okay.  Now, were there other moments on the march where

19   Ethan Nordean told Pam Hemphill he doesn't agree with what

20   she's saying and she should get out of there?

21   A.  Not that I recall seeing.

22   Q.  Okay.  So let me -- I'm going to Nordean Exhibit-316 at

23   5 minutes and 6 seconds.

24              (Brief pause.)

25              I'll just start it at 5 minutes so we can get our

```
 1   bearings here.
 2              MR. SMITH:  Permission to publish Nordean
 3   Exhibit-316?
 4              THE COURT:  All right.
 5   BY MR. SMITH:
 6   Q.  And this is -- before we start, this is Eddie
 7   Block right there in his wheelchair; right?
 8   A.  It is --
 9   Q.  Okay.
10   A.  -- yes.
11   Q.  So it appears that he's filming right now; right?
12   A.  Yes.
13   Q.  Okay.
14              (Video played.)
15   BY MR. SMITH:
16   Q.  Did you hear Mr. Nordean say "You should get out of here
17   and give us some space for your safety and ours"?
18   A.  I hear him say "We need" -- "give us some space for your
19   safety and ours," which he says multiple times to the media
20   as they march throughout here.
21   Q.  Okay.
22   A.  Media on this side, Proud Boys on this side.
23   Q.  Not this individual who's filming right there; right?
24   A.  No, not --
25   Q.  Okay.
```

1    A.  -- Eddie.

2    Q.  Not the guy right there --

3    A.  I don't think he considers Eddie media.

4            (Video played.)

5    BY MR. SMITH:

6    Q.  Okay.  So now, at multiple points during the march,

7    Ethan Nordean indicated the purpose of the march; right?

8    A.  What do you mean?

9    Q.  So you said you reviewed multiple video streams of the

10   march from various figures; right?

11   A.  I did.

12   Q.  And at various points in those video streams,

13   Mr. Nordean indicated what the purpose -- why they're

14   walking down there; right?

15   A.  Do you have a specific clip?  Because I don't recall him

16   giving a specific purpose.

17   Q.  You don't recall?

18           Okay.  It wasn't -- the specific purpose wasn't to

19   take pictures; that they do a photo op at the Capitol and

20   then head back to the rally?

21   A.  I think he did say that at some point, yes.

22   Q.  At multiple points?

23   A.  Do you have a certain clip?

24   Q.  Well, first, I'm asking your testimony.  He said that at

25   multiple points; right?

1    A.  I know he did say it at some point.  I don't know if it

2    was multiple or --

3    Q.  Okay.

4    A.  -- once or twice, but it was said, yes.

5    Q.  Okay.  And that wasn't in the montages; right?

6    A.  I don't recall.

7           MR. SMITH:  Okay.  So this is Nordean Exhibit-316.

8    We're going to 22 minutes and 10 seconds.  Now, I'm just

9    going to let you -- I'm going to start at 21 minutes and

10   37 -- 44 seconds just so we can get -- let the witness know

11   where we're at here on the march.

12   BY MR. SMITH:

13   Q.  So does this appear to be the Capitol building in the

14   background here?

15   A.  It does.  We're on the east side right now.

16   Q.  The east side.  Right.  And so I'll just let this play.

17          (Video played.)

18          MR. SMITH:  Well, before we get to Mr. Nordean's

19   comment, let's just look at what Mr. Nugent is doing here.

20   I'll roll that back to 22 minutes and 9 seconds.

21          (Video played.)

22          MR. SMITH:  I've got to -- sorry.  I'll play that

23   again, because that wasn't loud enough.  Let's just see

24   here.  Play here.

25          (Video played.)

1    BY MR. SMITH:

2    Q.  Did you hear "Meet and greet and take some pictures"?

3    A.  I did hear "take some pictures."

4    Q.  Okay.  We'll just -- I'll -- sorry.  I'll just play that

5    again.

6                (Video played.)

7    BY MR. SMITH:

8    Q.  Did you hear that?

9    A.  "Meet and greet and take some pictures," yes.

10   Q.  Okay.  And then -- okay.  So again, we have this -- I'm

11   drawing a yellow circle around -- is that Travis Nugent?

12   A.  It is.

13   Q.  And what is he doing right now?

14   A.  He's pointing east.

15   Q.  He's pointing east?

16   A.  So they're on the east side of the Capitol and he's

17   pointing east.

18   Q.  Okay.  And where is Mr. Nordean pointing?

19   A.  Also pointing east.

20   Q.  I think he might be pointing south or north, but --

21   A.  Maybe southeast.

22   Q.  Yeah.  Okay.  So right -- again, so we have this

23   individual, Nugent, who is pointing out directions; right?

24   A.  He's holding his hand.  I'd -- again, I don't know

25   exactly what he's doing, but his hand, yes, is, kind of,

1    going east -- in the --

2    Q.  Okay.

3    A.  -- east -- direction of east.

4    Q.  Okay.  And Mr. Nordean, again, indicated here, I think

5    he said "Hang out for a bit and take some pictures"?

6    A.  "Meet and greet," but --

7    Q.  "Meet and" --

8    A.  -- "take some" --

9    Q.  -- "greet and take some" --

10   A.  Yes.

11   Q.  -- "pictures"?

12   A.  Yes.

13   Q.  Okay.  And this is -- we're on the east front of the

14   Capitol; right?

15   A.  We are.

16   Q.  And this is before the group walks back to the food

17   trucks which is on Constitution Avenue on the west side;

18   right?

19   A.  Correct.

20   Q.  Okay.  So this is approximately -- this is shortly

21   before the group walks back to the food trucks?

22   A.  Yes.

23   Q.  Okay.  So there's another moment when the group that's,

24   kind of, pointing out where the crowd will go -- where this

25   marching group will go -- when they indicate that the

1    purpose of the march is to do a photo op; right?

2    A.  I don't know that the -- do you have a clip?

3    Q.  Yes.  So I'm going to Nordean-316 at 28 minutes and 40

4    seconds.  And that's just a few -- that's, like, a couple

5    minutes after where we just were.

6              MR. SMITH:  I'm going to just make sure I've got

7    the time right here, 28 minutes and 40 seconds.  We can

8    watch it from here at 28 minutes and 36 seconds, Nordean

9    Exhibit-316.

10   BY MR. SMITH:

11   Q.  And now, we're looking at the Capitol again here.  This

12   is a few minutes after the scene we saw where Mr. Nordean

13   said "hang out," or whatever, "and" -- "meet and greet and

14   take a photo op."  This is a few minutes later.  And we're

15   facing the east front of the Capitol here; correct?

16   A.  Correct.

17   Q.  Okay.

18              (Video played.)

19   BY MR. SMITH:

20   Q.  Did you hear what Defendant Biggs said there?  I'll play

21   that again.

22              (Video played.)

23   BY MR. SMITH:

24   Q.  Did you hear "Turn and face that way and get a picture

25   at the Capitol"?

1    A.  I heard "Something's going to be here.  Turn and face

2    that way."

3    Q.  Okay.

4              (Video played.)

5    BY MR. SMITH:

6    Q.  "And get a picture at the Capitol"?

7    A.  Yes.

8    Q.  Okay.  And so this is just the -- so we just heard, a

9    few minutes before this, Nordean saying "meet and greet,

10   take a photo, hang out," or whatever he said.  And then this

11   is a couple minutes later where Joe Biggs says "We're going

12   to turn around and take a picture at the Capitol"; right?

13   A.  Yes.

14   Q.  Okay.  Now, here's an important -- or excuse me, strike

15   that.

16              I'm going to go to Government Exhibit-1000 at

17   11 minutes and 14 seconds which is a little bit later in

18   time, and this is -- we can see exactly where the group is

19   on this map here.

20              MR. SMITH:  Permission to publish Government

21   Exhibit-1000?

22   BY MR. SMITH:

23   Q.  Okay.  So can you -- the Government put a map on the top

24   of the montage to indicate where the group was at each point

25   in time; right?

1    A.  Yes.

2    Q.  Okay.  So do you see the image below with Ethan Nordean

3    and Travis Nugent?

4    A.  I do.

5    Q.  Okay.  And this is -- where is the group walking now?

6    A.  You're asking where they're walking?

7    Q.  Mm-hmm.

8    A.  So they're going to proceed this direction on

9    Constitution, (indicating) and then towards New Jersey --

10    oh, wait.  I think I actually messed that up.  Hold on.

11    Sorry.  This way, (indicating.)  They're eventually going to

12    end up on the east side of the Capitol.

13    Q.  Okay.  And then when they -- and then they -- and that's

14    where we just saw the last image of Joe Biggs saying "doing

15    a photo op" --

16    A.  Was on the east side of the Capitol, yes.

17    Q.  Yeah.

18    A.  Yep.

19    Q.  So this is -- sorry.  So this is before -- this scene

20    that we're looking at is before the one we just watched --

21    A.  And before the other -- yeah, before the last two.

22    Q.  Okay.  So I'm going to let this play for a second here.

23            (Video played.)

24    BY MR. SMITH:

25    Q.  Okay.  So this is where the montage stops here.  We have

1    a little dialogue here.  "We have a plan and they can

2    adjust," Mr. Nordean says; right?

3    A.  Yes.

4    Q.  And you understand Mr. Nordean to be referring to what

5    plan?

6                MR. KENERSON:  Objection.

7                MR. SMITH:  Based on your review of the video.

8                THE COURT:  The witness can answer, if she knows.

9                THE WITNESS:  I don't know.

10    BY MR. SMITH:

11    Q.  You don't --

12    A.  What exactly he's speaking to -- when we -- when he says

13    "We have a plan," I don't know what he means.

14    Q.  Oh.  Do you understand it, based on your review of the

15    video, to be referring to something relating to the Capitol?

16    A.  It could be.  It could be referring to many things.  I

17    don't know what specifically he's saying when he says "We

18    have a plan."

19    Q.  Okay.  So the montage cuts off here right after he says

20    "We have a plan"; right?  So I'll -- we'll play that again.

21                (Video played.)

22                MR. SMITH:  I'll just let the montage keep

23    playing.

24    BY MR. SMITH:

25    Q.  And then it jumps to another scene; right?

1    A.   It does.

2    Q.   Doesn't Mr. Nordean say the plan is to do a photo op on

3    the east side and go back to the rally right after that?

4    A.   I don't think he says to do a photo on the east side

5    specifically.  He does say "take a picture," yes, but I

6    don't -- again, I don't know if that's what he's referring

7    to when he says "We have a plan; they can adjust."  He's

8    also looking in the direction of the Capitol.

9    Q.   Wait, wait, wait.  So you're saying -- did you see where

10   that montage just cut off there?

11   A.   Yes.

12   Q.   There's two comments on the screen: "We have a plan and

13   they can adjust," from Mr. Nordean; correct?

14   A.   Yes.

15   Q.   And then there -- and then Biggs:  "They're going to

16   look for the patriots"; right?

17   A.   Mm-hmm.

18   Q.   And then we fade to black here; right?

19   A.   To the next scene, yes.

20   Q.   To the next scene in the montage; right?

21   A.   Mm-hmm.

22   Q.   You're saying you understand that following this fade,

23   Mr. Nordean says "We're doing a photo op on the east side"?

24   A.   No, no, no.  You --

25   Q.   Okay.

1   A.   -- had asked me if, at any point, he had said "Are we

2   doing a photo op?"  And he does say that --

3   Q.   Okay.

4   A.   -- just not at this specific moment.  And you asked me

5   if that's what I believed the plan to be, was the photo op,

6   and I don't know what he means by "We have a plan."

7   Q.   So you don't know whether, when I bring up the video

8   next showing what happens after this moment, we'll hear

9   Mr. Nordean saying "We're going to go to the east side, do a

10  photo op, and head back"?

11  A.   I'm -- I don't know if he'll specifically say that.  I

12  think something to that extent might have been said, yes.

13  Q.   Oh.  You remember that?

14  A.   No, no, no.  I'm saying -- again, I said I don't

15  specifically remember him saying that, but there could have

16  been a chance something like that was said.

17  Q.   So I'm not asking you whether there could have been a

18  chance.  I'm asking you whether you remember.

19  A.   I know he gives a speech after this.  So they end up at

20  New Jersey Avenue on the east side right before they cross

21  over to Capitol.  He gives a speech about "taking in our

22  boy," says things to the police officer such as "Do your

23  oath; we're going to do your job for you," is what's to

24  follow this video.

25  Q.   So on -- just to be absolutely clear, I'm not asking you

1  what follows this in a montage.  I'm saying this video clip

2  we're looking at was taken from Pam Hemphill's video in real

3  time; right?

4  A.  Yes.

5  Q.  And in the montage, the video fades to black at this

6  moment after these two lines; right?

7  A.  Yes.

8  Q.  Okay.  I'm asking you whether, in the original source

9  footage from Pam Hemphill at this exact moment when the

10  video fades to black, do you recall Mr. Nordean saying

11  "We're going to the east side of the Capitol, take a photo,

12  and then head back"?

13  A.  I don't recall.

14          MR. SMITH:  Okay.  So I'm bringing up Nordean

15  Exhibit-316 at 11 minutes and 15 seconds.

16          (Brief pause.)

17          I'm going to this moment here which we just saw.

18          Okay.  Permission to publish Nordean Exhibit-316?

19  BY MR. SMITH:

20  Q.  So does this appear to be the same scene we were looking

21  at in the montage but the original source?

22  A.  Yes.

23          MR. SMITH:  Okay.  I'm actually going to go back

24  to 11:09 just so we don't miss the first part of this here

25  and I'll play this.

1           (Video played.)

2     BY MR. SMITH:

3     Q.  Did you hear someone say "We're going to wrap around"?

4           I'll play that again.

5           (Video played.)

6     BY MR. SMITH:

7     Q.  Did you hear "We're going to wrap around"?

8     A.  I can hear "wrap around."  Very faint, but yes.

9     Q.  Right.  It's -- it -- could it be faint because the

10    camera is facing away from the crowd of people who are

11    speaking?

12    A.  Yeah, it's probably faint because the photographer -- or

13    the person taking the video is moving away.

14    Q.  Okay.  Now, I'm going to ask you to keep listening to

15    the same voice.  Okay?

16          (Video played.)

17    BY MR. SMITH:

18    Q.  Now, around 23 to 25 seconds here -- I'm at 11 minutes

19    and 20 seconds -- can you see that -- the timestamp on the

20    screen, Agent?

21    A.  I see 11:20 at the bottom.  Is that what you are talking

22    about?

23    Q.  Yes.  You can see that now?

24    A.  Yes.

25    Q.  Okay.  Between 11 minutes and 22 seconds and 11 minutes

1    and 25 seconds, I'm going to ask you if you hear the same

2    person, Nordean, saying "We're going to walk there and then

3    head" -- "a bad-ass photo" -- "take a bad-ass photo and then

4    head back."  Okay?

5              (Video played.)

6    BY MR. SMITH:

7    Q.   Did you hear "bad-ass picture"?

8    A.   I didn't.  Can you play it again?

9    Q.   Yep.

10   A.   You don't happen to have the scene from Eddie Block's

11   camera, do you?  You might get a better --

12   Q.   It's actually -- because Eddie Block is screaming when

13   he's filming, it's --

14   A.   Worse?

15   Q.   Yeah.  Yeah.

16              MR. KENERSON:  Objection to testifying.

17              MR. SMITH:  Your --

18              THE COURT:  Overruled.

19              MR. SMITH:  She said --

20              (Video played.)

21   BY MR. SMITH:

22   Q.   So at 11:20, did you hear "bad-ass picture"?

23   A.   No, but -- sorry.  There's a lot of background --

24   Q.   We have a transcript that we're going to bring up in a

25   minute, but I'm just going to let it -- going to let

1   you play this again.

2                  (Video played.)

3   BY MR. SMITH:

4   Q.  Did you hear "bad-ass picture" there?

5   A.  I can hear "bad-ass," but I can't make out --

6   Q.  I'll play it again -- well, so the -- part of the

7   problem is, I think -- is the speaker is facing towards the

8   jury rather than you.  So I, you know -- if --

9                  MR. SMITH:  Judge, can we have permission to allow

10  the witness to just go to the speaker?

11                  THE COURT:  I see the Government pivoting the

12  speaker as we speak.

13                  MR. SMITH:  Okay.

14                  THE COURT:  So why don't we try it that way.

15  BY MR.  SMITH:

16  Q.  I'll try it again at 11 -- I'm asking you to listen to

17  11 minutes and 20 seconds.  Okay.

18                  (Video played.)

19  BY MR. SMITH:

20  Q.  Did you hear the "bad-ass picture"?

21  A.  Again, I keep hearing "bad-ass."  I can't make out

22  "photo," but I believe you if, like --

23  Q.  Well, we'll -- unfortunately, that's -- okay.  Hang on.

24                  (Video played.)

25                  THE WITNESS:  I heard it that time.  "Bad-ass

```
 1    picture" is what I heard.
 2    BY MR. SMITH:
 3    Q.  Okay.  "Bad-ass picture."  Okay.
 4          Now, the last thing I'm going to ask you to listen
 5    to, around 11 minutes and 24 to 26 seconds, is "head back."
 6    Okay?  You might also hear "walk towards the Capitol."  You
 7    might hear "Rotunda."  Those are the words.
 8          (Video played.)
 9          THE WITNESS:  I hear a lot of laughing.
10          MR. SMITH:  Okay.  Your Honor, at this point,
11    we're going to bring up a transcript -- a forensic
12    transcript created by Creative Forensic Services; it's the
13    four comments we were just listening to -- and ask the
14    witness whether they reflect what she heard.
15          MR. KENERSON:  Can --
16          MR. SMITH:  This is Nordean Exhibit -- this one
17    would be Nordean Exhibit-3.
18          MR. KENERSON:  Can we be heard?
19          THE COURT:  Yes.  It's also -- well, yes.  Yes.
20          (Bench conference:)
21          THE COURT:  Mr. Kenerson?
22          MR. KENERSON:  So I think -- one, unless I'm
23    mistaken, I don't think we've been provided a copy of this.
24    I do see it on the screen now.
25          Two, I don't know if he's -- I don't know the
```

1    purpose of this.  I don't think he gets to put it in

2    evidence.  And I also don't think that we've had an

3    identification of the voice at this point.

4           THE COURT:  All right.  Well, I --

5           MR. SMITH:  I can -- on the latter point, Your

6    Honor, I can elicit that after the break, if Your Honor

7    would want, and then --

8           THE COURT:  Let's just -- look, at a minimum, I

9    didn't hear -- have to hear much more than Mr. Kenerson

10    saying, "I've never seen this before," to know that we're

11    going to go to lunch and come back and talk about it.  So --

12           MR. SMITH:  Okay.

13           THE COURT:  -- let's do that.

14           MR. SMITH:  Okay.

15           THE COURT:  I wanted -- Mr. Smith, I know this is,

16    kind of, you know, building on what you've just done and I

17    would have tried to squeeze --

18           MR. SMITH:  Okay.

19           THE COURT:  -- it in before lunch, but that's what

20    we're going to do.

21           (Return from bench conference.)

22           THE COURT:  All right.  Ladies and gentlemen, it's

23    12:26.  I'm going to send you to lunch and we'll see you on

24    the other side of the lunch hour.

25           (Jury returned to jury room.)

1        THE COURT:  All right.  Everyone may be seated.

2   And, Agent, you may step down.

3        MR. SMITH:  Your Honor, I'm just seeing if the

4   Court would prefer to hear argument now or at the back end

5   of the --

6        THE COURT:  I would rather the Government have the

7   opportunity to see what it's arguing about before we do

8   that.  So we'll come back at 1:30 and go from there.

9        MR. KENERSON:  (Indicating.)

10       THE COURT:  Mr. Kenerson?

11       MR. KENERSON:  So just to clarify, is the Court

12  ordering Mr. Smith to provide us a copy of that?

13       MR. SMITH:  I will provide it.  I will provide it

14  as soon as I --

15       MR. KENERSON:  And then I would also just request,

16  on an unrelated topic, that to the extent that Mr. Pattis

17  still intends to pursue the line he identified this morning,

18  that he identify for chambers and the Government over the

19  lunch break the message he was referring to.

20       THE COURT:  If that's possible.  I'm certainly not

21  going to rule on his request until we know what it's based

22  on.

23       Mr. Pattis, you look confused.  Do you know what

24  we're talking about?

25       MR. PATTIS:  I'll -- Mr. Kenerson --

1          THE COURT:  All right.  Very well.

2          MR. PATTIS:  My --

3          THE COURT:  We'll see everyone back here at 1:30.

4          THE DEPUTY CLERK:  All rise.  This Honorable Court

5     stands in recess until the return of Court at 1:30.

6          (Luncheon recess taken at 12:28 p.m.)

7                    * * * * * * * * * * * *

8          **CERTIFICATE OF OFFICIAL COURT REPORTER**

9     **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

10    **that the above and foregoing constitutes a true and accurate**

11    **transcript of my stenographic notes and is a full, true and**

12    **complete transcript of the proceedings to the best of my**

13    **ability, dated this 13th day of March 2023.**

14                              /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                               Official Court Reporter
15                             United States Courthouse
                               Room 6722
16                             333 Constitution Avenue, NW
                               Washington, DC 20001

17

18

19

20

21

22

23

24

25

## /

**/s/Timothy** [1] - 13016:14

## 0

**06511** [1] - 12898:21

## 1

**1** [7] - 12901:3, 12901:8, 12901:13, 12960:2, 12960:3, 12965:11, 12973:18
**1-ETHAN** [1] - 12898:4
**10** [2] - 12983:11, 13000:8
**100** [1] - 12979:7
**10003** [1] - 12898:18
**10016** [1] - 12899:13
**1014** [1] - 12899:9
**10:00** [1] - 12898:6
**11** [8] - 13004:17, 13009:15, 13010:18, 13010:25, 13012:16, 13012:17, 13013:5
**113** [1] - 12899:15
**11:09** [1] - 13009:24
**11:20** [2] - 13010:21, 13011:22
**12856** [1] - 12921:6
**12:00** [1] - 12933:10
**12:26** [1] - 13014:23
**12:28** [1] - 13016:6
**13** [3] - 12898:6, 12994:17, 12994:19
**13th** [1] - 13016:13
**14** [1] - 13004:17
**1420** [1] - 12898:24
**15** [2] - 12960:2, 13009:15
**15,000** [1] - 12961:14
**153** [1] - 12899:5
**16** [3] - 12940:3, 12940:4, 12960:3
**17** [2] - 12973:18, 12987:19
**1776** [4] - 12962:23, 12963:5, 12963:9, 12966:16
**18th** [1] - 12960:1
**1:21-cr-00175-TJK-1** [1] - 12898:2
**1:21-cr-00175-TJK-2** [1] - 12898:3
**1:21-cr-00175-TJK-3** [1] - 12898:3
**1:21-cr-00175-TJK-5** [1] - 12898:4

## 1:21-cr-00175-TJK-6

[1] - 12898:4
**1:30** [3] - 13015:8, 13016:3, 13016:5
**1st** [2] - 12898:21, 12966:3

## 2

**2** [7] - 12901:4, 12901:9, 12901:14, 12903:5, 12927:5, 12965:11, 12982:8
**2-JOSEPH** [1] - 12898:5
**20** [2] - 13010:19, 13012:17
**20-year-old** [2] - 12918:19, 12930:8
**20001** [2] - 12899:19, 13016:16
**20005** [1] - 12898:24
**2011** [1] - 12917:23
**202** [3] - 12898:15, 12898:25, 12899:20
**2021** [1] - 12915:16
**2022** [1] - 12962:20
**2023** [2] - 12898:6, 13016:13
**203** [1] - 12898:22
**20530** [1] - 12898:14
**20777** [1] - 12899:3
**209** [1] - 12899:6
**20th** [1] - 12898:17
**21** [1] - 13000:9
**21-175** [1] - 12901:2
**22** [3] - 13000:8, 13000:20, 13010:25
**23** [1] - 13010:18
**24** [1] - 13013:5
**240** [1] - 12899:3
**25** [2] - 13010:18, 13011:1
**252-7233** [1] - 12898:15
**253-0514** [1] - 12899:13
**26** [1] - 13013:5
**28** [3] - 13003:3, 13003:7, 13003:8
**2nd** [2] - 12963:22, 12966:14

## 3

**3** [7] - 12901:4, 12901:10, 12901:14, 12927:5, 12965:11, 12991:6, 12992:20
**3-ZACHARY** [1] -

12898:5
**30** [5] - 12905:10, 12917:22, 12983:14, 12991:6, 12992:21
**305** [2] - 12899:7, 12899:10
**30th** [3] - 12963:20, 12965:24, 12965:25
**316** [2] - 12991:10, 12991:11
**32** [1] - 12982:9
**33012** [1] - 12899:9
**33014** [1] - 12899:6
**333** [2] - 12899:19, 13016:16
**338** [3] - 12918:13, 12922:22, 12930:2
**354-3111** [1] - 12899:20
**36** [1] - 13003:8
**37** [1] - 13000:10
**383** [1] - 12898:20
**393-3017** [1] - 12898:22
**3:58** [1] - 12993:9

## 4

**4** [1] - 12965:11
**40** [4] - 12983:14, 12994:19, 13003:3, 13003:7
**400** [1] - 12927:5
**403** [14] - 12914:19, 12914:24, 12918:2, 12919:15, 12920:17, 12923:12, 12924:2, 12924:10, 12925:9, 12928:19, 12929:12, 12932:19, 12934:9, 12935:6
**403-7323** [1] - 12899:7
**429-6520** [1] - 12898:25
**44** [2] - 12982:9, 13000:10
**45** [1] - 12905:10
**46** [2] - 12898:8, 12960:3
**472-3391** [1] - 12899:3
**49** [2] - 12899:9, 12960:2
**4r** [1] - 12898:17
**4th** [3] - 12898:14, 12963:22, 12966:3

## 5

**5** [5] - 12901:5, 12901:11, 12901:14,

12997:23, 12997:25
**5-ENRIQUE** [1] - 12898:6
**506** [2] - 12960:10, 12960:22
**55** [1] - 12994:18
**555** [1] - 12898:14
**56** [1] - 12973:18
**59** [1] - 12917:22
**59047** [1] - 12899:16
**5:00** [1] - 12941:23

## 6

**6** [4] - 12901:5, 12901:12, 12901:15, 12997:23
**6-DOMINIC** [1] - 12898:6
**6175** [1] - 12899:5
**646** [1] - 12899:13
**651** [1] - 12917:22
**6722** [2] - 12899:18, 13016:15
**6th** [4] - 12899:12, 12963:24, 12966:12, 12974:25

## 7

**7** [1] - 12898:17
**7166** [1] - 12899:2
**764-9347** [1] - 12899:16
**775** [1] - 12899:16

## 8

**80** [10] - 12907:18, 12933:13, 12935:15, 12937:7, 12937:8, 12937:9, 12939:8, 12939:25, 12940:18, 12941:2
**822-2901** [1] - 12899:10

## 9

**9** [1] - 13000:20
**902-3869** [1] - 12898:18
**917** [1] - 12898:18
**99** [1] - 12899:12
**9th** [2] - 12920:25, 12924:17

## A

**a.m** [1] - 12898:6

**Aaron** [7] - 12908:16, 12915:14, 12915:15, 12916:17, 12916:22, 12917:3, 12920:11
**ability** [2] - 12940:10, 13016:13
**able** [12] - 12905:24, 12910:10, 12912:9, 12912:11, 12915:7, 12922:23, 12925:18, 12934:18, 12934:24, 12936:5, 12953:3, 12957:11
**absent** [1] - 12938:17
**absolutely** [1] - 13008:25
**accept** [2] - 12916:3, 12936:3
**accepting** [2] - 12916:3, 12930:21
**access** [2] - 12915:5, 12938:4
**accessed** [4] - 12908:14, 12937:17, 12966:15, 12966:17
**accessing** [1] - 12966:19
**according** [1] - 12918:20
**accurate** [2] - 12922:8, 13016:10
**acting** [3] - 12945:20, 12947:18, 12949:23
**actual** [1] - 12923:18
**add** [1] - 12921:19
**adding** [2] - 12921:11, 12924:22
**additional** [4] - 12908:2, 12908:3, 12960:19, 12984:15
**additionally** [3] - 12956:5, 12963:17, 12966:13
**address** [7] - 12903:2, 12918:9, 12924:3, 12929:25, 12933:6, 12936:17, 12940:24
**addressed** [1] - 12936:18
**addressing** [2] - 12933:13, 12988:20
**adjourned** [1] - 12907:13
**adjust** [3] - 13006:2, 13007:7, 13007:13
**administrative** [15] - 12921:10, 12921:16, 12921:17, 12922:5, 12922:8, 12922:16, 12923:1, 12923:19,

13018

12924:8, 12924:19, 12924:20, 12924:21, 12924:25, 12925:2, 12925:8

**admissible** [3] - 12920:14, 12962:2

**admitted** [3] - 12984:20, 12991:9, 12991:12

**ado** [1] - 12910:4

**advance** [1] - 12904:24

**advancing** [1] - 12936:10

**adversarial** [1] - 12940:9

**advised** [1] - 12958:18

**affect** [1] - 12902:15

**affected** [1] - 12927:9

**afterwards** [1] - 12950:21

**Agent** [78] - 12906:4, 12906:7, 12906:9, 12906:13, 12906:17, 12906:19, 12906:22, 12907:1, 12907:6, 12907:9, 12907:11, 12907:20, 12907:24, 12908:6, 12908:9, 12908:13, 12908:16, 12908:19, 12908:25, 12909:2, 12909:6, 12909:10, 12909:13, 12909:15, 12910:2, 12910:20, 12911:6, 12911:16, 12913:5, 12913:7, 12913:14, 12913:19, 12913:21, 12913:25, 12914:3, 12914:14, 12914:15, 12914:18, 12914:23, 12915:3, 12915:13, 12915:16, 12915:21, 12915:24, 12916:1, 12916:10, 12916:21, 12917:7, 12917:11, 12917:15, 12917:17, 12918:7, 12918:11, 12918:24, 12919:4, 12919:11, 12919:18, 12919:24, 12920:5, 12920:7, 12920:16, 12921:15, 12921:20, 12937:18, 12942:13, 12943:16, 12944:14, 12944:16, 12956:12, 12957:23, 12973:11, 12974:1, 12974:7, 12982:14, 12994:11, 13010:20, 13015:2

**agent** [70] - 12908:11, 12908:20, 12909:1, 12909:23, 12911:9, 12911:10, 12911:17, 12913:5, 12913:6, 12915:4, 12915:16, 12918:11, 12918:14, 12921:21, 12922:3, 12922:22, 12923:2, 12923:21, 12927:6, 12929:1, 12930:15, 12930:24, 12930:25, 12932:18, 12938:15, 12943:2, 12943:16, 12944:1, 12944:12, 12945:14, 12945:16, 12946:2, 12946:18, 12946:25, 12948:15, 12948:16, 12949:3, 12949:4, 12949:13, 12949:20, 12949:23, 12950:2, 12950:5, 12950:10, 12950:18, 12951:2, 12951:6, 12951:7, 12951:12, 12951:14, 12951:18, 12951:25, 12952:14, 12952:17, 12952:22, 12953:14, 12953:25, 12954:14, 12954:23, 12955:4, 12955:5, 12955:6, 12956:2, 12956:21, 12957:2, 12958:21, 12959:15, 12992:23

**agent's** [7] - 12917:23, 12918:8, 12929:10, 12931:7, 12931:24, 12932:15, 12948:1

**agents** [13] - 12906:10, 12908:1, 12915:14, 12919:21, 12920:5, 12921:17, 12926:23, 12927:11, 12928:15, 12931:6, 12942:20, 12942:23

**agents'** [6] - 12907:2, 12907:6, 12910:7, 12920:11, 12920:12, 12928:12

**ago** [1] - 12912:3

**agree** [5] - 12909:11, 12956:13, 12956:20, 12996:23, 12997:19

**agreed** [2] - 12928:4, 12949:16

**ahead** [4] - 12905:1, 12929:20, 12947:8, 12959:2

**aided** [1] - 12899:21

**Alaska** [2] - 12930:24, 12931:20

**allegation** [1] - 12914:15

**alleged** [2] - 12911:7, 12912:4

**allow** [5] - 12904:2, 12905:5, 12911:19, 12919:15, 13012:9

**allowed** [4] - 12925:12, 12926:3, 12926:7, 12941:14

**allowing** [1] - 12932:23

**almost** [2] - 12978:11, 12989:23

**alone** [2] - 12909:14, 12910:7

**altering** [1] - 12922:15

**amended** [1] - 12903:9

**Amendment** [17] - 12902:6, 12911:22, 12911:25, 12912:5, 12913:8, 12914:3, 12914:5, 12914:10, 12914:12, 12930:23, 12931:20, 12932:4, 12933:18, 12933:19, 12934:5, 12934:6, 12938:13

**Amendment's** [1] - 12912:7

**AMERICA** [1] - 12898:2

**America** [1] - 12901:3

**amount** [2] - 12911:25, 12928:18

**angle** [1] - 12990:21

**animal** [1] - 12941:9

**answer** [10] - 12902:16, 12911:5, 12921:5, 12921:6, 12930:25, 12953:2, 12953:4, 12969:1, 12977:8, 13006:8

**answered** [1] - 12911:3

**answers** [1] - 12930:25

**anyhow** [1] - 12937:17

**anytime** [1] - 12934:18

**anyway** [2] - 12940:18, 12966:5

**apart** [1] - 12909:13

**apologies** [2] - 12957:23, 12960:6

**apologize** [3] - 12976:6, 12977:11, 12993:8

**appeals** [1] - 12918:23

**appear** [6] - 12905:19, 12946:21, 12977:23, 12986:8, 13000:13, 13009:20

**APPEARANCES** [2] - 12898:11, 12899:1

**appeared** [1] - 12907:12

**application** [2] - 12933:15, 12934:2

**appreciate** [1] - 12927:25

**appropriate** [5] - 12903:24, 12909:5, 12909:12, 12916:4, 12945:5

**approve** [5] - 12947:3, 12947:5, 12947:14, 12947:21, 12956:7

**approved** [1] - 12956:11

**approving** [1] - 12947:19

**areas** [2] - 12907:21, 12908:8

**arguably** [1] - 12908:11

**argue** [3] - 12909:7, 12913:4, 12927:7

**argues** [5] - 12909:5, 12913:7, 12915:2, 12915:20, 12916:25

**arguing** [1] - 13015:7

**argument** [7] - 12906:12, 12912:18, 12912:19, 12924:1, 12931:18, 12931:22, 13015:4

**arguments** [1] - 12919:20

**arrest** [1] - 12905:15

**arrow** [3] - 12974:10, 12974:11, 12974:14

**articulated** [1] - 12928:20

**aside** [1] - 12928:9

**aspects** [1] - 12934:11

**ass** [10] - 13011:3, 13011:7, 13011:22, 13012:4, 13012:5, 13012:20, 13012:21, 13012:25, 13013:3

**asserted** [1] - 12919:11

**asserts** [1] - 12917:15

**assigned** [1] - 12918:12

**assist** [1] - 12931:13

**assistance** [2] -

12965:3, 12965:22

**assisted** [1] - 12967:4

**assume** [1] - 12991:25

**AT** [1] - 12899:15

**attach** [1] - 12914:8

**attempt** [1] - 12929:14

**attempted** [1] - 12916:6

**attempting** [2] - 12925:25, 12970:3

**attention** [2] - 12939:11, 12988:7

**ATTORNEY** [1] - 12899:15

**attorney** [14] - 12901:25, 12908:14, 12911:13, 12911:18, 12911:22, 12912:22, 12914:6, 12915:5, 12921:18, 12921:20, 12921:22, 12922:4, 12922:14, 12924:24

**ATTORNEY'S** [1] - 12898:13

**attorney-client** [10] - 12908:14, 12911:22, 12912:22, 12915:5, 12921:18, 12921:20, 12921:22, 12922:4, 12922:14, 12924:24

**audible** [1] - 12986:11

**audio** [4] - 12960:1, 12960:5, 12962:17, 12962:25

**author** [1] - 12919:18

**authority** [2] - 12905:3, 12905:9

**Avenue** [5] - 12899:12, 12899:19, 13002:17, 13008:20, 13016:16

**avoid** [1] - 12905:14

**avoiding** [1] - 12905:12

**await** [2] - 12938:19, 12938:21

**aware** [5] - 12907:5, 12916:19, 12957:12, 12959:23, 12972:21


### B

**B.A** [1] - 12898:12

**back-and-forth** [1] - 12911:8

**background** [6] - 12974:8, 12987:22, 12996:13, 12996:18, 13000:14, 13011:23

**bad** [10] - 13011:3,

13011:7, 13011:22, 13012:4, 13012:5, 13012:20, 13012:21, 13012:25, 13013:3
**bad-ass** [10] - 13011:3, 13011:7, 13011:22, 13012:4, 13012:5, 13012:20, 13012:21, 13012:25, 13013:3
**ball** [1] - 12936:10
**Ballantine** [2] - 12936:25, 12937:2
**banner** [1] - 12914:9
**barricade** [1] - 12979:16
**barrier** [2] - 12979:6, 12980:4
**base** [1] - 12965:15
**based** [10] - 12901:18, 12910:24, 12914:13, 12914:14, 12924:2, 12927:4, 12969:25, 13006:7, 13006:14, 13015:21
**basis** [9] - 12914:13, 12914:16, 12917:16, 12919:2, 12919:16, 12936:8, 12963:10, 12964:18, 12965:5
**bat** [1] - 12965:8
**bearing** [2] - 12909:19, 12919:1
**bearings** [1] - 12998:1
**beast** [2] - 12982:25, 12983:1
**becomes** [1] - 12923:20
**BEFORE** [1] - 12898:9
**began** [1] - 12968:21
**begin** [4] - 12904:22, 12904:23, 12910:20, 12944:18
**beginning** [1] - 12970:4
**behind** [3] - 12978:24, 12980:21, 12981:8
**belongs** [1] - 12930:8
**below** [1] - 13005:2
**Bench** [5] - 12957:9, 12958:16, 12961:3, 12991:24, 13013:20
**bench** [6] - 12957:21, 12958:15, 12959:13, 12962:16, 12992:14, 13014:21
**Bertino** [15] - 12958:4, 12958:8, 12960:12, 12962:19, 12963:2, 12963:4, 12963:8,

12963:15, 12963:24, 12963:25, 12964:6, 12964:12, 12965:1, 12966:12, 12966:23
**Bertino's** [1] - 12957:14
**best** [3] - 12904:21, 12916:2, 13016:12
**better** [1] - 13011:11
**between** [12] - 12907:8, 12911:17, 12913:6, 12913:20, 12915:14, 12922:2, 12935:3, 12942:19, 12945:24, 12965:16, 12966:2, 13010:25
**beyond** [4] - 12916:24, 12931:24, 12958:24, 12959:4
**bias** [1] - 12931:9
**bigger** [1] - 12944:14
**BIGGS** [1] - 12898:5
**Biggs** [7] - 12901:4, 12901:14, 12976:20, 13003:20, 13004:11, 13005:14, 13007:15
**Biggs's** [1] - 12926:21
**bit** [6] - 12933:11, 12935:11, 12974:1, 12977:10, 13002:5, 13004:17
**black** [7] - 12911:20, 12977:17, 12984:17, 12986:5, 13007:18, 13009:5, 13009:10
**black-letter** [1] - 12911:20
**blah** [2] - 12941:5, 12941:6
**Block** [17] - 12969:10, 12969:12, 12969:20, 12970:3, 12970:7, 12970:10, 12970:16, 12971:15, 12981:9, 12981:10, 12982:5, 12984:4, 12984:5, 12984:7, 12984:12, 12986:7, 13011:12
**block's** [1] - 12901:25
**Block's** [1] - 13011:10
**Bloody** [3] - 12915:15, 12916:17, 12917:3
**blow** [1] - 12959:9
**blundered** [1] - 12938:14
**bolster** [1] - 12925:22
**boss** [12] - 12923:2, 12930:1, 12930:6, 12947:2, 12947:4, 12947:6, 12947:13,

12948:22, 12950:6, 12956:5, 12956:7
**bottom** [1] - 13010:21
**bounds** [1] - 12935:6
**box** [1] - 12942:7
**Boy** [1] - 12980:6
**boy** [1] - 13008:22
**Boys** [2] - 12974:21, 12998:22
**Brady** [1] - 12940:2
**breach** [3] - 12912:20, 12979:10, 12985:23
**breached** [2] - 12979:6, 12980:3
**break** [2] - 13014:6, 13015:19
**bridge** [1] - 12938:5
**brief** [5] - 12906:13, 12926:14, 12984:21, 12997:24, 13009:16
**Brief** [2] - 12941:21, 12942:5, 12982:11
**briefed** [1] - 12928:8
**briefing** [6] - 12903:16, 12924:12, 12927:1, 12928:3, 12928:22, 12933:6
**briefly** [4] - 12902:15, 12930:1, 12957:8, 12991:22
**bring** [17] - 12931:1, 12935:7, 12939:10, 12941:19, 12941:20, 12944:10, 12959:25, 12973:10, 12982:4, 12984:18, 12991:4, 12994:10, 12994:18, 13008:7, 13011:24, 13013:11
**bringing** [3] - 12931:6, 12994:9, 13009:14
**British** [1] - 12971:24
**broke** [2] - 12942:15, 12942:17
**browser** [1] - 12937:17
**Bu** [1] - 12993:3
**building** [8] - 12967:11, 12969:18, 12974:19, 12986:23, 12990:4, 13000:13, 13014:16
**Bundy** [1] - 12993:5
**Bureau** [1] - 12914:8
**Bureau's** [1] - 12930:7
**business** [1] - 12926:18
**BY** [59] - 12942:12, 12944:13, 12945:8, 12946:15, 12953:6,

12956:19, 12957:22, 12959:14, 12962:18, 12973:25, 12974:6, 12975:15, 12976:9, 12977:14, 12980:18, 12981:15, 12981:23, 12983:19, 12986:2, 12986:17, 12987:10, 12988:10, 12988:17, 12989:9, 12992:15, 12992:22, 12993:1, 12993:15, 12994:22, 12995:5, 12995:21, 12996:9, 12996:16, 12997:3, 12997:10, 12998:5, 12998:15, 12999:5, 13000:12, 13001:1, 13001:7, 13003:10, 13003:19, 13003:23, 13004:5, 13004:22, 13005:24, 13006:10, 13006:24, 13009:19, 13010:12, 13010:6, 13010:17, 13011:6, 13011:21, 13012:3, 13012:15, 13012:19, 13013:2

# C

**cabined** [1] - 12962:1
**camera** [4] - 12970:13, 12971:5, 13010:10, 13011:11
**canceled** [1] - 12926:4
**cannot** [6] - 12930:2, 12932:7, 12937:1, 12947:3, 12947:4, 12947:13
**Capitol** [49] - 12915:19, 12967:11, 12969:18, 12970:6, 12970:18, 12972:1, 12972:12, 12974:18, 12975:10, 12975:18, 12978:17, 12979:2, 12979:8, 12979:14, 12979:17, 12979:24, 12980:8, 12981:8, 12983:21, 12984:10, 12985:13, 12986:23, 12987:2, 12988:24, 12989:23, 12990:4, 12991:1, 12993:21, 12994:14, 12995:16, 12995:23, 12996:13, 12996:18, 12999:19, 13000:13, 13001:16, 13002:14, 13003:11, 13003:15, 13003:25, 13004:6, 13004:12,

13005:12, 13005:16, 13006:15, 13007:8, 13008:21, 13009:11, 13013:6
**caps** [1] - 12923:6
**Carmen** [2] - 12899:2, 12901:10
**Case** [2] - 12904:22
**case** [58] - 12905:3, 12905:7, 12907:5, 12909:16, 12910:17, 12915:6, 12917:23, 12918:15, 12918:16, 12918:22, 12919:7, 12919:18, 12920:1, 12920:11, 12920:12, 12921:11, 12922:20, 12923:3, 12923:21, 12923:22, 12924:22, 12926:20, 12926:24, 12927:6, 12927:8, 12927:9, 12930:8, 12930:10, 12930:11, 12930:14, 12931:4, 12932:1, 12932:14, 12932:17, 12934:22, 12938:12, 12939:20, 12940:12, 12941:5, 12942:21, 12942:23, 12943:2, 12943:9, 12945:19, 12949:25, 12957:2, 12958:9, 12962:6, 12967:5, 12967:10, 12970:7, 12972:11, 12989:4, 12989:7
**cases** [1] - 12931:21
**categories** [1] - 12922:13
**category** [1] - 12941:1
**CCR** [3] - 12899:17, 13016:9, 13016:14
**certain** [13] - 12902:25, 12908:21, 12911:23, 12931:23, 12957:12, 12961:6, 12966:2, 12968:14, 12969:6, 12977:25, 12979:7, 12986:13, 12999:23
**certainly** [2] - 12915:25, 13015:20
**CERTIFICATE** [1] - 13016:8
**certify** [1] - 13016:9
**chain** [1] - 12948:8
**challenge** [3] - 12912:4, 12912:9, 12913:8, 12914:12
**chambers** [1] -

13020

13015:18
**chance** [3] - 12982:1,
13008:16, 13008:18
**change** [1] - 12911:10
**characterization** [1] -
12917:24
**characterized** [1] -
12979:20
**charged** [2] -
12920:15, 12980:11
**charges** [2] -
12905:16, 12919:22
**Charles** [2] - 12957:5,
12958:1
**chat** [3] - 12906:21,
12908:17, 12915:18
**chats** [3] - 12916:18,
12916:23, 12917:4
**check** [3] - 12963:22,
12979:7, 12995:15
**choose** [1] - 12967:6
**chooses** [1] -
12910:11
**chronologically** [1] -
12973:13
**CHS** [27] - 12908:10,
12908:23, 12909:1,
12909:16, 12910:17,
12911:2, 12919:2,
12922:15, 12932:12,
12941:14, 12943:5,
12943:9, 12943:10,
12943:14, 12943:17,
12944:20, 12950:12,
12950:19, 12951:3,
12951:8, 12951:13,
12951:14, 12951:19,
12952:2, 12953:15,
12953:18, 12954:24
**CHS's** [1] - 12909:22
**CHS-related** [1] -
12911:2
**Circle** [6] - 12967:20,
12979:10, 12983:9,
12983:12, 12983:15,
12985:21
**circle** [5] - 12976:11,
12976:12, 12984:23,
12984:24, 13001:11
**circled** [1] - 12994:24
**circling** [1] - 12985:12
**circuit** [1] - 12911:21
**Circuit** [2] - 12912:19,
12917:23
**circumstances** [2] -
12911:23, 12913:12
**cite** [2] - 12917:21,
12931:19
**cited** [1] - 12928:11
**claim** [1] - 12907:19

**clarification** [1] -
12962:6
**clarifies** [1] - 12965:1
**clarify** [1] - 13015:11
**class** [1] - 12938:1
**classification** [6] -
12933:15, 12935:17,
12936:2, 12937:21,
12938:2, 12941:2
**classified** [16] -
12907:2, 12907:14,
12907:19, 12936:4,
12936:25, 12937:15,
12938:2, 12938:6,
12939:7, 12939:25,
12940:20, 12940:21,
12940:24, 12941:1,
12941:4, 12941:9
**claw** [1] - 12938:11
**claw-back** [1] -
12938:11
**cleaning** [1] - 12923:5
**clear** [11] - 12905:10,
12911:21, 12916:24,
12919:23, 12923:10,
12927:1, 12932:12,
12937:24, 12940:19,
12941:11, 13008:25
**clearly** [1] - 12914:9
**CLERK** [12] - 12901:2,
12942:6, 12960:10,
12960:15, 12960:17,
12960:22, 12960:24,
12961:21, 12962:9,
12991:10, 12991:12,
13016:4
**client** [10] - 12908:14,
12911:22, 12912:22,
12915:5, 12921:18,
12921:20, 12921:22,
12922:4, 12922:14,
12924:24
**clip** [13] - 12973:12,
12977:3, 12980:5,
12982:8, 12986:13,
12988:20, 12989:11,
12992:23, 12994:16,
12999:15, 12999:23,
13003:2, 13009:1
**clips** [6] - 12968:1,
12968:15, 12973:14,
12982:5, 12984:15,
12991:17
**close** [3] - 12905:6,
12928:16, 12976:16
**closed** [2] - 12915:19,
12917:4
**collateral** [1] -
12929:4
**colleague** [2] -

12913:20, 12914:4
**colloquy** [3] -
12920:24, 12926:18,
12926:19
**colored** [2] - 12979:3,
12980:9
**COLUMBIA** [1] -
12898:1
**coming** [1] - 12992:9
**comment** [11] -
12917:15, 12918:8,
12918:18, 12923:22,
12944:18, 12968:23,
12976:10, 12980:19,
12981:17, 12996:20,
13000:19
**commented** [1] -
12915:16
**comments** [7] -
12910:13, 12968:14,
12969:4, 12969:6,
12969:25, 13007:12,
13013:13
**committed** [1] -
12914:15
**communicate** [1] -
12945:24
**communicating** [2] -
12914:6, 12951:12
**communication** [21] -
12949:10, 12950:15,
12951:3, 12951:20,
12952:2, 12952:13,
12952:15, 12952:18,
12953:15, 12953:16,
12953:20, 12953:22,
12954:2, 12955:3,
12955:5, 12955:7,
12955:9, 12955:11,
12955:14, 12955:15,
12955:19
**communications** [24]
- 12906:20,
12908:14, 12908:16,
12911:12, 12911:17,
12911:24, 12912:22,
12913:15, 12913:20,
12914:1, 12915:5,
12917:6, 12917:7,
12921:18, 12921:21,
12921:23, 12922:3,
12922:4, 12922:14,
12924:24, 12951:8,
12951:14, 12957:13,
12957:14
**compared** [1] -
12915:9
**compilation** [1] -
12967:4
**compiled** [1] -

12936:24
**complete** [2] -
12925:18, 13016:12
**completed** [1] -
12918:22
**completely** [1] -
12933:14
**complicated** [2] -
12906:5, 12929:3
**comply** [5] - 12905:19,
12906:22, 12930:7,
12944:3, 12945:15
**computer** [1] -
12899:21
**computer-aided** [1] -
12899:21
**concern** [2] -
12921:16, 12940:8
**concerning** [2] -
12917:3, 12917:5
**concerns** [1] -
12955:5
**conduct** [4] -
12909:18, 12909:21,
12932:15, 12946:14
**conducted** [1] -
12960:1
**conference** [11] -
12957:9, 12957:21,
12958:15, 12958:16,
12959:13, 12961:3,
12962:16, 12991:24,
12992:14, 13013:20,
13014:21
**confessed** [1] -
12919:12
**confirm** [4] -
12956:10, 12960:8,
12991:22, 12992:9
**confirmed** [1] -
12941:24
**conflict** [1] - 12905:6
**confrontation** [1] -
12938:13
**confrontation/cross**
[1] - 12932:4
**confrontation/cross-**
**examination** [1] -
12932:4
**confused** [2] -
12933:4, 13015:23
**confusion** [5] -
12906:15, 12915:1,
12915:10, 12918:5,
12920:20
**connection** [7] -
12903:1, 12913:10,
12932:17, 12932:18,
12942:20, 12943:11,
12970:25

12936:24
**Conor** [2] - 12898:13,
12901:8
**consider** [1] - 12909:9
**considerations** [1] -
12928:19
**considered** [1] -
12907:23
**considering** [2] -
12928:7, 12944:3
**considers** [1] -
12999:3
**consistent** [2] -
12918:21, 12964:24
**conspiracy** [7] -
12916:1, 12919:22,
12920:1, 12922:13,
12926:20, 12926:24,
12927:10
**constable** [1] -
12938:14
**constitutes** [1] -
13016:10
**Constitution** [9] -
12899:19, 12986:25,
12990:2, 12990:3,
12990:6, 12990:10,
13002:17, 13005:9,
13016:16
**constitutional** [1] -
12912:19
**construe** [1] -
12909:18
**consulting** [1] -
12976:19
**contained** [1] -
12907:6
**containing** [2] -
12906:20, 12907:5
**contains** [1] -
12907:25
**contemporaneously**
[1] - 12936:11
**contends** [3] -
12907:22, 12940:20,
12940:21
**content** [3] -
12921:18, 12921:20,
12921:24
**contention** [2] -
12926:16, 12926:21
**context** [6] -
12907:21, 12908:1,
12916:20, 12929:8,
12931:23, 12977:22
**CONTINUED** [1] -
12899:1
**continues** [1] -
12981:12
**continuously** [1] -
12970:24

13021

**contradict** [2] - 12911:5, 12925:7
**contradicting** [1] - 12925:5
**contradiction** [4] - 12915:3, 12915:9, 12916:3, 12916:7
**contradicts** [1] - 12910:18
**conversation** [24] - 12915:14, 12923:15, 12944:12, 12946:18, 12946:22, 12949:9, 12949:22, 12950:4, 12950:17, 12950:21, 12950:24, 12951:16, 12952:4, 12953:14, 12954:7, 12954:15, 12954:23, 12956:1, 12956:5, 12958:21, 12977:21, 12987:7, 12987:8
**conversations** [14] - 12907:12, 12917:2, 12921:10, 12924:19, 12924:25, 12925:7, 12942:20, 12970:11, 12972:8, 12972:13, 12976:22, 12977:19, 12980:2, 12986:10
**conveyed** [1] - 12921:21
**Copeland** [1] - 12912:20
**copied** [21] - 12909:24, 12948:6, 12948:25, 12949:11, 12949:15, 12951:7, 12951:14, 12952:1, 12952:13, 12952:14, 12952:18, 12953:15, 12953:16, 12953:20, 12953:22, 12954:1, 12955:3, 12955:5, 12955:7, 12956:1, 12956:2
**copy** [2] - 13013:23, 13015:12
**core** [1] - 12934:11
**correct** [73] - 12903:7, 12942:1, 12943:2, 12943:15, 12945:25, 12946:1, 12946:16, 12947:1, 12947:15, 12948:3, 12949:7, 12949:8, 12949:21, 12950:12, 12950:13, 12950:15, 12950:16, 12950:19, 12951:4, 12951:5, 12951:8,

12951:20, 12952:13, 12952:18, 12953:8, 12953:15, 12953:21, 12954:2, 12954:6, 12955:9, 12957:3, 12957:4, 12957:18, 12957:19, 12960:11, 12960:23, 12963:2, 12964:24, 12964:25, 12967:11, 12967:14, 12967:24, 12968:3, 12968:16, 12968:25, 12969:14, 12970:10, 12971:19, 12972:17, 12974:12, 12974:15, 12974:19, 12974:20, 12974:22, 12974:23, 12975:1, 12975:11, 12975:12, 12978:9, 12983:9, 12986:7, 12986:23, 12987:3, 12993:18, 12993:25, 12994:24, 12994:25, 12995:1, 12995:17, 13002:19, 13003:15, 13003:16, 13007:13
**correction** [1] - 12903:10
**Counsel** [2] - 12944:23, 12946:8
**counsel** [3] - 12907:9, 12913:6, 12913:21
**couple** [7] - 12901:18, 12902:15, 12926:4, 12933:5, 12942:15, 13003:4, 13004:11
**course** [3] - 12910:18, 12943:1, 12943:4
**COURT** [144] - 12898:1, 12901:16, 12902:22, 12903:9, 12903:11, 12903:18, 12904:4, 12904:8, 12904:17, 12905:21, 12905:23, 12912:16, 12912:23, 12912:25, 12913:2, 12913:4, 12920:22, 12923:10, 12923:25, 12924:5, 12924:9, 12924:14, 12924:16, 12925:3, 12925:9, 12925:14, 12925:16, 12925:20, 12926:6, 12926:9, 12926:11, 12927:17, 12927:23, 12927:25, 12928:21, 12929:6, 12929:16, 12929:20, 12929:23, 12930:4, 12930:13, 12931:10,

12931:12, 12931:14, 12931:16, 12931:18, 12931:22, 12932:8, 12932:10, 12932:21, 12932:25, 12933:3, 12933:21, 12934:3, 12934:19, 12935:9, 12935:13, 12935:18, 12936:15, 12937:6, 12937:8, 12937:11, 12937:13, 12937:22, 12937:24, 12938:20, 12938:22, 12939:3, 12939:14, 12939:24, 12940:4, 12940:6, 12940:15, 12941:11, 12941:16, 12941:18, 12942:1, 12942:3, 12942:8, 12944:22, 12944:25, 12945:3, 12945:5, 12945:6, 12946:8, 12946:11, 12946:13, 12953:3, 12956:17, 12957:7, 12957:17, 12957:20, 12958:14, 12958:22, 12959:2, 12959:5, 12960:7, 12960:25, 12961:2, 12961:4, 12961:7, 12961:11, 12961:15, 12961:17, 12961:19, 12961:23, 12962:10, 12962:13, 12962:15, 12973:21, 12977:8, 12977:12, 12980:13, 12980:15, 12981:1, 12981:3, 12981:5, 12989:8, 12991:19, 12991:23, 12992:11, 12992:13, 12992:18, 12993:10, 12998:4, 13006:8, 13011:18, 13012:11, 13012:14, 13013:19, 13013:21, 13014:4, 13014:8, 13014:13, 13014:15, 13014:19, 13014:22, 13015:1, 13015:6, 13015:10, 13015:20, 13016:1, 13016:3, 13016:8
**Court** [13] - 12899:17, 12899:18, 12905:19, 12911:21, 12931:4, 12931:21, 12937:5, 12938:17, 12944:11, 13015:11, 13016:4, 13016:5, 13016:14
**court** [22] - 12902:18, 12903:8, 12904:2, 12905:3, 12905:8,

12922:24, 12923:7, 12923:18, 12928:3, 12928:7, 12928:11, 12928:20, 12930:20, 12932:22, 12936:3, 12936:11, 12937:4, 12939:5, 12940:8, 12940:14, 12941:24, 13015:4
**court's** [2] - 12939:10, 12940:10
**Courthouse** [2] - 12899:18, 13016:15
**courtroom** [1] - 12919:14
**cover** [1] - 12927:12
**covered** [3] - 12923:12, 12926:13, 12926:25
**covering** [1] - 12978:11
**CR** [1] - 12898:2
**crafted** [3] - 12943:5, 12943:7, 12943:8
**crazy** [1] - 12923:17
**create** [2] - 12909:15, 12965:2
**created** [13] - 12908:10, 12940:25, 12963:9, 12964:3, 12964:10, 12964:17, 12964:19, 12965:3, 12965:6, 12966:15, 12966:17, 12966:19, 13013:12
**creating** [1] - 12965:18
**creation** [2] - 12965:7, 12967:1
**Creative** [1] - 13013:12
**credibility** [23] - 12908:12, 12908:13, 12908:15, 12909:7, 12909:10, 12909:19, 12913:7, 12913:10, 12913:12, 12913:18, 12913:22, 12917:10, 12919:1, 12920:9, 12922:18, 12922:20, 12923:23, 12933:19, 12934:13, 12958:12, 12959:7, 12959:11
**credibility's** [1] - 12933:20
**crime** [1] - 12919:12
**crimes** [1] - 12920:15
**Criminal** [1] - 12901:7
**CROSS** [1] - 12942:11
**Cross** [1] - 12900:3

**cross** [29] - 12901:21, 12904:5, 12906:8, 12908:6, 12908:19, 12909:6, 12909:12, 12910:10, 12911:16, 12911:19, 12914:11, 12914:18, 12914:23, 12915:13, 12916:5, 12917:1, 12918:1, 12920:2, 12920:3, 12920:16, 12932:3, 12932:23, 12935:15, 12938:5, 12938:24, 12938:25, 12942:10, 12980:3, 13008:20
**CROSS-EXAMINATION** [1] - 12942:11
**Cross-Examination** [1] - 12900:3
**cross-examination** [16] - 12901:21, 12906:8, 12909:6, 12909:12, 12911:16, 12911:19, 12914:11, 12914:18, 12914:23, 12916:5, 12918:1, 12920:2, 12920:3, 12920:16, 12935:15, 12942:10
**cross-examine** [5] - 12908:6, 12908:19, 12915:13, 12917:1, 12932:23
**crossroads** [1] - 12933:12
**crowd** [4] - 12974:21, 12974:22, 13002:24, 13010:10
**CRR** [3] - 12899:17, 13016:9, 13016:14
**CT** [1] - 12898:21
**custody** [1] - 12918:19
**cut** [2] - 12948:14, 13007:10
**cuts** [1] - 13006:19

---

# D

**D.C** [3] - 12898:5, 12912:19, 12917:22
**danger** [3] - 12914:25, 12918:4, 12920:19
**date** [2] - 12965:24, 12966:2
**dated** [1] - 13016:13
**dates** [1] - 12963:23
**DAVID** [1] - 12898:16
**Davis** [2] - 12930:23,

12931:20
**DAY** [1] - 12898:8
**days** [4] - 12926:4,
12942:15, 12958:19,
12966:22
**DC** [4] - 12898:14,
12898:24, 12899:19,
13016:16
**deadline** [5] -
12928:3, 12928:5,
12933:11, 12939:9,
12939:10
**dealt** [2] - 12934:15,
12934:16
**December** [2] -
12963:20, 12965:23
**decide** [1] - 12908:5
**decided** [1] - 12950:5
**decision** [3] -
12920:7, 12934:9,
12940:11
**decision-making** [1] -
12940:11
**declaration** [1] -
12932:24
**decorum** [1] - 12946:9
**defendant** [6] -
12911:19, 12915:6,
12918:20, 12919:9,
12921:23, 12967:9
**Defendant** [25] -
12901:3, 12901:4,
12901:5, 12901:8,
12901:9, 12901:10,
12901:11, 12901:12,
12901:13, 12901:14,
12901:15, 12906:8,
12907:9, 12907:21,
12908:14, 12908:18,
12911:18, 12912:5,
12918:9, 12921:22,
13003:20
**defendant's** [2] -
12924:23, 12924:24
**defendants** [19] -
12907:16, 12908:6,
12911:15, 12913:4,
12919:20, 12937:20,
12970:7, 12970:12,
12970:16, 12970:21,
12971:1, 12971:16,
12971:17, 12972:17,
12977:18, 12979:2,
12982:24, 12983:8
**Defendants** [3] -
12898:7, 12898:16,
12899:2
**defendants'** [1] -
12918:23
**defense** [9] -

12904:11, 12905:5,
12911:3, 12937:1,
12940:9, 12941:7,
12941:14, 12958:18
**defenses** [1] -
12940:12
**defines** [1] - 12924:21
**definitely** [2] -
12904:24, 12921:24
**definition** [3] -
12939:6, 12939:16
**deleted** [5] -
12906:24, 12917:2,
12917:15, 12924:18,
12925:8
**deletions** [2] -
12921:14, 12921:15
**deliver** [2] - 12930:9,
12937:4
**DEPUTY** [12] -
12901:2, 12942:6,
12960:10, 12960:15,
12960:17, 12960:22,
12960:24, 12961:21,
12962:9, 12991:10,
12991:12, 13016:4
**described** [2] -
12923:11, 12925:11
**describes** [1] -
12935:24
**designation** [1] -
12939:21
**destination** [1] -
12977:24
**destroy** [6] -
12908:20, 12918:12,
12922:22, 12923:2,
12930:2, 12931:7
**destroying** [2] -
12918:8, 12923:9
**destruction** [9] -
12918:15, 12922:17,
12922:19, 12922:25,
12923:16, 12923:19,
12924:13, 12930:20,
12931:8
**determination** [1] -
12938:8
**determine** [2] -
12940:22, 12990:21
**dialogue** [1] - 13006:1
**different** [22] -
12912:18, 12932:18,
12933:5, 12933:14,
12933:15, 12934:11,
12935:15, 12940:13,
12940:25, 12941:9,
12950:6, 12955:20,
12957:1, 12965:9,
12965:11, 12967:13,

12967:22, 12968:10,
12979:17, 12990:20
**difficult** [2] -
12984:18, 12988:13
**direct** [9] - 12909:8,
12913:16, 12915:21,
12916:2, 12917:9,
12920:6, 12937:19,
12967:16, 12973:14
**direction** [19] -
12974:12, 12974:15,
12975:6, 12975:10,
12975:22, 12975:24,
12979:17, 12981:9,
12981:13, 12985:11,
12986:19, 12987:12,
12988:1, 12988:2,
12989:17, 12990:18,
13002:3, 13005:8,
13007:8
**directions** [6] -
12976:25, 12977:6,
12977:17, 12980:1,
12986:5, 13001:23
**directly** [1] - 12914:1
**disagree** [1] -
12913:12
**disclose** [1] - 12911:7
**disclosed** [1] -
12911:3
**discoverable** [1] -
12940:23
**discovered** [2] -
12906:9, 12907:10
**discussed** [6] -
12912:2, 12915:11,
12915:22, 12921:1,
12925:1, 12958:14
**discussing** [4] -
12902:24, 12921:17,
12931:6, 12986:3
**discussion** [2] -
12913:5, 12928:14
**discussions** [2] -
12926:23, 12927:11
**dismiss** [2] - 12902:3,
12934:22
**disobeyed** [1] -
12973:3
**display** [1] - 12906:23
**disposing** [1] -
12918:21
**DISTRICT** [3] -
12898:1, 12898:1,
12898:10
**document** [30] -
12906:23, 12932:12,
12933:8, 12933:16,
12941:1, 12941:7,
12941:8, 12946:17,

12946:21, 12954:5,
12954:24, 12962:23,
12963:5, 12963:9,
12963:13, 12963:16,
12963:19, 12964:1,
12964:4, 12964:19,
12964:21, 12964:24,
12965:8, 12965:10,
12965:17, 12965:22,
12966:15, 12966:16,
12966:20, 12967:1
**documents** [4] -
12935:24, 12935:25,
12936:20, 12938:16
**DOJ** [2] - 12918:22,
12934:14
**Dominic** [1] - 12901:5
**done** [8] - 12904:21,
12926:11, 12938:24,
12943:9, 12957:24,
12959:10, 12968:9,
13014:16
**Donohoe** [2] -
12957:5, 12958:2
**Donohoe's** [1] -
12957:13
**door** [2] - 12929:18,
12934:18
**double** [2] - 12963:22,
12979:7
**double-check** [2] -
12963:22, 12979:7
**doubt** [1] - 12960:7
**down** [10] - 12906:6,
12915:18, 12970:25,
12978:20, 12986:25,
12988:23, 12994:9,
12996:19, 12999:14,
13015:2
**draw** [1] - 12974:14
**drawers** [1] - 12923:5
**drawing** [3] -
12974:10, 12984:23,
13001:11
**drawn** [2] - 12974:8,
12984:24
**drink** [1] - 12981:24
**Drive** [1] - 12899:15
**drove** [1] - 12983:2
**during** [5] - 12911:8,
12963:5, 12968:15,
12986:4, 12999:6
**duties** [1] - 12923:24

**E**

**early** [2] - 12906:11,
12917:24
**earshot** [1] - 12971:2
**easier** [2] - 12929:17,

12985:9
**East** [5] - 12898:17,
12899:15, 12915:15,
12916:18, 12917:3
**east** [27] - 12974:15,
12974:17, 12974:18,
12985:13, 12985:15,
12985:16, 12987:2,
13000:15, 13000:16,
13001:14, 13001:15,
13001:16, 13001:17,
13001:19, 13002:1,
13002:3, 13002:13,
13003:15, 13005:12,
13005:16, 13007:3,
13007:4, 13007:23,
13008:9, 13008:20,
13009:11
**easy** [1] - 12919:8
**eat** [1] - 12981:24
**eats** [1] - 12982:21
**Eddie** [22] - 12969:10,
12969:12, 12970:7,
12970:10, 12970:11,
12970:12, 12970:16,
12970:23, 12971:2,
12971:15, 12981:9,
12982:5, 12984:4,
12984:5, 12984:7,
12984:12, 12998:6,
12999:1, 12999:3,
13011:10, 13011:12
**edit** [15] - 12909:1,
12943:17, 12944:1,
12944:2, 12944:20,
12946:3, 12946:18,
12948:1, 12949:13,
12950:11, 12951:19,
12953:25, 12955:6,
12955:7, 12955:18
**edited** [1] - 12968:15
**Edition** [1] - 12965:11
**edits** [2] - 12965:12,
12968:8
**efficient** [1] -
12927:19
**effort** [1] - 12909:3
**either** [9] - 12907:19,
12913:10, 12923:11,
12923:12, 12931:6,
12937:15, 12966:15,
12987:12, 12990:15
**elicit** [2] - 12920:24,
13014:6
**Ellipse** [7] - 12975:2,
12975:3, 12975:4,
12975:5, 12976:1,
12987:22, 12990:16
**email** [11] - 12930:5,
12945:17, 12948:5,

13023

12948:6, 12948:8, 12948:25, 12949:2, 12949:4, 12949:15, 12950:3
**emails** [5] - 12909:24, 12917:5, 12939:8, 12956:3, 12958:19
**end** [15] - 12910:11, 12921:13, 12941:8, 12948:18, 12950:2, 12970:4, 12979:2, 12985:12, 12985:16, 12985:19, 12985:21, 12986:19, 13005:12, 13008:19, 13015:4
**ended** [3] - 12956:8, 12991:1, 12993:9
**ending** [1] - 12985:13
**ends** [3] - 12965:25, 12966:3, 12966:5
**engaged** [1] - 12913:22
**Enrique** [4] - 12901:5, 12963:9, 12963:14, 12966:25
**enter** [1] - 12949:20
**entertain** [1] - 12927:11
**entire** [2] - 12968:11, 12978:11
**entirely** [2] - 12923:4, 12940:25
**entitled** [2] - 12922:10, 12938:25
**entitlement** [1] - 12938:16
**entry** [3] - 12949:21, 12953:8, 12954:5
**equities** [1] - 12907:3
**equivalent** [1] - 12936:7
**Erik** [2] - 12898:12, 12901:8
**Eryka** [3] - 12963:16, 12965:9, 12965:17
**especially** [1] - 12935:2
**Esq** [11] - 12898:12, 12898:12, 12898:13, 12898:16, 12898:19, 12898:23, 12899:2, 12899:4, 12899:8, 12899:11, 12899:14
**essentially** [1] - 12969:16
**establish** [1] - 12957:12
**estimate** [1] - 12904:22
**Ethan** [13] - 12901:3,

12966:20, 12968:15, 12975:16, 12976:17, 12993:18, 12994:23, 12995:13, 12996:2, 12996:10, 12997:19, 12999:7, 13005:2
**ethics** [1] - 12912:20
**evaluate** [2] - 12909:10, 12920:8
**eventually** [1] - 13005:11
**evid** [1] - 12961:16
**Evidence** [1] - 12910:9
**evidence** [50] - 12908:21, 12910:7, 12910:21, 12914:4, 12917:19, 12917:21, 12918:8, 12918:13, 12918:15, 12918:19, 12918:21, 12919:15, 12919:21, 12920:13, 12920:15, 12922:17, 12922:19, 12922:20, 12922:22, 12922:25, 12923:3, 12923:16, 12923:19, 12923:21, 12924:13, 12925:1, 12928:16, 12930:2, 12930:13, 12930:20, 12931:1, 12941:15, 12958:10, 12958:20, 12959:18, 12959:22, 12960:4, 12960:9, 12961:5, 12961:18, 12961:21, 12965:10, 12967:4, 12967:6, 12970:21, 12972:10, 12972:19, 12973:6, 12973:19, 13014:2
**evidentiary** [5] - 12902:9, 12902:12, 12903:15, 12912:12, 12934:10
**exact** [4] - 12937:14, 12961:12, 12961:18, 13009:9
**exactly** [6] - 12916:24, 12932:10, 12962:11, 13001:25, 13004:18, 13006:12
**exaggerate** [2] - 12928:17, 12929:5
**exaggerating** [1] - 12926:15
**exaggeration** [1] - 12926:20
**EXAMINATION** [1] - 12942:11
**Examination** [1] -

12900:3
**examination** [20] - 12901:21, 12906:8, 12909:6, 12909:11, 12909:12, 12911:16, 12911:19, 12914:11, 12914:18, 12914:23, 12915:21, 12916:5, 12918:1, 12920:2, 12920:3, 12920:6, 12920:16, 12932:4, 12935:15, 12942:10
**examine** [5] - 12908:6, 12908:19, 12915:13, 12917:1, 12932:23
**example** [1] - 12929:12
**except** [1] - 12978:12
**exchange** [9] - 12910:3, 12910:21, 12915:20, 12922:3, 12922:9, 12961:18, 12962:1, 12963:6, 12964:6
**exclude** [2] - 12918:1, 12993:13
**excluded** [4] - 12920:2, 12923:12, 12936:7, 12969:7
**excluding** [2] - 12924:2, 12925:9
**exclusion** [1] - 12936:8
**excuse** [5] - 12905:12, 12928:5, 12956:12, 12960:16, 13004:14
**exhausted** [1] - 12918:23
**exhibit** [4] - 12944:10, 12991:8, 12994:10, 12994:11
**Exhibit** [2] - 12994:14, 13013:16
**Exhibit-1000** [4] - 12967:17, 12994:17, 13004:16, 13004:21
**Exhibit-1001** [1] - 12967:18
**Exhibit-3** [1] - 13013:17
**Exhibit-301** [3] - 12973:11, 12973:17, 12987:19
**Exhibit-305** [1] - 12984:19
**Exhibit-316** [8] - 12991:6, 12992:20, 12997:22, 12998:3, 13000:7, 13003:9, 13009:15, 13009:18

**Exhibit-506** [1] - 12959:25
**exhibits** [3] - 12962:7, 12967:5, 12991:16
**exists** [1] - 12920:1
**expect** [1] - 12902:10
**explain** [5] - 12926:20, 12943:23, 12943:25, 12955:24, 12969:3
**explained** [2] - 12909:22, 12910:2
**explanation** [7] - 12909:21, 12911:9, 12918:18, 12926:10, 12932:16, 12952:6, 12956:20
**explore** [2] - 12908:9, 12910:14
**extension** [1] - 12902:21
**extensive** [1] - 12914:20
**extent** [5] - 12928:9, 12964:10, 12975:19, 12982:2, 13008:12, 13015:16
**extrinsic** [2] - 12910:21, 12931:1
**eyes** [1] - 12978:12

## F

**F.3d** [1] - 12917:22
**face** [12] - 12909:14, 12910:7, 12911:4, 12916:4, 12919:5, 12921:17, 12926:17, 12936:3, 12978:11, 12978:20, 13003:24, 13004:1
**facing** [3] - 13003:15, 13010:10, 13012:7
**fact** [20] - 12902:16, 12914:5, 12914:8, 12922:2, 12922:4, 12927:10, 12928:4, 12928:6, 12928:13, 12931:5, 12948:2, 12950:3, 12952:1, 12952:17, 12954:24, 12955:8, 12955:10, 12955:13, 12955:14, 12979:12
**fact-finding** [1] - 12902:16
**facts** [10] - 12910:20, 12952:9, 12954:21, 12956:14, 12956:22, 12964:23, 12965:14, 12966:24, 12967:2,

12967:3
**factual** [3] - 12914:16, 12953:19, 12963:10
**fade** [2] - 13007:18, 13007:22
**fades** [2] - 13009:5, 13009:10
**failure** [3] - 12911:7, 12913:17, 12917:9
**faint** [3] - 13010:8, 13010:9, 13010:12
**fair** [6] - 12902:22, 12903:4, 12926:24, 12932:13, 12968:18, 12976:4
**faith** [1] - 12919:16
**false** [10] - 12948:2, 12949:21, 12953:8, 12954:5, 12954:23, 12955:2, 12955:4, 12958:9, 12959:17, 12959:21
**family** [3] - 12930:9, 12930:10, 12930:12
**far** [6] - 12907:4, 12921:11, 12923:11, 12924:22, 12929:9, 12933:12
**FBI** [9] - 12906:10, 12906:19, 12907:1, 12917:23, 12918:19, 12921:4, 12928:15, 12937:16, 12963:14
**female** [1] - 12963:17
**few** [7] - 12910:13, 12915:22, 12991:16, 13003:4, 13003:12, 13003:14, 13004:9
**fielded** [1] - 12905:4
**figure** [7] - 12903:16, 12976:12, 12977:16, 12978:8, 12983:23, 12989:14, 12997:11
**figure's** [1] - 12990:9
**figures** [2] - 12976:25, 12999:10
**file** [6] - 12903:9, 12925:21, 12925:22, 12925:24, 12933:22, 12937:16
**filed** [5] - 12902:5, 12903:20, 12904:6, 12904:11, 12912:2
**files** [4] - 12921:11, 12924:22
**filing** [6] - 12902:14, 12909:20, 12919:10, 12919:23, 12933:9, 12933:10
**filings** [5] - 12906:17,

12908:8, 12908:18, 12915:2, 12939:10
**film** [3] - 12970:3, 12970:10, 12972:7
**filmed** [2] - 12969:21, 12972:20
**filming** [14] - 12969:17, 12970:8, 12970:16, 12970:17, 12970:24, 12971:15, 12971:17, 12971:21, 12971:25, 12972:11, 12984:3, 12998:11, 12998:23, 13011:13
**filmmaker** [2] - 12969:10, 12971:24
**films** [1] - 12993:17
**filtered** [1] - 12906:23
**filtering** [1] - 12907:11
**final** [1] - 12956:9
**finally** [2] - 12915:2, 12919:19
**fine** [1] - 12925:23
**finer** [1] - 12910:22
**fingers** - 12977:20
**finished** [1] - 12964:2
**first** [20] - 12901:24, 12903:25, 12908:23, 12908:24, 12913:14, 12916:8, 12928:8, 12933:5, 12935:2, 12938:1, 12938:3, 12942:16, 12952:9, 12958:15, 12979:6, 12979:10, 12980:3, 12982:9, 12999:24, 13009:24
**First** [2] - 12979:16, 12989:22
**five** [2] - 12927:12, 12929:2
**FL** [2] - 12899:6, 12899:9
**flagging** [1] - 12928:1
**Floor** [2] - 12898:21, 12899:12
**Flores** - 12963:16
**focus** [1] - 12952:9
**focused** [1] - 12981:21
**follow** [3] - 12923:7, 12947:9, 13008:24
**follow-up** [1] - 12947:9
**followed** [2] - 12906:15, 12973:3
**following** [7] - 12906:17, 12907:15, 12956:3, 12970:14, 12994:6, 12994:8,

13007:22
**follows** [5] - 12916:7, 12920:25, 12922:19, 12964:12, 13009:1
**Fonticoba** [1] - 12997:13
**food** [16] - 12982:17, 12982:20, 12982:21, 12983:7, 12983:14, 12985:6, 12985:19, 12985:20, 12987:13, 12987:15, 12989:19, 12989:25, 12990:14, 12990:19, 13002:16, 13002:21
**footage** [15] - 12967:9, 12968:8, 12969:9, 12969:21, 12970:2, 12970:15, 12970:22, 12971:4, 12972:3, 12982:23, 12990:25, 12991:1, 12991:15, 12995:1, 13009:9
**FOR** [1] - 12898:1
**foregoing** [1] - 13016:10
**forensic** [1] - 13013:11
**Forensic** [1] - 13013:12
**forgive** [1] - 12906:5
**former** [1] - 12911:13
**forth** [1] - 12911:8
**forward** [1] - 12931:4
**foundation** [4] - 12929:14, 12957:11, 12957:15, 12977:7
**foundational** [1] - 12906:13
**four** [1] - 13013:13
**Friday** [4] - 12906:12, 12907:13, 12939:5, 12941:25
**Friday's** [1] - 12942:1
**Friedman** [1] - 12905:4
**friend** [1] - 12963:17
**front** [7] - 12961:9, 12965:19, 12980:21, 12986:24, 12989:23, 13002:13, 13003:15
**fronting** [1] - 12927:25
**full** [2] - 12928:13, 13016:11
**functional** [1] - 12936:7

**G**

**gained** [1] - 12915:5
**gaiter** [3] - 12977:17, 12978:8, 12984:17
**game** [1] - 12932:13
**gaps** [1] - 12907:12
**gather** [1] - 12977:3
**general** [3] - 12913:19, 12916:8, 12959:20
**generally** [1] - 12917:22
**gentlemen** [2] - 12942:9, 13014:22
**given** [7] - 12914:20, 12921:4, 12927:4, 12935:2, 12959:17, 12959:21, 12973:7
**God** [3] - 12922:24, 12923:6, 12923:8
**good-faith** [1] - 12919:16
**Googled** [1] - 12964:20
**Googles** [2] - 12963:18, 12963:21
**Googling** [4] - 12965:25, 12966:3, 12966:5, 12966:11
**Gossjankowski** [1] - 12905:7
**government** [50] - 12901:7, 12902:7, 12902:10, 12902:17, 12903:6, 12903:12, 12903:22, 12903:25, 12904:20, 12905:15, 12907:14, 12907:22, 12909:20, 12910:1, 12910:5, 12912:21, 12914:4, 12918:17, 12918:20, 12919:4, 12927:18, 12927:20, 12931:15, 12931:23, 12932:16, 12932:24, 12935:20, 12935:21, 12935:22, 12936:6, 12936:17, 12936:18, 12936:19, 12936:21, 12939:6, 12940:16, 12940:20, 12941:6, 12945:24, 12958:17, 12958:18, 12959:21, 12961:4, 12994:10, 12994:11, 13004:23, 13012:11, 13015:6, 13015:18
**Government** [8] - 12959:16, 12959:25,

12962:7, 12967:17, 12994:14, 12994:17, 13004:16, 13004:20
**Government's** [5] - 12928:25, 12933:9, 12959:18, 12967:18, 12991:17
**government's** [14] - 12905:6, 12907:17, 12910:6, 12911:24, 12912:10, 12919:6, 12920:14, 12922:25, 12930:21, 12940:12, 12958:10, 12959:22, 12991:16, 12992:5
**Government-506** [1] - 12962:8
**granted** [1] - 12973:22
**greet** [6] - 13001:2, 13001:9, 13002:6, 13002:9, 13003:13, 13004:9
**grounds** [7] - 12924:10, 12926:24, 12978:17, 12979:8, 12979:14, 12979:18, 12980:8
**group** [27] - 12967:9, 12971:25, 12972:7, 12972:9, 12972:11, 12972:23, 12977:18, 12979:5, 12979:21, 12980:9, 12982:20, 12984:5, 12985:3, 12986:4, 12986:6, 12986:11, 12987:1, 12988:20, 12990:25, 12993:24, 13002:16, 13002:21, 13002:23, 13002:25, 13004:18, 13004:24, 13005:5
**groups** [1] - 12908:17
**guess** [8] - 12927:19, 12932:5, 12936:4, 12940:1, 12940:17, 12947:25, 12988:11, 12991:16
**guy** [2] - 12978:8, 12999:2

**H**

**hand** [5] - 12919:8, 12926:12, 12929:24, 13001:24, 13001:25
**handler** [4] - 12909:22, 12945:19, 12948:20, 12949:25
**handling** [10] - 12948:23, 12948:24,

12950:3, 12950:12, 12950:19, 12951:3, 12951:6, 12951:13, 12951:18, 12951:25
**hands** [1] - 12977:2
**Hang** [1] - 13002:5
**hang** [3] - 13003:13, 13004:10, 13012:23
**hanging** [2] - 12935:19, 12936:16
**happy** [1] - 12993:16
**hard** [1] - 12978:14
**Harris** [4] - 12941:19, 12960:8, 12961:24, 12962:6
**Hassan** [2] - 12899:4, 12901:11
**HASSAN** [1] - 12899:5
**Haven** [1] - 12898:21
**hay** [1] - 12929:10
**head** [21] - 12927:5, 12973:5, 12976:12, 12988:23, 12988:24, 12989:12, 12989:14, 12989:15, 12996:2, 12996:6, 12996:10, 12996:11, 12996:12, 12996:17, 12996:20, 12999:20, 13008:10, 13009:12, 13011:3, 13011:4, 13013:5
**headed** [1] - 12941:12
**heading** [4] - 12985:5, 12988:4, 12988:11, 12988:16
**headphones** [2] - 12988:13, 12988:14
**headquarters** [2] - 12906:20, 12921:5
**hear** [35] - 12924:1, 12927:17, 12927:19, 12933:24, 12961:2, 12964:8, 12964:9, 12964:15, 12975:16, 12988:4, 12988:12, 12988:16, 12998:16, 12998:18, 13001:2, 13001:3, 13001:8, 13003:20, 13003:24, 13008:8, 13010:3, 13010:7, 13010:8, 13011:1, 13011:7, 13011:22, 13012:4, 13012:5, 13012:20, 13013:6, 13013:7, 13013:9, 13014:9, 13015:4
**heard** [20] - 12906:12, 12914:20, 12914:21, 12927:1, 12935:4,

12935:5, 12936:2,
12938:18, 12962:25,
12963:4, 12963:6,
12964:6, 12982:1,
12993:2, 13004:1,
13004:8, 13012:25,
13013:1, 13013:14,
13013:18
**hearing** [8] - 12902:9,
12902:12, 12903:15,
12912:12, 12926:11,
12934:10, 12936:22,
13012:21
**heart** [1] - 12933:8
**held** [1] - 12974:25
**HELD** [1] - 12898:9
**help** [1] - 12909:10
**Hemphill** [17] -
12971:5, 12971:10,
12990:24, 12991:15,
12992:3, 12993:5,
12993:17, 12993:24,
12994:12, 12995:1,
12995:25, 12996:7,
12996:12, 12997:6,
12997:15, 12997:19,
13009:9
**Hemphill's** [1] -
13009:2
**hereby** [1] - 13016:19
**HERNANDEZ** [19] -
12903:5, 12903:10,
12903:17, 12930:19,
12931:11, 12931:13,
12931:15, 12931:17,
12931:19, 12932:2,
12932:9, 12932:20,
12932:22, 12939:2,
12939:4, 12939:15,
12940:3, 12940:5,
12940:7
**Hernandez** [10] -
12899:2, 12901:10,
12902:5, 12902:8,
12903:12, 12912:8,
12930:18, 12931:10,
12939:3, 12941:3
**Hernandez's** [1] -
12934:1
**herself** [3] - 12910:23,
12913:25, 12916:21
**Hialeah** [1] - 12899:9
**hidden** [3] - 12906:10,
12907:7, 12907:10
**higher** [1] - 12934:14
**Highland** [1] - 12899:3
**highlight** [1] - 12978:2
**highly** [2] - 12939:21
**hmm** [7] - 12972:18,
12985:18, 12987:23,

12993:6, 13005:7,
13007:17, 13007:21
**hold** [6] - 12934:14,
12944:14, 12946:8,
12960:20, 12987:8,
13015:10
**holding** [1] - 13001:24
**Hollow** [1] - 12899:2
**honestly** [1] -
12911:20
**Honor** [56] - 12902:13,
12903:5, 12903:17,
12904:10, 12904:12,
12905:2, 12905:11,
12905:14, 12912:17,
12912:24, 12920:23,
12921:2, 12921:25,
12922:12, 12922:17,
12922:23, 12923:9,
12923:14, 12923:20,
12923:23, 12924:6,
12924:11, 12924:13,
12924:20, 12924:23,
12925:6, 12926:2,
12930:19, 12932:2,
12933:4, 12933:7,
12934:1, 12934:8,
12934:9, 12935:8,
12935:12, 12936:21,
12939:4, 12941:13,
12944:9, 12946:9,
12957:10, 12958:12,
12958:17, 12959:24,
12961:1, 12961:12,
12977:11, 12980:24,
12991:14, 12992:2,
12993:8, 13013:10,
13014:6, 13015:3
**Honor's** [1] - 12905:17
**HONORABLE** [1] -
12898:9
**Honorable** [1] -
13016:4
**hoodie** [1] - 12997:12
**hope** [1] - 12922:23
**hopefully** [1] -
12901:21
**hour** [5] - 12960:2,
12960:3, 12973:18,
12987:19, 13014:24
**hours** [1] - 12982:8
**housekeeping** [2] -
12901:18, 12901:23
**Hull** [2] - 12898:23,
12901:9
**HULL** [1] - 12898:23

---

I

**idea** [1] - 12904:23

**identification** [1] -
13014:3
**identifications** [2] -
12926:16, 12927:4
**identified** [3] -
12907:21, 12936:7,
13015:17
**identify** [2] -
12978:14, 13015:18
**II** [1] - 12899:11
**image** [2] - 13005:2,
13005:14
**imagine** [2] - 12919:8,
12930:2
**immediately** [1] -
12996:17
**impeach** [10] -
12913:18, 12915:3,
12915:7, 12917:10,
12917:16, 12922:8,
12922:10, 12923:22,
12924:7, 12925:12
**impeached** [1] -
12916:21
**impeaches** [1] -
12913:7
**impeachment** [6] -
12910:19, 12910:24,
12916:7, 12917:18,
12918:3, 12926:25
**implausible** [1] -
12926:17
**imply** [1] - 12979:9
**important** [6] -
12906:5, 12912:7,
12929:13, 12940:17,
12997:1, 13004:14
**impression** [1] -
12929:9
**improper** [1] -
12917:20
**improperly** [1] -
12908:11
**IN** [1] - 12898:1
**inaccurate** [1] -
12911:2
**inadvertently** [1] -
12932:6
**inartful** [1] - 12927:12
**inception** [2] -
12927:7, 12929:3
**inclined** [1] -
12905:17
**include** [4] -
12902:10, 12920:7,
12936:25, 12968:23
**included** [5] -
12969:4, 12973:14,
12982:6, 12991:5,
12991:15

**including** [3] -
12911:15, 12915:22,
12929:4
**incomplete** [1] -
12909:17
**inconsistent** [1] -
12923:4
**incorrect** [1] -
12909:17
**indicate** [4] -
12904:10, 12914:9,
13002:25, 13004:24
**indicated** [6] -
12921:23, 12963:25,
12986:10, 12999:7,
12999:13, 13002:4
**indicates** [1] -
12965:21
**indicating** [22] -
12905:13, 12911:17,
12912:15, 12920:21,
12933:2, 12939:2,
12948:1, 12972:19,
12974:15, 12975:6,
12976:1, 12976:2,
12977:16, 12979:21,
12985:11, 12989:24,
12990:8, 12990:11,
12990:12, 13005:9,
13005:11, 13015:9
**indication** [2] -
12931:25, 12970:20
**individual** [14] -
12916:16, 12945:18,
12945:20, 12947:5,
12947:18, 12948:6,
12948:9, 12948:14,
12948:21, 12949:25,
12950:8, 12984:16,
12998:23, 13001:23
**infer** [1] - 12909:15
**inference** [1] -
12913:24
**inform** [2] - 12901:25,
12940:10
**informant** [1] -
12943:14
**information** [17] -
12907:2, 12907:15,
12911:2, 12934:10,
12934:13, 12936:25,
12937:3, 12937:4,
12939:18, 12941:9,
12942:24, 12948:5,
12948:9, 12958:9,
12959:17, 12959:22,
12963:13
**informed** [4] -
12901:25, 12902:3,
12914:7, 12963:8

**inherent** [1] - 12905:3
**initial** [1] - 12960:18
**innocent** [1] -
12932:16
**innocuous** [1] -
12909:21
**inquire** [1] - 12908:25
**inquired** [1] - 12931:5
**inquiry** [2] - 12919:16,
12926:22
**insane** [3] - 12922:24,
12923:6, 12923:8
**inside** [4] - 12992:4,
12993:21, 12993:24,
12994:13
**insinuate** [1] -
12919:9
**instance** [3] -
12935:2, 12938:1,
12978:22
**intend** [2] - 12920:24,
12941:15
**intends** [3] -
12916:25, 12919:24,
13015:17
**intent** [1] - 12908:18
**intentionally** [1] -
12909:16
**interest** [1] - 12927:7,
12927:8
**internal** [7] -
12921:10, 12924:19,
12925:7, 12926:19,
12926:22, 12928:14,
12937:16
**Internal** [1] - 12922:7
**interview** [3] -
12960:1, 12962:22,
12963:15
**interviewed** [7] -
12957:2, 12957:5,
12957:15, 12958:1,
12958:4, 12958:6,
12971:16
**interviewing** [4] -
12958:8, 12959:16,
12959:21, 12962:19
**introduced** [2] -
12915:24, 12960:11
**introducing** [1] -
12910:21
**intrusion** [1] -
12911:24
**invading** [1] -
12917:25
**investigation** [14] -
12908:10, 12917:25,
12921:8, 12922:6,
12931:3, 12943:2,
12943:4, 12943:11,

12943:16, 12957:3,
12957:25, 12959:8,
12959:10, 12972:10
**investigations** [1] -
12922:7
**investigator** [1] -
12912:21
**involve** [1] - 12922:20
**involved** [9] -
12915:17, 12916:18,
12916:22, 12917:4,
12918:14, 12927:6,
12929:3, 12951:3,
12982:24
**involvement** [3] -
12965:7, 12965:12,
12966:25
**involving** [1] -
12993:18
**issue** [27] - 12901:21,
12904:6, 12908:5,
12910:14, 12910:22,
12911:20, 12913:11,
12914:2, 12918:10,
12920:9, 12920:11,
12922:18, 12928:4,
12928:22, 12930:20,
12932:3, 12932:4,
12932:11, 12933:20,
12934:11, 12934:16,
12935:19, 12936:16,
12941:15, 12958:13,
12959:8
**issues** [9] - 12902:8,
12915:1, 12918:5,
12920:20, 12933:13,
12934:5, 12935:19,
12938:13, 12940:23
**item** [1] - 12936:7
**items** [1] - 12918:13
**itself** [4] - 12910:21,
12913:21, 12956:14,
12956:23
**IV** [1] - 12898:23

**J**

**January** [5] -
12963:22, 12963:24,
12966:14, 12974:25
**Jason** [2] - 12898:12,
12901:7
**Jauregui** [2] -
12899:8, 12901:12
**JAUREGUI** [1] -
12899:8
**jeez** [1] - 12934:24
**Jencks** [18] -
12906:10, 12906:22,
12906:25, 12907:8,

12907:23, 12908:3,
12913:10, 12913:15,
12917:8, 12918:25,
12920:6, 12920:8,
12930:15, 12932:3,
12932:5, 12938:4,
12938:6, 12940:2
**Jeremy** [8] - 12958:4,
12962:19, 12963:1,
12963:15, 12963:25,
12965:1, 12966:12,
12966:23
**jerk** [1] - 12904:19
**Jersey** [2] - 13005:9,
13008:20
**job** [1] - 13008:23
**Joe** [2] - 13004:11,
13005:14
**John** [2] - 12898:23,
12901:9
**joke** [1] - 12923:17
**Joseph** [1] - 12901:4
**journalist** [2] -
12984:1, 12984:9
**JUDGE** [1] - 12898:10
**Judge** [2] - 12905:4,
12980:23
**judge** [1] - 13012:9
**July** [1] - 12948:13
**jumps** [1] - 13006:25
**jurisdiction** [1] -
12937:2
**juror** [1] - 12909:18
**jury** [19] - 12906:11,
12909:10, 12910:15,
12912:14, 12915:11,
12915:11, 12917:19,
12917:21, 12918:5,
12920:20, 12926:4,
12934:20, 12941:19,
12942:6, 12942:7,
12943:13, 12968:12,
13012:8, 13014:25
**JURY** [1] - 12898:8
**Jury** [2] - 12942:7,
13014:25
**jury's** [1] - 12934:7

**K**

**keep** [5] - 12977:9,
12993:16, 13006:22,
13010:14, 13012:21
**KELLY** [1] - 12898:9
**KENERSON** [43] -
12902:13, 12904:1,
12928:2, 12936:21,
12937:7, 12937:10,
12937:12, 12937:14,
12937:23, 12941:10,

12941:24, 12942:2,
12944:21, 12946:4,
12946:7, 12953:1,
12956:15, 12957:6,
12957:19, 12958:11,
12959:1, 12959:3,
12959:12, 12960:13,
12961:6, 12961:8,
12962:5, 12977:7,
12980:12, 12980:14,
12989:6, 12991:21,
12991:25, 12992:7,
12993:8, 13006:6,
13011:16, 13013:15,
13013:18, 13013:22,
13015:9, 13015:11,
13015:15
**Kenerson** [12] -
12898:12, 12901:8,
12940:19, 12957:18,
12958:24, 12961:4,
12962:4, 12991:20,
13013:21, 13014:9,
13015:10, 13015:25
**Kenny** [1] - 12958:6
**kind** [17] - 12913:23,
12919:13, 12928:12,
12929:13, 12951:21,
12952:3, 12971:2,
12971:8, 12977:3,
12978:1, 12982:10,
12985:16, 12986:25,
12995:6, 13001:25,
13002:24, 13014:16
**kinds** [1] - 12959:6
**knee** [1] - 12904:19
**knee-jerk** [1] -
12904:19
**knowing** [1] -
12910:11
**known** [1] - 12963:18
**knows** [4] - 12923:18,
12944:11, 12977:8,
13006:8
**Kyles** [3] - 12930:23,
12931:3, 12931:20

**L**

**lack** [1] - 12912:4
**ladies** [2] - 12942:9,
13014:22
**lady** [1] - 12971:8
**Lake** [1] - 12899:15
**Lakes** [1] - 12899:6
**landmarks** [1] -
12977:24
**large** [2] - 12906:19,
12916:1
**last** [23] - 12902:14,

12903:20, 12905:4,
12906:2, 12906:4,
12906:7, 12912:2,
12915:4, 12919:11,
12935:21, 12936:12,
12936:22, 12942:17,
12945:24, 12955:12,
12959:15, 12968:18,
12980:19, 12983:20,
12989:10, 13005:14,
13005:21, 13013:4
**late** [3] - 12902:23,
12904:18, 12906:17
**latter** [1] - 13014:5
**laughing** [1] - 13013:9
**LAW** [3] - 12899:5,
12899:8, 12899:15
**law** [1] - 12911:20
**lawyer** [1] - 12921:23
**lawyers** [1] - 12958:18
**lay** [1] - 12929:14
**laying** [1] - 12957:10,
12957:14
**layman's** [1] -
12943:14
**leadership** [3] -
12908:17, 12916:23,
12979:21
**leads** [2] - 12929:2,
12966:24
**learn** [2] - 12934:22,
12934:23
**least** [7] - 12901:20,
12906:25, 12908:11,
12909:2, 12935:23,
12938:7, 12962:2
**leave** [2] - 12953:13,
12997:15
**left** [3] - 12903:8,
12936:16, 12983:23
**legal** [1] - 12920:14
**less** [1] - 12907:18
**letter** [1] - 12911:20
**letting** [1] - 12985:24
**level** [1] - 12928:15
**lift** [1] - 12978:18
**likely** [1] - 12937:17
**limited** [5] - 12909:11,
12926:22, 12927:2,
12928:18, 12928:25
**line** [10] - 12903:8,
12909:9, 12910:11,
12927:2, 12927:3,
12927:16, 12928:15,
12936:12, 12974:8,
13015:17
**lines** [7] - 12935:1,
12935:16, 12935:19,
12936:24, 12937:6,
12939:25, 13009:6

**list** [2] - 12960:18,
12960:20
**listed** [1] - 12960:17
**listen** [4] - 12964:16,
12986:14, 13012:16,
13013:4
**listening** [2] -
13010:14, 13013:13
**litigate** [1] - 12914:12
**live** [2] - 12968:7,
12970:22
**Livingston** [1] -
12899:16
**Lizardo** [1] - 12958:6
**LLC** [1] - 12898:20
**log** [2] - 12935:23,
12936:6
**look** [16] - 12903:11,
12904:18, 12905:24,
12906:4, 12918:6,
12925:20, 12940:13,
12981:17, 12981:25,
12982:2, 12990:9,
12995:18, 13000:19,
13007:16, 13014:8,
13015:23
**looked** [2] - 12959:7,
12978:19
**looking** [11] -
12946:21, 12962:6,
12963:5, 12974:18,
12980:20, 12987:18,
13004:13, 13005:20,
13007:8, 13009:2,
13009:20
**looks** [6] - 12948:11,
12978:7, 12981:8,
12981:9, 12983:23,
12986:22
**loud** [2] - 12927:1,
13000:23
**lower** [1] - 12939:21
**lunch** [6] - 12904:13,
13014:11, 13014:19,
13014:23, 13014:24,
13015:19
**Luncheon** [1] -
13016:6
**Lync** [9] - 12906:21,
12907:6, 12911:1,
12916:10, 12916:12,
12916:17, 12917:2,
12919:25, 12921:14

**M**

**machine** [1] -
12899:21
**main** [2] - 12967:17,
12975:19

**male** [2] - 12995:10, 12995:15
**Mall** [4] - 12974:22, 12987:20, 12988:21, 12990:16
**management** [1] - 12905:3
**manner** [1] - 12931:3
**map** [5] - 12978:24, 12989:22, 12990:6, 13004:19, 13004:23
**March** [6] - 12898:6, 12920:25, 12928:5, 12960:1, 12962:19, 13016:13
**march** [27] - 12967:19, 12967:23, 12968:12, 12968:22, 12968:24, 12969:17, 12970:3, 12970:17, 12971:25, 12972:12, 12976:17, 12976:21, 12977:16, 12978:7, 12978:17, 12978:19, 12980:22, 12981:13, 12982:3, 12986:4, 12997:18, 12998:20, 12999:6, 12999:7, 12999:10, 13000:11, 13003:1
**marchers** [2] - 12972:23, 12982:20
**marching** [1] - 13002:25
**marked** [3] - 12959:25, 12973:10, 12984:19
**markers** [2] - 12979:3, 12980:9
**mask** [2] - 12978:20, 12986:5
**master** [1] - 12936:12
**material** [5] - 12907:23, 12919:1, 12919:20, 12920:6, 12938:4
**materially** [1] - 12920:8
**materials** [1] - 12939:13
**matter** [13] - 12908:21, 12909:5, 12916:8, 12916:9, 12916:13, 12919:4, 12922:2, 12922:5, 12923:1, 12924:25, 12932:18, 12952:1, 12961:25
**Matter** [1] - 12901:2
**matters** [4] - 12901:18, 12901:23, 12921:16, 12922:15

**McCullough** [2] - 12898:12, 12901:7
**MCGUIRE** [1] - 12898:23
**MD** [1] - 12899:3
**mean** [31] - 12902:22, 12904:19, 12904:23, 12905:24, 12906:1, 12921:6, 12929:8, 12929:16, 12934:17, 12937:9, 12938:5, 12938:8, 12938:22, 12939:17, 12939:18, 12939:24, 12940:7, 12947:16, 12948:12, 12949:6, 12955:16, 12959:1, 12959:3, 12959:5, 12959:7, 12965:1, 12968:6, 12978:22, 12996:1, 12999:8
**mean,I** [1] - 12927:18
**meaning** [1] - 12955:7
**means** [8] - 12922:6, 12934:22, 12937:8, 12939:17, 12949:10, 12949:16, 13006:13, 13008:6
**meant** [1] - 12930:6
**meantime** [1] - 12942:16
**media** [3] - 12998:19, 12998:22, 12999:3
**Meet** [2] - 13001:2, 13002:7
**meet** [4] - 13001:9, 13002:6, 13003:13, 13004:9
**meeting** [1] - 12908:12
**mentioned** [2] - 12933:16, 12943:1
**mere** [1] - 12923:1
**merely** [2] - 12923:5, 12923:8
**merits** [2] - 12913:8, 12920:14
**message** [15] - 12908:19, 12908:25, 12909:3, 12910:8, 12915:12, 12918:14, 12919:5, 12919:7, 12919:9, 12919:17, 12922:12, 12963:23, 12966:12, 12966:23, 13015:19
**messaged** [2] - 12918:11, 12945:18
**messages** [51] - 12906:9, 12906:16,

12906:23, 12906:24, 12907:2, 12907:6, 12907:7, 12907:11, 12907:18, 12907:20, 12907:23, 12907:25, 12908:7, 12909:14, 12910:7, 12910:15, 12910:19, 12910:24, 12911:1, 12911:4, 12911:7, 12911:14, 12911:16, 12913:6, 12915:8, 12915:22, 12915:24, 12916:5, 12916:17, 12916:21, 12916:25, 12917:2, 12917:11, 12917:12, 12917:13, 12917:17, 12919:2, 12919:6, 12920:1, 12920:18, 12921:1, 12921:3, 12924:18, 12924:23, 12937:9, 12940:18, 12941:3, 12947:6, 12965:16
**messaging** [1] - 12916:10
**messed** [1] - 13005:10
**Metcalf** [6] - 12899:11, 12901:12, 12933:3, 12933:21, 12934:19, 12935:10
**METCALF** [9] - 12899:11, 12933:2, 12933:4, 12933:25, 12934:8, 12935:8, 12935:11, 12935:14
**methods** [1] - 12937:16
**Miami** [1] - 12899:6
**middle** [1] - 12925:23
**might** [17] - 12914:24, 12915:7, 12919:9, 12920:18, 12927:22, 12934:4, 12936:4, 12938:16, 12978:21, 12991:17, 12992:4, 12992:5, 13001:20, 13008:12, 13011:11, 13013:6, 13013:7
**Miller** [50] - 12899:17, 12906:4, 12906:9, 12906:14, 12906:19, 12906:23, 12907:1, 12907:20, 12908:6, 12908:10, 12908:13, 12908:16, 12908:19, 12908:25, 12909:2, 12909:13, 12909:15, 12910:2, 12910:20, 12911:16, 12913:15,

12913:25, 12914:15, 12914:18, 12914:23, 12915:3, 12915:13, 12915:17, 12915:24, 12916:10, 12916:21, 12917:1, 12917:7, 12917:11, 12917:15, 12917:17, 12918:7, 12918:11, 12919:4, 12919:12, 12919:18, 12919:24, 12920:16, 12921:15, 12921:20, 12923:17, 12937:18, 12942:4, 12960:2, 13016:14
**MILLER** [2] - 12900:3, 13016:9
**Miller's** [21] - 12906:8, 12906:18, 12907:6, 12907:9, 12907:11, 12907:25, 12908:13, 12909:6, 12909:10, 12911:6, 12913:5, 12913:7, 12913:19, 12913:22, 12914:4, 12914:14, 12915:21, 12916:2, 12918:24, 12920:5, 12920:7
**mine** [2] - 12947:20, 12956:4
**mini** [1] - 12995:7
**minimal** [2] - 12915:9, 12918:2
**minimum** [4] - 12936:5, 12938:20, 12938:22, 13014:8
**Mink** [1] - 12899:2
**minute** [2] - 12966:20, 13011:25
**minutes** [32] - 12905:11, 12960:2, 12960:3, 12973:18, 12982:9, 12983:11, 12983:14, 12987:19, 12991:6, 12992:21, 12994:18, 12994:19, 12997:23, 12997:25, 13000:8, 13000:9, 13000:20, 13003:3, 13003:5, 13003:7, 13003:8, 13003:12, 13003:14, 13004:9, 13004:11, 13004:17, 13009:15, 13010:18, 13010:25, 13012:17, 13013:5
**miraculous** [1] - 12927:4
**Mirandized** [1] - 12919:12

12913:25, 12914:15, 12914:18, 12914:23, 12915:3, 12915:13, 12915:17, 12915:24, 12916:10, 12916:21, 12917:1, 12917:7, 12917:11, 12917:12, 12918:11, 12919:4, 12919:12, 12919:18, 12919:24, 12920:16, 12921:15, 12921:20, 12923:17, 12937:18, 12942:4, 12960:2, 13016:14
**MILLER** [2] - 12900:3, 13016:9
**Miller's** [21] - 12906:8, 12906:18, 12907:6, 12907:9, 12907:11, 12907:25, 12908:13, 12909:6, 12909:10, 12911:6, 12913:5, 12913:7, 12913:19, 12913:22, 12914:4, 12914:14, 12915:21, 12916:2, 12918:24, 12920:5, 12920:7

**misconduct** [5] - 12913:23, 12914:14, 12914:15, 12919:3, 12919:10
**misleading** [5] - 12909:17, 12915:1, 12915:10, 12918:5, 12920:20
**miss** [1] - 13009:24
**missed** [1] - 12906:16
**mistake** [3] - 12903:6, 12903:7, 12910:2
**mistaken** [1] - 13013:23
**mistakenly** [1] - 12909:25
**modified** [2] - 12966:15, 12966:17
**modifying** [1] - 12966:19
**modules** [1] - 12967:15
**moment** [9] - 12912:3, 12926:8, 12982:19, 13002:23, 13008:4, 13008:8, 13009:6, 13009:9, 13009:17
**moments** [2] - 12976:24, 12997:18
**Monday** [2] - 12898:6, 12905:18
**money** [1] - 12929:15
**monitored** [1] - 12914:7
**montage** [25] - 12968:2, 12968:22, 12969:4, 12969:7, 12969:8, 12969:9, 12971:4, 12971:13, 12972:3, 12973:13, 12973:15, 12982:5, 12983:8, 12992:5, 12992:7, 12995:7, 13004:24, 13005:25, 13006:19, 13006:22, 13007:10, 13007:20, 13009:1, 13009:5, 13009:21
**montages** [8] - 12967:16, 12967:21, 12967:25, 12968:4, 12968:8, 12968:22, 12991:2, 13000:5
**months** [1] - 12968:12
**Monument** [16] - 12967:11, 12969:18, 12970:17, 12972:1, 12972:12, 12974:7, 12974:11, 12975:24, 12978:16, 12979:24,

13028

12981:14, 12985:4, 12987:13, 12987:22, 12989:19, 12990:15
**monument** [2] - 12967:20
**Moore** [3] - 12917:22, 12928:13
**moot** [1] - 12902:3
**moreover** [2] - 12914:2, 12917:16
**MORNING** [1] - 12898:9
**morning** [10] - 12901:16, 12902:15, 12902:20, 12903:3, 12904:3, 12906:12, 12942:13, 12942:14, 12974:24, 13015:17
**MOSD** [2] - 12908:17, 12916:23
**Moseley** [1] - 12917:6
**most** [4] - 12908:7, 12920:3, 12929:9, 12955:25
**motion** [14] - 12902:1, 12902:2, 12902:6, 12902:7, 12903:20, 12903:22, 12904:11, 12908:3, 12912:2, 12912:8, 12912:10, 12914:9
**motions** [2] - 12918:6, 12939:9
**motive** [6] - 12926:15, 12926:18, 12928:17, 12928:18, 12929:4, 12929:5
**motorcade** [1] - 12983:1
**move** [2] - 12902:21, 12956:25
**moved** [1] - 12948:21
**moving** [2] - 12978:20, 13010:13
**MR** [217] - 12902:13, 12904:1, 12904:7, 12904:10, 12905:2, 12905:22, 12912:15, 12912:17, 12912:24, 12913:1, 12913:3, 12920:21, 12920:23, 12923:14, 12924:4, 12924:6, 12924:11, 12924:15, 12924:17, 12925:6, 12925:12, 12925:15, 12925:17, 12926:2, 12926:8, 12926:10, 12926:13, 12927:21, 12927:24, 12928:2, 12928:22,

12929:14, 12929:19, 12929:22, 12929:25, 12930:5, 12933:2, 12933:4, 12933:25, 12934:8, 12935:8, 12935:11, 12935:14, 12936:1, 12936:21, 12937:7, 12937:10, 12937:12, 12937:14, 12937:23, 12938:10, 12938:21, 12941:10, 12941:13, 12941:17, 12941:24, 12942:2, 12942:12, 12944:9, 12944:13, 12944:21, 12944:24, 12945:1, 12945:4, 12945:6, 12945:8, 12946:4, 12946:6, 12946:7, 12946:9, 12946:12, 12946:15, 12953:1, 12953:6, 12956:15, 12956:19, 12957:6, 12957:10, 12957:19, 12957:22, 12958:11, 12958:12, 12958:17, 12959:1, 12959:3, 12959:12, 12959:14, 12959:24, 12960:6, 12960:11, 12960:13, 12960:14, 12960:16, 12960:21, 12960:23, 12961:1, 12961:6, 12961:8, 12961:10, 12961:12, 12961:16, 12961:18, 12962:5, 12962:11, 12962:14, 12962:18, 12973:20, 12973:23, 12973:25, 12974:3, 12974:6, 12975:15, 12976:6, 12976:9, 12977:7, 12977:11, 12977:14, 12980:12, 12980:14, 12980:16, 12980:18, 12980:23, 12980:24, 12981:2, 12981:4, 12981:6, 12981:11, 12981:15, 12981:23, 12983:19, 12986:2, 12986:17, 12987:10, 12988:10, 12988:17, 12989:6, 12989:9, 12991:8, 12991:11, 12991:14, 12991:21, 12991:25, 12992:2, 12992:7, 12992:10, 12992:12, 12992:15, 12992:17, 12992:20, 12992:22, 12993:1, 12993:8, 12993:15,

12994:22, 12995:5, 12995:21, 12996:9, 12996:16, 12997:3, 12997:8, 12997:10, 12998:2, 12998:5, 12998:15, 12999:5, 13000:7, 13000:12, 13000:18, 13000:22, 13001:1, 13001:7, 13003:6, 13003:10, 13003:19, 13003:23, 13004:5, 13004:20, 13004:22, 13005:24, 13006:6, 13006:7, 13006:10, 13006:22, 13006:24, 13009:14, 13009:19, 13009:23, 13010:2, 13010:16, 13010:17, 13011:6, 13011:16, 13011:17, 13011:19, 13011:21, 13012:3, 13012:9, 13012:13, 13012:15, 13012:19, 13013:2, 13013:10, 13013:15, 13013:16, 13013:18, 13013:22, 13014:5, 13014:12, 13014:14, 13014:18, 13015:3, 13015:9, 13015:11, 13015:13, 13015:15, 13015:25, 13016:2
**MS** [19] - 12903:5, 12903:10, 12903:17, 12930:19, 12931:11, 12931:13, 12931:15, 12931:17, 12931:19, 12932:2, 12932:9, 12932:20, 12932:22, 12939:2, 12939:4, 12939:15, 12940:3, 12940:5, 12940:7
**MT** [1] - 12899:16
**Mulroe** [2] - 12898:13, 12901:8
**multi** [1] - 12918:20
**multi-defendant** [1] - 12918:20
**multiple** [9] - 12945:17, 12958:18, 12994:4, 12998:19, 12999:6, 12999:9, 12999:22, 12999:25, 13000:2
**must** [1] - 12910:20

# N

**name** [9] - 12909:1, 12910:17, 12944:2, 12944:11, 12947:20,

12947:22, 12948:24, 12956:6
**named** [4] - 12921:21, 12958:6, 12969:10, 12971:24
**names** [1] - 12948:7
**narrate** [2] - 12980:24, 12980:25
**National** [4] - 12974:22, 12987:20, 12988:21, 12990:16
**nature** [5] - 12922:13, 12935:3, 12958:10, 12959:17, 12959:22
**Nayib** [2] - 12899:4, 12901:11
**NAYIB** [1] - 12899:5
**nearly** [2] - 12918:19, 12927:4
**necessarily** [1] - 12943:9
**neck** [3] - 12977:17, 12978:8, 12984:17
**need** [22] - 12902:9, 12902:17, 12904:2, 12905:16, 12912:12, 12924:3, 12938:23, 12941:1, 12944:5, 12946:3, 12956:9, 12964:9, 12964:15, 12965:24, 12966:4, 12977:2, 12979:7, 12980:5, 12983:6, 12990:20, 12998:18
**needed** [1] - 12919:12
**needs** [2] - 12904:16, 12941:7
**never** [2] - 12939:8, 13014:10
**New** [16] - 12898:18, 12898:21, 12899:13, 12934:15, 13005:9, 13008:20
**new** [1] - 12933:13
**newly** [1] - 12967:18
**next** [10] - 12904:12, 12911:14, 12918:6, 12952:10, 12953:5, 12967:18, 12974:8, 13007:19, 13007:20, 13008:8
**Nicholas** [2] - 12898:16, 12901:9
**Nick** [1] - 12971:24
**Nicole** [1] - 12942:4
**NICOLE** [1] - 12900:3
**night** [3] - 12902:14, 12906:2, 12912:2
**NJ** [3] - 12899:17, 13016:9, 13016:14

**NJ-CCR** [3] - 12899:17, 13016:9, 13016:14
**no-go** [2] - 12941:25, 12942:1
**non** [3] - 12917:23, 12940:24, 12980:23
**non-classified** [1] - 12940:24
**non-responsive** [1] - 12980:23
**non-testifying** [1] - 12917:23
**none** [3] - 12907:22, 12937:18
**noon** [1] - 12965:25
**NORDEAN** [1] - 12898:4
**Nordean** [69] - 12901:3, 12901:13, 12904:11, 12906:8, 12907:9, 12907:22, 12908:24, 12909:5, 12909:11, 12910:5, 12910:9, 12910:14, 12910:19, 12910:25, 12911:14, 12912:3, 12915:2, 12915:7, 12915:13, 12915:20, 12916:6, 12916:11, 12916:15, 12916:24, 12917:14, 12966:21, 12968:15, 12968:23, 12972:22, 12973:11, 12973:17, 12975:16, 12976:10, 12976:17, 12976:20, 12984:19, 12987:19, 12988:20, 12988:23, 12989:11, 12991:6, 12992:20, 12993:18, 12994:23, 12997:19, 12997:22, 12998:2, 12998:16, 12999:7, 12999:13, 13000:7, 13001:18, 13002:4, 13003:8, 13003:12, 13004:9, 13005:2, 13006:2, 13006:4, 13007:2, 13007:13, 13007:23, 13008:9, 13009:10, 13009:14, 13009:18, 13011:2, 13013:16, 13013:17
**Nordean's** [10] - 12906:15, 12908:7, 12910:8, 12916:1, 12918:6, 12919:23, 12969:4, 12969:7, 12973:5, 13000:18

13029

**Nordean-301** [1] - 12982:8
**Nordean-316** [2] - 12991:10, 13003:3
**Nordean-506** [1] - 12962:8
**Norman** [2] - 12898:19, 12901:10
**north** [6] - 12975:7, 12985:12, 12987:24, 12989:25, 12990:16, 13001:20
**Nos** [1] - 12898:2
**note** [2] - 12912:17, 12937:15
**notes** [1] - 13016:11
**nothing** [5] - 12910:4, 12917:13, 12918:13, 12934:7, 12941:18
**notice** [1] - 12980:21
**Nugent** [16] - 12976:15, 12976:16, 12976:19, 12976:25, 12977:6, 12978:8, 12978:18, 12979:5, 12984:17, 12984:25, 12986:5, 12987:25, 13000:19, 13001:11, 13001:23, 13005:3
**number** [5] - 12902:4, 12902:5, 12934:21, 12937:14, 12957:3
**numbers** [2] - 12960:19, 12967:19
**numerous** [3] - 12906:17, 12934:16
**NW** [5] - 12898:14, 12898:24, 12899:5, 12899:19, 13016:16
**NY** [2] - 12898:18, 12899:13

**O**

**o'clock** [1] - 12941:23
**oath** [3] - 12920:25, 12933:20, 13008:23
**obeyed** [1] - 12973:8
**objecting** [1] - 12958:24
**objection** [19] - 12921:2, 12922:9, 12944:21, 12946:4, 12946:7, 12956:15, 12957:6, 12957:18, 12958:11, 12959:3, 12977:7, 12980:12, 12980:23, 12981:2, 12989:6, 12991:20, 12992:8, 13006:6,

13011:16
**objects** [2] - 12987:20, 12987:21
**obligations** [1] - 12906:22
**obviously** [7] - 12902:8, 12902:14, 12902:23, 12902:25, 12903:15, 12912:4
**occurred** [1] - 12914:5
**October** [1] - 12915:16
**OF** [5] - 12898:1, 12898:2, 12898:8, 12899:5, 13016:8
**offer** [1] - 12923:7
**OFFICE** [1] - 12898:13
**officer** [1] - 13008:22
**officers** [1] - 12937:4
**OFFICES** [1] - 12899:5
**OFFICIAL** [1] - 13016:8
**Official** [2] - 12899:18, 13016:14
**often** [1] - 12986:5
**old** [2] - 12923:9, 12930:8
**older** [1] - 12971:8
**omitted** [1] - 12908:11
**once** [5] - 12918:22, 12932:6, 12964:21, 12994:5, 13000:4
**one** [44] - 12902:4, 12902:8, 12902:11, 12903:19, 12905:7, 12907:17, 12908:22, 12912:13, 12915:16, 12921:19, 12923:24, 12926:13, 12927:7, 12928:3, 12929:2, 12934:21, 12935:18, 12936:15, 12938:11, 12941:2, 12943:7, 12945:16, 12949:10, 12949:11, 12955:25, 12956:1, 12960:8, 12962:5, 12967:17, 12967:18, 12968:21, 12974:2, 12974:4, 12982:5, 12983:20, 12987:16, 12991:17, 12991:18, 12993:20, 13005:20, 13013:16, 13013:22
**ones** [1] - 12967:17
**online** [2] - 12969:21, 12970:22
**oops** [1] - 12960:6
**op** [9] - 12999:19,

13003:1, 13003:14, 13005:15, 13007:2, 13007:23, 13008:2, 13008:5, 13008:10
**open** [4] - 12934:13, 12936:3, 12959:9, 12964:21
**opened** [2] - 12910:23, 12963:19
**opens** [1] - 12929:18
**opine** [1] - 12915:25
**opinion** [2] - 12955:1, 12956:16
**opinions** [1] - 12928:12
**opportunities** [1] - 12914:20
**opportunity** [8] - 12903:25, 12905:18, 12912:9, 12933:22, 12943:25, 12952:7, 12955:24, 13015:7
**opposed** [1] - 12965:6
**opposite** [1] - 12975:10
**optional** [1] - 12928:23
**orally** [1] - 12928:6
**Orange** [1] - 12898:20
**order** [5] - 12905:19, 12938:17, 12938:18, 12939:12, 12939:20
**ordered** [2] - 12922:22, 12930:1
**ordering** [3] - 12923:2, 12931:8, 13015:12
**orders** [5] - 12941:5, 12972:23, 12973:2, 12973:4, 12973:7
**original** [5] - 12907:17, 12924:15, 12960:20, 13009:8, 13009:21
**otherwise** [1] - 12938:16
**ought** [1] - 12936:4
**outcome** [2] - 12927:8
**outside** [2] - 12912:13, 12934:20
**outweighed** [5] - 12914:25, 12917:19, 12918:4, 12920:19, 12928:19
**overall** [1] - 12957:25
**overruled** [2] - 12956:17, 13011:18
**own** [2] - 12907:11, 12929:10

**P**

**P.A** [2] - 12899:5, 12899:8
**P.C** [1] - 12899:11
**p.m** [2] - 12933:10, 13016:6
**Page** [1] - 12903:5
**page** [1] - 12921:5
**PAGE** [1] - 12900:2
**pages** [2] - 12960:19, 12961:14
**Palace** [10] - 12963:18, 12963:19, 12963:21, 12963:24, 12964:20, 12964:22, 12966:1, 12966:4, 12966:13, 12966:23
**Pam** [12] - 12993:3, 12993:23, 12994:12, 12995:1, 12995:25, 12996:7, 12996:12, 12997:6, 12997:15, 12997:19, 13009:2, 13009:9
**Pamela** [4] - 12971:5, 12971:10, 12990:24, 12991:15
**panel** [1] - 12942:6
**paraplegic** [1] - 12969:13
**Park** [1] - 12899:12
**part** [7] - 12913:17, 12917:9, 12952:10, 12964:14, 12991:4, 13009:24, 13012:6
**particular** [3] - 12959:9, 12960:13, 12960:14
**particularly** [2] - 12920:4, 12940:11
**parties** [6] - 12901:19, 12904:6, 12904:20, 12906:13, 12922:2, 12935:23
**parties'** [1] - 12919:19
**parts** [2] - 12968:10, 12977:25
**pass** [1] - 12930:12
**passing** [1] - 12985:4
**past** [1] - 12979:9
**paths** [1] - 12937:16
**patriots** [1] - 13007:16
**Pattis** [9] - 12898:19, 12901:10, 12926:12, 12928:4, 12929:7, 12935:20, 12937:25, 13015:16, 13015:23
**PATTIS** [14] - 12898:20, 12926:13,

12927:21, 12927:24, 12928:22, 12929:14, 12929:19, 12929:22, 12936:1, 12938:10, 12938:21, 12980:23, 13015:25, 13016:2
**Pattis's** [1] - 12936:22
**pause** [10] - 12912:6, 12941:21, 12942:5, 12960:7, 12980:22, 12981:8, 12982:11, 12984:21, 12997:24, 13009:16
**paused** [1] - 12986:3
**pay** [1] - 12988:6
**PC** [1] - 12898:23
**Peace** [7] - 12967:20, 12979:10, 12983:9, 12983:12, 12983:15, 12985:4, 12985:21
**pending** [1] - 12934:1
**people** [8] - 12927:4, 12948:8, 12971:18, 12974:21, 12979:5, 12980:2, 12988:20, 13010:10
**perceived** [2] - 12926:19, 12927:9
**percent** [1] - 12979:7
**perhaps** [1] - 12907:3
**permission** [1] - 12927:14, 12929:15, 12970:10, 12972:7, 12973:20, 12973:21, 12992:17, 12998:2, 13004:20, 13009:18, 13012:9
**permitted** [2] - 12917:1, 12953:2
**perpendicular** [1] - 12990:3
**person** [9] - 12909:23, 12949:23, 12950:23, 12971:5, 12984:24, 12986:4, 12994:12, 13010:13, 13011:2
**personal** [1] - 12939:18
**perspective** [2] - 12974:17, 12975:4
**pertained** [2] - 12923:1, 12937:16
**pertaining** [2] - 12943:8, 12959:19
**pertains** [1] - 12922:5
**pestering** [2] - 12994:1, 12994:3
**Pezzola** [6] - 12901:6, 12901:15, 12911:15, 12912:4, 12918:9,

13030

12919:10
**PEZZOLA** [1] -
12898:6
**Pezzola's** [1] -
12908:18
**phone** [6] - 12963:14,
12966:13, 12966:16,
12966:17, 12966:20,
12971:16
**phones** [1] - 12991:22
**photo** [15] - 12999:19,
13003:1, 13003:14,
13004:10, 13005:15,
13007:2, 13007:4,
13007:23, 13008:2,
13008:5, 13008:10,
13009:11, 13011:3,
13012:22
**photographer** [1] -
13010:12
**phrase** [2] - 12989:12,
12989:15
**pick** [2] - 12942:9,
12969:8
**picture** [10] -
13003:24, 13004:6,
13004:12, 13007:5,
13011:7, 13011:22,
13012:4, 13012:20,
13013:1, 13013:3
**pictures** [6] -
12999:19, 13001:2,
13001:3, 13001:9,
13002:5, 13002:11
**pieces** [2] - 12922:22,
12930:2
**pivoting** [1] -
13012:11
**place** [2] - 12919:13,
12971:3
**plain** [1] - 12936:8
**plainly** [2] - 12913:16,
12917:8
**plan** [12] - 12936:23,
12992:3, 13006:1,
13006:5, 13006:13,
13006:18, 13006:20,
13007:2, 13007:7,
13007:12, 13008:5,
13008:6
**planning** [7] -
12915:18, 12916:18,
12917:4, 12935:20,
12941:22, 12965:21,
12989:4
**plans** [1] - 12918:7
**platform** [1] -
12906:21
**plausible** [3] -
12909:15, 12910:8,

12914:13
**play** [25] - 12962:3,
12966:24, 12981:19,
12983:6, 12985:25,
12986:13, 12987:8,
12992:1, 12992:2,
12992:23, 12994:20,
12994:23, 12997:8,
13000:16, 13000:22,
13000:24, 13001:4,
13003:20, 13005:22,
13006:20, 13009:25,
13010:4, 13011:8,
13012:1, 13012:6
**played** [45] - 12959:6,
12960:5, 12962:17,
12973:24, 12974:5,
12975:14, 12976:5,
12976:8, 12980:17,
12981:22, 12983:18,
12986:1, 12986:16,
12987:9, 12988:9,
12988:15, 12992:25,
12994:21, 12995:4,
12995:20, 12996:8,
12996:15, 12997:2,
12997:7, 12997:9,
12998:14, 12999:4,
13000:17, 13000:21,
13000:25, 13001:6,
13003:18, 13003:22,
13004:4, 13005:23,
13006:21, 13010:1,
13010:5, 13010:16,
13011:5, 13011:20,
13012:2, 13012:18,
13012:24, 13013:8
**playing** [3] - 12960:4,
12993:16, 13006:23
**PLLC** [1] - 12898:16
**point** [43] - 12907:8,
12910:22, 12918:11,
12921:19, 12922:11,
12922:17, 12924:13,
12924:15, 12925:7,
12926:13, 12933:25,
12937:24, 12938:7,
12939:4, 12939:25,
12940:16, 12944:9,
12945:1, 12954:22,
12956:16, 12961:25,
12962:6, 12966:11,
12972:16, 12977:20,
12978:21, 12979:18,
12983:13, 12985:3,
12986:5, 12987:1,
12989:10, 12990:6,
12990:16, 12993:10,
12995:6, 12999:21,
13000:1, 13004:24,

13008:1, 13013:10,
13014:3, 13014:5
**pointed** [3] -
12919:20, 12987:20,
12989:22
**pointing** [41] -
12975:20, 12975:22,
12975:23, 12976:2,
12976:7, 12976:25,
12977:2, 12977:6,
12977:17, 12977:23,
12979:1, 12980:1,
12980:20, 12981:21,
12986:9, 12986:11,
12986:18, 12986:19,
12986:22, 12986:24,
12987:6, 12987:11,
12988:1, 12988:2,
12988:3, 12989:17,
12989:19, 12990:10,
12990:11, 12990:14,
12990:15, 12990:17,
13001:14, 13001:15,
13001:17, 13001:18,
13001:19, 13001:20,
13001:23, 13002:24
**points** [10] - 12910:5,
12925:4, 12972:22,
12977:15, 12981:8,
12981:13, 12999:6,
12999:12, 12999:22,
12999:25
**poke** [1] - 12959:11
**police** [1] - 13008:22
**policy** [2] - 12918:22,
12930:7
**portion** [4] - 12992:1,
12992:3, 12992:8,
12992:9
**portions** [1] - 12961:6
**position** [4] -
12904:14, 12936:9,
12938:12, 12938:18
**positive** [2] -
12991:18, 12992:6
**possible** [2] -
12925:19, 13015:20
**potential** [2] -
12922:15, 12933:18
**potentially** [2] -
12913:21, 12926:15
**power** [1] - 12905:3
**powers** [1] - 12947:19
**precedent** [1] -
12911:21
**preclude** [5] -
12914:17, 12914:22,
12920:3, 12920:16,
12939:12
**precluded** [3] -

12930:22, 12930:24,
12939:23
**prefer** [1] - 13015:4
**prejudice** [4] -
12914:25, 12915:10,
12918:4, 12920:19
**prepared** [1] -
12901:20
**preparing** [1] -
12935:15
**presence** [4] -
12912:14, 12934:20,
12975:18, 12988:24
**present** [36] - 12901:7,
12901:8, 12901:9,
12901:10, 12901:11,
12901:12, 12901:13,
12905:18, 12905:25,
12908:12, 12909:25,
12943:17, 12944:20,
12946:19, 12947:17,
12947:22, 12948:2,
12948:3, 12949:1,
12949:3, 12949:6,
12949:10, 12949:14,
12949:16, 12950:11,
12950:14, 12951:20,
12954:1, 12955:6,
12955:9, 12955:10,
12955:14, 12955:15,
12955:19
**presentation** [1] -
12967:7
**pretty** [3] - 12941:8,
12965:24, 12970:13
**priority** [1] - 12956:4
**Prisons** [1] - 12914:8
**privilege** [3] -
12913:9, 12935:23,
12936:6
**privileged** [1] -
12911:24
**privy** [1] - 12972:13
**probative** [7] -
12914:22, 12914:24,
12915:8, 12917:18,
12918:2, 12920:17,
12928:10
**problem** [2] - 12962:9,
13012:7
**problems** [1] -
12940:25
**procedure** [1] -
12910:13
**proceed** [13] -
12935:9, 12935:14,
12936:19, 12936:23,
12957:20, 12981:5,
12982:3, 12983:8,
12983:12, 12983:15,

12992:13, 12993:12,
13005:8
**proceeding** [1] -
12985:11
**Proceedings** [1] -
12899:21
**proceedings** [1] -
13016:12
**proceeds** [1] -
12978:1
**process** [2] -
12910:22, 12940:9
**produce** [4] -
12913:17, 12917:9,
12935:22, 12936:6
**produced** [8] -
12899:21, 12907:15,
12909:13, 12913:15,
12917:7, 12918:25,
12937:20, 12940:18
**production** [7] -
12906:10, 12907:8,
12907:18, 12907:24,
12913:11, 12920:8,
12933:9
**productions** [1] -
12908:4
**proffer** [2] - 12917:14,
12919:6
**proffered** [4] -
12909:21, 12910:1,
12914:4, 12918:17
**proffering** [1] -
12923:15
**proffers** [1] - 12903:1
**prohibited** [1] -
12927:15
**promise** [1] -
12902:20
**promoted** [1] -
12909:22
**proof** [1] - 12923:7
**proper** [2] - 12910:9,
12914:11
**properly** [1] -
12907:23
**property** [1] - 12931:8
**prosecutor** [3] -
12968:14, 12968:22,
12969:3
**prosecutor's** [1] -
12946:12
**prosecutors** [3] -
12907:4, 12942:20,
12942:23
**protective** [3] -
12939:12, 12939:20,
12941:5
**protects** [1] -
12911:22

**protesting** [1] -
12971:9
**Proud** [3] - 12974:21,
12980:6, 12998:22
**provide** [9] -
12907:21, 12908:1,
12928:18, 12937:1,
12937:3, 12939:6,
13015:12, 13015:13
**provided** [5] -
12916:11, 12921:9,
12921:12, 12967:6,
13013:23
**providing** [1] -
12928:16
**province** [2] -
12917:20, 12917:25
**proximity** [1] -
12976:16
**publish** [6] -
12973:20, 12973:21,
12992:17, 12998:2,
13004:20, 13009:18
**purchase** [1] -
12904:15
**purpose** [7] -
12917:20, 12999:7,
12999:13, 12999:16,
12999:18, 13003:1,
13014:1
**purposes** [7] -
12906:25, 12910:1,
12910:19, 12933:17,
12936:9, 12941:22,
12959:11
**pursue** [1] - 13015:17
**put** [13] - 12902:17,
12904:13, 12910:22,
12926:8, 12932:7,
12944:19, 12948:7,
12967:21, 12968:1,
12968:8, 12982:12,
13004:23, 13014:1

**Q**

**quash** [1] - 12902:1
**Quested** [4] -
12971:24, 12972:8,
12972:11, 12973:19
**questioning** [3] -
12909:9, 12910:11,
12930:24
**questions** [18] -
12902:15, 12910:10,
12910:24, 12913:9,
12914:13, 12916:15,
12927:2, 12927:12,
12932:12, 12946:14,
12950:8, 12950:25,

12951:23, 12957:11,
12957:16, 12963:1,
12992:24, 12993:17
**quick** [2] - 12997:4,
12997:5
**quickly** [1] - 12941:8
**quote** [10] - 12912:20,
12915:17, 12915:19,
12917:1, 12917:3,
12917:4, 12918:12,
12919:25, 12921:13,
12930:1

**R**

**raised** [2] - 12921:15,
12935:20
**raises** [1] - 12902:8
**raising** [1] - 12928:6
**rally** [11] - 12974:25,
12975:1, 12975:19,
12981:13, 12984:7,
12988:5, 12988:25,
12989:14, 12989:17,
12999:20, 13007:3
**rather** [6] - 12903:2,
12910:15, 12956:14,
12973:3, 13012:8,
13015:6
**re** [1] - 12975:23
**re-see** [1] - 12975:23
**reaches** [1] - 12982:20
**reaction** [2] -
12904:19, 12997:4
**read** [9] - 12902:14,
12903:16, 12906:6,
12909:3, 12914:7,
12917:11, 12918:6,
12944:16, 12950:2
**reading** [2] - 12910:8,
12913:6
**reads** [1] - 12955:21
**real** [2] - 12968:4,
13009:2
**real-time** [1] - 12968:4
**reality** [2] - 12940:22,
12968:5
**realize** [1] - 12909:24
**really** [6] - 12904:18,
12904:25, 12961:20,
12961:25, 12974:3,
12984:12
**reason** [9] - 12913:14,
12913:18, 12917:6,
12917:10, 12926:1,
12932:11, 12940:23,
12952:19, 12960:9
**reasonable** [1] -
12909:18
**reasons** [11] -

12915:11, 12920:2,
12925:10, 12928:11,
12955:20, 12956:13,
12956:21, 12956:22,
12956:24, 12959:5,
12959:6
**recalled** [1] - 12946:17
**received** [10] -
12904:6, 12905:13,
12906:19, 12906:21,
12908:2, 12908:19,
12908:25, 12921:20,
12964:19, 12965:2
**receiving** [3] -
12964:24, 12965:6,
12965:17
**recent** [2] - 12908:7,
12956:1
**recently** [1] -
12963:14
**recess** [2] - 13016:5,
13016:6
**recipient** [2] -
12949:2, 12949:4
**recognize** [1] -
12938:11
**recognizing** [2] -
12912:6, 12913:4
**recollection** [3] -
12944:23, 12945:11,
12951:17
**reconsider** [3] -
12927:2, 12927:15,
12934:9
**record** [19] - 12907:4,
12912:18, 12913:24,
12914:16, 12915:23,
12918:13, 12919:3,
12919:11, 12920:12,
12921:19, 12925:18,
12925:22, 12925:23,
12926:10, 12930:11,
12935:1, 12992:19,
12993:9
**recorded** [1] -
12899:21
**recording** [3] -
12960:1, 12962:25,
12964:9
**recovered** [1] -
12963:13
**recovery** [1] -
12965:11
**redacted** [1] -
12944:11
**reference** [3] -
12948:4, 12949:12,
12949:19
**referenced** [1] -
12944:19

**referred** [1] - 12923:2
**referring** [11] -
12945:2, 12946:22,
12947:1, 12947:5,
12948:15, 12954:1,
13006:4, 13006:15,
13006:16, 13007:6,
13015:19
**refers** [1] - 12923:16
**reflect** [3] - 12950:18,
12968:4, 13013:14
**reflected** [1] - 12963:1
**refresh** [1] - 12945:11
**refreshed** [1] -
12951:17
**refreshing** [1] -
12944:22
**regard** [3] - 12903:18,
12906:3, 12913:11
**regarding** [7] -
12919:21, 12921:10,
12922:7, 12922:13,
12922:14, 12924:19
**regardless** [2] -
12914:10, 12937:20
**regards** [1] - 12933:15
**REHL** [1] - 12898:5
**Rehl** [9] - 12901:4,
12901:14, 12911:15,
12911:18, 12913:6,
12913:20, 12914:6,
12934:23, 12976:20
**Rehl's** [6] - 12908:14,
12911:12, 12912:1,
12912:5, 12917:5,
12921:22
**relate** [4] - 12916:9,
12920:5, 12921:12,
12923:21
**related** [13] -
12901:22, 12901:23,
12902:23, 12908:10,
12909:13, 12909:16,
12911:2, 12916:12,
12918:15, 12918:18,
12919:2, 12921:8,
12966:21
**relating** [1] - 13006:15
**relationship** [1] -
12911:23
**relatively** [1] -
12917:24
**released** [3] -
12906:11, 12932:6,
12932:7
**relevance** [9] -
12907:3, 12911:6,
12911:9, 12917:14,
12929:12, 12956:15,
12957:6, 12980:14,

12980:15
**relevant** [7] - 12909:9,
12913:9, 12913:21,
12920:8, 12928:12,
12928:13, 12931:2
**relief** [2] - 12903:23,
12934:25
**reluctant** [1] - 12941:6
**remedy** [3] - 12934:4,
12934:6
**remember** [14] -
12948:10, 12950:5,
12956:10, 12964:14,
12966:14, 12968:16,
12968:21, 12969:5,
12972:14, 12982:19,
12987:18, 13008:13,
13008:15, 13008:18
**remind** [1] - 12943:13
**reminding** [1] -
12942:3
**remove** [2] -
12910:17, 12921:3,
12921:7, 12952:17
**removed** [5] -
12935:19, 12936:24,
12937:15, 12945:21,
12956:6
**repeat** [3] - 12955:12,
12956:18, 12977:13
**rephrase** [1] -
12951:11
**reply** [1] - 12903:14
**report** [28] - 12908:10,
12908:23, 12909:1,
12909:2, 12909:16,
12910:1, 12910:17,
12919:2, 12922:15,
12941:14, 12943:17,
12943:18, 12944:2,
12944:20, 12945:21,
12946:25, 12947:3,
12947:13, 12947:16,
12947:20, 12947:23,
12949:1, 12952:18,
12954:24, 12955:18,
12956:7, 12956:11
**REPORTER** [1] -
13016:8
**Reporter** [3] -
12899:17, 12899:18,
13016:14
**reporting** [5] -
12931:7, 12947:4,
12948:7, 12950:6,
12956:9
**reports** [3] - 12943:5,
12943:10, 12945:17
**represent** [2] -
12903:22, 12961:13

13032

**representation** [1] -
  12930:21
**representations** [3] -
  12910:6, 12931:24,
  12936:3
**represents** [1] -
  12903:12
**reproduction** [1] -
  12907:17
**request** [17] - 12903:4,
  12905:4, 12908:20,
  12910:3, 12911:10,
  12936:22, 12944:4,
  12945:14, 12950:11,
  12953:7, 12954:4,
  12956:14, 12956:22,
  12956:23, 13015:15,
  13015:21
**requested** [1] -
  12911:11
**requesting** [1] -
  12936:13
**required** [4] -
  12902:12, 12928:24,
  12936:6, 12937:20
**rescheduled** [1] -
  12928:5
**reserve** [1] - 12904:24
**resisted** [1] -
  12938:17
**resolve** [1] - 12912:8
**resolved** [4] -
  12902:2, 12912:13,
  12914:2
**respect** [3] -
  12917:17, 12920:10,
  12921:15
**respond** [11] -
  12902:7, 12902:19,
  12903:13, 12903:22,
  12903:25, 12904:2,
  12909:4, 12912:11,
  12939:9, 12944:2
**responded** [7] -
  12909:2, 12916:11,
  12916:13, 12939:8,
  12944:7, 12945:13,
  12946:25
**responding** [1] -
  12997:6
**response** [13] -
  12902:11, 12904:1,
  12922:21, 12923:3,
  12923:5, 12928:2,
  12928:7, 12928:8,
  12928:20, 12944:5,
  12945:9, 12945:16,
  12955:25
**responsibilities** [1] -
  12938:12

**responsible** [2] -
  12948:22, 12948:23
**responsive** [2] -
  12906:24, 12980:23
**resumed** [1] - 12942:4
**retained** [1] - 12914:7
**retention** [1] - 12930:7
**retracted** [1] - 12910:3
**Return** [5] - 12957:21,
  12959:13, 12962:16,
  12992:14, 13014:21
**return** [1] - 13016:5
**returned** [2] - 12942:7,
  13014:25
**returning** [1] -
  12938:17
**Returns** [3] -
  12962:23, 12963:5,
  12963:9
**reveal** [1] - 12908:8
**revealed** [3] - 12906:8,
  12907:1, 12907:12
**reveals** [1] - 12907:4
**revelation** [1] -
  12906:16
**review** [17] -
  12912:21, 12922:14,
  12924:23, 12924:24,
  12933:8, 12935:25,
  12936:5, 12936:14,
  12937:25, 12938:7,
  12938:18, 12938:21,
  12939:1, 12940:1,
  12943:8, 13006:7,
  13006:14
**reviewed** [11] -
  12907:14, 12911:17,
  12913:25, 12936:13,
  12938:23, 12943:5,
  12943:7, 12943:10,
  12946:17, 12967:23,
  12999:9
**reviewing** [4] -
  12913:20, 12921:22,
  12939:23, 12940:8
**revised** [1] - 12907:24
**revisit** [1] - 12930:17
**rid** [1] - 12912:8
**rights** [2] - 12912:1,
  12912:5
**rise** [1] - 13016:4
**risk** [2] - 12915:10,
  12917:19
**risks** [1] - 12917:25
**road** [1] - 12986:24
**Road** [1] - 12899:2
**Roger** [2] - 12899:14,
  12901:13
**ROGER** [1] - 12899:15
**role** [7] - 12908:17,

12909:23, 12915:25,
  12917:12, 12917:24,
  12948:22, 12964:4
**roll** [1] - 13000:20
**room** [1] - 13014:25
**Room** [2] - 12899:18,
  13016:15
**roots** [4] - 12903:20,
  12903:23, 12925:16,
  12929:23
**Roots** [4] - 12899:14,
  12901:13, 12930:4,
  12930:13
**ROOTS** [4] -
  12899:15, 12925:17,
  12929:25, 12930:5
**Rotunda** [1] - 13013:7
**roughly** [1] - 12963:20
**route** [3] - 12921:1,
  12985:17, 12987:6
**row** [1] - 12982:14
**rows** [4] - 12907:10,
  12907:12, 12907:18,
  12933:14
**RPR** [3] - 12899:17,
  13016:9, 13016:14
**rude** [1] - 12954:18
**Rule** [10] - 12914:19,
  12914:24, 12918:2,
  12919:15, 12920:17,
  12925:9, 12932:19,
  12935:6, 12940:3,
  12940:4
**rule** [3] - 12901:20,
  12925:25, 13015:21
**ruled** [5] - 12924:10,
  12930:16, 12932:11,
  12932:19, 12933:21
**Rules** [1] - 12910:9
**ruling** [11] - 12904:14,
  12906:5, 12923:12,
  12926:13, 12927:1,
  12927:14, 12930:17,
  12932:22, 12933:6,
  12934:1, 12935:6
**run** [1] - 12941:3
**runs** [2] - 12990:3

---
**S**
---

**Sabino** [2] - 12899:8,
  12901:11
**safety** [2] - 12998:17,
  12998:19
**saw** [6] - 12927:5,
  12965:10, 12967:8,
  13003:12, 13005:14,
  13009:17
**scenario** [1] - 12933:6
**scenarios** [1] -

12934:15
**scene** [13] - 12974:4,
  12982:24, 12982:25,
  12983:7, 12991:16,
  12997:14, 13003:12,
  13005:19, 13006:25,
  13007:19, 13007:20,
  13009:20, 13011:10
**scenes** [1] - 12993:18
**schedule** [1] -
  12912:8
**scheduling** [2] -
  12904:11, 12905:6
**scope** [14] - 12901:20,
  12904:5, 12909:7,
  12913:16, 12915:20,
  12917:8, 12922:9,
  12937:19, 12941:12,
  12957:6, 12958:11,
  12958:25, 12959:4,
  12980:12
**screaming** [1] -
  13011:12
**screen** [5] - 12982:13,
  12983:24, 13007:12,
  13010:20, 13013:24
**seated** [2] - 12942:8,
  13015:1
**second** [7] -
  12911:12, 12913:19,
  12943:24, 12944:15,
  12974:2, 12984:15,
  13005:22
**secondary** [1] -
  12938:3
**seconds** [24] -
  12960:3, 12960:4,
  12973:18, 12982:9,
  12991:7, 12991:17,
  12992:21, 12994:18,
  12994:19, 12997:23,
  13000:8, 13000:10,
  13000:20, 13003:4,
  13003:7, 13003:8,
  13004:17, 13009:15,
  13010:18, 13010:19,
  13010:25, 13011:1,
  13012:17, 13013:5
**section** [2] - 12982:4,
  12994:10
**security** [1] - 12937:4
**see** [53] - 12916:4,
  12920:18, 12929:7,
  12929:21, 12933:1,
  12934:4, 12936:10,
  12944:5, 12945:6,
  12945:9, 12954:25,
  12956:9, 12960:15,
  12960:17, 12960:18,
  12970:13, 12972:10,

12974:7, 12975:20,
  12975:23, 12976:12,
  12977:2, 12977:3,
  12977:16, 12978:24,
  12980:1, 12980:3,
  12980:5, 12982:14,
  12983:23, 12984:18,
  12984:20, 12986:18,
  12986:24, 12987:11,
  12987:25, 12990:20,
  12994:19, 12995:19,
  12996:2, 12997:1,
  13000:23, 13004:18,
  13005:2, 13007:9,
  13010:19, 13010:21,
  13010:23, 13012:11,
  13013:24, 13014:23,
  13015:7, 13016:3
**seeing** [2] - 12997:21,
  13015:3
**seek** [4] - 12911:15,
  12918:9, 12925:3,
  12934:25
**seeking** [2] -
  12903:24, 12923:6
**seeks** [1] - 12964:8
**segment** [1] - 12982:6
**seize** [1] - 12905:16
**send** [3] - 12916:21,
  12919:4, 13014:23
**sending** [1] - 12930:5
**sense** [5] - 12903:14,
  12923:8, 12947:23,
  12947:24, 12957:24
**sensitive** [9] -
  12907:19, 12939:7,
  12939:11, 12939:17,
  12939:19, 12939:22,
  12940:21, 12940:24
**sensitivity** [1] -
  12937:23
**sent** [16] - 12906:9,
  12906:20, 12907:25,
  12916:22, 12918:14,
  12937:18, 12945:17,
  12948:5, 12948:8,
  12963:16, 12963:23,
  12964:7, 12964:13,
  12965:9, 12965:23,
  12966:12
**separate** [5] -
  12912:2, 12950:14,
  12951:7, 12951:13,
  12951:23
**serious** [2] -
  12912:20, 12919:9
**server's** [1] - 12970:25
**Services** [1] -
  13013:12
**SESSION** [1] -

12898:9
**set** [4] - 12911:14, 12912:7, 12916:6, 12928:3
**setting** [1] - 12915:9
**several** [1] - 12978:23
**shaking** [7] - 12996:2, 12996:6, 12996:10, 12996:11, 12996:12, 12996:17, 12996:20
**shared** [1] - 12942:23
**short** [3] - 12936:8, 12940:21, 12941:4
**shorthand** [1] - 12899:21
**shortly** [3] - 12901:22, 12966:1, 13002:20
**shouting** [1] - 12946:12
**show** [8] - 12907:12, 12921:19, 12922:23, 12926:4, 12926:5, 12974:4, 12984:14, 12985:7
**showed** [1] - 12962:23
**showing** [5] - 12909:2, 12910:15, 12960:24, 12978:6, 13008:8
**shown** [1] - 12982:23
**sic** [11] - 12906:12, 12907:1, 12907:13, 12911:16, 12916:3, 12920:9, 12922:7, 12923:16, 12951:6, 12951:25, 12967:20
**side** [24] - 12940:9, 12983:24, 12985:13, 12985:15, 12985:16, 12986:22, 12987:2, 12995:7, 12998:22, 13000:15, 13000:16, 13001:16, 13002:17, 13005:12, 13005:16, 13007:3, 13007:4, 13007:23, 13008:9, 13008:20, 13009:11, 13014:24
**sidebar** [2] - 12957:8, 12961:2
**sign** [1] - 12950:7
**signed** [1] - 12945:21
**significant** [1] - 12938:14
**similar** [3] - 12904:1, 12905:4, 12996:1
**similarly** [2] - 12971:15, 12972:6
**simply** [3] - 12910:14, 12912:21, 12968:7

**site** [1] - 12969:24
**sitting** [1] - 12944:6
**situated** [1] - 12982:10
**situation** [1] - 12938:10
**six** [3] - 12929:2, 12943:3
**Sixth** [18] - 12902:5, 12911:22, 12911:25, 12912:5, 12912:7, 12913:8, 12914:3, 12914:5, 12914:10, 12914:12, 12930:23, 12931:19, 12932:4, 12933:18, 12934:5, 12934:6, 12938:13
**skeptical** [1] - 12903:23
**smell** [1] - 12930:12
**Smith** [23] - 12898:16, 12901:9, 12901:24, 12904:9, 12912:16, 12914:19, 12920:22, 12923:10, 12923:25, 12925:17, 12926:11, 12928:20, 12935:4, 12941:11, 12953:4, 12959:11, 12960:7, 12962:7, 12977:9, 12992:18, 12993:12, 13014:15, 13015:12
**SMITH** [153] - 12898:16, 12898:20, 12904:7, 12904:10, 12905:2, 12905:22, 12912:15, 12912:17, 12912:24, 12913:1, 12913:3, 12920:21, 12920:23, 12923:14, 12924:4, 12924:6, 12924:11, 12924:15, 12924:17, 12925:6, 12925:12, 12925:15, 12926:2, 12926:8, 12926:10, 12941:13, 12941:17, 12942:12, 12944:9, 12944:13, 12944:24, 12945:1, 12945:4, 12945:6, 12945:8, 12946:6, 12946:9, 12946:12, 12946:15, 12953:6, 12956:19, 12957:10, 12957:22, 12958:12, 12958:17, 12959:14, 12959:24, 12960:6, 12960:11, 12960:14, 12960:16, 12960:21, 12960:23, 12961:1,

12961:10, 12961:12, 12961:16, 12961:18, 12962:11, 12962:14, 12962:18, 12973:20, 12973:23, 12973:25, 12974:3, 12974:6, 12975:15, 12976:6, 12976:9, 12977:11, 12977:14, 12980:16, 12980:18, 12980:24, 12981:2, 12981:4, 12981:6, 12981:11, 12981:15, 12981:23, 12983:19, 12986:2, 12986:17, 12987:10, 12988:10, 12988:17, 12989:9, 12991:8, 12991:11, 12991:14, 12992:2, 12992:10, 12992:12, 12992:15, 12992:17, 12992:20, 12992:22, 12993:1, 12993:15, 12994:22, 12995:5, 12995:21, 12996:9, 12996:16, 12997:3, 12997:8, 12997:10, 12998:2, 12998:5, 12998:15, 12999:5, 13000:7, 13000:12, 13000:18, 13000:22, 13001:1, 13001:7, 13003:6, 13003:10, 13003:19, 13003:23, 13004:5, 13004:20, 13004:22, 13005:24, 13006:7, 13006:10, 13006:22, 13006:24, 13009:14, 13009:19, 13009:23, 13010:2, 13010:6, 13010:17, 13011:6, 13011:17, 13011:19, 13011:21, 13012:3, 13012:9, 13012:13, 13012:15, 13012:19, 13013:2, 13013:10, 13013:16, 13014:5, 13014:12, 13014:14, 13014:18, 13015:3, 13015:13
**Smith's** [2] - 12927:21, 12942:10
**Smith.................. 12942** [1] - 12900:3
**someone** [14] - 12930:3, 12935:5, 12936:13, 12948:3, 12952:12, 12953:20, 12958:6, 12961:22, 12964:7, 12964:13, 12976:11, 12984:3,

12984:23, 13010:3
**Something's** [1] - 13004:1
**sometimes** [2] - 12913:22, 12970:2
**somewhat** [2] - 12901:22, 12978:14
**somewhere** [1] - 12966:2
**soon** [2] - 12939:1, 13015:14
**sooner** [1] - 12903:2
**sorry** [17] - 12914:19, 12923:25, 12924:12, 12926:7, 12935:13, 12954:16, 12955:12, 12959:15, 12966:7, 12981:19, 12988:12, 13000:22, 13001:4, 13005:11, 13005:19, 13011:23
**sort** [9] - 12902:23, 12904:14, 12914:14, 12928:17, 12936:16, 12938:3, 12987:6, 12995:6, 12996:2
**sounds** [1] - 12996:1
**source** [13] - 12909:25, 12945:18, 12945:19, 12948:5, 12948:8, 12948:21, 12948:23, 12948:24, 12950:4, 12956:4, 12956:9, 13009:8, 13009:21
**sources** [1] - 12937:16
**south** [1] - 13001:20
**southeast** [1] - 13001:21
**space** [2] - 12998:17, 12998:18
**speaker** [3] - 13012:7, 13012:10, 13012:12
**speaking** [3] - 12977:4, 13006:12, 13010:11
**Special** [6] - 12906:3, 12906:7, 12907:20, 12907:24, 12915:21, 12918:24
**special** [1] - 12936:12
**specific** [8] - 12916:15, 12977:3, 12978:4, 12978:22, 12999:15, 12999:16, 12999:18, 13008:4
**specifically** [10] - 12908:7, 12915:16, 12917:20, 12959:19,

12981:10, 12988:2, 13006:17, 13007:5, 13008:11, 13008:15
**speculation** [2] - 12906:15, 12919:13
**speech** [2] - 13008:19, 13008:21
**spreadsheet** [6] - 12906:11, 12906:19, 12907:5, 12907:10, 12907:14, 12921:4
**squeeze** [1] - 13014:17
**stand** [4] - 12923:23, 12935:3, 12938:15, 12942:4
**standalone** [1] - 12913:11
**standard** [2] - 12918:21, 12934:14
**standing** [4] - 12912:4, 12971:19, 12974:22, 12977:18
**stands** [1] - 13016:5
**start** [10] - 12906:7, 12913:24, 12916:6, 12959:20, 12960:4, 12973:17, 12996:12, 12997:25, 12998:6, 13000:9
**Start** [2] - 12988:11, 12988:16
**started** [1] - 12933:10
**starting** [1] - 12996:25
**state** [1] - 12930:11
**statement** [12] - 12915:8, 12916:12, 12918:18, 12918:25, 12925:13, 12929:8, 12929:18, 12930:1, 12931:25, 12936:9, 12945:6, 12954:24
**statements** [8] - 12905:13, 12916:9, 12919:21, 12919:24, 12920:4, 12921:7, 12929:11, 12963:1
**STATES** [3] - 12898:1, 12898:2, 12898:10
**States** [4] - 12898:12, 12901:3, 12917:22, 13016:15
**stating** [1] - 12996:21
**status** [3] - 12936:2, 12938:2, 12941:2
**statutory** [1] - 12939:6
**stay** [1] - 12950:6
**stayed** [1] - 12956:10
**Steal** [1] - 12975:1
**stenographic** [1] -

13034

13016:11
**step** [3] - 12954:18, 12954:19, 13015:2
**Steven** [2] - 12899:11, 12901:12
**still** [16] - 12907:22, 12909:24, 12916:4, 12918:7, 12935:11, 12936:13, 12936:23, 12938:18, 12948:24, 12951:25, 12964:4, 12965:13, 12966:24, 12985:15, 12988:12, 13015:17
**Stop** [1] - 12974:25
**stop** [4] - 12928:13, 12941:23, 12972:15, 12972:25
**stopping** [1] - 12993:13
**stops** [4] - 12982:20, 12983:20, 12987:4, 13005:25
**Storming** [1] - 12964:22
**stream** [2] - 12968:7, 12969:17
**streamed** [3] - 12969:23, 12969:24, 12970:22
**streaming** [1] - 12969:20
**streams** [6] - 12967:13, 12967:22, 12968:1, 12972:17, 12999:9, 12999:12
**Street** [8] - 12898:14, 12898:17, 12898:20, 12898:24, 12899:5, 12899:9, 12979:16, 12989:23
**strength** [1] - 12928:15
**stretch** [1] - 12915:23
**strike** [1] - 13004:14
**stuck** [1] - 12930:25
**stuff** [3] - 12930:8, 12936:2, 12974:3
**subject** [15] - 12908:8, 12908:24, 12909:12, 12911:7, 12912:1, 12915:3, 12916:7, 12916:9, 12916:13, 12918:1, 12918:3, 12919:16, 12953:13, 12957:1, 12958:19
**subjects** [1] - 12916:16
**submit** [1] - 12947:19
**submitted** [1] -

12901:19
**subpoena** [6] - 12902:1, 12904:19, 12904:21, 12905:12, 12905:14, 12905:20
**substance** [1] - 12925:4
**substantially** [6] - 12914:25, 12917:18, 12918:4, 12920:19, 12925:10, 12928:19
**substantive** [1] - 12920:15
**sufficiency** [1] - 12920:13
**suggest** [3] - 12918:14, 12919:3, 12936:18
**suggested** [2] - 12908:18, 12935:22
**suggesting** [3] - 12916:22, 12944:3, 12973:7
**suggestion** [6] - 12922:21, 12922:25, 12923:4, 12923:18, 12936:12, 12996:6
**Suite** [2] - 12898:17, 12899:6
**sum** [1] - 12972:16
**Sunday** [1] - 12982:5
**super** [1] - 12950:7
**supervisor** [7] - 12910:2, 12910:16, 12918:12, 12945:20, 12947:18, 12949:24, 12951:24
**supervisor's** [2] - 12908:20, 12931:8
**supervisory** [5] - 12909:23, 12911:8, 12911:10, 12951:18, 12956:21
**supplemental** [1] - 12906:17
**support** [1] - 12913:24
**supported** [1] - 12919:22
**supporting** [1] - 12914:17
**suppose** [1] - 12957:17
**Supreme** [3] - 12911:21, 12931:4, 12931:20
**surprises** [3] - 12920:24, 12924:7, 12924:9
**surrounding** [1] - 12917:13

**sustained** [5] - 12944:22, 12946:5, 12980:13, 12980:15, 12989:8
**sworn** [2] - 12922:10, 12932:23
**system** [4] - 12914:6, 12916:10, 12947:4, 12947:17
**systems** [1] - 12948:7

## T

**talks** [1] - 12965:17
**tapes** [1] - 12923:9
**targeted** [1] - 12950:25
**Tarrio** [10] - 12901:5, 12901:15, 12963:9, 12963:16, 12964:3, 12964:19, 12965:5, 12965:12, 12965:16, 12966:25
**TARRIO** [1] - 12898:6
**Tarrio's** [1] - 12963:14
**task** [1] - 12934:7
**technically** [3] - 12948:9, 12949:3, 12949:14
**Telegram** [4] - 12915:15, 12915:22, 12917:12, 12917:14
**tenuous** [2] - 12916:2, 12935:3
**term** [3] - 12939:11, 12939:19, 12966:13
**terms** [2] - 12939:7, 12943:14
**test** [2] - 12922:9, 12930:12
**testified** [16] - 12945:23, 12946:16, 12946:24, 12951:2, 12955:17, 12957:12, 12957:13, 12958:1, 12967:16, 12967:22, 12967:25, 12972:22, 12977:15, 12982:4, 12987:1, 12990:24
**testifies** [1] - 12924:17
**testify** [1] - 12905:5
**testifying** [5] - 12917:23, 12921:9, 12971:12, 12982:19, 13011:16
**testimony** [23] - 12901:21, 12905:11, 12906:13, 12906:18, 12907:9, 12909:8, 12913:17, 12916:2,

12916:10, 12916:13, 12917:9, 12921:13, 12922:6, 12922:10, 12925:1, 12925:5, 12937:19, 12946:6, 12958:20, 12969:13, 12979:1, 12987:5, 12999:24
**tether** [1] - 12916:1
**text** [6] - 12922:3, 12930:5, 12955:21, 12963:23, 12965:16, 12966:22
**THE** [166] - 12898:1, 12898:1, 12898:9, 12901:2, 12901:16, 12902:22, 12903:9, 12903:11, 12903:18, 12904:4, 12904:8, 12904:17, 12905:21, 12905:23, 12912:16, 12912:23, 12912:25, 12913:2, 12913:4, 12920:22, 12923:10, 12923:25, 12924:5, 12924:9, 12924:14, 12924:16, 12925:3, 12925:9, 12925:14, 12925:16, 12925:20, 12926:6, 12926:9, 12926:11, 12927:17, 12927:23, 12927:25, 12928:21, 12929:6, 12929:16, 12929:20, 12929:23, 12930:4, 12930:13, 12931:10, 12931:12, 12931:14, 12931:16, 12931:18, 12931:22, 12932:8, 12932:10, 12932:12, 12932:25, 12933:3, 12933:21, 12934:3, 12934:19, 12935:9, 12935:13, 12935:18, 12936:15, 12937:6, 12937:8, 12937:11, 12937:13, 12937:22, 12937:24, 12938:20, 12938:22, 12939:3, 12939:14, 12939:24, 12940:4, 12940:6, 12940:15, 12941:11, 12941:16, 12941:18, 12942:1, 12942:3, 12942:6, 12942:8, 12944:22, 12944:25, 12945:3, 12945:5, 12945:7, 12946:5, 12946:8, 12946:11, 12946:13, 12953:3, 12956:17, 12956:18,

12957:7, 12957:17, 12957:20, 12958:14, 12958:22, 12959:2, 12959:5, 12960:7, 12960:10, 12960:15, 12960:17, 12960:22, 12960:24, 12960:25, 12961:2, 12961:4, 12961:7, 12961:11, 12961:15, 12961:17, 12961:19, 12961:21, 12961:23, 12962:9, 12962:10, 12962:13, 12962:15, 12973:21, 12977:8, 12977:12, 12977:13, 12980:13, 12980:15, 12981:1, 12981:3, 12981:5, 12981:7, 12981:12, 12988:16, 12989:8, 12991:10, 12991:12, 12991:19, 12991:23, 12992:11, 12992:13, 12992:18, 12993:10, 12998:4, 13006:8, 13006:9, 13011:18, 13012:11, 13012:14, 13012:25, 13013:9, 13013:19, 13013:21, 13014:4, 13014:8, 13014:13, 13014:15, 13014:19, 13014:22, 13015:1, 13015:6, 13015:10, 13015:20, 13016:1, 13016:3, 13016:4
**themselves** [4] - 12910:6, 12935:25, 12972:19, 12992:5
**theory** [2] - 12920:14, 12940:2
**thereafter** [1] - 12966:1
**therefore** [1] - 12920:7
**thinking** [1] - 12965:15
**third** [1] - 12915:12
**threaten** [1] - 12905:15
**three** [6] - 12907:24, 12908:8, 12908:9, 12908:15, 12972:16
**threshold** [1] - 12938:7
**throughout** [7] - 12919:19, 12976:17, 12976:20, 12977:25, 12978:7, 12978:16, 12998:20
**Thursday** [6] -

13035

12906:4, 12906:7, 12910:25, 12919:25, 12933:7, 12942:17
**tickets** [1] - 12904:15
**tied** [1] - 12959:8
**timestamp** [2] - 12960:2, 13010:19
**timestamps** [3] - 12960:13, 12960:14, 12961:8
**TIMOTHY** [2] - 12898:9, 13016:9
**Timothy** [1] - 12899:17
**title** [1] - 12964:21
**today** [6] - 12902:24, 12904:17, 12937:2, 12941:23, 12944:6, 12945:25
**together** [3] - 12902:18, 12967:21, 12968:2
**tomorrow** [5] - 12902:19, 12903:3, 12903:13, 12904:3, 12937:3
**tons** [1] - 12978:15
**took** [3] - 12921:7, 12933:8, 12990:25
**toothpaste** [1] - 12932:7
**top** [1] - 13004:23
**topic** [8] - 12911:12, 12913:19, 12914:18, 12914:23, 12915:12, 12920:4, 12920:16, 13015:16
**topics** [2] - 12908:9, 12920:3
**total** [1] - 12943:3
**towards** [10] - 12974:11, 12974:17, 12974:18, 12985:5, 12990:14, 12990:15, 12990:25, 13005:9, 13012:7, 13013:6
**TRANSCRIPT** [1] - 12898:8
**transcript** [9] - 12899:21, 12921:5, 12961:13, 12995:7, 13011:24, 13013:11, 13013:12, 13016:11, 13016:12
**transcription** [1] - 12899:21
**Travis** [7] - 12976:15, 12976:16, 12979:5, 12984:16, 12984:25, 13001:11, 13005:3

**trial** [6] - 12918:20, 12921:24, 12925:23, 12926:4, 12930:22, 12942:15
**TRIAL** [1] - 12898:8
**tricky** [1] - 12974:3
**tried** [2] - 12929:9, 13014:17
**trip** [1] - 12905:12
**trucks** [15] - 12982:14, 12982:17, 12982:20, 12983:14, 12985:6, 12985:19, 12985:20, 12987:13, 12987:15, 12989:19, 12989:25, 12990:14, 12990:19, 13002:17, 13002:21
**true** [12] - 12909:17, 12910:3, 12946:10, 12948:2, 12955:2, 12955:3, 12955:8, 12955:10, 12955:13, 12955:14, 13016:10, 13016:11
**truth** [1] - 12925:6
**try** [6] - 12904:14, 12904:22, 12944:14, 12986:14, 13012:14, 13012:16
**trying** [2] - 12944:24, 12954:18
**tube** [1] - 12932:9
**turn** [3] - 12913:13, 13004:1, 13004:12
**Turn** [1] - 13003:24
**twice** [1] - 13000:4
**two** [15] - 12902:5, 12907:20, 12908:13, 12928:2, 12934:5, 12951:23, 12953:12, 12967:17, 12987:17, 12987:20, 12987:21, 13005:21, 13007:12, 13009:6, 13013:25
**type** [1] - 12902:17

## U

**U.S** [2] - 12898:13, 12899:18
**ultimately** [3] - 12956:8, 12967:6, 12986:20
**unable** [1] - 12947:21
**unaware** [1] - 12956:2
**unbroken** [1] - 12969:17
**uncomfortable** [1] - 12938:11
**under** [20] - 12904:19,

12904:21, 12910:9, 12911:23, 12913:12, 12914:18, 12914:23, 12918:2, 12919:15, 12920:17, 12920:25, 12923:12, 12925:9, 12928:12, 12928:13, 12930:23, 12931:2, 12932:19, 12991:25
**understood** [3] - 12949:6, 12949:20, 12959:12
**underway** [1] - 12901:22
**undisputed** [1] - 12922:2
**unfair** [4] - 12914:25, 12915:10, 12918:4, 12920:19
**unfortunately** [1] - 13012:23
**unfounded** [1] - 12919:13
**UNITED** [3] - 12898:1, 12898:2, 12898:10
**United** [4] - 12898:12, 12901:3, 12917:22, 13016:15
**universe** [1] - 12927:13
**unknown** [1] - 12977:20
**unless** [2] - 12963:19, 13013:22
**unlike** [2] - 12905:14, 12919:1
**unrelated** [2] - 12908:21, 13015:16
**up** [56] - 12904:13, 12904:17, 12905:23, 12906:1, 12908:22, 12910:12, 12910:23, 12916:6, 12926:12, 12929:24, 12933:13, 12934:13, 12934:19, 12941:8, 12942:10, 12944:10, 12947:9, 12956:8, 12958:20, 12959:25, 12964:12, 12965:25, 12966:3, 12966:5, 12971:16, 12972:16, 12973:10, 12974:2, 12977:9, 12979:2, 12982:4, 12982:12, 12984:18, 12985:12, 12985:13, 12985:15, 12985:16, 12985:19, 12985:21, 12986:19, 12988:6, 12991:1, 12991:4,

12994:10, 12994:18, 12994:19, 12995:7, 12996:19, 13005:10, 13005:12, 13008:7, 13008:19, 13009:14, 13011:24, 13013:11
**uses** [1] - 12966:13
**utilize** [2] - 12934:12, 12934:18

## V

**valid** [1] - 12905:12
**value** [11] - 12911:4, 12914:22, 12914:24, 12915:8, 12917:18, 12918:3, 12920:17, 12928:10, 12928:25, 12929:1, 12936:3
**variations** [1] - 12965:10
**various** [8] - 12934:11, 12968:1, 12972:22, 12977:15, 12979:2, 12980:1, 12999:10, 12999:12
**vehicle** [1] - 12914:11
**verbatim** [1] - 12965:19
**verify** [1] - 12965:24
**vicinity** [1] - 12989:20
**video** [29] - 12967:13, 12967:16, 12967:22, 12968:7, 12968:11, 12969:25, 12975:23, 12977:25, 12978:4, 12978:15, 12978:19, 12978:22, 12980:5, 12983:8, 12983:13, 12988:19, 12990:25, 12994:8, 12999:9, 12999:12, 13006:7, 13006:15, 13008:7, 13008:24, 13009:1, 13009:2, 13009:5, 13009:10, 13010:13
**Video** [42] - 12973:24, 12974:5, 12975:14, 12976:5, 12976:8, 12980:17, 12981:22, 12983:18, 12986:1, 12986:16, 12987:9, 12988:9, 12988:15, 12992:25, 12994:21, 12995:4, 12995:20, 12996:8, 12996:15, 12997:2, 12997:7, 12997:9, 12998:14, 12999:4, 13000:17, 13000:21, 13000:25,

13001:6, 13003:18, 13003:22, 13004:4, 13005:23, 13006:21, 13010:1, 13010:5, 13010:16, 13011:5, 13011:20, 13012:2, 13012:18, 13012:24, 13013:8
**videos** [3] - 12968:10, 12971:11, 12972:17
**view** [5] - 12902:11, 12906:25, 12928:25, 12978:13, 12978:15
**viewed** [2] - 12928:23, 12967:9
**views** [2] - 12919:21, 12920:13
**violated** [1] - 12912:1
**violation** [7] - 12911:25, 12912:5, 12914:3, 12914:5, 12914:11, 12933:19, 12934:6
**violations** [1] - 12933:18
**visible** [1] - 12971:18
**visually** [1] - 12970:13
**voice** [10] - 12977:9, 12993:2, 12995:10, 12995:15, 12995:18, 12995:22, 12995:24, 13010:15, 13014:3
**volume** [1] - 12906:9

## W

**wait** [5] - 12935:8, 13005:10, 13007:9
**waited** [1] - 12933:8
**waiting** [1] - 12994:16
**waiver** [1] - 12913:9
**walk** [3] - 12934:18, 13011:2, 13013:6
**walking** [7] - 12967:10, 12979:19, 12979:23, 12990:25, 12999:14, 13005:5, 13005:6
**walks** [3] - 12987:1, 13002:16, 13002:21
**Wang** [1] - 12921:21
**wants** [3] - 12908:24, 12925:20, 12965:22
**Washington** [17] - 12898:5, 12898:14, 12898:24, 12899:19, 12967:10, 12969:18, 12970:17, 12971:25, 12972:12, 12974:7, 12974:11, 12978:16,

12979:24, 12987:13, 12987:22, 12990:15, 13016:16
**watch** [4] - 12976:4, 12996:7, 12996:14, 13003:8
**watched** [8] - 12969:7, 12971:10, 12971:13, 12972:4, 12978:22, 12988:19, 12989:11, 13005:20
**watching** [2] - 12968:21, 12972:14
**Wave** [1] - 12981:24
**weaknesses** [3] - 12926:19, 12926:23, 12927:9
**wearing** [4] - 12977:17, 12978:8, 12984:17, 12997:11
**Wednesday** [1] - 12968:18
**week** [9] - 12904:12, 12905:4, 12915:4, 12919:11, 12936:12, 12936:22, 12942:17, 12945:24, 12945:25
**weekend** [3] - 12901:19, 12919:11, 12925:21
**weigh** [1] - 12917:21
**weighing** [1] - 12929:12
**weight** [1] - 12920:13
**welcome** [1] - 12942:9
**West** [1] - 12899:9
**west** [5] - 12974:12, 12975:5, 12975:8, 12987:24, 13002:17
**wheelchair** [2] - 12969:13, 12998:7
**Whitley** [3] - 12930:23, 12931:3, 12931:20
**wholly** [1] - 12909:12
**Winter** [10] - 12963:18, 12963:19, 12963:21, 12963:24, 12964:20, 12964:22, 12966:1, 12966:3, 12966:13, 12966:23
**wishes** [2] - 12908:8, 12915:13
**withdrawing** [3] - 12902:1, 12902:3, 12902:4
**withheld** [6] - 12908:16, 12919:25, 12922:1, 12922:3, 12922:6, 12925:8

**withhold** [3] - 12911:1, 12916:9, 12916:17
**Witness** [2] - 12956:12, 12960:12
**witness** [46] - 12904:15, 12904:25, 12905:5, 12905:7, 12905:9, 12905:13, 12905:18, 12905:19, 12905:25, 12908:9, 12910:15, 12910:16, 12910:18, 12910:23, 12916:20, 12919:3, 12920:24, 12923:15, 12923:17, 12923:23, 12924:8, 12925:13, 12926:3, 12928:17, 12931:9, 12933:19, 12935:3, 12935:9, 12941:20, 12942:4, 12944:10, 12945:1, 12946:13, 12946:14, 12953:1, 12953:3, 12959:17, 12959:21, 12962:3, 12973:19, 12977:8, 12993:13, 13000:10, 13006:8, 13012:10, 13013:14
**WITNESS** [10] - 12900:2, 12945:7, 12956:18, 12977:13, 12981:7, 12981:12, 12988:16, 13006:9, 13012:25, 13013:9
**witness's** [5] - 12922:21, 12923:3, 12923:5, 12925:1, 12926:15
**witnesses** [4] - 12904:12, 12904:21, 12957:3, 12957:16
**Wolkind** [7] - 12915:12, 12915:15, 12915:17, 12915:23, 12915:24, 12916:22, 12920:11
**Wolkind's** [3] - 12908:17, 12917:12, 12917:24
**woman** [1] - 12996:18
**woman's** [1] - 12995:22
**word** [4] - 12964:20, 12966:6, 12966:8, 12994:3
**words** [3] - 12964:11, 12964:17, 13013:7
**works** [1] - 12947:17
**worse** [1] - 13011:14

**worth** [1] - 12912:3
**wrap** [3] - 13010:3, 13010:7, 13010:8
**writ** [1] - 12916:1
**write** [1] - 12947:3
**wrongdoing** [1] - 12931:5
**wrote** [2] - 12906:6, 12948:25

**Y**

**yards** [1] - 12927:5
**yellow** [5] - 12974:8, 12976:11, 12984:24, 12994:24, 13001:11
**yesterday** [4] - 12903:21, 12909:20, 12919:23, 12933:10
**York** [3] - 12898:18, 12899:13, 12934:15
**yourself** [2] - 12981:25, 12982:2
**yourselves** [1] - 12981:17
**YouTube** [1] - 12969:23

**Z**

**Zachary** [1] - 12901:4
**zoom** [1] - 12944:15